# EXHIBIT A

I5nWhacC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JIHAD A. HACHEM, Individually
     and on behalf of all others
 4   similarly situated, et al.,

 5               Plaintiffs,

 6          v.                          17 Civ. 8457 (JMF)

 7
     GENERAL ELECTRIC INC., et al.
 8                                      Oral Argument

 9               Defendants.

10   ------------------------------x
                                        New York, N.Y.
11                                      May 23, 2018
                                        4:30 p.m.
12

13

14   Before:

15
                        HON. JESSE M. FURMAN,
16
                                        District Judge
17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I5nWhacC

1                              APPEARANCES

2

3    GRANT & EISENHOFER P.A.
          Attorneys for Plaintiffs Deka
4    BY:  DANIEL L. BERGER

5

6    LABATON SUCHAROW LLP
          Attorneys for Movant
7          Arkansas Teacher Retirement System
     BY:  CHRISTOPHER J. KELLER

8

9

10   LIEFF CABRASER HELMANN & BERNSTEIN, LLP
          Attorneys for Movants New York City Funds
     BY:  STEVEN E. FINEMAN

11

12

13   KESSLER TOPAZ MELTZER & CHECK LLP
          Attorneys for Movant  Sjunde Ap-Fonden
     BY:  NAUMON A. AMJED
14        GREGORY M. CASTALDO
          RYAN T. DEGNAN

15

16

17   LATHAM & WATKINS LLP
          Attorneys for Defendant General Electric Inc.
     BY:  MILES N. RUTHBERG
18        BLAKE T. DENTON

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

I5nWhacC

1          THE COURT:  We're here on the matter of Hachem v.

2    General Electric, et al., 17 Civ. 8457.

3          To make it easy, let me just run through the moving

4    parties who I understand are here.  If you could state your

5    names for the record, that would be helpful, and then I'll turn

6    to defendants.

7          For the Arkansas Teacher Retirement System.

8          MR. KELLER:  Yes, your Honor.  Christopher Keller,

9    Labaton Sucharow, for the Arkansas Teacher Retirement System.

10          THE COURT:  All right.  Very good.

11          For Deka International, et al.

12          MR. BERGER:  Good afternoon, your Honor.  Daniel

13    Berger, from Grant & Eisenhofer.

14          THE COURT:  For New York City Employees' Retirement

15    System.

16          MR. FINEMAN:  Good afternoon, your Honor.  Steve

17    Fineman, from Lieff Cabraser.

18          THE COURT:  For AP7, I'll call you.

19          MR. AMJED:  Good afternoon, your Honor.  Naumon Amjed,

20    Kessler Topaz Meltzer & Check.

21          THE COURT:  All right.  Is there anyone here for the

22    MN funds, or have they chosen not to appear given the

23    withdrawal of that motion?

24          I'll assume that.

25          For defendants.

I5nWhacC

1          MR. RUTHBERG:  Good afternoon, your Honor.  Miles

2     Ruthberg, from Latham & Watkins.

3          MR. DENTON:  Your Honor, Blake Denton, also from

4     Latham & Watkins.

5          THE COURT:  All right.  Good afternoon to all of you.

6          There have been a lot of moving parts in connection

7     with the pending applications for appointment of the new lead

8     plaintiffs and lead counsel.  In particular, there were five

9     motions filed by the deadline that I had set.  One of those

10    motions, as I mentioned a moment ago, a motion by MN funds, has

11    been withdrawn.  I will ignore it.

12         Two moving parties, and you can correct me if I'm

13    wrong, seem in my estimation to more or less concede that they

14    have a smaller financial interest than the other two movants,

15    and that is ATRS, the Arkansas Teacher Retirement System, and

16    the New York City pension funds, and that is, I think, without

17    even getting into whether the calculation of the loss amount

18    for the New York City funds is correct in light of the price

19    used in connection with the Synchrony transaction.  If that is

20    correct, then I think that effectively leaves two moving

21    parties, the Deka parties, and again, for lack of my ability to

22    say the name correctly, AP7.

23         Am I missing anything in setting up the landscape?

24         MR. BERGER:  No, your Honor.  That's correct.

25         THE COURT:  All right.  With respect to those two

I5nWhacC

1    parties, first of all, there was an issue raised in the MN

2    funds' papers with respect to the standing of both of those

3    parties to be appointed lead plaintiff.

4            In my judgment, that is a nonissue substantially for

5    the reasons set forth in *United Union of Roofers, Waterproofers*

6    *and Allied Workers Local Union No. 8 v. Ocwen Financial*

7    *Corporation*, 2014 WL 7236985 at page 3 (S.D. of Fla. 2014)

8            Now, I do conclude that the "prudential exception"

9    applies here with respect to both of those parties and that

10   standing is not an issue.  I should note that Deka

11   anticipatorily responds to an objection about the appointment

12   of a foreign plaintiff, an objection that would obviously apply

13   to both of the movants that I've mentioned, but no one else has

14   even raised that issue, and I don't see it as a relevant, let

15   alone disqualifying factor in any event, so I won't address

16   that.

