UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SJUNDE AP-FONDEN, individually and on behalf of
all others similarly situated,

<div style="margin-left:2em">Plaintiff,</div>

<div style="margin-left:2em">v.</div>

THE GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, HARVEY M. SCHWARTZ, and
GARY D. COHN,

<div style="margin-left:2em">Defendants.</div>

Case No.: 1:18-cv-12084

**ORAL ARGUMENT
REQUESTED**

---

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

Sharon L. Nelles (*nelless@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Matthew A. Schwartz
(*schwartzmatthew@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
Stephen H.O. Clarke (*clarkest@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs Group,
Inc., Lloyd C. Blankfein, Harvey M. Schwartz, and
Gary D. Cohn*

January 21, 2020

# TABLE OF CONTENTS

<div align="right">*Page*</div>

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ................................................................................... 4

    A.    The Parties .............................................................................4

    B.    The Origins of 1MDB .............................................................5

    C.    The 2012-2013 1MDB Bond Transactions ...............................6

    D.    The Initial Revelation of the 1MDB Conspiracy ....................7

    E.    The Alleged Misstatements and Omissions .............................8

    F.    The Extensive Coverage of 1MDB and Government Investigations.....................9

    G.    The Alleged "Corrective Disclosures".................................12

LEGAL STANDARD .......................................................................... 13

ARGUMENT ...................................................................................... 13

I.      PLAINTIFF DOES NOT PLEAD THAT ANY OF THE SIX "CORRECTIVE DISCLOSURES" REVEALED ANY HIDDEN FACTS .............. 13

    A.    None of the Purported Corrective Disclosures Revealed New Material Information About 1MDB ....................................14

    B.    None of the Purported Corrective Disclosures Showed the Falsity of Any Statements, Disclosed Any Omitted Facts, or Signaled the Materialization of Any Concealed Risks ....................................18

II.    PLAINTIFF DOES NOT ADEQUATELY ALLEGE ANY MATERIAL MISSTATEMENTS OR OMISSIONS BY ANY DEFENDANT ............................. 19

    A.    General Statements About Goldman Sachs' Business...........................20

    B.    Statements About 1MDB and Coastal Energy.........................23

    C.    The Individual Defendants Cannot Be Held Liable Under Section 10(b) for Statements They Did Not Make or Disseminate...................................29

III.    PLAINTIFF DOES NOT ADEQUATELY ALLEGE THAT ANY DEFENDANT INTENDED TO DEFRAUD SHAREHOLDERS ............................. 30

    A.    Plaintiff Does Not Allege that the Individual Defendants Acted with an Intent to Deceive or Defraud ............................31

    B.    Plaintiff Does Not Allege that Goldman Sachs Acted with an Intent to Deceive or Defraud ............................37

IV.    THE SAC DOES NOT STATE A SECTION 20(A) CLAIM ..................................... 39

CONCLUSION ................................................................................... 40

<div align="center">-i-</div>

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alpha Capital Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP,*
    2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ..........................................................40

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)................................................................................39, 40

*BankUnited, N.A.* v. *Merritt Envtl. Consulting Corp.,*
    360 F. Supp. 3d 172 (S.D.N.Y. 2018).....................................................................4

*Barilli* v. *Sky Solar Holdings Ltd.,*
    389 F. Supp. 3d 232 (S.D.N.Y. 2019).............................................................37, 38

*Barrett* v. *PJT Partners Inc.,*
    2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ............................................. 22-23, 38

*C.D.T.S.* v. *UBS AG,*
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ........................................................27

*In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.,*
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016)......................................................30, 31

*City of Brockton Ret. Sys.* v. *Avon Prods. Inc.,*
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)............................................... *passim*

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG,*
    752 F.3d 173 (2d Cir. 2014)................................................................... *passim*

*Credit Suisse Sec. (USA) LLC* v. *Billing,*
    551 U.S. 264 (2007)............................................................................26

*In re CRM Holdings, Ltd. Sec. Litig.,*
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................3

*Das* v. *Rio Tinto PLC,*
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)..............................................................31, 36

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.,*
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ......................................22, 23, 37

*Diehl* v. *Omega Protein Corp.,*
    339 F. Supp. 3d 153 (S.D.N.Y. 2018)..................................................................21

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008).................................................................34

*DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018).................................................................19

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................... *passim*

*Emps' Ret. Sys. of City of Providence* v. *Embraer S.A.*,
    2018 WL 1725574, at *1 (S.D.N.Y. Mar. 30, 2018) .................................21, 22, 36

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008).................................................................21

*Fila* v. *Pingtan Marine Enter. Ltd.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016)......................................................... 17-18

*Fogel* v. *Vega*,
    759 F. App'x 18 (2d Cir. 2018) .....................................................................20, 21

*Foley* v. *Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012).................................................................35

*Fries* v. *N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018).................................................................36

*Furher* v. *Ericsson LM Tel. Co.*,
    363 F. App'x 763 (2d Cir. 2009) ....................................................................3, 28

*Gagnon* v. *Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)..............................................................24, 38

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ............................................................................36

*Jackson Nat. Life Ins. Co.* v. *Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994).................................................................................25

*Jackson* v. *Halyard Health, Inc.*,
    2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) ....................................................32

*Johnson* v. *Siemens AG*,
    2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011)................................................36, 39

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)...............................................................................39

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................................................34

*Lapin* v. *Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ....................................................20

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .....................................................................18

*Lorenzo* v. *SEC*,
    139 S. Ct. 1094 (2019) ..............................................................................30

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) .......................................25, 27, 30

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ......................................................2

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    758 F. Supp. 2d 264 (S.D.N.Y. 2010) ....................................................19

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .....................................................................30

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) ....................................................23

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...............................................3, 13

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ....................................................13, 17, 18

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) .............................................29, 31

*Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .......................................................................4

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago* v. *FXCM Inc.*,
    333 F. Supp. 3d 338 (S.D.N.Y. 2018) ....................................................33

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) ....................................................32

*In re PXRE Group Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) .............................................34, 35

*Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima,*
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)................................................................ *passim*

*Richman* v. *Goldman Sachs Grp., Inc.,*
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................20

*Rombach* v. *Chang,*
    355 F.3d 164 (2d Cir. 2004)....................................................................................20

*In re Salomon Analyst Level 3 Litig.,*
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)........................................................................26

*In re Sanofi Sec. Litig.,*
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)........................................................................22

*In re Sanofi-Aventis Sec. Litig.,*
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)........................................................................28

*In re Satyam Comput. Servs. Ltd. Sec. Litig.,*
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)....................................................................4, 36

*Schiro* v. *Cemex, S.A.B. de C.V.,*
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)..........................................................21, 22, 38

*In re Sec. Capital Assurance Ltd. Sec. Litig.,*
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)..................................................................13, 15

*Shemian* v. *Research In Motion Ltd.,*
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ......................................................30, 39

*Shemian* v. *Research In Motion Ltd.,*
    570 F. App'x 32 (2d Cir. 2014) ................................................................................31

*Shields* v. *Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)....................................................................................34

*Singh* v. *Cigna Corp.,*
    918 F.3d 57 (2d Cir. 2019)..........................................................................3, 13, 20

*Slayton* v. *Am. Express Co.,*
    604 F.3d 758 (2d Cir. 2010)......................................................................................4

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.,*
    33 F. Supp. 3d 401 (S.D.N.Y. 2014)........................................................................40

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008)....................................................................................31

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .......................................................................19

*Thomas* v. *Shiloh Indus., Inc.*,
    2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018) .......................................................................38

*Tyler* v. *Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ...................................................................................39

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. 2012) ...............................................................................3, 29

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) .......................................................................29, 31, 36

*Walk-In Med. Ctrs., Inc.* v. *Breuer Capital Corp.*,
    651 F. Supp. 1009 (S.D.N.Y. 1986) .....................................................................................25

## Rules & Statutes

15 U.S.C. § 78u-4(b)(2)(A) ...........................................................................................4, 30

Federal Rule of Civil Procedure 9(b) ...................................................................................19

17 C.F.R. § 240.10b-5 ............................................................................................13, 29, 39

## PRELIMINARY STATEMENT

Reporters around the world have been detailing for years how a small group of co-conspirators stole billions of dollars from a Malaysian sovereign development company called 1MDB, including from the proceeds of bonds that 1MDB issued in 2012 and 2013 that were underwritten by a subsidiary of The Goldman Sachs Group, Inc. (together with its subsidiaries, "Goldman Sachs" or the "Firm").[1]  (Second Amended Complaint ("SAC") ¶ 26.)  Indeed, since the conspiracy first came to light in 2016, no fewer than 5,000 stories containing the term "1MDB" have appeared in major publications, and in September 2018, a best-selling book consolidated years of media coverage about the alleged 1MDB misconduct.  (SAC ¶ 63 n.47.)  This level of press attention is hardly surprising:  the co-conspirators reportedly included Malaysia's then Prime Minister, jet-setting executives of an Abu Dhabi sovereign wealth fund, senior 1MDB executives and a 1MDB "advisor" known for throwing extravagant parties attended by A-list celebrities, and certain Asia-based employees of Goldman Sachs.  (SAC ¶¶ 3, 15.)  Regulators and criminal authorities around the globe have been no less interested (SAC ¶ 1), and, since August 2016, Goldman Sachs has disclosed that authorities are investigating its actions with respect to 1MDB.  (*See, e.g.*, Ex. 1 at 92 (Q2 2016 10-Q); Ex. 2 at 88 (Q3 2018 10-Q).)[2]

Against this backdrop of extensive press coverage and disclosures, Plaintiff contends that the Firm defrauded its shareholders by hiding from them—*from February 28, 2014 to November 9, 2018*—criminal and regulatory risks regarding 1MDB.  (SAC ¶¶ 26, 382-93.)  According to Plaintiff, Goldman Sachs accomplished this feat by including general statements about its business

---

[1] The Goldman Sachs Group, Inc. has many separate corporate subsidiaries.  For purposes of this motion to dismiss only, Defendants do not distinguish among the various Goldman Sachs entities.

[2] Citations to "Ex." are to exhibits to the Declaration of Stephen H.O. Clarke.  Unless otherwise indicated, all internal quotation marks and internal citations in quotations are omitted.

practices and risk management framework in its annual reports and securities filings, and over the course of four years, making a handful of narrow statements to the media about its business with 1MDB.  (SAC ¶¶ 336-93.)  Plaintiff's contention that these statements concealed anything is implausible, and the SAC should be dismissed for three independent reasons:

*First*, Plaintiff comes nowhere close to pleading loss causation.  To adequately allege this essential element, a plaintiff must plead that (i) "the market reacted to a corrective disclosure, which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted," or (ii) defendants' alleged misstatements or omissions "concealed a risk that later materialized to cause the plaintiff's loss."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 359 (S.D.N.Y. 2008).  In other words, a plaintiff must allege that new information, previously concealed by the defendant, was revealed and caused the defendant's share price to decline.  Thus, securities fraud cases typically involve allegations that a specific disclosure of unexpected negative information (*e.g.*, a disclosure of accounting violations and an earnings restatement) caused an immediate stock drop.  There is nothing like that here at all.

Instead, simply ignoring the massive amount of information about 1MDB published to the market in the years after the 1MDB conspiracy was exposed and the Firm's own repeated disclosure of ongoing investigations regarding 1MBD, Plaintiff has cherry-picked five dates in November and December 2018 on which the Firm's stock price happened to decline, matched them to six stories about 1MDB, and called the results "corrective disclosures."  For example, Plaintiff alleges that on November 12, 2018, the market reacted to the supposed revelation that Malaysia would "seek repayment of Goldman's underwriting fees."  (SAC ¶ 401.)  But that *exact same* information had been reported five months earlier by *Reuters*, *The New York Times*, and *The Wall Street Journal*.  (*See* Ex. 3 (6/8/2018 *Reuters*); Ex. 4 (6/14/2018 *NYT*); Ex. 5 (6/22/2018

*WSJ*).)  Indeed, not one of Plaintiff's six alleged "corrective disclosures" was actually new news. Thus, the Court can and should dismiss this action for this obvious pleading failure.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (no loss causation where "corrective disclosures" are "recharacterization[s] of previously disclosed facts"); *Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (no loss causation from "materialization of a known risk, rather than the disclosure of a concealed one"); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (no loss causation where information in alleged "corrective disclosures" was "simply not concealed").

