UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                                        :
SJUNDE AP-FONDEN, *individually and on*                 :
*behalf of all those similarly situated*                :
                                                        :
                                        Plaintiff,      :          18-CV-12084 (VSB)
                                                        :
                    - against -                         :          **OPINION & ORDER**
                                                        :
                                                        :
THE GOLDMAN SACHS GROUP, INC. et al.,                   :
                                                        :
                                        Defendants.     :
                                                        :
------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/28/2021

Appearances:

Andrew L. Zivitz
Kessler Topaz Meltzer & Check, LLP
Radnor, PA
*Lead Counsel for Plaintiff and the Class*

Salvatore J. Graziano
Bernstein Litowitz Berger & Grossman LLP
New York, NY
*Liaison Counsel for the Class*

Sharon L. Nelles
Sullivan & Cromwell LLP
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Lead Plaintiff Sjunde AP-Fonden ("Plaintiff" or "AP7") brings this action against

Defendants Lloyd C. Blankfein ("Blankfein"), Harvey M. Schwartz ("Schwartz"), Gary D. Cohn

("Cohn," and together with Blankfein and Schwartz, the "Individual Defendants"), and The

Goldman Sachs Group, Inc. ("Goldman," and together with the Individual Defendants,

"Defendants") asserting violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Before me is Defendants' motion to dismiss Plaintiff's second amended complaint.[1] (Doc. 79.) For the reasons listed below, Defendants' motion to dismiss Plaintiff's second amended complaint is GRANTED IN PART and DENIED IN PART.

## I.   __Factual Background__[2]

This case centers around Goldman's investment banking activities for the 1Malaysia Development Berhad ("1MDB"), a sovereign wealth fund that was ostensibly designed to stimulate economic development in Malaysia. (SAC ¶ 2.) Plaintiff alleges that in a ten-month period beginning in May 2012, Goldman underwrote $6.5 billion of 1MDB debt in connection with three bond offerings, which resulted in Goldman earning $600 million in fees. (*Id.*) The Class Period for this litigation is from February 28, 2014 to December 20, 2018, and concerns statements and omissions made by Defendants in the aftermath of the 1MDB scandal, which is described and discussed in more detail below. (*Id.* ¶ 4.)

### A.   *Defendants and Other Relevant Figures in the Litigation*

Goldman is a Delaware corporation that has its principal place of business in New York City. (*Id.* ¶ 32.) It is one of the world's largest investment banks and financial service companies. (*Id.*) Blankfein was the CEO and Chairman of Goldman from 2006 until September 30, 2018. (*Id.* ¶ 33.) Cohn served as President and COO at Goldman from 2006 through 2016. (*Id.* ¶ 34.) During the relevant period, Cohn chaired the firm's Business Standards Committee. (*Id.*) Schwartz took over as Goldman President and COO in January 2017 until his retirement on

---

[1] The Second Amended Class Action Complaint will be referred to in this Opinion & Order as "Second Amended Complaint" or "SAC." (Doc. 63.)
[2] The facts set forth herein are taken from allegations in the Second Amended Complaint. (Doc. 63.) I assume Plaintiff's allegations in the Second Amended Complaint to be true for purposes of the motion. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, my reference to these allegations should be not construed as a finding as to their veracity, and I make no such findings.

April 20, 2018.  (*Id.* ¶ 35.)

There are several other Goldman executives that, despite not being defendants in this case, are relevant to the litigation.  Timothy Leissner ("Leissner") joined Goldman in 1998, became a partner in 2006, and Head of Investment Banking for Southeast Asia no later than 2007.  (*Id.* ¶ 37.)  He was promoted to Goldman's Chairman of Southeast Asia in July 2014 and left the bank in 2016.  (*Id.*)  On August 28, 2018, he pleaded guilty to conspiracy to violate the Foreign Corrupt Practices Act of 1977 ("FCPA") and commit money laundering, and is currently awaiting sentencing.  (*Id.*)[3]  Roger Ng ("Ng") worked at Goldman from 2005 until May 2014, serving as a Managing Director in Singapore from 2009.  (*Id.* ¶ 38.)  Prosecutors filed a three-count indictment against Ng on October 3, 2018, based on his involvement in the 1MDB scandal. (*Id.*)[4]  David Ryan ("Ryan") served as President of Goldman Asia from 2011 until his resignation in July 2013.  (*Id.* ¶ 39.)

Two other non-Goldman employees also play material roles in this litigation.  Low Taek Jho ("Jho Low" or "Low") is a Malaysian national that Plaintiff alleges acted as a liaison between Goldman, 1MDB, and Malaysian government officials in connection with the three bond deals at issue in this case.  (*Id.* ¶ 43.)  Federal prosecutors indicted Low on two counts for his involvement in the 1MDB scandal on October 3, 2018.  (*Id.*)[5]  Najib Razak ("Najib") served as Prime Minister of Malaysia from April 3, 2009 until May 10, 2018.  (*Id.* ¶ 44.)

---

[3] Leissner's sentencing hearing is currently scheduled for August 18, 2021 in the United States District Court for the Eastern District of New York.  *See United States v. Leissner*, No. 18-cr-439.

[4] Ng pleaded not guilty on all counts and his trial is currently scheduled for January 24, 2022, in the United States District Court for the Eastern District of New York.  *See United States v. Jho et al*, No. 18-cr-538.

[5] As of this writing, Low is not currently located in the United States, and there is therefore no timeline as to any plea or trial in his criminal case in the United States District Court for the Eastern District of New York.  *See United States v. Jho et al*, No. 18-cr-538.

## B.     *General Overview of 1MDB*

After Najib became Prime Minister, Low persuaded him to turn the recently created provincial oil fund, the Terengganu Investment Authority ("TIA"), into a new, national sovereign wealth fund called 1Malaysia Development Berhad, known as 1MDB.  (*Id.* ¶ 90.) Low told Najib that the fund could be used as a tool to pay off voters and finance patronage. (*Id.*)  In April 2009, the fund, in one of its first ventures, invested $1 billion in Islamic bonds issued by TIA in a joint venture with a Saudi Arabian oil company, PetroSaudi.  (*Id.* ¶ 91.)  Low used the deal to embezzle $700 million to a shell account, and used some of this money to pay off co-conspirators.  (*Id.*)  In July 2009, Malaysia's Ministry of Finance took control of TIA, changing its name to 1MDB in September 2009.  (*Id.* ¶ 118.)  From October 2009–June 2010, Low spent $85 million, often in ostentatious, public, and conspicuous displays of wealth.  (*Id.* ¶ 92.)  John Pang, who worked for Najib's government for a time and served as an adviser on a deal involving Goldman and Leissner, said of 1MDB:  "This fund was dodgy from the beginning.  There is no excuse for not knowing this fund had to do with Najib's political patronage and his election plans.  This was an open secret." (*Id.* ¶ 99.)

## C.     *Goldman's Initial Dealings with, and its Compliance and Legal Departments' Reservations About, Low and 1MDB*

On January 5, 2009, Ng emailed Leissner to introduce him to Low, describing a previous meeting between Ng and Low and potential business opportunities for Goldman in Malaysia. (*Id.* ¶ 112.)  Leissner, Ng, and Low ultimately worked together on Project Tiara, Low's venture to create an investment fund that began as TIA and would ultimately become 1MDB, and for which Low wanted Goldman's help to lend the project the patina legitimacy.  (*Id.* ¶¶ 113–17.) Ng and Leissner petitioned Najib and Low to try to work on the joint venture with PetroSaudi, including at a meeting with Najib in October 2009, but there is no indication that Goldman

worked on the deal.  (*Id.* ¶ 119.)

In September 2009, Ng referred Low for an account with Goldman's private wealth management ("PVM") team in Switzerland, but Goldman's Global Compliance Department refused to approve Low's application, citing Low's lavish spending and unknowns about the source of Low's wealth.  (*Id.* ¶¶ 121, 123.)  This was the first of three times where Goldman's Compliance or Legal Departments flagged or rejected Low.  (*Id.* ¶ 24.)

On November 3, 2009, Ng informed Leissner that he had recently met with Low and another 1MDB official and learned that 1MDB intended to raise $1.5 billion.  (*Id.* ¶ 125.)  Less than a week later, a Goldman banker sent Leissner and Ng a New York Post article about Low's lavish spending habits and partying, including his $160,000 one-night bar tab, and which stated that "[s]peculation is brewing over where Low is getting his money from."  (*Id.* ¶ 126.)  On November 22, 2009, Blankfein met with Low, Leissner, and Najib at the Four Seasons Hotel in New York City, a meeting where Najib asked Goldman and Blankfein to support and consult on 1MDB investments and for Goldman's commitment to 1MDB.  (*Id.* ¶¶ 127–28.)  This meeting was not publicly disclosed until nearly nine years later when Bloomberg reported it on November 8, 2018.  (*Id.* ¶ 287.)

