**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SJUNDE AP-FONDEN, individually and on
behalf of all others similarly situated,

                    Plaintiff,

    v.

THE GOLDMAN SACHS GROUP, INC.,
et al.,

                    Defendants.

Civil Case No.: 1:18-cv-12084-VSB

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## **TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 3

III. ARGUMENT ......................................................................................................... 9

    A.   Securities Class Actions Are Well-Suited for Class Certification ......................... 9

    B.   Rule 23(a) Is Satisfied .................................................................................. 10

        1.   Numerosity Is Established ....................................................................... 10

        2.   Commonality Is Established .................................................................... 11

        3.   Typicality Is Established ......................................................................... 12

        4.   Adequacy Is Established ......................................................................... 12

        5.   The Proposed Class Is Ascertainable ...................................................... 14

    C.   Rule 23(b)(3) Is Satisfied ............................................................................. 15

        1.   Predominance Is Established ................................................................... 15

            a.   The Fraud-on-the-Market Presumption of Reliance Applies ........ 17

                i.   The Cammer Factors Weigh in Favor of Market Efficiency ...................................................................... 18

                ii.  The Krogman Factors Support Market Efficiency ............. 21

            b.   Damages Are Measurable by a Common Methodology .............. 22

        2.   Superiority Is Established ....................................................................... 23

    D.   Class Counsel Satisfies the Requirements of Rule 23(g) ................................... 25

IV.  CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................................19

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)............................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..........................................................................9, 10, 15, 16

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ....................................................10, 11, 12, 13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)............................................................................................10

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................16

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................... 11-12, 22

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ..........................................................3, 17, 18, 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................17, 18, 21

*In re Deutsche Bank AG Sec. Litig.*,
328 F.R.D. 71 (S.D.N.Y. 2018) .....................................................................12, 13

*In re Deutsche Telekom AG Sec. Litig.*,
229 F. Supp. 2d 277 (S.D.N.Y. 2002)....................................................................1

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................................16

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ........................................................................14

*In re Globalstar Sec. Litig.*,
2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ......................................................11

*Gruber v. Gilbertson*,
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019).......................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)............................................................................................. 9-10, 17

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*
    *v. AMC Ent. Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) .................................................................. 3, 17, 19-20

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
    2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) (Broderick, J.)................................................10

*In re JPMorgan Chase & Co. Sec. Litig.*,
    2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)............................................................. *passim*

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................3, 17, 21

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .........................................................................13

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).....................................................................11

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) .......................................................................18, 24

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................15, 21, 24, 25

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)..........................................................................15, 17, 20

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ..........................................................................16

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ....................................................................17, 18, 20, 22

*Pub. Emps.' Ret. Sys. of Miss.. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ..........................................................................11

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)...........................................................................22, 23

*In re Sadia S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ..................................................................... 19-20

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) ......................................................................16

*Sjunde AP-Fonden v. The Goldman Sachs Grp., Inc.*,
    2021 WL 2659797 (S.D.N.Y. June 28, 2021) ................................................ *passim*

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ..............................................................................14

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom.*
    *Waggoner*, 875 F.3d 79 (2d Cir. 2017) ................................................ 16, 20, 21-22

*Sykes v. Mel S. Harris & Assocs., LLC*,
    780 F.3d 70 (2d Cir. 2015) ................................................................................22, 23

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ........................................................................12, 24

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ....................................................................................10

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ...............................................................................19

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...................................................... 9-10

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ........................................................................... *passim*

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ........................................................................ 19-20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................................................2

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ................................. 11, 14-15, 21, 23

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .........................................................................19, 20

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) .............................................................................14

**Other Authorities**

17 C.F.R. § 239.13 ...........................................................................................................20

Fed. R. Civ. P. 23 ................................................................................................ *passim*

H.R. Conf. Rep. No. 104- 369 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730 ..........................13

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Lead Plaintiff Sjunde AP-Fonden ("AP7" or "Plaintiff") respectfully requests that the Court: (i) certify the Class (defined below); (ii) appoint Plaintiff as Class Representative; and (iii) appoint Kessler Topaz Meltzer & Check, LLP ("KTMC") as Class Counsel and Bernstein Litowitz Berger & Grossmann LLP ("BLBG") as Liaison Counsel (together with Class Counsel, "Counsel").

## I.   PRELIMINARY STATEMENT

This action arises out of Defendants'[1] material misrepresentations and omissions concerning Goldman's role in one of the largest financial frauds in history, effectuated through 1Malaysia Development Berhad ("1MDB"), the corrupt sovereign wealth fund, and its notoriously deceptive representative Low Taek Jho ("Low"). Plaintiff seeks to certify a class of all persons and entities that purchased or otherwise acquired Goldman's common stock during the period from October 29, 2014 through December 14, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2] ¶ 4. Securities fraud cases are well-suited for class certification. *See e.g.*, *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002) ("Class actions are generally well-suited to securities fraud cases"). This case is no exception. The Class satisfies all the prerequisites for certification under Rule 23(a) and Rule 23(b)(3).

---

[1] "Defendants" are The Goldman Sachs Group, Inc. ("Goldman"), Lloyd C. Blankfein ("Blankfein"), and Gary D. Cohn ("Cohn"). Unless otherwise stated, all internal quotations and citations are omitted and all emphasis is added. Citations to "¶ __" refer to paragraphs of the Second Amended Class Action Complaint (Doc. No. 63) (the "Complaint" or "SAC"). Citations to "Ex. __" refer to the exhibits attached to the accompanying Declaration of Andrew L. Zivitz in Support of Plaintiff's Motion for Class Certification. Capitalized terms shall have the definitions ascribed to them in the Complaint.

