**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SJUNDE AP-FONDEN, individually and on
behalf of all others similarly situated,

                      Plaintiff,

     v.

THE GOLDMAN SACHS GROUP, INC.,
et al.,

                    Defendants.

Civil Case No. 1:18-cv-12084-VSB

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
ISSUANCE OF HAGUE CONVENTION LETTERS OF REQUEST FOR
INTERNATIONAL JUDICIAL ASSISTANCE TO OBTAIN TESTIMONY**

**TABLE OF CONTENTS**

**Page**

I.   STATEMENT OF FACTS ................................................................................................ 1

    A.   Procedural History and Current Status ............................................................. 1

    B.   Summary of the Allegations .............................................................................. 2

    C.   DOJ's Criminal Charges of Goldman, Leissner, Ng, and Low ......................... 4

    D.   The UK Witnesses and Their Relation to the Dispute ...................................... 5

        1.   Patrick Kidney ....................................................................................... 5

        2.   Toby Watson .......................................................................................... 7

        3.   Cyrus Shey ............................................................................................. 9

II.  ARGUMENT ............................................................................................................... 10

III. CONCLUSION ............................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmTrust N. Am., Inc. v. KF&B, Inc.*,
  2020 WL 5552522 (S.D.N.Y. Sept. 16, 2020) .........................................................................16

*Apple Computs. Inc. v Doe*,
  2002 WL 31476324 (High Court of Justice, Queen's Bench Div., Sept. 18,
  2002) ........................................................................................................................................15

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*,
  262 F.R.D. 293 (S.D.N.Y. 2009) .............................................................................................12

*Blagman v. Apple, Inc.*,
  2014 WL 1285496 (S.D.N.Y. Mar. 31, 2014) ...................................................................11, 12

*Crouch v. Liberty Pride Corp.*,
  2016 WL 4718431 (E.D.N.Y. Sept. 9, 2016) .............................................................11, 12, 15

*Elliott Assocs. v. Peru*,
  1997 WL 436493 (S.D.N.Y. Aug. 1, 1997) ..............................................................................12

*Ings v. Ferguson*,
  282 F.2d 149 (2d Cir. 1960) .....................................................................................................11

*Metso Mins. Inc. v. Powerscreen Int'l Distrib. Ltd.*,
  2007 WL 1875560 (E.D.N.Y. June 25, 2007) ...................................................................11, 12

*Netherby Ltd. v. Jones Apparel Grp., Inc.*,
  2005 WL 1214345 (S.D.N.Y. May 18, 2005) ..........................................................................12

*Pearlstein v. BlackBerry Ltd.*,
  332 F.R.D. 117 (S.D.N.Y. 2019) .............................................................................................15

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2018 WL 2958361 (S.D.N.Y. June 12, 2018) ..........................................................................11

**Statutes**

28 U.S.C. § 1781 ..............................................................................................................................11

**Other Authorities**

Fed R. Civ. P. 26(b) ........................................................................................................................15

Fed. R. Civ. P. 28(b) ..................................................................................................................11, 12

Fed. R. Civ. P. 32(a)(4)(B) ..........................................................................................16

Fed. R. Civ. P. 45(b) ....................................................................................................12

Fed. R. Evid. 401 .........................................................................................................16

Fed. R. Evid. 804(b)(1) ...............................................................................................16

Plaintiff respectfully submits this Memorandum of Law in support of its motion pursuant to Federal Rule of Civil Procedure ("Rule") 28(b)(2), 28 U.S.C. §1781(b)(2), and the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, reprinted in 28 U.S.C. § 1781 (the "Hague Convention") (the "Motion"). The Motion seeks the issuance of Letters of Request, attached as Exhibits A to C to the accompanying Declaration of Andrew L. Zivitz ("Zivitz Decl."), to the Senior Master of the Queen's Bench Division of the High Court of England and Wales for international judicial assistance in obtaining sworn testimony from three former employees of Defendant, The Goldman Sachs Group, Inc. ("Goldman") who, upon information and belief, reside in the United Kingdom. Those three former Goldman employees are: (1) Patrick Kidney ("Kidney"); (2) Toby Watson ("Watson"); and (3) Cyrus Shey ("Shey") (collectively, the "UK Witnesses").

