```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____          │
│ DATE FILED:  7/31/2023          │
└─────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

SJUNDE AP-FONDEN, individually and on behalf
of all others similarly situated,

                          Plaintiff,

              -against-

THE GOLDMAN SACHS GROUP, INC.,
LLOYD C. BLANKFEIN, HARVEY M.
SCHWARTZ, and R. MARTIN CHAVEZ,

                       Defendants.
-----------------------------------------------------------------X

**18-CV-12084 (VSB) (KHP)**

**OPINION AND ORDER ON**
**MOTION TO AMEND COMPLAINT**

**KATHARINE H. PARKER, United States Magistrate Judge:**

       Lead Plaintiff Sjunde AP-Fonden ("AP7") has moved post-fact discovery pursuant to

Federal Rule of Civil Procedure 15 to amend its complaint a third time. For the reasons stated

below, the motion is granted.

### FACTUAL BACKGROUND

       This putative securities fraud class action arises out of investment banking work that

Defendant, The Goldman Sachs Group Inc. ("Goldman"), provided for 1Malaysia Development

Berhad ("1MDB"), a sovereign wealth fund ostensibly set up to spur economic development in

Malaysia. During a ten-month period beginning in May 2012, Goldman underwrote $6.5 billion

of 1MDB debt in three bond offerings for which it was paid $600 million in fees. After each

offering, hundreds of millions of dollars were misappropriated by high level officials of the fund

and their associates, including to pay off voters and finance political patronage of Malaysia's

then Prime Minister Najib Razak ("Najib") and fund the extravagant lifestyle of Low Taek Jho

("Low"), a businessman and architect of the 1MDB fund.  Ultimately, the corruption scheme

was discovered, and a number of individuals involved with the fund were criminally charged.

In particular, in 2018, the U.S. Attorney for the Eastern District of New York ("EDNY")

charged former Goldman Chair of Southeast Asia, Timothy Leissner, with conspiracy to violate

the Foreign Corrupt Practices Act ("FCPA") and commit money laundering in connection with

his role in the scheme.  Leissner pleaded guilty in August 2018 to the charges and awaits

sentencing.  His plea came to light on November 1, 2018 when his indictment was unsealed.

The U.S. government also filed criminal charges in the EDNY against Low and former Goldman

Managing Director Roger Ng for their roles in the corruption scheme.  Ultimately, Ng was

convicted after trial for conspiring to launder money embezzled from the fund and to violate

the FCPA by, among other things, paying bribes to government officials in Malaysia and Abu

Dhabi.  Low remains a fugitive.  In 2020, Goldman entered into a deferred prosecution

agreement with the U.S. Department of Justice in connection with a criminal information

charging it with conspiracy to violate the anti-bribery provisions of the FCPA.  That same year,

Najib was convicted of corruption in a Malaysian court.

Plaut initiated this action on December 20, 2018.  An amended complaint was filed on

March 11, 2019, after which the Court appointed AP7 as Lead Plaintiff.  AP7 then filed a second

amended complaint on October 28, 2019 ("SAC").  On June 28, 2021, the Honorable Vernon S.

Broderick denied Defendants' motion to dismiss the SAC.  (ECF No. 102.)  That opinion contains

a full recitation of the facts alleged in this case, which are not repeated here.  In sum, AP7

alleges that shareholders of Goldman common stock were injured by various misstatements

and omissions Defendants made during the period October 29, 2014 through November 8,

2018 about the nature of Goldman's interactions with 1MDB and knowledge of any corruption associated with the fund.[1]  According to AP7, the misstatements and omissions caused Goldman common stock to trade at an inflated price during the class period.  Then, when the truth came to light about Goldman's and its executives' involvement in the criminal scheme, the stock price dropped, injuring AP7 and other shareholders.

