# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SJUNDE AP-FONDEN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>THE GOLDMAN SACHS GROUP, INC., LLOYD C. BLANKFEIN, AND GARY D. COHN,<br><br>        Defendants. | Civil Case No. 1:18-cv-12084-VSB<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................2

II.    JURISDICTION AND VENUE ...............................................................................16

III.   PARTIES ...................................................................................................................17

    A.     Lead Plaintiff ...............................................................................................17

    B.     Defendants ...................................................................................................17

        1.     The Goldman Sachs Group, Inc. ..................................................... 17

        2.     The Individual Defendants ............................................................... 17

    C.     Non-Party Goldman Executives ..................................................................18

    D.     Relevant Non-Parties ...................................................................................20

IV.    FACTUAL ALLEGATIONS ....................................................................................20

    A.     Goldman Sachs .............................................................................................20

        1.     Global Prestige, Checkered Past ...................................................... 20

        2.     Goldman Claims to Clean Up Its Image through a Multiyear
              "Business Standards Committee" Review ................................................. 24

        3.     Goldman's Internal Post-Financial Crisis Push to "Monetize the
              State" in Emerging Markets .......................................................................... 29

            a)     As Western Economies Languish, Goldman Resolves to
                    Tap Sovereign Wealth Funds as a New Source of Revenue ......... 29

            b)     Goldman's First Foray into State-Fund "Monetization"
                    Results in an FCPA Investigation Involving Kickbacks and
                    Intermediaries .............................................................................. 30

            c)     A Quest for Returns Leads Goldman to Asia .............................. 34

    B.     Ignoring Internal Objections and Glaring External Warning Signs,
        Goldman Reaps Hundreds of Millions in Fees from 1MDB and Jho Low ..........36

        1.     1MDB: Red Flags from Its Inception ............................................. 36

            a)     Doing Business in Malaysia: A Hotbed of Corruption ................. 36

            b)     The Najib Regime: "A Government of Thieves" ......................... 38

            c)     Jho Low: The "Asian Great Gatsby" ........................................... 39

            d)     1MDB: Suspect from the Start ..................................................... 42

            e)     Goldman's Lead Bankers: On a "Very Long Leash" in the
               Wild West of Southeast Asia ........................................................ 45

               (1)     Andrea Vella ....................................................................45

               (2)     Tim Leissner .....................................................................47

2. Top Bankers Resolve to Show Low "Goldman Affection"...................... 48

3. Goldman, through Its Global Compliance Department, Vets and Rejects Low for the First Time ................................................ 51

4. Blankfein Meets Privately with Low and Najib to Solicit Business from 1MDB................................................................................ 52

5. Goldman's 1MDB Bankers Engage with Najib through Low, Dispensing Favors and Payouts ................................................ 54

6. Vella and Leissner Join Forces to Sell Bonds for a Corrupt Malaysian State Government, Earning Goldman a Public Rebuke .......... 55

7. Goldman's Legal Department Reviews—and Rejects—Working with Low ................................................................................ 56

8. Multiple Departments within Goldman Reject Low for the Third Time ........................................................................................ 58

9. Project Magnolia: Goldman Nets $192 Million from 1MDB's First Bond Offering Amid a Sea of Red Flags ................................... 59

   a) Goldman's Top Bankers Agree to Pay Bribes and Kickbacks........................................................................ 59

   b) Numerous Other Red Flags Signal Corruption at 1MDB ............ 61

      (1) Low's Role Is Well Known Inside the Bank .................... 61

      (2) Goldman Bankers Voice Concerns about the Deal's Terms But Are Steamrolled by Senior Management ......... 63

      (3) Project Magnolia's Terms Are Highly Suspicious ............ 65

      (4) Sensing Political Corruption, Investment Bank Lazard Pulls Out of the Deal............................................. 68

      (5) Outrage Over Corruption in Najib's Regime Spills into Malaysia's Streets ................................................ 70

   c) Defying the Warnings, Goldman Forges Ahead With the Magnolia Offering—and the Funds Quickly Disappear ............... 70

10. Project Maximus: As the Warning Signs Multiply, 1MDB's Second Offering Brings Goldman Another $114 Million in Fees ............ 73

   a) Immediately After the First Offering, 1MDB Seeks a Second........................................................................... 73

   b) Red Flags Again Signal Corruption ............................................. 74

      (1) The Second Deal's Terms Are Again Suspect.................. 75

      (2) Asia President David Ryan Again Speaks Out But Is Overruled and Sidelined by President Gary Cohn ......... 76

c)   Goldman Again Ignores the Warning Signs, and Hundreds of Millions More Are Stolen .......................................................... 77

11.   Low's Extravagance Continues to Grab Headlines ................................... 79

12.   Between Bond Deals, Blankfein Meets Privately with Low Again—This Time One-On-One .................................................... 81

13.   Project Catalyze: Goldman Rushes a Third Offering to Market Amid Proliferating Evidence of Corruption ............................................. 82

a)   Najib Looks to Refill His Campaign Slush Fund as an Election Nears, and Goldman Gladly Obliges .............................. 82

b)   Red Flags Mark Project Catalyze As a Conduit for Corruption ...................................................................................... 83

(1)   The Speed, Secrecy, and Shifting Purpose of the Issuance Are Red Flags ......................................................84

(2)   The Timing of the Raise Strongly Indicates Corruption .......................................................................85

(3)   Internally, Goldman Bankers Discuss Najib's Misuse of 1MDB Funds ...................................................86

(4)   The Third Offering's Terms Are Equally Suspicious ........86

(5)   1MDB's Capital Structure and Interest Obligations Render the Offering Suspect ...........................................87

(6)   Ryan Resigns After Cohn Silences Him a Third Time ....................................................................................88

(7)   BSI Questions Its Role, Prompting Goldman to Intervene to Keep the Deal on Track ...............................89

(8)   Goldman's Own Outside Counsel Identifies BSI as a Compliance Risk ...........................................................89

c)   Goldman Rams Through Project Catalyze Despite the Red Flags, Nettings Its Biggest Payday Yet While Billions More are Stolen ..................................................................................... 90

14.   Questions About 1MDB's Legitimacy and Low's Role in the Fund Spill into the Press .................................................................................... 92

15.   Blankfein Meets with Low for the Third Time as Goldman Pushes for More Business with 1MDB ................................................................ 95

16.   The Federal Reserve Warns Goldman of Reputational Risk from Its Work with 1MDB .......................................................................... 97

17.   Coastal Energy: Goldman's Dubai Office Helps Low Move Stolen Money, Hides Low's Involvement, and Blesses a Highly Suspicious Payout to Low a Week Later .................................................. 98

18.     "We Have to Do More of That": Blankfein Extols Vella and Leissner, Urging Other Goldman Bankers to Emulate Them................. 101

C.      As Outside Scrutiny Grows and Prosecutors Close in, Goldman Tries to Obscure Its Role in the Fraud ............................................................102

D.      Goldman Mounts a "Rogue Banker" Defense that is Widely Rejected.............112

V.      SUMMARY ALLEGATIONS OF SCIENTER ............................................................118

A.      Scores of Red Flags Surrounded Goldman's Relationship with 1MDB.............118

B.      Defendant Blankfein Met with Low Three Times to Discuss Goldman's Business with 1MDB ........................................................................................126

C.      Goldman's Asia President David Ryan Repeatedly Warned of the Risk 1MDB Posed.....................................................................................................127

D.      Gary Cohn and Other Top Executives Not Only Heard Concerns about the Risks Posed by 1MDB, They Retaliated Against Those Who Voiced Them......128

E.      Vella and Leissner Were Among Goldman's Most Powerful Senior Bankers ............................................................................................................129

F.      Goldman's Dubai Office and Global Compliance Knew the Bank Was Advising Low and that Low Would Receive a Highly Suspicious Payout on the Coastal Energy Deal........................................................................................130

VI.     DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ...................................................................131

A.      Materially False or Misleading Statements Regarding the 1MDB Deals............131

B.      Materially False or Misleading Statements Regarding Goldman's Reputation, Integrity, and Compliance with Relevant Laws ...............................151

VII.    LOSS CAUSATION..........................................................................................................155

VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES .........161

IX.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY .............................................................................................................162

X.      CLASS ACTION ALLEGATIONS ................................................................................163

XI.     CAUSES OF ACTION....................................................................................................166

XII.    PRAYER FOR RELIEF ..................................................................................................171

Court-appointed Lead Plaintiff, Sjunde AP-Fonden ("AP7" or "Lead Plaintiff"), by and through its undersigned counsel, brings this action individually and on behalf of all other similarly situated persons and entities who purchased or otherwise acquired The Goldman Sachs Group, Inc. ("Goldman" or the "Company") common stock between October 29, 2014, and November 8, 2018, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Goldman, Lloyd C. Blankfein, and Gary D. Cohn (collectively, "Defendants"). Blankfein and Cohn are collectively referred to as the "Individual Defendants."

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon, among other things, the ongoing investigation that Court-appointed Lead Counsel is conducting under Lead Plaintiff's supervision. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that Goldman filed with the SEC; (ii) securities analysts' reports about Goldman; (iii) transcripts of Goldman investor conference calls; (iv) Goldman press releases and presentations; (v) press and media reports, including online news sources and other journalistic sources; (vi) public material obtained in connection with the continuing investigations discussed herein; and (vii) consultation with economic and industry consultants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

I.        **INTRODUCTION**

1.        For five years beginning in 2009, Goldman Sachs fueled a multi-billion-dollar embezzlement and money-laundering scheme that, according to *The Wall Street Journal*, has "***put[] the bank at the center of one of the biggest financial frauds in history***."[1] Today, one of Goldman's most powerful bankers awaits sentencing in federal court for paying bribes and laundering money to generate business for the bank; a senior Managing Director stands accused of the same; and Goldman's Head of Investment Banking in Asia has been identified in court papers as a co-conspirator. Seventeen current and former Goldman managers, along with three subsidiaries, have been criminally charged overseas. Intense media coverage since the scandal broke has implicated executives at the highest level of the bank, including former CEO Lloyd Blankfein and former President Gary Cohn. The Justice Department, in a federal indictment, has publicly blamed a "business culture" at Goldman that is "***highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions***." Criminal and civil probes into the bank itself are ongoing in the United States and abroad.

2.        This extraordinary fallout stems from Goldman's work as investment banker to the 1Malaysia Development Berhad ("1MDB"), a sovereign wealth fund purportedly set up to spur economic development in Malaysia. Goldman played a central role in the fund's origins in 2009. Then, during a ten-month period beginning in May 2012, Goldman underwrote $6.5 billion of 1MDB debt in three rapid-fire bond offerings that it was awarded without any bidding process, netting the bank an astronomical ***$600 million in fees—200 times the typical sum for such deals***. Goldman did so amid a sea of red flags, including repeated protests from both within

---

[1] Unless otherwise noted, all emphasis is added.

and outside the bank, which included explicit warnings about the very type of potential fraud that ultimately occurred.

3.     After each offering, hundreds of millions of dollars in proceeds—several billion in total—were siphoned away to, among other things: (i) fund the corrupt Malaysian Prime Minister, Najib Razak, who created 1MDB; (ii) pay off co-conspirators in Malaysia and the Middle East; and (iii) finance the playboy lifestyle of the key architect of the sprawling fraud, Low Taek Jho (also known as "Jho Low"). Then, after the last offering closed, Goldman's Head of Investment Banking for the Middle East structured a transaction to clean some of Low's stolen money, fully aware that the transfer of several hundred million dollars to Low lacked any legitimate business purpose.

4.     Throughout the Class Period, Goldman lied to and misled its shareholders about its true role in the 1MDB fraud. Once public scrutiny of 1MDB and Low started to mount in 2014, Defendants falsely portrayed Goldman's work for both while denying all wrongdoing. Furthermore, Defendants repeatedly touted Goldman's supposedly robust risk management framework and internal controls. When facts demonstrating Goldman's central role came to light, its shareholders suffered huge losses, as the bank's stock price fell precipitously on the market's astonishment that Goldman had actively facilitated—and handsomely profited from— the unprecedented global fraud.

5.     Ironically, Goldman's current predicament traces its origins to the Company's exit from another set of scandals not long before. In the wake of the financial crisis, Goldman faced a raft of regulatory inquiries, criminal investigations, and civil fraud lawsuits concerning various charges of self-dealing, ethical lapses, and governance failures, leading to billions of

dollars in settlements. Goldman's prized reputation as the most prestigious of the global investment banks was badly tarnished.

6.     Looking to repair the damage, Goldman created a "Business Standards Committee" ("BSC") to conduct what Blankfein called "the most extensive review of the firm's business standards and practices in the firm's 144-year history." Several months later, the BSC produced a sixty-three page report detailing "39 recommendations for change" at the bank. These reforms focused on improving compliance at the bank to safeguard its reputation, mandating, among other things: (i) stronger due diligence; (ii) robust internal reporting mechanisms; (iii) pre- and post-transaction monitoring; (iv) an annual review process that linked advancement and compensation to compliance; and (v) a hierarchy of committees that would review important transactions to ensure that they did not pose reputational or compliance risks. An oversight group set about implementing these changes immediately, and Cohn issued a letter to Goldman's shareholders representing that these measures had been "fully implemented" no later than February 2013. A remade Goldman was born, publicly chastened and newly committed to effective compliance and risk controls.

7.     In private, however, its top executives were plotting a course away from the intense regulatory spotlight and lower profits of its traditional markets. Goldman's deal fees in the United States and Europe were depressed as a result of the Great Recession, and the bank was stung by the billions in penalties it had paid for recent misconduct. Seeking new fee opportunities, Blankfein pushed his bankers to "***be Goldman Sachs in more places***"—namely, in emerging markets, particularly Asia. Building on Blankfein's pivot, Cohn rolled out a plan to tap sovereign wealth funds in these growth economies to serve as a new source of advisory and

underwriting fees for the firm's core Investment Banking Division. Cohn called the initiative Goldman's drive to "***monetize the state***."

8.      Goldman gave Cohn's new strategy a test run in Libya, where the Company pitched the post-sanctions Gaddafi regime on a series of complex derivative trades that the country's rich, but naive, state investment fund failed to understand. While internally disparaging their client's "zero-level" financial sophistication, senior Goldman bankers gushed to each other that "[i]nvestment opportunities with this account is [sic] one of the largest I've ever seen." The bank's sales team plied Libyan officials and their family members with lavish dinners, trips to London and Dubai, and for one, a long-term internship at Goldman, leading to a criminal investigation into whether Goldman violated the Foreign Corrupt Practices Act of 1977 ("FCPA"). The attention worked. The Libyans piled into trades that the bank recommended, and ***Goldman earned between $200 million and $350 million in fees***. The trades proved disastrous for Goldman's client, with the Libyan state fund losing $1.2 billion. Nevertheless, Goldman sent the banker overseeing the Libya account team, Andrea Vella, to Hong Kong as part of Blankfein's focus on emerging economies. Vella was twice promoted, rising to Goldman's Co-Head of Investment Banking for all of Asia ex-Japan.

9.      In his new post in Hong Kong, Vella worked with another star Goldman banker, Tim Leissner, then the Head of Investment Banking for Southeast Asia. Like Vella, Leissner had a reputation for skirting internal controls well before the 1MDB scandal, including dolling out favors to drum up business that exposed the bank to FCPA violations in the Far East. Leissner's transgressions were tolerated, however, because he generated large fees for the bank.

10.     Goldman's work with Low and 1MDB began in 2009, when Roger Ng, a Managing Director in Goldman's Singapore office, introduced Leissner to Low. A Malaysian in

5

his twenties with few professional accomplishments and no track record as a professional investor, Low had traveled throughout the Middle East to meet managers of the Gulf states' sovereign investment funds, with the idea of leveraging those contacts to establish and control such a fund himself. Back home, one of his closest contacts had become the incoming Prime Minister of Malaysia, Najib.

11.    With Leissner's assistance, Low convinced the sultan of an oil-rich Malaysian state to set up a local investment fund and issue $1.4 billion in Islamic bonds. A local bank underwrote the debt, but Goldman advised on the offering—the first of five deals that Goldman would do with Low in as many years. When Najib assumed the premiership in April 2009, Low persuaded him to take over the regional fund and expand its charter nationally, becoming 1MDB. Najib viewed 1MDB as a political slush fund, while Low viewed it as a font of wealth that would put him on par with the fund managers that he had encountered in the Gulf.

12.    While Najib nominally oversaw 1MDB, Low was its *de facto* CEO, making all of its significant operational decisions. That power in hand, Low embezzled $700 million in proceeds from the Islamic bond issuance through a sham joint venture with a Saudi Arabian oil company. Then, Low embarked on a spending spree of unprecedented magnitude, pouring hundreds of millions of dollars into cavorting with celebrities in New York nightclubs, yacht and private jet rentals, hotels and real estate, and alcohol-fueled parties across the globe. Low's consumption quickly attracted widespread press attention, with a variety of news outlets detailing his jet-setting exploits in 2009 and 2010.

13.    Meanwhile, Goldman sought more work with Low and the fund that he controlled, which was precisely the sort of client that the bank was seeking for new revenue streams in Cohn's drive to "monetize the state." In September 2009, Leissner and Ng

recommended Low for an account with Goldman's private banking arm in Switzerland, as Low was eager to find new banks at which to stash his illicit funds. After reviewing Low's finances, however, Goldman's Global Compliance Department rejected Low over concerns about his unexplained source of wealth. It was the first of at least three instances that various Goldman departments charged with maintaining internal controls rejected Low as a compliance risk, concluding, "***we have pretty much zero appetite for a <u>relationship</u> with this individual***."

14.     Despite these unequivocal warnings, senior investment bankers and high-level executives at Goldman sought instead to deepen the bank's relationship with Low. Indeed, only two months after Low was first flagged as an intolerable compliance risk, ***Blankfein met privately with Low, Najib, and Leissner*** at the Four Seasons in New York in November 2009 to discuss how Goldman could do business with 1MDB. The meeting laid the groundwork for a half-decade of lucrative deals—as well as at least two more in-person meetings between Blankfein and Low.

15.     In 2012, with $1.4 billion in debt and virtually no assets to show for it, 1MDB looked to tap the international capital markets, and Low approached Goldman for help. The bankers met with Low and determined that, with no credit rating, 1MDB would need a guarantor. Low suggested the International Petroleum Investment Company ("IPIC"), a sovereign wealth fund in Abu Dhabi whose managers had an equal penchant for corruption. After traveling together to the emirate, Low informed Leissner and Ng that, to secure the guarantee, they would have to pay kickbacks to government officials in Malaysia and Abu Dhabi. Ng relayed the message to Vella, who agreed. Goldman, through Vella, Leissner, and Ng, and with the approval of other senior executives, including Blankfein and Cohn, then exclusively underwrote three bond offerings for 1MDB at Low's behest, raising ***$6.5 billion*** for the fund in only ten months.

For its work, Goldman received a staggering ***$600 million in fees***—200 times the $1 million per offering that banks would typically receive for such transactions in the region.

16.     There was a reason for this surfeit of riches: Low and 1MDB did not offer other investment banks an opportunity to bid on any of these deals, and paid Goldman to lend its name and prestige to large debt raises ***riddled with red flags*** from start to finish, as described below. Goldman proved happy to oblige, disregarding the following warning signs while quashing those within the bank who dared to call attention to the obvious.

17.     **Jho Low**. By the first bond offering, Low had been rejected numerous times as *persona non grata* by various compliance functions within Goldman due to his unexplained wealth and extensive press about his unbridled spending. Furthermore, knowledge within Goldman of Low's role as 1MDB's principal representative and facilitator extended well beyond the deal team:

   a. *First*, ***Blankfein met privately with Low at least three times*** before, during, and after the bond deals to discuss how the bank could do more business with 1MDB.

   b. *Second*, Leissner explicitly informed Goldman's Head of Global Compliance and the Capital and Suitability Committees—two top firmwide committees charged with reviewing the deals for reputational risk—that Low was a key intermediary for 1MDB.

   c. *Third*, internal documents, including Goldman emails, discussed Low's importance to the 1MDB account, with one Managing Director writing that Low was "***the* 1MDB Operator or intermediary in Malaysia**" just before the first offering came to market.

     d. *Fourth*, Goldman bankers traveled openly with Low and included him in 1MDB-related meetings with third parties across Asia, the Middle East, and the United States.

     e. *Fifth*, the 1MDB deal team repeatedly alerted compliance-related functions and other Goldman business units that they were working with Low and considered him an important client.

Goldman's decision to move ahead with each multi-billion-dollar deal despite its knowledge that Low was orchestrating each reflected the bank's willingness to disregard its compliance departments' warnings when large fees were in play.

18.   **The Najib Regime**. Various indicators around the government of Najib, which chartered 1MDB, further reflected a strong likelihood of corruption. To begin with, corruption in Malaysia was endemic. *The Wall Street Journal* reported in 2012 that Malaysia was the most corrupt country in the world in which to do business, with kickbacks and bribes frequently required to win business from the government. Both Najib, who had been dogged by allegations of corruption for years as a government minister, and his wife, Rosmah Mansor, had a reputation for graft. In fact, soon after Goldman began working with 1MDB, Rosmah, whose ostentation was a frequent subject of controversy in Malaysia, had demanded a $300,000 contribution from Goldman to a "charity" that she controlled, which the 1MDB deal team sought to make through Goldman's charitable arm. Moreover, just before Goldman launched 1MDB's first $1.75 billion bond offering in May 2012, tens of thousands of protesters took to Kuala Lumpur's streets to demand reforms, calling for Najib's resignation amid charges of corruption. The third and largest of the bond deals—$3 billion, which Najib requested only weeks after the second $1.75 billion offering had funded—came in the midst of a heated national election during which ***Goldman***

*bankers openly discussed the likelihood that Najib was diverting 1MDB funds for political gain*. Nevertheless, in a country rife with corruption and a regime taking it to extremes, Goldman chose to remain 1MDB's exclusive underwriter.

19.    **Deal Terms**. More than a half-dozen highly suspicious features of the $6.5 billion in bond offerings themselves indicated that the rushed, secretive deals were conduits for corruption:

    a.  *First*, 1MDB's willingness to pay Goldman nearly ***200 times the typical fee*** was a strong indicator that misconduct was afoot. As a former Goldman Partner put it to *Bloomberg*, "the amount of money Goldman Sachs made from relatively plain bond deals should have been ***a bright warning to its highest executives***."

    b.  *Second*, the deals involved guarantees by an Abu Dhabi investment fund half a world away, run by a managing director with ***a reputation for demanding kickbacks***.

    c.  *Third*, the offerings, each of which was awarded to Goldman without competition, were marked by extreme secrecy, with a ***Goldman employee being told to keep all discussion of the bonds off of email***.

    d.  *Fourth*, the stated intent of the offerings was frequently shifting and consistently inadequate. Half or more of each capital raise was devoted to unidentified "general purposes," with the offering circular for the third and largest round disclosing that the fund had no investment prospects.

    e.  *Fifth*, Goldman structured the deals as private placements, shrouding them from public view. While the bank later sought to justify its enormous fees on the ground that it bore increased risks by buying the bonds itself from 1MDB for

10

resale, it had in fact lined up purchasers in advance, meaning it took on virtually **no** risk from the deals.

f.   *Sixth*, the bonds' yields were unusually high, as much as 2 ½ times that of comparable securities, again raising the question of why 1MDB was willing to pay so much to bring these offerings to market. The high interest rates made the bonds extremely attractive to investors, however, making it all the more easy for Goldman to offload them.

g.   *Seventh*, the timing of the issuances was suspicious, with the three deals occurring in quick succession with little justification for the speed Najib demanded in closing them or why additional capital was required so soon after the most recent infusion.

h.   *Eighth*, 1MDB insisted on using a tiny Swiss private bank called BSI Ltd. to receive the mammoth proceeds of each bond offering—a selection designed to avoid the more rigorous compliance of a global financial institution.

20.   **Internal Dissent**. Within Goldman were executives and senior bankers who saw how dubious the 1MDB deals were and sensed the reputational damage that they could bring. Yet when they spoke out, as the BSC reforms had both encouraged and required, Goldman silenced them. For example, David Ryan, President of Goldman Asia and member of Goldman's Management Committee, expressed misgivings during each of the three offerings about the deals' suspect terms, the bank's unwarranted profits, and the fund's willingness to award Goldman the unusually lucrative underwriting business without soliciting competing bids. Rather than heed the concerns of one of the bank's senior-most executives, ***Cohn sidelined Ryan***, overruled his repeated warnings, and installed a pro-1MDB chairman above him. Another banker

in Southeast Asia, Alex Turnbull, faced similar treatment after sending an email to colleagues expressing disbelief about the first offering's terms, including its pricing and the lack of transparency about how the funds would be used. Turnbull was ***reprimanded*** by Goldman's own Compliance Department for questioning the deal and "b-tracked" until he left the bank two years later.

21.    **Outside Warnings**. Professionals outside the bank also sounded the alarm, again to no avail. During preparation for the first offering, Goldman engaged Lazard Ltd., another prominent investment bank, to provide a valuation for the power assets that a portion of the proceeds was earmarked to buy. Finding that the valuation sought by Goldman was far too high, Lazard pulled out, concluding that the deal "***smacked of political corruption***." Lazard proved correct: after the deal closed, the seller made $170 million in donations to a "charity" arm of 1MDB for Najib to use as a slush fund, while 1MDB wrote down $400 million of the assets' value, admitting it had overpaid. Outside auditors, lawyers, and compliance desks at other banks likewise saw signs of fraud. For example:

a.    1MDB fired its first auditors, Ernst & Young, when the firm would not certify an accounting sleight-of-hand that Low had demanded at the end of the fund's maiden year. The next auditors, KPMG, provided the certification only after conspicuously noting its concern about the issue in 1MDB's financial statements. It, too, was later fired. A third set of auditors, Deloitte, resigned after just two years with the fund.

b.    BSI, ***1MDB's own bank***, questioned why it, a small private Swiss institution, had been tapped to receive $3 billion in proceeds from the large debt offering of a

sovereign wealth fund. To keep the bond deal on track, Goldman bankers interceded and convinced BSI to accept the transfer.

c. Linklaters LLP., **Goldman's own outside counsel** on the third offering, also voiced concern about relying on BSI as the custodian bank. Goldman shrugged off the warnings and went ahead with the issuance anyway, earning its biggest payday to date.

22.    A similar cycle repeated itself after each of the offerings. After each deal funded, hundreds of millions of dollars disappeared from 1MDB's account almost immediately—just as it had with the $1.4 billion Islamic bond offering for 1MDB's predecessor fund on which Goldman had earlier advised. Then, within days or weeks, Low and Najib would return to Goldman to ask for another massive capital raise, providing no explanation as to where the hundreds of millions earmarked for "general purposes" in the last deal had gone. Goldman would immediately agree and begin work preparing the next offering. Yet even a cursory look into 1MDB's financial records during the due diligence that such preparation required would have revealed the enormous holes in 1MDB's balance sheet and explained why the fund needed more cash so soon.

23.    Goldman, however, was driven by the prospect of more fees from what had become one of its most lucrative clients. Indeed, soon after the third offering closed, **Blankfein met with Low for a third time** to discuss how the bank could do more business with 1MDB. Even as the Federal Reserve in 2014 began scrutinizing the 1MDB deals and warning Goldman about the reputational risk that the relationship posed, Blankfein continued his push for more profits. Inside the bank, Blankfein lauded Vella's and Leissner's work with 1MDB, and boasted

to a gathering of Goldman investment bankers, "[*l*]*ook at what Tim and Andrea did in Malaysia. We have to do more of that*."

24.     Blankfein's high praise aside, Goldman's *fifth* deal with Low had nothing to do with either Leissner or Vella. Since 2012, Goldman's Head of Investment Banking for the Middle East and North Africa, Hazem Shawki, had been advising Low on a proposed takeover of Houston-based Coastal Energy—one of many means by which Low sought to turn his stolen 1MDB funds into assets that appeared legitimate. Learning of the deal as it approached fruition in 2014, Goldman compliance personnel, who had rejected Low as a client on three separate occasions, wrote in an internal document, "*Jho Low's appearance is not welcome. But if he is in a very minor role . . . then we may be able to live with it*." With this encouragement, Shawki nominally changed clients to advise Low's partner in the acquisition, a subsidiary of IPIC, the Abu Dhabi fund whose corrupt executives had been taking kickbacks to guarantee 1MDB's bonds. Then, within days of the acquisition's closing, the IPIC subsidiary paid Low $350 million, supposedly to buy out the shares in Coastal Energy that Low had acquired with only $50 million a week before—a 600% return on investment. The transfer to Low was textbook money laundering, and *Shawki knew of the transfer at the time*.

25.     Beginning in late 2014 and continuing throughout the Class Period, media scrutiny on Goldman's inexplicably large fees from its cozy relationship with 1MDB and Low gathered steam. Now facing questions about a series of deals that it had tried to keep quiet, Goldman issued a series of materially false or misleading statements about its work with 1MDB and Low. For example:

> a.  Responding to an October 2014 article in the Malaysian outlet *The Edge*, Goldman stated: "Other than legal and accounting firms providing professional

services, ***no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with these transactions***, nor have we ever been asked by 1MDB or others to pay such fees or commissions[.]" Yet Goldman's own senior bankers had agreed to pay kickbacks to government officials in Malaysia and the Middle East, and it is beyond dispute that 1MDB paid ***billions*** to conspirators in the scheme.

b.   In December 2016, after *The Wall Street Journal* published an article titled, "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep," Goldman claimed publicly: "***We have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions***" Of course, Blankfein himself had personally met with Low before, during, and after the 1MDB bond offerings to discuss how Goldman could do business with the fund, and a mountain of other evidence, including internal Goldman emails, confirmed the bank's contemporaneous knowledge that Low was a key intermediary.

c.   In June 2018, as pressure on the bank mounted amid deepening civil and criminal probes in the United States and Malaysia, the bank claimed: "***What we earned from the debt transactions reflected the risks we assumed at the time***." In truth, Goldman had taken on virtually no risk in the offerings, as the bank had lined up buyers before closing and could have easily sold the bonds regardless due to their unusually high interest rates and dual-sovereign guarantee.

Meanwhile, in each of its annual and quarterly filings with the SEC during the Class Period, the bank consistently touted the strong risk-management and compliance safeguards that it claimed were so improved after the financial crisis.

26.     These and other statements that Goldman made to obscure its central role in the 1MDB scandal were exposed as false or misleading by a flurry of investigative reports, criminal charges, and civil suits filed amid intense media coverage. In a series of disclosures beginning in May 2016, continuing through December 2018, information concerning Goldman's culpability for facilitating one of the largest and most sprawling financial frauds in history was revealed. Goldman shares plummeted as the market began to grasp the magnitude of the bank's exposure, wiping out billions in market capitalization and directly causing damages to Lead Plaintiff and other class members. Through this action, Lead Plaintiff seeks to hold Defendants accountable for deceiving Goldman's shareholders.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

28.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

29.     Defendant Goldman maintains an office in this District, sponsors common stock on the New York Stock Exchange ("NYSE"), and engaged in the public offering of common stock in this District. Moreover, certain of the acts that constitute the violations of law complained of herein, such as the dissemination of materially false or misleading information to the investing public, including in Goldman's filings with the SEC, occurred in and/or were issued from this District.

30.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities market.

## III.   PARTIES

### A.      Lead Plaintiff

31.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $50 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired Goldman's common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

### B.      Defendants

#### 1.      The Goldman Sachs Group, Inc.

32.     Defendant Goldman is a Delaware corporation that maintains its principal executive offices at 200 West Street, New York, New York. Founded in 1869, Goldman is one of the world's largest investment banking and financial services companies. It maintains offices in major financial centers around the world and provides a wide range of financial services to corporations, financial institutions, governments, and individuals. The Company's common stock is listed and traded on the NYSE under the ticker symbol "GS."

#### 2.      The Individual Defendants

33.     Defendant Blankfein served as CEO and Chairman of Goldman from 2006 until September 30, 2018, and the end of 2018, respectively. He has served as Senior Chairman of Goldman since January 1, 2019. He was elected to the Board of Directors in 2003. During the Class Period, Blankfein was responsible for the day-to-day management and controlled and directed the business and activities of Goldman, including certifying Goldman's periodic filings

with the SEC and speaking on a regular basis with investors and securities analysts regarding the Company. Blankfein approved and signed Goldman's Forms 10-K, Proxy Statements, and Annual Reports throughout the Class Period.

34.     Defendant Cohn began his career at Goldman in 1990 and held various positions in the firm during his tenure. Most recently, Cohn served as Goldman's President and COO from 2006 through his resignation, effective December 31, 2016. Cohn was a member of the Company's Board of Directors from 2006 until his resignation and a member of its Management Committee from 2002 until he left the firm. He was also Chairman of the firmwide Business Standards Committee. During the Class Period, Cohn was responsible for the day-to-day management of the firm, controlling and directing the business and activities of Goldman, including certifying Goldman's periodic filings with the SEC, and speaking regularly with investors and securities analysts about the Company. Cohn approved and signed, among other things, Goldman's 2013, 2014, and 2015 Forms 10-K and Annual Reports.

### C.     Non-Party Goldman Executives

35.     J. Michael Evans joined Goldman in 1993 and was named a Partner in 1994. From 2011 until he retired in December 2013, Evans served as the Global Head of Growth Markets (also referred to as "emerging markets"). From 2004 to 2013, Evans held the post of Chairman of Goldman Sachs Asia, also serving as Vice Chairman of the Company from February 2008 until his retirement. From 2010 through 2013, Evans co-chaired the Business Standards Committee. Evans also held a seat on Goldman's Management Committee from 2009 through his retirement.

36.     Timothy Leissner joined Goldman in 1998 and was promoted to Head of Investment Banking for the Singapore office in 2002, then became Head of Investment Banking for Southeast Asia no later than 2007. He became a Partner (also referred to as a "Participating

Managing Director") in 2006. Leissner was also elevated to Goldman's Partnership Committee in 2013, becoming one of only about two-dozen members across the entire firm to hold a place on that Committee. In July 2014, Leissner was promoted to Chairman of Southeast Asia. Leissner left the bank in 2016. On June 7, 2018, federal prosecutors filed a two-count criminal complaint and supporting affidavit in connection with Leissner's involvement in the 1MDB scandal. On August 28, 2018, Leissner pled guilty to conspiring to violate the FCPA and commit money laundering. He is currently awaiting sentencing.

37.    Roger Ng is a Malaysian national who worked at Goldman from approximately 2005 until his resignation in May 2014, having served as a Managing Director in Singapore from 2009. Ng was also head of Goldman's Southeast Asian sales and trading unit for fixed income, currencies, and commodities at the time of his resignation. On October 3, 2018, federal prosecutors filed a three-count indictment against Ng for his involvement in the 1MDB scandal.

38.    David Ryan served as President of Goldman Asia from 2011 until his resignation in July, 2013. In this role, Ryan built out Goldman's Chinese and Indian businesses, acquired and integrated its Australian business, expanded the Company's head count in Singapore threefold, and opened the Malaysia business. Ryan was a member of the firmwide Management Committee.

39.    Hazem Shawki was Goldman's Head of Investment Banking for the Middle East and North Africa from June 2011 to July 2019, based in Goldman's Dubai office. Shawki had been a Managing Director for Goldman from 1999 to 2008, then worked for three years in private equity before returning to Goldman.

40.    David Solomon joined Goldman as Partner in 1999 and has served as Goldman's CEO and Chairman since October 1, 2018, and January 1, 2019, respectively. Before that,

Solomon served as Goldman's President and Chief Operating Officer beginning in 2017. Prior to that, Solomon served as Co-Head of the Investment Banking Division from 2006 to 2016. Earlier, Solomon was the Global Head of the Company's Financing Group, one of two departments within the Investment Banking Division.

41.     Andrea Vella joined Goldman as a Partner in 2007 and relocated to Asia in 2010, serving as Goldman's Head of Credit Capital Markets in Asia ex-Japan. In January 2014, Vella was promoted to Co-Head of Goldman's Financing Group for Asia ex-Japan. In May 2015, Vella was appointed Co-Head of Goldman's Investment Banking Division for all of Asia ex-Japan. Vella was placed on leave in November 2018 for his involvement in the 1MBD scandal.