17           With respect to those two remaining moving parties, if

18   I can describe them that way, there is some dispute back and

19   forth with respect to the financial interests and with respect

20   to the sort of "net seller net gainer" issue.  I wanted to make

21   sure that I understood those arguments correctly.  Let me start

22   with the financial interest question, because as I understand

23   it the "net seller net gainer" argument doesn't go to that but

24   really goes to whether a party is an adequate one, which is the

25   second step of the analysis.

1              Is that correct?

2              MR. AMJED:  Yes, your Honor.  That's correct.

3              MR. BERGER:  Yes, your Honor.

4              THE COURT:  All right.  In the Deka motion papers,

5    docket No. 107, the Berger declaration, there is a chart that

6    indicates that whether the LIFO approach is used or the *Dura*

7    approach is used, Deka has a higher financial interest.  Is

8    there agreement that that is accurate, or is that in dispute?

9              MR. BERGER:  Your Honor, we put the chart in.  We

10   believe it's accurate.  I think it's clear if you use the LIFO

11   method, we have 24,700,000.  They have 21 million, so we're

12   higher.

13             If you use the *Dura* method, we're also higher, so we

14   don't think there should be any dispute as to that.

15             THE COURT:  All right.

16             MR. AMJED:  We're not challenging Deka's losses, your

17   Honor.  We're just challenging their adequacy.

18             THE COURT:  All right.  In that regard, I take it you

19   concede that Deka's loss amount is indeed greater, so at least

20   on the first prong of the analysis, they would be the

21   presumptive lead plaintiff.  Is that correct?

22             MR. AMJED:  That's correct, your Honor.

23             THE COURT:  Talk to me about the "net seller net

24   gainer" issue so I understand it.

25             MR. AMJED:  Sure.  Should I take the podium?

I5nWhacC

1          THE COURT:  As long as you use a microphone, I frankly
2     don't care, if you use it at the podium or there, as long as I
3     make sure that one's on.

4          MR. AMJED:  OK.

5          THE COURT:  Give me a moment.  Can you just test it
6     and see if it's on.

7          It seems to be on.

8          MR. AMJED:  Thank you, your Honor.

9          Naumon Amjed, on behalf of AP7.

10          As Judge Crotty explained in *Goldman Sachs*, there is a
11     "wisdom to the rule that net sellers who are net gainers should
12     not be lead plaintiffs."  That wisdom applies with equal force
13     in this case.

14          Deka obtained millions of dollars in net profits by
15     selling shares into an artificially inflated market.  Rather
16     than make any effort to distinguish on-point law, which
17     requires a disqualification, Deka attempts to conflate the
18     issue here by obscuring their status with respect to their
19     losses and the net gains and net-seller analysis under the *Lax*
20     factor.

21          There are four *Lax* factors, as the Court is aware:
22     Total shares, net shares, net expenditures, and loss.  They are
23     using case law that addresses the fourth factor and applying it
24     to factors 2 and 3, which is completely unprecedented, and they
25     don't cite to any cases that support that point.

I5nWhacC

```
1        I think the courts uniformly hold that when the net
2   shares and net-expenditures factors go negative, there are
3   fatal consequences to your application for lead plaintiff.
4   Again, your Honor, they don't point to any cases where a court
5   has ever appointed a sole net gainer.  Rather, the cases they
6   generally cite to, such as *Foley*, discuss net losers.
7   *Momma.com*, *Weiss*, and *Gentiva* talk about in-and-out traders,
8   which is totally irrelevant to this situation.  *CannaVest*,
9   *Converse*, and *JA Solar* discuss only losses.  None of those
10  cases address net gainers, and none of those cases have any
11  discussion about the adequacy of a net gainer.
12       I think when we look at the cases that specifically
13  address this issue, and we cited them in our papers and I'll
14  refer the Court to the *Intuitive Surgical* decision by the
15  Northern District of California, which specifically addresses
16  net gainers, there the court --
17            THE COURT:  Sorry.  Which case is that?
18            MR. AMJED:  It's *Intuitive Surgical*, your Honor.
19            THE COURT:  OK.  Go ahead.
20            MR. AMJED:  2001 WL 566814.
21       In that case, your Honor, the Court addressed the
22  adequacy of net gainer, and it actually responds to the very
23  specific argument that Deka is making before this Court.  In
24  Deka's reply brief, they make the point that AP7's analysis is
25  not appropriate because AP7 doesn't take into account the
```

1    purchase price of the shares that they're selling into an

2    artificially inflated market.  The *Intuitive Surgical* court

3    addresses this exact issue and rejects the argument and says it

4    completely ignores the purpose of a net-gainer inquiry.  The

5    purpose, according to the court, is to isolate class period

6    transactions to determine, just based on the class period

7    purchases and sales, whether there's a potential argument that

8    you may have profited from the fraud.  And the way that the

9    benefit is measured, your Honor, is by netting, or matching,

10   the inflationary gains that you enjoyed against the losses that

11   you suffered.