*Second*, Plaintiff fails to plead that any alleged misstatements were materially false and misleading.  As the Second Circuit has repeatedly held, even when allegations of illegal conduct are raised, general statements about business practices and risk management are immaterial as a matter of law.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Indeed, the Second Circuit has rejected precisely what Plaintiff does here:  quote "vague corporate statements," "point to significant regulatory" matters, and declare "*voila* . . . securities fraud!"  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 59-60 (2d Cir. 2019). And Plaintiff's efforts to state claims based on scattered statements made in response to press inquiries about particular aspects of the 1MDB bond offerings fare no better.  Plaintiff misquotes and misconstrues factually accurate statements, and then charges that those statements somehow concealed Goldman Sachs' exposure to 1MDB.  But Plaintiff cannot make statements materially false and misleading by taking words "out of context," *Furher* v. *Ericsson LM Tel. Co.*, 363 F. App'x 763, 765 (2d Cir. 2009), or by alleging they hid facts "already in the public domain," *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *32 (S.D.N.Y. 2012).

*Finally*, Plaintiff fails to plead a "strong inference" that Defendants acted intentionally or recklessly as required by the Private Securities Litigation Reform Act ("Reform Act"). Plaintiff does not and cannot allege that any Defendant actually knew about the 1MDB conspiracy for the simple reason that, as Plaintiff concedes, the co-conspirators *actively concealed* their misconduct. (SAC ¶ 282.) Bereft of any ability to plead that Defendants were aware of the scheme, received any personal benefit from it, participated in it, condoned it, or learned of it before shareholders, Plaintiff asserts instead that everything about the 1MDB offerings, including the mere fact that the offerings involved Malaysian entities, was a "red flag" that *should have* alerted Defendants to a conspiracy to steal from 1MDB. (SAC ¶¶ 312-29.) But "should have" allegations are not enough to plead a strong inference that any Defendant intended to harm—or even was reckless to the risk of harming—the Firm's shareholders. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 187-88 (2d Cir. 2014) (rejecting "should have" allegations because "poor business judgment" does not show scienter). Rather, because "the allegations in the [SAC] concern an intricate and well-concealed fraud perpetrated by a very small group of insiders," they serve to "only reinforce the inference that the [Defendants] were themselves" deceived about 1MDB. *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 481 (S.D.N.Y. 2013).

## BACKGROUND[3]

### A.     The Parties

Plaintiff Sjunde AP-Fonden is a Swedish public pension fund (SAC ¶ 31) that regularly serves as a plaintiff in securities class action cases. (*See* ECF No. 44 at 1-2 (collecting cases).)

---

[3] For this motion, Defendants accept well-pled allegations. *See Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014). This Court may also consider "documents incorporated into the complaint by reference" and "public disclosure documents filed with the SEC," *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 763 n.2 (2d Cir. 2010), "documents integral to the complaint," and "facts of which judicial notice may properly be taken," *BankUnited, N.A.* v. *Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018).

Plaintiff seeks to represent a putative class that purchased Goldman Sachs common stock between February 28, 2014 and December 20, 2018.  (SAC at 1.)

Defendant Goldman Sachs provides global financial services through its subsidiaries.  (SAC ¶ 32; Ex. 6 at 32 (2013 Annual Report).)  Individual Defendants Lloyd Blankfein, Gary Cohn, and Harvey Schwartz were senior executives of the Firm.  (SAC ¶¶ 33-35.)  Mr. Blankfein served as the Firm's Chairman and Chief Executive Officer ("CEO") from 2006 until September 30, 2018.  (*Id.* ¶ 33.)  Mr. Cohn served as Chief Operating Officer ("COO") from 2006 until December 31, 2016.  (*Id.* ¶ 34.)  Mr. Schwartz served as Chief Financial Officer ("CFO") from 2013 through April 2017 and as Co-COO from 2017 through April 20, 2018.  (*Id.* ¶ 35.)

### B.    The Origins of 1MDB

In early 2009, the Firm, led by Asia-based bankers (Tim Leissner and Roger Ng), advised the Malaysian State of Terengganu when it formed a regional investment fund called TIA.  (SAC ¶¶ 9-10, 117.)  Jho Low, then known as a well-connected merchant banker, advised the Sultan of Terengganu on TIA.  (Ex. 7 (12/13/2009 *The Edge*); *see also* SAC ¶ 90.)  Later that year, Najib Razak became Prime Minister of Malaysia, nationalized TIA, and turned it into 1MDB, a sovereign development company wholly owned by the Malaysian Government.  (*See* SAC ¶¶ 90, 118.)

At its inception, 1MDB appeared to be a promising company owned by an important U.S. ally.  1MDB's Board of Advisors, chaired by Prime Minster Najib (SAC ¶ 118), consisted of "eminent individuals in the international business arena and senior Malaysian government officials" (Ex. 8 at 35 (Catalyze Offering Circular)).  Prime Minister Najib represented himself as a modernizing influence on Malaysia.  (*See* Ex. 9 at 117-18 (BDW).)  And President Obama described Malaysia as a valued trading partner.  (Ex. 10 (4/12/2010 White House Press Release).)

### C.     The 2012-2013 1MDB Bond Transactions

In early 2012 and 2013, 1MDB sought Goldman Sachs' assistance with three bond offerings.  (SAC ¶¶ 15, 149.)  The team on the transactions included Leissner, Ng, and Andrea Vella, another banker based in Asia.  (SAC ¶¶ 42, 149.)

***Project Magnolia***.   The first bond offering, known as Project Magnolia, raised $1.75 billion, $810 million of which was for the acquisition of a large power producer and the rest was reserved for "general corporate purposes."  (SAC ¶¶ 149, 156, 177.)  Because 1MDB was a new issuer with no credit rating, International Petroleum Investment Company ("IPIC"), a $70 billion dollar sovereign wealth fund of Abu Dhabi (SAC ¶ 15; Ex. 9 at 152 (BDW)), guaranteed the bonds (SAC ¶ 152.)  The offering was structured as a "firm commitment," meaning that Goldman Sachs, as underwriter, purchased all the bonds, taking the risk that it could not resell them to investors.  (SAC ¶ 180.)  Project Magnolia and the subsequent bond offerings were vetted by the Firm's compliance functions as well as the "Risk, Business Standards, Capital, and Suitability Committees."  (SAC ¶¶ 189, 206, 240.)  During this process, in response to questions about Low's involvement, Leissner told the Capital and Suitability Committees that, in March 2012, Low facilitated a meeting between Leissner and a high-ranking official at IPIC.  (SAC ¶ 162.)  But Leissner represented that neither Low nor any other intermediary was involved in the deal.  (*See* Ex. 11 ¶¶ 41, 53 (Leissner Compl.).)  The deal closed on May 21, 2012.  (SAC ¶ 190.)

***Project Maximus***.   Later in 2012, 1MDB sought help from Goldman Sachs to obtain acquisition financing through a second bond offering, called Project Maximus.  (SAC ¶¶ 194-95.)  1MDB requested a firm commitment underwriting for $1.75 billion in bonds to buy more power assets and fund other potential transactions.  (SAC ¶¶ 195-96.)  IPIC again guaranteed the bonds (SAC ¶ 196), and the deal closed on October 17, 2012 (SAC ¶ 207).

***Project Catalyze***.  In January 2013, Prime Minister Najib raised with Goldman Sachs the prospect of a joint venture with Abu Dhabi, which would involve major projects like the building of a new financial center in Kuala Lumpur.  (SAC ¶¶ 216-17, 221.)  1MDB agreed to fund half of the $6 billion joint venture (SAC ¶¶ 221, 226), and Prime Minister Najib told the Firm that 1MDB needed to raise funds quickly to take advantage of the opportunity (Ex. 9 at 219-20 (BDW)).  This third bond offering, known as Project Catalyze, also was structured as a firm commitment underwriting and closed on March 19, 2013.  (SAC ¶ 240.)

### D.     The Initial Revelation of the 1MDB Conspiracy

In 2015, news reports emerged alleging that funds from a 1MDB joint venture with an oil exploration firm had been misappropriated and that 1MDB money had flowed into Prime Minister Najib's bank accounts.  (*See, e.g.*, Ex. 12 (7/21/2015 *Bloomberg*); Ex. 13 (7/2/2015 *WSJ*).)  Amid building scrutiny of 1MDB, in June 2016, Bloomberg reported that the U.S. Department of Justice ("DOJ"), Federal Reserve and others were "examining Goldman [Sachs'] dealings with 1MDB." (Ex. 14 (6/10/2016 *Bloomberg*).)  The *Wall Street Journal* also reported that U.S. law enforcement officials were investigating whether Goldman Sachs violated the Bank Secrecy Act in connection with one of the 1MDB bond offerings.  (Ex. 15 (6/8/2016 *WSJ*).)

On July 20, 2016, the DOJ filed an asset forfeiture complaint alleging that more than $3.5 billion had been stolen from 1MDB (Ex. 16 ¶ 33 (Wolf Compl.)), including $2.7 billion from proceeds of the 1MDB bonds.  (*Id*. ¶¶ 6, 9, 11.)  As the complaint makes clear, those funds were stolen *after* they were transferred from Goldman Sachs to 1MDB's bank accounts at other financial institutions.  (*Id*.)  The DOJ alleged that the "funds diverted from 1MDB were used for the personal benefit of the co-conspirators" and that Low orchestrated the theft.  (*Id*. ¶¶ 6, 112-20, 227-30.) The DOJ did not allege that Goldman Sachs had any knowledge of this activity.  Two weeks after the DOJ complaint was filed, Goldman Sachs disclosed it was subject to a number of investigations

and reviews by "various governmental and regulatory bodies . . . relating to the firm's businesses and operations, including . . . those related to [1MDB]."  (Ex. 1 at 92 (Q2 2016 10-Q).)  In other words, as early as August 2016, amid allegations that billions had been stolen from 1MDB, the Firm put the world on notice that multiple authorities were investigating its dealings with 1MDB.

 **E.** **The Alleged Misstatements and Omissions**

 Goldman Sachs, like companies across America, makes generalized statements about its business practices and risk management framework, such as:  "the core of our operational risk management framework is risk identification and assessment" (SAC ¶¶ 371-79); "[i]ntegrity and honesty are at the heart of our business" (SAC ¶¶ 383-84); Goldman Sachs aspires to "reinforce a culture of effective risk management" (SAC ¶¶ 375-76, 385-86); and "operational and reputational risks are critical considerations when we evaluate new business opportunit[ies]" (SAC ¶¶ 388-89). Plaintiff alleges that the Firm made these standard statements to hide its exposure to criminal and regulatory actions related to 1MDB.  (SAC ¶¶ 370-93.)  Plaintiff even challenges as misleading warnings that "the geographical diversity" of the Firm's operations "greatly increases the risk" that the Firm could be "found in violation" of anti-corruption and anti-money laundering laws, which could subject it to "significant penalties" or reputational harm.  (SAC ¶¶ 380-81.)