In early 2011, in connection with a potential acquisition of a gold mining company in Kazakhstan, Goldman's Legal Department, upon learning that Low controlled the private equity firm at issue, raised concerns about Low in an internal email.  (*Id.* ¶¶ 140–41.)  Soon after, Goldman stopped advising that private equity firm and instead began advising a second private equity firm involved in the transaction, which was also run by Low.  (*Id.* ¶ 142.)  After hearing this, the Legal Department determined that the proposal was "even more problematic," and a senior employee in Goldman's Conflicts Resolution Group counseled against participating in the

transaction.  (*Id.* ¶ 143.)  "The deal was ultimately dropped . . ."  (*Id.* ¶ 144.)

In March 2011, Leissner referred Low for a PVM account, this time in Singapore.  (*Id.* ¶ 145.)  Goldman's Compliance Department again rejected Low, stating that it and the Legal Business Intelligence Group had determined that "no business [with Low] will be allowed due to significant adverse information and questionable source of wealth."  (*Id.* ¶ 146.)  Another Compliance Department official stated that "we have pretty much zero appetite for a relationship with this individual."  (*Id.*)

### D.    *Project Magnolia*

Project Magnolia was the first of three 1MDB bond offerings for which Goldman served as the fund's sole investment banking firm.  In early 2012, 1MDB engaged Goldman for advice in purchasing a Malaysian energy company, which became known as Project Magnolia.  (*Id.* ¶ 149.)  At a meeting between Low and Leissner, Ng, and Andrea Vella ("Vella"), who at the time was Goldman's Head of Credit Capital Markets for Asia, the parties agreed that Goldman could serve as underwriter of the bonds provided that it received a guarantee from the International Petroleum Investment Company ("IPIC"), a sovereign wealth fund in Abu Dhabi with a reputation for corruption.  (*Id.* ¶¶ 42, 150–52.)  Low informed Leissner, Ng, and Vella that they would have to pay kickbacks and bribes to Malaysian and Abu Dhabi governmental officials to secure the IPIC guarantee, to which Vella agreed.  (*Id.* ¶¶ 153–54.)  In March 2012—with Cohn's backing for the Project, (*id.* ¶ 155)—1MDB named Goldman the exclusive bookrunner for the $1.75 billion debt issuance to fund the deal, (*id.* ¶ 156).  Low's involvement with Project Magnolia was "widely discussed" at Goldman's Asia offices, and one Goldman Managing Director called Low "the 1MDB Operator or intermediary in Malaysia."  (*Id.* ¶¶ 160–61.)  Leissner also told Goldman's Capital and Sustainability Committees that "Low played a key role

for 1MDB" in facilitating the meeting between Goldman and IPTC.  (*Id.* ¶ 162.)

Several of Project Magnolia's terms were highly unusual and/or suspicious, including:

- Goldman's $192.5 million in fees was dramatically higher than industry standard, which for a deal of this size would more normally be $1 million, (*id.* ¶ 178);
- The issue was handled as a private placement, meaning there was no competition on the open market, (*id.* ¶ 174);
- The bond yield was almost two-and-a-half times higher than comparable securities, (*id.* ¶ 176);
- IPIC's guarantee for another country's sovereign fund, (*id.* ¶¶ 172–73); and
- The purpose of nearly half the money was left undefined, (*id.* ¶ 177).

Several Goldman employees raised concerns about these terms.  Ryan, a member of Goldman's Management Committee, stated that Goldman's huge fees, combined with the no-bid nature of the deal, looked unwarranted and too good to be true.  (*Id.* ¶¶ 165–66.)  Alex Turnbull, a Goldman Executive Director in Hong Kong, told colleagues in an email that "[t]he pricing is nuts," and later told a news publication that the red flags were "obvious" and "widely shared by the market participants at the time."  (*Id.* ¶¶ 167–68.)  Lazard, which Goldman engaged to provide an independent valuation of the deal, told Goldman that 1MDB was overpaying and that Project Magnolia "smacked of political corruption."  (*Id.* ¶ 181.)

Five Goldman Committees approved Project Magnolia in May 2012, including the Client and Business Standards Committee chaired by Cohn.  (*Id.* ¶ 189.)  Blankfein also approved the deal.  (*Id.*)  Project Magnolia closed on May 21, 2012 for $1.75 billion in 1MDB bonds, nearly $900 million of which was soon after diverted into shell accounts.  (*Id.* ¶¶ 190–92.)  Goldman earned $192 million in fees from the deal.  (*Id.* ¶ 193.)

### E.  *Project Maximus*

Ten days after Project Magnolia closed, Leissner, Ng, and Vella began forming a team to raise capital for a new $1.75 billion 1MDB bond deal.  (*Id.* ¶¶ 194–96.)  The terms of the deal were substantially similar to those of Project Magnolia, (*id.* ¶¶ 197, 200–02), prompting Ryan

again to speak out against the deal as potentially too good to be true and arguing that Goldman should rethink and potentially end its relationship with 1MDB, (*id.* ¶¶ 203–04).  Cohn rebuffed Ryan and hired Mark Schwartz, a proponent of Goldman's relationship with 1MDB, to serve as Chair of Goldman Asia, a position ranking above Ryan's.  (*Id.* ¶ 205.)  The same individuals and committees that approved Project Magnolia also approved Project Maximus—including Blankfein—and the deal closed on October 17, 2012, earning Goldman $114 million.  (*Id.* ¶¶ 206–07, 209.)  Nearly $800 million of the proceeds of the deal were diverted from 1MDB's account within 48 hours of the deal's closing, including at least $200 million to accounts controlled by Low.  (*Id.* ¶¶ 207–08.)

Near the end of 2012, Blankfein had his next personal meeting with Low, the second of three meetings between the two men but the only meeting that was one-on-one.  (*Id.* ¶ 214.)  A review published in the Harvard Law School Forum on Corporate Governance and Financial Regulation stated that the meeting was likely secured only after Low was "subject to the most rigorous background checks and due diligence. . . . it's inconceivable that the information in Goldman's own compliance system would not have been known."  (*Id.* ¶ 215.)

## F.  *Project Catalyze*

In January 2013, Najib asked Goldman Vice Chairman J. Michael Evans ("Evans") to raise $3 billion more for 1MDB, telling him that speed and secrecy were highly important.  (*Id.* ¶¶ 216–17, 221.)  Evans agreed, and soon after Goldman was awarded the deal, termed Project Catalyze, without any competition.  (*Id.* ¶ 217.)  Project Catalyze's terms were similar to the previous two bond offerings, and the lucrative deal was put together quickly and with minimal negotiation, modeling, or presentations, prompting Ryan again to speak out against the deal and prompting Cohn to rebuff him a third time.  (*Id.* ¶¶ 228, 231–32.)  Project Catalyze took place as

Najib was in the middle of a tough reelection fight, and Goldman bankers "discussed openly" the possibility that Najib "might be tapping 1MDB for money to help him win." (*Id.* ¶¶ 224, 227.) The same individuals and committees that approved Project Magnolia and Project Maximus also approved Project Catalyze—including Blankfein—and the deal closed on March 19, 2013, earning Goldman nearly $300 million. (*Id.* ¶¶ 240, 243.) More than $1 billion million of the proceeds 1MDB received from Project Catalyze were immediately diverted through accounts owned by Najib, Low, and other co-conspirators. (*Id.* ¶¶ 241–42.) The $600 million in fees that Goldman received in the 1MDB deals—about which Cohn told journalists—was just less than the total revenue Goldman earned from its bond underwriting business in the first quarter of 2013. (*Id.* ¶ 243.)

### G. *Coastal Energy*

In 2012, Low—advised by Goldman at the time—tried to acquire a Houston-based oil and gas company, Coastal Energy, but was rejected. (*Id.* ¶¶ 258–59.) In mid-2013, Low again approached Coastal Energy, this time with IPIC, with an offer to acquire the company alongside IPIC's Spanish energy group, Compañía Española de Petróleos ("CEPSA"), and Strategic Resources Global ("SRG"), a shell company controlled by Low. (*Id.* ¶ 260.) At this time, Goldman's Dubai office was advising Low and SRG in connection with the potential transaction. (*Id.*) Goldman, in light of the issues raised by its Compliance and Legal Departments about Low, "nominally switched to advising CEPSA, rather than SRG, knowing that Low would stay in the deal." (*Id.* ¶¶ 261–262.) CEPSA and SRG acquired Coastal Energy for $2.2 billion on November 19, 2013. (*Id.* ¶ 263.) Shortly after the deal closed, CEPSA transferred $350 million to SRG, purportedly buying out Low's shares in Coastal Energy, earning him a net profit of $300 million. (*Id.* ¶ 264.) Plaintiff alleges that Goldman's Dubai office knew about this $350 million

transfer and that Hazem Shawki ("Shawki"), Goldman's Head of Investment Banking for the Middle East and North Africa, said that the transfer was a "reward" to Low for scouting the deal. (*Id.* ¶¶ 258, 265.)