[2] Excluded from the Class are: (i) Defendants; (ii) Goldman's subsidiaries and affiliates; (iii) any officer, director, or controlling person of Goldman, and members of the immediate families of such persons; (iv) any entity in which any Defendant has a controlling interest; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vi) the legal representatives, heirs, successors, and assigns of any excluded party.

*First*, the Class is comprised of thousands of investors who purchased Goldman common stock during the Class Period and were injured thereby. Thus, joinder of all Class members is impracticable. *See infra*, § III.B.1.

*Second*, although "[e]ven a single [common] question" establishes commonality, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alterations in original), this action involves numerous common questions of law and fact, including whether Defendants misrepresented or omitted material facts during the Class Period, whether they acted with scienter, and whether their fraudulent statements and omissions caused damages to the Class. *See infra*, § III.B.2.

*Third*, Plaintiff's claims are typical of absent Class members' claims. Plaintiff, like all other Class members, seeks recovery for economic loss arising from Defendants' public misrepresentations and omissions during the Class Period, as alleged in the Complaint. *See infra*, § III.B.3.

*Fourth*, Plaintiff is an adequate representative of the Class. AP7 is the type of large institutional investor that Congress determined is best positioned to lead securities class actions. AP7's interests do not conflict with other Class members' interests, and along with Counsel, it has prosecuted—and will continue to prosecute—this action vigorously on behalf of the entire Class. *See infra*, § III.B.4. Additionally, Plaintiff's chosen lead counsel, KTMC, and liaison counsel, BLBG, are highly-experienced lawyers who have successfully prosecuted numerous, complex securities fraud class actions against financial institutions like Goldman. *See infra*, *id*. and § III.D.

*Fifth*, common questions predominate over any individual questions. The primary elements of Plaintiff's claims—including falsity, materiality, scienter, and loss causation—are issues that affect all Class members equally and are subject to common proof. The same is true for the element of reliance, as the "fraud-on-the-market" presumption of reliance applies. During the Class Period,

2

Goldman common stock traded on the NYSE which "courts presume to be an efficient market." *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 217 (S.D.N.Y. 2021). Moreover, Plaintiff's expert, Dr. Joseph R. Mason ("Dr. Mason"), has confirmed that the market for Goldman common stock was efficient throughout the Class Period, determining that each market efficiency factor set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), weighs in favor of market efficiency. *See infra*, § III.C.1., Ex. 1 (the "Mason Rpt.").

Common issues concerning damages likewise predominate. The out-of-pocket measure that will eventually be used to calculate Class members' damages has been repeatedly endorsed for securities class actions in this Circuit, is consistent with Plaintiff's theory of liability, and uses common evidence to measure damages on a classwide basis. *See infra*, § III.C.1.b.

*Finally*, the class action device is the superior method for fairly and efficiently adjudicating this action. Given the large number of investors who purchased Goldman common stock during the Class Period, it would be far too costly and inefficient for each individual Class member to file and litigate separate actions. *See infra*, § III.C.2.

Because this action meets each of the requirements of Rule 23(a) and Rule 23(b)(3), Plaintiff respectfully requests that the Court grant its Motion for Class Certification and certify the Class.

## II.    STATEMENT OF FACTS

The 1MDB scandal involved the fraudulent funneling of billions of dollars to one of the world's most corrupt regimes with the support of Goldman's most powerful and highest-ranking executives. ¶¶ 1, 18. Goldman's most senior personnel, including Chief Executive Officer Blankfein, courted Low, a dubious figure whom the bank's own compliance staff had repeatedly rejected as a client, to secure lucrative underwriting deals from 1MDB, a newly created state

investment fund that Low controlled. In personally reviewing and approving each of these deals, Blankfein, President and Chief Operating Officer Cohn, and dozens of other top Goldman executives disregarded the offerings' blatantly irregular terms and countless other red flags of corruption, reaping $600 million in fees for Goldman—*200 times the going rate*—while Low and others stole billions in cash raised by Goldman. ¶¶ 15, 172-79, 189, 206, 239-40.

Goldman's direct involvement in the 1MDB fraud sprang from Cohn's creation of a cross-departmental unit specifically instructed to "monetize the state" by strategically targeting as clients sovereign wealth funds with limited investment experience and less regulatory oversight, especially in Asia. ¶¶ 62-63, 76-79. Tim Leissner ("Leissner"), Goldman's Head of Investment Banking for Southeast Asia, was particularly focused on generating business in Malaysia. ¶¶ 79-80. To that end, on January 6, 2009, Leissner and Roger Ng ("Ng"), a Managing Director of Goldman, met with Low, who was well-connected to Malaysian Prime Minster Najib Razak ("Najib"), to establish a partnership that would lead to opportunities in Malaysia. ¶¶ 112-14.

When Najib became Malaysia's Prime Minister in 2009, Low urged him to transform a provincial oil fund into a new sovereign wealth fund—1MDB—which Najib could exploit to pay off voters and finance patronage. ¶¶ 44, 83, 90, 118; *see Sjunde AP-Fonden v. The Goldman Sachs Grp., Inc.*, 2021 WL 2659797, at *2 (S.D.N.Y. June 28, 2021) ("Order"). Low became the *de facto* chief executive of 1MDB. ¶ 90. Prior to its conversion, the oil fund issued $1.4 billion in Islamic bonds in 2009. ¶ 91. Goldman earned $300,000 for its assistance with the Islamic Bond Issuance, dubbed Project Tiara, opening the door to business opportunities for Goldman in Malaysia and lending 1MDB much-needed legitimacy, as Low planned. ¶¶ 113-17.