## I.    STATEMENT OF FACTS

### A.    Procedural History and Current Status

On October 28, 2019, Plaintiff filed the Second Amended Class Action Complaint ("Complaint"). Dkt. No. 63. The Complaint alleges that Goldman and its former executives, Lloyd C. Blankfein ("Blankfein"), and Gary D. Cohn ("Cohn") (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as the U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

On January 9, 2020, Defendants moved to dismiss the Complaint. Dkt. No. 79. On June 28, 2021, the Court denied in part and granted in part Defendants' motion to dismiss. Dkt. No. 102.  On August 31, 2021, Goldman, Blankfein, and Cohn filed their respective Answers to the Complaint. Dkt. Nos., 118, 119, 120. On September 27, 2021, the Court entered its Case Management Plan and Scheduling Order ("Scheduling Order"). Dkt. No. 131. On October 12,

2021, the Court entered its Stipulated Protective Order governing discovery. Dkt. No. 135.

On November 12, 2021, Plaintiff filed a motion to certify this action as a class action under Rules 23(a) and 23(b)(3) on behalf of purchasers of Goldman common stock during the period from October 29, 2014 through December 14, 2018, inclusive and were damaged thereby. Dkt. No. 140. That motion is fully briefed.

Under the Court's Scheduling Order, fact discovery is to be completed no later than December 30, 2022. Dkt. No. 131. Plaintiff has served its first set of requests for production of documents to Defendants, seeking records related to, among other things, Defendants' dealings with 1Malaysia Development Berhad ("1MDB") and Low Taek Jho ("Jho Low") and Defendants' review, due diligence, and approvals of these dealings. Through the document discovery process, the parties have agreed upon the document production of 46 custodians, including the three UK Witnesses, whom the parties have agreed possess *presumptively relevant* documents in this litigation. To date, Goldman has produced over 125,000 documents, and Plaintiff anticipates that Goldman will produce hundreds of thousands of additional documents before the June 30, 2022 deadline for "Substantial Completion of Party Document Productions." Dkt. No. 130 at 6.

### B.   Summary of the Allegations

This Action arises from Goldman's role in a multi-billion dollar financial fraud effectuated through the Malaysian sovereign wealth fund 1MDB and its representative Jho Low. The Complaint alleges that from 2014 to 2018, Defendants materially misled investors concerning Goldman's dealings with 1MDB and Low and Goldman's business practices. ¶¶ 337, 340, 344, 345, 348, 351, 354, 355, 358, 360, 362, 364, 367, 383, 388.[1]

Defendants' alleged false statements were issued after Goldman's involvement with Low

---

[1] Citations to "¶ __" refer to the Complaint.

and 1MDB, a relationship that spanned from 2009 to 2014. The Complaint alleges that throughout these dealings, Goldman's control functions raised multiple red flags regarding Low and 1MDB, particularly with respect to Low's inability to validate his sources of wealth. *E.g.*, ¶¶ 120-24, 140-43. Despite the repeated warnings concerning Low, Goldman did not cease its business dealings with him or 1MDB. Over the course of ten months in 2012-2013, Goldman underwrote $6.5 billion in debt through three 1MDB bond offerings, including Projects Magnolia (¶ 190), Maximus (¶ 207), and Catalyze (¶ 240), billions of which Low diverted to personal bank accounts belonging to himself, Malaysian and Emirati government officials, and Goldman banker Timothy Leissner ("Leissner"). *E.g.*, ¶¶ 190-92, 207-08, 240-41. For its role, Goldman earned more than $600 million in underwriting fees. ¶¶ 15, 243. Goldman also assisted Low in acquiring Coastal Energy, a Houston-based oil and gas company, in mid-2013, notwithstanding issues raised by Goldman's compliance department. ¶¶ 258-59.