In denying Defendants' motion to dismiss, Judge Broderick found that the following statements and omissions were actionable:

- Statements in Goldman's 2014-2017 annual reports about its general principles such as that Goldman is "dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us."  Judge Broderick found these statements were actionable to the extent they "falsely represent a record of past or present compliance with such policies."  (*Id.* at 16)

- A December 22, 2016 Wall Street Journal article in which Goldman is quoted saying "[w]e have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions."  Judge Broderick found AP7 plausibly pleaded falsity and that the SAC was "replete with information" contradicting that claim, including allegations that Defendant Lloyd Blankfein ("Blankfein"), former Chairman of Goldman, met to discuss business with 1MDB several times; that Low's involvement in the 1MDB bond deals was "widely discussed" with Goldman's Asia offices at the time; that one Goldman managing director described Low as the "1MDB Operator or intermediary in Malaysia" in a March 2012 email; that Leissner disclosed at a meeting with Goldman's Capital and Suitability Committees that "Low had played a key role for 1MDB"; and that Leissner testified that "employees and agents" of Goldman sought to "conceal facts from certain compliance officers and legal employees of [Goldman] that Low . . . was acting as an intermediary." (*Id.* at 19.)

- An October 29, 2014 article in which Goldman stated that "[o]ther than legal and accounting firms providing professional services, no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with" 1MDB's bond transactions to date.  Judge Broderick found AP7 plausibly pleaded falsity because of the

---

[1] AP7 previously proposed a class period ending December 14, 2018 but, in the proposed amended complaint, has shortened the class period.

allegations that Low, Najib, and others received bribes and kickbacks from 1MDB's bond proceeds.  (*Id.*)

- A July 2016 statement that Goldman "had no visibility into whether some of those funds may have been subsequently diverted to other purposes."  As to this statement, Judge Broderick found "it strains credulity under the facts and circumstances for [Goldman] to contend that it had no inclination that funds were being siphoned off, particularly in light of Goldman's representations that it was engaging in post-transaction monitoring." (*Id*. at 19-21.)

- Statements made in October 2014, July 2015 and June 2018 to the effect that the fees and commissions paid for 1MDB were standard terms reflecting the underwriting risk Goldman assumed in the bond transactions.  Judge Broderick found that AP7 plausibly pleaded falsity because it alleged that the fees received were "exponentially higher than industry standard" and "took on abnormally low risk in underwriting the bonds, because IPIC served as a guarantor for the transactions, because Goldman secured purchasers for the bonds before finalizing the deals, and because Goldman did not need to compete with other firms to underwrite the deals."  (*Id.* at 22.)

- A November 1, 2018 statement by Blankfein that he was not aware of any red flags concerning the 1MDB transactions.  Judge Broderick found that AP7 plausibly alleged facts suggesting Blankfein "likely knew or chose to ignore" warnings about Low and 1MDB.  (*Id.* at 23.)

- Statements related to Compañía Española de Petróleos ("CEPSA") and Strategic Resources Global's ("SRG") acquisition of Coastal Energy.[2]  Judge Broderick found that AP7 plausibly alleged that Goldman misleadingly omitted from a statement that it had advised Low and SRG on a joint venture and that it switched to advising CEPSA in large part because its Compliance Department determined that Low's "appearance is not welcome" and that it falsely said it "was not aware of, and had no involvement in, any transaction in which SRG sold its stake in a joint venture back to CEPSA."  (*Id.* at 25.)

- Statements made in 2014, 2015, and 2018 to describe part of Goldman's compensation for the risks assumed in underwriting the bonds in question; including that the "[1MDB] transactions were individually tailored financing solutions, the fee and commissions for which reflected the underwriting risks" and that earnings reflected risk.  (*Id.* at 21-22.)

---

[2]  Low controlled SRG. CESPA is a Spanish energy group associated with Abu Dhabi sovereign wealth fund International Petroleum Investment Company ("IPIC"), which, according to AP7, had a reputation for corruption.

Initially, AP7 alleged that the above misstatements and omissions were corrected in six different disclosures in November and December 2018, causing Goldman stock price to drop on the days of the various disclosures.  In his decision denying the motion to dismiss, Judge Broderick found that only two of the identified disclosures were sufficient to satisfy the element of loss causation.  The disclosures came to light on November 9, 2018 through several news outlets, including the Wall Street Journal, which reported that Blankfein met with Low and Najib in New York in September 2013 after Goldman's compliance department had raised concerns about Low.  The second disclosure was a December 17, 2018 New York Times report that the Malaysian government was pursuing criminal charges against Goldman over the 1MDB scandal and seeking more than $2.7 billion in criminal fines in connection with the charges. Judge Broderick rejected allegations that the disclosures on November 12 and 29 and December 20-21, 2018 had an actionable price impact on Goldman shares.