### D.     Relevant Non-Parties

42.     Low Taek Jho ("Jho Low" or "Low") is a Malaysian national that served as an intermediary on behalf of Goldman, 1MDB, and Malaysian and other foreign government officials in connection with the three bond offerings Goldman underwrote for 1MBD in 2012 and 2013, as well as other financial transactions involving Goldman and 1MDB. On October 3, 2018, federal prosecutors filed a two-count indictment against Low for his involvement in the 1MDB scandal.

43.     Najib Razak served as the sixth Prime Minister of Malaysia, holding that position from April 3, 2009 until May 10, 2018.

## IV.     FACTUAL ALLEGATIONS

### A.     Goldman Sachs

#### 1.     Global Prestige, Checkered Past

44.     Goldman is one of the world's largest and most profitable investment banks. It divides its operations among four segments: Investment Banking, Institutional Client Services, Investing and Lending, and Investment Management. Its Investment Banking segment—the

bank's most prominent—focuses on advisory and capital-raising services for a range of private and public sector clients.[2]

45.     The bank's internal hierarchy is clear. At the top are the Partners, who in 2010 numbered 375 out of roughly 35,000 employees—just over 1% of the firm's workforce.[3] The second-highest rung is held by the Managing Directors, the ranks of which have recently increased to about 2,150, or 7% of Goldman workers.[4] Stewardship of the firm's business and operations is done by committee, with multiple layers of regional and firmwide groups staffed by senior bankers and other executives. Above all others is the ***Management Committee***, which "oversees [Goldman's] global activities . . . directly and through authority delegated to committees it has established."[5] By the bank's own description, the Management Committee "consists of [its] most senior leaders, and is chaired by [its] chief executive officer."[6]

46.     Goldman's regulatory compliance functions are divided between the Legal and Global Compliance departments. Within Legal is the ***Business Intelligence Group***, which, according to the bank, "provides research and due diligence focused on legal, regulatory, financial and reputational risk to the firm's businesses and committees worldwide."[7] The group is supposed to play a key role in vetting clients and counterparties in Goldman's significant relationships, including informing executives and oversight committees of information they need to know to approve important transactions. From 1992 until January 2019, the Legal Compliance

---

[2] The Goldman Sachs Grp., Inc., 2018 Annual Report at 1.

[3] Susanne Craig, *How Goldman Makes (and Unmakes) Its Partners*, The N.Y. Times (Sept. 12, 2010), https://dealbook.nytimes.com/2010/09/12/how-goldman-makes-and-unmakes-its-partners/.

[4] Matt Turner & Alex Morrell, *Goldman Sachs' new managing-director list is out – and it's the largest class in the firm's history*, Bus. Insider (Nov. 8, 2017), https://www.businessinsider.com/goldman-sachs-new-managing-director-list-is-out-2017-11.

[5] The Goldman Sachs Grp., Inc., 2018 Annual Report at 78.

[6] *Id.*

[7] Legal, The Goldman Sachs Grp., Inc. (last visited Oct. 23, 2019), https://www.goldmansachs.com/careers/divisions/legal/.

21

department was managed by longtime General Counsel, Executive Vice President, Partner, and member of the Management Committee, Gregory Palm.[8]

47.     Goldman's **Global Compliance** department is intended to complement and overlap with Legal's risk-management functions. According to the bank, Global Compliance is "dedicated to protecting the reputation of the firm and managing risk across all business areas."[9] Its mandate is described as: "Working closely with each business, our professionals interpret and ensure compliance with regulatory requirements and determine how the firm can appropriately pursue global market opportunities. We monitor regulatory trends and changes in all jurisdictions in which the firm does business, and we share information and collaborate with regulators to manage financial market risk."[10] Specialized units within the department include Financial Crime Compliance (comprised of, among other groups, the Anti-Money Laundering/Suspicious Activities Group, the Government Sanctions Group, and the Anti-Bribery Group), Global Compliance Training, Regulatory Reporting, and Surveillance Analytics. From 2004 until 2017, the department was overseen by Global Head of Compliance, Executive Vice President, Partner, and Management Committee member, Alan Cohen.[11]

48.     These departments, as well as the executives and committees overseeing them, stumbled badly during the global financial crisis of 2007 to 2009, when Goldman was the subject of a series of high-profile legal actions that Goldman paid billions of dollars to resolve, including:

---

[8] Debra Cassens Weiss, *One of America's wealthiest corporate lawyers is retiring*, ABA Journal (Jan. 9, 2019), http://www.abajournal.com/news/article/one-of-americas-wealthiest-corporate-lawyers-is-retiring.

[9] Global Compliance, The Goldman Sachs Grp., Inc. (last visited Oct. 23, 2019), https://www.goldmansachs.com/careers/divisions/global-compliance/.

[10] *Id.*

[11] Press Release, The Goldman Sachs Grp., Inc., Goldman Sachs Names Alan Cohen Global Head Of Compliance (Feb. 2, 2004); Liz Hoffman, *Goldman's Compliance Chief Moves On*, The Wall Street Journal (Jan. 17, 2017), https://www.wsj.com/articles/goldmans-compliance-chief-moves-on-1484682859.

a.  Goldman's payment of $5.06 billion to settle claims that it misled mortgage bond investors during the financial crisis;[12]

b.  Goldman's repurchase of $3.15 billion worth of mortgage-backed securities to resolve allegations that it had knowingly "unload[ed] low-quality mortgage bonds" on Fannie Mae and Freddie Mac from 2005 to 2007;[13] and

c.  A $550 million payment from Goldman to the SEC to settle the "Abacus" mortgage-backed security scandal, then the largest-ever fine paid by a Wall Street firm to the SEC, along with an agreement to reform the bank's practices.[14]

49.  In total, Goldman paid more than $9.5 billion in fines and settlements stemming from allegations that its compliance and corporate governance measures failed to prevent the bank from engaging in deliberate wrongdoing to benefit itself.[15]

50.  Although the bank avoided the reckoning faced by some of its peers that shuttered their doors, Goldman emerged from the crisis with its reputation in tatters. Blankfein's public apology for its crisis-era misconduct, in which he admitted, "[Goldman] participated in things that were clearly wrong," did little to quell outrage at the bank.[16] While Palm and Cohen kept their jobs—Palm retired from the bank a decade later having earned $500 million during his

---

[12] Suzanna Barlyn, *Goldman Sachs to pay $5 billion in U.S. Justice Dept mortgage bond pact,* Reuters (April 11, 2016), https://www.reuters.com/article/us-goldman-sachs-mbs-settlement/goldman-sachs-to-pay-5-billion-in-u-s-justice-dept-mortgage-bond-pact-idUSKCN0X81TI.

[13] Nathaniel Popper, *Goldman to Pay $3.15 Billion to Settle Mortgage Claims,* The N.Y. Times (Aug. 22, 2014), https://dealbook.nytimes.com/2014/08/22/goldman-to-pay-3-15-billion-to-settle-mortgage-claims/.

[14] Francesco Guerrera, Henry Sender & Justin Baer, *Goldman Sachs settles with SEC*, Fin. Times (July 16, 2010), https://www.ft.com/content/4bd43894-904c-11df-ad26-00144feab49a.

[15] *Wall Street's Six Biggest Bailed-Out Banks: Their RAP Sheets & Their Ongoing Crime Spree*, Better Markets, 12 (Apr. 9, 2019), https://bettermarkets.org/sites/default/files/Better%20Markets%20-%20Wall%20Street%27s%20Six%20Biggest%20Bailed-Out%20Banks%20FINAL.pdf.

[16] *$500 Million, and an Apology, From Goldman*, The N.Y. Times (Nov. 18, 2009), https://dealbook.nytimes.com/2009/11/18/500-million-and-apology-from-goldman/.

tenure at Goldman[17]—its executive team recognized the need for a wholesale public image revamp.

### 2. Goldman Claims to Clean Up Its Image through a Multiyear "Business Standards Committee" Review

51. At Goldman's Annual Shareholder Meeting on May 7, 2010, Blankfein announced the creation of the BSC. In what purported to be "the most extensive review of the firm's business standards and practices in the firm's 144 year history,"[18] the BSC was given the mandate of "ensur[ing] that the firm's business standards and practices are of the highest quality; that they meet or exceed the expectations of our clients, other stakeholders and regulators; and that they contribute to overall financial stability and economic opportunity."[19] Its members included then-Investment Banking Division Co-Head (now Goldman CEO) Solomon; Global Head of Compliance Cohen; and Vice Chairman and Head of Emerging Markets for the bank, Michael Evans.

52. Eight months later, the BSC issued its findings in a sixty-three page report published on the firm's public website ("BSC Report"), which emphasized that "Goldman Sachs has one reputation" and that "*[e]very employee has an equal obligation to raise issues or concerns, no matter how small, to protect the firm's reputation*."[20] An overriding principle of the "new" Goldman Sachs would be to ask, "not just 'can we' undertake a given business activity, but 'should we.'"[21]

---

[17] Sridhar Natarajan & Tom Metcalf, *Goldman's $500 Million Lawyer Has Called It Quits*, Bloomberg (Jan. 9, 2019), https://www.bloomberg.com/news/articles/2019-01-09/goldman-s-last-million-share-man-set-to-go-as-partnership-fades.

[18] The Goldman Sachs Grp., Inc., Business Standards Committee Impact Report (May 2013) ("BSC Impact Report") at 3.

[19] *Id.* at 1.

[20] The Goldman Sachs Grp., Inc., Report of the Business Standards Committee (January 2011) at 4.

[21] *Id.* at 2.

53.    The Report made "39 recommendations for change" necessary to maintain "constant focus on the reputational consequences of every action we take."[22] Specific recommendations included: (i) "[s]trengthening our standards for the identification, review, approval and documentation of structured products"; (ii) "[i]mplementing enhanced disclosure and origination standards for each business unit that is responsible for originating structured product securities"; (iii) "implementing enhanced and consistent policies and procedures on disclosure, approval processes, and other controls"; and (iv) "[u]pdating and strengthening the Code of Business Conduct and Ethics and requiring employees to certify their compliance."[23] The bank's annual review process would also be revised to "[e]mphasize risk management and reputational judgment/compliance."[24]

54.    A key focus of the BSC review was improving committee governance.[25] Committee oversight was meant to play a critical role in risk management at Goldman, and the BSC Report affirmed that "***committees serve as a vital control function***."[26] The BSC revised the committee structure to "enhance accountability for business standards and practices, especially reputational risk management" and "provide a clear roadmap for identifying, escalating and resolving reputational and client matters."[27]

55.    At the top of this hierarchy was the firmwide Management Committee, which "oversees the global activities of the firm, including all of the firm's independent control and support functions."[28] In 2012, the year Goldman began underwriting 1MDB's bond issuances, its

---

[22] *Id.* at 1-2.

[23] *Id.* at 4-5.

[24] BSC Impact Report at 26.

[25] *Id.* at 2.

[26] The Goldman Sachs Grp., Inc., Report of the Business Standards Committee (January 2011) at 43.

[27] *Id.*

[28] The Goldman Sachs Grp., Inc., 2012 Annual Report at 78.

30 members included a number of executives later implicated in the 1MDB scandal, including: Defendants Blankfein and Cohn; Vice Chairmen Evans, Mark Schwartz, and Michael Sherwood; Asia President David Ryan; and Head of Investment Banking, Solomon.[29]

56.     As described below, at least five other committees reviewed and approved each of the 1MDB bond offerings, including the following firmwide committees:

a.  **Client and Business Standards Committee**. The permanent Client and Business Standards Committee (also referred to as simply the firmwide Business Standards Committee, distinct from the BSC) was responsible for "assess[ing] and mak[ing] determinations regarding business standards and practices [and] reputational risk management" and overseeing implementation of the BSC recommendations.[30] ***Chaired by Defendant Cohn***, this Business Standards Committee reported directly to the Management Committee.[31]

b.  **Risk Committee**. The firmwide Risk Committee was "globally responsible for the ongoing monitoring and control of the firm's financial risk."[32] It was chaired by the firm's CFO and reported to the Management Committee.

c.  **Suitability Committee**. Created by the BSC in February 2011, the firmwide Suitability Committee provided "major transaction review" oversight in applying "thorough and comprehensive standards for transaction approvals, particularly for those transactions that present reputational risk."[33] It reported to the Client and

---

[29] *Id.* at 229.

[30] *Id.* at 78.

[31] *Id.*

[32] *Id.* at 79.

[33] BSC Impact Report at 4, 9.

Business Standards Committee.[34] Its chair was Goldman's General Counsel, Palm.[35]

    d.  **Capital Committee**. The firmwide Capital Committee's purpose was to "ensure that the business and reputational standards for underwriting and capital commitments are maintained on a global basis."[36] It reported to both the Client and Business Standards Committee and the Risk Committee.[37]

57.    Due diligence ***throughout*** the transactional lifecycle was also implemented in order to protect the bank's reputation. So-called "strategic transactions"—large deals such as the 1MDB offerings—would "be subject to heightened review and approval" that included "new due diligence procedures" involving multiple layers of review.[38] Furthermore, Goldman expressed a new commitment to pre- and post-transaction monitoring, noting that the bank's "responsibilities do not end on the execution date of a transaction. ***Post-transaction monitoring and follow-up*** will create greater sales force accountability, greater transparency to clients and a better client experience overall."[39]

58.    Finally, the BSC sought to assuage shareholder concerns that the bank's internal reporting process was broken, assuring that, following the BSC's reforms, managers would "regularly reinforce the firm's strong culture of escalation and accountability across all divisions and functions."[40] The Suitability Committee in particular was tapped to "act[] as a central point of escalation and decision-making for suitability judgments across business and other firmwide

---

[34] The Goldman Sachs Grp., Inc., 2012 Annual Report at 78.

[35] *Id.* at 79.

[36] *Id.* at 80.

[37] *Id.* at 78.

[38] The Goldman Sachs Grp., Inc., Report of the Business Standards Committee (January 2011) at 29-30.

[39] *Id.* at 33.

[40] 2013 Annual Report at 78.

committees."[41] This emphasis, too, extended to post-transaction monitoring, with the BSC proclaiming that *after* a deal closed, "[s]ales managers will be responsible for reviewing the results of this monitoring and taking appropriate actions on relevant transactions," which would include "a mechanism for escalating issues to sales leadership and the Credit, Legal and Compliance Departments."[42]

59.     In a letter to shareholders accompanying its 2013 Annual Report, Goldman proclaimed that, by February 2013, "***all 39 recommendations had been fully implemented***."[43] The letter emphasized "the individual and collective accountability of our people," stating that, as a result of the BSC review, "initiating, approving and executing a transaction for a client at Goldman Sachs is now fundamentally different."[44] It continued:

> Process matters and the BSC changes have led to our processes being more clear, comprehensive and consistent. Business standards reflect the heightened scrutiny we bring to our own actions and activities, the role we play as a large financial institution and the responsibilities we have to our clients and to global financial intermediation. Documentation supporting our processes is more standardized and organized around escalation procedures. ***Transaction approvals focus on the core goals of serving our clients' long-term interests and protecting the firm's reputation***. Taken together, these changes result in better judgments and decision making, which are among the most important impacts emerging from the BSC.[45]

The letter's two signatories were Blankfein and Cohn.[46]

60.     Publicly, Blankfein and Cohn touted the "reforms" implemented by way of the BSC review as a wholesale change in the way the bank would do business, committing it to intensive due diligence, pre- and post-transaction monitoring, rigorous internal risk reporting, and the quick elevation of concerns to senior management and those responsible for safeguarding

---

[41] BSC Impact Report at 9.

[42] The Goldman Sachs Grp., Inc., Report of the Business Standards Committee (January 2011) at 33.

[43] 2013 Annual Report at 6.

[44] *Id.* at 7.

[45] *Id.*

[46] *Id.* at 8.

internal controls. Internally, however, the overhaul did little to change Goldman's irrepressible culture of prizing deal-making—and the fees it generated—over publicly promised compliance. Indeed, Palm and Cohen, the two top-level Goldman executives charged with ensuring adequate compliance who had so thoroughly failed during the financial crisis, each remained in their posts. Then, after the BSC's vaunted rollout, they again stood by as the Investment Banking Division that formed the bank's power center ran roughshod over their departments—sometimes with their staff's acquiescence, other times with direct encouragement. Meanwhile, the supposedly rigorous oversight function created by the BSC's new structure proved little more than a conveyor belt of rubber stamps, repeatedly approving profitable-but-suspect deals pushed by Solomon's investment bankers—including those involving Low and 1MDB.

> **3.** **Goldman's Internal Post-Financial Crisis Push to "Monetize the State" in Emerging Markets**

> **a)** **As Western Economies Languish, Goldman Resolves to Tap Sovereign Wealth Funds as a New Source of Revenue**

61.     In 2008, with the U.S. economy in a tailspin and investment banking fees in its traditional markets languishing, Goldman plied new waters in its search of profits. An especially promising source of new fees was sovereign wealth funds—state-owned investment pools, often in emerging markets in the Middle East and Asia, with trade surpluses fueled by oil exports. Flush with foreign currency reserves, sovereign wealth funds are intended to invest that cash to generate additional returns that can be reinvested in economic development and social programs in the countries of origin. Due to a lack of investment expertise, these funds often look to global investment banks like Goldman to provide advisory services and help them structure their investments.

62.     Goldman sought to exploit this need. President Cohn, then regarded as Blankfein's right-hand man, created a specialized, cross-departmental unit within the bank

specifically designed to target sovereign wealth funds.[47] Internally, Cohn called the strategy a drive to "***monetize the state***," a phrase that captured how the oft-times naive executives of these funds could be manipulated to generate maximum fees for the bank—with little regard for how the sovereign's investments actually performed.[48]

> **b)**    **Goldman's First Foray into State-Fund "Monetization" Results in an FCPA Investigation Involving Kickbacks and Intermediaries**

63.    The dictatorship of Col. Muammar Gaddafi saw longstanding economic sanctions lifted following the regime's renunciation of weapons of mass destruction in 2004. As the financial crisis set in several years later, Western financial firms—including Goldman—were competing for lucrative business with the Libyan government and its cash-rich, but hopelessly inexperienced, Libyan Investment Authority ("LIA").[49]

64.    Internal documents later revealed Goldman disparagingly describing the LIA as having "zero-level" of financial sophistication, with Goldman bankers "deliver[ing] a pitch on structured leveraged loans to someone who lives in the middle of the desert with his camels."[50] When another Goldman banker emailed the lead on the account to ask about the Libyans' knowledge of derivatives, the latter replied, "***Baaaaaaaasic.***"[51] Spotting a mark, Goldman deployed its bankers to the Libyan capital, instructing its sales team to "stay a lot in Tripoli,"

---

[47] Tom Wright & Bradley Hope, *Billion Dollar Whale: The Man Who Fooled Wall Street, Hollywood, and the World* ("Billion Dollar Whale") at 182 (2018).

[48] Billion Dollar Whale at 182-83.

[49] Joe Palazzolo, Michael Rothfeld & Justin Baer, *Probe Widens Into Dealings Between Finance Firms, Libya*, The Wall Street Journal (Feb. 3, 2014), https://www.wsj.com/articles/probe-widens-into-dealings-between-finance-firms-libya-1391403417.

[50] Jill Treanor, *Goldman Sachs hired prostitutes to win Libyan business, court told*, The Guardian (June 13, 2016), https://www.theguardian.com/business/2016/jun/13/goldman-sachs-hired-prostitutes-to-win-libyan-business-court-told.

[51] Matthew Campbell & Kit Chellel, *Hot Mess: How Goldman Sachs Lost $1.2 Billion of Libya's Money*, Bloomberg Businessweek (Sept. 29, 2016), https://www.bloomberg.com/features/2016-goldman-sachs-libya/.

adding, "[y]ou need to own this client."[52] A Goldman Partner confirmed, "[i]nvestment opportunities with this account is [sic] one of the largest I've ever seen. We are all over them."[53]

65.     A key figure in this courtship of the LIA was Andrea Vella, a Goldman Partner who specialized in selling derivative products. The *Financial Times* reported that, according to those who worked with him, "his rise [at Goldman] was fueled by an appetite for risk in frontier markets that stood out even among his colleagues at one of the world's most profitable investment banks."[54]

66.     In 2008, Vella began overseeing Goldman's relationship with the LIA from the bank's London office.[55] From that vantage, he directed the Goldman bankers' push to ingratiate themselves with LIA officials and their relatives. In one instance, Vella texted one banker to "just be close" to the younger brother of the LIA's deputy chief, regarded to be the principal decision-maker at the fund.[56]

67.     Overseen by Vella, Goldman bankers spent months cultivating the LIA, lavishing fund officials and their relatives with extravagant dinners at high-end London restaurants, iPods, foreign trips, and even prostitutes to win LIA's business. The lead banker involved later said that all of these expenses were signed off by at least two Goldman Partners and were fully reimbursed.[57]

---

[52] *Id.*

[53] *Id.*

[54] Laura Noonan & Don Weinland, *How Goldman's high-flying Italian partner was embroiled in scandal*, Fin. Times (Nov. 11, 2018), https://www.ft.com/content/faebf3fc-e3e6-11e8-8e70-5e22a430c1ad.

[55] Billion Dollar Whale at 122.

[56] Kit Chellel, *Goldman Executive Says Prostitutes for Libyan 'Inappropriate,'* Bloomberg (July 5, 2016), https://www.bloomberg.com/news/articles/2016-07-05/goldman-executive-says-prostitutes-for-libyan-inappropriate.

[57] Matthew Campbell & Kit Chellel, *Hot Mess: How Goldman Sachs Lost $1.2 Billion of Libya's Money*, Bloomberg Businessweek (Sept. 29, 2016), https://www.bloomberg.com/features/2016-goldman-sachs-libya/.

68.     When the LIA's deputy chief pushed for his younger brother to seek an internship at Goldman, Vella took notice, spotting an easy way to curry favor with the fund.[58] Despite being deemed unfit for the bank's traditional internship program, Vella took the brother onto his team.[59] The move earned Vella a rebuke by email from James Peters, Goldman's Head of Compliance for Investment Banking in Europe, who told Vella that he should have been informed.[60] Given Vella's position and profit generation, the matter was dropped, and the internship of the LIA official's younger brother was extended—six times.[61]

69.     Goldman's efforts to woo the LIA officials paid off. In 2008, Goldman convinced the LIA to enter into several billion dollars' in complex derivative trades linked to the value of shares in Citigroup and other foreign companies.[62] The lead banker in Tripoli called one trade "one of the biggest orders that GS has ever been given on single names."[63] The trades were acutely dangerous, carrying significant upside potential, but with enormous downside risk.[64] As the financial crisis swirling around the firms on which these bets were made intensified, the losses piled up for the LIA. Goldman, however, had succeeded in its new mission to "monetize the state."

70.     All told, the LIA lost $1.2 billion investing in derivatives that Goldman had recommended, but which the inexperienced fund did not understand. The LIA has contended that

---

[58] *Id.*

[59] Claire Milhench, *Goldman compliance head queried internship in Libya fund case, court told*, Reuters (July 5, 2016),        https://www.reuters.com/article/us-libya-swf-litigation/goldman-compliance-head-queried-internship-in-libya-fund-case-court-told-idUSKCN0ZL2IN.

[60] *Id.*

[61] Matthew Campbell & Kit Chellel, *Hot Mess: How Goldman Sachs Lost $1.2 Billion of Libya's Money*, Bloomberg Businessweek (Sept. 29, 2016), https://www.bloomberg.com/features/2016-goldman-sachs-libya/.

[62] *Id.*

[63] *Id.*

[64] Billion Dollar Whale at 123.

Goldman earned between $200 million and $350 million from the trades.[65] Goldman refused to disclose its fees, saying only that the sum was appropriate given the size and risk of the deals[66]— a line it would regularly reprise when its outsized haul on the 1MDB bonds later came to light.

71.     Goldman's dealings in Libya drew the attention of U.S. regulators and prosecutors. The bank, like all U.S.-based firms, was bound by the federal FCPA, the statute that prohibits, among other things, the payment of bribes by U.S. companies to obtain or retain business in foreign countries, and requires firms to maintain sufficient internal controls to help prevent such illegal payments.

72.     *The Wall Street Journal* revealed in February 2014 that the Justice Department had opened a criminal investigation into Goldman's dealings in Libya.[67] In another harbinger of the 1MDB scandal, the DOJ investigation focused on "fixers" with ties to leaders in developing markets, including those in the Gaddafi regime, who arranged deals between Goldman and other firms and government officials.[68] Federal prosecutors were probing whether Goldman and others had provided illegal "finder's fees" to the intermediaries and/or kickbacks to the government officials in exchange for business with the LIA.[69] The investigation followed the inception of one by the SEC in which similar allegations of FCPA violations were examined.[70]

---

[65] Matt Clinch, *Goldman ordered to pay legal fees to Libyan fund*, CNBC (Oct. 8, 2014), https://www.cnbc.com /2014/10/08/goldman-ordered-to-pay-legal-fees-to-libyans.html.

[66] Matthew Campbell & Kit Chellel, *Hot Mess: How Goldman Sachs Lost $1.2 Billion of Libya's Money*, Bloomberg Businessweek (Sept. 29, 2016), https://www.bloomberg.com/features/2016-goldman-sachs-libya/.

[67] Joe Palazzolo, Michael Rothfeld & Justin Baer, *Probe Widens Into Dealings Between Finance Firms, Libya*, The Wall Street Journal (Feb. 3, 2014), https://www.wsj.com/articles/probe-widens-into-dealings-between-finance-firms-libya-1391403417.

[68] *Id.*

[69] *Id.*

[70] Devika Krishna Kumar & Ken Wills, *SEC probing Goldman Sachs internship for brother of Libyan ex-official: WSJ*, Reuters (Sept. 18, 2014), https://www.reuters.com/article/us-goldmansachs-libya-sec-probe/sec-probing-goldman-sachs-internship-for-brother-of-libyan-ex-official-wsj-idUSKBN0HE05P20140919.

73.     Knowledge that the firm's bankers—including Vella—may have skirted anti-bribery laws extended to the bank's top executives. Indeed, discussions about the Libya controversy escalated to include Blankfein, then-CFO David Viniar, and Michael Sherwood, a Vice Chairman and Co-Head of Goldman Europe (later criminally charged by Malaysian authorities, along with sixteen others, for Goldman's role in the 1MDB bond deals).[71] Tellingly, Vella suffered no consequences and only continued his rise at Goldman, receiving two promotions after arriving in the region in 2010 and becoming Goldman's Investment Banking Division chief in Asia by 2015.

74.     The Libyan affair contained several omens of the far larger scandal that Goldman would fuel in Malaysia: (i) suspect "intermediaries" managing the relationship between the fund and Goldman bankers; (ii) exorbitant fees from a state-run investment fund; (iii) the corruption of key fund decision-makers; (iv) internal objections over suspect bank practices squelched by senior managers in favor of consummating deals, along with retaliation against those who voiced dissent; and (v) a compliance department that was easily evaded and did nothing in response to obvious red flags. Goldman's dealings with the LIA demonstrated that, despite its highly touted "recommitment" to proper compliance oversight, due diligence, and internal reporting through the BSC campaign, the bank would set aside these standards where large fees were involved.

c)      **A Quest for Returns Leads Goldman to Asia**

75.     As noted above, Defendants' drive to "monetize the state" led to a newfound enthusiasm for sovereign business in Asia. Top executives believed that the region's emerging economies offered an opportunity to make up for anemic returns in Western markets. The tilt eastward was driven by Blankfein, whose strategy after the financial crisis was to "Be Goldman

---

[71] Liz Rappaport & Giovanni Legorano, *Libyan Fund Helping SEC in Goldman Probe*, The Wall Street Journal (Feb. 28, 2013), https://www.wsj.com/articles/SB10001424127887323978104578332553842543488.

in More Places"—Asia foremost among them.[72] *CNBC* noted that the bank's "dedication to Asian growth" was "spoken of in tones that almost suggest a religious impulse."[73]

76.      While chasing yields was a primary reason for the pivot, escaping post-financial crisis regulation in the United States was also a motivating factor. Remarks on this motive from *Business Insider* included that "there's been talk within the bank's West Street [New York] offices that Dodd Frank's prop traders could end up across the Pacific."[74]

77.      Whatever the motive, Goldman began to pour resources into its offices in Asia, doubling its staff in the region.[75] In 2010, 26% of the bank's new Partners were based in or covered Asia, coinciding with a broader effort to steer top talent to the region.[76] Vella, the European rainmaker whose reckless stewardship of the LIA team had just reaped hundreds of millions of dollars for the bank, arrived in the firm's Hong Kong office the same year.[77]

78.      Also in 2010, Goldman created an Asia-specific leadership group for investment banking (the "IBS Leadership Group"). In an internal memo, the bank said, "We will ask this group to assume coverage of a series of our most important franchise accounts . . . in an effort to strengthen our footprint of trusted advisory relationships."[78] The group would "play an important role in influencing the compensation, promotion, and overall career development of our

---

[72] Shira Ovide, *Goldman Sachs Strategy: 'Be Goldman in More Places*,' The Wall Street Journal (Dec. 20, 2010), https://blogs.wsj.com/deals/2010/12/20/goldman-sachs-strategy-be-goldman-in-more-places/.

[73] John Carney, *The Banality of Goldman's Business Standards*, CNBC (Jan. 12, 2011), https://www.cnbc.com/id/41040099.

[74] Katya Wachtel, *Goldman Sachs' New Partners Show Exactly Where The Bank is Gazing: Asia*, Bus. Insider (Nov. 19, 2010), https://www.businessinsider.com/new-goldman-partners-show-where-firm-is-looking-asia-2010-11.

[75] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[76] *Id.*

[77] Billion Dollar Whale at 122.

[78] Sameera Arand, *Goldman Sachs creates investment banking leadership group*, FinanceAsia (Jan. 13, 2010), https://www.financeasia.com/article/goldman-sachs-creates-investment-banking-leadership-group/164597.

[investment banking division] bankers."[79] The Partners named to the three-member Asia IBS leadership group were: Fred Hu, Chairman of Greater China; James McMurdo, Head of Goldman's Investment Banking in Australia and New Zealand; and Tim Leissner, then Head of Investment Banking for Southeast Asia.

**B.  Ignoring Internal Objections and Glaring External Warning Signs, Goldman Reaps Hundreds of Millions in Fees from 1MDB and Jho Low**

79.     Before he had ever met Jho Low or Najib, Leissner, the Head of Investment Banking for Goldman in Southeast Asia, was interviewed by a government news agency in which he stated that Goldman wanted to do more business in Malaysia.[80] The Malaysian market provided a seemingly ideal growth opportunity to "be Goldman in more places," an emerging economy where Blankfein's and Cohn's initiatives to trod new ground in Asia and wring profits from sovereign wealth funds could dovetail. After Najib ascended to the head of government as Prime Minister, Malaysia's securities commission approved Goldman's application to start operations for fund management and corporate finance, opening the door for what was to follow.[81]

**1.  1MDB: Red Flags from Its Inception**

**a)     Doing Business in Malaysia: A Hotbed of Corruption**

80.     As with many emerging markets, doing business in Malaysia had its pitfalls. It was far less regulated than Western economies—part of the appeal to Goldman, stinging from a fresh round of enforcement actions in the U.S. and elsewhere. Yet it was also an economy notorious for graft. In fact, *The Wall Street Journal* reported in 2012 that ***Malaysia was the most***

---

[79] *Id.*

[80] Max Abelson & Elffie Chew, *The Rise and Fall of Tim Leissner, Goldman's Big Man in Malaysia*, Bloomberg (Mar. 30, 2016), https://www.bloomberg.com/news/articles/2016-03-30/the-rise-and-fall-of-tim-leissner-goldman-s-big-man-in-malaysia.

[81] *Id.*

***corrupt country in the world in which to do business***.[82] Transparency International, a global watchdog group, called corruption in the country "systemic" and "institutionalized," with bribes a virtual necessity to win business.[83] The head of Transparency International in Malaysia warned, "[*f*]***oreign companies looking to supply the government have to be aware that they're likely to be asked for a bribe***."[84] A similar report by Ernst & Young warned that "bribery and corrupt practices are prevalent in Malaysia."[85]

81.     A commercial environment of such extensive corruption demanded heightened vigilance. The DOJ's *FCPA Resource Guide*, which sets forth the federal government's expectations for minimum internal controls and compliance programs for U.S. companies operating abroad, emphasizes that, to be effective, compliance programs must focus on "the degree to which [the company] has operations in countries with a high risk of corruption" and "the extent of its government interaction."[86] With Goldman soliciting business from a government entity in one of the most institutionally corrupt countries in the world, Defendants knew from the start that the likelihood of bribes or kickbacks was high, meriting strict due diligence.

---

[82] Jason Ng, *Malaysia Tops Bribery Table*, The Wall Street Journal (Dec. 11, 2012), https://blogs.wsj.com/indonesiarealtime/2012/12/11/malaysia-tops-bribery-table/.

[83] *Id.*

[84] *Id.*

[85] *Building a more ethical business environment, Asia-Pacific Fraud Survey 2013*, EY (2013), http://rai-see.org/wp-content/uploads/2016/01/EY-Asia-Pacific-Fraud-Survey.pdf.

[86] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, Criminal Div. of the U.S. Dep't of Justice & the Enf't Div. of the U.S. Sec. & Exch. Comm'n, 40 (Nov. 14, 2012), https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2015/01/16/guide.pdf.

### b) The Najib Regime: "A Government of Thieves"

82.    Najib Razak was born into a political dynasty. The oldest son of Malaysia's second Prime Minister, he was the nephew of the third.[87] Najib would later become the sixth, unfurling his signature "1Malaysia" banner promoting unity and economic development in the multiethnic country.

83.    Sunny political platitudes aside, allegations of corruption trailed Najib well before he ascended to the premiership.[88] As Defense Minister, Najib was alleged to have steered $130 million in dubious commissions to a close associate in return for kickbacks.[89] The scandal exploded after a young translator who had worked on the deal was murdered in grisly fashion.[90] Several years later, Najib was under fire again after two U.S.-made fighter jets were stolen and sold to a South American arms dealer, prompting an opposition leader to call the regime's handling of the affair "*a frightening picture of a government of thieves*."[91]

84.    As Prime Minister, it was Najib's wife, Rosmah, who became the face of the regime's corruption, frequently exhibiting a taste for luxury goods and jewelry that drew scorn from a disbelieving public. A police raid resulting in her arrest after the 1MDB scandal broke

---

[87] Thomas Bell, *Profile: Najib Razak*, The Telegraph (Apr. 3, 2009), https://www.telegraph.co.uk/news/worldnews/asia/malaysia/5099246/Profile-Najib-Razak.html.

[88] Thomas Bell, *Opposition braced for hard time from Malaysia's new PM*, The Telegraph (Apr. 2, 2009), https://www.telegraph.co.uk/news/worldnews/asia/malaysia/5095696/Opposition-braced-for-hard-time-from-Malaysias-new-PM.html.

[89] Thomas Bell, *Profile: Najib Razak*, The Telegraph (Apr. 3, 2009), https://www.telegraph.co.uk/news/worldnews/asia/malaysia/5099246/Profile-Najib-Razak.html; Cyril Camu, Joseph Sipalan, Ingrid Melander, Andrew Callus & Matthew Mspoke Bigg, *French prosecutors investigate aide to Malaysia PM over submarine deal*, Reuters (Aug. 2, 2017), https://www.reuters.com/article/us-france-malaysia-submarines/french-prosecutors-investigate-aide-to-malaysia-pm-over-submarine-deal-idUSKBN1AI17L.

[90] Luke Hunt, *Could Sub Probe 'Sink' Najib?*, The Diplomat (July 6, 2012), https://thediplomat.com/2012/07/could-sub-probe-sink-najib/; *see also The Confession that Never was*, AsiaSentinel (Mar. 20, 2009), https://www.asiasentinel.com/politics/the-confession-that-never-was/; *see also* Yaroslav Trofimov, *Murdered Mistress Becomes Whodunit for Malaysia Elite*, The Wall Street Journal (Mar. 29, 2007), https://www.wsj.com/articles/SB117511113155152224.

[91] Kevin Brown, *Missing jet engines spark crisis in Malaysia*, Fin. Times (Dec. 22, 2009), https://www.ft.com/content/ff6c46d2-eef6-11de-92d8-00144feab49a.

yielded 567 handbags, 423 watches, 14 tiaras, and "so much cash that it took three days to count it all."[92] Some of the jewelry items cost millions of dollars each.