12        Deka's reply seeks to minimize the importance of

13   netting by pointing out there's scant evidence about issues

14   anywhere outside the lead plaintiff context.  That's absolutely

15   false.

16        In terms of netting coming up in the class

17   certification issue, there is an opinion from Judge Rakoff in

18   2015, the *Sonar Capital* case, where the court addresses the

19   suitability of a net gainer at class certification, and there

20   the court very clearly said that in a 10b-5 case, the

21   prevailing approach is to offset plaintiff's losses by any

22   gains that are attributable to the same conduct.  The court

23   goes on to explain that for most class members the netting

24   question is only one of secondary importance, as the pressing

25   issue for those who are net losers, like AP7, is establishing

liability.  For net gainers, by contrast, the netting issue is
paramount since for him it means a difference between a
potential recovery and no recovery at all.  Therefore, he is
highly likely to focus on the issue to the detriment of the
class.  Accordingly, the court rejected the net gainer in that
case.

In terms of the netting issue coming up again, later
in litigation, is the *Household* opinion, which is one of the
few cases to address how shares should be matched following a
jury verdict.  It's from the Northern District of Illinois.
The cite is 756 F.Supp.2d 928.  It's a 2010 opinion from Judge
Guzman.  There, the court, again, which is one of few cases to
ever consider the netting issue following a jury verdict,
specifically says that in Rule 10b-5 cases, the Second, Fifth,
Ninth and Tenth Circuits require that the plaintiff's losses be
netted against their profits attributable to the same fraud.
Clearly netting is a significant issue in any 10b-5 case that's
litigated in the Second Circuit.

Separate and apart from the netting arguments, Deka
tries to save its motion by incorporating *Dura*'s loss causation
concepts into the net-shares analysis.  Again, there's
absolutely no support for the argument that they're making that
shares sold after the first corrective disclosure should be
excluded from the *Lax* factors.  The *Olsten-Lax* factors
specifically talk about class period transactions, and while

I5nWhacC

certain courts have applied *Dura* to assess the fourth *Lax*

factor, losses, not a single court has ever applied it to the

net shares and net gains analysis, because it simply doesn't

apply.

Dura talks about whether your losses from corrective

events are recoverable under the federal securities laws.  It

says nothing about netting.  It says nothing about net gainers.

It says nothing about their adequacy.  Indeed, since *Dura* was

decided, in 2005, courts have routinely rejected net gainers.

The most recent reject happened six months ago in the *General*

*Cable* decision.  There, the court disqualified an institutional

investor who claimed the largest loss under LIFO, FIFO, and

*Dura*.  The court rejected that movant and said the movant's

sale of stock into an inflated market is exactly the type of

movants courts routinely hold to be inadequate.  The *General*

*Cable* decision accords with decisions of this district, such as

*Goldman Sachs* by Judge Crotty and the *Foley* decision by Judge

Buchwald, which put up a stop sign and say if you're a net

gainer, you should not be a lead plaintiff.

The question, your Honor, is not whether a net gainer

is barred from recovery.  Rather, the question is whether a net

gainer, by their very nature, creates such unique issues, the

class is forced to expend resources to litigate matters that

are critical to the net gainer but wholly irrelevant to the

class.  It's because of the serious risk and diversion of

I5nWhacC

1    resources and attention that courts routinely reject net

2    gainers.

3            There is no reason to subject the class to this risk,

4    your Honor, when AP7, who is a net loser of $47 million, is

5    fully qualified to act as a lead plaintiff.

6            With that, your Honor, I'm happy to address any

7    questions you may have.

8            THE COURT:  All right.  I take it part of the argument

9    that Deka made was that, No. 1, you're improperly treating the

10   shares that they owned prior to the class period, essentially

11   treating their cost basis, if I can call it that, as zero

12   rather than the price at which they bought it, and I take it

13   your argument is that whether that's true or not, that goes to

14   the fourth *Lax* factor and isn't relevant to the second and

15   third factors that you're essentially relying on.  Is that

16   correct?

17           MR. AMJED:  That is correct, and I think the *intuitive*

18   *Surgical* decision addresses that point specifically.

19           THE COURT:  All right.  I think I get the point for

20   now.