 Separately, Plaintiff challenges a dozen statements about the 1MDB bond offerings made between 2014 and 2018 in response to press inquiries relating to (i) the terms of offering documents for the 1MDB bonds and the fees 1MDB paid Goldman Sachs, (ii) the Firm's knowledge of how money was stolen from 1MDB, (iii) Low's role in the bond offerings, and (iv) how Goldman Sachs responds to "bad behavior."  (SAC ¶¶ 337-49, 353-69.)  Plaintiff also challenges a statement about a different transaction involving Low.  (SAC ¶¶ 350-51.)  Plaintiff calls these statements false and misleading because they supposedly "obscure[d]" the Firm's "central role in the 1MDB scandal" by "downplay[ing] the bank's involvement with 1MDB" and falsely reassured investors until the

end of 2018 about "the risks of criminal investigation, prosecution, and related fines and penalties" related to 1MDB.  (SAC ¶¶ 26, 336, 370, 396.)  This charge cannot be reconciled with the totality of the statements and the robust public record, including the Firm's own disclosures.

### F.     The Extensive Coverage of 1MDB and Government Investigations

#### 1.      Continuing Press Reports About 1MDB in 2016

In the wake of the DOJ's asset forfeiture complaint, reporters dubbed 1MDB "the world's biggest financial scandal."  (SAC ¶ 275 n.356.)  Reams of articles followed, reporting on, among other things, ongoing investigations related to 1MDB, including those directed at the Firm by authorities in the U.S. and Singapore, and connections between Goldman Sachs and 1MDB.  (*See, e.g.*, *id.* ¶¶ 275-77; Ex. 17 (7/28/2016 *Guardian*); Ex. 18 (12/22/2016 *WSJ*).)  Among this coverage was a December 22, 2016 *Wall Street Journal* article about alleged ties between Low, 1MDB, and the Firm, noting that (i) Leissner worked with Low on TIA's formation, (ii) Low, "who had Middle East ties, introduced people from Goldman and 1MDB to [IPIC officials]," and (iii) "some at Goldman seemed confused about Mr. Low's role," although "Leissner assured [Firm executives] Mr. Low played no part" in the first bond offering.  (Ex. 18 (12/22/2016 *WSJ*).)

#### 2.      The June 2017 DOJ Complaint

On June 7, 2017, the DOJ filed an asset forfeiture complaint referencing another deal involving Low.  (SAC ¶¶ 266, 350-51; Ex. 19 ¶ 512 (Real Prop. Compl.).)  The DOJ alleged that, in January 2014, a subsidiary of IPIC, Compañía Española de Petróleos, S.A.U. ("CEPSA") and a Low-affiliated company, Strategic Resources (Global) Ltd. ("SRG"), jointly acquired Coastal Energy Company, a U.S. energy company.  (SAC ¶¶ 258, 260; Ex. 19 ¶¶ 512, 515 (Real Prop. Compl.).)  Goldman Sachs advised CEPSA on the deal (SAC ¶ 262), and others advised SRG (Ex. 20 (11/19/2013 Press Release)).  According to the complaint, Low financed the transaction with funds diverted from 1MDB (*see* SAC ¶ 351; Ex. 19 ¶¶ 425, 512 (Real Prop. Compl.)), and,

about a week after the transaction closed, CEPSA paid SRG $350 million for SRG's shares in the joint venture, which SRG had purchased for $50 million.  (Ex. 19 ¶ 516 (Real Prop. Compl.).)  Six days later, on June 13, 2017, the *Wall Street Journal* reported that Goldman Sachs had "informally advised" Low about a prior failed bid for Coastal Energy.  (Ex. 21 (6/13/2017 *WSJ*).)

### 3. The June 2018 Reports of Action by the New Malaysian Government

As early as 2013, opposition politicians in Malaysia running against Prime Minister Najib's party criticized the 1MDB bond offerings and discussed the "renegotiation" of Goldman Sachs' allegedly excessive fees.  (*See, e.g.*, SAC ¶ 247-48;  Ex. 22  (5/3/2013 *Bloomberg*);  Ex. 23 (4/30/2013 *WSJ*).)  In June 2018, following the ouster of Prime Minister Najib, *Reuters*, *The New York Times*, and the *Wall Street Journal* reported that the new government believed that Goldman Sachs' fees for the 1MDB bond offerings were excessive and that Malaysia's new Finance Minister would try to recoup all of them.  (*See* Ex. 3 (6/8/2018 *Reuters*); Ex. 4 (6/14/2018 *NYT*); Ex. 5 (6/22/2018 *WSJ*); *see also* SAC ¶ 279.)

### 4. The September 2018 Best Seller:  *Billion Dollar Whale*

On September 18, 2018, *Billion Dollar Whale* was published, and quickly became a *New York Times* Bestseller.  (Ex. 24 (10/7/2018 *NYT* Bestseller List).)   The book, largely an amalgamation of prior news articles, also included allegations that:  (1) Mr. Blankfein met with Prime Minister Najib in New York in 2013 when Low was also in New York (Ex. 9 at 237-39 (BDW); *see also* SAC ¶¶ 252-53); and (2) Hazem Shawki, a Firm banker who worked on the Coastal Energy transaction, learned at some point that CEPSA had purchased SRG's stake in the venture for $300 million more than SRG had originally paid and told IPIC this "was to reward [Low] for scouting out the . . . deal."  (Ex. 9 at 245-46 (BDW); *see also* SAC ¶¶ 40, 264.)

5.      **The November 1, 2018 Unsealing of Charges Against Low, Leissner, and Ng**

On November 1, 2018, a U.S. federal court unsealed criminal charges against Low, Leissner, and Ng (SAC ¶¶ 281-83), detailing that the three "conspired" to "embezzl[e] funds from 1MDB for [themselves] and others" and pay "bribes and kickbacks." (Ex. 25 ¶ 17 (Leissner Information); *see also* Ex. 26 ¶¶ 15-16 (Ng Indictment).) The charges also detailed how Leissner and Ng repeatedly "conceal[ed] facts from . . . compliance and legal employees of Goldman Sachs," including Low's involvement in the transactions. (SAC ¶ 282.) The Leissner information alleged that Co-Conspirator #4 met with Leissner, Ng, and Low regarding Project Magnolia, was told that they "would have to pay bribes and kickbacks to government officials," and "agreed" not to "disclose this." (SAC ¶ 105; Ex. 25 ¶¶ 25-27 (Leissner Information).) Although not referenced by name, Vella was identifiable as "Co-Conspirator #4." (SAC ¶ 105.) The day after the charges were unsealed, Goldman Sachs disclosed that "proceedings by the DOJ or other governmental or regulatory authorities could result in the imposition of significant fines, penalties and other sanctions against the firm." (Ex. 2 at 89 (Q3 2018 10-Q).)

On November 9, 2018, the transcript of Leissner's August 2018 guilty plea was unsealed, revealing admissions that he had participated in the 1MDB conspiracy, concealed his involvement from Goldman Sachs' Legal and Compliance groups, and concealed Low's involvement in the 1MDB bond deals as well as the diversion of bond proceeds from the Firm. (SAC ¶ 282; Ex. 27 at 38-39 (Leissner Plea).) Leissner also acknowledged that his conduct was "contrary to Goldman Sachs's stated internal policies and procedures." (Ex. 27 at 39:14-40:9 (Leissner Plea).)

6.      **The November 2018 Widespread Reporting of the DOJ Allegations**

The DOJ charges and Leissner's plea were extensively reported. The day the filings were unsealed, *Bloomberg* reported that Leissner admitted to "circumventing" Goldman Sachs' internal

controls (Ex. 28 (11/1/2018 *Bloomberg*)), and the next day recited the DOJ's allegation of two meetings a "high-ranking [Firm] executive" attended with Najib and Low in 2009 and 2013 (Ex. 29 (11/2/2018 *Bloomberg*)), later identifying Mr. Blankfein as the executive who attended the 2009 meeting (Ex. 30 (11/8/2018 *Bloomberg*)).  Foreshadowing the charges Malaysia filed against the Firm on December 16, 2018 (Ex. 31 (12/17/2018 *Wash. Post*)), articles in mid-November 2018 quoted Malaysia's new Prime Minister as saying "[t]here is evidence that Goldman Sachs has done things wrong," that the Firm "cheated" the country, and stated that Malaysia's Finance Minister would seek restitution from Goldman Sachs over and above the Firm's fees.  (*See* Ex. 32 (11/12/2018 *Reuters*); Ex. 33 (11/13/2018 *Bloomberg*); *see also* SAC ¶ 292.)

### G.   The Alleged "Corrective Disclosures"

Notwithstanding the breadth of reporting on 1MDB and the Firm's own disclosures about its exposure to ongoing investigations, Plaintiff asserts that the truth about the Firm's exposure to "risks of criminal investigation, prosecution, and related fines and penalties" related to 1MDB was revealed for the first time through six articles published between November 9 and December 21, 2018.  (SAC ¶ 396.)  None of these articles, however, reported anything new; rather, each article repeated information from the 2016 DOJ complaint and the extensive media coverage that followed, or reflected what the Firm had disclosed about its exposure to investigations regarding 1MDB.  Yet the SAC does not allege that any of the earlier disclosures of the exact same allegedly material facts was a corrective disclosure.  None of that information, when actually first revealed, caused any meaningful change in the price of Goldman Sachs stock.  In fact, the price of the Firm's stock rose the day the charges against Leissner, Low, and Ng were unsealed (+.54%), rose the day *Billion Dollar Whale* was published (+.24%), rose the day *Bloomberg* first reported that Mr. Blankfein was the "senior executive" whom the DOJ alleged met with Prime Minister Najib and Low in 2009 (+.28%), and barely budged when the DOJ filed its initial asset forfeiture

complaint (-.48%), and when the Firm disclosed that investigations related to 1MDB could result in the imposition of significant fines and penalties (-.13%).  (Ex. 34 (*Bloomberg* Price Reports).) That same information did not magically become "corrective" when repeated in November and December 2018, even if each of the six articles on which Plaintiff relies conveniently coincides with an alleged decline in the Firm's stock price.

## LEGAL STANDARD

To state a Section 10(b) claim, Plaintiff must allege (i) a material misstatement or omission; (ii) scienter; (iii) a connection between the misstatement or omission and the purchase or sale of a security; (iv) reliance by the plaintiff (or transaction causation); (v) economic loss; and (vi) loss causation.  *Singh*, 918 F.3d at 62.  Here, the Court should dismiss the SAC for failure to plead the independently required elements of loss causation, material misstatement, and scienter.

## ARGUMENT

## I.  PLAINTIFF DOES NOT PLEAD THAT ANY OF THE SIX "CORRECTIVE DISCLOSURES" REVEALED ANY HIDDEN FACTS.

This Court can easily dispose of the SAC on the ground that it fails to plead loss causation. To adequately allege loss causation, Plaintiff must plead that "corrective disclosures" revealed "some then-undisclosed fact with regard to the specific [alleged] misrepresentations," or disclosed some "materialization" of a "risk concealed by [a] fraudulent statement."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010).  In other words, Plaintiff must allege "corrective disclosures" that are more than "recharacterization[s] of previously disclosed facts," *Omnicom*, 541 F. Supp. 2d at 552, or materializations of known risks, *YPF*, 15 F. Supp. 3d at 358.

Here, there was no "sudden" revelation of new, previously concealed facts that "cause[d] the stock value to plummet abruptly."  *In re Sec. Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010).  Instead, Plaintiff advances the entirely implausible contention that

Goldman Sachs shareholders suffered losses because "the truth" about the Firm's exposure to 1MDB was "gradually revealed" by six news articles published between November 9, 2018 and December 21, 2018.  (SAC ¶ 415; *see also* SAC ¶ 396 (articles allegedly revealed the true "risks of criminal, investigation, prosecution and related fines and penalties").)  Nothing in these articles added anything "new" to the mix of the information in the market, as revealed by Plaintiff's own reliance on years of prior reporting to allege its fraud claim, and the Firm had disclosed for years that it was facing ongoing investigations regarding 1MDB, including the week prior to these supposed corrective disclosures when it disclosed that such proceedings "could result in the imposition of significant fines, penalties and other sanctions."  (Ex. 2 at 89 (Q3 2018 10-Q).)  As detailed below, Plaintiff's loss causation allegations make absolutely no sense.