### H. *Blankfein's Last Meeting with Low and Contact with the Federal Reserve*

On September 25, 2013, Blankfein and Low had their third and final meeting, during which the two discussed with Najib, Ng, and Leissner how Goldman could do more business with 1MDB. (*Id.* ¶ 252.) In early 2014, the Federal Reserve contacted Goldman to discuss its dealings with 1MDB and criticized the firm for its vetting of the 1MDB deals, stating that the deals "posed reputational risk" for Goldman. (*Id.* ¶ 255.)

### I. *The Class Period and Aftermath*

Plaintiff alleges a litany of misstatements and omissions Defendants made during the Class Period, (*see id.* ¶¶ 336–93), which I discuss in full below. On November 1, 2018, the U.S. Attorney for the Eastern District of New York unsealed an indictment charging Leissner with conspiracy to violate the FCPA and commit money laundering. (*Id.* ¶ 281.) Leissner had pleaded guilty to both counts on August 28, 2018, and as part of his guilty plea allocution, he stated that it was "very much in line of its culture of Goldman Sachs to conceal facts from certain compliance and legal employees of Goldman Sachs, including the fact that Jho Low . . . was acting as an intermediary for and on behalf of Goldman Sachs, 1MDB, and Malaysian and Abu Dhabi officials." (*Id.* ¶ 282.) Ng and Low were also indicted on criminal charges in November 2018. (*Id.* ¶ 283.) Defendants further allege six corrective disclosures made in November and December 2018 that caused Goldman stock to drop and AP7 and other class members to suffer damages. (*Id.* ¶¶ 394–415.) These disclosures are discussed in full below.

## II.    **Procedural History**

On December 20, 2018, Plaintiff Daniel Plaut brought this securities fraud class action lawsuit.  (Doc. 1.)  On that same day, Plaintiff published a notice on Globe Newswire in accordance with the Private Securities Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1(a)(3)(A)(i).  (*See* Doc. 31.)  The notice detailed the claims in the complaint and informed class members that they had until February 19, 2019 to file to seek appointment as lead plaintiff.  (*See* Doc. 31-1.)  On February 19, 2019, five plaintiffs filed timely motions for the appointment of lead plaintiff and for approval of lead counsel.  (Docs. 15, 18, 21, 25, 29.)  On September 19, 2019, I appointed AP7 as lead plaintiff in this case, with Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") to serve as lead counsel and Bernstein Litowitz Berger & Grossman LLP ("Bernstein Litowitz") to serve as liaison counsel.  (Doc. 56.)  On October 28, 2019, AP7—now Lead Plaintiff in the case—filed the Second Amended Class Action Complaint.  (Doc. 63.)

On January 9, 2020, Defendants filed their motion to dismiss the Second Amended Complaint, along with a memorandum of law, declaration, and exhibits.  (Docs. 79–81.)  Defendants also submitted a request for oral argument on their motion to dismiss.  (Doc. 82.)  Defendants submitted a corrected memorandum of law on January 21, 2020, to correct a small error.  (Doc. 83.)  Plaintiff submitted its memorandum of law in opposition to Defendants' motion to dismiss on March 13, 2020.  (Doc. 90.)  The motion became fully briefed when Defendants filed their reply memorandum of law on May 4, 2020, accompanied by a declaration and exhibits.  (Docs. 94–95.)

On October 28, 2020, Plaintiff submitted a letter requesting that I take judicial notice of the Criminal Information ("Information") and Deferred Prosecution Agreement ("DPA") filed in *United States v. The Goldman Sachs Group, Inc.*, Cr. No. 20-437 (MKB), a criminal action in the

Eastern District of New York. (Doc. 100.) Defendants filed a letter in opposition to Plaintiff's request on November 9, 2020. (Doc. 101.)

### III. <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "First, a complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *Id.* (quoting Fed. R. Civ. P. 9(b)) (internal citation omitted). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*

## IV. Discussion

### A. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraud in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Rule 10b-5(b) targets misleading disclosures, and Rules 10b-5(a) and (c) target deceptive conduct. *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); *see also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129 (2d Cir. 2011) ("Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' prohibits not only material misstatements but also manipulative acts.") (citation omitted); *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("'Conduct itself can be deceptive,' and so liability under § 10(b) or Rule 10b-5 does not require 'a specific oral or written statement.'") (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008)).

"To maintain a private damages action under § 10(b) and Rule 10b-5," "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014)

(quoting *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157).

Defendants assert that Plaintiff's Second Amended Complaint suffers from three fatal

defects as to its Section 10(b) claim: that Plaintiff does not adequately plead 1) material

misstatements or omissions or falsity, 2) scienter, and 3) loss causation. (*See* Docs. 83, 94.) I

will now address each of these three arguments.

### 1. Misstatements or Falsity

The Exchange Act "requires that the complaint shall specify each statement alleged to

have been misleading, and the reason or reasons why the statement is misleading." *In re*

*Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (internal quotation marks omitted).

Plaintiff cannot merely state that the statements are false or misleading, "they must demonstrate

with specificity why and how" they are so. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.

2004). "An allegedly material misstatement must have been false at the time that it was made."

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014); *see also*

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006). "The

literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of

defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund*

*Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal quotation marks omitted).

Plaintiff alleges that Defendants made a wide variety of misstatements, which the parties

have generally agreed to fall into a number of thematic categories. I will address each category

of statements individually.

a. <u>Statements About Goldman's Risk Management and Business Principles</u>

I find that Goldman's statements about its risk management and controls do not constitute actionable misstatements. Plaintiff alleges that several of Goldman's statements directed to its investors indicating that the firm had systems in place to minimize risk constitute misstatements in light of how the firm and many of its officers "were permitted to bypass or disregard the Company's risk management and compliance controls." (SAC ¶ 374(a)); (*see also id.* ¶ 371) (stating that Goldman has "a comprehensive control framework designed to provide a well-controlled environment to minimize operational risks"); (*id.* ¶¶ 372–73, 375–78) (stating, in part, that Goldman has mechanisms to "reinforce a culture of effective risk management"). These vague "generalizations are precisely the type of puffery that this and other circuits have consistently held to be inactionable." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (internal quotation marks omitted). Perhaps more importantly, Plaintiff's Second Amended Complaint is replete with factual allegations that appear to support the idea that Goldman has risk control mechanisms in place— mechanisms that took action and alerted Goldman's officers that their relationships with Low and 1MDB were ill-advised. (*See, e.g.*, SAC ¶¶ 122–24, 140–47.) In other words, Goldman did have systems in place to minimize risk. Plaintiff cannot have it both ways here: it cannot argue on the one hand that Goldman did not have risk control mechanisms in place, while arguing on the other hand that Defendants had the requisite scienter in large part because Goldman's internal Compliance and Legal Departments, designed to assess risk, consistently raised red flags about the transactions at issue that the company and its high-level officials deliberately ignored.

However, I find that Plaintiff's allegations regarding Goldman's statements about its general principles, (*see* SAC ¶¶ 383, 388), are sufficient to survive a motion to dismiss. These

statements—that, for example, Goldman is "dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us", (*id.* ¶ 383), would generally constitute non-actionable puffery.  However, courts in this District have held on several occasions these statements from Goldman, and/or substantially similar ones, were actionable. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279–80 (S.D.N.Y. 2012); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006).  Defendants argue that *Richman* and *Lapin* "have been effectively overruled," but cite no legal authority for this claim. (*See* Doc. 83, at 20 n.13.)  Defendants are mistaken.  Rather, the holdings in these cases have been sharpened and clarified by recognizing that generic statements about business practices are generally not actionable; however, they become actionable where they "falsely represent a record of past or present compliance with such policies."  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017).  In other words, these statements may be actionable when paired with unlawful behavior or other actionable statements.  Thus, given that the Second Amended Complaint sufficiently pleads allegations that Goldman did not comply with laws and ethical principles as they relate to the 1MDB transactions, I find that these allegations can survive a motion to dismiss.

        b.  <u>Statements and Omissions about Goldman's Financial Results</u>

Plaintiff next points to a statement in Goldman's 2014 Form 10-K, wherein Defendants report the revenue the firm received in debt underwritings in 2013.  In relevant part, Defendants stated:  "Revenues in debt underwriting were significantly higher compared with 2012, principally due to leveraged finance activity."  (SAC ¶ 390.)  Plaintiff concedes that Goldman "accurately reported" the revenues in question, (Doc. 90, at 30); which generally means that the financial statements are not actionable, *see, e.g. Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir.