In early 2009, 1MDB invested $1 billion of the Islamic Bond Issuance into a joint venture with Saudi Arabian oil company PetroSaudi. ¶ 119. John Pang, who worked for Najib's

government and advised a Goldman deal with 1MDB, stated, "[t]his fund was dodgy from the beginning. There is no excuse for Goldman not knowing this fund had to do with Najib's political patronage and his election plans. This was an open secret." ¶ 99; *see* Order, 2021 WL 2659797, at *2. Indeed, Low embezzled $700 million in Islamic Bond Issuance proceeds for his co-conspirators, and he used the remainder to finance his profligate lifestyle. ¶¶ 91-93.

In September 2009, Goldman's Global Compliance Department rejected Low as a PWM applicant, citing his lavish spending and unexplained source of wealth. ¶¶ 120-23; *see* Order, 2021 WL 2659797, at *2. Further, in November 2009, a Goldman banker directly emailed Leissner and Ng a *New York Post* article regarding Low's extravagance, including a one-night $160,000 bar tab, which read "[s]peculation is brewing over where Low is getting his money from" ¶ 126; *see* Order, 2021 WL 2659797, at *2. Despite these uncontroverted early warnings, Blankfein, Leissner, Low, and Najib secretly met on November 22, 2009 to secure Goldman's "commitment to 1MDB." ¶¶ 127-28; *see id*.

Goldman's Compliance and Legal Departments flagged Low as an unacceptable risk at least two more times. ¶¶ 123-24, 141-44, 146, 148; *see* Order, 2021 WL 2659797, at *3. In early 2011, these Departments rejected as "problematic" a prospective acquisition deal after discovering that Low would be involved. ¶¶ 140-44. In March 2011, the Compliance and Legal Business Intelligence Groups again rejected Low as a PWM client, warning that "no business [with Low] will be allowed due to significant adverse information and questionable source of wealth" and that "we have pretty much zero appetite for a relationship with this individual." ¶ 146; *see* Order 2021 WL 2659797, at *3.

Nonetheless, over the course of ten months in 2012-2013, Goldman underwrote three rapid-fire and suspicious 1MDB offerings: Projects Magnolia (¶ 190), Maximus (¶ 207), and

Catalyze (¶ 240). *See* Order, 2021 WL 2659797, at *3-4. These deals raised more than $6.5 billion, and netted Goldman more than $600 million in underwriting fees, even though *a typical fee arrangement would only earn a bank about $1 million per offering*. ¶¶ 15, 209, 243. In exchange, Defendants ignored a parade of red flags from a variety of sources, including: (i) Low's headline-grabbing, ostentatious lifestyle, coupled with his unexplained source of wealth (¶¶ 91-93, 123-24, 141-44, 146, 158-63, 211-13, 245-47, 251, 261); (ii) the notorious, systemic and institutionalized corruption plaguing Malaysia (¶¶ 81-82, 184-85); (iii) the Najib regime's well-known reputation as a "government of thieves" (¶¶ 81-86); and (iv) 1MDB's unethical and corrupt business practices (¶¶ 94-99). Moreover, the terms of the 1MDB deals themselves were objectively suspicious, including: (i) an Emirati sovereign fund's puzzling involvement as a guarantor of a Malaysian sovereign fund (¶¶ 171-73, 197); (ii) Goldman's outsized underwriting fees (¶¶ 178-80, 228); (iii) the absence of any competition for Goldman in securing these lucrative deals (¶¶ 16, 19, 156, 165, 174, 194, 204, 217, 306); and (iv) the lack of any defined purpose for the more than $6.5 billion raised (¶¶ 177, 201-02, 222-28). *See* Order, 2021 WL 2659797, at *3.

In 2012, 1MDB approached Goldman for advice related to the first of three bond offerings, Project Magnolia. ¶ 149. With the approval of five committees and its top management, including Defendants Blankfein and Cohn (¶¶ 155, 189), Goldman exclusively underwrote the $1.75 billion offering, earning itself $192.5 million in fees—far higher than a standard fee arrangement. ¶¶ 156, 178-79; *see* Order, 2021 WL 2659797, at *3-4. In addition to the astronomical fees, Project Magnolia was abnormal and suspicious because Goldman handled the issuance as a highly confidential private placement, eliminating any risk of competition against Goldman for the lucrative deal. ¶¶ 174-75. Moreover, 1MDB never defined a specific purpose for nearly half of the cash—$744 million. ¶ 177. David Ryan ("Ryan"), President of Goldman Asia and a member of

Goldman's firmwide Management Committee, openly questioned the suspect terms, but Goldman quickly silenced such inquiry. ¶¶ 164-69. Lazard Ltd., which was retained to provide an independent valuation of Project Magnolia, noisily withdrew—telling Goldman the deal "smacked of political corruption." ¶ 181. Unbeknownst to investors, Project Magnolia's net proceeds vanished almost immediately after the offering. ¶¶ 191-92.

Just ten days after Project Magnolia closed, 1MDB again retained Goldman as the exclusive underwriter for Project Maximus, a $1.75 billion offering, for an outrageous $114 million fee without having to compete for the issuance. ¶¶ 194-96, 209. With terms nearly identical to Project Magnolia—a no-bid contract to confidentially underwrite a massive offering with no stated purpose in exchange for an absurd fee—Project Maximus raised exactly the same red flags signaling corruption and deceit, all of which Defendants disregarded. ¶¶ 197, 199-202; *see* Order, 2021 WL 2659797, at *4. When Ryan raised significant concerns about the deal, Cohn installed Mark Schwartz, a supporter of 1MDB's relationship with Goldman, as Chair of Goldman Asia, a position above Ryan's, effectively locking Ryan out of the business. ¶¶ 203-05.