The Complaint alleges that throughout each transaction, Goldman's firmwide capital and suitability committees, comprising of the bank's highest ranking officials, approved the transactions despite the recognized red flags associated with the deal terms and Low. ¶ 313. Blankfein, Goldman's Chief Executive Officer, met directly with Low on at least three occasions. ¶ 323. Low was involved in each of these transactions—and his influence at 1MDB, while unofficial, was well-known within Goldman. ¶¶ 159-63, 214-15, 225.

Based on this alleged conduct, this Court determined that Plaintiff sufficiently pled several of these alleged false statements. Those statements are summarized as follows and include statements made by Defendants regarding: (i) claims that Goldman lacked "visibility" into diverted funds from the bond transactions, *see* Dkt. No. 102 at 20-21; (ii) claims about Goldman's general business practices, including that it was "complying fully" with laws and ethical principles, *see id.*

at 15-16; (iii) the risks Goldman claims to have incurred to justify the fees it charged for these bond transactions, *see id*. at 21-22; (iv) Goldman's claim that no fees were paid by 1MDB or Goldman to external third parties in connection with the bond transactions, *see id*. at 19; (v) Blankfein's claim that he was "not aware" of any red flags, *see id*. at 23-24; (vi) Goldman's claim that Low and his shell company SRG were not clients of Goldman in connection with the Coastal Energy transaction, *see id*. at 25; and (vii) Goldman's claim that it "found no evidence" of any involvement by Low in the 1MDB bond transactions. *See id*. at 18.

### C.   DOJ's Criminal Charges of Goldman, Leissner, Ng, and Low

The U.S. Department of Justice ("DOJ") criminally charged Goldman, Leissner, Ng, and Low for their respective roles in the 1MDB fraud. In October 2020, Goldman entered into a Deferred Prosecution Agreement ("DPA") with the DOJ in connection with charges that it conspired to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and agreed to pay a fine of more than $2.9 billion as a part of the settlement. *See United States v. The Goldman Sachs Grp., Inc.*, Cr. No. 20-437 (MKB) (E.D.N.Y.). Goldman also admitted to a series of facts that demonstrated its culpability in these violations including, among other things, that the bank "failed to investigate . . . red flags or to perform an internal review of its role in the bond deals despite the clear implication that the deals had involved criminal wrongdoing." DPA at ¶ 72.

In August 2018, Leissner pleaded guilty to the DOJ's charges that he conspired to launder money and to violate the FCPA. *See United States v. Leissner*, Cr. No. 18-439 (MKB) (E.D.N.Y.).

On February 7, 2022, Ng's criminal trial commenced in the United States District Court for the Eastern District of New York before the Honorable Margo K. Brodie, on the DOJ's charges that he conspired to launder money and to violate the FCPA. *See United States v. Ng Chong Hwa*, Cr. No. 18-538 (MKB) (E.D.N.Y). On April 8, 2022, the jury convicted Ng on all counts.

Numerous witnesses testified at the proceeding, including several current and former Goldman Sachs employees. For example, on March 10, 2022, Patrick Kidney testified about his anti-money laundering ("AML") and compliance responsibilities at Goldman when Low applied to become a client of the bank's PWM division. This testimony is summarized below.

Low, for his part, remains a fugitive at large. *See* THE UNITED STATES DEPARTMENT OF JUSTICE (2018), https://www.justice.gov/opa/pr/malaysian-financier-low-taek-jho-also-known-jho-low-and-former-banker-ng-chong-hwa-also-known.

### D.    The UK Witnesses and Their Relation to the Dispute

#### 1.    Patrick Kidney

During the criminal trial of Ng, Kidney testified that his role at Goldman during his 2009 to 2011 tenure was to "oversee the anti-money laundering program" and conduct the bank's Know Your Customer ("KYC") and due diligence reviews of high net worth individuals who had been identified as potential clients for Goldman's private wealth management ("PWM") group. *United States v. Ng*, Cr. No. 18-538 (MKB) (E.D.N.Y), Trial Transcript ("Ng Trial Tr.") at 2717:11-2719:7.[2] According to Kidney, the purpose of the KYC and due diligence reviews was to verify background information on a potential client to understand the "risk factors that may be . . . relevant in that particular situation." *Id.* at 2718:11-23. Between January and June 2010, Kidney and his compliance team performed these reviews in connection with Low's PWM application. *Id.* at 2727:25-2728:2, 2765:5-24.