After discovery and expert analysis, AP7 now concedes that it cannot show loss causation from the December 17, 2018 New York Times report.  Therefore, it proposes to amend the complaint to remove the allegations associated with that report and modify the class period to end on November 8, 2018.  Additionally, AP7 now contends that the November 9 corrective disclosure actually began with a November 8, 2018 post-market closing disclosure that was repeated in the November 9 Wall Street Journal article and caused damage to the share price on November 9 and 12, 2018.  It therefore seeks to clarify that it is alleging a multi-day price impact associated with disclosures that began on November 8 and continued on November 9, 2018.  It also proposes other amendments that conform to Judge Broderick's decision denying the motion to dismiss.

Defendants object only to the amendment that seeks to change the date of the corrective disclosure to November 8 and 9 and extend the price impact window to include November 9 and 12, 2018.  First, they contend that the amendment is too late, as it is based on information known before the complaint was filed in this action and long after the Court dismissed the November 12 disclosure and its alleged price impact that day from this case. Second, they contend the proposed amendment is made in bad faith to alter what AP7 now realizes is a losing legal theory based on the November 9 disclosure – post discovery – and that the late amendment is prejudicial to Defendants.  Third, they argue the amendment is futile because it is based on factual allegations that conflict with AP7's existing allegations and class certification briefing based on those allegations, and because the proposed amendment contemplates a four-day (two-trading-day) price impact window, which Defendants argue is "incompatible" with established loss causation law.

## LEGAL STANDARD

Under Rule 15(a) of the Federal Rules of Civil Procedure, "a party may amend its pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (citation omitted).  Under Rule 15,

leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 283 (2d Cir. 2000).

The party opposing the amendment has the burden of demonstrating any bad faith, prejudice of the proposed amendment, or futility of the proposed amendment. *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 567 F. Supp. 3d 429, 438 (S.D.N.Y. 2021).

## DISCUSSION

### 1. *Whether AP7 Unduly Delayed in Seeking Leave to Amend*

Defendants argue that leave to amend should be denied because AP7 could have sought leave to amend much sooner, and accordingly, this motion – brought several years after the initial complaint and at the close of fact discovery – is untimely.

Mere delay is not a basis to deny leave to amend absent a showing that any delay was *undue. Kreisler v. P.T.Z. Realty, L.L.C.,* 318 F.R.D. 704, 706 (S.D.N.Y. 2016). "Simply alleging that the plaintiff could have moved to amend earlier than [he] did . . . is insufficient to demonstrate undue delay." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). Courts typically find that the moving party did not *unduly* delay when leave to amend is sought within the deadline stipulated to by the parties and approved by the Court in a scheduling order. *See, e.g.*, *Green v. Dist. Council 1707, Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO*, 2015 WL 4621107, at *2 (S.D.N.Y. Aug. 3, 2015) (finding that delay was not undue when leave to amend was sought within the stipulated deadline approved by the court); *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96 (S.D.N.Y. 2010) (same). Indeed, given the Circuit's clear preference for deciding cases on the merits, courts have permitted amendments even near the

end or after the close of discovery.  *See, e.g.*, *Hanlin v. Mitchelson,* 794 F.2d 834, 841 (2d Cir.

1986) (allowing amendment of a pleading after summary judgment had been filed where the

new claims arose out of the same operative facts as the initial claims).

Here, AP7's motion falls within the January 13, 2023 deadline set by the Scheduling

Order in this case.  (See ECF No. 131.)  This date was set with the understanding that pleadings

could be amended after the completion of fact discovery.  There are still three fact depositions

remaining and expert discovery is ongoing.  The only witness who will need to be re-deposed is

AP7's expert.  If class certification had been granted, Defendants were going to have to depose

the expert on his merits report in any event.  At this point, Defendants have the full merits

report of AP7's expert and can supplement their class certification briefing knowing the precise

analysis rather than a summary of what the analysis would be.

Moreover, AP7 sought leave to amend quickly after its expert completed a damages

analysis indicating that the fallout from the revelations that Blankfein had met with Low and

Najib in 2013 continued on November 12, 2018.  While AP7 may have had access to the factual

information necessary to amend the complaint earlier, it did not have the expert analysis until

recently.  Even if AP7 could have sought leave to amend sooner, it is permitted to wait until

discovery confirms or supports the merits of the amendment before seeking leave to amend.

*De Jesus v. Subway IP Inc.*, 2018 WL 3442888, at *3 (S.D.N.Y. July 17, 2018).  Accordingly, there

is no undue delay here.