85.     With Najib's reputation for graft well known before Goldman's relationship with the Prime Minister began, the bank knew that any dealings with his regime would likely require kickbacks in contravention of its compliance program and public representations. Nevertheless, Goldman chose to work with 1MDB, which was exclusively under Najib's control and run by Low. As detailed herein, Najib and Low stole billions from the proceeds of the 1MDB deals that Goldman underwrote in 2012 and 2013.[93]

### c)     Jho Low: The "Asian Great Gatsby"

86.     At the center of the 1MDB fraud was Jho Low. Low brought 1MDB business to Goldman and served as the essential intermediary between the bank and 1MDB.

87.     Born in Malaysia in 1981, Low attended the Wharton School of Business at the University of Pennsylvania, graduating in 2005.[94] While there, he garnered a reputation as the "Asian Great Gatsby" for his spendthrift ways and extravagant parties.[95] Low began to make connections in the Middle East, where he met officials running sovereign wealth funds in Saudi Arabia and Abu Dhabi. Low sought contacts at these Middle Eastern funds to help him create and run such a fund in Malaysia.[96]

---

[92] Hannah Beech & Austin Ramzy *Wife of Malaysia's Ex-Prime Minister, Known for Moneyed Lifestyle, Is Arrested*, The N.Y. Times (Oct. 3, 2018), https://www.nytimes.com/2018/10/03/world/asia/najib-razak-malaysia-corruption-charges.html?module=inline.

[93] Romil Patel, *Malaysia 1MDB scandal: Payments into Razak's personal accounts said to top $1bn*, Int'l Bus. Times (Mar. 1, 2016), https://www.ibtimes.co.uk/malaysia-1mdb-scandal-payments-into-razaks-personal-accounts-said-top-1bn-1546830.

[94] Kara Scannell, *1MDB: High flyer brought Low*, Fin. Times (Aug. 5, 2016), https://www.ft.com/content/e8d4ce3a-5989-11e6-9f70-badea1b336d4.

[95] Billion Dollar Whale at 22-26.

[96] *Id.* at 30-31.

88.      One of those connections was Riza Aziz, Najib's stepson, whom Low had befriended while both were students at boarding school in England.[97] Najib was not yet Prime Minister, but as the Minister of Finance and heir apparent to the premiership, his value was clear. Low cultivated the relationship by, among other things, setting up an offshore account to pay for Najib's daughter's college expenses at Georgetown University. Low also began soliciting investments by Middle Eastern investors for projects in Malaysia, seeking a role as a power broker at the center of large deals in Southeast Asia and the Middle East.[98]

89.      After Najib became Prime Minister in 2009, Low convinced him to convert a recently created provincial oil fund, the Terengganu Investment Authority ("TIA"), into a new, national sovereign wealth fund called 1Malaysia Development Berhad, or "1MDB," which could tap international capital markets.[99] Low did so by pointing out that the fund, which would be under Najib's control, could be used as a political slush fund to pay off voters and finance patronage.[100] Although Najib was 1MDB's titular head, Low was its *de facto* chief executive, and 1MDB employees and directors understood that Low was in charge.[101] Press accounts as early as December 2009 identified Low's critical role in establishing the fund.[102] At the 1MDB trial in Malaysia in September 2019, 1MDB's nominal CEO testified that "Low and Najib had a

---

[97] Kara Scannell, *1MDB: High flyer brought Low*, Fin. Times (Aug. 5, 2016), https://www.ft.com/content/e8d4ce3a-5989-11e6-9f70-badea1b336d4.

[98] Billion Dollar Whale at 35-48.

[99] *Id.* at 62-63

[100] *Id.* at 63, 106

[101] *Id.* at 69, 107-8.

[102] *Cover Story: Time of reckoning for 1MDB*, The Edge (Dec. 13, 2009), https://www.theedge markets.com/article/cover-story-time-reckoning-1mdb.

symbiotic relationship, with the former executing the wishes of the latter and the latter approved decisions."[103]

90.     In 2009, Low and Najib exploited 1MDB for the first time to steal hundreds of millions of dollars from the new state fund. Before its conversion, TIA had issued $1.4 billion in Islamic bonds ("Islamic Bond Issuance"), cash that it had on hand when it became 1MDB.[104] At Low's behest, 1MDB invested $1 billion of that issuance in what was structured as a joint venture with a Saudi Arabian oil company, PetroSaudi.[105] In reality, the investment was simply embezzlement on a massive scale: Low diverted $700 million of the investment funds to a shell account in the Seychelles that he used to pay off his co-conspirators, using much of the rest to fuel a multiyear spending spree that routinely drew press attention for its excess.[106]

91.     Over an eight-month period between October 2009 and June 2010, Low spent $85 million on alcohol-fueled nights out, gambling in Las Vegas, private jets, superyacht rentals, a $100,000-a-month rental apartment near Central Park in New York, and to pay Playboy Playmates and Hollywood celebrities to spend time with him.[107] Later, Low would replicate this feat several times over with Goldman as his banker and corrupt officials from the Abu Dhabi sovereign wealth fund IPIC helping to fuel the misdeeds. His displays of wealth would only grow more ostentatious—and more public.

92.     Low's outrageous public spending and the suspect source of his wealth provided Defendants with another red flag prior to Goldman's involvement in the 1MDB transactions.

---

[103] Nadirah H. Rodzi, *1MDB trial: Ex-CEO says Jho Low involved in key management decisions*, The Straits Times (Sept. 30, 2019), https://www.straitstimes.com/asia/se-asia/1mdb-trial-ex-ceo-says-jho-low-involved-in-key-management-decisions.
[104] Billion Dollar Whale at 62-63.
[105] *Id.* at 68.
[106] *Id.* at 74-88.
[107] *Id.* at 87.

Indeed, as described below, it was these very features that led Goldman's Global Compliance and Legal to repeatedly **reject** Low as a private wealth management client of the firm.

### d)     1MDB: Suspect from the Start

93.     Numerous features of 1MDB itself indicated that the fund was a vehicle for corruption. *First*, well before the fraud at 1MDB took off with Goldman's underwriting in 2012, the 1MDB board raised concerns about the $1.4 billion Islamic Bond Issuance. As noted above, $1 billion of that capital raise had been put in a supposed "joint venture" with PetroSaudi, $700 million of which was diverted to fuel Low's partying and kickbacks to co-conspirators. The 1MDB board's official minutes from its October 3, 2009 meeting noted, "[t]he substantial investment of $1 billion should have merited a more thorough thought and due diligence process." Board minutes from a meeting the next year were more direct, remarking that the fund was "perceived as a secretive cloak-and-dagger setup with sinister motives to benefit cronies and not the Malaysian people."[108] A modicum of due diligence would have prompted a third party considering business with 1MDB to look at where that money had actually gone.[109] This is especially the case for the post-financial crisis Goldman doing business in a hotbed of corruption, as its BSC program and public representations required it to know and understand the makeup of 1MDB's existing debt load before adding an additional $6.5 billion to it.

94.     *Second*, questions suggesting corruption had surfaced at the fund's very launch with the Islamic Bond Issuance. For example, a December 13, 2009 cover story in *The Edge*, an English language publication and Malaysia's main independent news outlet, noted, "***critics have suggested that certain intermediaries had pocketed a hefty profit from the [2009 Islamic] bond***

---

[108] *Id.* at 145.
[109] *Id.* at 105.

*issue*."[110] Additionally, observers questioned why the new sovereign wealth fund of Malaysia required the involvement of a Saudi sovereign firm and why the bonds had been issued to begin with, given the absence of announced projects or investments for the funds.[111]

95.   *Third*, the chairman of 1MDB's board, Mohammed Bakke Salleh, a respected businessman, immediately demanded an independent audit of the joint venture with the Saudi company and an accounting of the $700 million that Low had siphoned away through various shell accounts.[112] After Low convinced Najib to rule that there would be no audit, the chairman noisily resigned in a move covered in the press.[113] A second board member resigned several weeks later. They were replaced by loyalists who soon rubberstamped political patronage with fund assets.[114] Meanwhile, many of those who had been recruited to work for the fund quit within a year because of an absence of legitimate investments to keep them busy. One departing employee remarked: "***We even joked that many of the projects we were assessing were pretend projects to give the company a legitimate front***."[115] These rapid departures were another red flag at 1MDB.[116]

96.   *Fourth*, concerns and dismissals of 1MDB's auditors further highlighted compliance problems at the fund. In the fall of 2010, 1MDB management—now staffed exclusively by Najib loyalists—sought to issue the fund's first set of financial results. Yet interest costs from the Islamic Bond Issuance and an absence of legitimate investments meant

---

[110] *Cover Story: Time of reckoning for 1MDB*, The Edge (Dec. 13, 2009), https://www.theedge markets.com/article/cover-story-time-reckoning-1mdb.

[111] *Id.*

[112] Billion Dollar Whale at 104-05.

[113] *Cover Story: Time of reckoning for 1MDB*, The Edge (Dec. 13, 2009), https://www.theedge markets.com/article/cover-story-time-reckoning-1mdb.

[114] Billion Dollar Whale at 109-10.

[115] *Id.* at 109.

[116] *Id.* at 105-06.

that it would have to recognize a loss for its first year in existence. At Low's behest, the fund sought to record its $1 billion investment in the joint venture with PetroSaudi ($700 million of which had been stolen) as a $1.2 billion *loan* that would allow 1MDB to book a *profit*, rather than a loss.[117] When 1MDB's auditors at Ernst & Young refused to certify the accounting, Najib fired them.[118] The fund then hired KPMG, which signed off on the "loan," but only after issuing a conspicuous "emphasis of matter" paragraph in the fund's financial statements—a notation indicating the auditor's belief that the matter is fundamental to readers' understanding—that signaled a serious potential concern about the accounting treatment.[119] The dismissal of the fund's auditors during its first year of operations, followed by a second auditor underscoring potential problems with the financial statements, were glaring warning signs to any company seeking to do business with 1MDB.[120]

97.     *Fifth*, 1MDB's banking partner was itself a red flag. At Low's direction, the primary account for 1MDB was held at the Singapore office of a tiny Swiss private bank called BSI. The choice was highly unusual, as large international banks historically handled funds of 1MDB's size. Low had selected BSI because 1MDB's stature made BSI beholden to the fund— and to Low in particular—for bringing its business there, rendering it more pliable than the larger banks when compliance questions arose.[121]

---

[117] *Id.* at 145.

[118] Rachel Middleton, *1MDB scandal: Malaysia state fund sacked Ernst & Young and KPMG when auditors asked for documents*, Int'l Bus. Times (Apr. 8, 2016), https://www.ibtimes.co.uk/1mdb-scandal-malaysian-state-fund-sacked-ernst-young-kpmg-when-auditors-asked-documents-1553756.

[119] Billion Dollar Whale at 146.

[120] KPMG was later fired, and its third auditor, Deloitte, resigned two years later. Liz Lee, A. Anathalakshmi & Simon Cameron-Moore, *Malaysia probing audit firms' conduct in 1MDB scandal*, Reuters (Jan. 26, 2019), https://www.reuters.com/article/us-malaysia-politics-1mdb-auditors/malaysia-probing-audit-firms-conduct-in-1mdb-scandal-idUSKCN1PK079.

[121] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

98.     These red flags signaled to any potential business partner—particularly any U.S. financial firm like Goldman bound by the FCPA—that 1MDB carried enormous compliance risks from its creation. In the words of John Pang, who worked for Najib's government and was an adviser on one of Goldman's deals with 1MDB, "*[t]his fund was dodgy from the beginning*. There is no excuse for Goldman not knowing this fund had to do with Najib's political patronage and his election plans. This was an open secret."[122]

### e)     Goldman's Lead Bankers: On a "Very Long Leash" in the Wild West of Southeast Asia

99.     Although they were at the top of Goldman's Partner class that constituted only 1% of its employees, Vella and Leissner were themselves red flags whose controversial business practices were known throughout the bank.

### (1)     Andrea Vella

100.    Vella's rise through the ranks of Goldman's partnership was not free of controversy. In fact, even before he joined the bank, his deals, while profitable, garnered negative attention.

101.    In 2007, while still at JPMorgan's London office, Vella helped structure a bond deal for Greek pension funds that quickly soured and led to public recriminations that the bank had swindled Greece.[123]

102.    Vella moved to Goldman several months later, taking control of the LIA account in Libya. As noted above, the LIA deal that Vella oversaw was highly profitable for Goldman, but was riddled with malfeasance and staggering losses for the LIA, leading to an investigation

---

[122] Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

[123] Sridhar Natarajan & Max Abelson, *Goldman's Star in Hong Kong Turns Into 1MDB Scandal's Enigmatic Man*, Bloomberg (Aug. 15, 2019), https://www.bloomberg.com/news/articles/2019-08-15/goldman-s-star-in-hong-kong-turns-into-scandal-s-enigmatic-man.

into potential FCPA violations by Goldman arising from Vella's and his team's conduct. Vella was later called as a witness by the LIA in its suit to recoup losses from Goldman. During trial, when confronted on the stand with evidence of his team's use of prostitutes to woo the Libyans, he would concede under oath that it was "inappropriate."[124]

103.    Despite his controversial past, Vella's skill in generating fees for Goldman was rewarded when he moved to Goldman's Hong Kong office in the bank's broader reshuffling to focus on Asia, ascending to Co-Head of Investment Banking. As *Bloomberg* reported: "***Vella was one of two executives overseeing investment banking for all of Asia except Japan, making him one of the most powerful dealmakers outside the firm's New York Headquarters***."[125] From that perch, he worked with Tim Leissner and others advising 1MDB, structuring the fund's bond issuances.

104.    Leaving Vella in a senior post overseeing the 1MDB deal team even as the bank's highest-ranking executives dealt with federal criminal and civil investigations stemming from his alleged misconduct in Libya reflected Goldman's willingness to brook compliance violations by its top dealmakers. And, in Malaysia, that is precisely what it got, with *Bloomberg* later reporting, "***[a]uthorities have said that [Vella] dealt with the scandal's alleged mastermind, Jho Low, and was aware of plans to bribe officials***."[126] The Justice Department confirmed that Vella had approved these plans in the bank's quest to generate fees from 1MDB when he was identified as "Co-Conspirator #4" in Leissner's Criminal Information.[127] Vella also "knew that

---

[124] Kit Chellel, *Goldman Executive Says Prostitutes for Libyan 'Inappropriate,'* Bloomberg (July 5, 2016), https://www.bloomberg.com/news/articles/2016-07-05/goldman-executive-says-prostitutes-for-libyan-inappropriate.

[125] *Id.*

[126] *Id.*

[127] *United States of America v. Leissner*, No. 1:18-cr-00439-MKB (E.D.N.Y. August 28, 2018), ECF No. 16 ("Leissner Info."), ¶ 4.

[Low] played a central role in the bond transactions, including by acting as an intermediary between [Goldman Sachs], 1MDB and other Malaysian and Abu Dhabi officials."[128]

(2)   Tim Leissner

105.   In 2009, Leissner was already a Partner and Goldman's Head of Investment Banking for Southeast Asia. As his and Vella's work with Low and 1MDB took off, Goldman elevated Leissner to Chairman of Southeast Asia, gave him a seat on the bank's elite Partnership Committee, and paid him an eight-figure compensation package.

106.   Based on numerous conversations with Goldman employees, *The Wall Street Journal* reporters Bradley Hope and Tom Wright, authors of the seminal book on the 1MDB scandal, described Leissner as being "prone to go off the reservation," but such was permitted because of his ability to generate revenue. The reporters quoted a Goldman banker for the following assessment of Leissner: "***He never operated within boundaries***. . . . ***It was tolerated because he brought in business***."[129]

107.   Leissner's tendency to cross ethical lines was well known within the bank. For example, during negotiations for the IPO of a Malaysian holding company, Leissner struck up an affair with the company's CFO, doing little to hide the relationship from Goldman or rival bankers. Following an internal complaint, Goldman launched an investigation, but Leissner simply denied the affair and the matter was dropped.[130]

108.   Later, to curry favor with the Malaysian government, he arranged for the twenty-five year-old daughter of Malaysia's U.S. ambassador, a Najib ally, to intern at Goldman's

---

[128] Leissner Info., ¶ 20.
[129] Billion Dollar Whale at 56-57.
[130] *Id.*

Singapore office—a move that could have exposed the bank to prosecution under the FCPA.[131] [132] Leissner then had an affair with the intern—another potential FCPA violation—that was widely discussed within the firm.[133] On a separate occasion, he was caught passing information outside the firm without authorization, which yielded only a temporary pay cut.[134]

109.    As *The Wall Street Journal* reporters Wright and Hope described:

> Leissner was making money for Goldman, and the bank took no further action. Leissner took little notice of the admonishments—this was Asia, the Wild West of capitalism, after all—and, seemingly ***as long as the profits kept rolling in, Goldman bosses in the region allowed him a very long leash***.[135]

110.    In fact, as detailed below, far from merely tolerating Leissner's behavior, Goldman encouraged it by rewarding him repeatedly, making him one of the firm's most highly compensated and powerful employees.

## 2.    Top Bankers Resolve to Show Low "Goldman Affection"

111.    Goldman's entanglement with 1MDB began on January 5, 2009, when Roger Ng, a Managing Director based in Goldman's Singapore office, emailed Leissner to introduce him to Low, recounting a recent meeting between Ng and Low about business opportunities for Goldman in Malaysia.[136] Low appeared to be well-connected politically, an important calling card in a region known for endemic corruption. Ng and Leissner hoped that Low, whom Leissner

---

[131] Indeed, as described earlier, Vella's provision of a suspect internship to the video-clerk sibling of an LIA executive was a subject of inquiry by federal prosecutors investigating potential FCPA violations, and other banks have paid hefty fines for similar conduct. For example, the Bank of New York Mellon paid $14.8 million for hiring three inters whose relatives were high-ranking executives at a Middle Eastern sovereign wealth fund.

Antoine Gara, *JPMorgan Agrees To Pay $264 Million Fine For 'Sons And Daughters' Hiring Program In China*, Forbes (Nov. 17, 2016), https://www.forbes.com/sites/antoinegara/2016/11/17/jpmorgan-agrees-to-pay-264-million-fine-for-sons-and-daughters-hiring-program-in-china/#4ce6a4fc5688.

[132] Billion Dollar Whale at 124.

[133] *Id*.

[134] *Id*. at 57.

[135] *Id*.

[136] *United States of America v. Leissner*, No. 1:18-cr-00439-MKB (E.D.N.Y. August 28, 2018), ECF No. 1 ("Leissner Compl. & Aff."), ¶ 23.

remarked to others was a "dodgy" character, could land the bank new business in Malaysia, where Goldman was expending significant resources to generate business.

112.    According to records that the FBI obtained from Goldman, Leissner and Ng met with Low on January 6, 2009.[137] Low told Leissner that the sultan of the Malaysian state of Terengganu was looking to set up an investment fund (TIA, which would later become 1MDB) to manage the state's oil and gas resources. Low needed Goldman to lend legitimacy to his quest to become an influential financier, and he told Leissner and Ng that TIA could provide business to Goldman.[138] The venture was codenamed "Project Tiara" inside the bank.

113.    Emails from this period between Goldman employees and persons involved with the TIA confirmed that Low was integral to the relationship. For example, after the January 6, 2009 meeting, Low emailed Leissner and Ng, copying a future 1MDB officer and stating, "pleasure to meet with the both of you and look forward to forming a good working relationship with ure kindselves [sic] and [Goldman]." Leissner responded, "[Jho Low] and Team, . . . look forward to a great partnership."[139]

114.    On January 15, 2009, TIA's executive director of business development—later the Executive Director of 1MDB—emailed Ng, Leissner, and Low about Project Tiara, stating, "I think it *best to get [Jho Low] involve[d] at every stage*."[140] The same day, Ng emailed Leissner's administrative assistant, writing, "can u send mtg request for tim and I and block 8.30-9.30am with Low at the mandarin. Tim, we should [show] [Low] *some [Goldman] affection* to make certain he is focused with us on TIA."[141] These and other emails obtained by federal

---

[137] *Id.*
[138] Billion Dollar Whale at 58.
[139] Leissner Compl. & Aff., ¶ 23.
[140] *Id.*
[141] *Id.*

investigators and detailed in court filings prove that ***Goldman's own internal records reflected as early as January 2009 that its bankers were doing business with Low and that Low was integral to its business with 1MDB***.

115.     Leissner did not hesitate to reveal Low's role to other bankers at the firm. For example, in an email dated January 21, 2009, Leissner, copying Ng, confirmed to a colleague that they were working on Project Tiara with Low.[142]

116.     Leissner met with Low and the sultan of Terengganu in early 2009, winning Goldman a contract to advise the state on the formation of TIA.[143] While the bank would earn only $300,000 for the work in assisting TIA with the Islamic Bond Issuance, Leissner knew it was an important first step in winning new business for Goldman in Malaysia.[144]

117.     On April 3, 2009, Najib, then the Minister of Finance, was sworn in as Prime Minister. In July 2009, the Ministry of Finance assumed control of TIA, changing its name two months later to 1MDB and broadening its scope to a national concern.[145] Najib chaired 1MDB's advisory board, reflecting his control of the fund.[146]

118.     As detailed above, following Najib's rise to Prime Minister, in April 2009, 1MDB and PetroSaudi entered into a joint venture whereby 1MDB invested $1 billion of the Islamic Bond Issuance, from which Low stole $700 million. Goldman attempted to consult on that joint venture. Specifically, in September 2009, Ng emailed Leissner about the proposed joint venture between 1MDB and PetroSaudi. Ng's email relayed a recent meeting that Ng had with Low,

---

[142] *Id.*, ¶ 24.

[143] *Id.*, ¶ 25.

[144] Billion Dollar Whale at 51-52.

[145] Leissner Compl. & Aff., ¶ 56.

[146] Gavin Finch, *Goldman's Blankfein Met With Jho Low, the Man at Center of the 1MDB Probe*, Bloomberg (Nov. 22, 2018), https://www.bloomberg.com/news/articles/2018-11-22/goldman-s-blankfein-met-with-financier-at-center-of-1mdb-probe.

expressing his hope in securing Goldman a role in the project. Ng told Leissner that Low would "get [them] a date for week of Oct 19 for [a] presentation to [Prime Minister Najib]."[147] The Goldman bankers then met with Najib and various 1MDB officials to discuss how the bank could be of service, and while there is no indication that Goldman was involved in the 1MDB/PetroSaudi joint venture, the budding relationship between the fund and the bank set the stage for a meeting in New York with Goldman CEO Blankfein two months later.

### 3.    Goldman, through Its Global Compliance Department, Vets and Rejects Low for the First Time

119.   While Goldman bankers were working to show Low "some [Goldman] affection" to cultivate Low as an investment banking client, Goldman compliance personnel identified him as someone with whom the bank should not do business or maintain a relationship.

120.   In September 2009, Ng referred Low for an account at Goldman's private wealth management ("PWM") arm in Switzerland. Ng emailed a PWM banker, copying Leissner and stating that Low was "***currently our partner in a lot of transactions in [M]alaysia***. Largely the mid-east and [M]alaysia rationship [sic]."[148]

121.   The referral went to the Global Compliance Department, who reviewed Low's finances and raised concerns about the lack of information about Low's source of wealth. Ng and Leissner were consulted during the vetting and continued to support the application.

122.   Ultimately, Global Compliance refused to approve Low's application for the PWM account, pointing to unresolved questions about the source of Low's money and news coverage of Low's extravagant spending.[149] The failed referral was the first—but not the last—

---

[147] Leissner Compl. & Aff., ¶ 28.
[148] *Id.*, ¶ 35.
[149] *Id.*

time that Goldman's Global Compliance and Legal Departments would be alerted to Goldman's continued high-risk business relationship with Low.

123.    The incident also marked the beginning of an internal Goldman "file" on Low that included compliance reviews, analyses of his financial records, and internal emails between various departments discussing Low's high risk to the bank. These records remained available to Goldman throughout its relationship with 1MDB and Low, as demonstrated by their description in court filings submitted by the DOJ in 2018.

### 4.    Blankfein Meets Privately with Low and Najib to Solicit Business from 1MDB

124.    The Goldman Compliance Department's resounding decision to reject Low as a PWM client based upon conspicuously unresolved questions about the source of wealth that enabled his highly publicized lavish spending did nothing to dampen the enthusiasm of Goldman's Investment Banking division from working with him. On November 3, 2009, Ng emailed Leissner and advised him that he had met with Low and a high-ranking 1MDB official, and learned that the fund planned to raise $1.5 billion. In the email, Ng stated that he was "[g]earing this up to" a meeting with a high-ranking Goldman executive.[150]

125.    Meanwhile, Low's extravagant spending was continuing to draw attention in the press—and by others inside Goldman who knew of Low's relationship to the bank. On November 9, 2009, a Goldman banker sent Leissner and Ng a *New York Post* article published the day before detailing Low's partying habits.[151] The article, under a picture of Low and pop star Usher with a caption citing his $160,000 one-night bar tab, noted, "***[s]peculation is brewing***

_____

[150] *Id.*, ¶ 28.
[151] *Id.*, ¶ 29.

*over where Low is getting his money from*. One inside observer said, '*Nobody spends their own money like that*. It's just weird.'"[152]

126.    Just two weeks later, on November 22, 2009, **Goldman CEO Blankfein met privately with Low, Leissner, and Prime Minister Najib** at the Four Seasons Hotel in New York.[153] Remarkably, despite the bank's own compliance department having rejected Low as a client and documenting Low's intolerable risk to the firm in September 2009, and other bankers circulating press reports of Low's prodigal spending in the preceding weeks, Blankfein went forward with the meeting. The meeting laid the ground for Goldman's future work with the fund.

127.    As the fund's CEO, Shahrol Azral Ibrahim Halmi, later testified, "Jho Low and Tim Leissner . . . acted as matchmakers for the meeting. Jho Low was the facilitator for [Prime Minister] Najib while Leissner was the facilitator for Lloyd Craig Blankfein."[154] According to 1MDB's titular head, **it was during this 2009 meeting, in the presence of Low and Leissner, that "Najib requested Blankfein and Goldman Sachs to support and consult on 1MDB investments**. At the time, the Prime Minister asked Goldman Sachs for its commitment to 1MDB."[155] The 1MDB officials then left the room, while Blankfein, Low, Leissner, and Najib stayed behind. Thereafter, Goldman became 1MDB's global investment bank of choice.

128.    The private meeting between this quartet of Blankfein, Low, Leissner, and Najib in November 2009, established three critical facts shaping all that would follow: Goldman's CEO knew that: (1) Jho Low was a critical intermediary in the 1MDB relationship; (2) Low and

---

[152] Brian Niemietz & Jennifer Gould Keil, *Big-spending Malaysian is the mystery man of city club scene*, N.Y. Post (Nov. 8, 2009), https://nypost.com/2009/11/08/big-spending-malaysian-is-the-mystery-man-of-city-club-scene/.

[153] Sridhar Natarajan & Elffie Chew, *Lloyd Blankfein Was the Unidentified Goldman Executive Present at 2009 1MDB Meeting*, Bloomberg (Nov. 8, 2018), https://www.bloomberg.com/news/articles/2018-11-08/blankfein-said-to-be-in-09-1mdb-meeting-set-up-by-leissner-low.

[154] Hafiz Yatim, Adam Aziz & Ahmad Naqib Idris, *1MDB-Tanore Trial: 1MDB was gold mine for Goldman*, The Edge (Oct. 15, 2019), https://www.theedgemarkets.com/article/1mdbtanore-trial-1mdb-was-gold-mine-goldman.

[155] *Id.*

Leissner were working closely together on 1MDB; and (3) Goldman's top executives—including Blankfein—were willing to ignore documented warnings from the bank's own compliance personnel and numerous other red flags in pursuit of potentially lucrative investment banking business.

### 5.   Goldman's 1MDB Bankers Engage with Najib through Low, Dispensing Favors and Payouts

129.   Following the meeting with Blankfein, in late 2009, Goldman bankers began discussing ways to advise on a transaction concerning a special purpose vehicle that included 1MDB. The project was referred to inside Goldman as "Project Sunfish" and aligned with the bankers' broader effort to cultivate ties to Najib and 1MDB.[156]

130.   On March 26, 2010, Ng emailed Leissner and another banker at Goldman, emphasizing that Low was "close to [Najib]" and that Low's involvement in Project Sunfish "would be helpful . . . especially with [Najib]."[157]

131.   At the same time, Ng and Leissner sought favor with Najib directly, involving top Goldman executives in their efforts. For example, on April 7, 2010, Low emailed Ng to request help in securing the attendance of what federal court filings described as "a former high-ranking political official of the United States" at a charitable award ceremony celebrating Najib's wife, Rosmah, at an event in New York.[158] The award was to honor Rosmah for her work as head of a Malaysian charitable organization.

132.   According to the DOJ, Ng forwarded the request to Leissner, who forwarded it to "a high-ranking executive of [Goldman]," a description used in other internal Goldman

---

[156] Leissner Compl. & Aff., ¶ 32.
[157] *Id*.
[158] *Id*., ¶ 34.

documents for Blankfein.[159] This email again demonstrated top executives' awareness that Leissner was working with Low in the bank's relationship with Najib and 1MDB. Press accounts from later in April 2010 reflect that Rosmah received the award at the St. Regis Hotel in New York, presented by former U.S. Secretary of State Lawrence Eagleburger.[160]

133.    Separately, between April and September 2010, Ng, Leissner, and Low discussed making a donation of more than $300,000 to the same Malaysian organization headed by Najib's wife through Goldman's charitable giving program. The effort was a ploy to curry favor with Najib. Internal emails between Ng and Leissner discussed how "[Rosmah's] not happy [the donation is] taking so long and is questioning our sincerity," which was important to Goldman because the "Government maybe [sic] doing a sovereign [deal]."[161] In short, Goldman bankers were attempting to give money to the charity of a foreign official through an arm of the bank in order to solicit business in a sovereign wealth fund deal—*an obvious violation of the FCPA*.

134.    While it is unknown whether Goldman ultimately made the donation, the request was conveyed to Goldman's charitable arm (based in its New York headquarters) by the very bankers involved in the 1MDB relationship. The affair also demonstrated once again Low's central role in facilitating Goldman's dealings with 1MDB.

### 6.    Vella and Leissner Join Forces to Sell Bonds for a Corrupt Malaysian State Government, Earning Goldman a Public Rebuke

135.    In mid-2010, as efforts to find a workable deal with 1MDB continued, Leissner and Vella helped the Malaysian state government of Sarawak sell $800 million in bonds.[162]

---

[159] *Id.*

[160] *Rosmah receives peace and harmony award from US*, The Star (Apr. 18, 2010), https://www.thestar.com.my/news/nation/2010/04/18/rosmah-receives-peace-and-harmony-award-from-us.

[161] Leissner Compl. & Aff., ¶ 34.

[162] Billion Dollar Whale at 125-26.

136.    In highly unusual fashion, Goldman bought the entire issuance itself at a discount, later selling the bonds to institutional investors, and reaping a profit of $50 million on the deal—*50 times the typical $1 million fee charged for selling bonds for governments in the region*.[163] Goldman would later replicate this approach with the $6.5 billion in 1MDB bonds, buying them directly after having lined up private clients to purchase them and taking outsized fees in the process.

137.    While financially successful, the Sarawak deal drew negative attention to Goldman. Global Witness, an international watchdog organization that tracks corruption in emerging economies, issued a report chastising the bank for funding the "notoriously corrupt Sarawak regime":

> Goldman Sachs is at serious risk of facilitating corruption by doing business with the Sarawak State Government. If you drew up a list of the most corrupt regimes in the region, this one would be near the top. *Goldman Sachs either failed to do proper checks on its clients, or it did them and failed to highlight the risks to prospective buyers of the bonds*.[164]

138.    Rejecting any suggestion that Goldman helped to facilitate corruption, the bank's Goldman's Head of Corporate Communications (Asia-Pacific), Edward Naylor, stated: "*We perform the same consistently high global standards of due diligence in connection with all securities offerings*."[165]

7.    **Goldman's Legal Department Reviews—and Rejects—Working with Low**

139.    In early 2011, Low engaged Goldman to assist with his acquisition of a private gold mining company in Kazakhstan by a private equity firm that he controlled. Leissner again

---

[163] *Id.*

[164] *Goldman Sachs Underwrites US$1.6 Billion of 'Under the Radar' Bonds for Corrupt Sarawak Regime, and Wins Business Award for It*, Global Witness (Apr. 29, 2013), https://www.globalwitness.org/en/archive/goldman-sachs-underwrites-us16-billion-under-radar-bonds-corrupt-sarawak-regime-and-wins/.

[165] *Id.*

served as Low's primary relationship manager. Internally, the deal was known as "Project Gold."[166]

140.    According to the FBI's analysis of emails and other evidence in connection with the DOJ's ongoing 1MDB investigation, Goldman's Legal Department performed an Intelligence Group check on the deal, reviewing the entities and persons involved. Learning that Low controlled the private equity firm, Legal expressed its concern about Low to the deal team in an internal email about the bank advising on the transaction.[167]

141.    Rather than withdraw from the deal due to concerns over Low's involvement, Goldman pivoted to advising a *different* private equity firm in the transaction. Low, however, was behind the second firm as well.[168]

142.    When the Intelligence Group discovered Low's relationship to the second firm, it objected again, deeming the proposal "***even more problematic***."[169] Other Goldman personnel advised against the deal as well. For example, a senior employee in the bank's Conflicts Resolution Group—charged with managing the bank's reputational risk arising from potential conflicts of interest—counseled against completing the transaction.[170]

143.    The deal was ultimately dropped, but not before again confirming to Legal and Conflicts that top Goldman bankers were continuing to conduct new business with Low, a highly suspicious figure by the bank's own measure, and would manipulate the deal to conceal Low's

---

[166] Leissner Compl. & Aff., ¶ 35.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

involvement.[171] Goldman took no further action to ensure that the relationship with Low was severed or that additional due diligence was done on the deal team's Malaysia business in future.

### 8. Multiple Departments within Goldman Reject Low for the Third Time

144.    In March 2011, less than a month after the Project Gold deal team was advised not to work with Low, Leissner referred Low for a PWM account in Goldman's Singapore office. At Leissner's request, Global Compliance initiated a "high priority" review for Low.[172]

145.    Following a review of his finances and extensive press surrounding his inexplicable spending habits, Low was rejected for the third time in less than two years. A compliance employee explained to a PWM banker that Low "was reviewed by both my [Europe, Middle East, and Africa] counterpart and [Legal's Business Intelligence Group] team, and it was concluded that ***no business will be allowed due to significant adverse information and questionable source of wealth***. Please be informed that we do not recommend onboarding this client in PWM Singapore."[173] Another Global Compliance employee stated flatly, "***we have pretty much zero appetite for a <u>relationship</u> with this individual***."[174]

146.    After Goldman's decision to *again* refuse a "relationship" of any kind with Low, Ng, Leissner, and Low met with another Goldman PWM banker to solicit "guidance" on the process of opening a PWM account. Ng emphasized that although Low had been rejected by Goldman's Swiss PWM, "***[g]iven the various things we have with this client***, we should try to make an attempt, if possible" to open an account for Low.[175]

---

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*, ¶ 36.

147.     While Low did not get his private wealth management account with Goldman, the referral process again notified multiple departments and employees—at a minimum, PWM, Legal, and Global Compliance personnel for multiple regions—that **the Southeast Asia deal team viewed Low as a valuable client and was actively working with him**, despite Global Compliance's view that "no business" or "relationship" should be allowed with him. It also added to the bank's internal records of red flags concerning Low.

> ### 9.     Project Magnolia: Goldman Nets $192 Million from 1MDB's First Bond Offering Amid a Sea of Red Flags
>
> #### a)     Goldman's Top Bankers Agree to Pay Bribes and Kickbacks

148.     In early 2012, 1MDB engaged Goldman Sachs for advice in purchasing a Malaysian energy company, including several power plants that it owned. According to documents filed by the DOJ and unsealed in 2018, Low, Ng, Leissner, Vella, and multiple 1MDB officials met in Malaysia to discuss Goldman's role in obtaining financing for the acquisition.[176] The engagement was known within Goldman as "Project Magnolia."[177]

149.     During the meeting, Vella, Leissner, and Ng discussed with Low the type of guarantee that 1MDB needed to obtain for Goldman to serve as underwriter of the bonds. Low suggested backing from IPIC, the Abu Dhabi sovereign wealth fund whose managing director, Khadem Al Qubaisi, Low had cultivated.[178]

150.     The IPIC managing director had a reputation for demanding bribes even before the Abu Dhabi fund's relationship with 1MDB.[179] Indeed, Al Qubaisi had been sued in the United States in 2009 by a consulting firm from whom the director had demanded a $300 million

---

[176] Leissner Info., ¶ 25.