21           Mr. Berger, let me hear from you.

22           MR. BERGER:  Thank you, your Honor.

23           A couple of points.  First of all, to start where

24   counsel finished, he makes it appear as if we didn't have

25   losses in this case, but in fact, we have losses of 24 million

1    or 21 million, depending on how you calculate the losses, and

2    his client has less, so the net gainer issue can't be conflated

3    with whether you have losses or not.

4              I'm glad that counsel referred to the decision by

5    Judge Crotty, because, and I'm sure this wasn't intentional,

6    but in his brief and here in court, he didn't read the whole

7    quote.  If you read what Judge Crotty wrote in the *Foley*

8    case -- I'm sorry.  In the *Richman v. Goldman Sachs* case, he

9    wrote, "While there is wisdom to the rule that net sellers who

10   are net gainers should not be lead plaintiffs," and that's

11   where counsel stopped, the judge continued, "there is no good

12   reason not to recognize losses which a net seller has incurred.

13   West Virginia is well positioned to argue that the challenged

14   conduct caused it legal harm."

15             West Virginia, in that case, like we are here -- we

16   sold shares that were before the first corrective disclosure;

17   those shares are not entitled to recovery.  We also sold shares

18   after the first corrective disclosure.  Those shares are

19   entitled to recovery, for which we have losses, and if the

20   Court adopts, as it should, *Dura* in looking at lead plaintiff

21   motions, which many, many decisions in this district now do,

22   and we've cited them in our complaint, but there are many of

23   them.  I could list them off to your Honor, but they include

24   Judge Garufis's decision in *Converse*, Judge McMahon's decision

25   *Gutman*, Judge Carter's decision in the *Kux-Kardos* case, Judge

1   Broderick's decision in the *Micholle* case and Judge Gardephe's

2   decision in *Sallustro*, all of which were cited in our papers.

3        All of those decisions say that, No. 1, the most

4   important *Lax* factor is loss is suffered.  No. 2, they should

5   be looked at under *Dura*; that is, what losses are recoverable?

6   And in looking at what losses are recoverable, you get rid of

7   shares that are sold before a corrective disclosure, which were

8   actually the circumstances in the last case that counsel cited,

9   which is the *General Cable* case.  But if there are shares sold

10  after the corrective disclosure, which is the case here, those

11  are still damaged shares, so you don't exclude those.

12       THE COURT:  What about the argument that that goes to

13  the fourth prong, the actual financial loss, but ignores the

14  second and third?

15       MR. BERGER:  It doesn't ignore, because in considering

16  net shares, you're looking at what are the affected shares in

17  the case.  You want to eliminate the shares that are unaffected

18  by the fraud that don't have recoverable losses, and you want

19  to consider shares that do.  Our view is that along the lines

20  of those cases, you can be a quote/unquote net seller or net

21  gainer, but as Judge Crotty said, and indeed, Judge Buchwald

22  said, you still can be a lead plaintiff if you have recoverable

23  losses, because your claims are typical.

24       Recall, your Honor, what we're talking about here is

25  we have a presumption that we're the lead plaintiff, and that

1    presumption can be rebutted by evidence that we will not fairly

2    and adequately represent the class.  And there isn't any

3    evidence.  In fact, I believe it was in either Judge Crotty's

4    case or Judge Buchwald's case -- it was Judge Buchwald, who

5    said, and again, this was not fully quoted to the Court.  She

6    stated in that case, after noting that sometimes net gainers

7    maybe are not appropriate as lead plaintiffs, Judge Buchwald

8    said, "There is no reason why a net seller, who sold all of his

9    shares after the fraud began to be exposed and was thus legally

10   harmed by the fraud in all its sales, could not be an adequate

11   lead plaintiff.  In fact, such trading behavior is likely

12   typical of most members of the class."

13            Judge Buchwald addressed the net gainer and net seller

14   in the *Foley v. Transocean* decision, 272 F.R.D. 126, again,

15   cited in our papers.  Unfortunately, and I apologize, I don't

16   have the jump cite for that quote.  But the court said there's

17   no reason why a net seller, who sold all of their shares before

18   the class period, can't be an adequate lead plaintiff so long

19   as they sold their shares after initial corrective disclosure.

20            As the Court knows, here, we have an initial

21   corrective disclosure on July 21, 2017.  Then we had a number

22   of other corrective disclosures.  Our client sold some of its

23   shares before.  Those don't count.  They're taken out in the

24   *Dura* analysis.  We sold shares also afterwards.  Those shares

25   still have damages associated with the purchases, and if you

1    consider that, in fact, we're a net acquirer of shares, 990,000

2    shares.

3              But the important thing is, as the judge recognized in

4    the *Transocean* case, such trading behavior is likely typical of

5    members of the class, so not only would we not not adequately

6    represent the class, in fact, this type of trading is typical

7    of many, many members of the class.  It won't be a distraction.

8     It happens all the time.  That's what Judge Buchwald said in

9    that case.