### A.    None of the Purported Corrective Disclosures Revealed New Material Information About 1MDB.

The SAC itself demonstrates that investors were aware of Goldman Sachs' exposure to 1MDB before the first alleged "corrective" disclosure.  Indeed, the SAC relies upon the extensive media coverage about Goldman Sachs and 1MDB to allege the underlying wrongdoing.  But this same coverage informed the market and thus "sever[s] the causal link between the alleged misconduct" and Plaintiff's alleged losses.  *YPF*, 15 F. Supp. 3d at 357.  For example, the SAC references *Billion Dollar Whale*—published two months *before* the first alleged corrective disclosure—more than 200 times.[4]  The SAC also cites more than 90 news articles and other materials that predate any of the alleged corrective disclosures, including the DOJ's July 2016 asset forfeiture complaint, the DOJ's charges against Leissner and Ng, and Leissner's guilty plea,[5]

---

[4] *E.g.*, SAC ¶¶ 63 nn.47-48, 67 n.55, 70 n.64, 78 n.77, 88 nn.95-96, 89-90 nn.98-101, 91-92 nn.104-07, 94 nn.108-09, 109-10 nn.132-35.

[5] *E.g.*, SAC ¶¶ 64-65 nn.49-53, 98 n.121, 105 n.127, 112 n.136, 114-17 nn.139-43, 119 n.147, 121 n.148, 123 n.149, 125-26 nn.150-51, 130-33 nn.156-59, 140-47 nn.166-75, 149 n.176, 152 n.182,

and refers to Goldman Sachs' November 2, 2018 third quarter report,[6] which specifically disclosed the DOJ's allegations regarding Leissner and Ng and that "governmental and regulatory investigations relating to 1MDB . . . could result in the imposition of significant fines, penalties and other sanctions."  (Ex. 2 at 88-89 (Q3 2018 10-Q).)

Although all of these materials made clear that the Firm was exposed to regulatory action over 1MDB, Plaintiff ignores it all to allege that six follow-on news articles published on days when there were downward movements in Goldman Sachs' stock price somehow revealed the Firm's exposure.  Plaintiff, however, is not permitted to plead securities fraud by "cherrypicking dates" to create a causal link.  *Sec. Capital*, 729 F. Supp. 2d at 602 (plaintiff failed to plead "the incremental revelation of Defendants' fraudulent misrepresentations, and not the actions of third parties or other circumstances in the market, caused" losses).  The six articles, published between November 9 and December 21, 2018, did not introduce any previously undisclosed information, just more of the same information already disclosed by the Firm, the DOJ and major news outlets:

- ***First Alleged Corrective Disclosure***:  On November 9, 2018, the *Wall Street Journal* reported that Mr. Blankfein met with Prime Minister Najib while Low was also in attendance in 2009 and 2013.  (SAC ¶¶ 397-99; Ex. 35 (11/9/2018 *WSJ*).)  The information in this article was drawn directly from DOJ filings, which alleged that a "high-ranking [Firm] executive" attended such meetings in 2009 and 2013, and from prior reports that Mr. Blankfein was the executive who attended the 2009 meeting and that he met with Najib in 2013.[7]

- ***Second Alleged Corrective Disclosure***:  On November 12, 2018, *Bloomberg* reported that Malaysia's Finance Minister would try to recoup fees that 1MDB paid Goldman Sachs in

---

159(a) n.188, 159(b)-(c) nn.189-90, 162 nn.193-94, 168 nn.200-01, 178 n.211, 190-92 nn.230-32, 195 n.237, 201 n.242, 207-08, nn.251-54.

[6] SAC ¶¶ 371 n.393, 373 n.395, 376 n.397, 377 n.399, 380 n.400.

[7] *See* Ex. 9 at 237-39 (BDW) (alleging a meeting between Mr. Blankfein and Prime Minister Najib in 2013 when Low was also in New York); Ex. 11 ¶¶ 28(c), 31, 70 (Leissner Compl.); Ex. 29 (11/2/2018 *Bloomberg*) (reporting DOJ allegations of a "high-ranking [Firm] executive" meeting with Prime Minister Najib and Low in 2009 and 2013); Ex. 30 (11/8/2018 *Bloomberg*) ("[Mr.] Blankfein was the unidentified high-ranking Goldman Sachs executive referenced in U.S. court documents who attended" a meeting with Prime Minister Najib in 2009).

connection with the bond offerings (SAC ¶¶ 400-02; Ex. 36 (11/12/2018 *Bloomberg*)).  This followed at least three earlier reports that such action was imminent, including reports in *The New York Times* and the *Wall Street Journal* that Plaintiff concedes disclosed that "Malaysian authorities planned to seek . . . *at least* the $600 million in fees" from the Firm.  (SAC ¶¶ 279.)[8] And the Firm had specifically disclosed the risk of "fines, penalties and other sanctions" arising from 1MDB-related investigations on November 2, 2018.  (Ex. 2 at 88-89 (Q3 2018 10-Q).)

- *Third Alleged Corrective Disclosure*:  On November 29, 2018, *Bloomberg* reported that the Federal Reserve was "ramping up its investigation" into how certain executives evaded Goldman Sachs' controls with respect to the 1MDB bond offerings.  (SAC ¶¶ 403-04; Ex. 37 (11/29/2018 *Bloomberg*).)  This investigation was, however, well-known to the market based on reports dating back to 2016 in the *Wall Street Journal*, *Bloomberg,* and *Reuters*,[9] and the Firm had disclosed the risk of 1MDB-related investigations (Ex. 2 at 88-89 (Q3 2018 10-Q)).

- *Fourth Alleged Corrective Disclosure*:  On December 17, 2018, *The New York Times* reported that the Malaysian government filed criminal charges against Goldman Sachs in connection with the 1MDB bond offerings (SAC ¶¶ 406-07; Ex.40 (12/17/2018 *NYT*)).  The risk that Malaysia would bring such charges already had been reported by *Bloomberg* and *Reuters*,[10] and was glaringly obvious to any observer based on: (i) the DOJ's allegations that Low, Leissner, Ng conspired to steal from 1MDB, (ii) the statements Leissner made during his plea allocution, and (iii) the Firm's disclosure of 1MDB-related investigations (*see* p. 11-12, *supra*).

- *Fifth Alleged Corrective Disclosure*:  On December 20, 2018, *The Financial Times* reported that the Malaysian Finance Minister intended to seek $7.5 billion from Goldman Sachs.  (SAC ¶¶ 410, 412; Ex. 41 (12/20/2018 *FT*).)  Although the risk of such a demand being made should have been readily apparent following the criminal charges Malaysia filed and the Firm's disclosure of its exposure to ongoing investigations, no less than five publications, including *The New York Times*, the *Wall Street Journal* and *The Washington Post*, reported Malaysia would seek far more from Goldman Sachs than its fees, such as "consequential losses" from the issuance of the $6.5 billion in 1MDB bonds and fines.[11]

---

[8] *See* Ex. 3 (6/8/2018 *Reuters*) (Malaysia was "considering asking the U.S. Department of Justice . . . to get Goldman Sachs . . . to return nearly $600 million in fees it earned"); Ex. 4 (6/14/2018 *NYT*) (Malaysia "intends to seek restitution from Goldman Sachs" . . . "which pocketed $600million in fees"); Ex. 5 (6/22/2018 *WSJ*) ("Malaysia is also looking into whether it can recover money from Goldman Sachs Group Inc., which earned about $600 million").

[9] *See* Ex. 38 (4/6/2016 *WSJ*) (Federal Reserve had "raised concerns" to the Firm about the bond deals); Ex. 14 (6/10/2016 *Bloomberg*) (the Federal Reserve was "examining Goldman[ Sachs'] dealings with 1MDB"); Ex. 28 (11/1/2018 *Bloomberg*) (Leissner admitted to "circumventing Goldman[ Sachs'] internal accounting controls."); Ex. 39 (11/1/2018 *Reuters*) (same).

[10] *See* Ex. 32 (11/12/2018 *Reuters*) (Malaysian Prime Minister Mahathir foreshadows charges, noting that "[t]here is evidence that Goldman Sachs has done things that are wrong," and his view that Goldman Sachs bankers "cheated" the country); Ex. 33 (11/13/2018 *Bloomberg*) (same).

[11] *See* Ex. 4 (6/14/2018 *NYT*) (Malaysian Finance Minister Lim intended to "seek restitution from Goldman Sachs"); Ex. 5 (6/22/2018 *WSJ*) ("Lim's mission is to recover as much of the missing 1MDB money as possible"); Ex. 32 (11/12/2018 *Reuters*) (Lim intended to "seek consequential

- **Sixth Alleged Corrective Disclosure**:  On December 21, 2018, *Bloomberg* reported that Singapore would expand its criminal probe regarding 1MDB, which had reportedly focused on Goldman Sachs since 2017, to include Goldman Sachs' Singapore subsidiary.  (SAC ¶¶ 411-12; Ex. 42 (12/21/2018 *Bloomberg*).)  Yet, as stated in the very article Plaintiff asserts was a corrective disclosure, reports of investigations of the Firm by authorities in Singapore reached back no less than two years.[12]   And the Firm repeatedly disclosed ongoing investigations regarding 1MDB during that time period.  (*See* p. 7-8, 11, *supra*.)

In short, there was no new news here.

Furthermore, the SAC alleges that "the market for Goldman's common stock was efficient." (SAC ¶ 417.)  This means all these prior disclosures about 1MDB preceding the alleged corrective disclosures would have been absorbed into the Firm's stock price.  *See Omnicom*, 597 F.3d at 511 (alleged market efficiency meant plaintiff faced a "difficult task" showing loss causation because of "continuing media reports" prior to the alleged corrective disclosures).  In other words, by November 9, 2018, the stock price would have already reflected the "the risks of criminal investigation, prosecution, and related fines and penalties" related to 1MDB reflected in the six articles.  (SAC ¶ 396.)  Plaintiff's reliance upon stale information to plead loss causation is fatal to its claims.  *See Omnicom*, 597 F. 3d at 514 (no loss causation where the facts "were known a year before" the supposed materialization of the risk); *Fila* v. *Pingtan Marine Enter. Ltd.*, 195

---

losses [from the Firm] as well as the return of fees"); Ex. 33 (11/13/2018 *Bloomberg*) (in addition to recouping the $600 million in fees from Goldman Sachs, "Malaysia will also seek [from Goldman Sachs] losses that stemmed from the interest-rate differential"); Ex. 31 (12/17/2018 *Wash. Post*) ("Malaysia will seek fines [against Goldman Sachs] well in excess of both the $2.7 billion of allegedly misappropriated funds and the $600 million in fees . . . for the 1MDB deals.").

[12] *See* Ex. 43 (10/14/2015 *WSJ*) ("Transactions around [1MDB] are under investigation by . . . authorities in  . . . Singapore."); Ex. 18 (12/22/2016 *WSJ*) ("Singapore authorities" were "examining" the Firm's actions concerning 1MDB); Ex. 44 (11/2/2017 *Bloomberg*) (Singapore prosecutors were "examining [Goldman Sachs'] relationship with [1MDB]" and "links with" Low); Ex. 45 (11/7/2017 *Economist*) ("Singaporean prosecutors are investigating the role of current and former members of" the Firm regarding 1MDB); Ex. 46 (11/9/2018 *Bloomberg*) ("Goldman [Sachs] has been under scrutiny for years," referencing investigations in Singapore).

F. Supp. 3d 489, 496-97 (S.D.N.Y. 2016) (no corrective disclosure from article "based solely on public information").  The SAC can and should be dismissed in its entirety for this reason alone.

### B.   None of the Purported Corrective Disclosures Showed the Falsity of Any Statements, Disclosed Any Omitted Facts, or Signaled the Materialization of Any Concealed Risks.