2018) ("Accurately reported financial statements thus cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance."); *Schiro v. Cemex*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019) ("Because . . . Plaintiff does not dispute that the defendant's financial statements were (literally) accurate, the statements or omissions concerning its financial statements are not actionable.") (citation omitted).  Nevertheless, Plaintiff argues that the statement is still misleading because Goldman attributed the increased revenues to "leveraged finance activity" without referencing the $600 million in revenues Goldman received under the 1MDB deals. (Doc. 90, at 30.)  Even if I disregard the clear language in *Fogel*, Plaintiff fails to provide any evidence that the statement in Goldman's 2014 Form 10-K is actually false; that is, Plaintiff provides no evidence that the increase in revenues was not attributable to leveraged finance activity, and/or that the 1MDB revenues themselves were heavily responsible for the increase. *See In re Nokia Oyj*, 423 F. Supp. 2d at 392 ("a complaint must explain, with adequate specificity, why the alleged false or misleading statements were actually false or misleading when made").  As such, Plaintiff's conclusory allegation related to Goldman's statement in its 2014 Form 10-K about its financial results cannot survive the motion to dismiss.

c.  Defendants' Sarbanes-Oxley Certifications

Plaintiff further challenges as false or misleading Goldman's Sarbanes-Oxley ("SOX") Certifications that were signed during the Class Period in which Blankfein and Schwartz affirmed, in relevant part, that they designed and evaluated the firm's disclosure controls and procedures, and disclosed any fraud involving people with significant control over financial reporting.  (SAC ¶¶ 392–93.)  I find that Plaintiff has not met its burden in establishing falsity here.  Plaintiff contends the attestations here are false because "Goldman's controls were

disregarded." (Doc. 90, at 30.) Yet the certifications did not require Defendants to certify that they followed all of the firm's controls and procedures, and Plaintiff does not identify any affirmations to that effect. *See Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (noting that the challenged "certifications do not relate to whether [the corporate defendant's] controls were followed . . . or whether [its] controls were effective."). Plaintiff is incorrect to the extent it alleges that the certifications at issue in *Barrett* are distinguishable from the ones at issue here, (*see* Doc. 90, at 30), given that the language in the certifications are substantially similar or identical, *see Barrett*, 2017 WL 3995606, at *3.

### d. Statements About Low and 1MDB

Plaintiff challenges as false or misleading a variety of statements concerning the connection between Goldman, Low, and 1MDB. First, in a December 22, 2016 Wall Street Journal article, Goldman is quoted in a statement saying that "[w]e have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions." (SAC ¶¶ 277, 348; Doc. 81-18.) Plaintiff pleads that Low and Blankfein met three times over a four-year period "to discuss business with 1MDB," and that "Low was the facilitator" for Najib at a meeting between Low, Najib, Blankfein, and Leissner in which "Najib requested Blankfein and Goldman . . . support and consult on 1MDB investments." (SAC ¶¶ 128, 252.) Plaintiff also pleads that "Low's involvement in the 1MDB bond deal was 'widely discussed' at Goldman's Asia offices at the time," and that "one managing director described [Low] as 'the 1MDB Operator or intermediary in Malaysia' in a March 2012 email." (*Id.* ¶¶ 160–61.) Plaintiff further alleges that Leissner disclosed at a meeting with Goldman's Capital and Suitability Committees that "Low had played a key role for 1MDB." (*Id.* ¶ 162.) Plaintiff notes that Leissner has testified that "employees and agents of Goldman Sachs" sought "to conceal facts from certain compliance

officers and legal employees of Goldman Sachs that Low . . . was acting as an intermediary for and on behalf of Goldman Sachs, 1MDB, and Malaysian and Abu Dhabi officials." (*Id.* ¶ 282.) Plaintiff's Second Amended Complaint, in other words, is replete with information contradicting Goldman's claim. Tellingly, Defendants barely attempt to confront these allegations, and merely argue that Goldman's December 22, 2016 statement denied the firm's knowledge only as to Low's involvement with 1MDB's bond transactions, rather than knowledge of Low's connection to 1MDB and Goldman more broadly. (Doc. 83, at 27.) Even if I accepted Defendants' very narrow interpretation of Goldman's statement, Plaintiff's allegations listed above, taken as true, are more than sufficient to establish falsity.

Second, Goldman in an October 29, 2014 article stated that "[o]ther than legal and accounting firms providing professional services, no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with" 1MDB's bond transactions to date. (SAC ¶ 337; Doc. 81-49.) Plaintiff plausibly pleads that this statement is false because it is uncontested that Low, Najib, 1MDB officials, and other third parties received bribes and kickbacks from 1MDB's bond proceeds. (*See* SAC ¶¶ 191–92, 207–208, 241–42, 265.) Defendants claim that this statement was related only to Goldman Sachs' fees and commissions in the bond offering documents, (Doc. 83, at 24), but the plain text of the statement clearly contemplates monies "paid by 1MDB or Goldman Sachs to external third parties," (SAC ¶ 337; Doc. 81-49). As such, Plaintiff adequately pleads falsity with regard to this statement about payments to third parties.

Third, Plaintiff points to two identical statements Goldman made in late July 2016, stating:

> We helped raise money for a sovereign wealth fund that was designed to invest in Malaysia. We had no visibility into whether some of those funds may have been

subsequently diverted to other purposes.

(SAC ¶¶ 344–45.)  Plaintiff argues that the first sentence is false because Goldman calling 1MDB a "sovereign wealth fund that was designed to invest in Malaysia" misleadingly conveyed to Goldman's investors "that 1MDB was a legitimate investment fund, as opposed to a vehicle for embezzlement, bribery, and political graft."  (*Id.* ¶ 356.)  Yet there are no allegations in the Second Amended Complaint that Goldman knew that 1MDB was "designed" to be an illegitimate organization; to the contrary, Plaintiff pleads that Low initially told Leissner that a Malaysian sultan "was looking to set up an investment fund . . . to manage the state's oil and gas resources."  (SAC ¶ 113.)  Similarly, there are no allegations that when 1MDB invested $1 billion in one of its earliest deals with PetroSaudi, that anyone at Goldman—even Leissner or Ng—had any knowledge that any part of the transaction or 1MDB's involvement in it was fraudulent.  (*Id.* ¶ 119.)  "[W]ithout contemporaneous falsity, there can be no fraud."  *In re Magnum Hunter Res. Corp.*, 26 F. Supp. 3d at 290.  Plaintiff thus has not adequately pled falsity as to the first sentence of the July 2016 statements.

Plaintiff further argues that the second sentence—that Goldman "had no visibility into whether some of those funds may have been subsequently diverted into other purposes"—is independently actionable because Goldman knew that 1MDB was illegitimately diverting funds through kickbacks, bribes, and the disappearance of millions of dollars.  (SAC ¶ 347.)  The Second Amended Complaint notes that Goldman represented that it had "fully implemented" recommendations to conduct pre- and post-transaction monitoring, (*id.* ¶ 6); that Goldman was the only underwriter for three of 1MDB's transactions in which more than a billion dollars were illegitimately diverted; and that during the relevant period, Goldman had access to 1MDB's financial records, (*id.* ¶ 230), "which reflected the disappearance without explanation of

hundreds of millions of dollars from the Project Magnolia proceeds," (*id.* ¶ 347(f)).  Plaintiff also

alleges that there were open discussions at Goldman about "the possibility that the bond money

was being diverted to fuel political corruption" even before Project Catalyze was completed.  (*Id.*

¶ 227.)  Taken together, "the 'most plausible inference to be drawn . . . is that [Goldman] had

access to [1MDB's] financial records and . . . [was] familiar with [1MDB's] day-to-day financial

outlook, and, as such, should have known that [1MDB] was misrepresenting'" and diverting

funds.  *CAMOFI Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020(CM)(JLC), 2012

WL 6766767, at *9 (S.D.N.Y. Dec. 17, 2012).  While Plaintiff does not allege that Goldman

definitively knew that 1MDB was diverting funds, it strains credulity under the facts and

circumstances for the firm to contend that it had no inclination that funds were being siphoned

off, particularly in light of Goldman's representations that it was engaging in post-transaction

monitoring.  Therefore, Plaintiff has adequately alleged falsity as to this second sentence for

purposes the motion to dismiss.

Fourth, Plaintiff challenges as false or misleading several similar statements related to the

terms of the agreements between 1MDB and Goldman.  In an October 2014 article in The Edge,

Goldman stated that the fees and commissions in the 1MDB offer documents were "standard

terms used to describe part of Goldman Sachs' compensation for the risks assumed in

underwriting the bonds in question."  (SAC ¶ 337; Doc. 81-49).  In a July 2015 article, a

Goldman spokesperson is quoted as stating that the:

> [1MDB] transactions were individually tailored financing solutions, the fee and
> commissions for which reflected the underwriting risks assumed by Goldman
> Sachs on each series of bonds, as well as other prevailing conditions at the time,
> including spreads of credit benchmarks, hedging costs, and general market
> conditions.