Project Maximus was approved by the same groups that approved Magnolia, including Blankfein, and closed on October 17, 2012, earning Goldman $114 million for the deal and a total of *$300 million in five months* from just two 1MDB offerings. ¶¶ 206-07, 209; *see* Order, 2021 WL 2659797, at *4. Just as with Project Magnolia, hundreds of millions of dollars in Maximus proceeds were immediately looted: within 48 hours, $790 million was routed to a variety of accounts, with approximately $200 million funneled into accounts controlled by Low. ¶¶ 207-08.

By the end of 2012, Low's dubious credibility had been repeatedly flagged by Goldman's Global Compliance and Legal Departments, yet Blankfein and Low met for a second time in a one-on-one meeting in New York. ¶¶ 214-15, 252, 349(a). According to the Harvard Law School

Forum on Corporate Governance and Financial Regulation, this meeting was likely secured only after Low was "subject to the most rigorous background checks and due diligence" such that "it's inconceivable that the information in Goldman's own compliance system would not have been known." ¶¶ 214-15; *see* Order, 2021 WL 2659797, at \*4. Only three months after Project Maximus, the fraud-fueled gravy train rolled again when Goldman was asked, without any competition, to exclusively underwrite Project Catalyze, a \$3 billion bond offering, for an astonishing fee of approximately \$300 million. ¶¶ 217, 243.

The terms of Project Catalyze were substantially similar to Magnolia and Maximus, and equally suspicious. ¶¶ 228-30; *see* Order, 2021 WL 2659797, at \*4. Focused entirely on fulfilling 1MDB's key objectives of "confidentiality" and "speed," Goldman abandoned the usual process of presentations, financial modeling and negotiations, and even failed to specify any stated purpose for the funds. ¶¶ 217, 221-22, 231. The purpose, however, was clear within Goldman, as concerns that Najib was "tapping 1MDB for money to help him win" the May 2013 parliamentary election were "discussed openly." ¶¶ 224, 227; *see* Order, 2021 WL 2659797, at \*4. After Goldman disregarded Ryan's warnings for a third time, he resigned. ¶¶ 231-32. Once Catalyze was approved by the same individuals and committees that approved Magnolia and Maximus, the deal closed on March 19, 2013. ¶¶ 240, 243. Immediately, more than \$1 billion of the offering proceeds were redirected to the accounts of Low, Najib and his political allies. ¶¶ 241-42, 244.

Even amid intense public scrutiny of 1MDB, Blankfein sought further business opportunities with Low, and met with Low, Najib and Leissner for a third time on September 25, 2013. ¶¶ 244-50, 252. That follow-on business quickly came, as Goldman advised Low and his shell corporation SRG in 2013 on a proposed takeover of Houston-based Coastal Energy. ¶¶ 259-60. Goldman's compliance team again raised red flags about Low's involvement, claiming "Jho

Low's appearance is not welcome," but ultimately agreed on the condition that Low would play "a very minor role." ¶ 261. Goldman thus nominally altered its role to become the advisor to Low's partner, a subsidiary of IPIC called CEPSA, which acquired Coastal Energy on November 19, 2013 for $2.2 billion. ¶¶ 262-63. CEPSA in turn transferred $350 million to Low's shell company SRG to buy out the shares in Coastal Energy, which Low had purchased for $50 million a week earlier, earning him a 600% return. ¶ 264. Goldman's Dubai office knew of the transfer to Low's company and defended the payout as a "reward" for Low's participation in the deal. ¶ 265.

During the Class Period, Defendants made a number of materially false or misleading statements concerning 1MDB and Low, and Goldman's business practices. ¶¶ 337, 340, 344, 345, 348, 351, 354, 355, 358, 360, 362, 364, 367, 383, 388. On November 9, 2018, a portion of the relevant truth about Goldman's relationship with Low was revealed when multiple news outlets reported details about Defendant Blankfein's undisclosed meeting with Low and Najib in 2013. ¶ 397. Following these reports, Goldman's stock price declined. ¶ 398. On December 17, 2018, *The New York Times* reported that the Malaysian government filed criminal charges against Goldman and a number of individuals, including Leissner and Low, related to the 1MDB scandal. ¶ 406. This revelation caused Goldman's stock price to further decline. ¶ 407.

## III. ARGUMENT

### A. Securities Class Actions Are Well-Suited for Class Certification

To certify the Class, Plaintiff must establish that the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and at least one subsection of Rule 23(b) are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). Actions, like this one, "alleging violations of Section[ ] 10(b) . . . of the Exchange Act are especially amenable to class certification," and "[i]n light of the importance of the class action device in securities fraud suits," the Rule 23 "factors are to be construed liberally." *In re Virtus*

*Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (alterations in original); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-68 (2014) ("*Halliburton II*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 229-30, 249-50 (1988). Any "doubts concerning the propriety of class certification should be resolved in favor of class certification." *In re J.P. Morgan Stable Value Fund ERISA Litig.,* 2017 WL 1273963, at *5 (S.D.N.Y. Mar. 31, 2017) (Broderick, J.).

Class certification is appropriate where, as here, each requirement of Rule 23 is satisfied by a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). The inquiry at this stage is not whether Plaintiff will ultimately prevail on the merits, but "whether the requirements of Rule 23 are met." *See Gruber v. Gilbertson*, 2019 WL 4439415, at *1 (S.D.N.Y. Sept. 17, 2019). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."); *see also In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 140 (S.D.N.Y. 2012) ("class certification is emphatically not an opportunity for a second round of review, at a higher standard no less, of the substantive merits of plaintiffs' underlying claims").