---

[2] The relevant excerpts from the trial testimony in *United States v. Ng*, Cr. No. 18-538 (MKB) (E.D.N.Y) are appended as Attachment H to the Letter of Request seeking the sworn testimony of Patrick Kidney and the Letter of Request seeking the sworn testimony of Toby Watson. *See* Zivitz Decl. Exs. A, B.

By March 2010, Kidney and his compliance team had uncovered "a range of red flags" regarding Low related to his unexplained source of wealth, his political exposure to Prime Minister Najib, and the overall potential for foreign official corruption. *Id.* at 2728:3-17. Indeed, Kidney sent multiple emails raising red flags about Low to other members of Goldman's Global Compliance Department prior to the 1MDB bond offerings. *See, e.g.*, Kidney Ex. 1 (GS000559985), Kidney Ex. 5 (GS000130823).[3]  For instance, on March 12, 2010, regarding his connections to politically exposed funders, Kidney wrote: ████████████████████████

████████████████████████████████████

████████████████████████ Kidney Ex. 4 (GS000560073). Kidney further wrote about Low's unexplained wealth, stating: ██████████████████

████████████████████████████████████

████████████ Kidney Ex. 3 (GS000130889).

In an effort to get these compliance questions sufficiently addressed, Kidney testified during the Ng trial that the diligence review lasted six months and included two separate interviews of Low, all of which he described as "an exceptionally trying experience." Ng Trial Tr. 2720:15-2721:10, 2756:23-2757:7; *see also* Kidney Ex. 5 (GS000130823). Despite these efforts, Kidney further testified that because there were "so many red flags and so many concerns of corruption, potentially fraud and all sorts of issues so there was no way I could see that relationship ever being onboarded." Ng Trial Tr. at 2728:5-11, 2766:8-11. Kidney summarized his conclusions regarding the diligence assessment of Low in a PowerPoint slide deck that was presented to, at a minimum, the leaders of Goldman's Business Intelligence Group, another compliance group at the bank. The

---

[3] Citations to "Kidney Ex." refer to exhibits appended to Attachment A of the Letter of Request seeking the sworn testimony of Patrick Kidney. *See* Zivitz Decl. Ex. A.

PowerPoint set forth a summary of the red flags identified by Kidney and his colleagues, including Goldman's findings that:



Kidney Ex. 5 (GS000130823).

Ultimately, given the numerous red flags described above, Goldman rejected Low's request to become a client of its PWM group in 2010. And, as noted above, Goldman rejected Low's request to become a client of its PWM group *again in 2011*. After learning of Low's second attempt to become a Goldman PWM client in March 2011, Kidney wrote to a colleague: "To be clear, we have pretty much zero appetite for a relationship with this individual." Ng Trial Tr. 2768:6-7.

### 2.   Toby Watson

Discovery, along with evidence from the Ng criminal trial, has shown that between 2011 and 2014, Watson served as a managing director in Goldman's Hong Kong office, working in the Fixed Income Currency and Commodities ("FICC") Division, commonly referred to as the Securities Division. *Id*. at 118:21-120:8, 122:5-8. The Securities Division was responsible for, among other things, publicly trading stocks and bonds on behalf of institutional investors for Goldman, including the bond transactions at issue. *Id*. at 394:14-395:25. Watson served on the

core deal team that was responsible for processing the three bond transactions for Projects Magnolia, Maximus, and Catalyze. *Id*. at 393:9-23. Watson also worked closely with Ng and Leissner, as well as other members of the deal team, including Andrea Vella, who was head of the Capital Markets Group in Goldman Asia's Investment Banking Division, and Mike Evans, Global Head of Goldman's Growth Markets Division. *Id*. at 393:22-23, 431:2-433:2.