Defendants cite to no cases in which the court denied leave to amend based on undue

delay in similar circumstances.  Rather, many of the cases on which Defendants rely involve

situations where the amendments were filed after the close of all discovery or on the eve of

trial after summary judgment motions had been filed.  *See, e.g.*, *Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir. 1995) (leave to amend sought "three months prior to trial"); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) (amendment filed at summary judgment); *Priestley v. Am. Airlines, Inc.*, 1991 WL 64459, at *2 (S.D.N.Y. Apr. 12, 1991) (amendment would require "the reopening of discovery at this late stage").  Others are distinguishable because they were based on claims that were abandoned earlier in the case.  *See, e.g.*, *Anderson v. Greene*, 2017 WL 3503686, at *15 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 774 F. App'x 694 (2d Cir. 2019).

As to *Nightingale Group LLC v. CW Capital Management, LLC*, relied on by Defendants, this case did not even consider a motion to amend.  2012 WL 2674539 (S.D.N.Y. July 5, 2012). There, the defendant's motion to dismiss identified defects in the pleading, and after being alerted to these defects, the court gave plaintiff the opportunity to amend the complaint and advised plaintiff that the court would not permit any further opportunities to amend the complaint in the event the plaintiff chose not to amend the complaint at that time.  *Id.* at *10. The plaintiff chose not to amend the complaint and instead opposed the motion to dismiss on the merits.  Accordingly, in granting the motion to dismiss, the court did so with prejudice because the plaintiff had "chose[n] to forgo" the opportunity to amend.  *Id.* at *11.

Thus, Defendants' opposition to the amendment based on undue delay is unpersuasive.

**2.  *Whether the Proposed Amendment is Made in Bad Faith and Prejudicial to Defendants***

Defendants also argue bad faith and prejudice from the amendment.

In the context of a motion to amend under Rule 15, bad faith means something more than mere delay or inadvertence.  *Primetime 24 Joint Venture and Primetime 24 Relay Corp.*

*v. DirecTV, Inc.*, 2000 WL 426396, at *5 (S.D.N.Y. April 20, 2000) (citations omitted).  Similarly, mere allegations that an amendment "will require the expenditure of additional time, effort, or money do not themselves constitute undue prejudice." *Kreisler*, 318 F.R.D. at 706-07 (holding that under Second Circuit precedent, "the fact that the opposing party will have to undertake additional discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading").  Rather, prejudice in this context requires the expenditure of "*significant* additional resources to conduct discovery and prepare for trial or *significant*[] delay [in] the resolution of the dispute." *Mason Tenders Dist. Council of Greater NY v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 38 (S.D.N.Y. 2016) (citation omitted) (emphases added).  Defendants fail to meet their burden of showing either bad faith or prejudice.

Defendants' main objection is that AP7 is trying to maximize potential damages by the amendment and resurrect their claim that the November 12 disclosure caused a price impact. The prospect of additional liability is not a basis for finding prejudice. *Maiaro v. Alarm Specialists, Inc.*, 2014 WL 5285695, at *3 (S.D.N.Y. Oct. 15, 2014) (collecting cases).  The relevant issue "is legal prejudice, not the magnitude of the Defendant's potential liability." *In re Nasdaq Market–Makers Antitrust Litig.*, 1997 WL 805062, at *7 (S.D.N.Y. Dec. 3, 1997).

Nor is a plaintiff's attempt to maximize damages for a class bad faith – rather, that is the lead plaintiff's charge when appointed lead plaintiff. *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at *3 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 815 F. App'x 618 (2d Cir. 2020) (noting that it is the class representative's duty to act to maximize class recovery).  While a plaintiff should not seek leave to amend "solely to gain a tactical advantage," *Oneida Indian Nation of N.Y. State v. County of Oneida*, 199 F.R.D. 61, 80 (N.D.N.Y. 2000), an amendment for the purposes of

maximizing potential recovery does not itself constitute a "tactical advantage" that warrants denial of leave to amend, *Maiaro*, 2014 WL 5285695, at *3.

AP7's proposed amendment is also not an improper attempt to end-run Judge Broderick's motion to dismiss ruling, which dismissed AP7's allegations that the November 12 disclosure had a price impact on Goldman shares.  Although AP7's proposed amendment would bring in potential damages from a November 12 stock price decline, it would do so via a theory that is consistent with the motion to dismiss ruling.  That is, the proposed amended allegations would simply expand the event window for an earlier disclosure that Judge Broderick held is sufficient to state a claim.  Moreover, AP7's expert purports to account for any portion of the decline on November 12 that is attributable to the non-actionable November 12 disclosure by disaggregating the November 12 disclosure's impact in his calculations.  Although Defendants challenge whether the expert can meaningfully disaggregate that disclosure's impact, that issue is properly resolved on the merits—not on a motion to amend.