[177] Leissner Compl. & Aff., ¶ 38; Leissner Info., ¶ 28.

[178] Billion Dollar Whale at 176-77.

[179] *Id.* at 178-79.

kickback.[180] Tellingly, when Goldman's 1MDB team solicited help from their colleagues in the region, bankers in Goldman's Middle Eastern headquarters declined to get involved with the IPIC-guaranteed 1MDB bond offering, finding the idea "preposterous."[181]

151.   The quartet of Vella, Leissner, Ng, and Low nonetheless agreed that a guarantee from IPIC would suffice. According to a later filing by the DOJ, Vella, Leissner, and Ng **"understood that [Low] would act as an intermediary between 1MDB, [Najib] and other government officials from Abu Dhabi**."[182]

152.   Unsurprisingly, IPIC's participation did not come without a price. In late February 2012, Low, Leissner, Ng, a 1MDB official, and others met in London to discuss the bond deal. During the meeting, Low explained that to secure the guarantee from IPIC, they would have to pay bribes and kickbacks to government officials in Malaysia and Abu Dhabi.[183]

153.   After the meeting, Ng informed Vella that Goldman would have to pay bribes and kickbacks to foreign officials for the bond deal to occur. Given his motivation to get the deal done and drive profits for Goldman, Vella agreed.[184]

154.   Project Magnolia received support from top Goldman management, including President and COO Cohn, who recognized the deal's alignment with the bank's post-crisis "monetize the state" initiative. As *The Wall Street Journal* reporters Wright and Hope recount:

> [W]ith Western economic activity subdued, Cohn was spearheading a drive to do more deals with sovereign wealth funds in emerging markets. And that led him to throw his support behind a potentially lucrative line of business that Leissner and Andrea Vella were developing in Malaysia. . . . ***The backing of a domineering***

---

[180] Bradley Hope & Nicolas Parasie, *Abu Dhabi Sovereign-Wealth Fund Gets Entangled in Global 1MDB Scandal*, The Wall Street Journal (Dec. 1, 2016), https://www.wsj.com/articles/malaysian-money-trail-leads-to-the-middle-east-1480614247; Billion Dollar Whale at 152.

[181] Billion Dollar Whale at 178.

[182] Leissner Info, ¶ 25.

[183] *Id.*, ¶ 26.

[184] *Id.*, ¶ 27.

*and powerful personality like Cohn afforded significant cover to those involved in the 1MDB business and drowned out the voices who were uncomfortable with the plans to raise billions of dollars for the fund.*[185]

155.    In March 2012, 1MDB formally named Goldman as the "sole bookrunner and arranger" for the $1.75 billion debt issuance to fund the acquisition.[186] Goldman had won the deal with no competition, flouting the typical process by which potential underwriters compete for the issuer's business by offering favorable terms.

### b)    Numerous Other Red Flags Signal Corruption at 1MDB

156.    The first 1MDB offering was recognized as "the biggest sole-led bond deal ever printed in ex-Japan Asia."[187] Yet the inherently troubling features of doing business with the fund, apparent from Blankfein's first encounter with Low and Najib in 2009, had only grown more pronounced with time. In addition to those identified above in ¶¶ 80-110, the red flags around Project Magnolia included the following:

### (1)    Low's Role Is Well Known Inside the Bank

157.    Throughout Project Magnolia's formulation and execution, Low's involvement as the lynchpin of the deal was apparent.

158.    *First*, the 1MDB deal team did little to mask their involvement with Low, openly travelling together and conducting business publicly with Low and various third parties. For example:

a.    On March 5, 2012, Vella, Leissner, and Ng traveled with Low to Abu Dhabi meet with IPIC executives;[188]

---

[185] Billion Dollar Whale at 182-83.

[186] Leissner Compl. & Aff., ¶ 38.

[187] Jonathan Rogers, *Goldman ruffling feathers in Asian debt*, IFR (June 1, 2012), https://www.ifre.com /story/1225106/goldman-ruffling-feathers-in-asian-debt-xt8w2q8dml.

[188] Leissner Compl. & Aff., ¶ 40; Leissner Info., ¶ 30; Billion Dollar Whale at 176-81.

b. Later that month, Ng, Leissner, and Low met in New York for a dinner with the head of the company from which 1MDB ultimately purchased the energy company;[189] and

c. On April 21, 2012, Leissner and Low met with several bankers from the Singapore branch of a private bank at a restaurant in Singapore to discuss Project Magnolia.[190]

159.    *Second*, as *The Wall Street Journal* later reported, Low's involvement in the 1MDB bond deal was "widely discussed" at Goldman's Asia offices at the time.[191] If Low's role was meant to be a secret, it was an open one. Again, this is unsurprising, given the deal team's recent solicitations to various personnel to ingratiate the bank to Low by opening a PWM account for him in Singapore.

160.    *Third*, internal documents, including Goldman emails, reflected Low's role in the bond deal. For example, *The Wall Street Journal* reported that "one managing director described [Low] as '**the 1MDB Operator or intermediary in Malaysia**' in a March 2012 email."[192]

161.    *Fourth*, **Leissner himself informed Goldman that Low was involved in the deal**. On April 4, 2012, the Capital and Suitability Committees convened a firmwide meeting to review Project Magnolia.[193] Asked at this joint firmwide meeting about Low's involvement by the global Co-Head of Business Intelligence, Leissner admitted to the Committees that Low had

---

[189] Leissner Compl. & Aff., ¶ 40

[190] *Id.*

[191] Tom Wright & Liz Hoffman, *Goldman Sachs's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal*, The Wall Street Journal (Nov. 9, 2018), https://www.wsj.com/articles/goldman-sachss-ex-ceo-met-malaysian-twice-at-center-of-1mdb-scandal-1541779363.

[192] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[193] Leissner Compl. & Aff., ¶ 41.

played a key role for 1MDB by facilitating the March 5, 2012 meeting between Goldman and IPIC, the guarantor needed for the Project Magnolia deal to move forward.[194] His disclosure confirmed what copious other evidence inside the bank already reflected.

162.     *Fifth*, others outside of the Business Intelligence Group knew that Low was the central figure in the deal team's effort to drum up business in Malaysia. As described above, **CEO Lloyd Blankfein had personally met with Low, Leissner, and Najib** at least once by this time, discussing how Goldman could win business with 1MDB, leaving no doubt that Low's involvement was known at the bank's highest level. Furthermore, Global Compliance personnel from multiple regions, PWM bankers from Goldman's Switzerland and Singapore offices, Conflicts personnel, and employees from the bank's charitable arm had learned of the deal team's close relationship with Low—as well as the bankers' willingness to manipulate deals to hide Low's involvement and court FCPA violations through "charitable" gifts to the family of Low's patron, Najib.

> (2)     Goldman Bankers Voice Concerns about the Deal's Terms But Are Steamrolled by Senior Management

163.     Low aside, senior bankers within Goldman were expressing concerns about other features of the 1MDB deal even before the first offering had closed.

164.     Most conspicuous was **David Ryan, President of Goldman Asia and a member of Goldman's firmwide Management Committee** (along with Blankfein, Cohn, Michael Evans, current CEO David Solomon, and other key executives). Ryan expressed that Goldman's receipt

---

[194] *Id.*

of the lucrative underwriting assignment without any competition with other banks was ***too good to be true***.[195] Moreover, Ryan said, Goldman's profit appeared to be excessive.[196]

165.    Ryan also believed that the transaction was ill-suited for 1MDB. He had visited 1MDB's offices in Malaysia, and he left concerned that management did not have the experience to manage multi-billion-dollar investments and that the fund was taking on too much debt, which he expressed at the time.[197] His objections were overruled for the first of three times.

166.    Alex Turnbull, a Goldman Executive Director based in Hong Kong, likewise voiced concerns about Project Magnolia that Goldman quashed. Not involved in the deal himself, a colleague dropped off the paperwork for the bond sale and told him, "Check this out."[198]

167.    In an internal email that he sent to several colleagues, Turnbull expressed disbelief at the offering's terms and Goldman's expected profits.[199] The email exclaimed, "What the f--- is going on with this? ***The pricing is nuts, what is the use of funds***?"[200] These concerns, he told the *Australian Financial Review*, were "***obvious***" and "***widely shared by the market participants at the time***."[201]

---

[195] Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

[196] Billion Dollar Whale at 185.

[197] *Id.* at 183.

[198] Aaron Patrick, *Goldman Sachs, Lies and 1MDB*, Austl. Fin. Review (Jan. 19, 2019), https://www.afr.com/politics/goldman-sachs-lies-and-1mdb-20190117-h1a5is.

[199] Billion Dollar Whale at 185.

[200] Jamie Smyth & Don Weinland, *Australia PM's son says Goldman sidelined him after 1MDB warnings*, Fin. Times (Mar. 8, 2018), https://www.ft.com/content/cb0fbf5c-2284-11e8-9a70-08f715791301.

[201] Aaron Patrick, *Alex Turnbull's 1MDB complaints about Goldman Sachs look prescient*, Austl. Fin. Review (July 11, 2018), https://www.afr.com/markets/equity-markets/alex-turnbulls-1mdb-complaints-about-goldman-sachs-look-prescient-20180710-h12gxa.

168.    Unbeknownst to Turnbull, his email was forwarded to others inside the bank, including compliance personnel. Yet rather than investigate the concerns raised by Turnbull, Goldman silenced him—just as it had Ryan. **Compliance reprimanded Turnbull for questioning the deal**.[202] Separately, Turnbull's boss **told Turnbull to keep his mouth shut about the deal if he ever wanted to be promoted**.[203] Turnbull was then demoted to the so-called "b-track," frozen out of important business. He left the bank almost two years after the email incident.[204]

169.    Turnbull, a trader, later described the culture of Goldman investment bankers in Asia to the *Financial Times*: "The attitude among some of the banking guys was . . . 'Sure, all of my clients are crooks – so how the f--- else am I going to deal with them?' They kind of took the view that if I want to get things done in Asia, then I will have to do it in the 'Asian way.'"[205]

(3)    <u>Project Magnolia's Terms Are Highly Suspicious</u>

170.    As observed by Ryan, Turnbull, and others, the deal's terms and conditions were highly suspicious and indicated a likelihood of corruption.

171.    *First*, IPIC's guarantee was suspicious, as there was little reason for a foreign sovereign fund to be backstopping Malaysia's own sovereign fund. "After all," the *Financial Times* wrote in a July 2012 article titled "1MDB of Malaysia's $1.75b bond: one puzzle wrapped in another," "1MDB has secured a Malaysian state guarantee in the past. **Why is a Gulf emirate, many miles away, guaranteeing this bond?**" [206]

---

[202] *Id.*

[203] Billion Dollar Whale at 185-86.

[204] *Id.*

[205] Don Weinland, Stefania Palm & Jamie Smyth, *Goldman Sachs' Asia franchise suffers in 1MDB storm*, Fin. Times (Nov. 21, 2018), https://www.ft.com/content/8f33b9a0-e671-11e8-8a85-04b8afea6ea3.

[206] Camilla Hall, *1MDB of Malaysia's $1.75bn bond: one puzzle wrapped up in another*, Fin. Times (July 2, 2012), https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e#ixzz2XeyVxYLm.

172.    The *Financial Times* also noted that, even more curiously, IPIC did not receive a documented fee for its role as guarantor. This feature was particularly suspect given IPIC's managing director's reputation for soliciting bribes to influence IPIC investments—including allegations from a U.S. lawsuit in 2009 that he had demanded a $300 million kickback in connection with a deal. Equally telling was Goldman's own Middle East office declining to get involved due to suspicions over IPIC's involvement.

173.    *Second*, the entire issue was handled as a **private placement**, rather than an open market offering, another highly unusual feature of a large sovereign offering. Private placements, which lack the competition among buyers on the open market, often cost the issuer more, but maintain a veil of confidentiality, which Low and Najib desired. 1MDB's willingness to pay more to keep the deal secret was suspicious.

174.    *Third*, Goldman's underwriting process was marked by extreme secrecy. Despite being "Asia's biggest sole-led dollar-bond sale," the *Financial Times* noted on July 2, 2012, that "it almost slipped under the radar."[207] It continued, "***[t]he issue was never meant to be made public but somehow it flickered up on bankers' screens, sparking caustic commentary***."

175.    *Fourth*, the yield on the bond was nearly ***2 ½ times higher*** than comparable securities. The *Financial Times* remarked that the 1MDB bonds were priced at 425 basis points over 10-year Treasuries (a 6% yield), while comparable bonds traded at a spread of just 185 basis points.[208] 1MDB had no reason to agree to pay so much in interest unless it was trying to consummate an otherwise suspect deal.

176.    *Fifth*, **the purpose of nearly half of the money 1MDB netted from Project Magnolia was left undefined**. According to the offering circular, $810 million would be used to

[207] *Id.*
[208] *Id.*

acquire the target energy company from a well-connected Malaysian tycoon—itself a red flag in a country known for corruption—and the remaining $744 million would be set aside for "general corporate purposes."[209] This meant that investors had no way of knowing whether the money would be used for legitimate investments—or as a political or personal slush fund for Najib and his associates.

177.    *Sixth*, the fees that Goldman charged—and that 1MDB allowed—well exceeded the industry standard. According to *The Wall Street Journal*, **a typical fee on a deal like Project Magnolia would be about $1 million**, whereas the offering circular revealed that **Goldman charged 1MDB $192.5 million**, or about 11% of the bond issue.[210] The fees Goldman received also dwarfed a typical Malaysian investment grade bond deal, which, in an article titled "Rogue Bankers Don't Explain Goldman's 1MDB Mess," *Bloomberg* explained typically "compare with half a percentage point for underwriting a typical Malaysian investment-grade bond deal, one percentage point for high-yield and mere basis points for government debt." This seemed too rich a price for Goldman's services even to the Najib loyalists on 1MDB's board, but the bank cajoled them, "[l]ook at your number, not at our number."[211]

178.    While the deal went through, the fact that 1MDB permitted such exorbitant fees to go to Goldman was strongly indicative of corruption, as no sovereign client legitimately concerned about its country's funds would have reason to agree to such terms. Indeed, after the 1MDB scandal broke, former Partners of the firm told *Bloomberg* that "**the amount of money**

---

[209] Leissner Compl. & Aff., ¶ 44.

[210] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[211] Aaron Patrick, *How Goldman Sachs silenced 1MDB doubters*, Austl. Fin. Review, Sept. 7, 2018.

*Goldman Sachs made from relatively plain bond deals should have been a bright warning to its highest executives*."[212]

179.    Much like the bank's defense of Vella's and Leissner's earlier bond deal for the state of Sarawak in 2010, Goldman sought to justify its enormous take on the ground that it had undertaken heroic risk by buying the Magnolia issuance directly. In truth, Goldman had secured buyers—including mutual funds in South Korea, China, and the Philippines—to purchase the bonds prior to finalizing the deal, meaning that it had accepted virtually *no risk* in the deal.[213] This, too, Goldman concealed from everyone outside the bank. In fact, a Goldman employee was told to *keep all correspondence about the bond off email*, lest they become public and reveal that the bank's colossal fee was unjustified.[214] Even had Goldman not lined up purchasers ahead of time, it would have been able to easily offload the entire lot, as the markedly higher yields compared to comparable securities made them enormously attractive to investors.

(4)    Sensing Political Corruption, Investment Bank Lazard Pulls Out of the Deal

180.    Because the Project Magnolia offering was purportedly designed to provide funds to purchase power plants from a Malaysian tycoon for $2.7 billion, Goldman engaged the investment bank Lazard to provide an independent valuation of the plants to justify the purchase price. Lazard initially agreed, but its analysis indicated that the $2.7 billion price tag was too

---

[212] Max Abelson & Sridhar Natarajan, *Lloyd Blankfein's Final Days at Goldman Clouded by 1MDB Scandal*, Bloomberg Businessweek (Dec. 13, 2018), https://www.bloomberg.com/news/articles/2018-12-13/lloyd-blankfeins-final-days-at-goldman-clouded-by-1mdb-scandal.

[213] Billion Dollar Whale at 186.

[214] *Id*.

high. As *The Wall Street Journal* later reported, Lazard pulled out, telling Goldman it believed 1MDB was overpaying and that the deal "**smacked of political corruption**."[215]

181.    Rather than find another third party valuation expert or otherwise scrutinize the deal more objectively, Goldman stepped into Lazard's role, eliminating any semblance of an impartial valuation.[216] Goldman had good reason to push for the high acquisition price, even if it cost the bank's client more: Goldman was to receive 0.5% of the $2.7 billion deal in addition to its fees on the debt issuance.[217] Drawing no objection from the internal committees that the BSC created to prevent conflicts of interest or reputational harm, Goldman provided its own self-serving valuation to justify the $2.7 billion figure and forged ahead with the offering.[218]

182.    Lazard's concerns of corruption proved well-founded. In addition to the theft by Low and Najib of bond proceeds after the Magnolia offering closed, discussed below, the deal involved a circular flow of kickbacks between 1MDB and the tycoon that owned the plants. As stated in the circular that Goldman itself had drafted, that same tycoon was subscribing to a "significant" portion of the offering, earning a 6% return at a time when global interest rates were hovering around zero. In return, the tycoon made $170 million in donations to 1MDB's "charity" arm. Furthermore, **1MDB wrote off $400 million of the value of the plants**, which effectively conceded that it had paid a grossly inflated price—precisely Lazard's reason for withdrawing from the deal.[219]

---

[215] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802; Billion Dollar Whale at 184.

[216] Billion Dollar Whale at 185.

[217] Adam Aziz, *Jho Low, Tim Leissner 'matchmaker' for Najib and Goldman Sachs, court told*, EdgeProp (Sept. 27, 2019), https://www.edgeprop.my/content/1592465/jho-low-tim-leissner-matchmaker-najib-and-goldman-sachs-court-told.

[218] Billion Dollar Whale at 184.

[219] *Id.* at 186.

(5)   <u>Outrage Over Corruption in Najib's Regime Spills into Malaysia's Streets</u>

183.   Another salient warning of corruption at 1MDB was the unrest roiling Malaysian politics, reflecting opposition to the Najib regime and growing cynicism about his "1Malaysia" campaign. In late April 2012, tens of thousands of protesters took to Kuala Lumpur's streets to demand Najib's resignation and an overhaul of the country's electoral system after decades of institutionalized graft. Some held up caricatures of Najib's wife, Rosmah, asking how she had paid for her jewels on Najib's government salary.[220]

184.   The protests resulted in hundreds of arrests, with protestors clad in signature yellow t-shirts sprayed with tear gas and water cannons.[221] The unrest was reported around the world by outlets such as *The New York Times*, the *BBC*, and *Reuters*. Human Rights Watch chastised the Najib regime for using excessive force.[222]

185.   Occurring simultaneously with Goldman's readying of the Magnolia offering, these events highlighted that the bank was helping to fund a corrupt regime, just as Vella's and Leissner's underwriting in the state of Sarawak had reportedly done not long before.

c)   **Defying the Warnings, Goldman Forges Ahead With the Magnolia Offering—and the Funds Quickly Disappear**

186.   Goldman's Asia Pacific committee was tasked with reviewing the deal, pitched by Leissner and Ng, before sending it on to the firmwide Capital Committee in New York.[223] The Committee met in Hong Kong and was co-chaired by Eugene Leouzon, Goldman's ***Global Chief***

---

[220] *Id.* at 191.

[221] Liz Gooch, *Police Clash With Malaysia Protesters Seeking Electoral Reforms*, The N.Y. Times (Apr. 28, 2012), https://www.nytimes.com/2012/04/29/world/asia/malaysian-capital-braces-for-rally-by-democracy-activists.html.

[222] *Malaysia: Excessive Force Used to Disperse Peaceful Protests*, Human Rights Watch (Apr. 29, 2012), https://www.hrw.org/news/2012/04/29/malaysia-excessive-force-used-disperse-peaceful-protests.

[223] John Gapper & Laura Noonan, *NY Fed told Goldman to improve risk reporting shortly after 1MDB*, Fin. Times (Nov. 25, 2018), https://www.ft.com/content/bc59bc34-f0a0-11e8-ae55-df4bf40f9d0d?emailId=5bfa ce7617a34c00049cc5ce&amp;segmentId=ce31c7f5-c2de-09db-abdc-f2fd624da608.

*Underwriting Officer*.[224] The regional committee immediately recognized the risk of the deal, expressly identifying "potential media and political scrutiny" that the bank could suffer on the committee meeting's agenda.[225]

187.    The deal had powerful champions, however, and the committee went along. Vella was a member of the Hong Kong-based Asia Pacific Committee. While the Asia Pacific Committee's minutes reflected that Vella recused himself from the financing decision given his interest in the transaction, he remained in the room and continued to take part in the discussions. In fact, according to the *Financial Times*, "***Vella . . . was the most influential figure*** within the Asia Pacific committee in securing approval for 1MDB as a member of the deal team."[226]

188.    Ultimately, five Goldman committees, including four powerful firmwide committees charged with reviewing important transactions—the Risk, Business Standards, Capital, and Suitability Committees—approved Project Magnolia in mid-May 2012.[227] Among those who approved the deal were: CEO Blankfein; then-Head of Investment Banking and current CEO David Solomon; and then-Global Head of Financing, now CFO Stephen Scherr.[228] In its rush to complete the deal, Goldman failed to obtain approval from IPIC's board, the guarantor of the bonds. Instead, it relied on the approval of the two corrupt officials with whom

---

[224] *Id.*

[225] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[226] *Id.*

[227] Leissner Compl. & Aff., ¶ 41; Matt Wirz & Alex Frangos, *Goldman Sees Payoff in Malaysia Bet*, The Wall Street Journal (Apr. 30, 2013), https://www.wsj.com/articles/SB10001424127887323798104578452802751076598; Yantoultra Ngui & Liz Hoffman, *Malaysia Charges Goldman Sachs Executives in 1MDB Scandal*, The Wall Street Journal (Aug. 9, 2019), https://www.wsj.com/articles/malaysia-charges-goldman-directors-over-1mdb-scandal-11565342749.

[228] Hugh Son, *As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense*, CNBC (Dec. 18, 2018), https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

Low was conspiring, including the executive with a well-known reputation for demanding kickbacks.[229]

189.    Project Magnolia closed on May 21, 2012, for a total offering of $1.75 billion in 1MDB bonds.[230] As noted above, the offering was structured to operate effectively as a private placement, with Goldman buying the entire lot from 1MDB directly, then reselling them to a pre-defined group of clients—much like Vella and Leissner had done for the state of Sarawak in 2010, after which an international watchdog upbraided the firm for bankrolling corruption.

190.    Approximately one third of Project Magnolia's net proceeds disappeared almost immediately. According to the FBI's review of financial records, nearly $577 million was diverted to a BSI account held by a shell company incorporated in the British Virgin Islands, from which it was funneled elsewhere.[231] The offering circular had made no mention of such a use.

191.    On May 25, 2012, $295 million was transferred into a shell account at a Singapore bank controlled by Low's associate, Eric Tan, whom Low frequently used as a proxy for financial transactions to keep Low's name off the radar. Other funds from the Low-controlled Tan account went to officials at IPIC and 1MDB.[232]

192.    Meanwhile, Goldman's haul of over $192 million in fees from the deal singlehandedly moved the bank up two slots on the 2012 underwriting league tables for Asia.[233] Back in New York, Goldman awarded the Project Magnolia deal its **highest internal prize**, the

[229] Dave Guilas, *Report: Goldman proceeded with $1.75B bond sale without IPIC's board OK*, S&P Global Market Intelligence (Dec. 21, 2018), https://www.spglobal.com/marketintelligence/en/news-insights/trending/iVizr2kcCwL22Q2VlaAevA2.
[230] Leissner Compl. & Aff., ¶ 44.
[231] *Id.*, ¶ 45.
[232] *Id.*, ¶ 46.
[233] Camilla Hall, *1MDB of Malaysia's $1.75bn bond: one puzzle wrapped up in another*, Fin. Times (July 2, 2012), https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e#ixzz2XeyVxYLm.

Michael P. Mortara Award,[234] on a night that has been referred to as Goldman's "internal equivalent of the Oscars"—demonstrating that knowledge of the deal reached all members of senior management.[235] Acknowledging the breadth of involvement by the bank's various functions, the award's selection committee lauded bankers in four separate Goldman divisions for "solving an important client's problem through outstanding firmwide cooperation."[236]

> **10.** **Project Maximus: As the Warning Signs Multiply, 1MDB's Second Offering Brings Goldman Another $114 Million in Fees**
>
> **a)** **Immediately After the First Offering, 1MDB Seeks a Second**

193.    Only ten days after Project Magnolia closed on May 21, 2012, and as its proceeds were being funneled through shell accounts to pay off Low and officials at 1MDB and IPIC, Goldman was tapped to underwrite a second bond deal with 1MDB—again without any competition from rival investment banks.

194.    On May 31, 2012, Leissner informed a colleague at Goldman that 1MDB planned to buy a second energy company and was looking to retain Goldman as its adviser on a second capital raise to fund the acquisition. Internally, the venture was called "Project Maximus." Leissner and Ng, along with other Goldman bankers, were on the deal team, overseen by Vella.[237]

---

[234] Mortara was a Goldman Partner "who was instrumental in the founding of the market for mortgage-backed securities." Jonathan Fuerbringer, *Michael P. Mortara, 51, a Developer of Mortage-Backed Securities*, The N.Y. Times (Nov. 16, 2000), https://www.nytimes.com/2000/11/16/business/michael-p-mortara-51-a-developer-of-mortgage-backed-securities.html.

[235] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[236] *Id.*

[237] Leissner Compl. & Aff., ¶ 50.

195.    The offering was structured to raise $1.75 billion in additional funds for 1MDB.[238] The funds were ostensibly intended for the purchase of power plants from a casino-and-plantations conglomerate.[239] Pursuant to negotiations with Goldman, IPIC again agreed to guarantee the Project Maximus bonds.[240]

### b)    Red Flags Again Signal Corruption

196.    Various signs of corruption attended Project Maximus. Given the razor-thin interval between the first and second offerings, the same red flags that existed when Project Magnolia was underway persisted at the outset of Project Maximus: (i) knowledge of Low's role had not dissipated; (ii) the previously expressed concerns of experienced Goldman bankers during the first deal remained as valid; (iii) the terms and structure of the bonds remained as suspect, with the Project Maximus bonds bearing largely the same characteristics as the Project Magnolia bonds, including another inexplicable guarantee from IPIC and its graft-prone director; and (iv) Lazard's withdrawal over corruption concerns seemed only more prescient in the wake of the mass street protests demanding Najib's resignation.

197.    Indeed, had Goldman actually engaged in the post-transaction monitoring that the BSC had mandated—and which bank President Cohn assured investors in 2013 had been "fully implemented"—more personnel at the bank would have discovered the corruption that both Lazard and the protesters suspected. Irrespective of the bank's fulfillment of its commitment to post-transaction monitoring, even modest due diligence in connection with Project Maximus

---

[238] Billion Dollar Whale at 189; Leissner Compl. & Aff., ¶ 50.

[239] Billion Dollar Whale at 189.

[240] Carmel Crimmins, Olivia Oran, Sumeet Chatterjee, Grant McCool, Anshuman Daga & Martin Howell, *Goldman Sachs under spotlight in Malaysian fund scandal*, Reuters (July 20, 2016), https://www.reuters.com/article/us-malaysia-scandal-goldman-sachs/goldman-sachs-under-spotlight-in-malaysian-fund-scandal-idUSKCN1002OR.

would have revealed that hundreds of millions of dollars in proceeds from the first offering had

disappeared almost instantaneously.

198.    Furthermore, as was true throughout Goldman's relationship with Low and

1MDB, signs of corruption were only multiplying with time. Additional red flags during Project

Maximus included the following:

(1)    The Second Deal's Terms Are Again Suspect

199.    Press reports following consummation of the Project Magnolia deal in May 2012

raised questions about the structure of the deal that mirrored those of the second offering,

including: (i) the unusually onerous interest payments 1MDB was agreeing to make; (ii) the

extreme secrecy surrounding the issuance, including its sale by private placement; and (iii) the

inexplicable role that IPIC had undertaken as guarantor of the offering.[241]

200.    Moreover, the offering circular stated that of the approximately $1.63 billion in

net proceeds that the offering was expected to be generate, only $692 million would be used to

buy the second energy company. Over *$1 billion* of the second offering was allocated to "general

corporate purposes." This was itself a red flag, as there was no reason to rush an offering the

purpose of which had been left largely undefined.[242]

201.    Furthermore, even the stated justification for the portion of the raise that was

earmarked for a specific use was suspicious. As noted above, $744 million of the first offering

was purportedly set aside for "general corporate purposes," including future acquisitions. ***With***

---

[241] Camilla Hall, *1MDB of Malaysia's $1.75bn bond: one puzzle wrapped up in another*, Fin. Times (July 2, 2012), https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e#ixzz2XeyVxYLm; Carmel Crimmins, Olivia Oran, Sumeet Chatterjee, Grant McCool, Anshuman Daga & Martin Howell, *Goldman Sachs under spotlight in Malaysian fund scandal*, Reuters (July 20, 2016), https://www.reuters.com/article/us-malaysia-scandal-goldman-sachs/goldman-sachs-under-spotlight-in-malaysian-fund-scandal-idUSKCN1002OR; *A Thief and Liar, Caught Red Handed by the FBI! – PM Najib Razak ["Malaysia Official Number 1"] Is Unmasked!*, Sarawak Report (July 20, 2016), http://www.sarawakreport.org/2016/07/caught-red-handed-by-the-fbi-pm-najib-razak-malaysian-official-number-1-is-fingered-by-the-doj/.

[242] Leissner Compl. & Aff., ¶ 55.

*only $692 million needed to buy the second energy company, the set-aside funds from the first*

*offering would have sufficed*—had they not already been funneled offshore for corrupt

payments to Najib, officials at 1MDB and IPIC, and Low.

(2)    Asia President David Ryan Again Speaks Out But Is
Overruled and Sidelined by President Gary Cohn

202.   In connection with Project Maximus, Goldman's Asia President, David Ryan,

again voiced strong reservations about Goldman's investment banking work for 1MDB. Ryan

was Vella's and Leissner's superior. He was also one of only 25 Senior Directors at the bank and

served on Goldman's Management Committee, according to its 2013 Annual Report.[243]

Nevertheless, he received treatment similar to Turnbull, the Executive Director "b-tracked" and

reprimanded by compliance personnel after objecting to the first offering several months before.

203.   *The New York Times* reported that, after the first offering was completed, Ryan

had argued to colleagues that Goldman should reassess—and potentially end—its relationship

with 1MDB.[244] According to the paper's four sources, "[t]he unusual no-bid contract struck Mr.

Ryan and other Goldman executives as possibly *too good to be true*."[245] When the second

offering popped up on the heels of the first, Ryan questioned why Goldman was not lowering its

fees, given the ease with which it had offloaded the first round (indeed, lining up purchasers

before closing).[246]

---

[243] 2013 Annual Report.

[244] Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

[245] *Id.*

[246] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

204.    ***Gary Cohn immediately silenced Ryan***, rehiring Mark Schwartz, a former Goldman banker, and installing him as Chair of Goldman Asia, a post above Ryan.[247] Schwartz, who joined the firm's Management Committee, was a proponent of the 1MDB relationship.[248] Frozen out of the bank's hottest business in his own region, Ryan was marginalized.

### c)    Goldman Again Ignores the Warning Signs, and Hundreds of Millions More Are Stolen

205.    Despite these red flags, Goldman's compliance and supervisory committees rubber-stamped the deal. Five internal committees, including the firmwide Risk, Business Standards, Capital, and Suitability Committees, signed off on the offering.[249] CEO Blankfein, then-Head of Investment Banking and current CEO Solomon, and then-Global Head of Financing, now CFO Scherr, were again among those who approved the deal.[250]

206.    Project Maximus closed on October 17, 2012, supposedly yielding $1.75 billion in proceeds for the people of Malaysia.[251] As with Project Magnolia, however, a large chunk of the $1.75 billion offering was immediately siphoned off illegally. According to the FBI's review of financial records from the transaction, nearly half of the net proceeds of the deal—$790 million—was diverted from 1MDB's account within 48 hours of Goldman sending the offering's

---

[247] Susanne Craig, *The Return of Goldman's Mark Schwartz*, The N.Y. Times (June 12, 2012), https://dealbook.nytimes.com/2012/06/12/the-return-of-goldmans-mark-schwartz/; Billion Dollar Whale at 189

[248] Billion Dollar Whale at 189.

[249] Leissner Compl. & Aff., ¶ 53; Matt Wirz & Alex Frangos, *Goldman Sees Payoff in Malaysia Bet*, The Wall Street Journal (Apr. 30, 2013), https://www.wsj.com/articles/SB10001424127887323798104578452802751076598; Yantoultra Ngui & Liz Hoffman, *Malaysia Charges Goldman Sachs Executives in 1MDB Scandal*, The Wall Street Journal (Aug. 9, 2019), https://www.wsj.com/articles/malaysia-charges-goldman-directors-over-1mdb-scandal-11565342749; John Gapper & Laura Noonan, *NY Fed told Goldman to improve risk reporting shortly after 1MDB*, Fin. Times (Nov. 25, 2018), https://www.ft.com/content/bc59bc34-f0a0-11e8-ae55-df4bf40f9d0d?emailId=5bface7617a34c00049cc5ce&amp;segmentId=ce31c7f5-c2de-09db-abdc-f2fd624da608.

[250] Hugh Son, *As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense*, CNBC (Dec. 18, 2018), https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[251] Leissner Compl. & Aff., ¶ 55.

proceeds to the fund, again going to a shell company incorporated in the British Virgin Islands at an account held at BSI.[252] More followed.

207.   Beginning in late October, the stolen proceeds were used for, among other purposes, the following:

a.   Approximately $200 million was funneled into an account controlled by Low. Low used the stolen funds to buy jewelry, pay off credit cards, dole out to family members, and cover the costs of his private jet. Another $473 million was diverted to pay for luxury properties in New York and Beverly Hills.[253]

b.   Another $238 million was diverted to the account of Riza Aziz, Najib's son and a close friend of Low.[254] Aziz has since been charged with money laundering by Malaysian prosecutors.[255]

c.   In early December 2012, Leissner used proceeds from the 1MDB bond sales to pay kickbacks of $1.7 million to accounts controlled by Najib and a high-ranking 1MDB official. Leissner attempted to make another $1 million transfer to a second high-ranking 1MDB official but was thwarted by incorrect wire information.[256]

---

[252] *Id.*, ¶ 56.
[253] *Id.*, ¶ 58.
[254] *Id.*
[255] '*The Wolf of Wall Street*' *producer charged with money laundering in Malaysia*, CNBC (July 4, 2019), https://www.cnbc.com/2019/07/05/1mdb-scandal-najib-razak-stepson-charged-with-money-laundering.html.
[256] Leissner Compl. & Aff., ¶ 58.

208.    For its part, Goldman made about $114 million on the deal, again, well in excess of the typical banking fee of $1 million on a deal of this type.[257] This second fee brought ***Goldman's total haul from 1MDB in <u>five</u> months to over $300 million***.

209.    Blankfein and Cohn's strategy to "monetize the state" in Goldman's eastward tilt was being realized with spectacular success, and this success helped Blankfein take home $21 million in 2012. Leissner was rewarded with over $10 million in salary and bonuses in 2012, making him one of Goldman's highest paid Partners.[258] Blankfein also added Leissner to the firmwide Partnership Committee, the powerful group of about two-dozen of the bank's highest-profile Partners who select which Managing Directors will join them in Goldman's top 1%.[259]

## 11.    Low's Extravagance Continues to Grab Headlines

210.    As Goldman deepened its relationship with 1MDB and the bank's top bankers and executives reaped the financial benefits, reports of Low's extraordinary spending had been piling up for years. By the summer of 2010, items such as the following were regularly appearing in Western media:

    a.   Low, only 28 years old, "routinely" spent $50,000 to $60,000 at a popular Manhattan nightclub between rollicks with Hollywood celebrities like Jamie Foxx, Megan Fox, and Usher, with dubious sources of income: "Officially he is

---

[257] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[258] Billion Dollar Whale at 189-90.