10             THE COURT:  First of all, you're going to take

11   Mr. Fineman out with your glasses, so just be careful.

12             MR. BERGER:  I apologize.  Good friends; he'll let me

13   do it.

14             THE COURT:  I'll let you work that out between

15   yourselves.

16             Do you think there is a case on point with respect to

17   your application?  Let me withdraw that question for a moment.

18             Do you concede, without distinguishing between before

19   and after July 21, 2017, that just looking within the class

20   period itself you would qualify as a net seller and net gainer?

21             MR. BERGER:  If there was no corrective disclosure

22   before the end of the class period, correct, but here, we have

23   partially corrective disclosure, so it changes.

24             THE COURT:  What are your best two cases that have

25   facts like the ones here that say where there is a partial

1    disclosure within the class period of the sales after that?

2              MR. BERGER:  I suppose *Richman v. Goldman Sachs*, by

3    Judge Crotty; *Transocean*, and some of the other cases that

4    apply *Dura*, but those two I'd point to right away.

5              Your Honor, if I may, the important thing here is to

6    focus on *Dura*.  What *Dura* says is that the only shares that

7    you're entitled to recover for are shares that are not in and

8    out; that is, shares that you bought during the class period

9    but sold before a corrective disclosure.  No recovery.  That's

10   what *Dura* says.

11             The cases that I referred to earlier in this district,

12   starting with the *Converse* case and going forward, all of those

13   cases say that the courts ought to look at *Dura* for lead

14   plaintiff.  In fact, they all do.  And they say the most

15   important thing is the loss suffered, and in looking at the

16   loss suffered, what you do is what we did when we did the *Dura*

17   calculation.  You match up the purchases and sales before

18   corrective disclosure.  For all the purchases that are matched

19   with a sale before corrective disclosure, those are thrown out.

20   No recovery under *Dura*.  To the extent there are shares left,

21   and we had shares left, and some of those shares were sold

22   after the first corrective disclosure, there are damages that

23   are recoverable, typical of the class, appropriate to consider

24   for lead plaintiff.

25             Your Honor, let me also make one other point.

1          Counsel makes it appear that Deka did not own shares

2     at the end of the class period.  That's not true.  We did.  We

3     owned approximately 2,100,000 shares, I believe, at the very

4     end of the class period.  And as for netting and the *Household*

5     case, counsel's really talking about how the Court will

6     approach damages at trial; that is, will the Court require that

7     any profits be netted against losses.

8          First of all, it's not clear in this circuit that

9     netting is, in fact, something that would reduce damages.  I

10    know that Judge Scheindlin in the *Vivendi* case rejected netting

11    completely.  But it's really beside the point, your Honor,

12    because as we pointed out in our papers, that's an issue that

13    will involve the position that a plaintiff or a class member

14    held at the beginning of the class period.  Did you hold shares

15    before the class period started?  Do you have profits that

16    offset those purchases?, etc.  And that's a damages question

17    and the *Household* case was after trial, not lead plaintiff, and

18    involved damaged, so that's really a red herring at this point.

19          THE COURT:  All right.

20          MR. AMJED:  Your Honor, if I just may respond?

21          THE COURT:  Yes.  Let me ask you to respond, and in

22    particular, it doesn't sound like there's any dispute that

23    under a *Dura* analysis, Deka can show that it was damaged.

24          MR. AMJED:  No.

25          THE COURT:  As I understand the "net seller net

I5nWhacC

1    gainer" concern, the concern is that at the end of the day, the

2    plaintiff may not be able to show that it was damaged, but to

3    the extent that you would concede that there are damages under

4    a *Dura* analysis -- and I don't hear you disputing that -- why

5    wouldn't that concern be addressed?  In other words, I think

6    the central point, the gravamen of Mr. Berger's argument is

7    that, net seller net gainer aside, there is no dispute here

8    that they can show losses, and given that, they can satisfy the

9    typicality and adequacy requirements.

10             MR. AMJED:  I think that's the argument that every net

11   gainer makes, that they have losses under *Dura*, LIFO and FIFO,

12   but that's not the inquiry and that's not the analysis the

13   courts go through.

14             Again, the *General Cable* decision, there, the lead

15   plaintiff movant was disqualified even though they claimed

16   losses under LIFO, FIFO, and *Dura*, and the court still

17   determined that yes, you have losses but you also have this

18   huge adequacy issue, and that disqualifies you.

19             THE COURT:  And why?  What's the concern?

20             MR. AMJED:  The concern is, as explained by Judge

21   Rakoff in *Sonar Capital*, that as a net gainer, you have

22   specific damages issues and specific netting issues that are

23   vital to you which don't matter for the rest of the class.