Even if the six alleged corrective disclosures had revealed anything new to the market, it would still not be enough to show loss causation unless Plaintiff identified news that revealed the falsity of a prior statement, *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005), or the materialization of a "risk concealed by [a] misrepresentation," *Omnicom*, 597 F.3d at 513.

Plaintiff contends that the first alleged corrective disclosure, the November 9, 2018 *Wall Street Journal* article, revealed that in September 2013 Mr. Blankfein attended a meeting with 20 other people, including Prime Minister Najib and Low, after Goldman Sachs' "compliance department . . . said the bank shouldn't do business with" Low.  (SAC ¶ 397.)  But Plaintiff does not allege that Defendants ever denied such a meeting occurred.  Indeed, the *Wall Street Journal* article does not state that Mr. Blankfein learned of, or engaged in, any misconduct at the meeting, or even knew Low was present.  (Ex. 35 (11/9/2018 *WSJ*).)  It merely reports that those present discussed Malaysian business opportunities that "included discussions of 1MDB."  (*Id.*)  Plaintiff does not and cannot explain how a report regarding such a meeting could cause investors losses.

Plaintiff's five remaining "corrective disclosures" are all reports regarding ongoing regulatory investigations, potential sanctions, and criminal charges.  Plaintiff contends that such things are "a foreseeable consequence of, and within the zone of risk concealed by Defendants' misstatements."  (SAC ¶¶ 400-12.)  Plaintiff attributes alleged declines in the Firm's stock price to a growing perception that the Firm "wouldn't be able to avoid fines" (SAC ¶ 405), and speculation regarding the size of the Firm's exposure (SAC ¶ 408; *see also* SAC ¶ 409).  But here too, Plaintiff fails to allege that Goldman Sachs ever said it could avoid criminal or regulatory

scrutiny about 1MDB.  To the contrary, in 2016, following the DOJ asset forfeiture complaint's revelations about stolen proceeds, the Firm disclosed that it was subject to "investigations and reviews" related to 1MDB.  (*See, e.g.*, Ex. 1 at 85, 92 (Q2 2016 10-Q).)  Then, on November 2, 2018—prior to any alleged corrective disclosure—the Firm further stated that 1MDB-related matters could result in "significant fines, penalties [or] other sanctions."  (Ex. 2 at 88-89 (Q3 2018 10-Q).)  Given these warnings, all made amidst extensive press coverage of regulatory and criminal inquiries regarding 1MDB (*see* pp. 14-17, *supra*), the alleged stock price declines between November 12, 2018 and December 21, 2018, at most, reflect the market's reaction to news indicating the materialization of known risks of criminal and regulatory action.  *See YPF*, 15 F. Supp. 3d at 344, 351 (no loss causation when the nationalization of a private oil company resulted in a 32% in stock drop because "the risk of nationalization [was] widely discussed in major media reports months before").  Allegations that a firm's "stock price dropped when a *disclosed* risk . . . materialized," do not suffice to plead loss causation.  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *15 (S.D.N.Y. Mar. 26, 2019) (emphasis added); *see also DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 458 (S.D.N.Y. 2018) (reported investigations "confirm[ed] what had already been disclosed").  "[T]he securities laws were not designed to prevent investment risks from materializing or to provide investment insurance."  *In re Merrill Lynch Auction Rate Sec. Litig.*, 758 F. Supp. 2d 264, 279 (S.D.N.Y. 2010) (no loss causation because investors "assumed the risks" of losses from known risks).

## II.     PLAINTIFF DOES NOT ADEQUATELY ALLEGE ANY MATERIAL MISSTATEMENTS OR OMISSIONS BY ANY DEFENDANT.

The SAC also fails because Plaintiff has not pled that anything Defendants said was materially false and misleading in the first place.  Rule 9(b) requires Plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004). The Reform Act expands these requirements so Plaintiff "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Fogel* v. *Vega*, 759 F. App'x 18, 24 (2d Cir. 2018). As discussed below, and summarized in Exhibit 69, Plaintiff falls well short of its heightened pleading burden.

### A.   General Statements About Goldman Sachs' Business.

***General Statements and Risk Warnings.*** Plaintiff challenges as false and misleading general statements made by Goldman Sachs concerning its business practices and risk management, such as: "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us." (SAC ¶ 383.) Statements like these, however, are immaterial as a matter of law because "[n]o investor would take [them] . . . seriously in assessing a potential investment, for the simple fact that almost every investment bank makes the[m]." *ECA*, 553 F.3d at 206 (holding "routine representations" about risk management are inactionable). The Second Circuit has held unequivocally and repeatedly that "general declarations about the importance of acting lawfully" and about "compliance efforts" are inactionable. *See, e.g.*, *Singh*, 918 F.3d at 60, 63 (statement that company "established policies and procedures to comply with applicable [regulatory] requirements" inactionable); *ECA*, 553 F.3d at 205-06 ("risk management processes are . . . highly disciplined" inactionable).[13] The Second Circuit and courts in this district have adhered to this rule even when faced with allegations of bribery or other misconduct. *See,*

---

[13] The Second Circuit has issued at least ten different decisions holding that "general statements about reputation, integrity, and compliance with ethical norms are inactionable." *E.g.*, *UBS*, 752 F.3d at 183. To the extent that *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278 (S.D.N.Y. 2012) and *Lapin* v. *Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) stand for a contrary proposition, those cases have been effectively overruled.

*e.g.*, *Fogel*, 759 F. App'x at 21, 23-24 (statement about "strict compliance" with the law inactionable despite bribery); *UBS*, 752 F.3d at 183-84 ("tax evasion scheme" did not make general statements about "compliance, reputation, and integrity" actionable); *Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297-98 (S.D.N.Y. 2019) (statement that "Company does not tolerate bribery in any form" inactionable despite "bribery scheme"); *Emps' Ret. Sys. of City of Providence* v. *Embraer S.A.*, 2018 WL 1725574, at *1, 8 (S.D.N.Y. Mar. 30, 2018) (statement that "Company must work against corruption in all its forms" inactionable despite "bribery scheme"); *City of Brockton Ret. Sys.* v. *Avon Prods. Inc.*, 2014 WL 4832321, at *14-15 (S.D.N.Y. Sept. 29, 2014) (statements about "company's commitment to compliance" inactionable despite alleged bribery).

Furthermore, even if the challenged general statements were actionable, Plaintiff still fails to plead they were false. General statements regarding business practices and risk controls in place during the putative class period of February 28, 2014 to December 20, 2018 relate only to that period. They cannot be shown to be false by virtue of alleged misconduct that took place *years earlier* in 2012 and 2013. *See Fogel*, 759 F. App'x at 24 (internal controls statements not false based on alleged "bribery . . . years before"); *Embraer*, 2018 WL 1725574, at *11 (same). None of the challenged statements were backward-looking assurances that the Firm had not engaged in alleged 1MDB-related misconduct. *See, e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2008) (statement about "unwavering discipline" not actionable based on past insider trading); *Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153, 164-65 (S.D.N.Y. 2018) (risk warning not actionable based on environmental crimes). Similarly, since none of the challenged statements were guarantees about the effectiveness of Goldman Sachs' controls, to plead falsity, Plaintiff would need to demonstrate that some stated "controls did not exist," not "merely that they

were ineffective" at some point.  *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017).

**Financial Results.**  Plaintiff challenges as false and misleading a sentence in the Firm's 2014 Form 10-K about growth in debt underwriting revenue, asserting Defendants failed to disclose that some of that revenue was the result of 1MDB-related misconduct.  (SAC ¶¶ 390-91; Ex. 47 (2014 10-K).)  But Plaintiff does not suggest that Goldman Sachs reported false revenue, which is fatal to the claim, because "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."  *Schiro*, 396 F. Supp. 3d at 299; *see also Embraer*, 2018 WL 1725574, at *7 (financial statements not actionable because of undisclosed bribery).  Nor did a sentence that referenced only growth in revenue "put into play" anything that gave rise to a duty to disclose alleged details about 1MDB (SAC ¶ 391) because nothing about 1MDB is "sufficiently connected to" the challenged sentence.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403-04 (S.D.N.Y. 2016).

**SOX Certifications.**  Plaintiff challenges as false and misleading Sarbanes-Oxley ("SOX") Certifications Messrs. Blankfein and Schwartz, as CEO and CFO, respectively, signed that: (i) based on their knowledge, the Firm's securities filings did not contain any material misstatements; (ii) they designed and evaluated the Firm's disclosure controls; and (iii) they disclosed to the Firm's audit functions any fraud involving management or individuals with a significant role in disclosure controls.  (SAC ¶ 392.)  Plaintiff asserts that the Firm's "business culture" allegedly allowed "internal controls" to be "easily circumvented."  (SAC ¶ 393.)  But that alone is not enough to show the certifications were false when made.  *Schiro*, 396 F. Supp. 3d at 299.  Certifications are not actionable without an allegation that officers "were aware of" unreported "material weakness[es] in . . . internal controls," *Barrett* v. *PJT Partners Inc.*, 2017

WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017), matters as to which the Complaint is entirely silent. Indeed, Leissner admitted that he concealed his wrongdoing.  (*See* p. 11, *supra*.)  Moreover, Plaintiff alleges no facts showing "the actions articulated in the" certifications "were not undertaken."  *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358 (S.D.N.Y. 2015).

### B.   Statements About 1MDB and Coastal Energy.

Plaintiff also challenges as false and misleading a dozen disparate statements about 1MDB and Coastal Energy (grouped below into five categories) made over a four-year period, and portrays each as a sweeping denial of wrongdoing meant somehow to hide the Firm's exposure to potential liability.  (SAC ¶¶ 336-69.)  This is wrong.  Each challenged statement was a limited statement and true statement of fact or opinion that could not have misled any reasonable investor given the context in which it was made, especially as that context was usually an article reporting purported facts about 1MDB that the Firm did not deny.  Thus, Defendants had no duty to say more and Plaintiff's efforts to cobble together various distinct statements to allege some kind of cover-up fail.  *See Deutsche Bank*, 2017 WL 4049253, at *8 ("revealing one fact about a subject does not trigger a duty to reveal all facts on the subject").

### 1. *Statements About the Terms of Offering Documents, and Fees and Commissions*.

October 2014 *The Edge* Article:  On October 27, 2014, *The Edge* (a Malaysian newspaper) questioned whether terms in the 1MDB bond offering documents about "fees and commissions" signaled payments by Goldman Sachs to middlemen.  (Ex. 48 (10/27/2014 *The Edge*).)  Two days later, on October 29, 2014, *The Edge* published the response of a Firm spokesperson that the terms "are standard terms used to describe part of Goldman Sachs' compensation for the risks assumed in underwriting the bonds in question" and that "[o]ther than legal and accounting firms providing professional services, no fees or commissions were paid by 1MDB or Goldman Sachs to external

third parties in connection with these transactions, nor have we ever been asked by 1MDB or others to pay such fees or commissions."  (Ex. 49 (10/29/2014 *The Edge*); *see also* SAC ¶ 337.)

Plaintiff challenges this statement in two ways.  *First*, Plaintiff asserts the statement wrongly suggested that the *amount* of fees and commissions paid to Goldman Sachs was "standard" when, according to Plaintiff, it was excessive.  (*See* SAC ¶ 338.)  Plaintiff ignores, however, that *The Edge* also reported that the spokesperson *expressly* "declined to explain why the fees and commissions . . . were so much higher than the industry norm."  (Ex. 49 (10/29/2014 *The Edge*).)  Thus, when considered in context, the limited statement that the *terms* were standard could not have been misleading.  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 770 (S.D.N.Y. 2019) ("remarks surrounding the purportedly false or misleading statements" showed the limited nature of the statements).  *Second*, Plaintiff argues that the part of the statement about payments to "external third parties" was false because "bribes and kickbacks" allegedly were paid from 1MDB bond proceeds.  (SAC ¶ 339.)  The spokesperson's statement was, however, addressing the question of whether any third parties were paid from the "fees and commissions referred to in the [bond] offer[ing] documents," (Ex. 49 (10/29/2014 *The Edge*)), which were Goldman Sachs' fees and commissions (and those for legal and accounting firms), not 1MDB's proceeds.  Thus, the spokesperson's statement was accurate and not misleading.