(SAC ¶ 340, Doc. 81-12).  And in June 2018, Goldman again stated that "[w]hat we earned from

the debt transactions reflected the risks we assumed at the time." (SAC ¶ 279.) Plaintiff convincingly argues that these statements are false because (1) Goldman received fees for its work in the 1MDB transactions that were exponentially higher than industry standard, (SAC ¶¶ 178, 305–06), and (2) Goldman took on abnormally low risk in underwriting the bonds, because IPIC served as a guarantor for the transactions, because Goldman secured purchasers for the bonds before finalizing the deals, and because Goldman did not need to compete with other firms to underwrite the deals, (*see, e.g.*, *id.* ¶¶ 156, 172, 180, 190, 194, 196, 200).

Defendants argue that Goldman's 2014 statement did not concern the amount of compensation the bank received for underwriting the deals, but rather the terms of those deals—evidenced by the representation, later on in the article, that Goldman's spokesperson "declined to explain why the fees and commissions incurred for the two bond issuances . . . were so much higher than the industry norm." (Doc. 81-49.) Defendants do not acknowledge, however, that the same 2014 article reports that Goldman "said that the RM1.5 billion fees and commissions referred in the offer documents 'are standard terms,'" (*id.*), suggesting strongly that the amount of money Goldman received are the explicit "terms" at issue here. Regardless, any ambiguity in the 2014 statement is resolved in the 2015 and 2018 statements, in which Goldman makes clear that the amount of fees and commissions it received reflected the risks Goldman incurred. (*See* SAC ¶¶ 279, 340; Doc. 81-12). Finally, Plaintiff has plausibly alleged that there were several terms—aside from the amount of fees and commissions—that allowed Goldman to assume a much lower level of risk than it would in a normal deal. (*See* SAC ¶¶ 172–77.)

Defendants otherwise argue that these statements cannot be misleading because it was "public knowledge" that Goldman's fees were relatively high and Goldman did not have to put in a bid to underwrite the transactions. (Doc. 83, at 25.) To support this assertion, Defendants

refer to a line of Second Circuit cases that state that omissions cannot be misleading if they were already publicly disclosed, rather than misstatements. *See Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima (YPF)*, 15 F. Supp. 3d 336, 355 (S.D.N.Y. 2014) ("Many of these alleged omissions were either fully disclosed or matters of public knowledge."); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437 (S.D.N.Y. 2007) ("The law is clear that a party can be relieved of a duty to disclose when certain developments affecting a corporation become matters of general public knowledge.") (internal quotation marks omitted). Defendants are either asking me to extend this reasoning to misstatements—which I decline to do—or are taking the position that they can make misleading statements about anything, provided that the actual corrective facts are located somewhere in the public record. This position is obviously untenable and unsupported by law. Here, Plaintiff has plausibly alleged that Defendants affirmatively made a misleading statement: that the compensation it received from the 1MDB transactions "reflected the underwriting risks assumed by Goldman Sachs." (Doc. 81-12.)

Fifth, Plaintiff challenges as false or misleading two statements that Blankfein made in a November 1, 2018 interview with journalist Andrew Ross Sorkin. Asked about the 1MDB scandal and what it meant to Goldman's reputation, Blankfein, toward the end of his answer, stated that "when we see bad behavior we act, we jump on it and act on it." (SAC ¶ 367; Doc. 81-56.) This banal first statement is non-actionable puffery, a "generalization[] regarding [Goldman's] business practices" that is "too general to cause a reasonable investor to rely." *ECA*, 553 F.3d at 206; *see also Lasker v. N.Y.S. Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).

However, Sorkin then asked whether "there were red flags on this beforehand," to which Blankfein responded, "I'm not aware of them. But I'm not in a position to refute facts that I

don't have a complete picture of and haven't been presented." (*Id.*) Defendants suggest that I should somehow ignore the first part of Blankfein's answer, and assess only Blankfein's statement that he was "not in a position to refute facts." (*See* Doc. 83, at 28.) However, the transcript and video clearly demonstrate that Blankfein answered a direct question by stating that he was "not aware" of any red flags. (*See* Doc. 81-56, at 2, 2 n.1) The Second Amended Complaint contains sufficient allegations that Blankfein "likely knew or chose to ignore" warnings about Low and/or 1MDB. *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 361 (S.D.N.Y. 2005); (*see, e.g.*, SAC ¶ 323) (noting Blankfein met with Low three times after Goldman's Global Compliance and Legal Departments flagged Low as someone with whom the bank should not do business); (*id.* ¶ 324) (alleging "Blankfein personally reviewed and approved each of the 1MDB bond offerings"); (*id.* ¶ 215) (noting review in Harvard Law School Forum on Corporate Governance and Financial Regulation arguing that Low's and Blankfein's one-on-one meeting was "a rare and extremely difficult audience [for Low] to get and presumably only after [Low] is subject to the most rigorous background checks and due diligence."); (*id.* ¶ 99) (noting that former employee in Najib government and one-time adviser for deal work on by Goldman and Leissner stated that it "was an open secret" that 1MDB was corrupt and that "[t]here is no excuse for Goldman not knowing"); (*id.* ¶ 255) (alleging Federal Reserve warned Goldman about its dealings with 1MDB); (*id.* ¶ 19(a)) (noting one former Goldman partner stated that Goldman's enormous fees in the 1MDB deals "should have been a bright warning to its highest executives."). Taking these allegations as true, I find it unlikely that Blankfein would not have been aware of any warning signs about 1MDB prior to the scandal breaking, thus meaning that his representation to Sorkin was not "complete and accurate" such that it should survive a motion to dismiss. *In re Morgan Stanley Info. Fund*, 592 F.3d at 366 (citation omitted).

e.  Statements About 1MDB and Coastal Energy

Finally, Plaintiff adequately pleads falsity as to a couple of statements related to CEPSA and SRG's acquisition of Coastal Energy.  Plaintiff first challenges as misleading Goldman's statement that "[n]either Jho Low . . . or SRG were a client of Goldman Sachs in connection with the Coastal Energy acquisition."  (SAC ¶ 278.)  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."  *In re Morgan Stanley Info. Fund*, 592 F.3d at 366 (internal quotation marks omitted).  "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  Taking Plaintiff's allegations as true, Goldman's omission that it had advised Low and SRG on the joint venture at issue, and that it nominally switched to advising CEPSA in large part because its Compliance Department determined that "Jho Low's appearance is not welcome," is misleading.  (*See* SAC ¶¶ 261–62.)

Plaintiff next challenges as misleading Goldman's statement that it "was not aware of, and had no involvement in, any transaction in which SRG sold its stake in a joint venture back to CEPSA."  While the first statement was misleading by omission, this second statement is false by the terms of Plaintiff's Second Amended Complaint, which alleges that Goldman's Dubai office knew about the transfer, in large part because Shawki told other Goldman executives.  (*Id.* ¶ 265.)  Defendants note that this claim is based on one account of a single, unidentified source, which does not detail when Shawki's made the comments at issue.  (Doc. 83, at 29.)  However, the Second Circuit has made clear, "the PSLRA rejects any notion that confidential sources must be named as a general matter."  *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000).  Further, "[t]o satisfy Rule(b), a plaintiff need not plead dates, times and places with absolute precision, so

25

long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 475 (S.D.N.Y. 2017); *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *8 (S.D.N.Y. 2001); *Int'l Motor Sports Grp., Inc. v. Gordon*, No. 82709, 98 CIV 5611(MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999). Defendants have sufficient notice as to grounds for Plaintiff's claim here.

Given that Plaintiff has established falsity sufficient to survive a motion to dismiss for several statements and omissions, I now turn to scienter.

### 2. Scienter

Pursuant to the PSLRA, a well-pleaded securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

Conscious misbehavior "encompasses deliberate illegal behavior," *Novak*, 216 F.3d at 308, whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 312). If motive to commit fraud has not been shown, "the strength of the circumstantial allegations must be

correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). Additionally, a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

There are at least four circumstances that "may give rise to a strong inference of the requisite scienter":

> where the complaint sufficiently alleges that the defendants (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor."

*ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311). "Under certain circumstances, we have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308.

### a. Schwartz

Plaintiff has not established scienter for Schwartz, about whom there are few material allegations in the Second Amended Complaint. Indeed, Schwartz took over as Goldman President and COO in January 2017, and Plaintiff has not identified any allegations in the Second Amended Complaint that he had any involvement in the three 1MDB deals at issue here. This alone is likely fatal for Plaintiff's claim that Schwartz had the requisite scienter based on the alleged facts.

Plaintiff instead argues only that Schwartz, along with Blankfein, attested to and signed Goldman's SEC certifications that contained false information, "despite his 'access to [contrary] information.'" (Doc. 90, at 37) (quoting *Novak*, 216 F.3d at 311). However, "[a]n allegation

that defendants had access to information 'must specifically identify the reports or statements containing this information inconsistent with their alleged misstatements.'" *IKB Int'l S.A. in Liquidation v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014) (quoting *Novak*, 216 F.3d at 309). "Here, [Plaintiff's Second Amended Complaint] does not specifically identify the contemporaneous [reports or statements] containing inconsistent information." *Id.* As such, Plaintiff cannot establish scienter as to Schwartz, who must therefore be dismissed from this action.