As demonstrated below, all pertinent requirements of Rule 23 are met here.

### B.    Rule 23(a) Is Satisfied

#### 1.    Numerosity Is Established

Numerosity is established here, as the proposed Class consists of thousands of members. *See, e.g.*, *Bank of Am.*, 281 F.R.D. at 138 ("Numerosity may be presumed when a class consists of forty or more plaintiffs."). During the Class Period, Goldman's stock was heavily traded on the NYSE, with no less than 371 million shares of common stock outstanding every trading day, and

an average weekly turnover of 3.9%. Mason Rpt. ¶¶ 33, 70; *see Bank of Am.*, 281 F.R.D. at 138 ("[A] showing that a large number of shares were outstanding and traded during the relevant period" satisfies the numerosity requirement). Joinder of this vast number of investors would be impractical, satisfying the "numerosity" requirement. *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (32.9 million shares and average weekly trading volume of 6 million shares establishes numerosity).

### 2.    Commonality Is Established

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question of law or fact may suffice to satisfy the commonality requirement." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc*., 277 F.R.D. 97, 105 (S.D.N.Y. 2011); *see In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *4 (S.D.N.Y. Dec. 1, 2004) ("The commonality requirement has been applied permissively in securities fraud litigation.").

Here, the claims of all Class members arise out of the same misrepresentations and omissions by Defendants and are subject to common proof. Questions of law or fact common to the Class include: (i) whether Defendants misrepresented and omitted facts; (ii) whether those misrepresentations and omissions were material; (iii) whether Defendants acted with the requisite scienter; (iv) whether the price of Goldman common stock was artificially inflated by Defendants' misrepresentations and omissions; (v) the proper methodology of measuring damages; and (vi) whether Blankfein and Cohn were controlling persons of Goldman. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (such issues are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff"); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 157 (S.D.N.Y. 2012) (commonality satisfied as the "alleged misrepresentations and scienter, which form the basis of [p]laintiff's claims, are

necessarily common"). Thus, the commonality requirement is satisfied here.

### 3.    Typicality Is Established

The "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To establish typicality, Plaintiff must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *3 (S.D.N.Y. Sept. 29, 2015). Courts evaluating typicality "generally look not at the plaintiffs' behavior, but rather [at] the defendant's actions." *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (alteration in original). The typicality requirement "is not demanding." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018).

Here, the typicality requirement is easily met. Like all other members of the Class, AP7 purchased shares of Goldman common stock during the Class Period, when Defendants' misstatements created or maintained artificial inflation in Goldman's stock price. ¶ 31. AP7 also was harmed when the truth concealed by Defendants' misrepresentations and omissions was publicly revealed. ¶¶ 401, 407. The proof necessary for AP7 and all other Class members to prevail on their respective claims is the same. *See Bank of Am.*, 281 F.R.D. at 139 (typicality established where "class plaintiffs assert that they acquired BofA securities at prices allegedly inflated by defendants' misstatements and/or omissions, and have an interest in maximizing their recovery"). Thus, typicality is established.

### 4.    Adequacy Is Established

The "adequacy" prong of Rule 23(a) requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts assess "whether 1) plaintiff's interests are antagonistic to the interests of other members of the class and

2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Bank of Am.*, 281

F.R.D. at 139-40 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d

Cir. 2000)). Only a "fundamental" conflict of interest will defeat adequacy under Rule 23(a)(4).

*Deutsche Bank*, 328 F.R.D. at 82.

    As explained above, AP7 purchased Goldman common stock during the Class Period based

upon publicly-available information, and was injured by the same wrongful course of conduct that

injured the Class. *See* SAC at Exhibit A. As a result, AP7's interests are not antagonistic to the

Class. AP7 also has demonstrated its commitment to participate in and supervise the prosecution

of this action on behalf of the Class. It has kept itself informed of developments in the case,

vigorously prosecuted it on behalf of all Class members, and will continue to do so.[3] These facts

support a finding of adequacy. *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y.

2008) (plaintiff was adequate class representative where it was "familiar with the facts and legal

theories underlying the case, [] in regular contact with his lawyers, has met with them, has

reviewed the complaint and other case documents, and understands that [it] is responsible for

making decisions that impact the class and representing the class's best interests"); *Bank of Am.*,

281 F.R.D. at 140 (noting that "plaintiffs have retained experienced and qualified counsel who

have, to date, ably conducted this litigation").

    Additionally, as an institutional investor, AP7 is especially well-qualified to serve as Class

Representative. *See* H.R. Conf. Rep. No. 104- 369, at 34 (1995), *as reprinted in* 1995

U.S.C.C.A.N. 730, 733 (PSLRA intended to "increase the likelihood that institutional investors

---

[3] Through Counsel, Plaintiff has, among other things: (i) investigated and filed the SAC; (ii) opposed Defendants' motion to dismiss; (iii) conferred on case developments; (iv) served and responded to discovery requests, including by collecting and producing documents; and (v) retained an expert. Plaintiff will continue to perform similar activities throughout this action, including participating in discovery, trial preparation, and any settlement discussions.

will serve as lead plaintiffs"); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 525 (S.D.N.Y. 2018) (institutional investors are "unequivocally preferred"). Moreover, AP7 is not subject to any unique defense. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94 (S.D.N.Y. 2010) (the question is "whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members").