Watson played an integral role in developing the structure and so-called "de-risking" strategies for the sale of these private bond deals. *Id*. at 393:20-23 (Leissner testifying that Watson "ran the [structuring/funding] desk in Asia" and "did the underwriting for these transactions.") Leissner testified that Goldman's ability to structure and underwrite these bond deals was "critical" to the scheme's overall success because it meant that 1MDB and Low did not have to raise funds from other banks, but instead could rely exclusively on Goldman to "give the money in purses worth 1.7 billion, then 1.7 billion on the second case, and then 3 billion on the last one." *Id.* at 402:17-403:3. Indeed, Goldman repeatedly touted the risk it supposedly bore in these bond deals as the basis to justify its outsized fees for this work, claiming that its fees "reflected the underwriting risks." ¶¶ 279, 340. But, as the Complaint alleges and discovery is now confirming, Goldman assumed virtually *no risk* because, among other things, Watson and other members of the deal team had secured the buyers in advance, obtained the IPIC guarantee, and did not need to compete with other firms to underwrite the deal. ¶¶ 156, 172, 180, 190, 194, 196, 200; Ng Trial Tr. 401:6-14 ("with the help of Goldman Sachs' structuring group, the idea was generated [IPIC] should be a credit guarantee on 1MDB's debt obligations"). Goldman earned over $600 million in fees, which Leissner described as "unprecedented" at Goldman, "celebrated by Goldman . . . around the world," and "highlighted at the highest level" at the bank. Ng Trial Tr. 392:10-24.

Leissner also testified that Watson and other deal team members were directly aware of

Low's involvement in the 1MDB deals and that Low served as 1MDB's intermediary on the deals, despite the fact that Low had been twice rejected as a PWM client. *Id*. at 430:3-431:19; 436:21-438:1. And while Leissner testified that Watson and other members of the deal engaged in certain efforts to conceal Low's involvement from Goldman's approval committees and compliance divisions, *see id*., discovery now shows that numerous other Goldman employees were aware of Low's involvement in these bond transactions, and even openly exchanged communications on Goldman's internal email network about Low's role. *See* Watson Ex. 1 (GS000458998) █████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[4]

### 3.   Cyrus Shey

Cyrus Shey is a former Goldman investment banker who, as discovery has established, was core deal team member on the 2009 TIA Islamic bond transaction previously described, which was referred to internally at Goldman as "Project Tiara," as well as the three 1MDB bond transactions in 2012 and 2013 (Projects Magnolia, Maximus, and Catalyze). On Project Tiara, Shey was a member of Goldman's "financing execution" team and worked with Ng and Leissner to strategize and arrange the economics of the proposed $3 billion that TIA was seeking to raise. On Projects Magnolia, Maximus, and Catalyze, Shey was a member of Goldman's credit capital markets team, and was involved in various aspects of the deals, as further detailed below.

During Project Tiara, Shey met directly with Jho Low, who was serving as TIA's ████████

████████████████████████████████████████ in connection with the transaction. Shey Ex. 1

---

[4] Citations to "Watson Ex." refer to exhibits appended to Attachment A of the Letter of Request seeking the sworn testimony of Toby Watson. *See* Zivitz Decl. Ex. B.

(GS000116303).[5]  For instance, in January 2009, Shey acknowledged that he had 

Ex. 3 (GS000132147). Given Low's explicit role as a ███████████ Shey likely possesses important information further linking Low to Goldman's banking operations, despite Goldman's subsequent public denial of Low's involvement in the 1MDB bond offerings.

During Projects Magnolia and Maximus, Shey worked directly on aspects of the transactions that featured significant red flags. For instance, Shey worked closely with Leissner and Andrea Vella, who was head of the Capital Markets Group in Goldman Asia's Investment Banking Division, on the IPIC guarantee of the 1MDB bonds. Shey further helped structure Goldman's fees on the transactions. Shey also took part in deliberations with Leissner and others regarding handling the public narrative surrounding these transactions.