Defendants cite a variety of cases for the proposition that AP7's proposed amendment constitutes bad faith, but those cases all involved situations where the plaintiff delayed in amending the complaint until after the court had ruled on a pertinent issue that would have been decided differently had the plaintiffs amended the complaint in a timely fashion, and the evidence showed that the plaintiff purposefully delayed in seeking leave to amend in order to obtain a real tactical advantage that the plaintiff would not have had if it amended the pleading sooner.

For example, in *State Trading Corp. of India v. Assuranceforeningen Skuld*, the plaintiff waited over a year after the defendant challenged the applicability of Connecticut law and after

the motion to dismiss was decided to seek leave to plead that foreign law applied.  921 F.2d

409, 418 (2d Cir. 1990).  The court found that the reason the plaintiff waited to seek leave to

amend was clearly an attempt to avoid dismissal for *forum non conveniens* at the pleading

stage.  The court did not allow the plaintiff to gain this tactical advantage in the case through

the late amendment.  Likewise, in *In Re Interest Rate Swaps Antitrust Litigation*, the plaintiffs

waited until after the parties had spent months negotiating a discovery schedule that was

approved by the court before essentially seeking to "hitch[]" a "new MDL-sized lawsuit" to their

claims.  2018 WL 2332069, at *20 (S.D.N.Y. May 23, 2018).  The court found that during the

seven-month negotiation, the plaintiffs purposefully concealed the growing possibility that they

would seek leave to make "game-changing amendments," and declined to grant plaintiffs this

tactical advantage through bad-faith delay.  *Id.* at *24.

Similarly, in *City of Birmingham Firemen's & Policemen's Supplemental Pension System*,

the plaintiffs consistently stated that they did not intend to amend the complaint, and then

sought leave to amend *after* the court ruled on the scope of discovery based on an explicit

understanding that there was only one set of claims left in the case and other claims would not

be revived.  2022 WL 4377898 (S.D.N.Y. Sept. 22, 2022).  Had the plaintiffs been permitted to

file the late amendment, they would have gained an undue benefit from the court's discovery

ruling.  Finally, in *In re General Electric Company Securities Litigation*, after spending three years

disclaiming all allegations based on the defendant's knowledge and intent, the plaintiffs sought

leave to add claims based on the defendants' knowledge and intent, thus unfairly seeking the

advantage of avoiding a dismissal of those claims on the motion to dismiss under the Rule 9(b)

heightened pleading standard.  2012 WL 2892376 (S.D.N.Y. July 12, 2012).

Here, there is no evidence that AP7 waited to seek leave to amend to gain any advantage or avoid a negative ruling from the court on an earlier motion.  The proposed amendments arise from the same facts as the operative complaint, and AP7's assertion that its decision to amend is based on analysis conducted during expert discovery is persuasive. Indeed, AP7 would likely have been in a better position had it brought the proposed amended complaint in the first instance, and it gains no undue tactical advantage by waiting to bring it now.

Further, while it is true that class certification briefing focused to some extent on the Wall Street Journal article on November 9, 2018, AP7 never limited its allegations to that specific report or stated that its merits damages analysis would be restricted to the impact of that specific article.  Rather, the operative complaint lists multiple articles on November 9 that reported that Blankfein met with Low and Najib in New York in September 2013, of which the Wall Street Journal article is listed as one "example."  (SAC ¶¶ 287-88, 397.)  In his opinion denying Defendants' motion to dismiss, Judge Broderick similarly did not rely on the Wall Street Journal article, and instead found that Plaintiffs had sufficiently pleaded that "several news outlets" reported the first corrective disclosure regarding Blankfein's meeting with Low and Najib on November 9.  (ECF No. 102 at 36.)  In addition, Plaintiff's expert referred to other sources on November 9 besides the Wall Street Journal article that revealed Blankfein had met with Low and Najib in 2013, which Plaintiff characterizes as the critical disclosure.  (ECF Nos. 142-1 ¶ 22(a); 160-1 ¶¶ 48, 51, 55, 60.)  Since class certification briefing, additional discovery and analysis caused Plaintiff to refine – not change – its theory.  The claim is still based on the disclosures that came to light through multiple news articles, mostly on November 9, about

Blankfein's meeting with Low and Najib in 2013 and its impact on stock price.