[259] Liz Hoffman, *Goldman Sachs Adds Investment-Management Head to Partnership Committee*, The Wall Street Journal (Feb. 8, 2017), https://www.wsj.com/articles/goldman-sachs-adds-investment-management-head-to-partnership-committee-1486602136; Dakin Campbell, *A small group of Goldman Sachs employees just got the call of a lifetime – here's how it went down*, Bus. Insider (Nov. 7, 2018), https://www.businessinsider.com/becoming-a-partner-at-goldman-sachs-2014-11.

an adviser to some international corporations, but no one knows what that means or seems to believe that is the truth";[260]

    b.   A four-day birthday bash at Caesars Palace in Las Vegas, which included a nightclub outing during which Low bought 120 bottles of Cristal, one of the most expensive champagnes in the world, for club goers;[261]

    c.   Low's across-the-club delivery of 23 bottles of Cristal to Lindsay Lohan at New York's 1OAK one evening;[262]

    d.   A $160,000 bar tab at another New York club that Low ran up on a single night;[263]

    e.   Low's rumored $1 million stipend to Paris Hilton to stay with him aboard a yacht on the French Riviera;[264] and

    f.   Outings with the likes of Leonardo DiCaprio and Mick Jagger, alongside acting as an intermediary "put[ing] together deals for businessmen and even governments" in Malaysia and the Middle East.[265]

211.    As reported by *AsiaOne* on September 1, 2012, Low followed up these exploits by spending $2 million on a romantic dinner for two with a Taiwanese pop star at the Atlantis,

---

[260] Brian Moylan, *Jho Low: Manhattan's Mysterious Big-Spending Party Boy*, Gawker (Nov. 10, 2009), https://gawker.com/5401369/jho-low-manhattans-mysterious-big-spending-party-boy.

[261] *Clubs court low-key Mr. Low*, Page Six (Nov. 10, 2009), https://pagesix.com/2009/11/10/clubs-court-low-key-mr-low/.

[262] Lindsay Robertson, *Meet Jho Low: NYC Club Scene's 'Man of Mystery,'* Intelligencer (Nov. 8, 2009), http://nymag.com/intelligencer/2009/11/meet_jho_low_nycs_club_scenes.html.

[263] *Id.*

[264] Maureen O'Connor, *How Much Is Paris Hilton Getting Paid to Party in St. Tropez*, Gawker (July 29, 2010), https://gawker.com/5599561/how-much-is-paris-hilton-getting-paid-to-party-in-st-tropez.

[265] Wong Chun Wai, *Jho Low, love him or hate him*, The Star (Aug. 1, 2010), https://www.thestar.com.my/opinion/columnists/on-the-beat/2010/08/01/jho-low-love-him-or-hate-him.

The Palm Hotel and Resort in Dubai in 2011.[266] The evening involved copious flowers, 100 candles, fireworks, live violinists, and a pair of skydivers who presented Low's love interest with a $20,000 pendant-and-necklace set.[267] Then, on November 3, 2012, Low held another birthday celebration in Las Vegas.[268] The night began with a pre-party in a $25,000-a-night room at The Palazzo hotel, moving to an airplane-hanger-sized venue specially constructed for the occasion teeming with celebrities such as Bradley Cooper, Jamie Foxx, and Leonardo DiCaprio, and culminating in what *The Wall Street Journal* later called "the wildest party Vegas ever saw."[269]

212.    These reports revealed a level of profligacy rarely seen before and raised suspicions—especially for a recently fined and highly regulated bank like Goldman—absent any additional information. Critically, however, Goldman's own compliance personnel had already reviewed Low's finances in detail—twice—pursuant to his applications for PWM accounts at Goldman's Swiss and Singapore offices. Twice, Goldman's own employees had concluded that Low could not provide a legitimate account of where his money came from. Personnel from Legal and Conflicts had found him similarly suspect. Nevertheless, Goldman green-lighted the two 1MDB bond offerings knowing that Low was actively involved in both deals.

### 12.    Between Bond Deals, Blankfein Meets Privately with Low Again— This Time One-On-One

213.    At the end of 2012, Goldman having earned over $300 million in underwriting fees from 1MDB since March of that year, Blankfein again met with Low. Unlike Blankfein's introduction to Low and Najib at the Four Seasons Hotel in in 2009, this was a ***one-on-one***

---

[266] *Malaysian billionaire blows $2m to woo Taiwan pop star*, Asia One (Sept. 1, 2012), https://www.asiaone.com/News/Latest%2BNews/Showbiz/Story/A1Story20120901-368973.html.
[267] *Id.*
[268] Tom Wright & Bradley Hope, *The Billion-Dollar Mystery Man and the Wildest Party Vegas Ever Saw*, The Wall Street Journal (Sept. 15, 2018), https://www.wsj.com/articles/the-billion-dollar-mystery-man-and-the-wildest-party-vegas-ever-saw-1536984061.
[269] *Id.*

*meeting* between Low and Blankfein—a private opportunity for Low to pitch the head of Goldman on additional work that Low could steer to the bank.[270]

214.    The sit-down with one of the world's most powerful bankers came after Goldman's Global Compliance and Legal Departments had ***repeatedly*** flagged Low's unexplained source of wealth and independently said that the bank should not do business with Low. As noted in a review published by the *Harvard Law School Forum on Corporate Governance and Financial Regulation*, the Blankfein meeting was "a rare and extremely difficult audience to get and presumably only after the person is subject to ***the most rigorous background checks and due diligence***. Even if all the other red flags were somehow missed, ***it's inconceivable that the information in Goldman's own compliance system would not have been known***."[271]

       **13.**    **Project Catalyze: Goldman Rushes a Third Offering to Market Amid Proliferating Evidence of Corruption**

              **a)**    **Najib Looks to Refill His Campaign Slush Fund as an Election Nears, and Goldman Gladly Obliges**

215.    In January 2013, Goldman Vice Chairman Evans met with Prime Minister Najib on the sidelines of the World Economic Forum in Davos, Switzerland.[272] As one of only four vice chairmen among the bank's executive officers, Evans was viewed as a potential successor to Blankfein.[273] Evans had also served as one of two Co-Heads of the BSC.[274]

---

[270] Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

[271] Dennis M. Kelleher, *Goldman Sachs and the 1MDB Scandal*, Harvard Law Sch. Forum on Corp. Governance & Fin. Regulation (May 14, 2019), https://corpgov.law.harvard.edu/2019/05/14/goldman-sachs-and-the-1mdb-scandal/.

[272] Aaron Patrick, *How Goldman Sachs silenced 1MDB doubters*, Austl. Fin. Review, Sept. 7, 2018.

[273] Peter Lattman, *Goldman Executive Is Said to Buy $27 Million Luxury Apartment*, The N.Y. Times (Aug. 27, 2012), https://dealbook.nytimes.com/2012/08/27/goldman-executive-is-said-to-buy-27-million-luxury-apartment/.

216.     In Davos, Najib asked Evans if Goldman would raise an additional *$3 billion* for 1MDB—*less than three months after it had raised $1.75 billion through Project Maximus*. Najib added that he wished to raise the staggering sum quickly and quietly. Goldman, having already earned over $300 million from 1MDB over the prior nine months amid numerous red flags, readily agreed through Evans, who replied: "Of course, Goldman would be more than willing to help out."[275] The deal, which Goldman was again awarded without competition, was codenamed "Project Catalyze."[276] It would close just a few weeks later in March 2013, yielding Goldman its biggest payday in the relationship to date.[277]

217.     As they had with the prior issuances, Vella, Leissner, and others continued to work with Low as an intermediary between Goldman, 1MDB, Najib, and other government officials to bring the third round of 1MDB bonds to market.[278]

218.     Meanwhile, within days of being awarded the third bond deal, Leissner was again paying kickbacks. On January 17, 2013, he made two transfers of $1 million each to two high-ranking 1MDB officials.[279]

**b)     Red Flags Mark Project Catalyze As a Conduit for Corruption**

219.     Between Blankfein's one-on-one meeting with Low in November 2012, Evans's agreement to underwrite Project Catalyze in January 2013, and Goldman's closure of the deal in March 2013, red flags from the first two issuances had grown even more pronounced. Indeed, the flow of negative press reports about Low's profligate spending without any legitimate source of

---

[274]   *Goldman Sets Up Business Standards Committee*, The N.Y. Times (May 14, 2010), https://dealbook.nytimes.com/2010/05/14/goldman-sets-up-its-business-standard-committee/.

[275]   Aaron Patrick, *How Goldman Sachs silenced 1MDB doubters*, Austl. Fin. Review, Sept. 7, 2018.

[276]   Billion Dollar Whale at 220; Leissner Info., ¶ 41.

[277]   Billion Dollar Whale at 220.

[278]   Leissner Info., ¶ 42.

[279]   Leissner Compl. & Aff., ¶ 61.

funds and concerns with the 1MDB deals had only increased, and further awareness of Low's involvement with 1MDB continued to spread throughout the bank. In addition, the following specific features of Project Catalyze added to the suspicion.

(1)    The Speed, Secrecy, and Shifting Purpose of the Issuance Are Red Flags

220.    When Najib approached Evans in Davos in January 2013, he told the Goldman executive that speed and secrecy were of the essence. To justify the capital raise, Najib claimed that he had the opportunity to partner with an IPIC subsidiary to build a new financial center in Kuala Lumpur, the total cost of which would be $6 billion.[280] There was no explanation as to why financing for a massive $6 billion real estate development had to be raised *in a matter of weeks*. Although it had already won the deal in Davos, Goldman made a presentation to 1MDB and the IPIC subsidiary, citing its client's key objectives as "maintenance of confidentiality during execution" and "speed."[281]

221.    Even Najib's claimed justification for the raise—the $6 billion Kuala Lumpur financial center—vanished as the offering approached, as the ***offering circular for the bonds contained no stated purpose whatsoever for the use of funds***.[282] To the contrary, Goldman's circular for the deal stated that the joint venture with the IPIC subsidiary "has yet to adopt a formal investment plan or establish investment criteria"[283] and "does not have any specific investment, merger, stock exchange, asset acquisition, reorganization, or other business combination under consideration or contemplation."[284] Moreover, the circular stated that the

---

[280] Billion Dollar Whale at 219.

[281] *Id.* at 220.

[282] Offering Circular for 1MDB Global Investment Ltd. $3,000,000,000 4.4 Per Cent Notes Due 2023 ("Catalyze Offering Circular").

[283] Catalyze Offering Circular at 28.

[284] *Id.* at 15.

joint venture "has not, nor has anyone on [its] behalf, contacted, or been contacted by, any potential target investment or had any discussions, formal or otherwise, with respect to such a transaction."[285] These disclosures directly contradicted what Najib had told Evans in Davos as the reason for a rushed deal.

222.    After the deal closed and funds were moved to offshore investment funds, 1MDB explained the transfers on the ground that the money was not needed immediately.[286] The explanation made no sense and contradicted the purported urgency of the deal. The emphasis on speed and secrecy, coupled with the lack of a clear rationale for the raise and the transfer of funds offshore on dubious pretenses, were clear indications that corruption was afoot.

(2)    The Timing of the Raise Strongly Indicates Corruption

223.    In truth, the purpose of the funds was not for investment; it was political. A parliamentary election approached in May 2013, with Najib's continued role as Prime Minister hanging in the balance.[287] He was struggling in the polls and sought an infusion of cash into his campaign coffers to illegally dole out patronage and buy votes.

224.    Low, too, had a vested interest in seeing Najib succeed, as without Najib, Low would lose control of 1MDB: opposition leader Anwar Ibrahim had promised he would close down the fund if elected.[288] Low actively worked on Najib's behalf during the campaign, even organizing a massive "1Malaysia" concert with U.S. celebrities to draw supporters—a video of

---

[285] *Id.* at 28.

[286] Justin Baer, Tom Wright & Bradley Hope, *Goldman Probed Over Malaysia Fund 1MDB*, The Wall Street Journal (June 7, 2016), https://www.wsj.com/articles/goldman-probed-over-malaysia-fund-1465257383.

[287] *Id.*

[288] Billion Dollar Whale at 218.

the event, with Low giving an interview to a television station, was uploaded to YouTube, where it has since remained available.[289] Low's connections to Najib and 1MDB were on full display.

225.    Matched against the shifting and contradictory justifications that had been provided for the bond offering, the urgency of Najib's request for a quick, secret raise of $3 billion for no particular purpose—so soon after the prior two raises and so close to the election— was a glaring warning sign that the money would be diverted.

(3)    Internally, Goldman Bankers Discuss Najib's Misuse of 1MDB Funds

226.    Against this backdrop, Goldman bankers unsurprisingly engaged in internal discussions concerning the possibility that the bond money was being diverted to fuel political corruption. Indeed, *The Wall Street Journal* reported that at the time of the offering, "Mr. Najib faced a tough re-election fight, and ***concerns that [Najib] might be tapping 1MDB for money to help him win were discussed openly within Goldman***."[290] Even Leissner raised the issue internally, commenting to a colleague in early 2013 that he knew 1MDB was operating as a political slush fund.[291]

(4)    The Third Offering's Terms Are Equally Suspicious

227.    As with the first and the second offerings, the terms of Project Catalyze—as Goldman memorialized in the offering circular—were extremely unusual. The $3 billion in 10-year notes, issued through a British Virgin Islands-incorporated investment vehicle called "1MDB Global Investments Limited," bore a 4.4% annual interest rate, significantly higher than

[289] *Jho Low: 1Malaysia Penang Concert for 'Peace, Unity and Prosperity,'* YouTube (Apr. 21, 2013), https://www.youtube.com/watch?v=3eCoW44Um9w.
[290] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.
[291] *Id.*

the "close to zero" rates other governments were paying across the region around this time.[292] As noted above, the funds were supposedly intended to capitalize a joint investment entity that, by the terms of the offering circular, had no investment prospects. And the deal again involved IPIC, although this offering was accompanied by an unusual "Letter of Support" from the Malaysian government, with the express reservation that, "[n]otwithstanding the [Letter of Support], the Notes will not constitute general or direct obligations of the Government of Malaysia."[293] Even more bizarrely, the circular stated that "the Issuer has no employees"[294] and that "no members have been appointed to the management of [the joint entity] and only one person has been appointed to [its] Board of Directors."[295] The net proceeds of the offering were listed as about $2.716 billion, indicating that Goldman would reap nearly $300 million in fees[296]—again far above the typical fees for such a deal.

> (5)     1MDB's Capital Structure and Interest Obligations Render the Offering Suspect

228.    Even before Project Catalyze took shape, 1MDB had amassed excessive debt through the first two bond offerings but had not used the funds to acquire sufficient income-producing assets. Indeed, before Project Catalyze, 1MDB's debt load stood at $7 billion, yet the fund held few real assets.[297] This fact alone indicated that the fund was being bilked. Furthermore, because of the unusually high interest rate that the first two Vella-structured

---

[292] Catalyze Offering Circular; Aaron Patrick, *How Goldman Sachs silenced 1MDB doubters*, Austl. Fin. Review, Sept. 7, 2018.

[293] Catalyze Offering Circular at 19.

[294] *Id.* at 27.

[295] *Id.* at 16.

[296] *Id.* at 24.

[297] Billion Dollar Whale at 192.

issuances carried, 1MDB was hemorrhaging cash. In its 2012 financial report, the fund had booked a $30 million loss.[298]

229.    Goldman, as 1MDB's principal investment bank and underwriter, had access to 1MDB's financial records. It knew, therefore, that the offering was totally suspect and indefensible given the fund's current capital structure. It also knew that, if recent history were any guide, the money from this third offering would disappear without the assets to show for it—which it had expressly covenanted would not happen.

(6)    <u>Ryan Resigns After Cohn Silences Him a Third Time</u>

230.    For the ***third*** time, David Ryan, Goldman's Asia President and member of the Management Committee, voiced suspicions about 1MDB and cautioned the bank against the bond issuance. Ryan was suspicious about the bank's procurement of the massive bond deal through what appeared to have been a casual conversation, skipping entirely the usual process of detailed presentations, financial modeling, and negotiation that precedes deals of much lesser magnitude.[299]

231.    Again, bank President Gary Cohn and Mark Schwartz, the newly installed Chair of Asia, summarily overruled Ryan, short-circuiting the additional investigation and reporting to Legal and Compliance that the BSC had mandated.[300] Only 43 years old and highly regarded at Goldman before his protests of the bank's dealings with 1MDB, Ryan retired from Goldman in June 2013, partly because his concerns about the 1MDB deals were ignored.[301]

---

[298] *Id.* at 192-93.

[299] *Id.* at 219.

[300] *Id.* at 219-20.

[301] Cynthia Koons, *Goldman Sachs's Asia President Resigns; New York Banker to Step In*, The Wall Street Journal (July 2, 2013), https://www.wsj.com/articles/SB10001424127887323297504578581234058040970?mg=prod/com-wsj; Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

(7)    BSI Questions Its Role, Prompting Goldman to Intervene to
Keep the Deal on Track

232.    As noted earlier, Low had selected BSI to receive the funds from 1MDB's various

capital raises because he believed the Swiss bank would be more pliant than a global bank that

was less dependent on 1MDB's account, and less likely to have rigorous compliance protocols.

In the Project Catalyze transaction, however, 1MDB's continuing use of BSI at Low's direction

nearly derailed the offering, drawing scrutiny from BSI itself.

233.    As *The Wall Street Journal* noted, "[p]roceeds from a $3 billion bond issue would

typically go into a major international bank."[302] While Goldman's compliance department

acceded to 1MDB's insistence—at Low's behest—on depositing funds in the tiny Swiss bank,

"***BSI compliance officials questioned why the 1MDB bond proceeds were being sent to their***

***bank, given its small size and its focus as a manager of wealthy people's money***."[303]

234.    Low asked Goldman to meet with BSI's compliance staff to keep the deal on

track, which the bankers did at a Chinese restaurant in Singapore. BSI management later cited

the attendance of a senior Goldman executive at this meeting to overcome its compliance

department's concerns over the deal.[304]

(8)    Goldman's Own Outside Counsel Identifies BSI as a
Compliance Risk

235.    1MDB's reliance on BSI, long a red flag, was too much even for ***Goldman's own***

***outside counsel*** to ignore for a deal of this magnitude.

---

[302] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[303] *Id.*

[304] *Id.*

236.     Kevin Wong, a partner at Linklaters and Goldman's outside counsel on the Project Catalyze transaction, questioned the arrangement to deposit $3 billion in proceeds from the issuance in the small private bank's Swiss office, not the large international financial institution that would typically be involved in deals of this size.[305]

237.     Goldman acknowledged the concern, purported to look into BSI and summarily dismissed its attorney's concerns without further explanation.[306] As reported by *The Wall Street Journal*, federal investigators believed the transfer of the offering proceeds to BSI, rather than a large global bank, was an obvious red flag and may have violated the Bank Secrecy Act, which requires financial institutions to report suspicious transactions to regulators through "Suspicious Activity Reports."[307]

<blockquote>

**c)      Goldman Rams Through Project Catalyze Despite the Red Flags, Nettings Its Biggest Payday Yet While Billions More are Stolen**

</blockquote>

238.     In addition to the sea of red flags in Defendants field of vision, Goldman was obligated to know whether the proceeds of the deal were being used for an improper purpose as Goldman expressly warranted in the Project Catalyze Offering Circular that it would <u>ensure</u> that none of the deal's proceeds would violate anti-corruption or anti-money laundering laws:

> ***The Issuer [1MDB Global Investments Limited] and 1MDB have agreed with Goldman Sachs in the Arranger Agreement to ensure that none of the net proceeds raised from the issue of Notes shall be directly or indirectly lent, contributed or otherwise made available to any person or entity*** (whether or not related to the Issuer or 1MDB) for the purpose of financing the activities of any person, or for the benefit of any country, that is the subject of sanctions

---

[305] Justin Baer, Tom Wright & Bradley Hope, *Goldman Probed Over Malaysia Fund 1MDB*, The Wall Street Journal (June 7, 2016), https://www.wsj.com/articles/goldman-probed-over-malaysia-fund-1465257383.
[306] Billion Dollar Whale at 220.
[307] *Id.*

administered or enforced by a relevant sanctions authority or *in violation of any applicable anti-corruption or anti-money laundering laws*.[308]

239.   Like the two offerings before it, Project Catalyze received approval from the bank's highest reaches, with several firmwide committees and top executives, including Blankfein, Solomon, and Scherr, again approving the deal.[309] The firmwide Risk, Business Standards, Capital, and Suitability Committees were among the five that greenlit the offering.[310] Project Catalyze closed on March 19, 2013, and Goldman again purchased the bonds directly, reselling them in a private placement at a profit.

240.   After Goldman wired the net proceeds from the $3 billion issue to 1MDB's account at BSI, more than a third was immediately funneled through a web of offshore funds on its way to Low and his co-conspirators.[311] The dizzying movement included the following:

    a.   Two days after closing, Low transferred $681 million into an account owned by Najib at AmBank in Kuala Lumpur.[312]

    b.   Approximately $27.3 million from another account was paid to a New York jeweler to buy a 22-carat pink diamond pendant and necklace for Najib's wife, Rosmah.

---

[308] Catalyze Offering Circular at 97.

[309] Hugh Son, *As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense*, CNBC (Dec. 18, 2018), https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[310] Leissner Compl. & Aff., ¶¶ 63-64; Matt Wirz & Alex Frangos, *Goldman Sees Payoff in Malaysia Bet*, The Wall Street Journal (Apr. 30, 2013), https://www.wsj.com/articles/SB10001424127887323798104578452802751076598; Yantoultra Ngui & Liz Hoffman, *Malaysia Charges Goldman Sachs Executives in 1MDB Scandal*, The Wall Street Journal (Aug. 9, 2019), https://www.wsj.com/articles/malaysia-charges-goldman-directors-over-1mdb-scandal-11565342749.

[311] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[312] Leissner Compl. & Aff., ¶ 66; Billion Dollar Whale at 221.

      c.   Approximately $58 million was transferred to a New York auction house to acquire artwork for Low.[313]

241.    Other funds moved to Najib's political allies to shore up support in the election. The massive infusion of cash allowed Najib's party to hold on to power in the elections and he onto the premiership, although his coalition lost the popular vote.[314]

242.    For its part, Goldman made nearly $300 million.[315] The deal brought the bank's total haul from the three offerings to about $600 million. Back in New York, Cohn boasted about the fees to journalists.[316] He had reason to: ***The $600 million in fees that Goldman received from 1MDB in about 12 months was nearly equal to the $694 million in revenue from its <u>entire</u> global bond underwriting business in the first quarter of 2013***.[317]

      **14.**   **Questions About 1MDB's Legitimacy and Low's Role in the Fund Spill into the Press**

243.    Armed with hundreds of millions of dollars in cash stolen from the 1MDB offering, Najib was able to hang on to power by a thin margin in the May 2013 elections, although his coalition lost the popular vote and several seats in parliament.[318] Allegations of fraud were rampant, with *The Economist* observing that the result depended on "cash handouts and other goodies" and "blatant vote-buying."[319] Amid the open spigot of political patronage in the run-up to the vote and growing attention to the enormous profits Goldman was making from

---

[313] Leissner Compl. & Aff., ¶ 66

[314] Billion Dollar Whale at 224.

[315] *Id.* at 220.

[316] *Id.* at 226.

[317] Nisha Gopalan, *Rogue Bankers Don't Explain Goldman's 1MDB Mess*, Bloomberg (Dec. 21, 2018), https://www.bloomberg.com/opinion/articles/2018-12-21/rogue-bankers-don-t-explain-goldman-s-gs-1mdb-mess.

[318] *Malaysia vote: PM Najib Razak's Barisan Nasional wins*, BBC News (May 6, 2013), https://www.bbc.com/news/world-asia-22422172.

[319] *A dangerous result*, The Economist (May 11, 2014), https://www.economist.com/leaders/2013/05/11/a-dangerous-result.

its business in Malaysia, scrutiny on the Goldman-1MDB relationship in the local and international press increased exponentially.

244.    On March 26, 2013, only days after the third offering closed, a prominent Malaysian business news outlet, *KINIBIZ*, published a series of articles questioning 1MDB's legitimacy and leaving little doubt as to Low's central role. Reporting on what a Malaysian Minister of Parliament called "the biggest ponzi scheme the nation has ever seen," the outlet observed that "much of what 1MDB does is often shrouded in secrecy, and leaves many questions unanswered."[320]

245.    Clearly skeptical of the fund's claim that Low's role at 1MDB was "zero," the articles detailed Low's connections to various figures involved in its origins and important deals. Recounting what it called "[t]he colourful history of 1MDB," it also described how Goldman and Low played key roles in the fund's genesis by setting up TIA and bringing the Islamic Bond Issuance to market.[321]

246.    On April 22, 2013, the Malaysian newspaper *The Edge* published an article in which an opposition party leader publicly questioned both Low's role in the bond offerings and Goldman's fees:

> "Why were they all done through private placements? Why not launch it publicly, where the pricing of the bonds can be determined more efficiently?" queried [opposition party leader] Wong. . . . Wong highlighted that [the] company that arranged for the bond issuance, international investment bank and securities firm Goldman Sachs, had received a fee of $71 million. "***They were grossly overpaid by 1MDB***," said the corporate lawyer turned politician. "Since it is a company backed by the government, the local banks or arrangers would usually charge a very nominal fee. . . ." Wong also brought up mysterious investment "whizz kid"

---

[320]    *1MDB: Giant ponzi scheme or strategic investment fund?*, Kinibiz (Mar. 26, 2013), http://www.kinibiz.com/story/issues/11166/1mdb-giant-ponzi-scheme-or-strategic-investment-fund.html.
[321]    *Id.*

*Low Taek Jho, who he claimed was involved with 1MDB since its predecessor –
the Terengganu Investment Authority – was set up*.[322]

247.     A week later, *The Wall Street Journal* published an article titled, "Goldman Sees Payoff in Malaysia Bet."[323] Reporting that that Goldman had made profits of "more than $200 million" from the 1MDB bond deals—in fact, a gross underestimation of the bank's 1MDB earnings—the article observed that "***Malaysia is one of the most lucrative places in the world for Goldman Sachs***," a market into which the bank made a "concerted push" in the wake of the financial crisis.[324] The *Journal* noted that the outsized fees the bank was generating had drawn criticism, with Malaysian opposition politicians accusing Goldman of "overcharging the government" for its work with a fund that was unduly secretive and mismanaged. According to the article, even internally, there was dissent:

> Some Goldman bankers and compliance officials raised questions about the potential ***legal and reputational risks*** of doing business in what they see as a country with close ties between government and business, and about how the money Malaysian clients raised might be used, according to people familiar with the concerns. Goldman's risk committee, which includes several of the firm's top executives, approved the deals, said people familiar with the transactions.[325]

Bank spokesman Naylor responded to the article, "We're very proud of our track record in Malaysia."

248.     The scrutiny only increased from there. In July 2013, *The Sawarak Report*—later widely credited with having helped to expose the 1MDB fraud—published an article detailing the suspicious terms of the Project Magnolia offering, including its (i) secrecy, (ii) staggering interest rates, (iii) outsized fees to Goldman, and (iv) inflated purchase price of the power plants

---

[322] *#GE13* PKR questions timing of 1MDB's RM9.1b bond issuance*, The Edge (Apr. 22, 2013), https://www.theedgemarkets.com/article/ge13-pkr-questions-timing-1mdbs-rm91b-bond-issuance-0.

[323] Matt Wirz & Alex Frangos, *Goldman Sees Payoff in Malaysia Bet*, The Wall Street Journal (Apr. 30, 2013), https://www.wsj.com/articles/SB10001424127887323798104578452802751076598.

[324] *Id.*

[325] *Id.*

that had supposedly justified the issuance.[326] The article's authors called for an investigation of Goldman by U.S. regulators.

249.    The following month, *The Edge* published a lengthy investigative report on 1MDB detailing charges of "aggressive borrowings, opaque financial [maneuvers] and risky bets" that had plagued the fund since its inception."[327] The report observed, "1MDB's dizzying buildup of debt is also drawing international attention because of **the fund's cosy relations with international banking powerhouse Goldman Sachs**, which critics say has **allowed the US firm to charge supernormal fees**."[328] The article also again reported Jho Low's connection to the fund since its inception.  At all times during the Class Period, however, as detailed in Section VI, Goldman consistently and repeatedly denied any involvement in or knowledge of the 1MDB fraud, or Low's involvement in the fraud.

### 15.    Blankfein Meets with Low for the Third Time as Goldman Pushes for More Business with 1MDB

250.    In July 2013, Goldman Vice Chairman and Head of Emerging Markets Mike Evans—who, along with Gary Cohn, had silenced David Ryan's three separate objections to Goldman's work with 1MDB—attended a party for Najib arranged by Low aboard a luxury yacht in Saint-Tropez. Low had spent 3.5 million euros from the Project Catalyze bond offering to rent the yacht for a week.[329] During the gathering on the boat, Najib praised Goldman's work with the fund and promised the bank more work from 1MDB. Najib reinforced the connection

---

[326]  *Goldman Sachs' US$200million Charge For 1MDB Issue!*, Sarawak Report (July 8, 2013), http://www.sarawakreport.org/2013/07/goldman-sachs-us200million-charge-for-1mdb-bond-issue/.
[327]  *Debt-laden Malaysian fund stirs controversy*, The Edge (Aug. 25, 2013), https://www.theedgemarkets.com/article/debt-laden-malaysian-fund-stirs-controversy.
[328]  *Id.*
[329]  Billion Dollar Whale at 235-36; Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

between Goldman and 1MDB, rhetorically asking, "Do you see any other bankers on this boat?"[330]

251.    To that end, on September 25, 2013, Blankfein again met with Low, Najib, and Leissner to discuss how the bank could do more business with 1MDB.[331] The meeting, which included other 1MDB executives, took place at the Time Warner Center in New York. It marked the ***third time in less than four years that Blankfein had met personally with Low to discuss business with 1MDB***. He had reason to, as Blankfein's attention had paid off: between 2008 and 2013, Goldman was the only western investment bank to rank among Malaysia's top-ten fee earnings.[332]

252.    Three days after his meeting with Low and Najib, Blankfein hosted a meeting for Goldman clients at the Mandarin Oriental, with attendees including famed hedge fund manager John Paulson and head of private equity firm TPG Capital, David Bonderman.[333] Among these luminaries, Blankfein made Najib the headliner. The message of the meeting was clear: 1MDB was a prized client, worthy of regular attention from Goldman's top executive.

253.    The attention was part of a strategy to prevent other investment banks, who had noticed the astronomical fees that Goldman was earning from 1MDB, from stealing its Malaysian cash cow. It was a growing concern at the bank's New York headquarters, as other banks were trying to make inroads with 1MDB. For example, in mid-2013, Deutsche Bank had poached a Managing Director named Tan Boon-Kee from Goldman, naming her Deutsche

---

[330] Justin Baer, Tom Wright & Ken Brown, *Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep*, The Wall Street Journal (Dec. 22, 2016), https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[331] Leissner Compl. & Aff., ¶ 70.

[332] Don Weinland, Stefania Palm & Jamie Smyth, *Goldman Sachs' Asia franchise suffers in 1MDB storm*, Fin. Times (Nov. 21, 2018), https://www.ft.com/content/8f33b9a0-e671-11e8-8a85-04b8afea6ea3.

[333] Billion Dollar Whale at 238.

Bank's Head of Client Coverage for Southeast Asia.[334] Tan had a long-standing relationship with 1MDB, having been introduced to Low by Ng, then becoming one of the lead bankers on the 1MDB account.[335] The hiring by Deutsche Bank reflected increasing competition in what had, until then, been an exclusive and lucrative relationship between 1MDB and Goldman.

### 16. The Federal Reserve Warns Goldman of Reputational Risk from Its Work with 1MDB

254.    In early 2014, the Federal Reserve engaged Goldman to discuss its role in the 1MDB bond offerings. It questioned why 1MDB had continued to sell bonds despite supposedly holding large amounts of cash from prior offerings (the regulator not yet aware that virtually all had been stolen). According to *The Wall Street Journal*, "Fed officials were also critical of Goldman's vetting of the 1MDB deals, noting that they had posed *reputational risk*" to the firm.[336] The Fed criticized the bank's committee review system, which "seemed to reject very few deals as being too risky or inappropriate.[337]

255.    The scrutiny from Goldman's primary U.S. regulator marked another conspicuous warning sign that its relationship with 1MDB was suspect. Nevertheless, Goldman continued to court more business with the fund and its *de facto* chief executive, Jho Low.

---

[334] Isabella Steger, *Deutsche Bank Hires Southeast Asia Banker from Goldman Sachs*, The Wall Street Journal (July 8, 2013), https://blogs.wsj.com/moneybeat/2013/07/08/deutsche-bank-hires-southeast-asia-banker-from-goldman-sachs/.

[335] Andrea Tan, Elffie Chew & Joyce Koh, *Deutsche Bank Executive's 1MDB Role in Investigators' Focus*, Bloomberg (Sept. 17, 2018), https://www.bloomberg.com/news/articles/2018-09-17/deutsche-bank-executive-s-1mdb-role-in-focus-for-investigators.

[336] Justin Baer & Bradley Hope, *Fed Warned Goldman on Malaysia Bond Deals*, The Wall Street Journal (Apr. 6, 2016), https://www.wsj.com/articles/fed-warned-goldman-on-malaysia-bond-deals-1459974246.

[337] John Gapper & Laura Noonan, *NY Fed told Goldman to improve risk reporting shortly after 1MDB*, Fin. Times (Nov. 25, 2018), https://www.ft.com/content/bc59bc34-f0a0-11e8-ae55-df4bf40f9d0d?emailId=5bface7617a34c00049cc5ce&amp;segmentId=ce31c7f5-c2de-09db-abdc-f2fd624da608.

17. **Coastal Energy: Goldman's Dubai Office Helps Low Move Stolen Money, Hides Low's Involvement, and Blesses a Highly Suspicious Payout to Low a Week Later**

256.    Having stolen over $1 billion from 1MDB, Low needed vehicles through which to launder the proceeds from his schemes. Again, he sought—and received—Goldman's help.

257.    Through his work with Goldman, Low had made connections with top bankers in its Middle East offices, including Hazem Shawki, Goldman's Head of Investment Banking for the Middle East and North Africa.[338] Low had made various pitches to Shawki, including one to acquire a Houston-based oil and gas company called Coastal Energy.[339]

258.    In 2012, advised by Goldman, Low approached Coastal Energy about a transaction in which Low would acquire the company. Coastal Energy rejected the proposal but told Low to return with a partner.[340]

259.    In mid-2013, Low went back to Coastal Energy alongside IPIC, whose corrupt executives had guaranteed the 1MDB bond deals in return for hundreds of millions of dollars in kickbacks and bribes. IPIC had agreed, through its Spanish energy unit, Compañía Española de Petróleos ("CEPSA"), to join with a Low-controlled shell company called Strategic Resources Global ("SRG") to make a $2.2 billion bid for Coastal Energy. Goldman's Dubai office—which in 2012 had declined involvement in the Project Magnolia offering because of IPIC's "preposterous" role as guarantor—now advised Low and SRG.[341]

260.    As detailed above, Low had already been rejected—twice—by Goldman's private banking arm because of compliance officers' concerns about the source of his wealth. This time,

---

[338] *Hazem Shawki*, LinkedIn (last visited Oct. 25, 2019), https://www.linkedin.com/in/hazem-shawki-21a12b/?originalSubdomain=ae.

[339] Billion Dollar Whale at 245.

[340] *Id.*

[341] *Id.*

however, Goldman compliance personnel suggested a workaround in internal emails reviewed by

*The Wall Street Journal*, as far more lucrative investment banking fees were at stake. The paper

described the Goldman e-mails as follows:

> "***Jho Low's appearance is not welcome***," one compliance officer wrote to a
> banker in 2013 when Mr. Low teamed up with a Goldman client [IPIC] to buy a
> Houston-based oil company. "But if he is in a very minor role…then ***we may be
> able to live with it***." That deal, a takeover of Coastal Energy brokered by
> Goldman, is being investigated by U.S. prosecutors.[342]

261.    In response, the Goldman Dubai deal team nominally switched to advising

CEPSA, rather than SRG, knowing that Low would stay in the deal.[343] The workaround was

illusory, as the Goldman bankers were fully aware that (i) Low had long-standing ties to IPIC,

the entity that controlled CEPSA, (ii) SRG, which Goldman had advised until that point, was

controlled by Low, (iii) CEPSA and SRG were jointly purchasing Coastal Energy, and (iv) the

deal was the consummation of a transaction Low had been pursuing with Goldman since 2012.