24             If I could just provide a hypothetical, if the

25   inflation in a stock varies throughout the class period,

1    someone who sells early in the class period and is benefiting

2    from a highly inflated stock might be incentivized to make an

3    argument that benefits them but not might benefit the rest of

4    the class.

5            With respect to the citations to *Richman* and

6    *Transocean*, I represented the successful lead plaintiff in

7    *Transocean*, and they were not a net gainer.  While it's true

8    that net sellers, people who sell more shares in the class

9    period, could be adequate representatives if they are also net

10   losers, net losers -- I'm sorry, net gainers are not adequate.

11   Net gainers are folks that, in terms of actual dollars coming

12   in versus going out, took in more dollars from a class period,

13   and the concern is that by taking in more dollars from a class

14   period, you're potentially benefiting, and the benefit that you

15   have from taking in shares that are inflated could expose you

16   to arguments and risks that are not in the class's best

17   interests.

18           That's exactly what Judge Rakoff addressed in *Sonar

19   Capital*.  That's exactly what *Intuitive Surgical* addresses, and

20   that's exactly what *General Cable* talks about when it says net

21   gainers are not adequate.  And the same thing was in the

22   *Richman* case in front of Judge Crotty.  There, the net seller

23   was not the net gainer.  So it's completely different than the

24   Deka situation.

25           And in terms of *Vivendi*, counsel's citation to *Vivendi*

1     and the claim that *Vivendi* rejected netting, that's not true

2     *Vivendi* applied netting, and I refer the Court to 248 F.R.D.

3     144, at page 59.  The court applied the concept called partial

4     netting, where the court there looked at shares in a particular

5     period and applied the gain from a particular period to the

6     losses, but that's just one form of netting.  There's other

7     forms, and *Sonar Capital* talks about the various ways that

8     courts have addressed the netting issue.  While I agree there

9     is not one formula, there is certainly an issue in the Second

10    Circuit, and the concept of netting within the Second Circuit

11    cannot reasonably be disputed.

12            THE COURT:  All right.  Very good.  I think it's clear

13    that I need to more carefully review some of the cases that you

14    are each relying on.  The landscape of these motions has

15    changed dramatically in the last few days.  My preparations

16    have been complicated, and given that, I think I need to go

17    back to the case law and sort this out.

18            One question I have for both of you is your positions

19    with respect to how to maximize and leverage the work that has

20    already been done by ATRS in this case prior to reopening the

21    appointment question.

22            MR. AMJED:  I can start with that.

23            I think ATRS is obviously a committed fiduciary and

24    has always been a very suitable lead plaintiff, and I think we

25    would confer with counsel and ATRS to make sure to the extent

1    there are any efficiencies to be gained by including them sort

2    of within our working group, I think that's something we will

3    definitely explore.

4              MR. BERGER:  Your Honor, we'll certainly make use of

5    what they've done.  I believe they've done quite extensive

6    investigation.  We're going to have to take a look at the

7    complaint again, because their complaint, as the Court knows,

8    lasted three years in the class notice here, and the other

9    complaint that was filed was five years.  We'll have to look at

10   that, but we have no problem using what they've done and

11   working with them to make sure that they've made that

12   available, and then we can go forward with it.  That's fine.

13             THE COURT:  All right.  I did have one last question

14   on the prior argument, which is for Mr. Amjed.

15             MR. AMJED:  Yes, your Honor.

16             THE COURT:  You began by stating that you're not

17   quarreling that at the first step, if you will, Deka qualifies

18   as the party with the largest financial interest, but then you

19   relied on the *Lax* factors and the second and third.  I'm just

20   trying to understand precisely how this argument fits in.

21             My understanding, and correct me if I'm wrong, is that

22   the *Lax* factors are really the factors that are used to

23   determine which parties have the largest financial interests;

24   in other words, those are actually at the first step of the

25   analysis.  Were you imprecise earlier in conceding that point,

I5nWhacC

| | |
|---|---|
| 1 | or am I misunderstanding something in where this fits in? |
| 2 | MR. AMJED:  No, your Honor. |
| 3 | The *Lax* factors are used to assess financial interest, |
| 4 | and I think in a situation where the parties have a very |
| 5 | similar loss, the fourth *Lax* factor, I think it would be |
| 6 | appropriate to look at the other *Lax* factors to determine |
| 7 | financial interest.  But again, we're not challenging financial |
| 8 | interest. |
| 9 | What we're saying is that when the second and third |
| 10 | *Lax* factors go negative, that's a red flag.  And when that |
| 11 | happens, then you move from the financial interest analysis to |
| 12 | determine if it can be adequate, typical, and is subject to |
| 13 | class-unique defenses.  And that's the portion of the analysis |
| 14 | that we're sort of working under. |
| 15 | Again, the *General Cable* decision kind of provides the |
| 16 | framework where the court goes through the financial interest |
| 17 | analysis, notes that the movant, who is the net gainer, has the |
| 18 | largest financial interest, but then pivots to the adequacy and |
| 19 | typicality part of the test and determines that they're not |
| 20 | adequate or typical. |
| 21 | THE COURT:  All right.  Thank you. |
| 22 | MR. BERGER:  Your Honor, just one quick word on that. |
| 23 | THE COURT:  Sure. |
| 24 | MR. BERGER:  Since I believe as the Court correctly |
| 25 | noted, counsel has not contested that we are entitled to the |