July 2015 *Bloomberg* Article:  Plaintiff next challenges the following statement made by a Goldman Sachs spokesperson in a July 21, 2015 *Bloomberg* article:

> The [1MDB bond] transactions were individually tailored financing solutions, the fee and commissions for which reflected the underwriting risks assumed by Goldman Sachs on each series of bonds, as well as other prevailing conditions at the time, including spreads of credit benchmarks, hedging costs, and general market conditions.

(SAC ¶ 340; Ex. 12 (7/21/2015 *Bloomberg*).)[14]   Plaintiff first says that calling the transactions "individually tailored financing solutions" created the misimpression that the 1MDB offerings "were legitimate" and not "conduits for embezzlement." (SAC ¶ 341.)  But no such guarantee can be inferred from such a generic description of the transactions.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576-78 (S.D.N.Y. 2014) (rejecting efforts to allege falsity by portraying limited statements as absolute guarantees).

Plaintiff also contends that Goldman Sachs' view that its fees from 1MDB reflected the risks that it assumed as underwriter when it purchased the bonds[15] and "prevailing conditions at the time" was false, because the fees were high by comparison to fees on other offerings (SAC ¶¶ 338(b)-(d), (g)) and because 1MDB selected the Firm as underwriter on a "no bid basis" (SAC ¶ 338(h)).  But all of this information was "public knowledge," and thus cannot show the challenged statement was misleading.[16]  *YPF*, 15 F. Supp. 3d at 355-56.  Further, allegations that some within Goldman Sachs had concerns regarding the fees (SAC ¶¶ 338(e)-(f)) establishes

---

[14] Plaintiff also challenges similar statements made on June 22, 2018 and July 30, 2018.  (SAC ¶¶ 358-59, 362-63; *see also* Ex. 5 (6/22/2018 *WSJ*); Ex. 50 (7/30/2018 *Bloomberg*).)

[15] In a firm commitment underwriting, like the ones for the 1MDB bonds, the underwriter buys the bonds "irrespective of whether [they] can be sold," *Jackson Nat. Life Ins. Co.* v. *Merrill Lynch & Co.*, 32 F.3d 697, 701 (2d Cir. 1994), thus "assur[ing] the issuer of a specified amount of money at a certain time" and "*shift[ing] the risk of the market*" to the underwriter, *Walk-In Med. Ctrs., Inc.* v. *Breuer Capital Corp.*, 651 F. Supp. 1009, 1014 n.3 (S.D.N.Y. 1986).

[16] *See, e.g.*, Ex. 51 (5/9/2013 *Bloomberg*) ("Goldman won the underwriting work without competing for the deals" and the Firm's "revenue from the 1MDB deals amounted to about 7.7 percent of the face value of the securities" while "[u]nderwriters collected average fees of 1.32 percent . . . on junk bonds"); Ex. 49 (10/27/2014 *The Edge*); Ex. 49 (10/29/2014 *The Edge*); Ex. 18 (12/22/2016 *WSJ*) (Goldman Sachs "earned nearly $600 million in fees" on the bond offerings and fees on Project Magnolia were "$192.5 million or about 11% of the bond issue" when fees "on a deal like that would typically be about $1 million.").  Plaintiff's "no bid" allegation is also contradicted by other sources Plaintiff cites (*see* Ex. 52 (8/25/2013 *The Edge*) (the Firm "had to compete" for Project Catalyze)), and Plaintiff fails to plead facts to show how 1MDB's method of selecting its underwriter inflated fees.

diversity of opinion, not falsity. *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (internal disagreement did not show opinions were false). Lastly, the assertion that the bonds from each offering were resold to "a pre-arranged group of clients prior to closing" (SAC ¶ 338(a)) does not establish falsity. Gauging buyer interest ahead of underwriting is a standard industry practice and does not *guarantee* investors will buy the bonds. *See Credit Suisse Sec. (USA) LLC* v. *Billing*, 551 U.S. 264, 268 (2007) (underwriters "attempt to gauge the strength of . . . interest in purchasing" securities). The allegation is also without support.[17]

**2. *Statements About Goldman Sachs' Knowledge of 1MDB.*** The day the July 20, 2016 DOJ complaint alleging $3.5 billion was stolen from 1MDB was filed, *Reuters* quoted a Goldman Sachs spokesperson as saying: "We helped raise money for a sovereign wealth fund that was designed to invest in Malaysia. We had no visibility into whether some of those funds may have been subsequently diverted to other purposes." (SAC ¶ 344; Ex. 53 (7/20/2016 *Reuters*).)[18] Plaintiff asserts that referring to 1MDB as "a sovereign wealth fund that was designed to invest in Malaysia" was misleading as it too "created the . . . impression" 1MDB was "legitimate." (SAC ¶¶ 346, 354-56.) This is absurd. A spokesperson referencing what 1MDB was "*designed*" to be on the heels of a DOJ complaint stating that billions were stolen from 1MDB could not have misled any investor about what 1MDB *actually was*. And Plaintiff's assertions about what the Firm "*should* have learned" about 1MDB (SAC ¶¶ 347(d)-(j) (emphasis added)) fail because Plaintiff

---

[17] Plaintiff pleads no facts about how bonds from Projects Maximus and Catalyze were sold. (SAC ¶ 338(a).) Plaintiff's allegation that the Firm "secured buyers" for all the Project Magnolia bonds before the deal closed (SAC ¶ 180) is based on an unsupported assertion in *Billion Dollar Whale* that Goldman Sachs had "lined up mutual funds . . . to buy the bonds." (Ex. 9 at 186 (BDW).)

[18] Plaintiff also challenges similar statements made between July 28, 2016 and August 7, 2018. (SAC ¶ 345; Ex. 17 (7/28/2016 *Guardian*); SAC ¶ 354; Ex. 54 (3/13/2018 *The Australian*); SAC ¶ 355; Ex. 4 (6/14/2018 *NYT*); SAC ¶ 360; Ex. 50 (7/30/2018 *Bloomberg*); SAC ¶ 364; Ex. 55 (8/7/2018 *NYT*).)

does not plead any facts to show the Firm had any visibility into the *secret* conspiracy to divert funds out of 1MDB's bank accounts held at *other* financial institutions.  "The securities laws do not . . . require that banks be . . . omniscient."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *1 (S.D.N.Y. Dec. 13, 2013).

**3. *Statement About Low's Involvement With the 1MDB Bond Transactions.***   On December 22, 2016, *The Wall Street Journal* reported a number of facts about Goldman Sachs' dealings with Low and 1MDB (*see* p. 9, *supra*) and quoted a Firm spokesperson as saying, "We have found no evidence showing any involvement by Jho Low *in the 1MDB bond transactions*." (SAC ¶ 348 (emphasis added).)   Plaintiff alleges that this statement was false and misleading because there was "ample evidence that Low was inextricably linked to, and in fact ran, 1MDB." (SAC ¶ 349.)  Plaintiff, however, alleges nothing about what the Firm had actually *found* about *the bond transactions* as of December 2016.  The statement was expressly limited to a discussion of evidence regarding Low's involvement in the 1MDB bond transactions, and could not reasonably be interpreted as a broad denial of any "relationship between Goldman, 1MDB, and Low." (SAC ¶ 348.)  Thus, no investor could have been misled by it.  *See Lululemon*, 14 F. Supp. 3d at 576-77 (rejecting plaintiff's attempt to plead limited statements as broad guarantees).

**4. *Mr. Blankfein's November 1, 2018 Statements.***   During a conference on November 1, 2018, an interviewer asked Mr. Blankfein about the DOJ's charges against Leissner and Ng—a story that "broke while we were here."[19]  When asked what the charges "mean[] to the reputation of the firm," Mr. Blankfein said, "Well it's not good."  (Ex. 56 (11/1/2018 Interview Transcript).) He made clear, however, that he could not meaningfully respond because the Firm did not have

---

[19] SAC ¶¶ 366-68; Ex. 56 (11/1/2018 Interview Transcript).  A video of the interview is available at:  *The New York Times Conferences*, YOUTUBE (Nov. 1, 2018), https://www.youtube.com/ watch?v=EkFjjO3TqNY&feature=youtu.be.

"all the facts that were the predicate of the indictment." (*Id*.)  He then noted that, generally, "when we see bad behavior we act, we jump on it and act on it and you know . . . ." (*Id*.)  Interrupting, the interviewer asked about "reports" that there may have been "red flags on this beforehand." (*Id*.)  Mr. Blankfein replied, "You know something, my, my, I'm not aware of them.  But I'm not in a position to refute facts that I don't have a complete picture of and haven't been presented. . . . And so I can't say, if I looked at it, I can't say how I'd react to it." (*Id*.)

Plaintiff makes two claims based on this exchange.  *First*, Plaintiff challenges the vague remark that "when we see bad behavior we act, we jump on it and act on it." (SAC ¶ 368.)  That remark is, however, simply too general to be actionable:  it makes "no specific claims on which [reasonable persons] can rely." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011).  *Second*, taking words out of context, Plaintiff claims that Mr. Blankfein definitively said he was "not aware" of any "red flags." (SAC ¶ 369.)  Not so.  Mr. Blankfein stated that he was "not in a position to refute" anything about "red flags." (Ex. 56 (11/1/2018 Interview Transcript).)  This general response to a vague question is too indefinite to be actionable. *See Furher*, 363 F. App'x at 765 ("an informal back-and-forth with analysts—partially in response to questions that were themselves imprecise and potentially ambiguous . . . w[as] not misleading").

**5. *Statement About Coastal Energy.***  Finally, Plaintiff challenges a statement made in a June 12, 2017 *Wall Street Journal* report about the DOJ's asset forfeiture complaint concerning Coastal Energy (*see* p. 9-10, *supra*) that quoted a Goldman Sachs spokesperson as saying:  "Prior to reading the government filing, Goldman was not aware of, and had no involvement in, any transaction in which SRG sold its stake in a joint venture back to [CEPSA]." (SAC ¶ 350; Ex. 21 (6/13/2017 *WSJ*).)  A day later, a Firm spokesperson repeated this statement to CNBC, and added that "[n]either Jho Low, Jynwel or SRG were a client of Goldman Sachs in connection with the

Coastal Energy acquisition." (SAC ¶ 351; Ex. 57 (6/13/2017 CNBC).)  Plaintiff alleges the CNBC statement was misleading because the Firm had advised Low on a prior failed bid for Coastal Energy, and knew about Low's involvement in 2014.  (SAC ¶ 352.)

Plaintiff makes no suggestion that the statement was wrong, only that it should have been more expansive.  That is nonsensical here.  The supposedly concealed information that Goldman Sachs had advised Low on the prior failed bid was reported in the same *Wall Street Journal* article in which Goldman Sachs' first statement appeared, and was never denied by the Firm (*compare* SAC ¶¶ 352(a)-(c), (e)-(f), *with* Ex. 21 (6/13/2017 *WSJ*)).  *See UBS*, 2012 WL 4471265, at *33 (news reports about alleged malfeasance rendered failure to disclose it immaterial).

Plaintiff also asserts that Goldman Sachs was aware of SRG's sale of its shares before the filing of the DOJ's complaint because "Shawki told executives at IPIC *at the time* of" the sale that it was a "'reward' to Low for having found the deal."  (SAC ¶ 352(g) (emphasis added).)  The basis for this allegation is a single sentence in *Billion Dollar Whale* (SAC ¶ 265 & n.346) that comes from an unidentified source and does *not* specify *when* this comment was supposedly made. (*See* Ex. 9 at 246 (BDW).)[20]  Thus, nothing supports the allegation that Shawki knew of the sale before the filing of the DOJ complaint.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("undated" allegations are deficient).