### b. Cohn

Plaintiff has adequately alleged scienter as to Cohn. Plaintiff has alleged that, during the Class Period, Cohn chaired the Client and Business Standards Committee, which "reviewed and approved each of the 1MDB bond offerings" at issue in this case. (SAC ¶ 57(a).) Plaintiff has plausibly alleged that these deals contained a number of red flags that "are glaringly suggestive of fraud," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007), such that Cohn "ignored [these] obvious signs of fraud" when advocating for and approving these deals, *Novak*, 216 F.3d at 308.

First, Goldman received "nearly 200 times the typical fee" for their participation in these deals, which one former Goldman partner stated "should have been a bright warning to its highest executives." (SAC ¶ 19(a).) Second, Goldman was awarded all three of these deals on a no-bid basis and without needing to compete with any other firms. (*Id.* ¶¶ 156, 165, 194.) Third, the transactions were designed as private placements, rather than open market offerings, which was "highly unusual" and was much more costly to 1MDB. (*Id.* ¶¶ 174, 247.) Fourth, Low played a prominent role in all of these deals despite the fact that Goldman's Compliance and Legal teams had rejected and flagged Low on three separate occasions as someone with

whom Goldman should have "no business," all before Goldman's participation in any of the three 1MDB bond deals. (*Id.* ¶ 148.) Fifth, the underwriting process was highly secretive and the purpose of huge swaths of the funds 1MDB received in the deals were left undefined. (*Id.* ¶¶ 175, 177.) Finally, the deals were both extremely large and rushed—Goldman underwrote $6.5 billion in 1MDB bonds, and earned $600 million as a result of their role in the transactions, in the span of just ten months. (*Id.* ¶ 2); (*see also id.* ¶ 221) (Najib telling Evans that "speed and secrecy were of the essence" with regard to Project Catalyze).

It is important to note that the first three red flags—the astronomical fees, the no-bid structure, and the private placements—are even more blatant when considered together. As noted above, these highly irregular aspects of the 1MDB transactions all point the same direction: that Goldman was getting an unbelievably good deal. Indeed, several Goldman employees and/or other market participants stated—either at the time or later—that the deals were highly suspicious. (*See, e.g.*, *id.* ¶ 99) (John Pang, a former employee in Najib's government and one-time adviser on a deal with Goldman and 1MDB, stating that it "was an open secret" that 1MDB was corrupt and that "[t]here is no excuse for Goldman not knowing"); (*id.* ¶¶ 165–66) (Ryan expressing and stating that Goldman's profit was excessive and Project Magnolia too good to be true); (*id.* ¶ 168) (Goldman Executive Director emailing colleagues stating that "[t]he pricing is nuts" on Project Magnolia and telling a news outlet that concerns about the 1MDB deals were "obvious" and "widely shared by the market participants at the time,"); (*id.* ¶ 181) (Lazard telling Goldman that 1MDB was overpaying and the deal "smacked of political corruption"); (*id.* ¶ 227) (noting open discussions at Goldman ahead of Project Catalyze about "the possibility that the bond money was being diverted to fuel political corruption"); (*id.* ¶ 248) (quoting 2013 Wall Street Journal article stating "[s]ome Goldman

bankers and compliance officials raised questions about the potential legal and reputational risks of doing business" with 1MDB in Malaysia); (*id.* ¶ 19(a)) (one former Goldman partner stating that Goldman's huge fees in the 1MDB deals "should have been a bright warning to its highest executives."). The fact that Plaintiff does not allege that Cohn was aware of each of these comments is not dispositive; rather, Plaintiff's allegations make clear that Cohn, by virtue of reviewing and approving these deals, had information "that would place a reasonable party in defendant's position on notice that the . . . company was engaged in wrongdoing." *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) (internal quotation marks omitted).

Plaintiff does allege that Cohn was actually aware of several of these red flags, and sideliend Ryan on three occasions and boasted about the fees Goldman was receiving to journalists. (*See* SAC ¶¶ 204–05) (Cohn sidelining Ryan after Ryan says the no-bid contract and high fees are "possibly too good to be true"); (*id.* ¶¶ 231–32) (similar); (*id.* ¶ 243) (Cohn telling journalists about the fees Goldman received in the 1MDB deals). Ryan's concerns were informed in part by his visit to the 1MDB offices, after which he made clear his opinion that 1MDB had taken on too much debt and did not have the personnel or experience to manage its investments. (*Id.* ¶ 166.)

Defendants rightly note that "differences of opinion, even stark differences . . . do not reveal scienter." (Doc. 83, at 32) (quoting *In re Pretium Res. Inc.*, 256 F. Supp. at 481); (*see also* (Doc. 94, at 18)). However, Cohn's treatment of Ryan is not noteworthy because they had a disagreement, but rather because it demonstrates that Cohn was on notice and "specifically aware" of several of the red flags that Ryan raised, *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 201 (S.D.N.Y. 2006), that, based on Plaintiff's allegations, constituted "obvious signs of

fraud" that Cohn should not have ignored, *Novak*, 216 F.3d at 308. Cohn's apparent conscious disregard of the red flags, as pled in Plaintiff's Second Amended Complaint, constitutes "the conscious turning away from the true facts required for recklessness." *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

### c. Blankfein

As with Cohn, I find that Plaintiff adequately alleges scienter as to Blankfein. Plaintiff alleges that Blankfein—like Cohn—personally approved all three 1MDB deals, (SAC ¶¶ 189, 206, 240, 313), which contained all of the red flags detailed above. Defendants rightly note that "approval of transactions does not, without more . . . amount to knowledge of misconduct." (Doc. 83, at 31) (citing *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018)). However, even *Das* acknowledges that if a plaintiff goes further and plausibly alleges—as Plaintiff has done here—that Defendants "knew, or were reckless in not knowing, that the [conduct] was unlawful," the pleading defect would likely be remedied. *Das*, 332 F. Supp. 3d at 814. Plaintiff does not merely allege that Blankfein approved these deals; it plausibly alleges that he approved these deals that, by their plain terms, raised significant red flags of potential corruption or criminality.

Defendants further argue that Plaintiff's allegation that Blankfein approved the deals is "conclusory." (Doc. 83, at 31 n.21.) But conclusory allegations are those that constitute "formulaic recitation of the elements" of a legal claim. *Iqbal*, 556 U.S. at 681. Throughout its Second Amended Complaint, Plaintiff does make a slew of conclusory allegations and/or legal conclusions that I cannot and do not simply accept as true, such as a claim that a particular statement from Defendants is "materially false," (SAC ¶ 361), or that Defendants had "knowledge and/or deliberately disregard[ed]" information about the 1MDB fraud at the time

they made material misstatements, (*id.* ¶ 312). Here, however, Plaintiff makes a specific factual allegation that Blankfein approved all three 1MDB deals and—even though it is not required—Plaintiff supports this allegation with a news article that further references the reporting of another news organization. (*Id.* ¶ 189 & n.228.) This is in no way a conclusory allegation.

In addition, Blankfein met three times with Low, including a one-on-one meeting in late 2012 and two meetings with Leissner, Najib, and Low in 2009 and 2013. (*Id.* ¶¶ 127–29, 214, 252–53.) Defendants are correct that these meetings are not a smoking gun because Plaintiff does specifically allege that Low or the other meeting participants informed Blankfein that any aspect of the 1MDB deals would be corrupt or unlawful. *See Jackson v. Halyard Health, Inc.*, No. 16-CV-05093-LTS, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) (declining to find scienter where the complaint did not "include any specific allegations as to the information actually discussed at the alleged meetings."). However, Plaintiff does allege—citing news reports and sworn complaints and affidavits—that Blankfein, Low, Najib, and the others discussed at these meetings how Goldman could support and consult on 1MDB deals and how Goldman could do more business with 1MDB. (*See* SAC ¶¶ 127–28, 214, 252–53.) At a minimum, Blankfein's meetings with Low—two of which, including their one-on-one meeting, came after Goldman's Compliance and Legal Departments had flagged and rejected Low over various ethics concerns—are probative to the extent they show that Blankfein knew or should have known (1) about red flags about Low himself, and (2) that Blankfein's statement in November 2018 that he was "not aware of" any red flags about Low was either false or misleading. (*See, e.g.*, SAC ¶ 215) (noting Harvard Law School Forum on Corporate Governance and Financial Regulation stating that the one-on-one meeting between Low and Blankfein would have been set up only after Low was "subject to the most rigorous background

checks and due diligence"); (*id.* ¶ 367). Blankfein's meetings with Low, when combined with Blankfein's role in approving all three 1MDB bond deals, are sufficient to maintain a claim against Blankfein at this stage.

### d. Goldman

"When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc. (Teamsters)*, 531 F.3d 190, 195 (2d Cir. 2008). While "the most straightforward way" to establish scienter for a corporate defendant "is to impute it from an individual defendant who made the challenged misstatement," that is not required. *Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020) (internal quotation marks omitted). Indeed, "[t]he scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker," and "a shareholder need not always identify the individuals responsible for the fraudulent statement." *Id*.