Finally, AP7 also has protected the interests of the Class by retaining KTMC as proposed Class Counsel and BLBG as proposed liaison counsel. KTMC is highly experienced, has a proven track record in litigating complex securities class actions before this Court, and will vigorously prosecute the claims of the proposed Class. BLBG has also been involved in numerous complex securities actions before this Court, and is amply qualified to serve as liaison counsel. Exs. 2 and 3 (firm resumes). Counsel's adequacy is further established by their work on this case to date. *See, e.g.*, *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015) (adequacy established where "[c]ounsel is highly qualified and has prosecuted this action vigorously, their efforts resulting in surviving a motion to dismiss against some of the finest firms in the nation"). Accordingly, AP7 respectfully submits that it satisfies the adequacy requirement of Rule 23(a)(4).

### 5.    The Proposed Class Is Ascertainable

Though not a required showing under Rule 23, "[t]he standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." *Facebook*, 312 F.R.D. at 353. To meet the requirement, a class need only be "sufficiently definite"—a standard readily met when, as here, the proposed class is "defined by objective criteria that are administratively feasible" to apply. *Id.* at 352 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Here, the proposed Class is defined by objective criteria—persons and entities that

14

purchased or otherwise acquired Goldman common stock during the Class Period and were damaged thereby. *See, e.g.*, *Wilson*, 2018 WL 3913115, at *7 (purchasers of securities during specified period could be "identified from the books and records maintained by [the defendant] and its agents"); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *13 (S.D.N.Y. Jan. 26, 2021) (class members can be "easily" ascertained "by references to investor records").

## C.      Rule 23(b)(3) Is Satisfied

Once a proposed class representative shows that the class meets the four requirements of Rule 23(a), the court determines whether the action can be maintained under one of the three subsections of Rule 23(b). Here, Plaintiff seeks class certification under Rule 23(b)(3) because, as discussed below, "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.      Predominance Is Established

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This inquiry is satisfied where "*questions* of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original); *see Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) ("Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 268 (2d Cir. 2017) (predominance is a "comparative standard" that "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," only that common issues "*predominate* over any questions affecting only

15

individual [class] members") (emphasis and alterations in original).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). Courts regularly hold that the falsity, scienter, materiality, and loss causation elements of a Section 10(b) claim are common to all Class members. *See Amgen*, 568 U.S. at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alteration in original); *id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions"); *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("[a]ll of these [10(b)] elements, other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation").

Accordingly, whether common questions predominate for Plaintiff's Section 10(b) claims often "turns on the element of reliance." *Halliburton I*, 563 U.S. at 810; *Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner*, 875 F.3d at 79 ("[r]eliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts").

As demonstrated below, Plaintiff and other putative Class members are entitled to a presumption of reliance under *Basic* and *Halliburton II* because their claims arise from Defendants' public material misrepresentations and omissions, all of which are common to the Class. As such, predominance is satisfied.[4]

---

[4] Common questions also predominate as to Plaintiff's Section 20(a) claims because "provided there is predominance with respect to the Section 10(b) claim—i.e., the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008); *see also In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (finding common issues related to Section 20(a) claims predominate).

### a.      The Fraud-on-the-Market Presumption of Reliance Applies

Under *Basic* and *Halliburton II*, Plaintiff "satisf[ies] the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. Plaintiff ultimately must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time  the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. Of these four requirements "only market efficiency is to be considered at this stage." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018); *see also Halliburton II*, 573 U.S. at 279 (plaintiffs need only show that security at issue traded in a "generally efficient market" at the class certification stage). The burden to establish market efficiency is "not an onerous one." *Petrobras*, 862 F.3d at 278; *Waggoner*, 875 F.3d at 97 (same). For the reasons discussed below, Plaintiff has demonstrated that the market for Goldman common stock was efficient throughout the Class Period.

Initially, Goldman common stock was listed and actively traded during the Class Period on the NYSE, which "courts presume to be an efficient market." *Hawaii Structural Ironworkers Pension Tr. Fund*, 338 F.R.D. at 217; *JPMorgan*, 2015 WL 10433433, at *7 ("a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015) (NYSE listing "weighs in favor of finding market efficiency").

While the Second Circuit has not adopted a specific test to analyze market efficiency, courts consistently employ the five *Cammer* factors and the three additional *Krogman* factors. *See Petrobras*, 862 F.3d at 276; *Cammer*, 711 F. Supp. at 1286-87; *Krogman*, 202 F.R.D. at 478.

Dr. Mason's analyses of these factors confirm that Goldman stock traded in an efficient market throughout the Class Period, entitling Plaintiff to invoke the fraud on the market presumption of reliance.

> ### i. The *Cammer* Factors Weigh in Favor of Market Efficiency

Under *Cammer*, courts typically consider the following factors in assessing market efficiency: (i) a large weekly trading volume; (ii) significant securities analyst coverage; (iii) the existence of market makers and arbitrageurs in the security; (iv) the eligibility of the issuer to file an S-3 registration statement; and (v) a history of a cause-and-effect relationship between public information revealing unexpected corporate events or financial results and movement in the corporation's stock price. *See Cammer*, 711 F. Supp. at 1286-87. As Dr. Mason demonstrates, each of the five "*Cammer* factors" strongly supports a finding of market efficiency.

***Goldman Common Stock Had a High Weekly Trading Volume***. "[A]verage weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293. During the Class Period, the average market-maker-adjusted weekly trading volume of Goldman common stock was no less than ***3.9%*** of shares outstanding. Mason Rpt. at ¶ 33. This heavy trading volume justifies a strong presumption that Goldman stock traded in an efficient market. *See, e.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (trading volume of 3.2% points to market efficiency); *Pirnik*, 327 F.R.D. at 44 (2.5%).