. *See* Shey Ex. 8 (GS000003023) (May 16, 2012 FWSC meeting minutes); Shey Ex. 12 (GS000003120) (August 14, 2012 FWSC meeting minutes).

## II.   **ARGUMENT**

A deposition of a third party may be taken in a foreign country "on appropriate terms after

---

[5] Citations to "Shey Ex." refer to exhibits appended to Attachment A of the Letter of Request seeking the sworn testimony of Cyrus Shey. *See* Zivitz Decl. Ex. C.

an application and notice of it." Fed. R. Civ. P. 28(b)(2)(A). "One method for seeking discovery abroad is issuing a letter of request through the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters . . . which charges the signatory nations . . . . to cooperate on discovery matters." *Blagman v. Apple, Inc.*, 2014 WL 1285496, at *3 (S.D.N.Y. Mar. 31, 2014) (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. t for the S. Dist. of Iowa*, 482 U.S. 522, 530–31 (1987)).

The United States and the United Kingdom are parties to the Hague Convention. *Id.* Letters of request submitted under the Hague Convention "are the means by which a court can formally request that a court in another country lend its judicial assistance in obtaining evidence or performing some other judicial act." *Id.*; *see also Ings v. Ferguson*, 282 F.2d 149, 151 (2d Cir. 1960) (submission of letters of request under the Hague Convention is "the time honored custom of seeking evidence in foreign countries," and "is a request made to the foreign court to give its aid, backed by its power, to secure the desired information."); *Crouch v. Liberty Pride Corp.*, 2016 WL 4718431, at *2 (E.D.N.Y. Sept. 9, 2016) ("A Letter of Request, also commonly referred to as a letter rogatory, is 'an appropriate mechanism for securing the testimony of . . . witnesses who cannot be compelled to appear' in court.") (alterations in original). The Court has the authority to issue a letter of request to a signatory of the Hague Convention. *See* 28 U.S.C. § 1781; Fed. R. Civ. P. 28(b); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *1–2 (S.D.N.Y. June 12, 2018) ("District Courts have inherent authority to issue [a letter of request].") (brackets in original).

As the moving party, Plaintiff bears the burden of persuading the Court that issuance of the letter of request is "necessary and appropriate." *Crouch*, 2016 WL 4718431, at *2 (quoting *Metso Mins. Inc. v. Powerscreen Int'l Distrib. Ltd.*, 2007 WL 1875560, at *2 (E.D.N.Y. June 25, 2007)).

"That burden is not great, however, since the 'Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention.'" *Metso*, 2007 WL 1875560, at \*2 (quoting *Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 541 (1987)). It falls within the Court's discretion as to whether Plaintiff meets its burden. *Blagman*, 2014 WL 1285496, at \*4.

The Letters of Request attached as Exhibits A to C to the Zivitz Declaration are "necessary and appropriate," *Crouch*, 2016 WL 4718431, at \*2; *Metso*, 2007 WL 1875560, at \*2, and seek sworn testimony that would likely be "admissible at trial." *Blagman*, 2014 WL 1285496, at \*4.

First, the Letters of Request are necessary. The three UK Witnesses are each former employees of Goldman who, upon information and belief, reside in the United Kingdom and are neither domiciled nor doing business in the United States. Zivitz Decl. ¶ 2. Accordingly, these witnesses are not subject to subpoena service under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 45(b); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 262 F.R.D. 293, 305 (S.D.N.Y. 2009) ("[F]oreign nationals living abroad are not subject to subpoena service outside the United States").  It is thus necessary for Plaintiff to seek the depositions of the UK Witnesses under the Hague Convention, consistent with Federal Rule of Civil Procedure 28(b).