### 3.    Whether the Proposed Amendment is Futile

Proposed amendments are futile when they would fail to state a claim under Rule

12(b)(6).  *IBEW Local Union No. 58 Pension Tr. Fun & Annuity Fund v. Royal Bank of Scotland*

*Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  Because determination of futility is subject to the

same standards as a motion to dismiss under Rule 12(b)(6), "futility is generally adjudicated

without resort to any outside evidence," and the court must accept all facts pleaded as true.

*Wingate v. Gives*, 2009 WL 424359, at *5 (S.D.N.Y. Feb. 13, 2009) (citing *Nettis v. Levitt*, 241

F.3d 186, 194, n.4 (2d Cir. 2001)).

Defendants argue that AP7's proposed amendments are futile for two reasons: first,

because they "directly conflict" with AP7's prior allegations, and second, because they are

"incompatible" with established loss causation law.

As to Defendants' first contention, Defendants argue that until now, AP7 has maintained

that Goldman's stock price declined on November 9 due to the Wall Street Journal report, and

on November 12 solely because of a November 12 Bloomberg article.  However, as discussed

above, AP7 never limited its allegations to the Wall Street Journal article, nor did it argue that

the Wall Street Journal or Bloomberg articles were the *sole* cause of any stock price decline.

Rather, these articles are listed as examples in the SAC of disclosures that were responsible for

the stock price declines.  (SAC ¶¶ 287-88, 397.)  In any event, a party is permitted to seek to

revise or refine its pleading to assert new or different facts when it learns through discovery

that an amendment is appropriate.  AP7's revisions can reasonably be attributed to an

improved understanding of the facts as a result of expert discovery.

To the extent Defendants challenge AP7's expert's credibility based on the revision to AP7's theory, this challenge is appropriately resolved on the merits rather than at this stage. *City of New York v. Hotel Barbour Operating Co.*, 1988 WL 96859, at *1 (S.D.N.Y. Sept. 14, 1988) (rejecting argument that leave to amend should be denied based on concerns as to the credibility of the plaintiff's main witness, because "[q]uestions concerning the credibility of a potential witness . . . are insufficient to demonstrate that a claim lacks merit.")

As to Defendants' second contention, Defendants argue that AP7's proposed amendment would allege a multi-day price impact window, and that courts have rejected multi-day event windows where, as AP7 has argued here, the stock at issue trades in an efficient market. However, it is not the case that allegations as to a multi-day event window in an efficient market are necessarily insufficient to state a claim, and courts have permitted multi-day event windows. *See, e.g. Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015) (finding "appropriate" the expert's use of a two-to-three-day window in an efficient market). Indeed, "[t]he selection of an appropriate event window is an inexact science," and the question whether a multi-day window is appropriate is fact-dependent. *United States v. Hatfield*, 2014 WL 7271616, at *12 (E.D.N.Y. Dec. 18, 2014) (citation omitted). AP7 argues that the specific facts here favor a finding that the price impact would have occurred more slowly than initially anticipated. As this argument is fact-specific, the Court should not delve into the merits of the issue at this stage.

Because AP7's proposed amendments would be sufficient to survive a motion to dismiss, Defendants have not met their burden to show that the amendment is futile.

**CONCLUSION**

For the above reasons, Plaintiff's motion for leave to file a Third Amended Complaint is granted.  Plaintiff shall file the Amended Complaint by **Friday, August 4, 2023**.

Pursuant to the parties' agreed upon schedule, Plaintiff's Expert Reports are due on **Friday, September 29, 2023**; Defendants' Expert Reports are due on **Tuesday, November 28, 2023**; and Plaintiff's Reply Expert Reports are due on **Friday, January 12, 2024**.  The close of expert discovery is extended to **Monday, February 12, 2024.**

Additionally, in light of the amendments to the operative complaint, the parties may file supplemental briefing on the class certification motion.  Defendants' supplemental class certification brief and expert report are due on **Friday, September 29, 2023**, and Plaintiff's supplemental class certification brief and expert report are due on **Tuesday, November 28, 2023**.

**SO ORDERED.**

Dated: July 31, 2023
      New York, NY

_____
KATHARINE H. PARKER
United States Magistrate Judge