262.    On November 19, 2013, it was announced that CEPSA and SRG would acquire

Coastal Energy for $2.2 billion.[344] The announcement stated that CEPSA, advised by Goldman,

had created a new entity, funded by Low's SRG, to execute the acquisition, which would occur

in early 2014. The announcement contained a statement by Low, described as a "spokesperson"

for SRG. Contemporaneous press reports confirmed that Low and his private investment

company, Jynwel Capital, were behind the deal, with an article in *Forbes* published the same day

---

[342] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[343] Billion Dollar Whale at 245.

[344] Pres Release, Coastal Energy Co., CEPSA to Acquire Coastal Energy Company for C$19.00 Per Share (Nov. 19, 2013), https://www.globenewswire.com/news-release/2013/11/19/590787/10058583/en/CEPSA-to-Acquire-Coastal-Energy-Company-for-C-19-00-Per-Share.html.

as the announcement identifying "Jho Low, 31, CEO of Hong Kong-based Jynwel Capital" as controlling SRG.[345]

263.    The deal was a transparent money-laundering operation. Low put $50 million into the deal, with CEPSA funding the rest. One week after the transaction closed, CEPSA transferred $350 million into Low's shell company, SRG, purporting to buy out Low's shares in Coastal Energy—a *600% return over several days*.[346]

264.    Remarkably, ***Goldman's Dubai office knew about the $350 million payment from CEPSA to Low*** at the time. Shawki told executives at IPIC that the payout was a "reward" to Low for scouting out the deal—despite the fact that the transfer was structured as a share buyout.[347]

265.    The DOJ later determined that Low's $50 million was traceable to funds diverted from the third 1MDB bond offering in 2013, which rendered the $350 million received from CEPSA and used to purchase other assets, including an interest in the Viceroy Hotel Group, also tainted.[348] The *Wall Street Journal* reported on the DOJ's investigation into the Coastal Energy deal in a June 12, 2017, article titled, "U.S. Lawsuit Links $2.2 Billion Deal to Malaysian 1MDB Scandal."[349] Other outlets similarly covered the connection between the 1MDB scandal, Low, and the Coastal Energy acquisition. Moreover, the Coastal Energy deal appeared to be only the tip of the iceberg, with Low reportedly executing, or attempting to execute, a number of other

---

[345] Christopher Helman, *Texas Oil Legend Oscar Wyatt Hits $500M Payday In Deal With Malaysia Investor*, Forbes (Nov. 19, 2013), https://www.forbes.com/sites/christopherhelman/2013/11/19/texas-oil-legend-oscar-wyatt-hits-500m-payday-in-deal-with-malaysian-investor/#7a604d8b4010.

[346] Billion Dollar Whale at 245-46.

[347] *Id.*

[348] Rozanna Latiff & Nathan Layne, *Misappropriated 1MDB funds helped finance $2.2 billion energy firm deal – U.S. lawsuit*, Reuters (June 13, 2017), https://www.reuters.com/article/us-malaysia-scandal-usa/misappropriated-1mdb-funds-helped-finance-2-2-billion-energy-firm-deal-u-s-lawsuit-idUSKBN1941JH.

[349] Tom Wright, Justin Baer & Bradley Hope, *U.S. Lawsuit Links $2.2 Billion Deal to Malaysia 1MDB Scandal*, The Wall Street Journal (June 12, 2017), https://www.wsj.com/articles/u-s-lawsuit-links-2-2-billion-deal-to-malaysian-scandal-1497311418.

transactions by which to funnel illicit funds into ownership stakes in seemingly legitimate business interests, including EMI Music Publishing, Reebok, the Helmsley Park Lane Hotel, and Salamander Energy (which received a joint bid from a Low-controlled entity and CEPSA).[350]

266.    The Coastal Energy deal laid bare a fact suggested by the three 1MDB bond offerings preceded it: While Goldman's Global Compliance Department could prevent its private bank from taking on suspicious depositors, it would do little to thwart Goldman's powerhouse Investment Banking division. As *The Wall Street Journal* later noted, "***when Goldman bankers pursued deals involving Mr. Low, compliance officials offered mild protests, but not roadblocks***."[351]

### 18.    "We Have to Do More of That": Blankfein Extols Vella and Leissner, Urging Other Goldman Bankers to Emulate Them

267.    After Blankfein's solicitation of Najib and Low in New York, Leissner continued to seek new business with 1MDB.

268.    For instance, Goldman lobbied hard in 2014 to run an IPO of 1MDB's modest energy assets, which was necessary to restore the fund to solvency amid hundreds of millions of dollars in interest payments. When Goldman balked at making a quarter-billion dollar loan to 1MDB, however, Deutsche Bank's Tan Boon-Kee—who had just left Goldman—came up with the loan and secured the lead role in the IPO, with Goldman settling for a role as an advisor.[352]

---

[350] Gurmeet Kaur & Celia Kok, *Jho Low back in the limelight*, The Star Online (Nov. 1, 2014), https://www.thestar.com.my/business/business-news/2014/11/01/jho-low-back-in-the-limelight-jynwel-capital-involved-in-corporate-deals-worth-more-t.

[351] Tom Wright & Liz Hoffman, *Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business*, The Wall Street Journal (Dec. 17, 2018), https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[352] Billion Dollar Whale at 276-77.

269.    Looking to ensure that Leissner did not follow the lead of the Deutsche Bank defector and take his 1MDB ties elsewhere, Goldman elevated him to Chair of Southeast Asia, an extraordinary promotion within a year of adding him to the elite Partnership Committee.[353] Meanwhile, back at headquarters, CEO Blankfein lauded Vella's and Leissner's work with 1MDB as exemplifying his drive to "be Goldman Sachs in more places." At a 2014 meeting in New York focused on building Goldman's business in emerging markets, rather than in the heavily regulated United States, Blankfein was effusive: "***Look at what Tim and Andrea did in Malaysia. We have to do more of that.***"

### C.    As Outside Scrutiny Grows and Prosecutors Close in, Goldman Tries to Obscure Its Role in the Fraud

270.    As questions about 1MDB grew in the press, Goldman sought to distance itself from the scandal, particularly when the fund asked Goldman for a loan as it struggled to service the billions in debt it had taken on.[354] At every turn, Defendants publicly downplayed Goldman's involvement with 1MDB, denying knowledge of the thefts while characterizing its relationship with the fund as fully above board.

271.    For example, on October 29, 2014, *The Edge* raised concerns over 1MDB, including the "exceptionally high" fees Goldman had received in connection with the three bond offerings.[355] In response, Goldman falsely stated in no uncertain terms: "Other than legal and accounting firms providing professional services, ***no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with these transactions, nor have we ever been asked by 1MDB or others to pay such fees or commissions***[.]"

---

[353] *Id.* at 278.

[354] *Id.* at 277.

[355] Cindy Yeap, *Goldman says no payment to third parties*, The Edge (Oct. 29, 2014), https://www.theedgemarkets.com/article/goldman-says-no-payment-third-parties.

272.    The following summer, on July 21, 2015, Goldman again rejected any notion of wrongdoing stemming from its "close ties" with 1MDB, telling *Bloomberg* that the 1MDB bond "transactions were individually tailored financing solutions, ***the fee and commissions for which reflected the underwriting risks assumed by Goldman Sachs*** on each series of bonds, as well as other prevailing conditions at the time, including spreads of credit benchmarks, hedging costs, and general market conditions[.]"

273.    As Goldman was fending off press questions about 1MDB, it repeatedly represented in its SEC filings that: (i) it maintained a "culture of effective risk management"; (ii) "[e]ffective risk management underpins everything that we do"; (iii) it was "dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us"; and (iv) the bank's "continued success depends upon unswerving adherence to this standard."

274.    By 2016, news reports began to surface concerning Leissner's role in the 1MDB scandal. Additional reports in July 2016 revealed that Goldman's work on the 1MDB bond deals was under investigation by the DOJ.[356]

275.    In response, market commentators clamored for information from Goldman, questioning whether funds from the 1MDB bond offerings had been improperly siphoned off. Goldman denied any wrongdoing and claimed ignorance, falsely stating, "***[w]e had no visibility into whether some of those funds may have been subsequently diverted to other purposes***."

276.    As more information about 1MDB surfaced, the press continued to question Goldman's role in the 1MDB deals. On December 22, 2016, *The Wall Street Journal* asked

---

[356] Carmel Crimmins, Olivia Oran, Sumeet Chatterjee, Grant McCool, Anshuman Daga & Martin Howell, *Goldman Sachs under spotlight in Malaysian fund scandal*, Reuters (July 20, 2016), https://www.reuters.com/article/us-malaysia-scandal-goldman-sachs/goldman-sachs-under-spotlight-in-malaysian-fund-scandal-idUSKCN1002OR; Randeep Ramesh, *1MDB: The inside story of the world's biggest financial scandal*, The Guardian (July 28, 2016), https://www.theguardian.com/world/2016/jul/28/1mdb-inside-story-worlds-biggest-financial-scandal-malaysia.

questions about the intricate relationship between Goldman, 1MDB, and Low in an article titled "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep." In response to the report that "Goldman holds a unique position for its closeness to 1MDB and the principals," the Company again demurred: "*We have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions*[.]"

277.   On June 13, 2017, Goldman again shot down speculation concerning its relationship with Low, this time in response to reports that money was siphoned from 1MDB to fund the Goldman-backed Coastal Energy deal, stating "*[n]either Jho Low, Jynwel or SRG were a client of Goldman Sachs in connection with the Coastal Energy acquisition*."

278.   Goldman did not waiver in its denials. In June 2018, for example, *The New York Times* and *The Wall Street Journal* reported that Malaysian authorities planned to seek payback from Goldman for at least the $600 million in fees made in connection with the three 1MDB bond transactions.[357] Goldman stuck to its script, stating once more that it was entitled to the fees: "*What we earned from the debt transactions reflected the risks we assumed at the time, specifically movement in credit spreads tied to specific bonds, hedging costs and underlying market conditions*."

279.   Meanwhile, the DOJ investigation picked up steam. On August 7, 2018, *The New York Times* reported that Deputy Attorney General Rod Rosenstein had transferred full authority over the 1MDB criminal investigation from the U.S. Attorney's Office in Los Angeles to its

---

[357] Alexandra Stevenson & Hannah Beech, *Goldman Sachs Made Millions in Malaysia. Now Malaysia Wants Some Money Back*, The N.Y. Times (June 14, 2018), https://www.nytimes.com/2018/06/14/business/1mdb-malaysia-goldman-sachs.html; James Hookway, *Malaysia's Tall Order: Trying to Recoup 1MDB Funds*, The Wall Street Journal (June 22, 2018), https://www.wsj.com/articles/malaysias-tall-order-trying-to-recoup-1mdb-funds-1529668806.

counterpart in Brooklyn in a move that heightened scrutiny on the bank at the corporate level.[358]

The result was that "the investigation is now more intensively focused on the potential

culpability of Goldman Sachs" itself.[359]

280.    On the heels of Goldman's denials, on November 1, 2018, the U.S. Attorney for

the Eastern District of New York unsealed a multi-count criminal information charging Leissner

with conspiracy to violate the FCPA and commit money laundering.[360] An affidavit in support of

Leissner's arrest warrant, sworn to by an FBI agent and approved by a federal magistrate,

described "an overarching criminal scheme to divert billions of dollars in funds belonging to

1MDB to members of the conspiracy and others, and *to pay bribes to secure and retain business*

*for [Goldman]*."[361] The affidavit stated that "Leissner, *acting on behalf of [Goldman]*, and

[Low], together with others, made and endeavored to make corrupt payments to 1MDB officials

and to a family member of [Najib] to influence those officials to obtain and retain business from

1MDB *for, and direct business to, [Goldman Sachs]*."[362]

281.    The unsealed filings also revealed that, in a closed proceeding on August 28,

2018, Leissner pled guilty to the two counts of the information. As part of his guilty plea,

Leissner admitted to a conspiracy at Goldman, the corrupt nature of the bank's corporate culture,

and Goldman's disregard for internal controls and compliance protocols. Among other

confessions, Leissner admitted:

> During the course of the conspiracy, I conspired with other employees and agents
> of Goldman Sachs *very much in line of its culture of Goldman Sachs to conceal*
> *facts from certain compliance and legal employees of Goldman Sachs*, including

---

[358] Matthew Goldstein, *Goldman Sachs Is Said to Be Under U.S. Scrutiny in Malaysian Inquiry*, The N.Y. Times (Aug. 7, 2018), https://www.nytimes.com/2018/08/07/business/goldman-malaysia-1mdb.html.

[359] *Id.*

[360] Leissner Info.

[361] Leissner Compl. & Aff., ¶ 16.

[362] *Id.*, ¶18.

the fact that Jho Low . . . was acting as an intermediary for and on behalf of Goldman Sachs, 1MDB, and Malaysian and Abu Dhabi officials."[363]

Leissner's sentencing was originally scheduled for January 17, 2019, but was adjourned until December 17, 2019. Redacted text spanning six pages of the plea transcript, together with the continuance, has fueled speculation that Leissner may be cooperating with the Justice Department's criminal investigation of Goldman.[364]

282.    Also in November 2018, the United States unsealed an indictment of Ng and Low.[365]  Like Leissner, Ng was charged with conspiracy to violate the FCPA and conspiracy to commit money laundering. In the indictment, federal prosecutors alleged "***the business culture at [Goldman], particularly in Southeast Asia, was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions***."[366]

283.    Ng was detained in Malaysia and extradited to the U.S. on May 3, 2019.[367] After pleading not guilty, Ng reportedly entered plea negotiations with the government. Ng and his family have agreed to surrender about $29 million to authorities in Singapore, which would then repatriate the funds to Malaysia.[368] At the time of this pleading, Low is still at large.

284.    Despite Leissner's plea and Ng's indictment, Defendants held firm to their defense that they did nothing wrong and Goldman's role in the 1MDB scandal—which yielded more than $600 million in fees—was the work of a few rogue employees. In a November 1, 2018

---

[363] *United States of America v. Leissner*, No. 1:18-cr-00439-MKB (E.D.N.Y. August 28, 2018), ECF No. 30 at 38-39.

[364] Patricia Hurtado & Greg Farrell, *Leissner Cites Goldman's 'Culture' of Secrecy in 1MDB Scheme*, Bloomberg (Nov. 9, 2018), https://www.bloomberg.com/news/articles/2018-11-09/leissner-in-unsealed-plea-cites-goldman-culture-of-secrecy.

[365] *United States of America v. Low,* No. 1:18-cr-00538-MKB (E.D.N.Y. Oct. 3, 2018), ECF No. 1.

[366] *Id.* at 7-8.

[367] *Ex-Goldman Banker Extradited to US Over Multi-Billion-Dollar Scandal*, The Globe Post (May 6, 2019), https://theglobepost.com/2019/05/06/goldman-sachs-1mdb/.

[368] Gerald Porter Jr., *Ex-Goldman Banker in Plea Talks to Avoid U.S. Trial Over 1MDB Charges*, Bloomberg (July 18, 2019), https://www.bloomberg.com/news/articles/2019-07-18/ex-goldman-banker-in-plea-talks-for-alleged-role-in-1mdb-fraud.

*New York Times* article titled, "Goldman Sachs Ensnarled in Vast 1MDB Fraud Scandal," Defendant Blankfein "sought to frame the matter as the misdeeds of rogue employees," stating: "These are guys who evaded our safeguards, and lie, stuff like that's going to happen[.]" *The New York Times* further reported that "American prosecutors are continuing to investigate other bankers and Goldman itself, according to three people with knowledge of the matter."

285.    The same day Leissner's guilty plea was revealed—November 1, 2018— *Bloomberg* reported that Goldman had placed Vella, the former Co-Head of Investment Banking in Asia, on leave. *Bloomberg* further reported that Vella matched the description of "Co-Conspirator #4" in the Leissner charging documents.[369]

286.    As the evidence of Goldman's complicity piled up, on November 8, 2018, *Bloomberg* revealed that Defendant Blankfein had met personally in 2009 with former Prime Minister Najib and Low regarding 1MDB. Citing a "person with direct knowledge of the matter," the article, "Lloyd Blankfein was the Unidentified Goldman Executive Present at 2009 1MDB Meeting," reported that Blankfein had met with Najib and Low at the Four Seasons hotel in New York, as referenced in recently unsealed court documents. *Bloomberg* explained, "[t]he high-level gathering," which Leissner also attended, "laid the ground work for a relationship that would prove profitable for the investment bank."

287.    The next day, news media reported that Blankfein also met with Low and Najib in 2013, even "after [the] bank's compliance department had raised concerns about dealings with financier Jho Low." The article, titled "Goldman Sachs's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal," revealed: "Mr. Leissner arranged for Mr. Najib,

---

[369] Sridhar Natarajan, *Goldman Sachs Places Andrea Vella on Leave Over 1MDB Case*, Bloomberg (Nov. 1, 2018), https://www.bloomberg.com/news/articles/2018-11-01/goldman-sachs-is-said-to-place-vella-on-leave-over-1mdb-case.

Malaysia's then Prime Minister, to sit down with around 20 high-level Goldman clients at New York's Mandarin Oriental hotel. Mr. Low attended with Mr. Najib."[370]

288.   On November 12, 2018, *Bloomberg* reported in an article titled "Malaysia Seeking 'Full Refund' From Goldman For 1MDB Deals," that Malaysia's Finance Minister, Lim Guan Eng, intended to lean on Goldman's "indirect" admission of wrongdoing and U.S. kleptocracy law to help Malaysia claw back fees 1MDB paid Goldman for its role in the Magnolia, Maximus, and Catalyze bond deals. Goldman bankers had "cheated" the country in their dealings with 1MDB, Malaysia's incumbent Prime Minister, Mahathir Mohamad stated. When asked if Goldman would be banned from doing business in Malaysia, Mahathir responded: "We are watching."

289.   As Goldman was working to defend itself in the press, on November 21, 2018, *Reuters* reported that IPIC filed a civil legal action against Goldman and others alleging that they "played a central role in a long-running effort to corrupt former executives of IPIC and its subsidiary Aabar Investments, and mislead IPIC and Aabar," aiming to further the business of Goldman and 1MDB.[371]

290.   A week later, on November 29, 2018, *Bloomberg* reported in an article titled "Goldman Takes Another 1MDB Blow as Fed Steps Up Probe," that the Federal Reserve was "ramping up its investigation into how executives dodged [Goldman's] internal controls while helping Malaysian authorities raise billions of dollars that later went missing." The article then

---

[370] Tom Wright & Liz Hoffman, *Goldman Sachs's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal*, The Wall Street Journal (Nov. 9, 2018), https://www.wsj.com/articles/goldman-sachss-ex-ceo-met-malaysian-twice-at-center-of-1mdb-scandal-1541779363.

[371] Stanley Carvalho, Aparajita Saxena, Andrew Torchia, Jane Merriman & Elaine Hardcastle, *Abu Dhabi's IPIC files lawsuit against Goldman Sachs, others over 1MDB case,* Reuters (November 21, 2018); *see also Int'l Petroleum Inv. Co. v. The Goldman Sachs Grp., Inc.,* Index No. 655821/2018 (N.Y. Sup. Ct.).

stated the probe was examining "the actions of Goldman Sachs as well as individuals and has been gaining momentum in recent weeks," citing "people briefed on the matter."

291.   In the early morning hours on December 17, 2018, *Reuters* published an article titled "Goldman Sachs fires back after Malaysia charges bank in 1MDB probe," which reported that Malaysia had filed criminal charges against Goldman related to its dealings with 1MDB. On December 17, 2018, *The New York Times* reported in an article titled "Malaysia Files Criminal Charges Against Goldman Sachs Over 1MDB Scandal" that new charges, filed by the Malaysian government earlier that day, accused Goldman Sachs of making false and misleading statements related to the 1MDB scandal and were "a rare international rebuke of an institution that has long represented the pinnacle of money and power."

292.   In connection with these new charges, the Malaysian government said it would seek criminal fines in excess of $2.7 billion. The Malaysian government also filed charges against a number of individuals, including Leissner, Loo, and Low, and stated that it would also be charging Ng in the near future.

293.   Also on December 17, 2018, Goldman spokesperson Michael DuVally offered another refrain denying any wrongdoing by Goldman, stating: "Certain members of the former Malaysian government and 1MDB lied to Goldman Sachs, outside counsel and others about the use of proceeds from these transactions[.]"

294.   After the market closed on December 20, 2018, the *Financial Times* disclosed that Lim, the Malaysian Finance Minister, intended to seek $7.5 billion in reparations from Goldman Sachs related to its role in the 1MDB scandal. Lim stated: "We are not only looking at just the [bond] fees and issuance [volumes]. We are looking for a much larger sum." According to Lim, Goldman should return $6.5 billion—the sum of the three bond deals that Goldman underwrote

in 2012 and 2013, the proceeds of which "were not used for national development but w[ere] siphoned out"—as well as an additional $1 billion to account for the $600 million in underwriting fees Goldman received and the "higher than market rate" bond coupons.[372]

295.    The following day, on December 21, 2018, *Bloomberg* reported that Singapore had added Goldman to its criminal probe into funds linked to 1MDB, noting this was a "potential new battle front for Goldman less than a week after Malaysia filed the first criminal charges against the firm over a relationship that spawned one of the biggest scandals in its history." Authorities in Singapore are examining whether portions of Goldman's $600 million in fees from the 1MDB bond deals moved through any Singapore subsidiary.[373]

296.    As alleged below in Section VII, the gradual disclosures of Goldman's involvement in the 1MDB fraud and the ensuing government investigations shocked the market, resulting in significant declines in Goldman's stock price and massive losses for unsuspecting investors in Goldman stock.

297.    Details concerning Goldman's misconduct and of ongoing investigations into the Company's dealings with 1MDB have continued to emerge after the Class Period:

    a.  On Goldman's January 16, 2019 earnings call, Solomon reaffirmed that the DOJ investigation was still "open," and the Company was cooperating with the DOJ and other unnamed "regulators."

---

[372] Stefanie Palma & Robert Armstrong, *Malaysia finance minister wants $7.5bn from Goldman*, Fin. Times (Dec. 20, 2018), https://www.ft.com/content/11572a34-045e-11e9-9d01-cd4d49afbbe3.

[373] Andrea Tan, *Singapore to Expand 1MDB Criminal Probe to Include Goldman*, Bloomberg (Dec. 21, 2018), https://www.bloomberg.com/news/articles/2018-12-21/singapore-said-to-expand-1mdb-criminal-probe-to-include-goldman.

b.  On January 24, 2019, *Bloomberg* reported that Malaysian police raided Rahmat Lim & Partners, the law firm that represented Goldman in the 1MDB deals, to search for documents related to the bonds.[374]

c.  On April 24, 2019, the *Financial Times* reported that the DOJ staff have recommended that a settlement with Goldman over its role in 1MDB should include ***a guilty plea at the parent company level***.[375]

d.  On June 23, 2019, reports were published revealing that Goldman had offered 1 billion ringgit—approximately $241 million—to avoid criminal charges in Malaysia. Current Prime Minister Mahathir Mohamad rejected the offer as "peanuts," declaring that "[w]hat Goldman Sachs has offered is not adequate."[376]

e.  On July 11, 2019, *The Wall Street Journal* quoted Assistant Attorney General Brian Benczkowski, who commented that "[w]e do anticipate getting into active discussions with Goldman, at this point, in the near future." Citing an anonymous senior official, the *Journal* reported the DOJ will "soon . . . try to resolve allegations through a possible criminal settlement."

f.  On August 9, 2019, the Malaysia Attorney General, Tommy Thomas, filed charges against seventeen current and former Goldman executives over their involvement in the 1MDB fraud, including directors of three Goldman units.

---

[374] Anisah Shukry, *Malaysian Police Seek 1MDB Documents From Goldman's Lawyer*, Bloomberg (Jan. 24, 2019), https://www.bloomberg.com/news/articles/2019-01-24/malaysia-police-seek-1mdb-deal-documents-from-goldmans-lawyer.

[375] Kadhim Shubber, *DoJ staff push for Goldman guilty plea in 1MDB case*, Fin. Times (Apr. 24, 2019), https://www.ft.com/content/2658ac78-66a6-11e9-a79d-04f350474d62.

[376] Yen Nee Lee, *Goldman Sachs is offering 'peanuts' to compensate for 1MDB, says Malaysian prime minister*, CNBC (June 23, 2019), https://www.cnbc.com/2019/06/24/goldman-sachs-offers-peanuts-to-compensate-malaysia-for-1mdb-mahathir.html.

Those charged include Michael Evans and Richard Gnodde, CEO of Goldman Sachs International.[377]

298.    In addition to the foregoing, the Federal Reserve, the SEC, and the New York State Department of Financial Services ("DFS"), along with numerous authorities overseas, are all separately investigating Goldman's role in the 1MDB scandal.[378]

### D.    Goldman Mounts a "Rogue Banker" Defense that is Widely Rejected

299.    Goldman had celebrated its half-decade relationship with 1MDB, lauding Leissner and Vella for bringing in a remarkable bounty in deal fees. Yet, after Leissner pled guilty to money laundering and FCPA violations, Goldman set out to pin the blame on him alone. Abdicating all responsibility for the many Goldman executives who had approved the deals and courted Low—including both his predecessor and himself—newly installed CEO David Solomon stated, "[f]or Leissner's role in that fraud, we apologize to the Malaysian people."[379]

300.    Goldman adopted this refrain in presentations to U.S. prosecutors, seeking to distance itself while discrediting Leissner, pointing to his multiple affairs and doctorate from a "mail-order diploma mill." Of course, the bank was aware of these facts well *before* elevating Leissner to the Partnership Committee, making him Chair of Southeast Asia, and paying him

---

[377] *Malaysia charges 17 current and former Goldman Sachs executives in expansion of 1MDB fraud case*, The Wash. Post (Aug. 9, 2019), https://www.washingtonpost.com/business/economy/malaysia-charges-17-current-and-former-goldman-sachs-executives-in-expansion-of-1mdb-fraud-case/2019/08/09/c8d74ede-ba9b-11e9-bad6-609f75bfd97f_story.html.

[378] Carmel Crimmins, Olivia Oran, Sumeet Chatterjee, Grant McCool, Anshuman Daga & Martin Howell, *Goldman Sachs under spotlight in Malaysian fund scandal*, Reuters (July 20, 2016), https://www.reuters.com/article/us-malaysia-scandal-goldman-sachs/goldman-sachs-under-spotlight-in-malaysian-fund-scandal-idUSKCN1002OR; Randeep Ramesh, *1MDB: The inside story of the world's biggest financial scandal*, The Guardian (July 28, 2016), https://www.theguardian.com/world/2016/jul/28/1mdb-inside-story-worlds-biggest-financial-scandal-malaysia.

[379] Matthew Goldstein, Emily Flitter & Kate Kelly, *Goldman Sachs's Tactic in Malaysian Fraud Case: Smear an Ex-Partner*, The N.Y. Times (Jan. 16, 2019), https://www.nytimes.com/2019/01/16/business/goldman-malaysia-1mdb-leissner.html.

more than $10 million in a single year to reward his work on the 1MDB deals. *The New York Times* observed:

> The scorched-earth tactics, especially against someone who had been a star banker, reflect just how worried Goldman is about the criminal investigations into its role in the theft of at least $2.7 billion from [1MDB]. One big reason for concern is that senior Goldman officials, including the bank's chief executive at the time, helped win Malaysian business. And the relationship became a crucial engine of profits for the bank. . . . ***The bank's hope is that by casting Mr. Leissner as a rogue employee, Goldman will reduce its legal and reputational liability***.[380]

301.    Beyond its character attacks, Goldman's public defense has focused on Leissner's supposed concealment of Low's involvement in the 1MDB deals. In talks with federal prosecutors and regulators, "Goldman executives and their lawyers have depicted Tim Leissner, a former top investment banker, as a master con man, someone so sneaky that even the retired military intelligence officers who work for the bank couldn't sniff him out."[381]

302.    Goldman's attempt to isolate Leissner as a lone wolf whose activities were artfully concealed from other top executives has been met with skepticism, if not outright derision. *The New York Times* criticized the bank's "well-worn defense," questioning "whether those responsible for vetting the transactions simply took the word of Mr. Leissner and Mr. Ng":

> If only it were just some questionable shenanigans in the back room. Three Goldman Sachs partners have been implicated in paying bribes to win business from the investment fund, 1Malaysia Development Berhad, or 1MDB, as part of a multibillion-dollar fraud. . . . Goldman earned $600 million from helping to arrange bond offerings of about $6.5 billion for 1MDB in 2012 and 2013. Goldman's management was sure to notice fees of that size, and it has been reported that Mr. Blankfein met with the former Malaysian prime minister Najib Razak, Mr. Low and Mr. Leissner. But those fees were apparently not enough to raise questions about how the firm won a lead role in the transactions. . . . ***A partnership at Goldman is one of the most coveted positions on Wall Street, so labeling high-level managers as uncontrolled rogues as a way to avoid criminal***

---

[380] *Id.*

[381] *Id.*

***charges may not play well with prosecutors, especially when the deals were so
lucrative for the company***.[382]

303.    The *Times* further observed: "[T]he existence of a face-to-face meeting between
Goldman's chief executive and the man accused at the center of a sprawling fraud undercuts an
argument the bank has made: that its problems stem from the actions of a small number of rogue
employees."[383] Of course, Blankfein in fact had not one, but three such meetings. The *Australian
Financial Review*, which followed the 1MDB scandal closely, observed, "Goldman's contact on
the 1MDB deals was Jho Low. If know-your-client were practised [sic] at the bank, Low would
have made for interesting compliance visits."[384]

304.    A *Bloomberg* article titled "Rogue Bankers Don't Explain Goldman's 1MDB
Mess" was equally skeptical of Goldman's argument that it "didn't realize until January 2016
that Leissner had ties with Low, at which point the partner was suspended":

> ***The sheer amount of fees should have been the first red flag***: $600 million for
> underwriting $6.5 billion in bond sales between 2012 and 2013 for 1MDB. Let's
> put that in perspective. The amount Goldman raked in from the investment fund
> alone is nearly equivalent to the $694 million in revenue from its entire global
> bond underwriting business in the first quarter of 2013. . . . 1MDB was a quasi-
> sovereign, with two of the bonds backed by an Abu Dhabi sovereign wealth fund.
> Underwriting its bonds shouldn't have involved the rocket-science-type
> structuring for which Goldman is known. ***It's also well-known that Asian
> governments are loath to pay fees***. . . . ***All this should have triggered a wringer
> of committee approvals, especially because bank capital – so precious after the
> financial crisis – was at risk***.

305.    In a detailed examination of the scandal, the *Harvard Law School Forum on
Corporate Governance and Financial Regulation* was even more critical, dubbing the "rogue

***

[382] Peter J. Henning, *Goldman Blames Rogue Staff for Its 1MDB Scandal. That May Not Wash.*, The N.Y. Times (Nov. 15, 2018), https://www.nytimes.com/2018/11/15/business/dealbook/goldman-sachs-1mdb.html.

[383] Emily Flitter, Matthew Goldstein & Kate Kelly, *Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud*, The N.Y. Times (Nov. 22, 2018), https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

[384] Aaron Patrick, *Goldman Sachs, Lies and 1MDB*, Austl. Fin. Review (Jan. 19, 2019), https://www.afr.com/politics/goldman-sachs-lies-and-1mdb-20190117-h1a5is.

114

employee" campaign "**Goldman's 'Four Monkeys' defense: see no evil, hear no evil, speak no evil and keep all the money.**"[385] (Emphasis in original). The authors described the gambit as "the standard Wall Street playbook to deny all wrongdoing and proclaim total innocence, if not shamelessly suggesting that **they** are victims themselves."[386] (Emphasis in original). Yet, the article noted, "numerous red flags suggest[ed] fraud if not criminal conduct," including:

    a.  The "exorbitant" $600 million in fees that Goldman received "in three no-bid offerings over ten months in 2012-2013," which was "***more than two hundred times the typical fee***";

    b.  The observation that "any relationship that generated an apparent record of $600 or so million over a mere ten months would be expected to get the very close attention of Goldman's most senior officers, including the then-Co-Head of Investment Banking and now CEO, David Solomon, as well as the CEO at that time";

    c.  The deal was subject to "rigorous review by no less than five internal Goldman committees" and done "under the noses of more than 30 Goldman Sachs executives";

    d.  The fact that "a simple review of 1MDB's financials should have quickly revealed inexplicable layering and innumerable huge financial transactions all over the world, including prominently in locations well-known for money laundering";

    e.  Jho Low "was actually caught by Goldman's compliance system . . . not once, but at least twice" (emphasis in original);

---

[385] Dennis M. Kelleher, *Goldman Sachs and the 1MDB Scandal*, Harvard Law Sch. Forum on Corp. Governance & Fin. Regulation (May 14, 2019), https://corpgov.law.harvard.edu/2019/05/14/goldman-sachs-and-the-1mdb-scandal/.

[386] *Id.*

    f.   Blankfein's multiple meetings with Najib and Low, "after Goldman's compliance department had raised multiple concerns about the prime minister's primary co-conspirator, the inexperienced Jho Low, who was only in his late 20s or early 30s, but nonetheless de facto ran the 1MDB fund";

    g.   The April 2012 protests—"the largest democratic protests in Malaysia's history"—when "some one hundred thousand anticorruption protesters poured out into the streets of Kuala Lumpur" to "oust Prime Minister Najib's kleptocratic regime";

    h.   Within 1MDB itself, "there was significant staff and executive turnover; those working there had little or no experience; the Chairman of the Board of Directors resigned abruptly as did another director just weeks later; its first auditors, Ernst & Young, resigned as did its second auditors, KPMG, and its third auditor, Deloitte, was just fined by Malaysian authorities"; and

    i.   Lazard's withdrawal from one of the offerings and 1MDB's reliance on tiny BSI.

306.    Amid these and other red flags, the *Harvard Law School Forum*'s analysis found Goldman's explanation wanting:

> Goldman wants the world to believe that no one at Goldman was smart enough to get a ***hint*** of one of the biggest frauds in the world happening right under their noses in a multi-year, multi-deal relationship that stretched from junior bankers to the most senior executives at the bank. . . . ***Doesn't Goldman brag about having the worlds'*** **[sic]** ***state-of-the-art, high-tech, comprehensive systems and multiple, robust layers of compliance, risk, legal, audit and management designed to ensure that something like this could never happen, even at fractions of the size of this fraud and these fraudulent activities?*** Aren't they supposed to be experts at due diligence?

307.    As for Goldman's claims that Leissner and Ng had concealed their misconduct from management and compliance, the authors observed, "[n]one of this required Sherlock Holmes or even a business degree to uncover; scratch almost any surface with the most basic

questions and the fraud seemingly would have been visible for anyone to see and quickly unravel."[387] To the contrary, "Leissner and the other criminals just weren't that smart and there were red flags waving all over the Malaysia relationship and Goldman's 1MDB offerings, which caught the attention of senior Goldman officers." David Ryan's repeated protests of the deals were testament to how conspicuous the problems were.

308.    While unwavering in its "rogue banker" defense since Leissner's role in the scandal first came to light in 2016, Goldman has struggled to maintain it as new facts come to light. For example, in addition to Ng and Leissner, Vella was also deeply involved, having personally approved the bribes and kickback payments to government officials. Following the unsealing of Leissner's Information thinly veiling Vella's identity as a co-conspirator, the bank quietly put him on leave in late fall 2018.[388] It has been equally silent in addressing Co-Head of Investment Banking Hazem Shawki's role in obtaining Global Compliance's sign-off in Low's Coastal Energy deal—*a deal Leissner had no involvement in*—after Global Compliance had rejected Low as a private wealth client multiple times.