1    presumption.  That being the case, that presumption can only be

2    rebutted by proof that we would not be adequate or typical, and

3    it can't be speculation.  A lot of what counsel's said today is

4    speculation about what plaintiffs bought here and bought there,

5    but that's all speculation.  In fact, our claims are typical

6    and adequate, and we would very clearly represent the class.

7              Thank you, your Honor.

8              THE COURT:  Thank you.  I'll reserve judgment on that.

9              Does anyone else wish to be heard on the lead

10   plaintiff question?

11             MR. KELLER:  Your Honor, if I may?

12             THE COURT:  Yes.

13             MR. KELLER:  Christopher Keller, on behalf of Arkansas

14   Teacher Retirement System.

15             Just a couple of points, it's clear that Arkansas does

16   not possess the largest financial interest, and at the outset,

17   let me just make a disclosure.

18             Arkansas Teacher has a strong preexisting litigation

19   relationship with AP7.  They were co-lead plaintiffs in the

20   London Whale case, so I would just say with respect to losses,

21   even though we do not have the largest financial interest, I

22   think I could be helpful to the Court on one point, and that is

23   the point of the largest financial interest was never intended

24   to be a damages analysis.

25             Courts developed, over time, rough metrics to

1    determine who has the largest financial interest.  That started

2    out with FIFO.  Then it went to LIFO, and you have the four

3    factors.  The whole idea of the net seller/net gainer is rough

4    justice, but it's for a reason.  The point that counsel for

5    Deka is making is that sales were made after the first partial

6    disclosure, and therefore, they're damaged.

7            Well, the first partial disclosure only resulted in a

8    72-cent drop out of a $9 total drop, so the shares that sold

9    after that drop were still 92 percent inflated.  The problem is

10   that if you're going to accept counsel's argument, you have to

11   continue, then, that analysis and figure out what percentage of

12   inflation continued to drop after each disclosure.  And what

13   it's inviting you to do is do exactly what courts have said you

14   should not do, which is do a full-blown damage analysis.  I

15   haven't done it, but I can tell your Honor that you don't want

16   to do it, and that's why courts have said net sellers, net

17   gainers, sorry, no good.  No court has accepted his invitation

18   to go down that road.

19           That's the only point I'll make on losses.

20           With respect to Arkansas, the work done in this case,

21   as your Honor is aware, is extensive.  The amended complaint we

22   filed reflects, in almost irreplaceable way, the interview of a

23   hundred confidential witnesses, with which our employee

24   investigators have a personal relationship of trust.  I believe

25   the class would be best served by the appointment of Arkansas

I5nWhacC

1    as co-lead plaintiff.  It's with significant precedent.  Courts

2    are free to do that.

3         In fact, one quote, from *Oxford Health*, by Judge

4    Brieant, "The rebuttable presumption created by the PSLRA which

5    favors the plaintiff with the largest financial interest was

6    not intended to obviate the principle of providing the class

7    with the most adequate representation, and in general, the Act

8    must be viewed against established principles regarding Rule 23

9    class actions."

10        This is a distinct case.  This is a case that is

11   unique in the sense that the Court has reopened lead plaintiff,

12   so this is not necessarily off the rack.  The class would be

13   best served if Arkansas continues on that role as lead

14   plaintiff so that the case can proceed seamlessly, without

15   delay.  The reality is that whatever work comes from this point

16   forward, it cannot replace what's been done.  Those witnesses,

17   which are going to be critical to this case, have already

18   established relationships with our firm, and there's no

19   guarantee that those witnesses would be willing to work with

20   other law firms.

21        I think that Arkansas should be a lead plaintiff, and

22   there's no good reason for them not to be a lead plaintiff.

23   The Court has the discretion to do that, and if there was ever

24   a case that the facts presented speak to that, it's this case.

25        THE COURT:  All right.  And would you seek

1    co-appointment without regard for which of these parties was

2    appointed with you?

3            MR. KELLER:  I have to tell you, we would serve as

4    co-lead plaintiff with either, but given the preexisting

5    litigation relationship that our client has with AP7, personal

6    relationship -- we've met in person a number of occasions, both

7    in past cases -- my preference would clearly be with AP7.  But

8    we've also worked with counsel for Deka in cases past, in fact,

9    met in a number of cases, so we would be prepared to do that.