## C.   The Individual Defendants Cannot Be Held Liable Under Section 10(b) for Statements They Did Not Make or Disseminate.

Plaintiff asserts that "Defendants are liable for all" challenged statements.  (SAC ¶ 435.) This is wrong.  Only the maker or disseminator of a statement can be liable under Section 10(b), and the Individual Defendants cannot be liable for (i) challenged statements in documents they did

---

[20] This allegation about Shawki should also be disregarded because Plaintiff provides "no basis for believing" that the unidentified source the *Billion Dollar Whale* relied on was "likely to have known the relevant facts."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008).

not sign or (ii) challenged statements made by spokespersons. *Lululemon*, 14 F. Supp. 3d at 576-77 & n.14 (dismissing claims against chairman of the board for SEC filings he did not sign). Because Plaintiff does not allege that the Individual Defendants undertook acts to "disseminate" statements they did not make, it has no claim under Rule 10b-5(a) or (c). *Lorenzo* v. *SEC*, 139 S. Ct. 1094, 1104 (2019). Thus, any statement not "made" by a particular Defendant must be dismissed as against that Defendant; *e.g.,* Mr. Cohn left the Firm in 2016, and so cannot be liable for any statements made after that.

## III.    PLAINTIFF DOES NOT ADEQUATELY ALLEGE THAT ANY DEFENDANT INTENDED TO DEFRAUD SHAREHOLDERS.

Under the Reform Act, Plaintiff must also "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). A "strong" inference of scienter "must be more than merely plausible or reasonable—it must be . . . at least as compelling as any opposing inference of nonfraudulent intent." *ECA*, 553 F.3d at 198. Scienter can be pled by "alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *6 (S.D.N.Y. Mar. 7, 2016). To allege motive, Plaintiff must show that an Individual Defendant "benefited in some concrete and personal way from" defrauding stockholders. *Id.* at *7. Pleading "conscious misbehavior" requires allegations of "[i]ntentional misconduct" targeted at stockholders that is "deliberate illegal behavior," like insider trading. *Novak* v. *Kasaks*, 216 F.3d 300, 308, 310 (2d Cir. 2000). To allege recklessness, Plaintiff must plead facts to show a "reckless disregard for the truth" of each challenged statement and a "state of mind approximating actual intent, and not merely a heightened form of negligence." *Shemian* v. *Research In Motion Ltd.*, 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013). To plead corporate scienter, Plaintiff must allege particularized facts that create a "strong inference"

that "someone whose intent could be imputed to" Goldman Sachs made a false statement with intent to defraud. *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Plaintiff fails to plead scienter through any of these means.

### A. Plaintiff Does Not Allege that the Individual Defendants Acted with an Intent to Deceive or Defraud.

#### 1. Plaintiff Makes No Particularized Allegations of Scienter Against the Individual Defendants.

Because Plaintiff does not describe, as it must, how the Individual Defendants benefited "in some concrete and personal way from the alleged" fraud, *China Mobile*, 2016 WL 922711, at *7, Plaintiff's allegations of conscious misbehavior or recklessness must be "correspondingly greater," *Wachovia*, 753 F. Supp. 2d at 351. Yet instead of offering allegations of deliberate illegal behavior targeted at Goldman Sachs' stockholders, the SAC harps on supposed "red flags," which are hardly ever alleged to have even been seen by the Individual Defendants. (SAC ¶¶ 312-35.)

*Mr. Schwartz.* Other than noting his role at the Firm and that he signed SOX Certifications, the SAC makes no particularized allegations regarding Mr. Schwartz. It thus provides no basis for any inference that he acted with scienter. *See Shemian* v. *Research In Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014) ("inferences based on . . . corporate positions" are "insufficient").

*Mr. Blankfein.* Plaintiff asserts that Mr. Blankfein approved the 1MDB bond transactions (SAC ¶¶ 15, 189, 206, 240, 313, 324), but offers no support for that claim,[21] and, in any event, approval of transactions does not, without more (absent here), amount to knowledge of misconduct. *See Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018) (alleged approval of illegal payment to a foreign official did not show scienter). Plaintiff also alleges that,

---

[21] The closest Plaintiff comes to citing any support for its allegation is a single news article that makes a conclusory assertion that Mr. Blankfein reviewed the deals (SAC ¶ 189 n.228), but "[c]onclusory allegations . . . are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *Optionable*, 577 F. Supp. 2d at 690.

over a four-year period, Mr. Blankfein met with individuals connected with the governments of Malaysia and Abu Dhabi on three occasions: (i) a November 22, 2009 meeting in New York with, among others, Prime Minister Najib, Leissner, 1MDB executives, and Low, where Najib "requested [Mr.] Blankfein and Goldman Sachs to support and consult on 1MDB investments" (SAC ¶¶ 127-28); (ii) a December 14, 2012 meeting in New York with Mohamed Badawy Al-Husseiny, CEO of Aabar, an IPIC subsidiary and client of Goldman Sachs, who requested that Low also attend the meeting (SAC ¶¶ 214, 349(a), Ex. 58 (11/22/2018 *NYT*)); and (iii) a September 2013 client event hosted by Mr. Blankfein in New York for Firm clients at which Prime Minister Najib spoke (SAC ¶¶ 253, 288), prior to which Mr. Blankfein separately met with Prime Minister Najib, Leissner, and Low (SAC ¶ 252). But these unremarkable allegations of meetings lack the "specific allegations as to the information actually discussed," needed to support any inference of scienter. *Jackson* v. *Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018); *see also Avon*, 2014 WL 4832321, at *19-21 (CEO's meetings "with Chinese officials" failed to show knowledge of bribery). And Plaintiff cannot explain how the fact of the meetings is contrary to any challenged statement because Defendants did not deny that such meetings took place.

**Mr. Cohn.** Plaintiff alleges that Mr. Cohn's scienter can be inferred from allegations that he "overruled," "sidelined," and "silenced" David Ryan, then President of Goldman Sachs Asia, over Mr. Ryan's disagreements about the fees charged on Project Magnolia and Project Maximus and Mr. Ryan's non-specific purported "suspicions" about Project Catalyze. (SAC ¶¶ 20, 203-05, 231-32.) But "differences of opinion, even stark differences[,] . . . do not reveal scienter." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017); *see also UBS*, 752 F.3d at 187 (no scienter from "uncertainty and disagreement[] within UBS"). This is particularly true

for disagreements over discretionary business judgments, such as what amount of fees to charge for services or what transactions to undertake.  *See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago* v. *FXCM Inc.*, 333 F. Supp. 3d 338, 352 (S.D.N.Y. 2018) (allegations of "a different business judgment" failed to demonstrate scienter).   Furthermore, Plaintiff's contradictory allegations about Mr. Ryan[22] should be disregarded because they simply repeat conclusory statements in *Billion Dollar Whale* and news articles based on "people familiar with the matter" or that are entirely unsourced.[23]  *See, e.g.*, *Avon*, 2014 WL 4832321, at *23 (rejecting allegations from a news article relying on "a person familiar with the matter").   In any event, Plaintiff's allegations do not create a "strong inference" of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent."  *ECA*, 553 F.3d at 198.  Rather, Plaintiff's allegations that Mr. Cohn viewed the 1MDB transactions as being aligned with legitimate business objectives such as cultivating sovereign wealth funds as clients and expanding the Firm's global presence undermine any inference that his alleged interest in pursuing the 1MDB transactions signals an intent to defraud Goldman Sachs' shareholders.  (SAC ¶¶ 7, 63, 80.)

---

[22] The SAC itself undercuts the allegation that Mr. Cohn "silenced" Mr. Ryan by stressing that Mr. Ryan continued to make known his opposition to the 1MDB transactions, despite supposedly being "overruled" by Mr. Cohn.  (*See* SAC ¶¶ 203-205, 231-32.)  Similarly, sources cited in the SAC refute Plaintiff's allegations about how Mr. Ryan was supposedly "sidelined."  (*Compare* SAC ¶ 205 (alleging that Mr. Cohn hired Mark Schwartz to "silence" and "marginalize" Mr. Ryan), *with* Ex. 59 at 1 ((7/2/2013 *WSJ* Article) (Mr. Ryan was a "proponent of Mr. Schwartz's appointment and described him as a friend and mentor").)

[23] Ex. 9 at 183, 185, 219-20 (BDW) (allegations with no source); Ex. 58 at 3-4 (11/22/2018 *NYT*) (allegations based on "people familiar with his thinking" because "Ryan did not respond to requests for comment"); Ex. 18 at 3 (12/22/2016 *WSJ*) (allegations based on "people familiar with the matter" because Mr. Ryan "didn't respond to requests for comment").  Tellingly, the only article cited in the SAC in which Mr. Ryan commented reports "Mr. Ryan said his decision to leave Asia came after having spent nine years in the region" and that "[h]e and his family are returning to the U.S., where they are from."  (Ex. 59 at 1-2 (7/2/2013 *WSJ*).)

### 2.    Plaintiff's Generalized Allegations of "Red Flags" Also Fail.

Unable to plead particularized facts showing any Individual Defendant acted with scienter, Plaintiff instead resorts to asserting that the Individual Defendants disregarded a long list of supposed "red flags" about the 1MDB transactions that should have alerted them to the well-concealed 1MDB scheme.  (SAC ¶¶ 312-333.)  But Plaintiff cannot use information disclosed by the media and government complaints years after the 1MDB offerings to allege, in hindsight, that "defendants should have been more alert and more skeptical."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("We have rejected the legitimacy of alleging fraud by hindsight.").   None of Plaintiff's so-called "red flags" shows that the Individual Defendants "consciously disregarded proof of the alleged bribery scheme," *Avon*, 2014 WL 4832321, at *24-25 (whistleblower letter regarding alleged bribery did not show scienter), or otherwise disregarded some "specific and direct communication" showing that challenged statements were false, *In re PXRE Group Sec. Litig.*, 600 F. Supp. 2d 510, 537-38, 540 (S.D.N.Y. 2009).   Thus, even if Plaintiff's allegations of "red flags" could "raise an inference that [Defendants were] negligent in not following up" about some matters, they "certainly do[] not show the conscious turning away from the true facts required for recklessness."  *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008); *see also UBS*, 752 F.3d at 187 ("red flags" did not show conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care").

***General Features of 1MDB.***  Plaintiff asserts that the Individual Defendants ignored suspect "general features of 1MDB" (SAC ¶ 315), including how Malaysia was a "corrupt countr[y]" (SAC ¶¶ 315(a)-(c)).  Putting aside that this characterization is at odds with how the country was seen in 2012 and 2013 (*see* p. 5, *supra*), doing business in a country with alleged corruption problems is not equivalent to turning a blind eye to bribery.  *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 870-71 (S.D. Tex. 2016) (no scienter from work in

"notoriously corrupt" countries).  Plaintiff also fails to plead the Individual Defendants were made aware of how 1MDB "exhibited . . . potential compliance problems."  (SAC ¶¶ 315(d)-(e).)

    ***Low.***  Plaintiff's assertion that knowledge of Low's role in the bond transactions "was common and widespread" (SAC ¶ 317) fails because the supposed knowledge of other employees is not imputed to "top executive[s]."  *PXRE*, 600 F. Supp. 2d at 537-38.  Plaintiff relies on an April 4, 2012 meeting of the Firmwide Capital and Suitability Committees, where allegedly "Leissner stated that Low had facilitated" Goldman Sachs' "meeting with" IPIC in connection with Project Magnolia.  (SAC ¶ 317(d).)  But Plaintiff fails to plead that any Individual Defendants were on the committees, identify any information communicated to the Individual Defendants, or explain how it would have amounted to a "red flag" given what was known about Low at the time.  Nor does Plaintiff allege that the Individual Defendants received notice of Leissner's unsuccessful efforts to onboard Low as a Firm client.  (*See* SAC ¶¶ 13, 17, 127, 146, 261, 309, 317(e).)  And although Leissner allegedly told the committees that Low arranged the meeting with IPIC, Leissner lied by stating Low had no other involvement in the 1MBD deals.  (*See* p. 6, 11, *supra*.)  Plaintiff cannot plead "scienter based on . . . post-hoc assessments" of Low that reflect information the Individual Defendants "likely did not receive and the relevance of which is now being ascribed largely through a hindsight view."  *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 215 (S.D.N.Y. 2012).