It is possible that at least one statement—that Goldman "found no evidence showing any involvement by Jho Low in the 1MDB bond transactions," (SAC ¶¶ 277, 348)—is a pronouncement so dramatic that it would have been vetted with and "approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," *see Teamsters*, 531 F.3d at 196 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). Regardless, given that I have found that Plaintiff has sufficiently pled scienter as to two Individual Defendants—Blankfein and Cohn, who comprise two of the highest-ranking officials at Goldman—Plaintiff has sufficiently pled scienter as to Goldman. *See id.* at 195 ("the most straightforward way to raise such an inference for a corporate defendant

will be to plead it for an individual defendant.").

Defendants claim that "[t]o the extent any allegations in the SAC could give rise to some inference of corporate scienter, Goldman Sachs' 'substantial share repurchases' during the putative class period 'negate' it." (Doc. 83, at 39) (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 337–38 (S.D.N.Y. 2011)); (*see also* Doc. 94, at 17.) However, courts have applied this reasoning when plaintiffs attempt to plead scienter based on defendants' motive and opportunity to commit fraud. *See Kalnit*, 264 F.3d at 139–41; *Johnson v. Siemens AG*, No. 09–CV–5310 (JG)(RER), 2011 WL 1304267, at *13–15 (E.D.N.Y. Mar. 31, 2011). Such logic is inapplicable here, where Plaintiff pleads scienter based on conscious misbehavior or recklessness. Further, this argument is much less compelling as it pertains to Goldman, one of the largest financial firms in the world, and who could therefore have any number of reasons to make stock repurchases without regard to the matters at issue in this litigation.

Accordingly, I find that Plaintiff has failed to adequately plead scienter as to Schwartz, but satisfactorily pled scienter as to Blankfein, Cohn, and Goldman. As such, I will now address Defendants' final argument: that Plaintiff did not properly plead loss causation.

### 3. Loss Causation

"To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 232 (internal quotation marks omitted). "They may do so either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Id.* at 232–33 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)). "[T]he pleading rules

for loss causation were 'not meant to impose a great burden upon a plaintiff,'" and thus "plaintiffs need only plead 'a short and plain statement,' pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005)).  Indeed, "[p]artial disclosures can satisfy the loss causation requirement." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) (citation omitted).  That said, a plaintiff cannot satisfy loss causation by pointing to "a slow, steady decline" in stock prices or an "incremental[]" drop, but rather "'a sharp drop' resulting from the announcement of concealed facts." *In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010).  The drop in price cannot be traced to "materialization of a known risk, rather than the disclosure of a concealed one." *YPF*, 15 F. Supp. 3d at 358.

To demonstrate loss causation, Plaintiff identifies in the Second Amended Complaint a series of news reports that came out on six separate dates in November and December 2018. (*See* SAC ¶¶ 397–412).  Plaintiff argues that "[i]n response to each new disclosure, Goldman's share price fell, with analysts linking the decline to the new information."  (Doc. 90, at 9.) Defendants argue, essentially, that these six disclosures offered "no new news," (Doc. 83, at 17), and that only one of the six disclosures "reveal[s] a historical fact" as opposed to "a development in the investigations" against Goldman, (Doc. 94, at 7).  Defendants further posit that, after years of news reports and disclosures detailing investigations, potential prosecutions, and potential fines facing Goldman in light of the 1MDB scandal, Goldman's stock price already "would have already reflected" all that risk such that the disclosures constitute only "the materialization of known risks," which are not actionable.  (Doc. 83, at 17); (*see also id.* at 19; Doc. 94, at 4).  I

will briefly analyze these six disclosures and then provide a more comprehensive analysis.

a.  <u>First Disclosure:  November 9, 2018</u>

On November 9, 2018, several news outlets reported that Blankfein met with Low and

Najib in New York in September 2013, which The Wall Street Journal noted came "after

[Goldman's] compliance department had raised multiple concerns about [Low's] background

and said that the bank shouldn't do business with him."  (SAC ¶ 397).  Following that disclosure,

Goldman common stock dropped by 3.9%.  (*Id.* ¶ 398.)  Defendants appear to acknowledge the

2013 meeting between Blankfein and Low had never before been revealed to the public.  (*See*

Doc. 94, at 6–8.)  However, Defendants argue (1) that such a disclosure is not corrective,

because "Plaintiff does not allege that Defendants ever denied such a meeting occurred," (Doc.

83, at 18), and (2) the disclosure of the meeting between Blankfein and Low does not necessarily

mean that Goldman's prior statement that it had "found no evidence showing any involvement

by Jho Low in the 1MDB transactions" was false, (Doc. 94, at 8).

These arguments are premised on a too-strict interpretation of the requirements of loss

causation, particularly at the pleading stage.  Corrective disclosures need not "expose[] the

precise extent of [Defendants'] alleged fraud."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262

(2d Cir. 2016); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283

(S.D.N.Y. 2008) ("[L]oss causation may be premised on partial revelations that do not uncover

the complete extent of the falsity of specific prior statements.").  During the Class Period,

Defendants, including Blankfein, downplayed not only their own relationship with Low, but

Low's connection to 1MDB.  (*See* SAC ¶ 277) ("We have found no evidence showing any

involvement by Jho Low in the 1MDB bond transactions"); (*id.* ¶ 367) (Blankfein stating he was

"not aware" of red flags about Low and the 1MDB fraud beforehand); (Doc. 81-35) (a November

36

9, 2018 Wall Street Journal article noting that Blankfein "laid the blame [for the 1MDB scandal] on rogue employees."). The November 9, 2018 Wall Street Journal article notes that Low "was indicted this month by the U.S. Justice Department [("DOJ")] and charged with helping steal billions of dollars from [1MDB]" and that the 2013 meeting "included discussions of 1MDB." (Doc. 81-35.) The report also placed Blankfein's meeting with Low in context by noting his previous comments suggesting that he and senior officials were unaware of issues related to 1MDB, and that 1MDB was the fault of a handful of "rogue employees" who "evaded our safeguards and lie[d]." (*Id.*) Taken together, the revelation of this undisclosed meeting between Low and Blankfein—where the parties discussed 1MDB business, which took place after multiple warnings from Goldman's Compliance and Legal Departments, and which was reported just after Low was indicted by federal prosecutors—is more than sufficient as a partial disclosure to satisfy loss causation at the pleading stage.

b. Second Disclosure: November 12, 2018

On November 12, 2018, Bloomberg reported that Malaysia's Finance Minister, Lim Guan Eng ("Lim"), stated that the Malaysian government was seeking repayment of Goldman's underwriting fees. (*Id.* ¶ 400.) Following that disclosure, Goldman's common stock dropped by nearly 7.5%. (*Id.* ¶ 401.) However, as Plaintiff acknowledges, in June 2018, multiple news outlets reported that the Malaysian government planned to seek at least $600 million from Goldman—the full amount that Goldman received in the three 1MDB transactions. (*Id.* ¶ 279; Doc. 81-3.) Although Plaintiff is correct that these earlier articles did not indicate that such action was "imminent," (Doc. 90, at 12), this disclosure is substantially similar to the previous disclosures related to Goldman's fees and thus constitutes mere materialization of known risk. *See YPF*, 15 F. Supp. 3d at 358.

### c. Third Disclosure:  November 29, 2018

On November 29, 2018, Bloomberg reported that the Federal Reserve was "ramping up its investigation" into the 1MDB scandal, which was "gaining momentum in recent weeks." (SAC ¶ 403.)  The article further stated that "[Goldman's] troubles look far from resolution." (*Id.*)  Goldman common stock dropped by more than 2% following this disclosure.  (*Id.* ¶ 404.) However, more than two years before this article, Bloomberg reported that the Federal Reserve was already "examining Goldman's dealings with 1MDB."  (Doc. 81-14.)  As such, the risk presented by the Federal Reserve's investigation "necessarily was clear to the market" in 2016. *In re New Energy Sys. Secs. Litig.*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014).  Indeed, the description that the Federal Reserve was "ramping up" its 1MDB investigation, and that the investigation was "gaining momentum in recent weeks," (SAC ¶ 403), demonstrate the markets' awareness of the risk.

### d. Fourth Disclosure:  December 17, 2018

On December 17, 2018, The New York Times reported that the Malaysian government announced that it would pursue criminal charges against Goldman over the 1MDB scandal and that it would seek more than $2.7 billion in criminal fines in connection with the charges.  (SAC ¶ 406.)  Following this disclosure, Goldman's common stock dropped by 2.75%.  (*Id.* ¶ 407.)  In response, Defendants point to a 10-Q form in 2016 in which the firm disclosed it was subject to "investigations and reviews" related to 1MDB, (Doc. 81-1), and a 10-Q form from November 2, 2018, in which Goldman represented that it was "cooperating with the DOJ and all other governmental and regulatory investigations related to 1MDB" and that such investigations "could result in the imposition of significant fines, penalties, and other sanctions against the firm," (Doc. 81-2).  Although it is true that these reports disclosed some amount of risk to

investors, they are somewhat vague and fail to mention the possibility of any criminal probe into Goldman, let alone one by the Malaysian government.