***Goldman Common Stock Was Thoroughly Covered by Analysts***. "*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Carpenters Pension*, 310 F.R.D. at 79 (citing *Cammer*,

711 F. Supp. at 1286). At least twenty-nine securities analysts from major financial institutions published reports on Goldman's securities during each quarter of the Class Period (Mason Rpt. at ¶ 35), resulting in more than 650 individual Class Period analyst reports on Goldman. *Id.* at ¶ 36. Securities analysts' extensive coverage of Goldman supports the conclusion that Goldman common stock traded in an efficient market during the Class Period. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc*., 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (fifteen analyst firms providing coverage during class period supported finding of market efficiency); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (coverage by at least three analyst firms supports market efficiency).

***There Were Numerous Market Makers for Goldman Common Stock***. The third *Cammer* factor looks at the existence of market makers and traders who increase liquidity in the market. *Cammer*, 711 F. Supp. at 1286-87. As *Cammer* explained, "market makers and arbitrageurs . . . ensure completion of the market mechanism" and "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Id.*

The NYSE maintains a "designated market maker" system, ensuring that at least one entity acts as a market maker for NYSE-listed stocks. Mason Rpt. at ¶¶ 40-41. Additionally, during the Class Period, at least 81% of Goldman common stock was owned by more than 2,000 institutional investors, who had the resources and information to act as arbitrageurs. *Id.* at ¶ 44 & n.63; *see also In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (institutional investors who held substantial portion of defendant's common stock "likely acted as arbitrageurs and facilitated the efficiency of the market.").

In addition, as noted above, courts recognize that the NYSE is an "open, well-developed and efficient market," and that when "a security is listed on the NYSE . . . or a similar national

market, the market for that security is presumed to be efficient." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (alterations in original); *In re Sadia S.A. Sec. Litig.*, 269 F.R.D. 298, 309 (S.D.N.Y. 2010); *see also Hawaii Structural Ironworkers Pension Tr. Fund*, 338 F.R.D. at 217. The existence of market makers and traders clearly demonstrates that Goldman common stock traded on an open and liquid market.

**Goldman Was Eligible to File Form S-3 Registration Statements**. A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve straight months and possesses a float of at least $75 million. 17 C.F.R. § 239.13. "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. Goldman satisfied the conditions for S-3 registration eligibility throughout the Class Period, further supporting a conclusion of market efficiency. Mason Rpt. at ¶ 47.

**Goldman's Stock Price Reacted to Unexpected News**. The Second Circuit has recognized that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner*, 875 F.3d at 97; *see also Petrobras*, 862 F.3d at 277 ("The district court properly declined to view direct and indirect evidence as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented."). Thus, when, as here, "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact." *Pirnik*, 327 F.R.D. at 45, n.3; *see also Strougo*, 312 F.R.D. at 322-23 (same). Nevertheless, as described below, the robust event study analysis that Dr. Mason conducted demonstrates a causal connection between public releases of new company specific-information

and the market price of Goldman common stock. Mason Rpt. at ¶¶ 51-66;[5] *see Waggoner,* 875 F.3d at 94 (plaintiffs "generally attempt to satisfy *Cammer* 5 by submitting an event study.").

Dr. Mason's event study demonstrated, among other things, that statistically significant abnormal returns on Release Days during the Class Period were approximately seven times more likely to occur than on non-Release days – a difference that is itself statistically significant at the 95% confidence level. ¶¶ 64-66. Dr. Mason concluded that his analysis "directly supports a conclusion that Goldman's common stock traded in an efficient market during the Class Period in a manner that can be considered as having arisen from a cause and effect relationship." *Id.* at ¶ 67.

### ii.     The *Krogman* Factors Support Market Efficiency

Under *Krogman*, "[s]ubstantial market capitalization with a narrow bid-ask spread[ ] and a large public float . . . indicate that [a corporation's securities] trade[ ] in an efficient market such that the *Basic* presumption is appropriate." *JPMorgan*, 2015 WL 10433433, at *7 (first alteration supplied). Here, these considerations further support an inference of market efficiency. Goldman's market capitalization exceeded $57.4 billion throughout the Class Period. Mason Rpt. at ¶ 70. Goldman stock was also included in the S&P 500 and the S&P 100 Indices, suggesting it was "among the largest publicly traded companies in the U.S. at the time." *Id.*; *see Carpenters Pension*, 310 F.R.D. at 81 ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient."). During the Class Period, Goldman's common stock float averaged over 87% of the shares outstanding. Mason Rpt. at ¶ 71; *see Pearlstein*, 2021 WL 253453, at *16 ("average float of 84.4% of shares outstanding" supported "finding of market efficiency"); *Wilson*, 2018 WL 3913115, at *15 (82.41% average float).

---

[5] Dr. Mason evaluated changes in the price of Goldman common stock on days when Goldman released quarterly and annual financial results ("Release Days"). Mason Rpt. ¶¶ 51-56.

Finally, the average daily bid-ask spread for Goldman stock during the Class Period was 0.02% of the stock price. Mason Rpt. at ¶ 75; *see JPMorgan Chase*, 2015 WL 10433433, at *7 (average bid-ask spread of 0.02% supported efficient market finding); *Strougo*, 312 F.R.D. at 317 ("The markets for companies with . . . smaller bid-ask spread are more likely to be efficient.").[6]

### b.   Damages Are Measurable by a Common Methodology

Plaintiff's ability to establish Class members' damages using a common methodology further demonstrates predominance. *See Waggoner*, 875 F.3d at 105-06; *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Rule 23 does not require a plaintiff to set forth a detailed model for calculating damages at the class certification stage. *See Waggoner*, 875 F.3d at 105-06; *Pirnik*, 327 F.R.D. at 47. Plaintiffs need only show that their damages model "measure[s] damages that result from the class's asserted theory of injury." *Waggoner*, 875 F.3d at 106 (interpreting *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)); *Roach*, 778 F.3d at 407 (same); *see also Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").