Second, the Letters of Request are appropriate. Based on Plaintiff's investigation, including through reviewing documents produced by Goldman in this litigation, the UK Witnesses have direct knowledge of Goldman's relationship with 1MDB and Low that "may be material or may lead to the discovery of material evidence." *Netherby Ltd. v. Jones Apparel Grp., Inc.*, 2005 WL 1214345, at \*1 (S.D.N.Y. May 18, 2005); *see also Elliott Assocs. v. Peru*, 1997 WL 436493, at \*2 (S.D.N.Y. Aug. 1, 1997) (granting motion for issuance of letters rogatory for deposition when request met "liberal discovery provisions" of Federal Rule of Civil Procedure 26).

As set forth fully above, **Kidney** was the principal compliance officer responsible for performing KYC and due diligence reviews in connection with Low's PWM application in 2010, identified a number of red flags regarding Low, and shared these concerns with senior compliance personnel at Goldman. *See* § I.D.1 *supra*. Plaintiff thus seeks to depose Kidney regarding, among other things, (i) his knowledge of the various diligence reviews into Low; (ii) the bases for rejecting Low as PWM client; (iii) the manner in which the findings of Low's diligence reviews were conveyed to others at Goldman; and (iv) the ramifications of Low's PWM rejections on future deals with Goldman. Such testimony would be relevant to prove both falsity and scienter with respect to the alleged false statements regarding Goldman's claims that (i) it complied] fully with laws and ethical principles; (ii) the bank or 1MDB did not pay fees to external third parties; (iii) Blankfein was not aware of any red flags; (iv) Low and his shell company were not a client of Goldman in connection with the Coastal Energy transaction; and (v) Goldman found no evidence of any involvement by Low in the 1MDB bond transactions. ¶¶ 337-88.

**Watson** was a key member of the deal team on all three 1MDB bond issuances, who reported directly to Leissner and was responsible for creating and implementing the structure, pricing, and risk strategies for each bond transaction. Watson also had direct knowledge of Low's involvement in these transactions. *See* § I.D.2 *supra*. Plaintiff thus seeks to depose Watson regarding, among other things, (i) his knowledge of the various due diligence reviews into Low prior to, during, and after Projects Magnolia, Maximus, and Catalyze; (ii) his specific role in the bond transactions for Projects Magnolia, Maximus, and Catalyze; (iii) the underwriting and funding structures he and his colleagues at Goldman developed and used for Projects Magnolia, Maximus, and Catalyze; (iv) his knowledge of Low's involvement in Projects Magnolia, Maximus, and Catalyze, as well as his knowledge of any other Goldman employees' awareness of Low's

involvement; and (v) his knowledge of any compliance or underwriting-based red flags involving Projects Magnolia and Maximus. This testimony is relevant to prove falsity and scienter with respect to the alleged false statements regarding Goldman's claims that (i) it lacked visibility into diverted funds from the bond transactions; (ii) it complied fully with laws and ethical principles; (iii) the bank and 1MDB did not pay fees to external third parties; (iv) Blankfein was not aware of any red flags; (v) Low and his shell company were not a client of the bank in connection with the Coastal Energy transaction; and (vi) Goldman found no evidence of any involvement by Low in the 1MDB bond transactions. ¶¶ 337-88.

**Shey** served as a core deal team member on each of the 1MDB bond issuances (as well as Project Tiara) and worked closely alongside Leissner and Andrea Vella, including as a co-presenter of Projects Magnolia and Maximus to the FWSC. *See* § I.D.4 *supra*. Plaintiff thus seeks to examine Shey regarding (i) his involvement and knowledge of Projects Tiara, Magnolia, Maximus, and Catalyze, including any "red flags" associated with these transactions, Low's involvement in these transactions, and any uses or diversions of funds raised from these transactions; (ii) the committee approval processes for Projects Magnolia and Maximus, and any "red flags" recognized by Goldman committees during the approval process; and (iii) other related matters such as Goldman's efforts to control the public narrative surrounding these transactions. Such testimony would be relevant to prove falsity and scienter with respect to the alleged false statements regarding Goldman's claims that (i) it complied fully with laws and ethical principles; (ii) Goldman or 1MDB did not pay fees to external third parties; (iii) Blankfein was not aware of any red flags; (iv) Low and his shell company were not a client of the bank in connection with the Coastal Energy transaction; and (v) Goldman found no evidence of any involvement by Low in the 1MDB bond transactions. ¶¶ 337-88.