309.    The DOJ, following an exhaustive, multiyear investigation in which it sifted through internal Goldman documents obtained by subpoena and search warrant, refuted Goldman's "rogue banker" defense in its indictment of Low and Ng, describing the practice of skirting compliance to push deals through as endemic to the firm. Noting that while Global Compliance and Legal's Business Intelligence Group "worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval," the indictment, returned by a federal grand jury, stated that "*the business culture at*

---

[387] *Id.*

[388] Sridhar Natarajan, *Goldman Sachs Places Andrea Vella on Leave Over 1MDB Case*, Bloomberg (Nov. 1, 2018), https://www.bloomberg.com/news/articles/2018-11-01/goldman-sachs-is-said-to-place-vella-on-leave-over-1mdb-case.

*[Goldman Sachs], particularly in South Asia, was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions*."[389] Meanwhile, the affidavit supporting Leissner's arrest warrant stated unequivocally that Leissner was "*acting on behalf of [Goldman Sachs]*" and doing so "*to secure and retain business for [Goldman Sachs]*."[390]

310.    Given the extraordinary compensation that Goldman received for the three 1MDB deals—$600 million—claims that Leissner was a rogue actor operating against Goldman's interests or outside the scope of his authority ring hollow. Goldman was an extraordinary beneficiary of its relationship with 1MDB, and it hailed Leissner as a conquering hero for securing the fund's business—and compensated and promoted him as such.

## V.    SUMMARY ALLEGATIONS OF SCIENTER

311.    As detailed above, knowledge and/or deliberate disregard of the warning signs encircling Goldman's half-decade-long relationship with Jho Low and 1MDB permeated a range of departments and regions at the bank beginning in 2009, reaching its highest offices. Below is a summary of certain facts set forth above in Section IV reflecting Defendants' knowledge and/or deliberate disregard at the time that they made their materially false or misleading statements to investors.

### A.    Scores of Red Flags Surrounded Goldman's Relationship with 1MDB

312.    Five Goldman committees, including four powerful firmwide committees charged with reviewing important transactions and managing reputational risk for the bank—the Business Standards (chaired by President and COO Cohn), Risk, Capital, and Suitability Committees—approved each of the three 1MDB bond deals, along with CEO Blankfein, then-Head of

---

[389] *United States of America v. Low,* No. 1:18-cr-00538-MKB (E.D.N.Y. Oct. 3, 2018), ECF No. 1.
[390] Leissner Compl. & Aff., ¶¶ 16, 18.

Investment Banking and current CEO David Solomon, and then-Global Head of Financing, now CFO Stephen Scherr.

313.    Every executive, compliance official, and committee member who reviewed Goldman's dealings with 1MDB was confronted with a fleet of red flags indicating the likelihood of corruption, severe compliance risks, and reputational harm.

314.    *First*, several general features of 1MDB that persisted throughout Goldman's relationship with the fund signaled the likelihood of graft. They were readily apparent to anyone involved in reviewing the 1MDB deals. These red flags included the following:

  a. Malaysia was widely known as one of the most corrupt countries in the world in which to do business, where foreign companies doing business with the government "[had] to be aware that they're likely to be asked for a bribe" (¶ 80);

  b. Najib, who oversaw 1MDB and whom Blankfein and other Goldman executives repeatedly courted, was notoriously corrupt, with allegations of graft predating his premiership and growing exponentially after he became Prime Minister (¶¶ 83-85);

  c. As Goldman prepared the first offering, tens of thousands of Malaysians in Kuala Lumpur protested the corruption of Najib's regime (¶¶ 183-84);

  d. From its launch, 1MDB exhibited a range of potential compliance problems, including board and outside auditor resignations, press accounts and internal allegations of corruption, disagreements with auditors, and board minutes plainly acknowledging the fund's perception as "a ***secretive cloak-and-dagger setup with sinister motives to benefit cronies*** and not the Malaysian people" (¶¶ 93-96, 98); and

e.  1MDB insisted on tiny Swiss bank BSI as the fund's principal custodian bank, rather than a large institutional bank, because BSI would be beholden to a client of 1MDB's size—its largest—and less likely to question suspicious money transfers (¶ 97).

315.  *Second*, another red flag visible to Goldman during its relationship with 1MDB was ***Jho Low***, whose wildly extravagant spending, high-profile partying, and dubious source of wealth were well documented in the press beginning in 2009 and continuing throughout Goldman's relationship with Low. ¶¶ 91, 210-11. Following a review of Low's personal finances in connection with his first PWM application, the lack of a legitimate explanation for Low's wealth prompted Goldman's internal compliance personnel to reject him as a private client for the first of several times. ¶¶ 119-23.

316.  Knowledge of Low's role as 1MBD's representative and a key intermediary between Goldman, 1MDB, and IPIC was common and widespread at the bank throughout the relationship. For example:

a.  In 2009, press accounts that were readily accessible to Defendants detailed Low's key role in 1MDB since its inception (¶ 89);

b.  In 2009, Low was introduced to Goldman as 1MDB's central facilitator at the deal team (¶¶ 111-14, 118) and chief executive levels (¶¶ 126-28); and Low's role as 1MDB's key representative and control person was confirmed to Goldman numerous times over the next five years, again at both the deal team (¶¶ 130, 146-47) and chief executive levels (¶¶ 213, 251-53);

c.  From 2009 to 2014, Goldman bankers in Hong Kong, Singapore, and Dubai repeatedly confirmed to the Global Compliance and Legal Departments that Low

was Goldman's partner in transactions in Malaysia and the Middle East (¶¶ 119-23, 139-43, 161, 260);

d. At an April 4, 2012 firmwide meeting of the Capital Committee and Suitability Committee to review the Project Magnolia deal, ***Leissner stated that Low had facilitated Goldman's meeting with 1MDB's guarantor in offering***, IPIC, in response to questions from the Co-Head of Global Compliance (¶ 161);

e. Other business units and internal control functions also knew that Vella, Leissner, and Ng were working with Low, including PWM and the Conflicts Department, which reviewed—and rejected—requests to bring Low on as a client (¶¶ 120, 142, 144);

f. Bankers at Goldman outside the underwriting deal team knew of Low's involvement as "***the 1MDB Operator or intermediary***" and discussed it internally, including by email (¶¶ 159-60);

g. Internal Goldman emails and the deal team's travel schedule and meetings with third parties reflected that the deal team (including Vella, Leissner, and Ng) was regularly working with and courting Low in his capacity as 1MDB's representative (¶¶ 158, 233-34); and

h. Goldman Vice Chairman Michael Evans attended a party for Najib that Low had arranged on a superyacht in Saint-Tropez in July 2013 (¶ 250).

317.   *Third*, Defendants knew, or recklessly disregarded, the risk posed by ***Goldman's own lead bankers*** on the 1MDB deals—Vella and Leissner—who have both been implicated in the DOJ's investigation, with Leissner pleading guilty to the crimes with which he was charged.

Red flags regarding these two senior-level Partners before and during the 1MDB bond deals included the following:

   a.   Vella oversaw the LIA account team in Libya accused of bribing government officials, and he personally approved an internship for the close relative of a political official that exposed Goldman to FCPA violations (¶¶ 66-73);

   b.   Leissner had a reputation within the bank for being "prone to go off the reservation," a trait that Goldman "tolerated because he brought in business" (¶ 106);

   c.   Leissner exhibited a tendency to skirt ethical lines well before Goldman's work with 1MDB, including in ways that exposed the bank to potential FCPA violations (¶¶ 107-09);

   d.   In mid-2010, Vella and Leissner advised the Malaysian state of Sarawak on an $800 million bond offering, making Goldman *50 times* the customary fee on similar deals and causing an international watchdog organization to publicly chastise the bank for facilitating corruption in Malaysia (¶¶ 135-37);

   e.   In mid-2010, Leissner, along with Ng, alerted Goldman's charitable arm that the bankers sought to make payments to Najib's wife, Rosmah, through Goldman's charitable arm, *a potential FCPA violation* (¶ 133); and

   f.   Leissner continued to work with and recommend Low to Goldman as a client even after Global Compliance and Legal had rejected him because of his unexplained wealth (¶¶ 144-53, 194, 217).

318.   *Fourth*, Defendants and the committees reviewing the 1MDB bond deals were also faced with a litany of red flags concerning the deals' *highly suspicious terms*:

a. 1MDB agreed to pay Goldman nearly **$600 million in fees** for the three bond offerings, having solicited no competing bids and naming Goldman as sole lead underwriter, notwithstanding that: (i) the customary fee for such a deal was approximately $1 million per deal, and (ii) Goldman had secured buyers for the bonds before they finalized the deal, thereby assuming such a nominal risk that they warned at least one deal team member not to identify that pre-sale even on internal emails for fear of exposure (¶¶ 177-79, 189, 192, 208, 216, 227);

b. 1MDB and its representatives, including Low and Najib, emphasized **speed and secrecy** in the offerings when no business justification explained these imperatives (¶¶ 173-74, 199, 220-22);

c. 1MDB's willingness to award each of these deals to Goldman on a **no-bid basis**, with no competition from other investment banks despite the enormous fees that Goldman was earning, was suspicious, as it was both highly unusual and meant that 1MDB was foregoing a process that may have resulted in lower fees (¶¶ 155, 164, 193);

d. The **timing** of the second offering was suspicious in that 1MDB sought the new raise immediately after the first one had closed and when ample funds from the "general purposes" portion of the first offering were still available to cover the acquisition that was the claimed purpose of the second offering (¶¶ 193, 201);

e. The **timing and size** of the third offering were suspicious in that Najib sought the $3 billion raise shortly before his highly contested election and within 12 months of the fund having raised $3.5 billion, much of which was allocated to "general

corporate purposes" and thus, was once again still available for investment by
1MDB such that another capital raise was unnecessary (¶¶ 220-25);

f.  The *yields* on the three debt issuances—6% to 4.4%—were far higher than
comparable offerings, raising a red flag as to why a sovereign-backed entity like
1MDB would agree to pay so much interest (¶¶ 175, 227);

g.  There was *no stated purpose* for nearly 50% of the funds raised by the first
offering, 58% of the second offering, and 100% of the third offering (¶¶ 176, 200,
221); and

h.  The 1MDB bonds were backed up by an unusual, feeless guarantee from IPIC, an
Abu Dhabi fund whose director had a reputation (and had been sued) for
*demanding kickbacks* (¶ 150)—an arrangement that prompted Goldman's Middle
East headquarters to decline to work on the deal and to declare it "*preposterous*"
(¶¶ 150, 171).

319.  *Fifth*, multiple third parties identified red flags and alerted Goldman to them in
the 1MDB bond deals. These included the following:

a.  *Investment bank Lazard* withdrew from providing a valuation of the energy
assets that were the stated target of the Project Magnolia funds because the deal
"*smacked of political corruption*," prompting Goldman to step in and provide an
inflated valuation of the assets that was quickly written down (¶ 180);

b.  BSI, *1MDB's own bank*, protested the plan to transfer the $3 billion in Project
Catalyze proceeds to 1MDB's account at BSI, rather than to a global bank,
prompting Goldman bankers to intercede and convince BSI to accept the funds
(¶¶ 233-34);

c. An attorney at Linklaters, ***Goldman's own outside counsel*** on Project Catalyze, also questioned the use of BSI for such a massive deposit, but Goldman ignored him (¶¶ 235-37);

d. 1MDB ***fired its first auditor***, Ernst & Young, when the firm refused to certify a transaction to hide the fund's first-year losses and instead book a fictitious profit (¶ 96); and

e. 1MDB's second auditor, KPMG, issued an unusual "emphasis of matter" highlighting its concern over the transaction in the fund's first set of financial reports, after which it, too, was fired (¶ 96).

320.  Goldman's refusal to investigate and/or its disregard of these and other red flags breached its internal policies and the Project Catalyze Offering Circular. Specifically:

a. As part of the BSC review following the financial crisis, Goldman claimed to have implemented reforms creating a rigorous oversight process to "strengthen accountability, compliance, and internal control standards," committing to pre- and post-transaction monitoring, establishing a reporting mechanism for "escalating issues to sales leadership and the Credit, Legal and Compliance Departments," and emphasizing that "[e]very employee has an equal obligation to raise issues or concerns, no matter how small, to protect the firm's reputation" (¶¶ 51-60); and

b. Goldman's offering circular for the $3 billion Project Catalyze bond offering expressly represented that 1MDB and Goldman Sachs would "***ensure that none of the net proceeds raised from the issue of the Notes shall be . . . made***

125

*available to any person or entity . . . in violation of any applicable anti-corruption or anti-money laundering laws*" (¶ 238).

321.   Goldman's role as 1MDB's exclusive debt underwriter during this period—serving as the fund's sole bookrunner on three no-bid, sole-lead offerings in quick succession—gave it unique insight into the highly unusual and suspect workings of the fund. And, in particular, the second and third offerings required due diligence concerning 1MDB's controls and financial position that would have readily alerted Goldman to the fact that hundreds of millions of dollars from the previous offerings had disappeared without sufficient explanation. Despite these glaring red flags, and against the backdrop of its stated commitment to risk management and anti-corruption, Goldman rubber-stamped the deals which undergirded the 1MDB fraud.

### B. Defendant Blankfein Met with Low Three Times to Discuss Goldman's Business with 1MDB

322.   Before, during, and after 1MDB's three offerings, Blankfein met with Low to discuss how Goldman could serve as investment bank to and generate fees from 1MDB. *All* of these meetings occurred *after* Goldman's own Global Compliance Department had flagged Low as someone with whom the bank should not do business or have a relationship. Specifically:

   a.   In November 2009, after Global Compliance had already rejected Low as a PWM client due to press coverage of his spending and Global Compliance concerns over his unexplained wealth, Blankfein met with Low, Leissner, and Najib, where the four specifically discussed Goldman serving as 1MDB's investment bank and laid the groundwork for Goldman's ensuing work for 1MDB (¶¶ 126-28);

b.  Between the second and third 1MDB bond offerings, amid the red flags discussed above and after multiple compliance functions had repeatedly rejected Low as a Goldman client, **Blankfein met one-on-one with Low** in late 2012 (¶ 213); and

c.  In September 2013, as red flags and scrutiny of 1MDB proliferated, Blankfein **again** met with Low, Leissner, and Najib in New York to discuss how Goldman could do more business with 1MDB (¶¶ 251-52).

323.   Blankfein personally reviewed and approved each of the 1MDB bond offerings, and thus was exposed to all of the red flags discussed above. ¶¶ 188, 205, 239. Moreover, as the *Harvard Law School Forum on Corporate Governance and Financial Regulation* observed in an analysis of the scandal, a meeting with Blankfein, one of the world's most powerful bankers, would come after only "the most rigorous background checks and due diligence." ¶ 214. That he did so—not once, but at least *three times*—reflects that Blankfein was willing to overlook those red flags and Goldman's own internal compliance warnings to pursue what he recognized was a lucrative source of investment banking fees. Indeed, even after the warning signs had increased further, with the Federal Reserve explicitly warning Goldman of "reputational risk" from the 1MDB relationship (¶ 254), Blankfein urged his other bankers to emulate Leissner and Vella, proclaiming, "**We have to do more of that**." ¶ 269.

C.  **Goldman's Asia President David Ryan Repeatedly Warned of the Risk 1MDB Posed**

324.   David Ryan, President of Goldman Asia and a member of Goldman's Management Committee, specifically and repeatedly identified red flags around Goldman's relationship with 1MDB. In fact, he warned of the risk during each of Goldman's three bond offerings for the fund:

a.  Before Project Magnolia closed in May 2012, Ryan (i) voiced concern that the award of the lucrative underwriting assignment without any competing bids was too good to be true, (ii) opined that the bank's profit on the deal appeared excessive in light of its structure and limited risk, and (iii) expressed concern (based on his own visit to 1MDB's offices) that the fund did not have the personnel to handle so much capital or bear such a heavy debt load (¶¶ 164-65);

b.  Before Project Maximus closed in October 2012, Ryan expressed concern again that the no-bid assignment was too good to be true, urging the bank to consider terminating the relationship and, in any event, to lower its fees on the second offering, given how easily it had sold the bonds from the first offering (¶¶ 202-04); and

c.  Before Project Catalyze closed in March 2013, Ryan objected to the 1MDB relationship for the third time, expressing suspicion about the fund's award of the massive $3 billion offering without competition on the heels of two other no-bid deals (¶¶ 230-31).

325.  As President of Goldman's Asia business and a member of Goldman's Management Committee, Ryan's repeated warnings constituted knowledge of the relationship's red flags at the bank's highest level. Ryan resigned three months after the final offering, having been overruled three times by Gary Cohn and sidelined following the installation of pro-1MDB Asia Chair Mark Schwartz above Ryan.

**D.  Gary Cohn and Other Top Executives Not Only Heard Concerns about the Risks Posed by 1MDB, They Retaliated Against Those Who Voiced Them**

326.  Goldman President and COO Cohn, intent on seeing his and Blankfein's initiatives to "monetize the state" in emerging markets succeed, personally learned of and

*silenced* Ryan's repeated objections to the 1MDB bond deals. ¶¶ 164-65, 202-04, 230-31. Specifically, Cohn repeatedly overruled Ryan and elevated Mark Schwartz above Ryan to ensure the 1MDB deals proceeded unencumbered. *Id.*

327.    Like Cohn, Mark Schwartz was one of the highest-ranking executives at Goldman at the time of Project Catalyze. As the newly installed Asia Chair, Schwartz learned of Ryan's objections to the deal and, with Cohn, silenced Ryan, disregarding the additional investigation and reporting to the bank's internal control functions. ¶ 231.

328.    Alex Turnbull, an Executive Director based in Goldman's Hong Kong office, also voiced serious concerns about Project Magnolia's terms and Goldman's expected profits on the deal. ¶ 166-67. In response, he was reprimanded by compliance for questioning the deal. ¶ 168. Separately, Turnbull's boss told Turnbull to keep his mouth shut if he ever wanted to be promoted. *Id.* These individuals had knowledge of the red flags that Turnbull had identified, and each of them chose to disregard Turnbull's warnings and the reporting process supposedly established by the BSC. *Cf.* ¶¶ 52-53, 58.

     **E.**    **Vella and Leissner Were Among Goldman's Most Powerful Senior Bankers**

329.    Vella and Leissner were both Partners at Goldman and thus within the top 1% of the bank's hierarchy. ¶¶ 36, 41, 45. Moreover, they were senior-ranking members of that rarified class.

330.    Vella was a senior Partner when he moved to Goldman's Hong Kong office in 2010, was promoted to Co-Head of the Financing Group for Asia in January 2014, and was promoted again in 2015 to Co-Head of Investment Banking for Asia, the top post in Goldman's preeminent division in a region of prime importance to Goldman, Blankfein, and Cohn. ¶ 41.

331.    Leissner began the 1MDB relationship as Chair of Investment Banking for Southeast Asia but, because of his work helping to generate $600 million in fees through the

1MDB bond deals, was elevated to Chair of Southeast Asia in July 2014, added to the elite Partnership Committee, and rewarded with extraordinary compensation. ¶¶ 105, 269.

332.    In short, the pair were prominent executives and among the most powerful senior bankers at the firm. They were also behind the "overarching criminal scheme," orchestrated by Jho Low, "to pay bribes *to secure and retain business for [Goldman]*." ¶ 280. In fact, each personally approved the payment of kickbacks to government officials to win that business for the bank. ¶¶ 152-53. Through Leissner and Vella, that scheme extended to Goldman's top echelon, and thus Goldman issued its materially false or misleading statements with knowledge or deliberate recklessness of their false or misleading nature.

**F.    Goldman's Dubai Office and Global Compliance Knew the Bank Was Advising Low and that Low Would Receive a Highly Suspicious Payout on the Coastal Energy Deal**

333.    Hazem Shawki, Co-Head of Investment Banking for the Middle East and North Africa, was another top-level Goldman executive with knowledge of glaring warning signs concerning Low's misconduct. Shawki was based in Goldman's Dubai office, which had previously refused to support Project Magnolia because of the "preposterous" no fee guarantee provided by IPIC (a frequent Goldman Dubai client) to back up 1MDB's debt offering. ¶ 150. Despite the red flag, Shawki agreed to work with Low to acquire Coastal Energy. ¶ 259.

334.    Global Compliance once again objected to Goldman advising Low directly, but advised that "*if he is in a very minor role . . . then we may be able to live with it*." As a consequence, Shawki and his team nominally switched to advising CEPSA; however, as Goldman knew full well, Low stayed involved in the deal by partnering with CEPSA through SRG. ¶¶ 260-61. As detailed above, the transaction was a money-laundering gambit to cleanse money that Low had stolen from 1MDB. Low invested $50 million of the stolen 1MDB funds in the $2.2 Coastal billion acquisition, and then received a $350 million payment from CEPSA a

week later purportedly to "buy out" Low's shares in the acquired company. ¶¶ 263, 265. ***Shawki***

***knew of this inexplicably large payment to Low at the time***, referring to it as a "reward" for

Low scouting out the deal, even though it was structured as an equity buyout. ¶ 264. If not

evidence of criminality, the payment was at minimum a glaring red flag known at Goldman's

highest levels, made all the more so when matched against the bank's own repeated rejection of

Low as a client.

## VI.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.    Materially False or Misleading Statements Regarding the 1MDB Deals

335.    Throughout the Class Period, in response to growing market concern regarding

Goldman's dealings with 1MDB, Defendants falsely downplayed the bank's involvement with

1MDB and individuals connected to the fund, denied any wrongdoing, and misrepresented that

its work with the fund was legitimate and that its compensation for such work was fair.

336.    On October 29, 2014, *The Edge* published an article titled "Goldman says no

payment to third parties," which questioned the fees Goldman received for its role in

underwriting the 1MDB bond deals and whether any funds were paid to third parties. In

response, Goldman's Head of Corporate Communications (Asia-Pacific), Edward Naylor, stated

the following on behalf of the Company:

> [Goldman's fees and commissions referred to in offering documents] are standard terms used to describe part of Goldman Sachs' compensation for the risks assumed in underwriting the bonds in question.
>
> Other than legal and accounting firms providing professional services, no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with these transactions, nor have we ever been asked by 1MDB or others to pay such fees or commissions.

337.    Goldman's statement identified above in paragraph 336, representing that the fees

and commissions referred to in the 1MDB offering materials were "***standard terms used to***

***describe part of Goldman Sachs' compensation for the risks assumed in underwriting the bonds in question***" was materially false or misleading when made because, in truth, the terms were not "standard," and the fees and commissions were neither "standard" nor reflective of the risks assumed by the Company, for the following reasons:

a. Goldman took on virtually no risk in the 1MDB bond offerings because each offering was effectively structured to operate as a private placement, with Goldman buying the entire lot from 1MDB directly and then reselling them to a pre-arranged group of clients prior to closing. ¶¶ 173, 189, 199, 239. For example, by the closing date of the first bond offering, Project Magnolia, Goldman had already secured buyers—mutual funds in South Korea, China, and the Philippines—to purchase all of the bonds. ¶ 179.  Moreover, even had Goldman taken the bonds onto its balance sheet before lining up buyers, the yields on the bonds were so much higher than comparable securities that they could have easily offloaded them. ¶¶ 19, 179.

b. The fees Goldman received dwarfed the industry standards for the same or similar work on bond offerings. According to *The Wall Street Journal*, a typical fee on a deal like Project Magnolia would be about ***$1 million***. ¶ 177. Goldman charged 1MDB ***$192.5 million***, or about 11% of the Magnolia bond issue. *Id*. Altogether, Goldman received approximately ***$600 million*** for the three offerings, all of which closed over the course of roughly ten months. ¶ 242.

c. Numerous press reports confirmed that the compensation terms were not standard for debt issuances of governments in the region, and that the bond offerings did not possess any features warranting the massive fees. For example, *Bloomberg*

132

reported, "[u]nderwriting [1MDB's] bonds shouldn't have involved the rocket-science-type structuring for which Goldman is known. It's also well-known that *Asian governments are loath to pay fees*." ¶ 304.

d.  The fees Goldman received also dwarfed a typical Malaysian investment grade bond deal, which *Bloomberg* explained typically "compare with half a percentage point for underwriting a typical Malaysian investment-grade bond deal, one percentage point for high-yield and mere basis points for government debt." ¶ 177.

e.  Reflecting the fact that the fees were far in excess of standard terms, Goldman went to great lengths to conceal from the public the terms of the deal, including that Goldman had already lined up investors to purchase the full lot, virtually eliminating the bank's risk. For example, Goldman bankers were told to keep all correspondence about the bond offerings off email to prevent the terms from becoming public, which would reveal that the bank's fees were not justified. ¶ 179. The *Financial Times* observed that "[t]he issue was never meant to be made public," despite being the largest offering of its kind. ¶ 174.

f.  Goldman's own senior bankers questioned the compensation the bank received relative to the minimal risk (if any) the bank undertook, acknowledging that the fees and commissions received were not "standard terms" at all. For example, David Ryan, President of Goldman Asia, expressed that Goldman's compensation was excessive, particularly in light of how easily the bank offloaded the bonds to pre-offering purchasers, while pointing to suspicious circumstances around the three offerings. ¶¶ 164-65, 202-04, 230-31. Alex Turnbull similarly objected to

the terms and pricing of the first offering. ¶¶ 167-68. These objections reflected that the enormous fees that the bank received were not "standard terms" commensurate with the (nominal) risk the bank was undertaking.

g.  Goldman's client, 1MDB, was a sovereign wealth fund backstopped at all times by the Malaysian government. Furthermore, two of the bonds were backed by an Abu Dhabi sovereign wealth fund. ¶¶ 171, 195. These facts demonstrate that even if Goldman had taken the bonds onto its own books *without* lining up buyers in advance, there was nothing inherently risky about their terms that would justify the outsized fees.

h.  1MDB awarded Goldman each of the bond deals on a no-bid basis even though a competitive process involving bids from other investment banks was typical and likely would have resulted in lower fees for 1MDB. ¶¶ 155, 164, 193.

i.  In truth, 1MDB paid the enormous fees to Goldman not to account for the underwriting risks assumed by the bank, but to ensure speed and secrecy for each offering. ¶¶ 173-74, 199, 220-22.

338.  Goldman's statements identified in paragraph 336 that "***no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties in connection with these transactions, nor have we ever been asked by 1MDB or others to pay such fees or commissions***" were materially false or misleading when made because, in fact, hundreds of millions of dollars were paid or shared by Goldman or 1MDB with external third parties numerous times, and for the following reasons:

a.  Senior bankers at Goldman were explicitly informed that Goldman would need to pay bribes in order to consummate Project Magnolia. For example, in late

February 2012, during a meeting between Leissner, Ng, Low, a 1MDB official, and others in connection with Project Magnolia, Low told Leissner and Ng that to secure the guarantee from IPIC for the first bond offering, they would have to pay bribes and kickbacks to government officials in Malaysia and Abu Dhabi. The Goldman bankers agreed. ¶ 152.

b. After the February 2012 meeting, Ng informed Vella that Goldman would have to pay bribes and kickbacks to foreign officials for the bond deal to occur. Vella agreed. ¶ 153.

c. Leissner later pled guilty to two counts of conspiracy to violate the FCPA and to commit money laundering, admitting that hundreds of millions of dollars in kickbacks were paid by Goldman and 1MDB to third parties in connection with each 1MDB bond offering. ¶ 281. Pursuant to his guilty plea, Leissner admitted that Goldman was asked by 1MDB, Low, and others to pay fees and commissions to external third parties in connection with each 1MDB bond offering. *Id.*

d. The affidavit supporting Leissner's arrest warrant, sworn to by an FBI agent familiar with the underlying facts and approved by a federal magistrate judge, stated that Leissner's and his co-conspirators' payment of kickbacks and bribes to foreign government officials was done "***to secure and retain business for [Goldman]***" and that Leissner was "***acting on behalf of [Goldman]***" in making those payments. ¶ 280.

e. Nearly one third of net proceeds from Project Magnolia was diverted within days of its closing on May 21, 2012. ¶ 190. According to the FBI's review of financial records, approximately: (i) $577 million was moved to a Swiss bank account held

by a shell company incorporated in the British Virgin Islands; (ii) $295 million was transferred into a shell account at a Singapore bank controlled by Low's associate, Eric Tan; and (iii) other funds from the Low-controlled Eric Tan account went to officials at IPIC and 1MDB. ¶¶ 190-91.

f.  Nearly half of the net proceeds for Project Maximus ($790 million), which closed on October 17, 2012, was diverted from 1MDB's account within 48 hours after Goldman sent the offering's proceeds to the fund, again moving to the Swiss bank account of a shell company incorporated in the British Virgin Islands. ¶ 206.

g.  Beginning in late October 2012, the stolen Project Maximus funds were used for, among other things, the following purposes: (i) $200 million was funneled into an account controlled by Low, who used the stolen funds for personal uses; (ii) $473 million was diverted to pay for luxury properties; and (iii) $238 million was funneled to Riza Aziz, Najib's son and Low's close friend. ¶ 207.

h.  In early December 2012, Leissner used $1.7 million to pay kickbacks to Najib and two high-ranking 1MDB officials. *Id.*

i.  On January 17, 2013, within days of being awarded Project Catalyze, Leissner made two transfers of $1 million each to two high-ranking 1MDB officials. ¶ 218.

j.  After Goldman wired the proceeds from Project Catalyze, which closed on March 19, 2013, into 1MDB's BSI account, over one-third was immediately siphoned off to Low and others. Low transferred $681 million into an account owned by Najib at AmBank in Kuala Lumpur; approximately $27.3 million from another account was paid to a New York jeweler to buy a 22-carat pink diamond pendant and

necklace for Najib's wife, Rosmah; and approximately $58 million was transferred to an auction house in New York to acquire artwork for Low. ¶ 240.

k.   Assisted by Goldman's Dubai office, Low contributed $50 million stolen from the 1MDB bond offerings that Goldman had underwritten to the purchase of Coastal Energy with CEPSA, a subsidiary of IPIC, whose officials had taken kickbacks (including from the 1MDB bond proceeds) to guarantee the 1MDB bond offerings. ¶ 263. A week after the Coastal Energy acquisition closed, CEPSA paid Low $350 million, which Goldman's Shawki knew at the time. ¶¶ 263-64.

339.   On July 21, 2015, *Bloomberg* published an article titled "The Scandal That Ate Malaysia," which, among other things, discussed Goldman's "close ties" with 1MDB and the Company's role in the much maligned 1MDB bond issuances. In the article, Naylor, speaking on behalf of the Company, once again attempted to tamp down concerns arising from Goldman's outsized fees on the 1MDB bond deals, stating:

> These transactions were individually tailored financing solutions, the fee and commissions for which reflected the underwriting risks assumed by Goldman Sachs on each series of bonds, as well as other prevailing conditions at the time, including spreads of credit benchmarks, hedging costs, and general market conditions.

340.   Goldman's statement identified in paragraph 339 that "*[t]hese transactions were individually tailored financing solutions*" was materially false or misleading when made because it created the misleading impression that the bond offerings were legitimate transactions providing "financing solutions" for specific needs that Goldman considered when "individually tailor[ing]" each transaction, rather than hurried and secretive no-bid deals serving as conduits for embezzlement, bribery, and political graft on a massive scale, and omitted the true facts concerning the nature of the transactions so to not make the statement misleading. In truth, as set forth in paragraph 338, the "financing" 1MDB received from each bond offering was used in

large part to funnel kickbacks and illicit payments to government officials and other external third parties and intermediaries.

341.    In addition, Goldman's statement identified in paragraph 339 that "***the fee and commissions for which reflected the underwriting risks assumed by Goldman Sachs on each series of bonds***" was materially false or misleading when made for the reasons set forth in paragraph 337**.**

342.    Finally, Goldman's statement identified in paragraph 339 that the massive fees it received reflected "***prevailing conditions at the time***" was also materially false or misleading when made because Goldman had already secretly pre-sold the offerings prior to closing, such that "prevailing conditions" in the market had little impact on the value of the bonds or the bank's cost to hedge its exposure created by purchasing the bonds.

343.    On July 20, 2016, *Reuters* published an article titled "Goldman Sachs under spotlight in Malaysian fund scandal," which reported that Goldman's work on the 1MDB bond deals was under investigation by U.S. prosecutors. In the article, Goldman denied any complicity in the 1MDB scandal, stating:

> We had no visibility into whether some of those funds may have been subsequently diverted to other purposes.

344.    On July 28, 2016, Goldman repeated the materially false or misleading statement identified in paragraph 343 in response to inquiries from *The Guardian*. The Company's statement was published in a *The Guardian* article that same day titled "1MDB: The inside story of the world's biggest financial scandal."

345.    Goldman's statements identified in paragraphs 343-44 that "***[w]e had no visibility into whether some of those funds may have been subsequently diverted to other purposes***" was materially false or misleading when made for the following reasons:

a. Goldman executives, including Leissner, diverted funds from each of the 1MDB offerings for others to pay kickbacks and bribes to foreign officials in order to secure 1MDB business. ¶¶ 207, 218. Leissner has pled guilty to two counts of conspiracy to violate the FCPA and to commit money laundering, admitting that hundreds of millions of dollars in kickbacks were paid by Goldman and 1MDB to third parties in connection with each 1MDB bond offering. ¶¶ 280-81.

b. Vella and Ng agreed that bribes and kickbacks would be paid to government officials in Malaysia and Abu Dhabi pursuant to the 1MDB bond deals. ¶ 153. After the deals closed, Leissner, Low, and others made such corrupt payments from funds obtained from the offerings. ¶¶ 207, 218.

c. Goldman had "visibility" into how the Project Catalyze proceeds were used, as it expressly agreed with 1MDB in the offering circular to "ensure" that funds from the third offering were not diverted to third parties in violation of anti-corruption (e.g., the FCPA) or anti-money laundering laws. ¶ 238. This promise was predicated on Goldman's continued monitoring of how the funds from the offering were used.

d. Goldman committed to post-transaction monitoring of its transactions, particularly those as significant to the bank as the three 1MDB bond offerings, as part of its BSC-led reforms to improve the bank's compliance safeguards. ¶¶ 57-58. This, too, required an ability to see how the funds raised from its transactions were used. *Id.*

e. Goldman's role as 1MDB's exclusive, no-bid underwriter during the 2012-2013 period in which the three offerings were brought to market necessarily involved

"visibility" into 1MDB's use of funds, as the three offerings occurred in quick succession, closing over a period of ten months.

f.  Project Maximus began just ten days after Project Magnolia closed. ¶ 193. During the course of Goldman's due diligence in underwriting Project Maximus, it had access to 1MDB's financial records, which reflected the disappearance without explanation of hundreds of millions of dollars from the Project Magnolia proceeds almost immediately after closing. ¶ 197.

g.  Similarly, during Goldman's due diligence in underwriting Project Catalyze, which began only weeks after Project Maximus closed, it had access to 1MDB's financial records reflecting the nearly instantaneous disappearance without explanation of funds from Project Maximus's closing. ¶ 229. Access to 1MDB's financial records during due diligence for the second two offerings afforded Goldman ample "visibility" into how funds from such offerings were used.

h.  Goldman knew, or should have learned during its due diligence for each offering, that: Ernst & Young had been fired by 1MDB before certifying the fund's first set of financial records; KPMG had not issued an unqualified opinion regarding 1MDB within its first year of operations and was itself soon fired; members of 1MDB's board, including its chairman, resigned shortly after 1MDB was formed amid questions over the diversion of funds from the Islamic Bond Issuance; Goldman's own outside counsel had raised concerns regarding 1MDB's usage of tiny BSI to house the funds from the transactions; and BSI itself had questioned regarding its role in receiving 1MDB bond issuance funds. ¶¶ 93-98.

    i.   The unexplained wealth of individuals associated with 1MDB, like Low, which was widely reported in the press, indicated that money was being siphoned off from 1MDB's offerings, especially in light of Goldman's prior rejections of Low as a private wealth client based upon concerns as to the unexplained source of his wealth. ¶¶ 90, 122-23, 145, 210-12.

    j.   It was widely reported that Najib was prone to graft, and media reports regularly contended that 1MDB was being used as a political piggybank and slush fund. ¶¶ 83-84. Before Project Magnolia closed, as Goldman readied 1MBD's first offering, tens of thousands of Malaysians protested Najib's corruption in Kuala Lumpur. ¶ 183. Prior to the third offering, Najib's Prime Minister opposition candidate, Anwar Ibrahim, promised he would close down 1MDB if elected due to the concerns surrounding the fund. ¶ 224.

346.    On December 22, 2016, *The Wall Street Journal* published an article titled "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep," which reported on the intimate relationship between Goldman, 1MDB, and Low, stating, "Goldman holds a unique position for its closeness to 1MDB and the principals." Consistent with its prior denials, Goldman stated: "***We have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions***[.]"