10           THE COURT:  All right.  Thank you.

11           Mr. Fineman.

12           MR. FINEMAN:  Yes.  Thank you, your Honor.  I'll be

13   brief.

14           We do not have the largest overall financial interest

15   in the case, as you pointed out.  Our corrected number is 17.8

16   million.

17           One thing we did find, however, after the MN funds

18   withdrew is that we're the only movant left with bond losses of

19   the movants.  The issue here can be a question of standing.

20   The case law, we acknowledge, in the Second Circuit has, of

21   late, frequently allowed stockholders to act as class

22   representatives on behalf of bondholders.

23           Our view on this is, given our qualifications

24   otherwise to serve as lead, that we might obviate future

25   standing issues if your Honor was inclined to have somebody in

1   the case who actually has losses in the GE bonds at issue.

2   Thank you.

3            THE COURT:  All right.  Thank you.

4            Mr. Berger, Mr. Amjed, do you want each want to just

5   be heard on the co-appointment question with ATRS?  Otherwise,

6   let's wrap things up.

7            MR. BERGER:  Yes, your Honor.  I'll be very brief.

8            If that's the Court's inclination, obviously there

9   have been co-lead plaintiffs in many cases, and we'd certainly

10  have no problem with it.  I also think we can work with them as

11  attorneys in the case and take advantage of what they're doing

12  without the appointment as a co-lead plaintiff.  It's really up

13  to the Court what the Court thinks would work better in this,

14  but we're happy to work with them.  We've worked with them.

15           I don't really know much about the preexisting

16  relationship, but there's a lot of preexisting relationship

17  stuff going around these days, and I don't know much about

18  their preexisting relationship, but we have worked with their

19  client before and would have no problem doing it.

20           THE COURT:  All right.

21           MR. AMJED:  I would just say on the point of co-lead

22  counsel --

23           THE COURT:  Use the microphone, please.

24           MR. AMJED:  -- again, we would be happy to work with

25  whoever the Court appoints, but I think in terms of efficiency

1    and in terms of the process under the PSLRA, there should be a

2    lead plaintiff, and lead plaintiff can determine the help it

3    needs, if it needs any, from Arkansas Teacher.  And while we

4    would talk to them, I don't think formal co-lead appointment is

5    necessary.  I believe the Ninth Circuit, in the *Cohen* case, 586

6    F.3d 703, at footnote 4, suggested that appointment of co-lead

7    plaintiffs might not be appropriate.  Under the PSLRA, it might

8    violate the sequential process that's required for the

9    selection of lead plaintiff, so while we're happy to work with

10   them, and we do have a longstanding relationship with Arkansas

11   Teacher and the Labaton firm, we don't think a formal

12   appointment is necessary.

13              THE COURT:  All right.  Thank you.

14              I'll reserve judgment on the lead plaintiff

15   applications.  What I may do, because this has become a little

16   bit more complicated than I originally anticipated, is issue an

17   order with a bottom-line ruling, to get things rolling, and an

18   opinion to follow.

19              My recollection is, am I correct, that once an

20   appointment is made, the lead plaintiff would have, I think, 60

21   days to file a third amended consolidated complaint, at which

22   point the defendants' time to make a motion with respect to

23   that operative complaint would then run?  Is that where things

24   stand, or do I need to set deadlines for that?  What's the

25   situation?

I5nWhacC

```
 1              Yes, Mr. Ruthberg.

 2              MR. RUTHBERG:  Thank you, your Honor.

 3              With respect to the time to file a complaint, I

 4    believe that was set at 30 days, but I do know that the motion

 5    to dismiss deadline was set for 30 days after the new

 6    complaint, and we'll do whatever the Court wants us to do.

 7    That's a little bit tight, especially if it now looks like

 8    there's going to be a new complaint.  But whatever the Court

 9    please, and it doesn't need to be addressed today.

10              THE COURT:  All right.  Anyone wish to be heard on

11    that at the front table?  Otherwise, I'll just make it clear in

12    an order.

13              Now, I do want to make sure that the third amended

14    complaint doesn't force me to reopen lead plaintiff appointment

15    process once again.

16              MR. BERGER:  It will not, your Honor, because the

17    maximum period has been out there.  We're happy to do an

18    amended complaint in whatever time the Court allows, 30 or 60

19    days.

20              MR. AMJED:  We would do the same.  I would just state

21    my preference for 60, your Honor.

22              THE COURT:  I'm shocked.

23              All right.  Anything else that anyone wishes to bring

24    up?

25              MR. AMJED:  Nothing from me, your Honor.
```

I5nWhacC

1          MR. KELLER:  No, your Honor.

2          THE COURT:  All right.  In that case, thank you all.

3    I appreciate it.  Very helpful, and I will give you a ruling as

4    soon as I can.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25