    ***Leissner and Vella.***  Plaintiff asserts the Individual Defendants disregarded "red flags" about Leissner and Vella, but yet again fails to plead how supposed "red flags" warned of anything relevant or were known to the Individual Defendants.  (SAC ¶ 318.)  Plaintiff notes Vella's alleged experiences in Libya—while working with a different team than on 1MDB—but never explains how this could matter.  (SAC ¶ 318(a).)  Similarly, an article from an "international watchdog organization" criticizing Leissner and Vella's work for Sarawak (SAC ¶¶ 318(d), 138) could not

have alerted any Individual Defendant to misconduct related to 1MDB.  *See Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("executives are not charged with knowing the truth of whatever any public official anywhere in the world may assert").  Plaintiff's remaining allegations about Leissner's "reputation within the bank" and other misconduct (SAC ¶¶ 318(b)-(c), (e)-(f)) fail because Plaintiff does not plead that these matters "were brought to . . . [the] attention" of the Individual Defendants.[24]  *Avon*, 2014 WL 4832321, at *32.

   ***Terms of the Bond Transactions***.  Plaintiff also attempts to allege scienter based on the supposedly "highly suspicious" terms of the 1MDB bond transactions, *e.g.*, allegedly excessive fees or supposedly high yields for the bonds.  (SAC ¶ 319.)  Even setting aside that Plaintiff fails to plead how each of the Individual Defendants was informed of allegedly suspect terms, Plaintiff's allegations fail because such vague "warning signs" suggest, at most, negligence.  *Satyam*, 915 F. Supp. 2d at 479-80 (allegations of "excessive fees" paid to auditor insufficient).  Assertions about how the bond transactions should not have been approved based on their terms are again hindsight-based criticisms of business judgments, but "[b]ad judgment and poor management are not fraud." *Wachovia*, 753 F. Supp. 2d at 367; *see also Embraer*, 2018 WL 1725574, at *9 (securities laws "are not . . . an invitation to Monday morning quarterback a company's opinions").

   ***Concerns About the Transactions***.  Plaintiff asserts that assorted third parties, Goldman Sachs' "Dubai office," and Alex Turnbull, a banker for one of Goldman Sachs' Asia affiliates,

---

[24] In January 2016, Leissner was immediately separated from the Firm after it was discovered that he wrote an unauthorized reference to Banque Havilland for Low.  (SAC ¶ 37; Ex. 18 (12/22/2016 *WSJ*).)  This undercuts any inference that Goldman Sachs sought to conceal Leissner's alleged relationship with Low.  *See Fries* v. *N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 722 (S.D.N.Y. 2018) (prompt termination of executive "undermin[ed] scienter").  Goldman Sachs also disclosed the unauthorized reference letter to authorities in 2016 (Ex. 60 (3/30/2016 *Bloomberg*)), and this "must be counted against any inference of fraudulent intent."  *Johnson* v. *Siemens AG*, 2011 WL 1304267, at *18 (E.D.N.Y. Mar. 31, 2011); *see also Das*, 332 F. Supp. 3d at 816 ("self-reporting" creates inference of "good faith").

expressed certain concerns about the 1MDB bond transactions.  (SAC ¶¶ 320, 325-29, 334.)  But Plaintiff does not plead that any Individual Defendant was informed of these alleged concerns.

***Post-Transaction Monitoring***.  Finally, Plaintiff asserts that the Firm failed to engage in "post-transaction monitoring" of the 1MDB bond transactions without alleging any facts to show that the Individual Defendants knew of this.  (SAC ¶¶ 59, 321.)  And even if they had, such failure would, at most, "suggest an inference of potentially poor . . . management." *Deutsche Bank*, 2017 WL 4049253, at \*8.  Plaintiff also asserts that the Firm breached a representation in the Project Catalyze Offering Circular that it would "ensure that none of the net proceeds raised from the issue of the Notes" would be used "in violation of any . . . anti-corruption or anti-money laundering laws." (SAC ¶ 321.)  But Plaintiff has things backwards:  "[t]he issuer [1MDB Global Investments Limited, a 1MDB subsidiary] and 1MDB agreed with Goldman Sachs" that *the issuer and 1MDB* would ensure proceeds were used properly.  (Ex. 8 at 7, 97 (Catalyze Offering Circular).)

**B.      Plaintiff Does Not Allege that Goldman Sachs Acted with an Intent to Deceive or Defraud.**

Plaintiff attempts to plead corporate scienter by implying that the state of mind of Leissner, Vella, and Shawki can be imputed to the Firm.  (SAC ¶¶ 330-35.)  But Plaintiff fails to plead that these three were "sufficiently senior director[s] or officer[s] of the corporation with some oversight over the public-facing misrepresentation[s]" such that their state of mind could be imputed to Goldman Sachs.  *Barilli* v. *Sky Solar Holdings Ltd.*, 389 F. Supp. 3d 232, 268 (S.D.N.Y. 2019). Plaintiff also fails to plead that their allegedly improper actions were directed at Goldman Sachs' stockholders, and any inference of corporate scienter is negated by the Firm's substantial share repurchases during the putative class period.

***State of Mind Not Imputable***.  Although Plaintiff makes much of the fact that Leissner and Vella were Firm partners, they were only two of *three hundred and seventy-five*.  (SAC ¶¶ 46,

330.)  Their status as partners thus does not establish sufficient seniority to impute their state of

mind to Goldman Sachs.  *Barrett*, 2017 WL 3995606, at *8 (scienter of one of thirty-one partners

not imputable).  Their lack of seniority is reinforced by their position in the Firm's hierarchy:

neither reported to Mr. Blankfein or Mr. Schwartz, and each was at least two levels below senior

management.  Leissner and Vella reported to Mr. Ryan, who, in turn, reported to Mr. Schwartz

when Mr. Schwartz was installed as the Chair of Goldman Sachs Asia in June 2012.  (*See* SAC

¶¶ 203, 205 n.247.)  The state of mind of an officer "one or two rungs below senior management"

is not imputable.  *Schiro*, 396 F. Supp. 3d at 304; *accord Thomas* v. *Shiloh Indus., Inc.*, 2018 WL

4500867, at *4 (S.D.N.Y. Sept. 19, 2018) (same).[25]  The same is true of Shawki, who was one of

2,150 Managing Directors and held only regional titles.  (*See, e.g.*, SAC ¶¶ 46, 334.)  Even putting

aside their lack of seniority, Plaintiff fails to plead any facts demonstrating that any of the three

had "oversight over" challenged statements.  *Barilli*, 389 F. Supp. 3d at 268.

> ***No Scienter as to Leissner, Vella, and Shawki.***  Plaintiff also fails to plead that Leissner,
Vella, and Shawki acted with the requisite intent.  Leissner admitted to paying bribes and
kickbacks *to obtain business for the Firm* and enrich himself (SAC ¶ 368(a)), and while such
efforts to gain at the expense of 1MDB are reprehensible, they do not demonstrate the necessary
intent to defraud *Goldman Sachs' stockholders*.  *See ECA*, 553 F.3d at 203 (allegations that
company was "actively . . . duping other institutions for the purposes of gaining at the expense of
those institutions" did not show intent "to defraud its own investors").  Likewise, Plaintiff does

---

[25] Further, Leissner's scienter cannot be imputed to the Firm after he left in January 2016.  *See Gagnon*, 368 F. Supp. 3d at 775.  And, as to the statement about Goldman Sachs not having found evidence of Low's involvement with the bond transactions (SAC ¶ 348), Plaintiff fails to plead how any knowledge of Low that Vella allegedly had in 2016 and failed to disclose to the Firm can be imputed to Goldman Sachs.  *Barrett*, 2017 WL 3995606, at *8 (knowledge of employee who defrauded employer not imputable).

not explain how Vella's alleged knowledge of bribes and kickbacks could equate to a "reckless disregard for the truth" of each challenged statement. *Shemian*, 2013 WL 1285779, at *14. For example, with respect to statements about the fees from the bond offerings (*see, e.g.*, SAC ¶ 340), Plaintiff does not plead that Vella was ever told that illicit payments inflated those fees. Finally, Plaintiff's allegation that Shawki had knowledge of the Firm's advice to Low fails because all the facts Shawki supposedly knew about it were published in the same article as Goldman Sachs' challenged statement (*see* p. 28-29, *supra*), so Shawki could not have been aware of a "clear duty to disclose" something more. *Kalnit* v. *Eichler*, 264 F.3d 131, 144 (2d Cir. 2001).

**Any Scienter Negated.** To the extent any allegations in the SAC could give rise to some inference of corporate scienter, Goldman Sachs' "substantial share repurchases" during the putative class period "negate" it.[26] *Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 337-38 (S.D.N.Y. 2011). "If [Goldman Sachs] and its officers were engaged in a scheme to inflate the value of [Goldman Sachs'] securities," "it would defy economic reason for the company to engage in [a] large-scale buyback program." *Johnson*, 2011 WL 1304267, at *14.

## IV.    THE SAC DOES NOT STATE A SECTION 20(a) CLAIM.

Plaintiff fails to plead any of the necessary elements of a Section 20(a) claim. *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). *First*, because Plaintiff fails to plead a primary violation of Section 10(b) for the reasons stated above, it cannot advance a Section 20(a) claim. *ATSI*, 493 F.3d at 108.

---

[26] During the class period, Goldman Sachs repurchased over 117 million shares of its stock for over $22 billion. *See* Ex. 61 at 77 (Q2 2014 10-Q), Ex. 62 at 77 (Q3 2014 10-Q), Ex. 47 at 190 (2014 10-K), Ex. 63 at 180 (2015 10-K), Ex. 64 at 172 (2016 10-K), Ex. 65 at 166 (2017 10-K), Ex. 66 at 63 (Q1 2018 10-Q), Ex. 67 at 67 (Q2 2018 10-Q), Ex. 2 at 67 (Q3 2018 10-Q), Ex. 68 at 163 (2018 10-K).

*Second*, Plaintiff fails to plead that the Individual Defendants had actual control over challenged statements the Individual Defendants did not make.  "[I]t is not sufficient for [a plaintiff] to allege that [a defendant] has control person *status*; instead, [the plaintiff] must assert that [the defendant] exercised *actual* control over the matters at issue."  *Alpha Capital Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30, 2018). Plaintiff cannot plead control simply by alleging "day-to-day control over the Company."  (SAC ¶¶ 33-35, 443.)  Indeed, Mr. Cohn and Mr. Schwartz were not at the Firm when many challenged statements were made.

*Third*, Plaintiff does not adequately allege that any of the Individual Defendants was a "culpable participant" in the alleged fraud.  *ATSI*, 493 F.3d at 108.  To plead culpable participation, Plaintiff must allege "particularized facts of the *controlling person's* conscious misbehavior or recklessness."  *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014).  For all the reasons described above, Plaintiff fails to do so.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC in its entirety with prejudice and without leave to amend.

Dated:  January 21, 2020

Respectfully submitted,

/s/ Sharon L. Nelles
Sharon L. Nelles (*nelless@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Matthew A. Schwartz (*schwartzmatthew@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
Stephen H.O. Clarke (*clarkest@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax: (212) 558-3588

*Counsel for Defendants The Goldman Sachs Group, Inc.,
Lloyd C. Blankfein, Harvey M. Schwartz, and Gary D.
Cohn*