Defendants further point to earlier news articles that stated that the Malaysian government's efforts to seek restitution "could add significantly to [Goldman's] problems in Malaysia," (Doc. 81-4), and where the Malaysian government stated that "[t]here is evidence that Goldman Sachs has done things that are wrong," (Doc. 81-32), and that Goldman "cheated" Malaysia, (Doc. 81-33). While these articles suggest some amount of risk to Goldman, none of them explicitly mention any potential criminal investigation against Goldman, and Defendants provide no support for their claim that any such investigation or criminal charges against Goldman would be "glaringly obvious" to investors. (Doc. 83, at 16.) I cannot say as a matter of law that a couple of Goldman's statements that it faces investigations and potential liability from unnamed governments, combined with news reports that allude obliquely to Goldman's alleged bad acts and problems in Malaysia, sufficiently telegraphed Malaysia's eventual criminal prosecution against Goldman with its $2.7 billion in criminal fines. Given that loss causation is a fact-based inquiry, when it is a close call as to whether "contents of [a] disclosure had already been revealed"—as it is here—it is best "for the jury to make" that decision. *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2010).

e.  Fifth and Sixth Disclosures:  December 20-21, 2018

On December 20, 2018, the Financial Times reported that Lim intended to seek $7.5 billion in reparations from Goldman, stating that Malaysia was "looking for a much larger sum" simply than Goldman's fees from underwriting the 1MDB deals. (SAC ¶ 410.) Lim stated that Malaysia was seeking the $6.5 billion, the total proceeds of the bond deals that Goldman underwrote, as well as an additional $1 billion due to Goldman's revenues and its "higher than

market rate bond coupons." (*Id.*) (internal quotation marks omitted).

One day later, Bloomberg reported that Singapore was expanding its criminal investigation related to 1MDB to cover Goldman. (*Id.* ¶ 411.) Bloomberg reported that Singaporean authorities "had been examining Goldman's relationship with [1MDB] since at least late 2017, but until recently the firm's local unit itself wasn't a focus of any investigation." (*Id.*) Following these disclosures, Goldman's common stock dropped by nearly 5%. (*Id.* ¶ 412.)

The fifth disclosure is not actionable, as the Malaysian authorities had repeatedly telegraphed their intention "to recover as much of the missing 1MDB money as possible." (Doc. 81-5); (*see also* Doc. 81-4) (stating Malaysia seeks to recover restitution from Goldman). The sixth disclosure is also not actionable, as it likely constitutes materialization of known risk, outlined in a 2017 news report, that "Singaporean prosecutors are investigating the role of current and former members of" Goldman related to 1MDB transactions. (Doc. 81-45.)

Defendants generally and separately suggest that none of these six disclosures identified by Plaintiff are corrective, because Goldman disclosed in 2016 and 2018 that it was under investigation by "various governmental and regulatory bodies" and that such investigations "could result in the imposition of significant fines, penalties and other sanctions against the firm." (Doc. 94, at 5) (quoting Docs. 81-1, 81-2). There are two main problems with this argument. First, it does not account for the disclosure of the 2013 meeting between Blankfein and Low, which is highly material to the scope of Blankfein's and Goldman's connection to Low and the 1MDB scandal. Second, the effect of any such disclosures were at least partially diminished by Goldman's repeated statements during the Class Period downplaying its knowledge of, and role in, the 1MDB scandal. While the Second Circuit has made clear that courts may dismiss claims at the pleading stage based on loss causation, *see Axar Master Fund,*

*Ltd. V. Bedford*, 806 F. App'x 35, 37 (2d Cir. 2020), loss causation is also "a fact-based inquiry" that "[g]enerally . . . 'is a matter of proof at trial and not to be decided on a . . . motion to dismiss,'" *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 519 (S.D.N.Y. 2014) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005), and *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). In particular, it is prudent to let the jury make determinations as to whether "contents of [a] disclosure had already been revealed." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d at 253. As such, at this stage, I cannot state as a matter of law that these disclosures "fully disclosed [Goldman's] exposure . . . such that the [Second Amended Complaint] should be dismissed at this stage." *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 596 (S.D.N.Y. 2010).

### B. Section 20(a)

Section 20(a) of the Exchange Act provides a cause of action against anyone who exercises control over individuals who violate securities laws. *See Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78t(a)) ("Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act."). Pursuant to Section 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a prima facie claim under Section 20(a), the elements are "(1) a primary violation of the securities laws by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable

participant in the controlled person's fraud." *In re Bernard L. Madoff Inv. Secs. LLC*, 739 Fed. Appx. 679, 685 (2d Cir. 2018) (internal quotation marks omitted). Federal regulations state that the word "control" here "means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 230.405(2).

Plaintiff has no colorable Section 20(a) claim against Schwartz because the Second Amended Complaint fails to adequately plead a primary violation under Section 10(b) against him. However, I hold that Plaintiff can sustain Section 20(a) claims against Blankfein and Cohn. As noted above, Plaintiff has adequately alleged a Section 10(b) violation as to these two Individual Defendants, satisfying the first factor. As to the second factor, "whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved in a motion to dismiss", *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (citation omitted), and I see no reason to depart from this assessment. With regard to the third factor, I have already found sufficient "particularized facts of the controlling person's conscious misbehavior or recklessness" to satisfy this factor as to Blankfein and Cohn. *See Special Situations Fund III QP, L.P v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (citation omitted).

### C. Judicial Notice of Information and DPA

Finally, I must briefly address Plaintiff's request that I "take judicial notice of all admitted (and, thus, undisputed) facts set forth in the Information and the DPA in deciding the Motion to Dismiss." (Doc. 100, at 3.) On October 22, 2020, DOJ announced that Goldman entered into a DPA in connection with DOJ's criminal investigation into Goldman's involvement with 1MDB that charges the firm with a count of conspiracy to violate the FCPA. (*See* Doc.

100-2.)  The DPA contains various admissions from Goldman that, if taken as true, might potentially be relevant to this civil litigation—including that, for example, Goldman employees and executives between March 2013 and February 2016 were privy to "additional red flags . . . about Low's involvements in the [1MDB] deals and the possible payment of bribes in connection with the deals," and that Goldman "failed to investigate these red flags."  (Doc. 100-2, Statement of Facts, ¶ 72.)  Defendants appear to concede that I "may take judicial notice of the filing of a deferred prosecution agreement," but that judicial notice "should not extend to the factual matters discussed therein."  (Doc. 101, at 1 n.1.)  Defendants argue that Plaintiff's request is both "procedurally inappropriate," given that it seeks to expand the allegations in Second Amended Complaint to include those from a separate criminal proceeding with different legal standards, and "substantively . . . inappropriate" because, if anything, the allegations in the DPA overlap with allegations in Plaintiff's Second Amended Complaint that I must take as true for purposes of this motion.  (*Id*. at 1.)

I have found no clear guidance from the Second Circuit as to whether I may take judicial notice of the facts set forth in the DPA, and judges in this District have taken different approaches.  *Compare Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, No. 18 Civ. 1876 (PAE), 2019 WL 2327810, at * (S.D.N.Y. May 30, 2019) ("The Court grants plaintiffs' request to take judicial notice of the DPA, but solely for the fact of its filing, not the truth of its contents."), *with Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629, at *14 (S.D.N.Y. Mar. 28, 2017) (using defendant's admissions in the DPA as further evidence that defendant acted with scienter).  I do not agree with Defendants that the admissions in the DPA are purely duplicative of the allegations in Plaintiff's Second Amended Complaint.  That said, I have already determined that, even without taking into account the admissions in the

DPA, Plaintiff's Second Amended Complaint adequately states a claim as to Goldman, Blankfein, and Cohn. As such, absent further guidance from the Second Circuit, I decline to consider the factual admissions contained in the DPA, though I will take judicial notice of the fact that the DPA was filed.[6]

## V.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

All claims against Defendant Schwartz are DISMISSED.

Defendants' motions to dismiss related to Blankfein, Cohn, and Goldman are DENIED, and Blankfein, Cohn, and Goldman are directed to file an answer to Plaintiff's Second Amended Complaint within twenty-one (21) days of the filing of this Opinion & Order.

Defendants' motion for oral argument on this motion, (Doc. 82), is DENIED as moot.

The Clerk's office is directed to terminate the open motion at Document 79.


SO ORDERED.

Dated: June 28, 2021
     New York, New York

                Vernon S. Broderick
                United States District Judge

---

[6] Further, the DPA does not mention Schwartz, nor does it contain any factual admissions that, taken as true, would affect my decision to dismiss this case against him.