Dr. Mason proposes a straightforward event study methodology to measure out-of-pocket damages based upon Plaintiff's sole theory of liability—that Defendants' material misstatements and omissions created or maintained artificial inflation in Goldman's stock price during the Class Period, causing losses when that inflation was released from the stock price following the disclosure of information revealing the fraud. *See* Mason Rpt. ¶¶ 10, 90-97. Under this

---

[6] When assessing market efficiency, some courts also consider "autocorrelation," *see, e.g.*, *Billhofer*, 281 F.R.D. at 160-62, which refers to an investor's ability to use previous stock price movements to predict future price movements. Dr. Mason analyzed this factor, and concluded that it supports a finding of market efficiency here. Mason Rpt. at ¶¶ 76-79.

methodology, Dr. Mason will, at the appropriate time after the completion of fact discovery, use his event study to quantify the amount of artificial inflation in Goldman's stock price that Defendants' misstatements and omissions caused or maintained. *See id.* That artificial inflation amount—which will be calculated on a per-share basis using common evidence—can then be formulaically applied to all Class members' transactions using their investment histories to compute individual damages. *Id.*[7]

Plaintiff's proposed damages methodology is thus "directly linked with [its] underlying theory of classwide liability . . . and is therefore in accord with . . . *Comcast*." *Waggoner*, 875 F.3d at 106. This methodology has been endorsed repeatedly by courts in this Circuit. *See, e.g.*, *id*. at 106 (predominance satisfied where "damages for individual class members could be calculated by applying a method across the entire class that focused on the decline in stock price following the [corrective] disclosure . . . and then isolating company-specific events from market and industry events"); *Wilson*, 2018 WL 3913115, at *17 (proposed damages methodology using event study to measure artificial stock price inflation sufficient); *JPMorgan*, 2015 WL 10433433, at *7 (same). Accordingly, Plaintiff's damages methodology further supports predominance.

### 2.    Superiority Is Established

To determine whether a class action is superior to other methods of adjudication, courts consider the following four factors: (i) the interests of members of the class in individually controlling the prosecution of separate actions; (ii) whether other litigation has already commenced; (iii) the desirability or undesirability of concentrating claims in one forum; and (iv)

---

[7] While the actual amount of damages sustained will differ depending on each Class member's transactions in Goldman common stock, it is "well-established in [the Second Circuit] that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach*, 778 F.3d at 405.

the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, each of these factors supports a finding that superiority is established.

Plaintiff seeks to represent a Class consisting of a large number of geographically-dispersed Goldman common stock purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive. *See Menaldi*, 328 F.R.D. at 100 ("Securities suits easily satisfy the superiority requirement [because] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.") (Alterations in original).

Concentrating litigation against Defendants "in a single forum, particularly this one, has clear benefits," including eliminating the "risk of inconsistent adjudication" and promoting "the fair and efficient use of the judicial system." *Tsereteli,* 283 F.R.D. at 218. Multiple lawsuits, on the other hand, would be costly and inefficient. Currently, Plaintiff is not aware of any other pending litigation alleging the same claims against Goldman.

Finally, securities class actions generally raise no unusual manageability issues. Indeed, federal securities class actions are routinely certified in the Southern District. *Id*. ("There are no difficulties likely to be encountered in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel."). This case is no different. *See, e.g.*, *Pearlstein*, 2021 WL 253453, at *23 ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.")(alteration in original). Thus, superiority is established.

### D.      Class Counsel Satisfies the Requirements of Rule 23(g)

In appointing class counsel, courts must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to represent the class." Fed. R. Civ. P. 23(g)(1)(A).

Plaintiff has retained KTMC as lead counsel in this matter, and seeks its appointment as Class Counsel, pursuant to Rule 23(g). Plaintiff also seeks appointment of BLBG as Liaison Counsel to represent the Class in this matter. Both law firms are highly experienced in litigating federal securities class actions and other complex litigation. Moreover, as described in Section III.B.4, counsel has demonstrated its commitment to prosecuting this action, and will continue to devote the resources required to serve the Class's best interests. *See Pearlstein*, 2021 WL 253453, at *11 (finding Rule 23(g) requirements satisfied where lead counsel and additional counsel had together been "ably conduct[ing]" the litigation for several years).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Plaintiff to serve as Class Representative; (iii) appoint KTMC as Class Counsel and BLBG as Liaison Counsel for the Class; and (iv) grant such other and further relief as the Court deems just and proper.

Dated:  November 12, 2021                      Respectfully submitted,


                                         **KESSLER TOPAZ**
                                         **MELTZER & CHECK, LLP**

                                         *S/Andrew L. Zivitz*
                                         Andrew L. Zivitz
                                         Matthew L. Mustokoff

Johnston de F. Whitman, Jr.
Eric K. Gerard
Jamie M. McCall
Margaret E. Mazzeo
Nathan A. Hasiuk (*pro hac motion* pending)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
egerard@ktmc.com
jmccall@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com

*Lead Counsel for Sjunde AP-Fonden and the
Class*

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**

Salvatore J. Graziano
James M. Fee
Rebecca E. Boon
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
sgraziano@blbglaw.com
james.fee@blbglaw.com
rebecca.boon@blbglaw.com

*Liaison Counsel for the Class*