In sum, the testimony sought from the UK Witnesses is relevant to Plaintiff's claims that Defendants issued the false and misleading statements summarized above and is plainly discoverable evidence under Rule 26 based on its direct connection to Plaintiff's claims. *See Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 122 (S.D.N.Y. 2019), *on reconsideration in part*, 2019 WL 5287931 (S.D.N.Y. Sept. 20, 2019) ("The topics included in the letter of request . . . are relevant under Rule 26, and thus the Court will issue the letter of request."). Moreover, given the scope and timing of the alleged false statements, including their relation to numerous 1MDB bond transactions, there is no indication that this testimony would be "unreasonably cumulative or duplicative" of other evidence or that "the burden or expense of the proposed discovery" would "outweigh[] its likely benefit." Fed R. Civ. P. 26(b)(1), (2). Therefore, Plaintiff's request is appropriate. *Crouch*, 2016 WL 4718431, at *3 (granting motion for a letter of request when it sought "information that falls squarely within the scope of discoverable evidence[.]").

Third, the Letter of Request seeks evidence in the form of sworn testimony that would likely be admissible at trial. When reviewing letters of request, UK courts have considered whether the requesting party has shown "prima facie grounds for believing that those persons could give admissible evidence." *Apple Computs. Inc v Doe*, 2002 WL 31476324 (High Court of Justice, Queen's Bench Div., Sept. 18, 2002).[6] Plaintiff meets this burden here.

Plaintiff will question the UK Witnesses about facts regarding Goldman's relationship with 1MDB and Low known to them when they served as Goldman employees, including each witness's specific role with respect to the 1MDB transactions underwritten by Goldman, including information about their efforts on the deal team and the various committees on which they served.

[6] To this end, Plaintiff recognizes that, if this Court were to grant its motion, "[t]he UK courts will make the determination of whether to enforce the letter of request pursuant to UK law." *Pearlstein*, 332 F.R.D. at 122.

Such questioning, for example, will seek to uncover information regarding red flags that arose during the bond approval process and the due diligence practices and procedures employed by those committees. *See* Zivitz Decl. Exs. A-C. Each witness's sworn testimony therefore meets the standard for relevance under the Federal Rules of Evidence. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining this action.").

Moreover, each witness's sworn deposition testimony will likely be admissible at trial. Specifically, the testimony will likely qualify as the admissible deposition testimony of unavailable witnesses given that the witnesses are "outside the United States." Fed. R. Civ. P. 32(a)(4)(B); *see also* Fed. R. Evid. 804(b)(1)); *AmTrust N. Am., Inc. v. KF&B, Inc.*, 2020 WL 5552522, at *3 (S.D.N.Y. Sept. 16, 2020) ("The Court will admit the deposition testimony of Charrette and Shahri on the basis that they are more than 100 miles from the place of trial in the Southern District of New York and thus cannot be commanded to attend trial pursuant to Fed. R. Civ. P. 45(c).").

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court approve and sign the accompanying Letters of Request. Plaintiff further requests that the clerk authenticate the Court's signature by affixing the Court's seal thereto, and that the Letters of Request be thereafter returned to Plaintiff's counsel to transmit to the Senior Master of the Queen's Bench Division of the High Court of England and Wales for prompt execution.

Dated:  May 9, 2022

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*s/ Andrew L. Zivitz*
Andrew L. Zivitz
Matthew L. Mustokoff
Johnston de F. Whitman, Jr.
Jamie M. McCall
Margaret E. Mazzeo
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
jmccall@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com

*Lead Counsel for Sjunde AP-Fonden and the*
*Class*

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**

Salvatore J. Graziano
Rebecca E. Boon
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
sgraziano@blbglaw.com
rebecca.boon@glbglaw.com

*Liaison Counsel for the Class*