347.    Goldman's statement identified in paragraph 346 was materially false or misleading when made because there was ample evidence that Low was inextricably linked to, and in fact ran, 1MDB, including the following facts:

    a.   Before, during, and after the 1MDB bond transactions, ***Defendant Blankfein privately met with Low*** to discuss Goldman's business with 1MDB, with Low

acting as a representative of and intermediary for 1MDB. In fact, Blankfein personally met with Low at least ***three times***, including: (i) on November 22, 2009, Blankfein met privately with Low, Leissner, and Prime Minister Najib, during which "Najib requested Blankfein and Goldman Sachs to support and consult on 1MDB investments" (¶¶ 126-27); (ii) in or around December 2012, Blankfein met one-on-one with Low in New York during which Low served as 1MDB's exclusive representative (¶ 213); and (iii) on September 25, 2013, Blankfein met with Low, Najib, and Leissner to discuss how Goldman could do more business with 1MDB. ¶¶ 251-52.

b. Goldman's Legal Department, firmwide Capital Committee, and firmwide Suitability Committee knew Low was serving as a critical middleman for Goldman and 1MDB ***before the first offering even closed***. For example, on April 4, 2012, Leissner informed the Legal Department's Co-Head of Business Intelligence and the two important firmwide committees that Low had played a key role in the deal by setting up the meeting between Goldman and IPIC to arrange IPIC's guarantee of the offering, as Goldman had required. ¶ 161.

c. Goldman's own internal records reflected ***as early as January 2009*** that its bankers were doing business with Low and that Low was integral to its business with 1MDB and its predecessor fund, the TIA. ¶ 113. Goldman emails reviewed by federal investigators and detailed in pleadings filed by the DOJ confirm this fact. For example, after a January 6, 2009 meeting, Low emailed two senior Goldman bankers about his "partnership" with Goldman. *Id*. Similarly, a January 15, 2009 email from the future executive director of 1MDB to Leissner, Ng, and

Low affirmed the connection, stating "***I think it best to get [Jho Low] involve[d] at every stage***" in Goldman's advisory role to the TIA. ¶ 114.

d.  Subsequent internal emails, available to Goldman's Global Compliance and Legal Departments, reflected internal discussion about Low's involvement in the 1MDB bond deals as the offerings were being prepared. For example, a March 27, 2012 email from a Goldman Managing Director referred to Low as "***the 1MDB Operator or intermediary in Malaysia***." ¶ 160.

e.  Senior Goldman bankers working on the 1MDB deal team knew throughout the bank's relationship with 1MDB that Low was Najib's representative for the fund and the key facilitator between the fund and Goldman. For example, according to a later filing by the DOJ, Vella, Leissner, and Ng ***"understood that [Low] would act as an intermediary between 1MDB, [Najib] and other government officials from Abu Dhabi***." ¶ 151. In conjunction with his guilty plea to federal charges of conspiring with Vella, Ng, Low, and others to violate the FCPA and anti-money laundering laws, ***Leissner admitted that he and other Goldman executives knew at all times that Low was involved in the 1MDB bond transactions***. ¶ 281.

f.  Throughout Goldman's relationship with 1MDB, Goldman's 1MDB deal team openly traveled with Low and conducted business publicly with Low in the presence of third parties. ¶¶ 158, 234-35. For example, in arranging Project Magnolia, Vella, Leissner, and Ng travelled with Low to Abu Dhabi to meet with IPIC executives. ¶ 158.

g.  Knowledge of Low's involvement extended beyond the 1MDB deal team and Blankfein to other bankers. For example, as reported by *The Wall Street Journal*,

Low's involvement in the 1MDB bond deal was "widely discussed" at Goldman's Asia offices during the bank's work on Project Magnolia. ¶ 159.

h. From 2009 to 2014, Goldman bankers in Hong Kong, Singapore, and Dubai repeatedly confirmed to the Global Compliance and Legal Departments that Low was Goldman's partner in transactions in Malaysia and the Middle East. ¶¶ 120-21, 139-43, 161, 260. The Conflicts Department—a third unit responsible for maintaining internal controls—also learned of the bankers' work with Low and advised against it. ¶ 142.

i. Other business units also knew of Low's relationship to the 1MDB deal team. For example, in September 2009, Ng told a PWM banker in Switzerland that Low was an important business relationship and "***currently our partner in a lot of transactions in [M]alaysia***. Largely the mid-east and [M]alaysia rationship [sic]." ¶ 120. In March 2011, Leissner and Ng referred Low for a PWM account in the Singapore office, meeting with a PWM banker to solicit "guidance" on getting him approved after Low had again been rejected. ¶ 146.

j. Low was inextricably intertwined with Najib, another indication of Low's involvement in 1MDB, which Najib controlled. ¶ 89. For example, internal Goldman records reveal that, on March 26, 2010, Ng emailed Leissner and another banker at Goldman, emphasizing that Low was "close to [Najib]" and that Low's involvement "would be helpful . . . especially with [Najib]." ¶ 130. Later, in July 2013, Evans and Leissner attended a gathering with Najib that Low arranged on a superyacht in Saint-Tropez. ¶ 250.

k.  Tan Boon-Kee, one of Leissner's colleagues on the 1MDB team, worked with Low and continued to do so after she left Goldman and became Deutsche Bank's head of client coverage for Southeast Asia. ¶ 253. Tan Boon-Kee represented yet another senior banker at Goldman with intimate knowledge of Low's relationship to 1MDB and the Company.

348.    On June 12, 2017, *The Wall Street Journal* published an article titled "U.S. Lawsuit Links $2.2 Billion Deal to Malaysian 1MDB Scandal." That article reported that Goldman had rejected the notion that Low or any firm controlled by him was a Goldman client in the Coastal Energy deal.

349.    The next day, June 13, 2017, *CNBC* followed up on *The Wall Street Journal* story with an article titled "US reportedly investigating 1MDB ties to acquisition of US energy company," which reported that U.S. authorities were "probing whether the $2.2 billion purchase of U.S. energy company Coastal Energy was partly financed with funds allegedly funneled from . . . 1MDB." In a statement to *CNBC* on June 13, 2017, Goldman refused to comment on *The Wall Street Journal* article, but again denied the Company had any connection to Jho Low and others involved in the Coastal deal, stating: "***Neither Jho Low, Jynwel or SRG were a client of Goldman Sachs in connection with the Coastal Energy acquisition***" and that "[p]rior to reading the government filing, ***GS was not aware of, and had no involvement in, any transaction in which SRG sold its stake in a joint venture back to CEPSA***."

350.    Goldman's statements identified in paragraph 349 were materially false or misleading when made for the following reasons:

145

a.  Goldman's Dubai office had been advising Low on acquiring Coastal Energy since 2012, when Coastal Energy rejected Low's initial proposal concerning a potential acquisition. ¶¶ 257-58.

b.  Goldman's Dubai deal team, led by Co-Head of Investment Banking Shawki, was advising Low's SRG entity on the 2014 acquisition in which Low and IPIC's CEPSA subsidiary would acquire Coastal Energy. ¶¶ 259.

c.  Goldman's Global Compliance Department was aware of Low's role in the 2014 acquisition of Coastal Energy. As reported by *The Wall Street Journal*, one compliance officer wrote to a banker on the Coastal Energy deal in 2013, "***Jho Low's appearance is not welcome***." ¶ 260.

d.  Global Compliance then encouraged the deal team to restructure the deal to attenuate the link to Low: "[I]f he is in a very minor role . . . then ***we may be able to live with it***." ¶ 260. This statement acknowledged that Low would still be involved in the deal.

e.  After Global Compliance's half-hearted warning, rather than backing out of the deal, Goldman ostensibly switched clients, nominally advising CEPSA on the same side of the deal that Low had brought to Shawki in the first place. ¶ 261. Low's SRG remained a joint venturer with CEPSA.

f.  On November 20, 2013, it was announced that CEPSA and SRG would acquire Coastal Energy for $2.2 billion. ¶ 262. The announcement stated that CEPSA, advised by Goldman, had created a new entity, funded by Low's SRG, to execute the acquisition, and contained a statement by Jho Low falsely describing him as a "spokesperson" for SRG. *Id.*

g.  The deal involved Low investing $50 million, but one week after the transaction closed, CEPSA transferred $350 million to Low's, purportedly to buy out Low's shares in Coastal Energy—a 600% return over several days. Goldman's Shawki told executives at IPIC *at the time* of the $350 million CEPSA payment to Low that the transfer was a "reward" to Low for having found the deal that Low had first proposed to Goldman in 2012. ¶¶ 263-64. The statement reflected Shawki's knowledge of the payment to Low and the transaction in which SRG supposedly sold its stake in the joint venture back to CEPSA.

351.   On March 13, 2018, *The Australian* published an article titled "Goldman fires back at Alex Turnbull." As detailed above, Turnbull—an Executive Director at the bank from 2010 to 2014—had raised concerns internally about the pricing on the first 1MDB bond deal and the lack of clarity about the intended use of the funds, stating: "What the f--- is going on with this?  The pricing is nuts, what is the use of the funds?"[391]  Turnbull subsequently "got a talking-to by compliance" and was sidelined from his position with Goldman.

352.   In the *The Australian* article, Goldman refuted Turnbull's comments, once more stating: "***We had no visibility into whether some of those funds may have been subsequently diverted to other purposes.***"

353.   Naylor, speaking on behalf of the Company, repeated this statement to *The New York Times*, which published his statements in articles issued on June 14, 2018 and June 15, 2018, "Goldman Sachs Made Millions in Malaysia. Now Malaysia Wants Some Money Back" and "Malaysia Plans to Seek Payback From Goldman," respectively.

---

[391] Jamie Smyth & Don Weinland, *Australia PM's son says Goldman sidelined him after 1MDB warnings*, Fin. Times (Mar. 8, 2018), https://www.ft.com/content/cb0fbf5c-2284-11e8-9a70-08f715791301.

354.     Goldman's statements identified in paragraph 352-53 that "*[w]e had no visibility into whether some of those funds may have been subsequently diverted to other purposes*" were materially false or misleading when made for the reasons set forth in paragraph 345.

355.     On June 22, 2018, *The Wall Street Journal* published an article titled "Malaysia's Tall Order: Trying to Recoup 1MDB Funds," which chronicled the Malaysian authorities' plans to, among other things, recoup the excessive fees paid to Goldman in connection with the 1MDB transactions. In response, Goldman rejected any notion that the lucrative fees it received were improper, stating:

> What we earned from the debt transactions reflected the risks we assumed at the time, specifically movement in credit spreads tied to specific bonds, hedging costs and underlying market conditions . . . . Comparisons to 'fees' from plain vanilla underwritings, which involve far less risk, are not relevant.

356.     Goldman's statements identified in paragraph 355 were materially false or misleading when made for the reasons set forth in paragraph 337.

357.     On July 30, 2018, *Bloomberg* published an article titled "1MDB Lawyer Who Worked With Goldman a Target in Swiss Probe," which again raised concerns and speculation about the use of 1MDB funds from the offerings underwritten by Goldman. In response, Naylor repeated the Company's prior denials:

> We had no visibility into whether some of those funds may have been subsequently diverted to other purposes by the issuer, members of the Malaysian Government or others.

358.     Goldman's statements identified in paragraph 357 were materially false or misleading when made for the reasons set forth in paragraph 345.

359.     In the same July 30, 2018, *Bloomberg* article, Goldman stated that the commissions of nearly $600 million it had received reflected "the risks we assumed at the time,

specifically movement in credit spreads tied to the specific bonds, hedging costs and underlying market conditions."

360.    Goldman's statements identified in paragraph 359 were materially false or misleading when made for the reasons set forth in paragraphs 337 and 342.

361.    On August 7, 2018, *The New York Times* published an article titled "Goldman Sachs is Said to Be Under U.S. Scrutiny in Malaysian Inquiry." In the article, Goldman spokesperson Michael DuVally once again rejected the notion of any wrongdoing by the Company, stating on behalf of Goldman that "Goldman Sachs had no visibility into whether some of the funds we helped raise for 1MDB may have been subsequently diverted to other purposes."

362.    Goldman's statement identified in paragraph 361 was materially false or misleading when made for the reasons set forth in paragraph 345.

363.    On November 1, 2018, Blankfein was interviewed by Andrew Ross Sorkin of *The New York Times* and *CNBC* at *The New York Times* DealBook Conference by Andrew Ross Sorkin of *The New York Times* and *CNBC*.

364.    During the interview, Sorkin asked Blankfein about the 1MDB "scam" and the two Goldman bankers who had been charged with money laundering. Sorkin pressed Blankfein asking "[t]here were reports though that … senior management, there were red flags on this beforehand. Fair?" Blankfein, trying to distance himself from the fraud stated, in part, "I am not aware of them."

365.    Defendant Blankfein's statement identified in paragraph 364 that he was "***not aware***" of red flags relating to the 1MDB fraud was materially false or misleading when made for the following reasons:

a.  Before, during, and after 1MDB's three offerings, Blankfein met with Low to discuss how Goldman could serve as investment bank to and generate fees from 1MDB. *All* of these meetings occurred *after* Goldman's own Global Compliance Department had flagged Low as someone with whom the bank should not do business or have a relationship. In November 2009, after Global Compliance had already rejected Low as a PWM client due to press coverage of his spending and his unexplained wealth, Blankfein met with Low, Leissner, and Najib, where the four specifically discussed Goldman serving as 1MDB's investment bank and laid the groundwork for Goldman's ensuing work for 1MDB. ¶¶ 126-28. Between the second and third 1MDB bond offerings, Blankfein met one-on-one with Low in late 2012. ¶ 213. In September 2013, Blankfein again met with Low, Leissner, and Najib in New York to discuss how Goldman could do more business with 1MDB. ¶¶ 251-52. As the *Harvard Law School Forum on Corporate Governance and Financial Regulation* observed, a meeting with Blankfein, one of the world's most powerful bankers, would come after only "the most rigorous background checks and due diligence." ¶ 214.

b.  Blankfein *personally reviewed and approved* each of the three 1MDB bond offerings despite a host of red flags arising from each deal's terms. ¶¶ 188, 205, 239. He was thus personally exposed to the following red flags, among others: the $600 million in fees awarded with no competing bids and naming Goldman as sole lead underwriter (¶¶ 155, 164, 177-79, 189, 192-93, 208, 216, 227); the speed and secrecy required by Low, Najib, and 1MDB when no business justification

explained these imperatives (¶¶ 173-74, 199, 220-22); the timing of the deals, with the second following immediately after the first (¶¶ 193, 201), and the third coming right before a heavily contested election (¶¶ 220-25); the unusually high yields on the bonds (¶¶ 175, 227); the fact that there was no stated purpose for nearly 50% of the funds raised by the first offering, 58% of the second offering, and 100% of the third offering (¶¶ 176, 200, 221); and the unusual, feeless guarantee from IPIC, whose director had a reputation (and had been sued) for demanding kickbacks (¶ 150).

c.  Malaysia was widely known as one of the most corrupt countries in the world in which to do business, where foreign companies doing business with the government "[had] to be aware that they're likely to be asked for a bribe. ¶ 80. Najib, who oversaw 1MDB and whom Blankfein and other Goldman executives repeatedly courted, was notoriously corrupt, with allegations of graft predating his premiership and growing exponentially after he became Prime Minister (¶¶ 83-85), resulting in mass street protests before the first offering even closed (¶¶ 183-84).

**B.  Materially False or Misleading Statements Regarding Goldman's Reputation, Integrity, and Compliance with Relevant Laws**

366.   Throughout the Class Period, Defendants made statements in Goldman's Annual Reports concerning Goldman's commitment to reputation, integrity, and complying with the letter and spirit of all applicable laws, and the Company's purportedly firm-wide "dedication" and "unswerving adherence" to ensuring appropriate business practices. These representations, which are listed below, took on heightened significance following Goldman's missteps before and during the financial crisis and its purported implementation of the BSC guidelines.

367.    In Goldman's Annual Reports for 2014 through 2017, Defendants made the following statements in a section titled "The Goldman Sachs Business Principles":

> Our assets are our people, capital and reputation. If any of these is ever diminished, the last is the most difficult to restore. We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard.
>
> * * * *
>
> Integrity and honesty are at the heart of our business.

368.    Defendants' statements identified in paragraph 367 were materially false or misleading when made for the following reasons:

a.    Leissner, Ng, and Vella approved the payment of bribes and kickbacks to foreign officials in connection with the first 1MDB bond offering. ¶¶ 152-53.

b.    Leissner has pleaded guilty to two counts of conspiracy to violate the FCPA and to commit money laundering, admitting that kickbacks were paid by 1MDB and/or Goldman to third parties in connection **with each 1MDB bond offering**. Leissner stated under oath at his plea hearing that "conceal[ing] facts from certain compliance and legal employees of Goldman Sachs" was "**very much in line of [Goldman's] culture**." ¶ 281.

c.    Goldman senior management and executives, including Cohn, pushed to "**monetize the state**," a strategy that encouraged Goldman bankers to manipulate the executives of sovereign wealth funds due to their relative lack of sophistication in order to generate maximum fees with little regard for how the funds actually performed for the investing countries. ¶ 62.

d.    Blankfein personally met with Low on three separate occasions despite the fact that compliance personnel in several departments had already rejected Low

multiple times as a Goldman client due to suspicions about where he had obtained his wealth. ¶¶ 126-27, 213, 251-52.

e.  In 2014, despite the myriad red flags Defendants disregarded to consummate the three 1MDB deals, Blankfein lauded Vella and Leissner's work with 1MDB: "***Look at what Tim and Andrea did in Malaysia. We have to do more of that***." ¶ 269.

f.  Goldman's senior management, including Cohn and Mark Schwartz, sidelined, overruled, and took adverse employment action against individuals within Goldman that questioned the 1MDB deals, including Ryan and Turnbull. ¶¶ 164-65, 167-68, 202-04, 230-31.

g.  Despite his role in facilitating the illicit 1MDB bond offerings, Goldman rewarded Leissner by making him one of the firm's most powerful bankers, elevating him to Chair of Southeast Asia, handing him a seat on the bank's elite Partnership Committee, and paying him an eight-figure compensation package in consideration for Leissner's work with Low and 1MDB. ¶¶ 209, 269. In 2012 alone, Leissner was rewarded with over $10 million in salary and bonuses, making him one of Goldman's top-paid bankers. Indeed, Leissner was promoted to Partner and the Head of Investment Banking for Southeast Asia even after he was caught passing information outside the firm without authorization. ¶ 108.

h.  Vella was twice promoted, eventually rising to Co-Head of Investment Banking in Asia (¶ 41), despite his role in the Libya affair, which resulted in an investigation by regulators into potential FCPA violations (¶ 73), and involvement in facilitating the 1MDB bond offerings.

i.   Hazem Shawki remained Co-Head of Investment Banking even after disregarding Global Compliance's rejection of Low as a PWM client in order to advise Low on and consummate the Costal Energy deal. ¶¶ 259-64.

j.   Goldman ignored its own outside counsel's concerns that 1MDB was utilizing tiny BSI to handle the massive offerings, which counsel believed was suspicious in and of itself. ¶¶ 236-37.

k.   Goldman permitted Leissner to operate without restraint as a Goldman Partner because he successfully originated lucrative business on its behalf. ¶¶ 106, 109. Leissner remained one of the firm's most powerful and well compensated bankers despite: (i) currying favor with the Malaysia government by arranging for the twenty-five-year-old daughter of Malaysia's U.S. ambassador to intern at Goldman—a move that could have exposed the firm to FCPA liability; and (ii) engaging in an affair with the same intern that was widely discussed within the firm. ¶ 108.

l.   Goldman's primary U.S. regulator, the Federal Reserve, was "critical of Goldman's vetting of the 1MDB deals, noting that they had posed reputational risk." ¶ 254.

369.   During a May 31, 2016 presentation at the Deutsche Bank Global Financial Services Investor Conference, Defendant Cohn touted the importance of reputation, identifying it as a "critical consideration[]" in all of Goldman's new business opportunities:

> While returns are important, there are other factors that we also consider in our assessment.
>
> Our business decisions aren't binary and management's judgment is crucial. We look at every transaction in the context of our broader client relationships. Our goal is to build strong, enduring relationships over time. ***Additionally, operational***

*and reputational risks are critical considerations when we evaluate new business opportunity*.

370.     Defendant Cohn's statements identified in paragraph 369 were materially false or misleading when made for the reasons set forth in paragraph 368. Moreover, in stark contrast to Cohn's representations, Goldman executives, including the Individual Defendants, reprimanded and/or silenced Goldman employees who raised alarms concerning Goldman's dealings with 1MDB and the risks posed by the relationship. ¶¶ 164-65, 167-68, 202-04, 230-31.

## VII.   LOSS CAUSATION

371.     As alleged herein, Defendants engaged in a scheme to deceive investors by misrepresenting and omitting material facts concerning: (i) the 1MDB deals and Low; and (ii) Goldman's reputation, integrity, and compliance with the law.

372.     Defendants' materially false or misleading statements and omissions of material fact alleged above in Section VI caused the price of Goldman's common stock to be artificially inflated and/or maintained artificial inflation in the price of Goldman common stock, and operated as a fraud or deceit upon Class Period purchasers of Goldman's common stock.

373.     Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the foreseeable risks, including, but not limited to, the risks of criminal investigation, prosecution, and related fines and penalties, created and concealed by Defendants' misstatements and omissions materialized through the disclosure of new information concerning the fraud alleged herein on at least November 9, 2018. As alleged in this Section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of Goldman common stock by removing portions of the artificial inflation in the price of Goldman common stock caused and/or maintained by the materially false or misleading statements alleged herein.

374.    After trading hours on November 8, 2018, the *Financial Times* reported in an article titled "Lloyd Blankfein Revelation Piles Pressure on Goldman Over 1MDB," that "[p]rosecutors believe that Mr. Low met on a second occasion with a senior Goldman executive in 2013 at a gathering that included the Malaysian PM and one of his family members."  The article reported "[a] person briefed on the matter said that the unnamed executive at the 2013 meeting detailed in the filing was Mr. Blankfein, although it expressed some doubt over whether Mr. Low was at that second meeting."

375.    On November 9, 2018, multiple news sources reported that Blankfein met with Low and Najib in 2013. For example, *The Wall Street Journal* reported in an article titled "Goldman Sachs's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal," that Blankfein met with Low and Najib in 2013, "after the Wall Street bank's compliance department had raised multiple concerns about [Low's] background and said that the bank shouldn't do business with him." As *The Wall Street Journal* revealed: "Mr. Leissner arranged for Mr. Najib, Malaysia's then prime minister, to sit down with around 20 high-level Goldman clients at New York's Mandarin Oriental hotel. Mr. Low attended with Mr. Najib."

376.    The information regarding Blankfein's 1MDB meeting in 2013 with Low and Najib was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misstatements and omissions. As a direct result of this partial corrective disclosure and/or materialization of the risks concealed by Defendants' fraud, the price of Goldman common stock declined by $9.00 per share, or approximately 3.89%, from a closing price of $231.65 per share on November 8, 2018, to a closing price of $222.65 per share on November 9, 2018. Goldman's stock price continued to decline in a statistically significant manner on the next trading day— Monday, November 12, 2018—by $16.60 per share, or approximately 7.46%, from a closing

price of $222.65 per share on November 9 to a closing price of $206.05 per share on November 12, 2018. This stock price decline was also (at least in substantial part) the direct result of the corrective disclosure and/or materialization of the risks concealed by Defendants' fraud described above.

377.    Market commentators following Goldman cited the announcement of Blankfein's meetings with Najib, Low, and Leissner in explaining the Company's share price decline. For example: (i) *Barron's* reported, in an article titled "DJ Goldman Sachs Stock Slumps as Cloud of 1MDB Fund Scandal Darkens," on November 12, 2018: "Investors seem to be growing more worried about the potential fallout from the multibillion-dollar 1MDB fraud scandal on Goldman Sachs G[r]oup, driving its shares down 11% over the last two sessions. Shares of Goldman (ticker: GS) tumbled 9% on Friday, ***following reports that Lloyd Blankfein, the firm's current chairman and former CEO, had twice attended meetings with the figure at the center of the scandal, Jho Low***," noting that Blankfein had stated earlier in the month that "the former Goldman bankers who had been charged 'evaded our safeguards, and lie, stuff like that's going to happen.'"; (ii) *Dow Jones Newswires* reported, in an article titled "Financials Down as Goldman Weighs – Financial Roundup," on November 12, 2018: "Shares of Goldman fell by more than 7%, the biggest loss in seven years, ***after reports late last week that current Chairman and former chief [executive] Lloyd Blankfein was present at meetings [with] Jho Low***, a man accused of corruption in deals involving Malaysia's 1MDB sovereign-wealth fund. Investors fear that the U.S. Justice Department will build a case showing that the investment bank was complicit in wrongdoing in the case"; and (iii) *Barron's* reported, in an article titled "Goldman Sachs in Malaysia: Chasing Growth and Catching Grief," on November 16, 2018: "Investors initially appeared to shrug off the charges [against Leissner and Low]. But Goldman's

stock tumbled last week when it was reported that Blankfein met with Low, Leissner, and the then-prime minister of Malaysia in 2009 and 2013. ***The bank's shares are down more than 12% since the news about Blankfein*** . . . . The issue going forward is what questions Goldman—and Blankfein, now the firm's chairman—asked and when. If Low was so important to Leissner's relationships with 1MDB and the former prime minister that he brought Blankfein along to meetings, did the bank seriously question whether it could do business with the Malaysian fund without exposing themselves to risks it knew Low posed?"

378.    Before market open on November 12, 2018, *Bloomberg* reported that the Malaysian government was seeking repayment of Goldman's $600 million in underwriting fees received from 1MDB. However, the stock price decline on November 12, 2018, described in paragraph 376 above, was not, and could not have been, all (or even mostly) the result of this information, given that it had been previously disclosed in June 2018 that the Malaysian government would seek the return of the $600 million in fees from Goldman. Rather, downward trading in Goldman stock throughout November 12, 2018 resulted from the market's escalating concerns about Goldman management's complicity in the 1MDB bond deals and shortcomings in Goldman's compliance function in the wake of the news contained in the November 9 article in *The Wall Street Journal*—concerns that went beyond the previously disclosed effort by the Malaysian government to seek the fee disgorgement of $600 million. For example, on November 13, 2018, Morningstar reported that concern over Goldman's complicity in the 1MDB fraud is "***[m]ore worrisome***" than the $600 million fee disgorgement. Oppenheimer made a similar observation in its November 14, 2018 research report: "Reputationally it is a disaster for Goldman, and the new government of Indonesia [*sic*] wants its $600M in fees back. The

ramifications, however, **go beyond that** because Goldman could be charged by regulators with 'a failure to supervise' these employees."

379.   A material portion of the decline in Goldman's common stock price on November 12, 2018 is thus attributable to the information in the November 9 *Wall Street Journal* article, as the stock price continued to decline in reaction to that information. Goldman's common stock price decline on November 12 resulted in an abnormal stock price return of $11.70 per share, as calculated by Plaintiff's damages expert, Joseph R. Mason, PhD. No more than a fraction of this abnormal return is attributable to the information regarding the Malaysian government's intent to seek the $600 million disgorgement reported by *Bloomberg*. In considering expectations about the direct impact of the $600 million disgorgement, the repeated disclosure of this news is, at most, responsible for $1.61 of the abnormal return (or $600 million divided by 372 million Goldman shares outstanding), as calculated by Dr. Mason.  Disaggregating the impact of $1.61 per share from the abnormal stock price return of $11.70 results in an impact of $10.09 per share on November 12, 2018 that is attributable to the fraud.

380.   Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Throughout the Class Period, the prices at which Lead Plaintiff and other Class members purchased or otherwise acquired Goldman common stock were artificially inflated as a result of Defendants' materially false or misleading statements and omissions of material fact identified herein at Section VI. Specifically, the material misrepresentations and omissions detailed above had the effect of causing the price of Goldman common stock to be artificially inflated and/or maintained artificial inflation in the price of Goldman common stock throughout the Class Period.

381.    Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Goldman common stock at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts and risks from the public would cause the prices of Goldman common stock to be artificially inflated or maintain artificial inflation in the price of Goldman common stock. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Goldman common stock to decline, as the inflation resulting from and/or maintained by Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the stock price. Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and to the other members of the Class who purchased or otherwise acquired Goldman common stock during the Class Period.

382.    In summary, the economic losses, i.e., damages, suffered by Lead Plaintiff and other Class members are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact, which caused the price of Goldman common stock to be artificially inflated and/or maintained artificial inflation in the price of Goldman common stock; and (ii) the subsequent significant decline in the price of Goldman common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized, removing portions of the artificial inflation from the price of Goldman common stock.

## VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

383.    At all relevant times, the market for Goldman's common stock was efficient for the following reasons, among others:

a.  Goldman's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market, under the ticker symbol "GS";

b.  As a registered and regulated issuer of securities, Goldman filed periodic public reports with the SEC, in addition to the Company's frequent voluntary public dissemination of information;

c.  Goldman regularly communicated with public investors via established market communication mechanisms, including conference calls, regular disseminations of press releases on the national circuits of major newswire services, the Company's website, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  Goldman was followed by securities analysts employed by major brokerage firms, including Credit Suisse, Deutsche Bank, Morningstar, Wells Fargo, and Barclays, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

384.    As a result of the foregoing, the market for Goldman common stock promptly digested current information with respect to Goldman from all publicly-available sources and reflected such information in the price of these securities. Under these circumstances, all purchasers of the Company's publicly-traded common stock during the Class Period suffered

similar injury through their purchases of Goldman common stock at artificially inflated prices, and a presumption of reliance applies.

385.    Further, at all relevant times, Lead Plaintiff and all other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Goldman's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

386.    The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

387.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

388.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants

were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

389.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Goldman who actually knew that the statement was false or misleading.

390.    Moreover, to the extent that Goldman or the Individual Defendants issued any disclosures purporting to "warn" or "caution" investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose that the risks that were the subject of such warnings had materialized or Goldman and the Individual Defendants had actual knowledge of undisclosed material adverse facts that rendered such purportedly "cautionary" disclosures materially false or misleading.

## X.    CLASS ACTION ALLEGATIONS

391.    Lead Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Goldman's common stock between October 29, 2014, and November 8, 2018, inclusive, and who were damaged thereby. Excluded from the Class are (i) Defendants (as set forth herein), (ii) present or former executive officers of Goldman, members of Goldman's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))), (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors or

assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Goldman.

392.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Goldman's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and could only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members in the proposed Class. During the Class Period, Goldman had approximately 379 million shares of common stock outstanding and available for trading on the NYSE. Record owners and other members of the Class may be identified from records maintained by Goldman and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

393.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Goldman's common stock during the Class Period at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of herein.

394.    Lead Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class action and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the interests of other Class members.

395.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in managing this litigation that would preclude maintaining it as a class action.

396.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether Defendants violated the federal securities laws through the acts alleged herein;

b.    Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

c.    Whether and to what extent the market prices of Goldman's common stock, were artificially inflated and/or distorted during the Class Period due to the misrepresentations or omissions of material facts complained of herein;

d.    Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

e.    Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or the *Affiliated Ute* presumption; and

f.    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

397.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of

the other Class members who are not parties to the adjudications or substantially impair their ability to protect their interests.

398.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XI.    CAUSES OF ACTION

<u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated<br>Thereunder Against Goldman and the Individual Defendants**

399.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought against Goldman and the Individual Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

400.    During the Class Period, Goldman and the Individual Defendants, while in possession of material adverse, non-public information, disseminated or approved the false or misleading statements or omissions alleged herein, which each defendant knew or recklessly disregarded were false or misleading in that they misrepresented material facts or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants carried out a plan, scheme, and course of conduct that: (i) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein, regarding the intrinsic value of Goldman's common stock; (ii) caused the price of Goldman common stock to be artificially inflated or maintained artificial inflation in the price of Goldman common stock; and (iii) caused Lead Plaintiff and other members of the Class to purchase Goldman's common stock at artificially inflated prices

that did not reflect their true value. In furtherance of this unlawful scheme, plan, and course of conduct, Goldman and the Individual Defendants took the actions set forth herein while using the means and instrumentalities of interstate commerce and the facilities of a national securities exchange.

401.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they, individually and in concert, directly and indirectly, knowingly or recklessly: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiff and other members of the Class in connection with their purchases of Goldman's common stock in an effort to maintain artificially high market prices during the Class Period for Goldman's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. As alleged herein, the material misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, materially false or misleading representations and omissions during the Class Period, as alleged here in Section VI.

402.    Defendants are liable for all materially false or misleading statements and omissions of material fact alleged above in Section VI. By virtue of their high-level positions at the Company during the Class Period, the Individual Defendants were authorized to make public statements, and made public statements during the Class Period on Goldman's behalf. The Individual Defendants were privy to and participated in the creation, development, and issuance of the materially false or misleading statements alleged herein, and they and the Company disseminated information to the investing public that they either knew, or were reckless in not knowing, was materially false or misleading.

403.   In addition to the duties of full disclosure imposed on Defendants as a result of making affirmative statements and reports to the investing public, Defendants also had a duty to disclose information required to update or correct their prior statements, misstatements, or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events. Further, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.

404.   Defendants' material misrepresentations or omissions were made knowingly, recklessly, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Goldman's common stock. By concealing material facts from investors, Defendants maintained artificially inflated prices for Goldman's common stock throughout the Class Period.

405.   As a result of the dissemination of the materially false or misleading information or failure to disclose material facts, as set forth above, the market price of Goldman's common stock was artificially inflated throughout the Class Period. In ignorance of the fact that market prices of Goldman's common stock were artificially inflated, and relying directly or indirectly on the false or misleading statements made by Goldman and the Individual Defendants or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Goldman and the Individual Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired

Goldman's common stock during the Class Period at artificially inflated prices and were damaged thereby.

406.    At the time of the material misrepresentations or omissions, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class known the truth underlying Defendants' materially false or misleading statements alleged herein and the intrinsic value of Goldman's common stock, Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Goldman's common stock at the artificially inflated prices that they paid.

407.    By virtue of the foregoing, Goldman and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their purchases and/or acquisitions of Goldman's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

408.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class.

409.    During the Class Period, each of the Individual Defendants was a controlling person of Goldman within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions at Goldman and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated

to the investing public, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff contends were materially false or misleading.

410.    Each of the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause Goldman to engage in the wrongful conduct complained of herein. In this regard, each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

411.    Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period, as alleged here in Section VI. Accordingly, each Individual Defendant was a culpable participant in the underlying violations of Section 10(b) alleged herein.

412.    As set forth above, Goldman violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Goldman and, as a result of their own aforementioned conduct, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Goldman is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and other members of the Class who

purchased or otherwise acquired Goldman's common stock during the Class Period at artificially inflated prices.

413.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of Goldman's common stock during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff hereby demands a trial by jury.

Dated: August 4, 2023                        Respectfully submitted,

                                             **KESSLER TOPAZ**
                                             **MELTZER & CHECK, LLP**

                                             *S/ Andrew L. Zivitz*
                                             Andrew L. Zivitz
                                             Matthew L. Mustokoff
                                             Johnston de F. Whitman, Jr.
                                             Jamie M. McCall

Margaret E. Mazzeo
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
jmccall@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com

*Lead Counsel for Sjunde AP-Fonden and the
Class*

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**

Salvatore J. Graziano
Rebecca E. Boone
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
sgraziano@blbglaw.com
rboone@glbglaw.com

*Liaison Counsel for the Class*

172

**APPENDIX A**

| DEFENDANT GOLDMAN'S SEC FILINGS AND ANNUAL REPORTS | | |
|---|---|---|
| **Term** | **Definition** | **Alleged False or Misleading Statements Issued by:** |
| 2014 Annual Report | Annual Report for 2014 (published April 10, 2015) | Goldman<br>Lloyd C. Blankfein<br>Gary D. Cohn |
| 2015 Annual Report | Annual Report for 2015 (published April 8, 2016) | Goldman<br>Lloyd C. Blankfein<br>Gary D. Cohn |
| 2016 Annual Report | Annual Report for 2016 (published March 16, 2017) | Goldman<br>Lloyd C. Blankfein |
| 2017 Annual Report | Annual Report for 2017 (published March 23, 2018) | Goldman<br>Lloyd C. Blankfein |