O2MQfon1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   SJUNDE AP-FONDEN, et al.
4               Plaintiffs
5          v.                          18 CV 12084 (VSB)(KHP)
6   THE GOLDMAN SACHS GROUP INC.
    et al.
7
                Defendants
8   ------------------------------x
9
10                                     New York, N.Y.
11                                     February 22, 2024
                                       10:00 a.m.
12  Before:
13                  HON. KATHARINE H. PARKER
14                                     Magistrate Judge
15
16
17                  APPEARANCES
18  KESSLER TOPAZ MELTZER & CHECK LLP
         Attorneys for Lead Plaintiff
19  MATTHEW L. MUSTOKOFF
    NATHAN HASIUK
20  ANDREW L. ZIVITZ
    NATHANIEL SIMON
21
22  BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
         Attorney for Lead Plaintiff
    SALVATORE J. GRAZIANO
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2MQfon1

1    APPEARANCES CONTINUED:

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Goldman Sachs
3    AUDRA J. SOLOWAY
     DANIEL J. TOAL
4    ROBERT Y. SPERLING
     STACI L. YABLON
5    ROBERT J. O'LOUGHLIN III
     GARRETT WEST
6        – AND –
          Attorneys for Defendant Blankfein
7    ANDREW J. EHRLICH
     KRISTINA A. BUNTING

8

9

10   MILBANK LLP
          Attorneys for Defendant Cohn
11   GRANT R. MAINLAND

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2MQfon1

```
 1              (In open court)
 2              DEPUTY CLERK:  Calling case 18 Civ. 12084, Plaut v.
 3    Goldman Sachs Group.
 4              Beginning with counsel for the plaintiffs, please make
 5    your appearance for the record.
 6              MR. MUSTOKOFF:  Good morning, your Honor.  Matthew
 7    Mustokoff of Kessler Topaz firm on behalf of lead plaintiff.
 8              MR. HASIUK:  Good morning, your Honor.  Nathan Hasiuk
 9    also of Kessler Topaz Meltzer & Check on behalf of the
10    plaintiff.
11              MR. SIMON:  Good morning, your Honor.
12              Nathaniel Simon from Kessler Topaz on behalf of
13    plaintiff.
14              MR. ZIVITZ:  Andy Zivitz from Kessler Topaz, also on
15    behalf of lead plaintiff.
16              MR. GRACIONE:  And Salvatore Graziano from Bernstein
17    Litowitz.  Good morning, your Honor.
18              DEPUTY CLERK:  Counsel for the defendants, please make
19    your appearance for the record.
20              MS. SOLOWAY:  Good morning, your Honor.  Audra Soloway
21    from Paul Weiss for Goldman Sachs.
22              MR. TOAL:  Good morning, your Honor.  Dan Toal from
23    Paul Weiss on behalf of Goldman Sachs.
24              MR. SPERLING:  Good morning, your Honor.  Bob Sperling
25    from Paul Weiss on behalf of Goldman Sachs.
```

O2MQfon1

1              MS. YABLON:  Good morning, your Honor.  Staci Yablon,

2    Paul Weiss fro Goldman Sachs.

3              MR. EHRLICH:  Good morning, your Honor.  Andrew

4    Ehrlich from Paul Weiss on behalf of defendant Lloyd Blankfein.

5              MR. MAINLAND:  Good morning, your Honor.  Grant

6    Mainland of Milbank LLP on behalf of defendant, Gary Cohn.

7              THE COURT:  Welcome everyone.

8              It looks like everybody is ready to go.  The first

9    thing on the schedule, I think, are opening arguments with

10   plaintiffs going first.

11             MR. MUSTOKOFF:  Thank you, your Honor.  We have a

12   slide presentation.

13             THE COURT:  Sure.

14             MR. MUSTOKOFF:  We do have a hard copy if the Court

15   would prefer.

16             THE COURT:  I can look at this, but a hard copy I can

17   maybe write on.

18             MR. MUSTOKOFF:  Your Honor, good morning.

19             Matthew Mustokoff, again on behalf of lead plaintiff

20   Sjunde AP-Fonden.

21             We are here on plaintiff's motion for class

22   certification today.  We submit that we satisfy all the

23   requirements of Rule 23.  Now, the defendants seek to rebut the

24   presumption of reliance by challenging price impact.  For the

25   next 20 minutes, I will preview why the defendants don't meet

O2MQfon1

 1    their burden.

 2            This is a case about Goldman's denials of wrongdoing

 3    in the London DB scandal, one of the largest financial frauds

 4    in recent memory your Honor.  This is not a case about generic

 5    statements or generic risk disclosures, such as the ones that

 6    were the subject of the *Arkansas Teachers* case.  This is a case

 7    about very specific denials of culpability in response to an

 8    unrelenting investigation by the international press for four

 9    years.

10            Judge Broderick noted this at the motion to dismiss

11    stage.  At Docket 102 he said, "During the class period

12    defendants downplayed not only their relationship with Low, but

13    Low's connection to 1MDB."

14            For four years, Goldman said, "We had no involvement

15    or no knowledge of the wrongdoing."  Jho Lo had no role in the

16    deals.  And to the extent that we, Goldman Sachs, did anything

17    wrong, it was the fault of two rogue bankers in the Southeast

18    Asia office.

19            The 1MDB statements were a constant stream of denials.

20    Each statement informed the market that Goldman had no

21    culpability with respect to 1MDB or Low, and that Goldman was

22    unaware of any red flags or corruption associated with Mr. Low

23    or 1MDB.

24            And when the news came out on November 8, 2018 that

25    Mr. Blankfein, the CEO of the bank, met with Low, a known

O2MQfon1

1    corruption risk, after the bank's compliance department had on

2    multiple occasions flagged him as a risk and as somebody that

3    the bank should not do business with, it called all of

4    Goldman's denials into question.

5            Judge Broderick said that this corrective disclosure

6    was "highly material to the scope of Blankfein and Goldman's

7    connection to Low and the 1MDB scandal."  That's at page 40 of

8    Docket 102.

9            The November 2018 disclosure on November 8 and 9 was

10   the first time in four years, your Honor, that Goldman stock

11   dropped on news of the scandal.  For two straight days, the

12   stock dropped in a statistically significant manner.

13           Now, why is that?  Because before November 8, the

14   market believed that this was all about two rogue employees in

15   Asia.  In fact, on November 1 when Leissner's guilty plea was

16   announced by the justice department, the market yawned.  There

17   was no stock reaction.  But once that news about Blankfein and

18   Low's meeting came out a week later, the market now understood

19   this is a Goldman Sachs problem.  It was no longer an issue of

20   two rogue bankers.  The market now understood that Goldman's

21   role in the scandal, its complicity with Low, and its business

22   dealings with Low went all the way to the top of the senior

23   levels of the bank.  This was the tipping point.

24           And in the two days following this news, Goldman's

25   stock price suffered its worst two-day decline in eight years.

O2MQfon1

1    And the *Financial Press* attributed this decline to the

2    Blankfein-Low news.

3              I direct your attention to the first slide.  Now,

4    there's many examples of this which we'll see today, but these

5    two pieces of commentary right here, they really tell the whole

6    story.  For the first time since the scandal began, investors

7    now feared that the DOJ would bring a case against Goldman, and

8    they were concerned that there was going to be a showing that

9    Goldman was complicit in the wrongdoing.  The *Barron's* article,

10   which is the second article, that provides the context.

11   Initially, investors, they shrugged off the charges against

12   Mr. Leissner.  But when the market learned that Low had met

13   with Blankfein, even after the compliance department had raised

14   the multiple red flags, the market punished Goldman Sachs

15   stock.

16              THE COURT:  Can I ask you --

17              MR. MUSTOKOFF:  Yes.

18              THE COURT:  -- a question?  Because in the briefing,

19   Goldman points to analysts' reports after the disclosure of the

20   2013 Blankfein-Low meeting, and says those reports really

21   didn't discuss 1MDB or the meeting.

22              What is your position on the qualitative weight of

23   news articles versus analysts' reports in assessing whether

24   plaintiffs have met their burden of showing price impact or,

25   alternatively, whether defendants have met their burden on

O2MQfon1

1    rebuttal?

2            MR. MUSTOKOFF:  You're going to hear Dr. Mason talk

3    about that today.  Generally, the press reports the news,

4    right?  Analysts don't typically repeat the news.  Analysts

5    talk about the economic implications of the news.  In fact, I

6    do have a slide on this.  I wasn't going to get to this until

7    later, but we're here, so...

8            This is important, your Honor.  Before the November 8

9    and 9 disclosure, there were only 14 analyst reports during the

10   entire class period that even mentioned 1MDB, okay?  But in the

11   three months after the disclosure, there's 72 analyst reports

12   between November 9, 2018 and January 31, 2019.  And before the

13   disclosure, all the analysts are saying, well, there's no

14   indication Goldman did anything wrong.  After the Blankfein

15   news, everything changes.

16           Here are three examples.  There was an analyst from

17   Barclay's that talked about the meetings.  And then the two

18   other bullets right there, your Honor, those are just two of

19   many examples where after the Blankfein news comes out, the

20   analysts, they change their outlook.  They downgrade the stock.

21   We submit that was -- but for the Low-Blankfein news, which,

22   again, was the tipping point here, the analysts wouldn't have

23   changed their outlook.

24           And I'll also make the other point, your Honor.

25   There's two cases in this district, the *Perlstein* case by Judge

O2MQfon1

1    McMahon, and the *Chicago Bridge* case by Judge Scheindlin.  in

2    both of those cases, the judges said the presence or absence of

3    analysts' commentary is not a scientific basis.  And so there

4    were analysts that discuss the meetings, and there were several

5    more that discussed the change in the outlook.

6            So you're going to hear the testimony of Mr. Mason,

7    Dr. Mason, I should say.  And he substantiates that the

8    Blankfein-Low news moved the stock.  You're going to see the

9    market commentary before the corrective disclosure, in the

10   corrective disclosure itself, and after the corrective

11   disclosure that discussed Goldman's statements and denials.

12   And this is exactly the type of evidence, your Honor, that was

13   absent in *Arkansas Teachers*.  The Second Circuit made a point

14   of that, that there was no commentary discussing the

15   statements.  That is hardly the case here.

16           Now, before we hear the evidence today, I want to

17   spend a few minutes on the law.  I want to spend a few minutes

18   on the legal framework that the Court must abide by.  I want to

19   be clear about what *Arkansas Teachers* says and what it doesn't

20   say.  I want to point out two decisive passages from the Second

21   Circuit's decision, which I submit should serve as guideposts

22   for today's discussion.

23           First, ATRS says that the match between the

24   misstatement and the disclosure need not be precise.  I can't

25   emphasize that enough.  The Second Circuit has made clear, you

O2MQfon1

1    don't need a mirror image between the statement and the

2    disclosure.

3            The Second Circuit gives the example of *Vivendi*.  In

4    *Arkansas Teachers*, they call it the classic price maintenance

5    case.  Now, in *Vivendi* it was a case about -- *Vivendi* was

6    misrepresenting their liquidity situation.  So they were making

7    false statements like "our liquidity is great.  We're in good

8    condition."  The corrective disclosures were events that

9    constructively revealed the fraud.  For example, there was an

10   announcement that *Vivendi* had sold one of its subsidiaries.

11   There was an announcement that *Vivendi* had sold a hundred

12   million shares of its treasury shares, and the market

13   understood these purchase events as corrective.  When they saw

14   *Vivendi* was selling off its assets, they realized the

15   representations about the cushy liquidity were false.  And as

16   we'll see today, the match here is equal, if not greater than

17   it was, in *Vivendi*.

18           THE COURT:  Didn't Judge Broderick say in his earlier

19   motion to dismiss that it was -- I think he used the word

20   partial disclosure or partially revelatory.  I don't know the

21   extent to -- what is your view on the extent to which that goes

22   to the sliding scale on the mismatch analysis -- or the match

23   analysis.

24           MR. MUSTOKOFF:  Yeah, I don't think that has any

25   import here.  The fact that there were other corrective

O2MQfon1

1    disclosures that were dismissed from the case, some were

2    dismissed by Judge Broderick.  One was dismissed voluntarily on

3    our part.  I don't think that has any import here.  The burden

4    that defendants have to meet, they have to show a complete lack

5    of price impact.  That means not a little bit.  None.

6         And so we submit there was -- there's plenty of

7    evidence of price impact, back-end price impact on both the 9th

8    and the 12th, which we'll get to.  So the fact there were other

9    corrective disclosures in the case doesn't -- there's been

10   plenty of cases that have been certified on one corrective

11   disclosure.

12        THE COURT:  How does the court evaluate price impact

13   if there is a partial match and not a full match?  What is your

14   position on that?  Is the analysis qualitative as well as

15   quantitative?

16        MR. MUSTOKOFF:  I think it's mainly qualitative.  And

17   as I said in my opening remarks, the news of the meeting

18   about -- the news of the meeting with Blankfein and Low, it

19   upended all the denials for four years.  They're telling the

20   market, there's nothing to see here.  We did nothing wrong.  If

21   there was any wrongdoing, it's all Leissner's fault and Roger

22   Ng's fault.  We knew nothing about this stuff.

23        When the market learns that Mr. Blankfein had met with

24   Low on multiple occasions, including the 2013 meeting after

25   Goldman had made $600 million on these illicit deals, after the

O2MQfon1

1   compliance department had raised these red flags -- and that's

2   something that -- we're going to get to the corrective in a

3   minute, but that's something that is expressly noted in the

4   *Wall Street Journal* report on November 9.

5           THE COURT:  Right.  I don't know that you fully

6   answered my question.  So the Second Circuit in its decision in

7   *Arkansas Teachers* talked about the genericness and the mismatch

8   inquiries going to the value of the back-end price drop, and as

9   indirect evidence of the front-end inflation maintaining price

10  impact, right?  That's the calculus.

11          And so hypothetically -- I know your position is that

12  it's a very close match; that the back-end statement is a close

13  match to the front-end statements -- but hypothetically if the

14  match were, let's just say 50 percent.  There's a 50 percent

15  match, say that.  How does that impact the analysis of the

16  back-end price drop?

17          MR. MUSTOKOFF:  Your Honor --

18          THE COURT:  What is the test for that?

19          MR. MUSTOKOFF:  Respectfully, I've never seen a

20  decision that talks about price impact in a quantitative

21  manner.  I just haven't seen it.

22          THE COURT:  Right.  Neither have I.  That's why I'm

23  asking you because there's a sliding scale on the match

24  according to the case law.

25          MR. MUSTOKOFF:  There certainly is a sliding scale,

O2MQfon1

1   but, again, I would say here the match is about as close as

2   you're going to get.  If you allow me, I can walk through the

3   evidence.

4          The second point that *Arkansas Teachers* makes -- the

5   first point is you don't need a precise match.  The second

6   point is corrective disclosure is not required to expressly

7   recant or reference the alleged misstatements.

8          Now, in this case, the false statements are referenced

9   in the corrective disclosure.

10          THE COURT:  You can just tell me which page you want

11   to go to.  I have it on paper.

12          MR. MUSTOKOFF:  Your Honor, if you could turn to

13   slide -- fixed.  Okay, great.  This is slide 5.

14          These are quotes from the November 8 *Financial Times*

15   report and the November 9 *Wall Street Journal* report.  Together

16   these collectively comprise the corrective disclosure.  If you

17   look at first and third bullets up there, Goldman has always

18   maintained it didn't know how the proceeds of the bond

19   offerings were spent.  The bank has said it couldn't have known

20   what would happen to the money it raised.  Those are the

21   diverted fund misstatements.  They're right there in the

22   corrective disclosure.

23          If you look at the second bullet, the very fact that

24   Blankfein and Low met could complicate the bank's attempts to

25   prove that it did not know that Low was involved as a middleman

O2MQfon1

1    in the 1MDB deals.  Respectfully, your Honor, that tracks

2    Goldman's false statement on November 22, 2016 when they told

3    the market "We have no evidence of Low's involvement."

4         So I would submit, given that the corrective

5    disclosure makes explicit reference to the statements, much of

6    the heightened inquiry in *Arkansas Teachers*, your Honor doesn't

7    even need to get there.

8         *I'm skipping ahead a little bit here, but this is --*

9    *the last section of Arkansas Teachers* is a section called

10   Guidance Moving Forward, I believe.  This is what they say.

11   They say there's three circumstances, and it's conjunctive, not

12   disjunctive.  So they say there's three circumstances that must

13   be present to trigger the sort of heightened inquiry.  You need

14   a considerable gap in front-end-back-end genericness.  You need

15   a situation where the corrective disclosure does not directly

16   refer, as it did in the *Waggoner* case, to the alleged

17   misstatement.  And, three, the plaintiff claims — as plaintiffs

18   claims in Arkansas Teachers — that a company's generic-risk

19   disclosure was misleading.  I submit, none of these

20   circumstances apply here.

21        If you go back to slide three, these statements, these

22   were nothing like the statements in *Arkansas Teachers*.  In

23   *Arkansas Teachers*, the statements were generic boilerplate

24   statements like "We're committed to integrity" or "Conflicts of

25   interest could destroy our business."  These were very, very

O2MQfon1

1    specific responses.  This is the testimony of the heads of

2    Goldman's press office, Mr. Naylor and Mr. DuVally.  They sat

3    around and contemplated the responses to these questions, and

4    the market understood the statements as denials.  Goldman has

5    consistently said it did nothing wrong; had no way of knowing

6    there was fraud.  This is what the press was saying for four

7    years.  You don't see anything like this in *Arkansas Teachers*.

8            Your Honor, just to address a question you had a few

9    minutes ago about the partial disclosure.  Partial means

10   something else.  When we talk about partial disclosures in a

11   securities case, you're generally talking about a series of

12   disclosures.  So in some cases you can have as many as five,

13   six, seven, ten disclosures.  There's other cases where there's

14   one disclosure, which is the case here.  I think we're mixing

15   apples and oranges, respectively, in terms of concepts.

16           In terms of a match, there is a match between the

17   corrective and the statements, so I don't know if that clears

18   it up, but that's sort of how I conceptualize your question.

19           When the Blankfein -- so we went through this slide.

20   When the Blankfein-Low news comes out on November 8 and

21   November 9, all of a sudden the market is questioning all of

22   these denials of complicity.  For the first time the market is

23   expressing concern that Goldman was complicit with Low.  As

24   noted by the Dow Jones "And that the firm's leaders would now

25   get dragged into the case," as noted by the *New York Times*.

O2MQfon1

1    You didn't see any of this commentary before the news of

2    Blankfein.

3          And we submit this evidence satisfies *Arkansas*

4    *Teachers*.  It's the kind of evidence described by the Second

5    Circuit.  If you look at footnote 14 of *Arkansas Teachers*,

6    that's where the court talks about the type of evidence that

7    might satisfy the test here.  "Evidence that the media and

8    market participants made the connection between the revelations

9    and the allegations of wrongdoing."

10          Now, defendants in their expert Dr. Kothari, they make

11   several unavailing arguments.  First they say the defendants --

12   sorry, strike that.

13          First, the defendants argue that the truth regarding

14   Goldman's complicity was known before November 8 and 9.  Now as

15   an initial matter, *Arkansas Teachers* says this truthful

16   substitutes formula applies only where the corrective

17   disclosure does not reference the alleged misstatements.  And

18   as we just saw, that is not the situation here.

19          But putting that aside, the market didn't know that

20   Goldman was complicit and that its complicity rose to the

21   highest levels of the bank before the disclosure.  Nobody knew

22   before November 8 and 9 that Blankfein met with Low to discuss

23   1MDB business in spite of the repeated warnings, and none of

24   the reports that Dr. Kothari points to disclose that.

25          In addition, your Honor — this is very important — the

O2MQfon1

1    defendant's argument about truthful substitutes, it completely,

2    completely ignores their repeated denials of wrongdoing.

3    23 percent of the articles that Dr. Kothari cites to either

4    contained or reprinted the misstatements or they made clear

5    that Goldman had not been implicated in the wrongdoing.

6    23 percent of the articles.  That's nearly a quarter.  This

7    extinguishes their truthful substitutes argument.

8            As the Second Circuit in the *Ganino* case said, and as

9    Judge Broderick held in this case:  "If the defendant's false

10   statements or denials are counteracting or downplaying the

11   truthful information so as to keep the stock price maintained,

12   it can't be said that the truth was known or fully understood

13   by the market."  That's the *Ganino* case, 228 F.3d 167.  And

14   Judge Broderick says it himself in the motion to dismiss

15   opinion.

16           Now, Dr. Kothari also says that the stock price didn't

17   decline in a statistically significant manner until the

18   afternoon of November 9.  But the law does not require an

19   immediate stock price reaction.  If we go to slide 8, those are

20   the words of Justice Blackman up on the screen.

21           THE COURT:  All right.  I just want to be mindful of

22   the time.  So technically 20 minutes is up.  Why don't you--

23           MR. MUSTOKOFF:  I'll wrap up very quickly.

24           This is important.  "The law doesn't require immediate

25   reaction."  Supreme Court said that there's no bright-line test

O2MQfon1

1    for stock price reaction.  We cite two cases from the Second

2    Circuit in our brief, and both of these cases, your Honor, in

3    the *Carpenters* case and the *Alexion* case, it took over 24 hours

4    for the stock price to react after the corrective disclosure.

5    And in both cases, the court found there was price impact and

6    that the delayed reaction didn't mean that the market was

7    inefficient.

8          One last point, your Honor.  Just a very quick word

9    about November 12 because we have two stock drops here.

10          THE COURT:  Right.

11          MR. MUSTOKOFF:  As I said before, the defendant's

12    burden to rebut the presumption is to show no price impact.

13    Zero.  And because we will show price impact with respect to

14    November 9, your Honor doesn't needs to reach November 12.  The

15    Court does not need to reach the question of November 12 for

16    purposes of class certification.  It does not have any impact.

17          The question of how long the price reaction endured,

18    did it end on November 9 or did it continue to November 12,

19    that's a damages question for the jury, your Honor.  Once

20    there's a finding that there was price impact from the

21    November 9 drop, there's price impact.  But, regardless,

22    Dr. Mason explains how under the facts of this case, the

23    evidence supports a finding that Goldman stock price reacted

24    for two trading days after the news of Blankfein.  Just very

25    quickly, he offers three reasons why a two-day window was

O2MQfon1

1    appropriate here.  It was a statistically significant reaction

2    for two straight days, and the *Financial Press*, as we saw,

3    linked the decline expressly to the corrective disclosure.

4            Second — and we'll see it in the commentary — the

5    market engaged in a substantial re-evaluation of Goldman stock.

6    It didn't end on November 9.  It continued on to November 12.

7    The example up there, the Dow Jones on the 12th is talking

8    about the DOJ bringing a case.

9            And then, finally, momentum trading by investors at

10   the end of the trading day.  You'll hear from Dr. Mason, this

11   is a very typical thing in the markets.  Momentum builds

12   throughout the day.  He cites academic literature to support

13   that.

14           And so while your Honor doesn't need to reach the

15   issue of November 12, there's compelling evidence as to why the

16   stock drop continued for two straight days.

17           Thank you.

18           THE COURT:  Thank you.

19           MS. SOLOWAY:  Your Honor, would you mind if we

20   approached to hand up a copy of our slides as well.  I should

21   have introduced Randall Carter, who is operating the equipment

22   today.

23           Your Honor, the Supreme Court and the Second Circuit

24   have made very clear what is required to certify a class in a

25   maintenance case like this one.  If the plaintiff contends that

O2MQfon1

1    a back-end drop is the measure for front-end inflation, there

2    has to be a match or tight fit between the front-end and the

3    back-end.  You need evidence that stock price is actually being

4    propped up, and you need evidence on the back-end that the

5    corrective disclosure costs had declined.

6            As we're going to show for the next 20 minutes, your

7    Honor, the plaintiff here has not done any of these things.

8    The plaintiff's arguments, we think, misapply the law, ignore

9    voluminous and significant public information that undermines

10   their theory, and ignore basic principles of market efficiency,

11   as well, your Honor, as common sense, which the Supreme Court

12   did say we should apply.

13           So, your Honor, if we could turn to slide two, this is

14   sort of my roadmap for this morning.  I want to start by

15   talking about the question, the legal question, of match or

16   tight fit.  And I think the starting place here is to really

17   look at the statements that are left in this case and really

18   look at the corrective disclosure.  They just do not have the

19   kind of tight fit or they don't speak to each other in the way

20   that the Supreme Court decision and the Second Circuit decision

21   require.

22           THE COURT:  Well, I would like you to specifically

23   address it with respect to the comments that plaintiff's

24   counsel focused on:  The front-end misstatement, particularly

25   the one that Goldman had no idea that Low was involved in 1MDB

O2MQfon1

1  because that's what they focused on in their opening.

2           MS. SOLOWAY:  Understood, your Honor.  I'm actually

3  going to walk through each of the four categories and we are

4  going to talk about them individually.  And then, your Honor,

5  I'm going to move to the second question before the Court,

6  which is:  What is the economic evidence here that the stock

7  price was actually being propped up?  I heard from the

8  plaintiffs that there are press reports that, you know,

9  repeated Goldman's statements.  But as we're going to show —

10  and as our expert is going to walk you through today — press

11  reports that simply repeat the statements or actually publish

12  Goldman's statements as they come from Goldman are not

13  sufficient here.

14           The fact that no analyst across a four-year period so

15  much as mention these alleged misstatements is enormously

16  impactful evidence.  And I think I heard the plaintiffs say,

17  well, the press reports the news and analysts talk about what's

18  value relevant.  Exactly.  They talk about what's value

19  relevant.  And we're going to explain why that, among much

20  other evidence, demonstrates that there's no propping-up effect

21  going on here.

22           THE COURT:  What I'm hearing from you is you believe

23  stock analyst reports have more evidentiary weight than news

24  reporting.

25           MS. SOLOWAY:  Absolutely.  Absolutely.  I think

O2MQfon1

1    there's a couple of problems with the news reports, your Honor.

2              One problem is, look, one -- no one here is going to

3    deny 1MDB was a big deal; it was getting a lot of discussion.

4    The problem, of course, with the plaintiff is that they have

5    now cherrypicked what's the back-end?  What's important?  Your

6    Honor, I brought this to show, there's an entire book published

7    before the alleged corrective disclosure filled with details

8    about 1MDB, Jho Lo, Goldman Sachs.

9              THE COURT:  Where in the book does it say that Goldman

10   was culpable as an institution; that Blankfein-level executives

11   were aware of Low's involvement with 1MDB?

12             MS. SOLOWAY:  Well, we'll go through this again

13   chapter and verse, your Honor, but the book comes out in

14   September, comes out a couple days before the corrective

15   disclosure, and it goes into details about Low and Leissner

16   meeting, so the suggestion that the market didn't know that --

17   let me back up.  Leissner, of course, is the chair of Goldman's

18   Southeast Asia office, right?  So, Tim Leissner, the chair of

19   Goldman's Southeast Asia office, is having meetings with

20   Jho Lo; that comes out in the book of September of 2018.

21   That's come out in news articles even before that.

22             THE COURT:  Right.  But what plaintiffs are saying is

23   that that's the rogue employee narrative; that Goldman

24   propagated a narrative that Leissner hid everything from

25   compliance and legal such that the high executives back in New

O2MQfon1

1    York could say, well, we don't know.

2         MS. SOLOWAY:  That is the plaintiff's argument, and

3    actually this goes back to the problem with the press articles.

4    When I go through the plaintiff's press articles, and I sat and

5    read them cover to cover, they do a few things.  Some of the

6    articles report on the alleged misstatements themselves.  So

7    they give the Goldman statement.  Some of them, as we get later

8    in the class period, harken back to Goldman's alleged — what

9    plaintiffs are calling their — denials, but they actually

10   contrast them to Mr. Leissner's guilty plea.

11        So the press isn't making a connection between the

12   2013 client event.  They're making a connection between

13   Leissner's guilty plea and the alleged misstatements.  This, if

14   anything, undermines the plaintiff's argument that there's a

15   link, a front-end-back-end match.  And so we're going to go

16   through that as well.

17        And then the other thing, this rogue employee

18   narrative, that's something that doesn't even come out until

19   Leissner's guilty plea is unsealed.  If you go back, your

20   Honor, and you look at the articles about the rogue employee

21   narrative, what they're actually talking about are comments

22   that Goldman makes immediately following the guilty plea of Tim

23   Leissner.  They're not alleged to be false in this case.

24   They're not the alleged misstatements.  So I think these press

25   articles are a lot of smoke and mirrors.  And, most

O2MQfon1

1    importantly, the fact that there is no analyst commentary is a

2    very, very significant fact.

3         So, your Honor, let me just in the interest of time

4    try to get to the match question because I think that's a

5    really important one to cover this morning.

6         So, Randall, if I could ask you to turn to four.

7    Thank you.

8         Your Honor, of course, this is the language from the

9    Goldman Sachs decision that talks about how the -- if there's a

10   mismatch in the front-end and the back-end, this inference that

11   the back-end is a way to measure the front-end just falls

12   apart, right?

13        THE COURT:  But what is your position on if there's a

14   partial match, there's a sliding scale, and so hypothetically

15   let's say there's a 50 percent match — I'm going to ask you

16   this question too — what does that mean quantitatively, if

17   anything, as to the back-end price drop?

18        MS. SOLOWAY:  I think I have two answers for you on

19   that, your Honor.

20        When you've alluded to Judge Broderick's ruling on the

21   2013 client event being a partial corrective disclosure, I

22   think -- although I actually don't think that ruling applies

23   here because, of course, it was issued before *Arkansas Teachers*

24   even came out, and it's about loss causation, which the Second

25   Circuit has now said is a different standard.  But even in that

O2MQfon1

1   decision, the judge only tied the client event to certain of

2   the front-end statements.  And so to the extent it's partial in

3   that respect, I actually think for the categories that Judge

4   Broderick wasn't talking about, things, for example, like fees

5   and commissions that he never tied, I think that's a real

6   problem for the plaintiffs because I think what *Arkansas*

7   *Teachers* tells us is you have to go statement by statement,

8   right?  The Second Circuit walked methodically through the

9   alleged misstatements in that case, and it looked at each of

10   them, and then it looked at whether there was a match.  So I

11   think we have to do that here.

12        I think *Arkansas Teachers* also tells us what to do

13   about the question you just asked, which is, what happens if

14   there's some overlap, but it's not compelling, right?  Or

15   certainly, it's not -- you'll recall that the Second Circuit

16   walks through the *Waggoner-Vivendi-Goldman* trio.  *Waggoner* is

17   the case where you've got — I'm going to use the word sort of

18   mirror image or sort of an exact correction.  You said X.  The

19   corrective disclosure is, oh, I said X?  It's not X, right?

20   That's *Waggoner*.  That's when the statements have a tight fit.

21   They're just a hundred percent on all fours with each other.

22        But the court says, and it applies *Vivendi* to say,

23   well, sometimes you're not going to have the statement

24   expressly reference back.  The correction may not expressly

25   reference back.  So what do we do in that situation?  Well, we

O2MQfon1

1    have to look and we have to see, does it directly render false

2    the front-end statement.  And here, your Honor, we would

3    respectfully submit that none of them do.  But even if we were

4    to get -- again, I'm going to go through each of the statements

5    themselves, but even if you found, for example, for one

6    category of alleged — misstatements, and the plaintiffs have

7    picked on the Jho Lo's involvement statement — you would still

8    need to do all of the analysis.  Following the mismatch

9    argument, you would then have to look at whether that

10   statement, in particular, is there economic evidence that it

11   was propping up the stock price?

12          So, your Honor, just -- let's do that analysis, but

13   before we get there, I think it's really important to point

14   out -- Randall, if you wouldn't mind flipping to slide five,

15   please.

16          I think it's really important to focus on what's

17   actually new here, right?  The alleged corrective disclosure,

18   we kind of have to set the scene for that.  Before the alleged

19   corrective disclosure comes out, there is a lot of public

20   information about high-ranking executives meeting with Low,

21   and, in fact, Blankfein meeting with Low, and we're going to

22   walk --

23          THE COURT:  Well, the Blankfein meeting with Low that

24   had been disclosed previously was the 2009 meeting.

25          MS. SOLOWAY:  That's correct, your Honor.  That's

O2MQfon1

1    correct.  And there was no stock price drop.

2              THE COURT:  But there was no bond deal either.

3              MS. SOLOWAY:  Well, the two meetings are at different

4    times, but the 2009 meeting is described as the meeting that

5    was the precursor that laid the groundwork for the bond

6    offerings.

7              The fact that the market has absolutely no reaction to

8    a meeting between Blankfein and Low that purportedly laid the

9    ground work for the deal, zero reaction.  It fundamentally

10   undermines the notion that the 2013 meeting, which, by the way,

11   wasn't even a meeting.  It's a client event where the prime

12   minister of Malaysia is speaking to 20 high-net-worth Goldman

13   clients and Low purportedly is in attendance.

14             THE COURT:  Aren't you downplaying that a little bit?

15   In the *Billion Dollar Whale*, it says Blankfein himself was

16   involved in organizing that meeting.

17             MS. SOLOWAY:  Well, first of all, I don't know that

18   Blankfein himself was involved in organizing the meeting, but--

19             THE COURT:  He may not have been as a factual matter,

20   but isn't that what's said in the *Billion Dollar Whale*?

21             MS. SOLOWAY:  I would think, your Honor, CEO's arrange

22   to have prime ministers speak to -- or like government

23   politicians, like important people speak to high-net-worth

24   clients.  The part that the plaintiffs are seizing on this

25   purportedly corrective isn't that Najib and Blankfein had a

O2MQfon1

1    meeting with 20 people.  It's that Low was purportedly was in

2    attendance.

3              THE COURT:  Right.

4              MS. SOLOWAY:  But we already know that they were at a

5    meeting together previously, and there's no reaction.  So, your

6    Honor, I think what we have to focus on first is what is this

7    tiny granule of new information?  The market already new about

8    high-ranking executive meetings.  It already knew that Low and

9    Blankfein had met.  And it already knew there was a 2013

10   meeting with a high-ranking Goldman executive, which could only

11   be a small number of people.  So this new granule of

12   information is that Blankfein was the person that happened to

13   be at that 2013 client event.  So that's the new piece of

14   information.  So I think we start by matching that against the

15   statements themselves.

16             So if we could walk through --

17             THE COURT:  Can I just stop you one more time because

18   you say there was lots of news that high-ranking officials met

19   with Low.

20             MS. SOLOWAY:  That's right.

21             THE COURT:  And knew what was going on that would

22   reveal to the market that the truth prior to this the

23   corrective disclosure that the plaintiffs are pointing to.  So

24   is it your position that other high-level executives who could

25   bind the company, their knowledge essentially is it's -- their

O2MQfon1

1    knowledge of Low's involvement is equivalent to Blankfein's

2    meeting with Low and his knowledge of Low's involvement for

3    purposes of impacting the stock price?

4            MS. SOLOWAY:  So I'm not making a merits argument,

5    your Honor.  What I'm doing is I'm saying we have to look at

6    the economic evidence that information is important to the

7    market.  And if we look at other very similar information

8    coming out, and we'll show you a couple of articles, big

9    headlines, high-ranking Goldman --

10           THE COURT:  Right, but that does go to the class

11   certification question because you're saying that disclosures

12   that high-ranking executives knew is corrective, essentially

13   before -- and happened before the disclosure of the 2013

14   Blankfein-Low meeting.

15           MS. SOLOWAY:  And that may well be, your Honor, but

16   what we are really trying to get at is the fact that when you

17   have all of these announcements of high-ranking Goldman

18   executives meeting with Low, with Najib, and you see no stock

19   price reaction, it fundamentally undermines the premise that

20   the 2013 meeting caused the stock price reaction.  So we'll get

21   to that because that's the back-end piece of this.

22           But I'm sure you know from the papers there's an

23   extremely long delay for an efficient market to take 15 hour —

24   we'll go through this, your Honor, in this case — to

25   incorporate new information, you're going to hear testimony

O2MQfon1

1    from our financial economist expert, that doesn't happen in an

2    efficient market.  And so this evidence that other meetings

3    came out and the stock price went uh, nothing, that means that

4    the 2013 meeting was likely a big nothing too, which is

5    corroborated by the timing of the stock price decline.

6          THE COURT:  There is no bright-line rule that the

7    stock has to react in any specific amount of time.

8          MS. SOLOWAY:  Well, is there a bright-line legal rule?

9    I don't think there's a bright-line legal rule.  In economics

10   though, that's another matter and we'll hear from the

11   economists today.  But even the plaintiff's expert admits that

12   the stock price would begin to react here at the market open on

13   November 9 because the information had come out on the 8th

14   between the time when the market closed and when the market

15   opened.  So the fact that you do not see an impact at the

16   market open on the 9th, all the economists agree it should have

17   been incorporated beginning at the opening, and we see

18   nothing--

19         THE COURT:  Well, the plaintiff's expert says there

20   was a ten percent confidence level as opposed to the

21   five percent confidence level.

22         MS. SOLOWAY:  We'll talk about that with the experts,

23   your Honor, but that is essentially trying to like adjust the

24   target after you've already, you know, taken the shot, right?

25   That's not the standard that academic experts use.  It's not

O2MQfon1

1    the standard used in studies, and it wouldn't even help the

2    plaintiffs in this case because you can only even say that

3    about that first period from the close the day before until 15

4    minutes after.  15 minutes into the day, it's nowhere near that

5    confidence interval, up until 3:00.  So unless the plaintiffs

6    want to base their theory on a -- that ten-percent interval for

7    15 minutes, and they want to put all their eggs in that basket,

8    that actually doesn't get them anywhere because as the day goes

9    on, the interval is plainly not statistically significant under

10   any of these standards, whether you use the more permissive one

11   or less permissive one.  And we'll go through that with our

12   expert today.

13          I know I'm sort of on limited time here, but I want to

14   get through this matching analysis.

15          Randall, if you could bring us to slide six.

16          This goes to the partial corrective disclosure point

17   as well, your Honor.  The statement here is that Goldman is

18   allegedly making misstatements that the fees and commissions

19   for which it was paid reflected the underwriting risks it

20   assumed.

21          On the back-end, we've got a 2013 client event, and we

22   find out that Mr. Blankfein is the unnamed high-ranking

23   executive at that meeting.  These statements are not even on

24   the same subject, your Honor, right?  One is about a meeting.

25   Another is about whether fees and commissions are market rate.

O2MQfon1

1          Let's go to the next category.  This is the statement:
2    We found no evidence showing -- excuse me -- we had no
3    visibility into whether some of the funds have been
4    subsequently diverted.
5          Again, the mere presence of Mr. Blankfein as the
6    high-ranking executive at this meeting doesn't tell you that
7    Goldman had visibility in the fund diversion.  These two
8    statements also, under the standard of the Second Circuit,
9    there is certainly no tight fit.  This does not directly render
10   false the alleged misstatement.
11          The next category, your Honor.  We have found no
12   evidence showing any involvement by Jho Lo in the 1MDB bond
13   transactions.  The statement references Mr. Low, but, again,
14   the fact that Mr. Low and Mr. Blankfein met, purportedly, at
15   this 2013 client event doesn't tell you that Mr. Low was
16   involved until the 1MDB bond transaction
17          THE COURT:  Aren't you leaving out that the articles
18   also said 1MDB was discussed at the 2013 meeting?
19          MS. SOLOWAY:  It's interesting, your Honor, if you
20   actually look at the article itself, there's an introductory
21   paragraph where it says there were these two meetings.  Now
22   they're harkening back to the previous --
23          THE COURT:  There's more than one article.
24          MS. SOLOWAY:  I'm talking about the alleged corrective
25   disclosure article.

O2MQfon1

1          THE COURT:  There's more than one corrective

2    disclosure article.  There's a *Financial Times*, the *Journal*.

3          MS. SOLOWAY:  You're correct, your Honor.  You're

4    correct.

5          And what the article actually says is that the

6    discussions include a discussion of 1MDB, but when you actually

7    read the text itself, it says that the 2009 meeting was about

8    1MDB, and it doesn't say that the 2013 meeting was about 1MDB.

9    It describes it as a client event with all of these people in

10   attendance.  So I think the article is actually ambiguous about

11   whether 1MDB was discussed.  And, frankly, it seems pretty

12   implausible to me.  There are 20 different clients at this

13   client event.  The notion that 1MDB was discussed, much less a

14   fund diversion was being discussed, that's not even a

15   reasonable inference.

16         THE COURT:  Well, this statement is not a fund

17   diversion statement.  Right now we're talking about just no

18   evidence that Low was involved in 1MDB.

19         MS. SOLOWAY:  Correct.  But it's the same argument,

20   your Honor.  The notion that there's really a fraud here that's

21   afoot to keep Jho Low's secret, it's going to be discussed at a

22   client event with 20 other Goldman Sachs clients sitting there?

23   I mean, this is not a reasonable inference to draw from the

24   article.

25         More importantly, your Honor, this really goes to the

O2MQfon1

1    question of is there a match?  Is there a tight fit?  Do these

2    statements speak to each other?  We would submit, they just

3    don't, under the standard that the Second Circuit has set out.

4            Finally, your Honor, the last statement is this red

5    flag statement.  Again, Lloyd Blankfein's statement -- he's

6    asked the question, you know, "What flags were known to senior

7    management beforehand?  And he says, "I'm not aware of them."

8    The fact that he attends this meeting, this client event does

9    not tell you anything about his knowledge of red flags

10   beforehand.

11           Your Honor, I am going to ask Randall to turn to slide

12   ten.

13           I think you're going to hear from the experts that the

14   plaintiffs aren't really arguing that these statements match

15   when you read them as they're written, right?  This is some

16   testimony from the deposition of Dr. Mason.  He says none of

17   the misstatements specifically refer to a meeting, and there

18   are other discrepancies between the content of the statements

19   that he acknowledges as well.

20           So the plaintiff's argument instead — if we could go

21   to slide eleven — is that really we should interpret these

22   statements as denials.  We should just group them all together.

23   They're just denial, denial, denial.  And on the back-end, they

24   say ignore the fact that this is a tiny incremental piece of

25   information that Lloyd Blankfein is the high-ranking executive

O2MQfon1

1    at the 2013 meeting, and instead, we're just going to call it

2    culpability.  They rewrite the front-end, and they rewrite the

3    back-end.

4    Well, *Arkansas Teachers* had something to say about

5    that.  Slide 12.  Thank you so much, Randall.

6    Repeatedly, the court uses the words "as written,"

7    right?  Goldman requires that any gap among the

8    front-end-back-end statements "as written" be limited.

9    THE COURT:  But they also discussed *Vivendi* and

10   *Waggoner*, and that it doesn't necessarily have to be an exact

11   match as written if the subsequent statement rendered the first

12   statement false.  Wouldn't you agree?

13   MS. SOLOWAY:  I do agree, your Honor, but what the

14   plaintiffs are doing here isn't permitted because what the

15   plaintiffs are doing is they're trying to ignore what the words

16   actually are.  They're mushing everything together and saying

17   this is all just being interpreted as denials, and they are

18   effectively trying to rewrite the statements and the back-end

19   disclosure into two things that it isn't.

20   With respect to the back-end disclosure, again, this

21   idea that this additional detail that Blankfein is at this 2013

22   client meeting isn't the big reveal, your Honor.  As I

23   mentioned earlier — and we'll get into this — there is a ton of

24   information that has already come out.  This is actually a good

25   segue, I think, into sort of the next question, which is the

O2MQfon1

1    second question before your Honor.

2                So the economic evidence that the alleged

3    misstatements propped up the stock price here.

4                THE COURT:  You've gone on for about 20 minutes.  So

5    just use your time in the next five minutes to make final

6    points.

7                MS. SOLOWAY:  I will.  I'm just going to preview some

8    of the evidence you're going to hear today.

9                So very quickly, if we look at slide 14, this goes

10   right to your Honor's point.  What the plaintiffs have done

11   here is they have seized this nugget, this tiny incremental

12   additional piece of information, the 2013 meeting, and say "We

13   found it; it's the culpability."  The problem is, your Honor,

14   that over the four-year period as the news about 1MDB and

15   Goldman's role starts to come out and get more and more dark

16   and more and more problematic, there's lots of information that

17   comes out.  That information that we'll call it the truthful

18   information, right — it contrasts with the alleged

19   misstatements — is much closer in content to the front-end

20   misstatements.  It's actually on the same subjects.  And it

21   does not cause the stock price to move.  And that is

22   devastating for the plaintiff's argument that somehow these

23   alleged misstatements are propping up Goldman stock price.

24               Just one example, your Honor.  If the alleged

25   misstatement is fees and commissions were market rates, and

O2MQfon1

1    tons of information comes out that says, actually, these were

2    not market rates.  These are very strange rates, and the stock

3    price doesn't move, well, that information, the truthful

4    substitute, is much closer in content to the front-end

5    statement, and it doesn't cause the stock price to decline.

6          So you're going to hear from our economic expert that

7    this evidence, as well as the total lack of analyst attention,

8    is incredibly powerful evidence of a lack of price decline.

9          THE COURT:  Well, do any --

10          MS. SOLOWAY:  Excuse me.  Price inflation.

11          THE COURT:  Do any of the disclosures that you point

12    to build off of one another so they would be read in

13    conjunction?  That's something that the case law talks about a

14    little bit.  I think it talks about it more in the context of

15    the misstatements as opposed to the disclosure statements, but

16    I don't know.  What is your view on that and how relevant that

17    would be?

18          MS. SOLOWAY:  I think that there is this gradual

19    ramping up of information and news as you come into the fall of

20    2018.  I hope I'm answering your Honor's question.  And the

21    Leissner guilty plea, which is unsealed, which happens a week

22    before the alleged November --

23          THE COURT:  Right, November 1st.

24          MS. SOLOWAY:  -- corrective disclosure.  Yes.  Let's

25    quickly, if we could look at slide 16.  This pulls everything

O2MQfon1

1    together, your Honor.  It literally pulls everything together.

2    It contains very specific information.  Fees.  These were — to

3    use a colloquial term — juiced, right, in order to get more

4    money for Goldman and more money for Leissner.  That's what the

5    charging documents that were unsealed say.

6          On fund diversion, Leissner pleads guilty to helping

7    divert $2.7 billion in funds on the topic of Jho Lo's

8    involvement.  This was conspiracy.  He's a co-conspirator,

9    Jho Lo, and the two of them together engaged in the alleged

10   crimes.  Again, this is the chair of the Southeast Asia office

11   of Goldman Sachs pleading guilty.

12         So I think if there's a moment where you could say the

13   news has been coming out slowly for a couple years until it

14   builds in the fall of 2018, but does it pull it all together,

15   the Leissner indictment is devastating.

16         THE COURT:  Are you saying this is sufficient for the

17   public to think Goldman itself has a problem?  Because what

18   plaintiffs are saying is this news is not moving the market

19   because it wasn't enough to say Goldman as an entity doesn't

20   have a problem.  But what I'm hearing you argue is this is

21   sufficient for the public to think Goldman as an entity has a

22   problem.

23         MS. SOLOWAY:  Again, your Honor, Tim Leissner is the

24   chairman of the Southeast Asia office.  He's a managing

25   director.  The plaintiff's own complaint pleads that he's in

O2MQfon1

1    the top one percent of all employees, and the plaintiff's own

2    complaint is premised on the notion that you can charge

3    Leissner's conduct to Goldman Sachs because he's such a

4    senior-ranking executive.  You can't have it both ways, your

5    Honor.  You can't build a case based on Mr. Leissner's conduct

6    and, then say I don't know if he's high-ranking enough, doesn't

7    Mr. Blankfein have to be implicated?  The fact that Blankfein

8    happens to be the high-ranking executive at that 2013 meeting

9    is totally disconnected from the front-end statements.  The

10   front-end statements aren't about Blankfein's complicity.  In

11   fact, the articles even say we're not accusing Mr. Blankfein of

12   having himself engaged in wrongdoing.

13           I think if the plaintiffs want to bring a case that's

14   based on Mr. Leissner's conduct, then they have to acknowledge

15   that when this guilty plea gets unsealed, the market knows --

16   and the markets already knows Goldman has a major problem.

17   We'll she you some additional disclosures, your Honor.  Goldman

18   issues a Q the day after it comes out I think right after the

19   guilty plea, and it says this is all happening.  We're facing a

20   DOJ investigation.  We may face significant fines and

21   penalties.  The client --

22           THE COURT:  Well, that's on November 7.

23           MS. SOLOWAY:  No.  No.  It comes out on November 1,

24   your Honor.

25           THE COURT:  Where Goldman is saying it may face

O2MQfon1

1    significant fines and penalties?

2              MS. SOLOWAY:  Yes.

3              THE COURT:  There's another statement on November 7 of

4    the same nature, no?

5              MS. SOLOWAY:  I'm sure it's repeated multiple times,

6    but right after the guilty plea, Goldman puts out a very robust

7    risk disclosure where says, candidly, we have a real problem.

8    So, again, this is a very convenient narrative that the

9    plaintiffs are telling now that the 2013 tidbit of information

10   about Blankfein is the big reveal.  The big reveal has already

11   happened, your Honor.

12             So I think that -- I'm going to sum up with this

13   point.  The Second Circuit says in *ATRS* that we have to be

14   really careful of a situation where the plaintiffs have

15   identified a stock price drop on the back-end, and they find

16   some super specific information on a back-end date, and they

17   say, oh, it's on the same subject as the front-end, voilá, we

18   get a class certified.  I think here the additional tidbit that

19   Blankfein is at this 2013 client meeting in light of all the

20   other information out there in the market, it doesn't match,

21   it's not persuasive, it defies economic theory as we're going

22   to show you today with our expert, your Honor, and it doesn't

23   make sense.

24             Thank you very much, your Honor.

25             THE COURT:  So we're going to take just a few minutes

O2MQfon1

1    break so the court reporters can change.  And if anybody needs

2    a bio break, and then we're going to have the first witness.

3              (Recess)

O2MCfon1                              Mason – Direct

1            THE COURT:  We have plaintiff's expert?

2            MR. HASIUK:  Yes, your Honor.  Plaintiffs will call

3    Dr. Joseph Mason.

4            THE COURT:  Step on up.

5     JOSEPH MASON,

6        called as a witness by the Plaintiffs,

7        having been duly sworn, testified as follows:

8            THE DEPUTY CLERK:  State your name for the record.

9            THE WITNESS:  Joseph Russell Mason.

10           THE COURT:  Dr. Mason, I'm just going to ask that you

11   speak slowly into the microphone so the court reporter can get

12   down everything that you say.  Thanks.

13   DIRECT EXAMINATION

14   BY MR. HASIUK:

15   Q.  Good morning, Dr. Mason.

16   A.  Good morning.

17   Q.  Dr. Mason, is it your opinion that the stock for Goldman's

18   common stock was efficient during the class period in this

19   case?

20   A.  Yes.

21   Q.  How did you reach that conclusion?

22   A.  I evaluated the typical factors and measures that are used

23   by courts to assess market efficiency for a common stock, and

24   inclusive of the Cammer factors as well as the Croton and other

25   factors.

O2MCfon1                        Mason - Direct

1    Q.  Did all of those factors support the market efficiency?

2    A.  Yes.

3    Q.  Directing your attention to slide one --

4           MR. HASIUK:  That's a summary of the Croton and Cammer

5    factors that are set forth in Dr. Mason's report

6    Q.  Dr. Mason, in addition to market efficiency, did you assess

7    whether the misstatements in this case had a price impact?

8    A.  Yes, I did.

9    Q.  What is your opinion with respect to price impact?

10   A.  My opinion is that, first of all, there was a statistically

11   significant change in the stock price after the announcement to

12   the meeting between Mr. Blankfein and Mr. Low that established

13   Goldman Sachs' complicity with the 1MDB fraud.  That was

14   statistically significant at the 99-percent level and

15   constituted about a $7 billion change in the market

16   capitalization of Goldman Sachs across two days.

17          I also then looked at the misstatements themselves

18   alleged in this case, and I looked at the corrective disclosure

19   and noted the match between those.  I also looked to a change

20   in the volume and the nature of media and analyst commentary

21   after the disclosure on the evening of November 8th in the

22   Financial Times.

23          Last, I looked for any other explanation for this

24   $7 billion decline in market capitalization across those two

25   days and found none.

O2MCfon1                          Mason – Direct

1    Q.  Dr. Mason, you referenced the misstatements and analyzing

2    the misstatements.  Did you examine how the misstatements in

3    this case were understood during the class period?

4    A.  Yes, I did.

5    Q.  How did you conduct that analysis?

6    A.  I looked at the misstatements themselves in light of

7    Goldman Sachs' situation, in light of what was known about

8    Goldman Sachs' involvement generally with 1MDB at the time, and

9    noted the segments were all essentially denials of greater

10   institutional complicity of Goldman Sachs as a firm.

11   Q.  Dr. Mason, directing your attention to slide 3, there is a

12   number of class periods, articles that are cited in your

13   report.  Can you explain how these articles support your

14   opinion that the misstatements in this case were understood as

15   denials?

16   A.  Sure.  These were all denials.  Goldman said they had no

17   visibility on whether the funds were diverted.  They

18   consistently said they did nothing wrong.  They repeatedly

19   played down their role.  And they maintained they were duped by

20   some what we refer to as rogue employees and I had no idea

21   Mr. Low was operating in the shadows of these deals.

22   Q.  Directing your attention to the last bullet here, there's a

23   reference to Goldman being duped by two of its Asia-based

24   bankers.  Can you explain what is the difference, in your view,

25   between an individual employee of a company committing

O2MCfon1                          Mason - Direct

1    wrongdoing and the company as a whole?

2    A.  As a financial economist, the implications of that for the

3    firm's stock price are two very different things.  If there

4    happens to be a fraud that's perpetuated by a couple of

5    employees, without the firm overall being complicit, the costs

6    of that are much, much lower than if the firm is found to be

7    involved in the fraud, as well, that is found to be complicit.

8    Q.  When you say the costs would be much greater, economically

9    speaking, what does that imply for the firm?

10   A.  That implies that the stock drop one would expect to see

11   associated with revelation of this fraudulent activity would be

12   much less if the activity was just cabined off to a couple of

13   rogue employees compared to that which one would expect to see

14   if the firm itself was implicated.

15   Q.  So directing your attention to the next slide, can you

16   explain why, in your view, the November 2018 corrective

17   disclosure provided new information to the market that revealed

18   that the information concealed by the misstatements was --

19   strike that.  That revealed that the misstatements in this case

20   were untrue?

21   A.  Sure.  This is the on November 8th evening Financial Times

22   report, text from that report.  It gives an account of the 2013

23   meeting that's in issue here, revealing that Mr. Low met on a

24   second occasion with a senior Goldman executive, and noting

25   that unnamed executive at the 2013 meeting was Mr. Blankfein,

O2MCfon1                          Mason – Direct

1   Goldman Sachs' CEO.

2            As connected to the misstatements, we see from the

3   same article note that Goldman is wholly maintained, but it did

4   not know how the proceeds of the bond offering were spent.

5   Previously, they said they didn't know the funds were diverted.

6   So that's referring to that fund diversion misstatement, as

7   it's been called.

8            The article also notes that the very fact that the two

9   met could complicate the bank's attempts, but it didn't know

10  Low was involved, that's Jho Low involvement misstatement right

11  there in the same article.

12  Q.  Dr. Mason, does the fact that the November 8th after-hours

13  Financial Times report specifically references Goldman's

14  statements support your opinion that there's a match between

15  the corrected disclosure and the misstatements?

16  A.  Yes, absolutely.

17  Q.  Directing your attention to the last snippet on the

18  right-hand side, it says the revelation that Mr. Low met with

19  Mr. Blankfein at least once could undermine Goldman's rogue

20  employee narrative.  Dr. Mason, is it your view that the rogue

21  employee statements conceal the same information as the

22  misstatements in this case?

23  A.  Yes.  It's my opinion the rogue employee statement came

24  from the interview with Mr. Blankfein a couple of days before.

25  And if one looks at the interview, as I recall, that statement

O2MCfon1                        Mason – Direct

1    is made really in the same breadth in the statement which

2    Mr. Blankfein said he was aware of no red flags.

3    Q.   Turning to the next slide here, there are some quotes from

4    The Wall Street Journal article the following day.  Can you

5    explain how the information that came out in this article

6    supports your price impact opinion.

7    A.   Sure.  So this article added additional context the next

8    day, noting that the 2013 meeting in particular happened after

9    Goldman Sachs' compliance department had raised multiple

10   concerns about Lowe's background and said the bank shouldn't do

11   business with him, and noted that the meeting in 2013 included

12   discussions of 1MDB.

13   Q.   What's the significance of the fact that the 2013 meeting

14   occurred after the bank's compliance department had raised

15   concerns about Mr. Low, said that the bank shouldn't do

16   business with him, and that the meeting, according to the

17   article, included discussions about 1MDB?

18   A.   It was noted earlier this morning.  This 2013 meeting is

19   very different than the 2009 meeting in that in the 2009

20   meeting, Goldman Sachs hadn't yet underwritten these 1MDB

21   bonds, and the funds had not been diverted at the direction of

22   Mr. Low, and all the other aspects of the fraud hadn't mounted

23   up yet.  But in 2013, they had, and we find Mr. Blankfein now

24   is evidently going back to talk about 1MDB's business,

25   potentially more 1MDB business, I'm not sure, but this is

O2MCfon1                         Mason - Direct

1    pretty bad.

2    Q.   Directing your attention to the right-hand side, there's a

3    number of quotes from the Wall Street Journal article.  In your

4    view, do these statements in the article also refer back to the

5    misstatements in this case?

6    A.   Yes.  Here we see a reference to the fees, the

7    $600 million, we see reference to, again, the bank said it

8    couldn't have known what would happen to the money it helped

9    raise, referring to the diversion misstatement.  And again,

10   Mr. Blankfein laid the blame on rogue employees.  These are

11   guys who evaded our safeguards and lie, referring back to what

12   he said around that red flag statement.

13   Q.   Does the fact that The Wall Street Journal article also

14   refers back to Goldman's statements in this case support your

15   opinion that there was a match between the corrected disclosure

16   and the misstatements?

17   A.   Yes, these reports are both tying the misstatements to the

18   corrective, yes.

19   Q.   After the corrective disclosure in this case, I think you

20   referenced this at the outset, what happened with respect to

21   the analyst and media commentary concerning Goldman and 1MDB?

22   A.   There was a distinct change in both.  The perception of

23   Goldman's complicity changed with this corrective disclosure.

24   Market commentary, as well as analyst commentary, was really

25   the same prior to this disclosure, really taking Goldman Sachs'

O2MCfon1                        Mason – Direct

1  denials at face value and proceeding as if.

2           Afterward, media and analysts not only questioned

3  Goldman's role in the transactions and continued to dig deeper,

4  but analysts in particular sought to now value Goldman Sachs'

5  1MDB disclosure in a way that they had not previously.

6  Q.  I want to direct your attention to the following slide.

7  There was two quotes from reports that were issued on November

8  12th that are cited in your report.  Can you explain why these

9  or how these reports support your opinion that the corrected

10 disclosure matched the misstatements and that price impact is

11 established.

12 A.  This first quote notes that this share price drop was

13 really big.  They note that the share price dropped by more

14 than 7 percent just on November 12th, which was the biggest

15 loss in seven years.  The two-day share price drop was the

16 biggest drop in eight years, the biggest since — it's in my

17 report — April 2011.

18          This followed reports, they said late last week, the

19 current chairman and former chief executive Lloyd Blankfein was

20 present at the meetings with Low, directly tying that drop to

21 the news of those meetings.

22          And also pointing out the basic financial economic

23 principle I talked about before, investors fear that the

24 U.S. justice department will build a case showing that the

25 investment bank, the bank itself was complicit in wrongdoing in

O2MCfon1                              Mason - Direct

1    the case.  That's a very costly position to be in.  Investors

2    are very concerned now in a way they were not previously.

3              THE COURT:  Dr. Mason, as an expert who evaluates the

4    market and share prices, how do you assess the value of a news

5    report versus a stock analyst report in assessing impact on

6    price of stock?

7              THE WITNESS:  The two are different sources of

8    information to be sure, and they are separated.  I note in my

9    report by what they can do and what they can ethically talk

10   about.  I quote in my report language from the chartered

11   financial analysts guide to ethics.  They note that analysts

12   need to be very careful, they can't be reporters, they can't go

13   spouting stuff that they're not quite sure of.  In particular,

14   they can't go getting material nonpublic information, whereas a

15   reporter can search for such information and disseminate such

16   information and often do so.

17             So, an analyst couldn't -- well, I don't want to weigh

18   in quite that strongly.  I'm not sure an analyst could break

19   the story the evening of November 8th the same way that

20   reporters at the Financial Times did in an ethical manner

21   searching for material nonpublic information.

22             THE COURT:  But after the story breaks, how do you

23   assess what a newspaper says versus the financial reporter

24   versus a stock analyst in assessing the aftermath of the news

25   that broke?

O2MCfon1                           Mason - Direct

1          THE WITNESS:  Before I answer that, I'd like to add
2     one more thing to what I said.  The concern is that the analyst
3     might break that news to certain investors before others and
4     not tell the public as a whole as a reporter would do.

5          So you asked about then what analysts do with the
6     information, I think.  Well, now the information's out there.
7     Analysts consume, you read the newspaper.  Some analysts in
8     this case did repeat the information in their reports, but
9     analysts are really concerned with valuing the information now.
10    And now we have information that the CEO's been meeting with
11    Jho Low so that Goldman Sachs faces a possibility of
12    institutional complicity — how do we value that?

13         Analysts did note — and I think I have this quote on a
14    later slide — that this is a complex thing to value.  This is
15    really hard to figure out because now Goldman Sachs is going to
16    undertake -- or Goldman Sachs is going to be subjected to a DOJ
17    investigation, they're going to dig deep into that possibility
18    of institutional complicity in a formal sense and costs of
19    fines and penalties could rise quite significantly.

20         Also, once Goldman Sachs is involved, their reputation
21    takes a much bigger hit.  This is a common financial economic
22    principle.  It's in papers that are cited by both myself and
23    Dr. Kothari in our various reports that the reputational damage
24    at the institutional level is far greater than the reputational
25    damage at the employee level.  So the cost in terms of the

O2MCfon1                          Mason - Direct

1    ability to generate future business and generate future

2    earnings and make money to pay future dividends to support the

3    stock price becomes much more difficult.  So the stock price

4    falls greater with institutional complicity than it would with

5    a mere rogue employee narrative.

6    BY MR. HASIUK:

7    Q.  Dr. Mason, just directing your attention to this slide,

8    slide 12, this lists a number of examples of analyst commentary

9    when citing the report.  Please explain how the nature of this

10   commentary, post-disclosure, show that analysts were concerned

11   with the implications of Goldman's institutional complicity.

12   A.  Sure.  We see at the top direct reference to Lloyd

13   Blankfein meeting with 1MDB representatives.  We see in the

14   second concern about widespread gaps in compliance, which would

15   lead to fines and penalties.  We also see this reference in the

16   fourth bullet to that legitimate and difficult-to-quantify

17   risk, and that's November 13th.  And that's new here.  No

18   analysts talked about this with regard to 1MDB before the

19   evening of November 8, but now analysts are concerned with a

20   legitimate and difficult-to-quantify risk.  And the last bullet

21   points out that, despite news on November 1st and previously,

22   Goldman Sachs' stock price didn't react because it was

23   perceived as an investigation just against former bankers, but

24   later — and I interpret this as later after the evening of

25   November 8th when it's found that Lloyd Blankfein's been

O2MCfon1                         Mason – Direct

1   meeting with Mr. Low — it became evident that Goldman Sachs

2   wouldn't be able to avoid fines.

3           THE COURT:  Why do you interpret that as referring to

4   the corrective disclosures identified -- that you identified on

5   the 8th and the 9th as opposed to Goldman's own statements that

6   it could face fines?

7           THE WITNESS:  Because those -- Goldman's own

8   statements were made based on information that came out on the

9   1st, those statements were included in the reports on the 2nd,

10  though I think defense counsel might have mentioned it might

11  have come out on the 1st.  That's fine.  The stock price didn't

12  move either of those days.  The stock price moved after the

13  8th.  And this entry specifically refers to Goldman Sachs'

14  shares tumbling by 11.1 percent during trading days of 9 and 12

15  November on Malaysia 1MDB well fund.

16  Q.  Dr. Mason, was there any 1MDB specific news that you

17  believe was value relevant between the guilty plea on the 1st

18  and the corrective disclosure on the evening of November 8th?

19  A.  No.

20  Q.  Her Honor has asked you about sort of impact on analyst

21  views of Goldman.  Directing your attention to slide 13,

22  there's a number of quotes from analyst reports, analysts who

23  lowered their price targets or the ratings of Goldman following

24  the corrective disclosure.  Can you explain how these reports

25  factored into your price impact analysis?

O2MCfon1                          Mason - Direct

1    A.  Sure.  These are all downgrades to views about Goldman

2    Sachs based upon Goldman Sachs' newly established exposure to

3    1MDB, newly established as potentially institutionally

4    complicit based upon the existence of meetings between Lloyd

5    Blankfein himself and Jho Low, the mastermind of the fraud.

6    Q.  And Dr. Mason, just turning back to some of the market

7    commentary in this case, I know we reviewed two examples.  Can

8    you explain how some of these additional reports that are cited

9    on slide 8 supported your assessment of price impact?

10   A.  Sure.  These reports are also -- for instance, the second

11   bullet, timing things off of Thursday's November 8th close, and

12   noting Goldman shares are down since the evening of November

13   8th because of concerns over whether the firm's leaders might

14   be dragged into the case.

15       The third bullet -- the third and fourth I think speak

16   very well to what I see in the pattern here of the investors

17   initially appear to shrug off the charges against Leissner and

18   Low, but went down more than 12 percent since the news about

19   Blankfein.

20       The last one on November 19th notes for the first time

21   investors are punishing Goldman Sachs for its role in one of

22   the biggest financial scandals in history.  As I noted, this is

23   pattern, investors were accepting Goldman Sachs' denials at

24   face value, and the evening of November 8th changed their view

25   of the situation.

O2MCfon1                         Mason - Direct

1    Q.  Dr. Mason, we previously saw an Arbor Capital report from

2    December 7 that made the point that the Goldman stock didn't

3    react in response to the Leissner plea.  This Barron's report

4    on November 16th, in your view, is that making the same point?

5    A.  Yes.

6    Q.  Is it significant to you that both the media and the

7    analysts make the same distinction between Leissner's guilty

8    plea and additional news of Goldman's institutional complicity?

9    A.  Yes.  Absolutely.  This is credible media.  This is

10   Barron's, the New York Times, the Financial Times, The Wall

11   Street Journal.  This media doesn't want to get it wrong.

12   Q.  So focusing specifically on the misstatements in this case,

13   did you review or identify evidence that each type of

14   misstatement that Goldman issued was corrected through the

15   corrective disclosure in this case?

16   A.  Yes, I do.

17   Q.  So just directing your attention to slide 9, which has some

18   examples of pre- and post-disclosure commentary with respect to

19   two types of misstatements, can you explain how these pre- and

20   post-disclosure commentaries reflect a change in market

21   perceptions as to the truth of these misstatements?

22   A.  Sure.  With regard to the Jho Low misstatements, Goldman

23   Sachs previously claimed they had no idea that Mr. Low was

24   operating in the shadows of the deals, but to the right in the

25   post-disclosure commentary, we see that Mr. Lowe's meeting with

O2MCfon1                          Mason - Direct

1    Mr. Blankfein could complicate the bank's attempts to prove

2    that it didn't know Low was involved.  That's really a direct

3    contrast to pre-disclosure commentary in the Jho Low

4    misstatements.

5    Q.  Dr. Mason, what's the significance of the fact that these

6    two examples of commentary are by the same publication on the

7    same day, one before the corrective disclosure and one after?

8    A.  That's a 180-degree shift in perspective in a matter of

9    hours.

10   Q.  Does that support your opinion that the corrective

11   disclosure revealed new information that upended Goldman's

12   denial?

13   A.  Yes.

14   Q.  Directing your attention to the second set of pre- and

15   post-disclosure commentary, can you explain how this reflects a

16   change in market perceptions?

17   A.  Well, here we see the fund diversion misstatement that

18   Goldman Sachs had no visibility into whether some of the funds

19   may have been subsequently diverted to other purposes.  We see

20   post-disclosure concern by investors reflected in the press

21   that the U.S. justice department will build a case showing the

22   investment bank was complicit in such transfers and wrongdoing

23   in the case.

24   Q.  And maybe a simplistic question, but is being complicit

25   consistent with doing nothing wrong?

O2MCfon1                    Mason - Direct

1    A.   Absolutely.

2    Q.   Directing your attention to the next slide here, this

3    focuses on fees, commissions, misstatements, and

4    Mr. Blankfein's November 1st misstatement.  Can you explain how

5    the pre- and post-disclosure commentary reflects a change in

6    perceptions as to these types of statements?

7    A.   Yes.  These fees and commissions misstatements included a

8    statement that Goldman says there was no payment made to third

9    parties, and also Goldman's defensive fees on the transactions

10   is reflecting the market rate and risk taken at the time.  On

11   the right there, we again see a reference to the investment

12   bank being complicit in wrongdoing in the case.  And as I just

13   noted that complicity, in part, involved a case in which funds

14   were diverted to a lot of different payoffs, to a lot of

15   different people and entities that would cause concern by

16   investors as to some of these fees might have constituted

17   payoffs to Goldman Sachs.

18   Q.   How is being complicit inconsistent with their fees being

19   justified, as Goldman claimed?

20   A.   When you're complicit, you're cooperating with the bad

21   guys, and if you're cooperating with the bad guys, how can you

22   claim your fees are justified at least without further evidence

23   of the case?

24   Q.   And finally, just on the November 1st red flags

25   misstatement, does this commentary reflect a change in

O2MCfon1                        Mason - Direct

1    perceptions as to that specific statement?

2    A.  Yes.  As I noted previously, Mr. Blankfein said in that

3    interview he didn't know of senior managers missing red flags

4    and noted, really in the same breadth, that these employees

5    lied, lied to Goldman Sachs, which is really the rogue employee

6    narrative, but now the narrative in the media is that the

7    bank's attempt to paint Mr. Leissner as a rogue agent in this

8    way has been undercut by the revelation of the meeting, and

9    that because of concern over whether the firm's -- and that

10   Goldman shares are down nearly 13 percent by the 15th of

11   November because of concern over whether the firm's leaders

12   might be dragged into the case.

13   Q.  Dr. Mason, just briefly, can you explain how the

14   pre-disclosure commentary, the corrective disclosure itself,

15   and the post-disclosure commentary supports your opinion that

16   the statements in this case impacted Goldman's stock price.

17   A.  I see the pre-disclosure commentary as constituting denials

18   of institutional complicity.  The disclosure themselves

19   referenced such denials in the same article that provided the

20   disclosure of the meeting between Mr. Blankfein and Mr. Low.

21   And in post-disclosure commentary, we see that these denials no

22   longer carried weight.

23   Q.  In your view, did the news of Leissner's guilty plea on

24   November 1st upend any of Goldman's denials?

25   A.  No.

O2MCfon1                          Mason - Direct

1    Q.  And why not?

2    A.  Mr. Leissner's association with Mr. Low and with the 1MDB

3    deals had been discussed at great length by this point in time.

4    And so, it's not surprising that when that came out on November

5    1st, the stock price didn't move.  So there's no stock price

6    movement to suggest what's concerned by investors and it's not

7    surprising given that the information was already known at the

8    time.

9    Q.  Dr. Mason, as part of your analysis, did you analyze

10   whether information that was concealed by the misstatements had

11   been revealed prior to the corrective disclosure?

12   A.  I did.

13   Q.  What did that analysis show?

14   A.  I didn't see any prior reports or suggestions that Goldman

15   Sachs, as an institution, was complicit with Mr. Low and the

16   1MDB fraud before the corrective disclosure.

17   Q.  From an economic standpoint, what's the significance of the

18   fact that the articles that Dr. Kothari identifies as revealing

19   the truth actually, in many cases, contain the very denials

20   that plaintiffs allege maintained inflation?

21   A.  So in response to some of Dr. Kothari's claims in this

22   case, I noted that he cited a lot of articles and claimed

23   pre-disclosure articles and noted that the stock price never

24   moved.  I mean, he suggests that's because investors already

25   knew.  I don't think he can point to anything that they knew.

O2MCfon1                                    Mason - Direct

1    As I noted, I haven't seen reference to Goldman Sachs'

2    institutional complicity being disclosed prior to the evening

3    of November 8th.

4              And, in fact, I noted that nearly one-fourth of the

5    reports cited by Dr. Kothari -- and these were media reports.

6    We're talking about information in the media versus analysts

7    here.  He's talking about media reports.  One-fourth of those

8    contain Goldman Sachs' denials.

9    Q.  Dr. Mason, I think you mentioned at the outset that you

10   looked for confounding information that could otherwise explain

11   the stock price reaction.  Can you explain how you did that and

12   what that entailed?

13   A.  Sure.  I looked for anything else that happened on the 9th

14   and the 12th or what is announced on the 9th or the 12th that

15   could explain -- well, that was even negative.  And then, of

16   course, we would really need something that was sufficiently

17   negative to justify a $7 billion decline in the market

18   capitalization of Goldman Sachs, at that time more than a

19   10-percent drop in the stock price.  I found nothing myself.

20             Dr. Kothari then, in his reply report, noted or

21   suggested certain things that he thought seemed negative.  And

22   I use that language because he was fairly soft about this in

23   his deposition.  He said these items had a negative tone.  He

24   never tried to value any of these aspects, he merely suggests

25   they're negative.  And those included some news about Brexit

O2MCfon1                          Mason - Direct

1    and the transfer of Goldman offices from London to Frankfurt.

2              He noted initially the Leissner plea transcript on

3    November 1st, though he seemed to back away from that in

4    deposition and said I'm not trying to say this is some major

5    piece of information, and I agree, it was known.  He talks

6    about some comments made by a White House official about the

7    China trade talks, which the White House backed away from very

8    quickly.  And also noted a Fed speech about the stress capital

9    buffer that was being imposed.  He thought that was negative.

10   In fact, I correct him in my response to his reply.  Analysts

11   view this Fed speech as positive.  Actually, when he points to

12   the impact upon Goldman Sachs, nothing happened.

13             THE COURT:  How would an economist tease out what

14   impact, if any, these individual pieces of news might have had

15   on the stock price?

16             THE WITNESS:  So, for the Leissner plea transcript, it

17   seems Dr. Kothari and I agree, it's not a major piece of

18   information.  This doesn't matter --

19             THE COURT:  Because it had been disclosed?

20             THE WITNESS:  It was disclosed on the 1st, yeah.

21   Yeah.  The market knew what it needed to know there.  The China

22   trade talks, the White House reversed that, it's not news.  The

23   stress capital buffer is the wrong way around.  It's not

24   negative.  It's either neutral or positive.  Analysts

25   considered it positive, so we can get rid of that.

O2MCfon1                              Mason - Direct

1          So that leaves us with Brexit.  In preparing for

2     today, I noted that a report estimated total costs of the move

3     from London to Frankfurt for Goldman Sachs -- actually, for all

4     banks, they all faced the same cost of about $500 million.

5     What we were talking about here would not be the entire

6     $500 million, but change in the 500, maybe it went up to --

7     well, I don't want to put a number on it, but if one believed

8     that the costs might become more costly, but rised from

9     10 percent to 550.

10         THE COURT:  Right.  My question is, besides just

11    characterizing the news as positive or negative or maybe the

12    cost would be $500 million, from an economic standpoint, how

13    would you determine whether Brexit, as opposed to these other

14    pieces of news, affected the stock price on the 9th?

15         THE WITNESS:  I would say the other three don't affect

16    the stock price because they're either not new information or

17    not genuine information or information in the wrong direction

18    that affect the stock price positively.  The last one, the

19    Brexit, even at $500 million, you would have to have a market

20    cap decline on the 9th or 12th of $7 billion.  Even

21    $500 million, full value of the Brexit transfer, doesn't get

22    you to filling that $7 billion hole.

23    BY MR. HASIUK:

24    Q.  Dr. Mason, perhaps we'll step back.  Can you explain what

25    is an event study and what did you do in this case in assessing

O2MCfon1                              Mason – Direct

1    statistical, significant changes in Goldman's stock price

2    during the class period, and specifically on the corrective

3    disclosure?

4    A.   So an event study is a methodology by which we identify

5    stock price movements that are unique to a particular firm — in

6    this case, Goldman Sachs.  We do that by controlling for broad

7    market movements through using a market index, and noting that

8    if the market index went down by 1 percent, say, then we can't

9    attribute that 1 percent decline to anything at Goldman Sachs.

10   Then we also include an industry index that might be

11   constituted of Goldman Sachs' peers or another off-the-shelf

12   index of financial services companies, and maybe that day the

13   broad market went down by 1 percent and the financial industry

14   went down by another half a percent.  So then you have a

15   one-and-a-half percent piece that you can't attribute uniquely

16   to Goldman Sachs, but if Goldman Sachs' stock price went down

17   by two-and-a-half percent that day, you can attribute the last

18   1-percent decline to Goldman Sachs.  So you would identify what

19   we call abnormal returns through that technique.  Then we look

20   to see is a movement in those abnormal returns on any given day

21   statistically significant.  So we utilize statistics to

22   generate standards on past abnormal return movements in order

23   to generate a measure of statistical significance and attach

24   that to each day's movement.

25              There was some discussion this morning about a

O2MCfon1                              Mason - Direct

1    5-percent level or a 10-percent level.  I do feel it incumbent
2    upon myself to say to the Court that economics has moved to a
3    point of really acknowledging there is no bright-line cutoff.
4    Major journals like the American Economic Review really want to
5    see you report just what it is, because in some cases, you
6    might wish to impose a 99-percent certainty level, but in other
7    cases, you might be okay with an 85-percent certainty level,
8    but the association moved in this direction because of concern
9    about what's been known over the last couple of decades as
10   P-hacking.  When you work with a lot of data, you have millions
11   of observations, there's a mechanical, mathematical result,
12   everything's going to be statistically significant.  So then
13   you really need to look at, well, do you believe the
14   coefficient size, other things.  There's more beyond just a
15   95-percent cutoff that needs to be taken into account.  So
16   while 95 percent is thrown around, sometimes it's a rule of
17   thumb, it does not bind in any way.
18   Q.  Dr. Mason, what was the confidence level for the stock
19   drop, stock price decline, the abnormal return on November 9th?
20   A.  It was -- these are significant, well above 99-percent
21   level.
22   Q.  So 99 percent up.
23          What is the significance of the fact that Dr. Kothari
24   did not identify a statistically measurable impact for any of
25   the allegedly confounding factors that are discussed in his

O2MCfon1                              Mason - Direct

1    report?

2    A.  He has no basis by which to opine that any of these factors

3    generated a stock price reaction that offset the $7 billion

4    decline in market capitalization on the 9th and the 12th at

5    all.

6              THE COURT:  How would he do that?

7              THE WITNESS:  Really, he would -- let's say that the

8    Brexit news -- let's say the costs of the transfer, I don't

9    know, was $50 billion, let's say then the analyst had

10   established that Goldman was on the hook for an extra

11   $7 billion of transfer costs announced on the 9th or the 12th

12   or a combination of those days, well, then you have $7 billion

13   in transfers costs additionally that could explain the

14   $7 billion market capitalization decline, but the numbers don't

15   get anywhere that close.

16             THE COURT:  So you're saying you have to quantify and

17   compare it to the -- is it just a mathematical $7 billion minus

18   $500 million, is that what you're doing?

19             THE WITNESS:  In this case, yes.  Though, it wouldn't

20   even be $500 million.  Now we can get more refined.  If those

21   costs were recurring, the Brexit costs were recurring, then you

22   might take a net present value of those, you'd have to assign a

23   discount rate and go through a lot of other techniques to

24   properly value the news, but here, Brexit doesn't come close to

25   offsetting a $7 billion market cap decline.

O2MCfon1                         Mason - Direct

1   Q.  In your opinion, Dr. Mason, did any of these so-called

2   confounding factors have any impact on Goldman stock price on

3   November 9th?

4   A.  No.

5   Q.  Turning to November 12th, can you explain why -- actually,

6   let me just take a step back.

7           Dr. Mason, in this case, in assessing price impact and

8   also just part of your merits, loss causation, and damages

9   analysis, you used a two-day event window in order to assess --

10  to calculate inflation.  Can you explain why you did that?

11  A.  Sure.  I did that because I initially looked at the first

12  day's decline, November 9th, which is a standard whenever I

13  look at a stock drop.  Want to know more about it, I look to

14  the next day, as well, and noted -- I'd want to know as a

15  researcher, did it reverse the next day.  That would be

16  important to me.  I found, no, it didn't reverse the next day.

17  In fact, it kept on going.  So I thought okay, let's look not

18  only for confounding information on the 9th, let's also look on

19  the 12th and see if there's anything that can otherwise explain

20  the stock price movement on the 12th.  We know that there is

21  media coverage continuing, we just saw analyst reports from the

22  13th and beyond this date talking about the 9th and the 12th.

23  So those also suggested that this could be a two-day window.

24  And I also saw the analyst commentary that Mr. Blankfein's

25  involvement in Goldman Sachs' institutional complicity would be

O2MCfon1                          Mason - Direct

1    difficult to quantify.  So it would make sense that things

2    would take two days.

3            I looked for anything else going on the 12th and

4    didn't identify anything new.  There was no new news that day,

5    so I'm comfortable advancing the hypothesis that this was a

6    two-day decline attributable to the news released the evening

7    of November 8th.

8    Q.  Dr. Mason, what's the significance of the fact that there

9    is commentary on the 12th about the Blankfein-Low meeting, and

10   also -- well, let me stop there.  What's the significance of

11   the fact that there is commentary on the 12th about the

12   Blankfein-Low meeting?

13   A.  This first entry is commentary on the 12th after the market

14   closed.  So this is commenting on the move on the 9th and the

15   12th and identifying that a reason for Goldman's stock price

16   decline is that the former Goldman Sachs CEO Lloyd Blankfein

17   met with 1MDB representatives.

18   Q.  And then you made a second point about analysts discussing

19   the news was difficult to quantify.  Can you explain how that

20   factors into your use of a two-day event window in this case?

21   A.  Things that are difficult to quantify are going to result

22   in a longer period for investors to get their head around and

23   value and trade on.

24   Q.  And I think you mentioned that when you were assessing

25   price impact, you were looking at -- you also looked at

O2MCfon1                          Mason - Direct

1    confounding information on the 12th.  Did you identify any

2    confounding information on November 12th that could explain the

3    statistically significant stock price reaction on that date?

4    A.  I didn't find anything new on the 12th, no.

5    Q.  Dr. Kothari has contended that the entire stock price

6    decline on the 12th is attributable to a radio interview and

7    report about that interview concerning the Malaysian finance

8    minister's intention to seek recovery from Goldman Sachs for

9    1MDB-related costs.  Can you explain why, in your view, that

10   information did not impact Goldman's stock price on the 12th?

11   A.  That information didn't impact Goldman's stock price on the

12   12th because it was nearly identical to what's illustrated here

13   from June 14th, 2018.  The new administration in Malaysia that

14   had come into office in May had made a firm commitment as part

15   of their campaign promises that they were going to pursue any

16   and all avenues of recovery, including those involved in

17   Goldman Sachs, and noted that they're going to do so wherever

18   there are grounds for claims against the companies.

19   Q.  So had there been any change, in your view, in Malaysia's

20   position of intending to recover all funds illicitly taken from

21   1MDB, including from firms like Goldman Sachs?

22   A.  No, not at all.  The only changes was Goldman Sachs'

23   institutional complicity that came to light as a result of

24   meetings between Mr. Blankfein and Mr. Low, and the news

25   released the evening of November 8th.

O2MCfon1                          Mason - Direct

1   Q.   Does the reputation of old news generally impact stock

2   prices?

3   A.   No.

4   Q.   What about the fact that Mr. Lim, the finance minister,

5   referenced Goldman's 10Q, Leissner's guilty plea, which had

6   been reported on November 1st, did that factor into your

7   analysis?

8   A.   Again, those were previously reported.  They were already

9   out there on November 1st and 2nd.  Investors had already seen

10  those.

11  Q.   Dr. Mason, my understanding is that in calculating

12  inflation in this case, you made an adjustment to reduce your

13  estimate of inflation by $1.61.  Can you explain why you did

14  that?

15  A.   I did that because I understand generally -- I'm not an

16  attorney, so please correct me if I go off the rails here, but

17  as a financial economist, I saw the Court had previously

18  expressed concern with this statement, noting, I think, that

19  the statement issued the 12th had previously been issued very

20  similarly, don't want to say verbatim, but awful close in June,

21  and as a financial economist, I read that as the Court saying

22  that this was old news.

23       Nonetheless, I calculated this adjustment in case the

24  Court was concerned that the government of Malaysia had made

25  this previous commitment back in June in a world before the

O2MCfon1                        Mason - Direct

1    disclosure of the meeting between Mr. Blankfein and Mr. Low,

2    before concerns about Goldman's institutional complicity.  And

3    in that world where, really, this is just a rogue employee

4    issue and there are no problems with Goldman Sachs' compliance,

5    really nothing else wrong at Goldman Sachs, there wouldn't

6    really be justification for Goldman Sachs to face fines and

7    penalties.  Though, if Goldman Sachs wished to preserve

8    reputation with its clients, it might refund the $600 million

9    in fees, full refund, to the government of Malaysia.  But in

10   this world, Goldman Sachs wasn't complicit, they didn't take

11   anything more, there was nothing else going on at Goldman

12   Sachs.  So the value of the $600 million refund would be

13   divided by the number of shares at the time, would be $1.61 per

14   share on November 12th.  I believe that effect would have

15   already been priced in in June, it wouldn't have anything to do

16   with November 12th.  But again, for the convenience of the

17   Court or for the convenience of the jury, if someone was

18   concerned with this at all, I performed the calculation.

19   Q.  And accounting for that adjustment, is your view that the

20   corrective disclosure in this case still impacted Goldman's

21   stock price on November 12th?

22   A.  Yes.

23   Q.  Dr. Mason, in assessing statistical significance in this

24   case, why did you do so on the basis of daily or close-to-close

25   stock price returns?

O2MCfon1                         Mason - Direct

A.   I used close-to-close returns because those are

acknowledged to be the most reliable measure of the movement of

a stock price.  At the close of any trading day, the New York

Stock Exchange has what they call closing auction.  The

procedures for the closing auction begin at about 2:00 p.m.

when they start revealing the orders that are on the order book

and the mean balance between buy and sell orders.  The NYSC

controls trading in this way to -- I don't want to say

controls.  That's the wrong word.  But has these procedures to

make sure that there's sufficient liquidity as we get toward

the end of the day so investors can establish the positions

they want to establish at the end of that day when that day's

trading is done so that when those positions are crystalized at

the end of the day, there's a valid price referenced that's

reflective of the value of the trading all through the day that

can be utilized for very important things like funds marking

their positions to market at the end of the day and reporting

those to investors and regulators.  We want valid prices, we

want to make sure there are very absolutely valid prices to be

used for that market exercise.  So that's why those end-of-day

prices are viewed to be the most informative prices at any time

during the day.

Q.   Dr. Mason, given the facts of this case, is there any

reason to assess significance on an intraday basis on either

the 9th or the 12th?

O2MCfon1                           Mason - Direct

1    A.  No, not in my opinion.  No.

2    Q.  What is the significance of the fact that the Goldman's

3    stock price reaction was significant on the -- even at the

4    intraday level on the afternoon of the 9th and continued a

5    significant decline on the morning of the 12th?

6    A.  The significance to me was that the trajectory that the

7    stock price had at the end of the 8th and 9th continued into

8    the 12th.  So this really seems to me to be a continuation of

9    investors' concerns.  It expressed through what could be orders

10   that they placed on Friday that weren't filled until Monday.

11   There was discussion among the expert reports about large

12   institutional investors have to place big block orders, it

13   might break those up, and when they break those up, some of

14   those might be honored the next day because there's not

15   sufficient liquidity during one day for those to be honored

16   without those orders moving the price in an adverse way.

17             THE COURT:  Now, I think in your report you mention

18   that approximately 80 percent of Goldman's investors were

19   institutional investors.  Does that play into what you're

20   saying about needing to sell shares in blocks?

21             THE WITNESS:  It could.  I want to be careful because

22   I haven't dug into this.  Though, it's not me who raised the

23   intraday analysis.  This is something very important for an

24   intraday analysis, that one would take into account the order

25   book to see those buy-sell orders and note the imbalance.

O2MCfon1                         Mason - Direct

1    There could be a lot more people seeking to sell than there are

2    seeking to buy on the 9th all through the day of the 9th.  And

3    that would be evidence that there's price pressure.  And if you

4    want to undertake an intraday study, you really need to dig

5    into this because during the day, there are varyingly liquidity

6    conditions during the day as some traders are in the market,

7    some are not.  A lot of stuff goes on during the day.  That's

8    my point about the closing auction.  At the end of the day, the

9    NYSC brings all this in to make sure they have a valid price

10   quoted at the end of the day.

11          THE COURT:  What impact, if any, does the fact that

12   there was a weekend between the 9th and the 12th have on

13   continuation of the price decline?

14          THE WITNESS:  You know, that's an interesting question

15   in financial economics.  It is sometimes felt that timeouts

16   help calm the nerves, and that's why some exchanges will have

17   triggers if activity gets too hot and the share prices are

18   diving, they'll halt trading.  More recent research has

19   shown -- and they actually create more pressures, potentially,

20   and that having the timeout can lead people to think wait, no,

21   I really do want out.  So that pressure can intensify.  And so,

22   it's not unreasonable to think that the weekend didn't help

23   things and, in fact, might have pressured things to continue

24   into Monday.  Again, there was no recovery Tuesday either.  The

25   stock price went down and it stayed down reflective of, in my

O2MCfon1                          Mason – Direct

1    opinion, the value of this information about institutional

2    complicity that came to light the evening of November 8th and

3    the greater costs one would typically associate with such

4    institutional complicity.

5              THE COURT:  And you already said that a close-to-close

6    is a favored way of looking at the stock price.  Is it also

7    correct that a one-day event window is most typical?

8              THE WITNESS:  Yes, I would agree with that.  Though,

9    having described my methodology, I would say that's largely

10   because usually prices adjust within one day.  Many times,

11   there's nothing there the second day, so there's really nothing

12   to look at.  But when you do have dramatic announcements about

13   firm-wide complicity in a global fraud scheme by a major large

14   cap organization that shocks markets leading to a $700 billion

15   market cap decline, more than 10-percent share decline on those

16   two days, I wouldn't be surprised to see it go for two days

17   while investors figure it out.

18             THE COURT:  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

O2MQfon3                          Mason - Direct

1   BY MR. HASIUK:  (Continued)

2   Q.  Dr. Mason, is there any economic principle that you're

3   aware of that would require you to stop your analysis at the

4   end of trading on the 9th and not look at the 12th?

5   A.  No.

6   Q.  Dr. Mason -- and, your Honor, I am just wrapping up.  I

7   want to return to one point from the November 8 *Financial Times*

8   report.  At the end on the left-hand side, you'll see that

9   there's some language that says:  "Although there is some doubt

10  over whether Mr. Low was at that second meeting."

11        Can you explain, Dr. Mason, do your opinions in this

12  case depend in any way on whether Mr. Low actually attended

13  this planned meeting with Mr. Blankfein in 2013?

14  A.  No.

15  Q.  Can you explain why not?

16  A.  There's a great deal of financial and economic research on

17  the importance of CEOs and what they do.  And you don't even

18  want talk out there about your CEO meeting with a criminal

19  mastermind.  Yeah, the letters focuses on far less dramatic

20  aspects, and even those are found to significantly affect firm

21  value.  And the reason it makes sense because this would

22  identify your CEO as a risk-taker, and the CEO signs off on the

23  financials, and you kind of don't want a risk-taker signing off

24  on your financials.  They might be taking some risks with

25  accounting categorizations or generating some earnings that are

O2MQfon3                              Mason - Direct

1   not really high quality.  They could be accounting earnings

2   rather than cash earnings, or maybe not earnings at all.  You

3   just don't want that exposure.

4   Q.  Dr. Mason, is it your view that Goldman's stock price

5   decline on November 9 and November 12 occurred despite the

6   doubt that Mr. Low may or may not have been at the meeting?

7   A.  That's correct.

8   Q.  Are you aware that there was market commentary on the 9th

9   in the *Wall Street Journal* stating that he was at the meeting?

10  A.  Yes.  The *Wall Street Journal* went the other direction with

11  his presence.

12  Q.  Would you agree that there was commentary in the afternoon

13  of the 9th, I believe it's by a French publication, that said

14  he was not at the meeting?

15  A.  Yes.

16  Q.  Did Goldman's stock price recover when additional news came

17  out that Mr. Low may not have been at the meeting?

18  A.  No, the stock continued to decline into Monday.

19  Q.  Does that in your view show that the investors are

20  responding to the implications of the meeting and not Mr. Low's

21  attendance or nonattendance?

22  A.  Yes, they were responding to Mr. Blankfein's direct

23  involvement with Mr. Low, and the issue of institutional

24  complicity that presents for Goldman Sachs.

25          MR. HASIUK:  Your Honor, unless you have further

O2MQfon3                              Mason - Cross

1   questions for Dr. Mason, I'll offer him for counsel.

2            THE COURT:  I do not.  Thank you very much.

3            Are you ready to go now or do you want to take a

4   minute break?

5            MR. TOAL:  I'm ready to go, your Honor.

6            THE COURT:  All right.

7            MR. TOAL:  I have some documents I may show to

8   Dr. Mason.  May I approach the witness?

9            THE COURT:  Yes.

10  CROSS-EXAMINATION

11  BY MR. TOAL:

12  Q.  Good afternoon, Dr. Mason.

13  A.  Good afternoon.

14  Q.  So Dr. Mason, you understand that the plaintiff's theory in

15  this case is that -- I'm sorry.

16            You understand there are approximately 13 alleged

17  misstatements that remain in this case?

18  A.  I think that fits with my recollection, yes.

19  Q.  And your analysis found that there is no statistically

20  significant price movement in Goldman stock at the 95 percent

21  confidence level for any of those alleged misstatements,

22  correct?

23  A.  That's what I recall, yes.

24  Q.  And so you agree that the alleged misstatements here didn't

25  increase the value of Goldman stock at the time they were made,

O2MQfon3                                   Mason - Cross

1    correct?

2    A.   Correct.

3    Q.   So you and Dr. Kothari are in agreement that there was no

4    affirmative inflation introduced into Goldman's stock price by

5    virtue of any of the alleged misrepresentations, correct?

6    A.   That's correct.

7    Q.   And you understand that the plaintiff's theory in this case

8    is that the alleged misstatements preserved Goldman's stock

9    price at the time they were made, correct?

10   A.   Yes, preserved or maintained.  Yes.

11   Q.   Okay.  You're fine with either of those, preserved or

12   maintained?

13   A.   I'm fine with them as long as there's no legal distinction.

14   Q.   Okay.  And your position in this case is that it actually

15   doesn't matter how many alleged misstatements are at issue for

16   inflation purposes, correct, whether it's one or 13 or any

17   number in between, correct?

18   A.   That's right.  They're all essentially denials of

19   Goldman Sachs' institution-wide complicity; they're not

20   additive.

21   Q.   And so your position is that if plaintiffs here decided to

22   abandon 12 of the 13 alleged misrepresentations, it wouldn't

23   change your measure of price inflation in any way, correct?

24   A.   I think that's right.  I'd want to see the details of that

25   hypothetical, but on its face, I wouldn't disagree.

O2MQfon3                              Mason – Cross

1   Q.  And for your purposes, it wouldn't even matter which of the

2   12 were dropped because you see all of the alleged

3   misstatements as essentially being denials of culpability,

4   correct?

5   A.  That's right.

6   Q.  Now, Dr. Mason, you've read the Second Circuit's decision

7   in *Arkansas Teachers*, correct?

8   A.  It's been awhile, but yes.  Yes, I have.

9   Q.  And we recognize that you're not a lawyer, but you

10  generally understand that in an inflation maintenance case,

11  there has to be a close fit between the substance of the

12  alleged corrective disclosure and the substance of the alleged

13  misrepresentations, correct?

14  A.  Correct.  I understand that generally, though I do want to

15  respect the arguments earlier this morning about the subtleties

16  to that.

17  Q.  Okay.  And you also understand that the alleged corrective

18  disclosure in this case that remains in this case concerned a

19  2013 meeting that both Lloyd Blankfein and Jho Lo supposedly

20  attended, right?

21  A.  Yes.  That was the subject of a newspaper article released

22  the evening of November 8.

23  Q.  That's the *Financial Times* article that came out sometime

24  after 11:00 p.m. Eastern Time on November 8, 2018, correct?

25  A.  Yes.

O2MQfon3                          Mason - Cross

1   Q.  And that's the corrective disclosure on which your entire

2   economic analysis hinges, correct?

3   A.  Yes, that's the disclosure in this case.

4   Q.  Okay.  And you agree that none of the alleged

5   misrepresentations in this case specifically refer to a meeting

6   between Lloyd Blankfein and Jho Lo in 2013, right?

7   A.  That's right.  They don't mention those words.

8   Q.  The alleged misrepresentations don't say anything about a

9   meeting involving Lloyd Blankfein in any way, correct?

10  A.  I don't know if I'd agree with that.  One of the

11  misrepresentations was essentially we don't know Jho Lo or

12  don't know of Jho Lo's involvement.  It turns out that the CEO

13  was meeting with Mr. Low to discuss 1MDB business.  It seemed

14  like that one is directly contradicted.

15  Q.  Okay.  So that you at least agree that none of those

16  alleged misstatements specifically reference a 2013 meeting

17  between Lloyd Blankfein and Jho Lo, correct?

18  A.  Right.  There was no direct statement saying -- I guess

19  you're saying it would say that Jho Lo and Lloyd Blankfein

20  didn't meet in 2013.  There was no such statement issued

21  previously.

22  Q.  And you agree that the November 8 alleged corrective

23  disclosure here about a Blankfein-Low meeting doesn't talk

24  about, for instance, the fees and commissions that Goldman made

25  from the 1MDB bond transactions, correct?

O2MQfon3                              Mason - Cross

1   A.  I'm sorry, can you restate that?

2   Q.  Yeah, the alleged corrective disclosure in this case

3   concerns a 2013 meeting between Lloyd Blankfein and Jho Lo,

4   correct?

5   A.  Yes.

6   Q.  Okay.  And you agree that alleged corrective disclosure

7   doesn't talk about fees and commissions that Goldman made from

8   the 1MDB bond transactions, correct?

9   A.  I covered the disclosure excerpts earlier.  I don't think

10  they talk directly about fees and commissions, though there was

11  to be a discussion of 1MDB business that might have involved

12  fees and commissions.

13  Q.  Do you remember being deposed in this case?

14  A.  Yes.

15  Q.  Let me ask you to take a look at tab 2 — or we can show it

16  on the screen — which is your deposition testimony from your

17  2023 deposition.  If I could direct your attention to page 124,

18  lines 14 to 19.  Do you see here you're asked:  "The

19  November 8th and November 9th disclosure about the

20  Blankfein-Low meeting does not talk about the fees and

21  commissions that Goldman made from the 1MDB bond transactions,

22  correct?"

23          And your answer is:  "That is correct."

24          Do you see that?

25  A.  Okay, I see that.

O2MQfon3                              Mason – Cross

1    Q.  Okay.  So that was your testimony?

2    A.  Yes.

3    Q.  And that was at your testimony, correct?

4    A.  As I said in my deposition, there are not words in the

5    *Financial Times* article referring to fees.

6            I do want to note that I was never shown the *Financial*

7    *Times* article in this deposition nor any document and made note

8    of that in the transcript.  So while I was asked to comment

9    about verbatim language, I was not allowed to do so with the

10   aid of the document itself to confirm that language.

11   Q.  Okay.  We'll have a chance to go through that article

12   today.  You also agree, Dr. Mason, that the November 8

13   corrective disclosure about the supposed Blankfein–Low meeting

14   doesn't talk about how funds relating to the 1MDB transaction

15   were actually used, correct?

16   A.  Well, you said I'd be presented with the disclosure later.

17   If you'd like, I can take a look at it now.  We can just take a

18   look at the words on the page, but I haven't committed it to

19   memory.

20   Q.  The specific corrective disclosure that's at issue in the

21   November 8 *Financial Times* article, you agree, concerns a

22   meeting between Mr. Blankfein and Mr. Low in 2013, right?

23   That's what you point to as the alleged corrective disclosure,

24   correct?

25   A.  Sure.  I note that the article did relate this meeting to

O2MQfon3                              Mason - Cross

other aspects of the previous misstatements as we had on the

slide earlier.  I guess I could just go back to the slides if

I'd like.

Q.  Well, we'll have a chance to get there, Dr. Mason, but at

least the corrective disclosure information about the 2013

meeting between Mr. Blankfein and Mr. Low, that particular

corrective disclosure doesn't have anything to say about how

funds from the 1MDB bond transaction were actually used,

correct?

A.  Oh, well as I noted previously on slide 4, that same

article notes that Goldman has always maintained that it did

not know how the proceeds of the bond offerings were spent, so

that the article itself related the fund proceeds back to the

statement about the meeting between Mr. Low and Mr. Blankfein.

Q.  Okay.  But that information had been in the market for a

long time, right?  The language of the article says "Goldman

has always maintained," right?

A.  Right.  And that's the point of the article containing this

language, it's reflecting that claim now back upon Goldman in a

world now where Mr. Blankfein and Mr. Low are meeting

personally in 2013 after the fraud has been complicit -- I'm

sorry -- after the fraud has been ongoing, raising issues of

Goldman Sachs' institutional complicity.

Q.  And what you identify as new value relevant information in

this article is the information about a supposed 2013 meeting

O2MQfon3                          Mason – Cross

1    between Mr. Blankfein and Mr. Low, correct?

2    A.   That is the new information, and the authors of the article

3    are putting that new information against the old information

4    such that the old information comes into substantial question

5    as a result.

6    Q.   Now, Dr. Mason, you agree that shares traded on major

7    exchanges are efficient with respect to publicly available

8    information, correct?

9    A.   Sure, I discuss semi-strong market efficiency in the

10   context of my report and show that the market for Goldman Sachs

11   stock traded in a semi-strong efficient market.

12   Q.   And Goldman Sachs trades its stock trades on the New York

13   Stock Exchange, correct?

14   A.   Yes.

15   Q.   And that's considered a major exchange, correct?

16   A.   Yes.

17   Q.   And, as you said, in this case you're actually offering an

18   opinion that Goldman Sachs stock traded in a semi-strong

19   efficient market, correct?

20   A.   Yes, that's what I just said.

21   Q.   Okay.  So that means that new value relevant information

22   about Goldman would have been promptly reflected in its share

23   price, correct?

24   A.   Yes.

25   Q.   And do you agree that semi-strong efficiency means that

O2MQfon3                          Mason – Cross

1   stock prices respond to relevant news quickly and completely?

2   A.   I wouldn't disagree with that, and they do so in a prompt

3   fashion.

4   Q.   Now, Dr. Mason, you agree that prior to the publication of

5   the *Financial Times* article after 11:00 p.m. on November 8,

6   there is already a lot of information in the market about the

7   relationship between Goldman Sachs and 1MDB, correct?

8   A.   Sure.  Everybody knew that Goldman Sachs underwrote the

9   deals.

10  Q.   And there was already a lot of information in the market as

11  of that time about connections between Goldman Sachs and

12  Jho Lo, correct?

13  A.   Well, if by Goldman Sachs you mean Mr. Leissner and Mr. Ng,

14  yes.

15  Q.   There's also information in the market about connections

16  between Jho Lo and others at Goldman by that time, correct?

17  A.   I don't have the exact timeline with regard to others, but

18  I understand that at some point there was a discussion of, I

19  think, involvements of Mr. Vella.  I don't know about others

20  sitting here today, but it was primarily Mr. Ng and

21  Mr. Leissner.

22  Q.   One of the pieces of information that came out about the

23  relationship between Goldman Sachs and Mr. Low was the Tim

24  Leissner criminal information, correct?

25  A.   That was between Mr. Leissner and Mr. Low, but yes.

O2MQfon3                          Mason - Cross

1    Q.  You're aware there was a criminal information against

2    Mr. Leissner that was released on November 1, 2018, correct?

3    A.  Yes.

4    Q.  In the course of your analysis in this case, did you review

5    that document?

6    A.  I have reviewed that document.  I have not reviewed it

7    recently.

8    Q.  Okay.  And your understanding was that Mr. Leissner was the

9    chairman of the Southeast Asia Goldman Sachs division, correct?

10   A.  Sure.

11   Q.  And do you recall that in the Leissner information, it was

12   revealed that Mr. Leissner and others at Goldman had structured

13   the deals with 1MDB to generate higher fees for Goldman even

14   though that was more expensive for 1MDB?

15   A.  I recall something to that effect, yes.

16   Q.  Okay.  So that was already in the market as of the time of

17   the corrective disclosure on November 8, right?

18   A.  Well, when you say "that was," yes, everybody knew the fees

19   were high.

20   Q.  And beyond knowing the fees were high, they knew the entire

21   transaction had been structured to increase the fees even

22   though it was more expensive than 1MDB by virtue of the

23   Leissner information, right?

24   A.  Everyone knew by virtue of the Leissner information, is

25   that what you asked?

O2MQfon3                              Mason – Cross

1    Q.   That's right.

2    A.   Sure.  The Leissner information contained information about

3    the structuring.  As a rational economic agent, Goldman Sachs

4    certainly wanted to charge the highest price that it could

5    reasonably charge for its services, and did so.

6    Q.   Okay.  The Leissner information also revealed that

7    Mr. Leissner and his co-conspirators misappropriated more than

8    $2.7 billion from 1MDB, correct?

9    A.   Correct.  That the information contains that fact?

10   Q.   Is that your recollection that the criminal information

11   against Mr. Leissner contained that information?

12   A.   I don't know about that detail.

13   Q.   Okay.

14   A.   It probably has something similar, but, again, if you're

15   going to ask me about quotes from the criminal information, I'd

16   appreciate having it in front of me.  I have not committed it

17   to memory, and, as I said, have not even reviewed it recently.

18   Q.   You can take a look at Exhibit 10 in front of you,

19   paragraph 19 of the Leissner information, and let me know if

20   this refreshes your recollection that the information revealed

21   that Mr. Leissner and his co-conspirators misappropriated more

22   than $2.7 billion from 1MDB?

23   A.   Paragraph 19?

24   Q.   That's correct.

25   A.   I see paragraph 19, yes.

O2MQfon3                          Mason - Cross

1    Q.  Does this refresh your recollection that that information

2    was contained in the Leissner information that was released on

3    November 1, 2018?

4    A.  Yes.

5    Q.  And this information also revealed that Mr. Leissner and

6    his co-conspirators paid bribes to government officials in both

7    Malaysia and Abu Dhabi, correct?

8    A.  Probably does.

9    Q.  Take a look at paragraph 19 and see if that refreshes your

10   recollection.  You see right under the language we were looking

11   at before, it says, "More than 2.7 billion was instead

12   misappropriated by the defendant Tim Leissner and his

13   co-conspirators and distributed as bribes and kickbacks to

14   government officials in Malaysia and Abu Dhabi"?

15   A.  Yes.

16   Q.  Does that refresh your recollection that that information

17   was available to the market as of November 1, 2018?

18   A.  Yes.

19   Q.  And are you aware there was a criminal complaint released

20   that same day that revealed that Mr. Leissner and others at

21   Goldman knew that Mr. Low was involved in the 1MDB bond deals?

22   A.  Do I have that criminal complaint in the binder?

23   Q.  That's at -- that's Exhibit 9, which is at tab 9 in your

24   binder.  You can take a look at page 22.  There's a heading,

25   Heading F.  So if you just let me know when you get there in

O2MQfon3                          Mason - Cross

1  your binder.

2  A.  Okay, I'm there.

3  Q.  Is this a document that you reviewed in the course of your

4  analysis in this case?

5  A.  I reviewed it at some point in this case, yes.

6  Q.  Okay.  So do you see Heading F says, "Leissner and

7  co-conspirator number 2 concealed co-conspirator number 1's

8  involvement in the 1MDB bond offerings in 2012 and 2013 from

9  U.S. financial institution number 1.  Do you see that language?

10 A.  I see that.

11 Q.  And in the course of your review, did you develop an

12 understanding that co-conspirator number 1 referred to in this

13 criminal complaint was Jho Lo?

14 A.  Yes, that's my understanding.

15 Q.  Okay.  And --

16 A.  Leissner, therefore, concealed Jho Lo's involvement from

17 Goldman Sachs.

18 Q.  Okay.  And you recognize that U.S. financial institution

19 number 1 is a reference to Goldman Sachs, correct?

20 A.  Yes.

21 Q.  And co-conspirator number 2, do you recognize was Mr. Ng?

22 A.  I would presume so.

23 Q.  And was your understanding that Mr. Ng was a managing

24 director at Goldman Sachs?

25 A.  Yes.

O2MQfon3                              Mason – Cross

1   Q.  Do you recall that the November 1 complaint against

2   Mr. Leissner also revealed that a high-ranking Goldman

3   executive met with the former prime minister of Malaysia and

4   Mr. Low in 2009?

5   A.  Where are you pointing to here?

6   Q.  Do you have a recollection of that?  Let me ask you first.

7   A.  That sounds right.  And as I recall, part of the disclosure

8   in the *Financial Times* was that that unnamed executive at the

9   2013 meeting detailed in the filing was Mr. Blankfein.  That's

10  the important detail that comes out in this *Financial Times*

11  article.

12  Q.  We'll get to the *Financial Times* article.  But you agree

13  with me that this information was available to the market as of

14  November 1, 2018, correct?

15  A.  Yes.

16  Q.  And do you also recall that it was revealed in this

17  criminal complaint that in September 2013, Mr. Leissner and

18  Mr. Low met with a high-ranking executive of Goldman.  Do you

19  recall that being revealed in this same complaint?

20  A.  I think you just asked that, and --

21  Q.  I asked it as to the 2009 meeting.  Now I'm asking it as to

22  the 2013 meeting.  Do you remember that both pieces of

23  information were revealed in this criminal complaint that was

24  released on November 1, 2018?

25  A.  I'm sorry, then I misunderstood your previous question

O2MQfon3                              Mason – Cross

1    because I answered it with regard to the FT article with regard

2    to the 2013 meeting.

3    Q.   Okay.  Then let's back up.

4         My prior question was:  Do you recall that this

5    November 1 criminal complaint against Mr. Leissner revealed

6    that a high-ranking Goldman executive met with the former prime

7    minister of Malaysia and Mr. Low in 2009.  Do you remember

8    that?

9    A.   I have to say I don't think I do.  Only because, again, I

10   haven't reviewed this document for quite some time.  I'm happy

11   to take a look at it.  Wouldn't dispute it, but ...

12   Q.   Let's take a look just so we're all clear on this.  If you

13   could turn to Exhibit 9, which is at tab 9 in your binder.

14        So do you recognize this as the Leissner complaint

15   that you reviewed in the course of your work?

16   A.   Yes.  Thank you.

17   Q.   If I could direct your attention to paragraph 31.  So this

18   is actually part of a complaint and affidavit.  So this is

19   submitted by an FBI agent.  Do you remember that?

20   A.   I don't know who it was submitted by.

21   Q.   If you look at the first page, do you see that this is

22   submitted by an FBI agent?

23   A.   I see that, yes.

24   Q.   Okay.  So now if you look at paragraph 31, do you see

25   there's language here that says, "For example, based on my

O2MQfon3                         Mason - Cross

1    review of emails and documents, I've learned that on or about

2    November 22, 2009, Leissner and co-conspirator number 2" -- who

3    you've told us was Mr. Ng, correct?

4    A.   Yes.

5    Q.   --"helped arrange a meeting between a high-ranking

6    executive of financial institution number 1" -- which you said

7    was Goldman, correct?

8    A.   That's my understanding, yes.

9    Q.   -- "and a Malaysia official in New York, New York,

10   co-conspirator number 1," who you told us was Mr. Low, "helped

11   arrange this meeting and evidence supports that co-conspirator

12   number 1 was present."

13           Does that refresh your recollection that it was

14   revealed in this complaint that Mr. Low met with a high-ranking

15   executive of Goldman as of November 1, 2018?

16   A.   To be clear, this language with regard to co-conspirators,

17   et cetera, is, I think, meant to conceal their identity.  I've

18   answered questions with the benefit of hindsight so far, but

19   this does say there was a meeting with a high-ranking executive

20   of U.S. financial institution number 1.  It doesn't say who

21   that is.

22   Q.   Okay.  And then if I could direct your attention to

23   paragraph 70 of this same complaint, do you see that this

24   paragraph reveals that in September of 2013, Mr. Leissner and

25   co-conspirator number 1 met with a high-ranking executive at

O2MQfon3                         Mason - Cross

1    Goldman?

2    A.  Yes, I see the high-ranking executive language again.  Yes.

3    Q.  You're also aware that Goldman released its 10-Q for the

4    third quarter of 2018 on either November 1 or November 2, 2018,

5    correct?

6    A.  Yes.

7    Q.  And in that 10-Q, do you recall that Goldman said it was

8    unable to predict the outcome of the department of justice's

9    investigation.  However, any proceedings by the DOJ or other

10   governmental or regulatory authorities could result in the

11   imposition of significant fines, penalties, and other sanctions

12   against Goldman.

13           Do you remember that language appearing in the 10-Q?

14   A.  Yes.

15   Q.  Okay.  And so that told the market that Goldman believed it

16   faced potential exposure in connection with 1MDB, correct?

17   A.  I wouldn't agree with that at this point in time.  Goldman

18   has issued denials of institutional complicity for four years

19   now.  That's pretty stock language.  I wouldn't expect it to

20   move markets, and it didn't move markets at the time.

21   Q.  Well, whatever it did to the market, Goldman is putting in

22   a regulatory -- SEC regulatory filing that it can't predict the

23   outcome of the regulation, and the investigation could result

24   in imposition of significant fines, penalties, and other

25   sanctions, right?

O2MQfon3                        Mason - Cross

1    A.   Sure.  And when I say move markets, it's another way of

2    saying investors weren't particularly concerned with this at

3    the time, certainly not enough to sell off Goldman Sachs at

4    that moment.  They only become with --

5              THE COURT:  Let the witness answer and then you can

6    ask your next question.

7              Go ahead finish your answer.

8    A.   They didn't become -- investors didn't become concerned

9    until the evening of November 8 when it was revealed that

10   Mr. Blankfein had personally been meeting with Mr. Low raising

11   the specter of institutional complicity on the part of

12   Goldman Sachs.

13   Q.   Okay.  So what you're saying that it didn't move markets is

14   from your perspective as a financial economist, what you're

15   saying is there's no statistically significant price drop

16   following the release of this 10-Q on either November 1 or

17   November 2, right?

18   A.   That's right.

19   Q.   Okay.  And there's also no statistically significant price

20   drop after the criminal information and the criminal complaint

21   that we just reviewed that came out on November 1, correct?

22   A.   That's correct.

23   Q.   Now, you're also aware that on November 2, 2018, the

24   *Financial Times* reported that more than 30 Goldman executives

25   have reviewed the 1MDB debt deals that led to the criminal

O2MQfon3                          Mason - Cross

1    charges against Mr. Leissner, correct?

2    A.   Sure.   That's standard for any debt deal.   The deals that

3    go out the door have to be reviewed by executives, and

4    executives reviewed the deals in the normal course of business.

5    Q.   It reported that 30 different Goldman executives of

6    reviewed these deals.   Do you remember that?

7    A.   I don't remember the number 30.   I remember Goldman

8    executives reviewed the deals, and that is completely

9    unsurprising.   For any bond issue, a number of executives are

10   going to review the deals before they're finalized and

11   approved.

12   Q.   Let's take a look at Exhibit 14 in your binder.

13        Is this a *Financial Times* article that you reviewed in

14   the course of your work?

15   A.   I haven't reviewed this recently sitting here today.   There

16   have been almost a thousand media reports reportedly reviewed

17   by myself and Mr. Kothari -- Dr. Kothari.   So I think this was

18   among them.   I do recall media reports about Goldman Sachs

19   executives reviewing the 1MDB deals.

20   Q.   So you think you reviewed this article in the course of

21   your work, correct?

22   A.   Yes.

23   Q.   And at least this reporter thought it was noteworthy to

24   report as reflected in the headline that 30 Goldman executives

25   reviewed the 1MDB deals, correct?

O2MQfon3                            Mason - Cross

1    A.  Yes.

2    Q.  Do you also recall that on November 2, Bloomberg published

3    an article entitled, "Mystery Goldman Exec at MDB Meeting

4    Signals New Woes for Bank"?

5    A.  What day was that, did you say?

6    Q.  November 2?

7    A.  November 2?  I recall that article, I believe.  I think it

8    still didn't mention -- that might have been discussing the

9    2009 meeting, but we can take a look at that.

10   Q.  So take a look at tab 13 in your binder, if you would.

11   A.  Okay, I'm there.

12   Q.  Do you see the first bullet point under the headline says,

13   "High-Ranking Exec Met with Jho Lo After Years of Red Flags"?

14          If you look at the screen, it shows you where it is in

15   the article.  Do you see that language, Dr. Mason?

16   A.  Yes.

17   Q.  Do you recall being aware of that in the course of your

18   work on this matter?

19   A.  Yes, I recall these reports of a high-ranking executive met

20   with Jho Lo but not naming who that was.

21   Q.  Okay.  When we looked at the criminal complaint, you

22   pointed out that people might not know who co-conspirator

23   number 1 was.  By this time, at least Bloomberg has

24   identified co-conspirator number 1 as Jho Lo, correct?

25   A.  By this time, who has identified?

O2MQfon3                              Mason - Cross

1   Q.  By this time, November 2, 2018, this Bloomberg author has

2   made the connection that co-conspirator number 1 is Jho Lo,

3   correct?

4   A.  Probably.  This is November 2.  So, as was noted earlier

5   this morning, this was after the book *Billion Dollar Whale* came

6   out.  This was also after other press coverage that had

7   revealed the ties between Mr. Leissner and Mr. Low.

8   Q.  Okay.  And you recall that you referenced *Billion Dollar*

9   *Whale*.  You recall that book was published in September 2018?

10  A.  Yes.

11  Q.  And at least as of the time you submitted your expert

12  reports and as of your deposition in the case, you had read

13  that book, correct?

14  A.  That's correct.

15  Q.  Have you read it since?

16  A.  Yes, I have.

17  Q.  Okay.  Now, if we move to the document that you identify as

18  containing the corrective disclosure -- actually, before we get

19  there, do you recall on November 8 at 11:38 a.m. *Bloomberg News*

20  reported that Mr. Blankfein was the previously unidentified

21  high-ranking Goldman Sachs executive referenced in U.S. court

22  documents who attended a 2009 meeting with a former Malaysian

23  prime minister?

24  A.  I recall reports to that effect, yes.

25  Q.  So that came out during trading hours on November 8,

O2MQfon3                           Mason – Cross

1    correct?

2    A.   Yes.

3    Q.   And if I could direct your attention to tab 15.  Do you

4    recall this *Bloomberg* article being published during trading

5    hours on November 8?

6    A.   That's what I recall, yes.

7    Q.   And do you see the second paragraph, it says, "Blankfein

8    was the unidentified high-ranking Goldman Sachs executive

9    referenced in U.S. court documents who attended a 2009 meeting

10   with the former Malaysian prime minister, the people said."

11            Do you see that language?

12   A.   Yes.

13   Q.   And you were aware of that language in the course of the

14   work you've done in this matter, correct?

15   A.   Yes.

16   Q.   And do you see the next paragraph after the picture of

17   Mr. Blankfein, it says, "The meeting at the Four Seasons hotel

18   in New York was set up and attended by two key figures in the

19   1MDB scandal, Malaysian businessman Jho Lo and former Goldman

20   partner Tim Leissner, one person with direct knowledge of the

21   matter said, asking not to be identified as the information

22   isn't public."  Do you see that?

23   A.   I see that.

24   Q.   So as of 11:38 a.m. New York time on November 8,

25   information was available to the market that Lloyd Blankfein

O2MQfon3                          Mason - Cross

1    had met with Jho Lo in 2009, right?

2    A.  Right.  Before the 1MDB -- before Goldman Sachs

3    participation in 1MDB.

4    Q.  Now, the *Financial Times* article on which your economic

5    analysis in this case hinges, do you remember that came out

6    what you call after hours on November 8, right?

7    A.  Yes.

8    Q.  And when you say "after hours," you mean after trading

9    hours on the New York Stock Exchange, right?

10   A.  Yes.

11   Q.  Let me ask you to take a look at Exhibit 16 in your binder.

12        Can you tell me if this is the *Financial Times* article

13   that contains the corrective disclosure that you focused on in

14   your analysis?

15   A.  Yes.  I do want to ask why we have 16(1) and 16(2).  Are

16   those different versions of the same article or different

17   articles?

18   Q.  So the first version of this article has a timestamp on it.

19   Do you see it indicates that this article was published at

20   11:17 p.m. on November 8?

21   A.  Yes, in 16(1), I see a timestamp of 23:17.

22   Q.  Behind the divider, there's a version of the article that

23   doesn't have a timestamp?

24   A.  Thank you.

25   Q.  Is that consistent with your recollection of when this

O2MQfon3                            Mason - Cross

1   article was published?

2   A.  Yes.

3   Q.  And that is the article that contains the corrective

4   disclosure that you've identified in this case, right?

5   A.  Yes.  It looks like the second version has a figure.  The

6   first doesn't.  It's pointing out that there might be some

7   differences that raised my concern.

8   Q.  Okay.  If that makes a difference to your testimony, just

9   let me know.

10  A.  Thank you.

11  Q.  So you understand the disclosure in this article was about

12  a meeting between Mr. Blankfein and Mr. Low in 2013, correct?

13  A.  Yes.

14  Q.  Now, if we look at this article, immediately below the

15  byline and the copyright, it starts off by saying, "Attendance

16  of ex-chief at 2009 meeting threatens to undermine defense in

17  scandal."

18          Do you see that?

19  A.  I see that.

20  Q.  This article actually starts off talking about the 2009

21  meeting, correct?

22  A.  Yes.

23  Q.  And then do you see in the third paragraph of this article,

24  it says that, "Mr. Blankfein attended a meeting with Mr. Low

25  and Najib Razak, who was then Malaysian's prime minister"?

O2MQfon3                                Mason - Cross

A.  Yes.  I think that's the fourth, given the single sentence
paragraph at the beginning, unless that's a header.  But the
paragraph beginning, "So it is surprising."

Q.  Okay.

        And then if you go to the next page, by my count it is
the 13th paragraph in this article, you see it says, "However,
the revelation that Mr. Low met with Mr. Blankfein at least
once could undermine this rogue employee narrative.
Mr. Blankfein is still chairman of Goldman, having handed over
to Mr. Solomon as CEO earlier this year."  Do you see that?

A.  I see.

Q.  It continues, "It is not clear whether Mr. Blankfein knew
that Mr. Low helped arrange the 2009 meeting with the Malaysian
prime minister or whether the pair even spoke."

        Do you see that language?

A.  Yes.

Q.  In the prior paragraph, where it says "The revelation that
Mr. Low met with Mr. Blankfein at least once could undermine
this rogue employee narrative," that's a reference to the 2009
meeting, right?

A.  Possibly.  Though as a financial economist, I've already
stated that what's really going to upend the rogue employee
narrative was the meeting in 2013 after the deals had been
underwritten.

Q.  So in this article, which contains the corrective

O2MQfon3                          Mason - Cross

1   disclosure that you focused on, by the time you get to

2   paragraph 13, the article hasn't even discussed a 2013 meeting,

3   has it?

4   A.  Again, that's why I said possibly.  If one was to start

5   parsing English language here, that could be the case.  You

6   might reach that conclusion on the basis of grammar.  I am not

7   an expert in grammar.  I'm a financial economist.  I'm pretty

8   good at grammar, I think.  I've been told I'm a clear writer.

9   But the one thing I can be sure of as a financial economist is

10  the next day the stock price began its biggest two-day decline

11  in eight years.

12  Q.  We'll talk about that, Dr. Mason.  My point is, this

13  reference in paragraph 13 to information about a meeting

14  undermining a rogue employee narrative, that's a reference to

15  the 2009 meeting, right, because the 2013 meeting hasn't even

16  been discussed in this article yet, right?

17  A.  Okay.  So looking at how you're stacking this up, the

18  paragraph beginning, "However, the revelation" is two

19  paragraphs before the discussion of "Prosecutors believe that

20  Mr. Low met on a second occasion discussing the 2013 meeting."

21  The "However, the revelation" paragraph noting undermining the

22  rogue employee narrative, there's a reference to "met with

23  Mr. Blankfein at least once."  That could undermine the rogue

24  employee narrative.  And I think this is the position that

25  Goldman Sachs is probably in at this point.  Of course, I'm

O2MQfon3                          Mason – Cross

1    speculating on fact pattern and evidence and English language,

2    but --

3    Q.  Dr. Mason, I don't want you to speculate.  If you can't

4    answer the question, you can't answer the question.

5    A.  Well, it seems to me that Goldman Sachs, as you noted,

6    disclosed in their financial reporting on, let's call it

7    November 2 — could be the evening of the 1st — that they could

8    face fines.  Yes, the DOJ is probably looking at them, but so

9    far they've maintained there's nothing to look at through four

10   years of denials.

11           So you covered just a moment ago the Bloomberg

12   article, which I think came out earlier in the day on the 8th,

13   which revealed Mr. Blankfein had met with Mr. Low in 2009.

14   That could complicate things, though, again, the fraud hadn't

15   yet involved bond offerings underwritten by Goldman Sachs.

16           I do remain of the opinion, however, that the 2013

17   meeting would make it really hard for Goldman Sachs to continue

18   to credibly maintain the rogue employee narrative because that

19   2013 meeting happened after Goldman Sachs underwrote three bond

20   offerings for 1MDB.

21           THE COURT:  Counsel, I just want to mention we're

22   coming up on about 1:00.  So I want you to take a minute just

23   to focus on the remaining time that you have left.

24           MR. TOAL:  Thank you, your Honor.

25           THE COURT:  We can go a little bit past, but I want

O2MQfon3                              Mason - Cross

1     you to focus on what's most important to your arguments.

2              MR. TOAL:  Thank you.

3     A.  If I may, I just want to complete my answer because as a

4     financial economist, I see this news article accompanied by a

5     very significant stock drop over the next two days, which would

6     be consistent with my interpretation of that 2013 meeting

7     presenting a particularly important risk having taken place

8     after those three offerings for 1MDB.

9     Q.  So, Dr. Mason, the information that you say is the new

10    value relevant information here that appears in the 15th and

11    16th paragraphs of this article where it says, "Prosecutors

12    believe that Mr. Low met on a second occasion with a senior

13    Goldman executive in 2013 at a gathering that included the

14    Malaysia prime minister, one of his family members.  The

15    meeting took place at the Time Warner Center in New York

16    according to court filings.  A person briefed on the matter

17    said that the unnamed executive at the 2013 meeting detailed in

18    the filing was Mr. Blankfein, although there is some doubt over

19    whether Mr. Low was at that second meeting," correct?

20    A.  Sure.  That doubt might be why the author used the "at

21    least once."  But, again, as a financial economist, there

22    anything else out -- after this article, there wasn't some

23    massive revelation of something else that occurred the morning

24    of the 9th, say, that would explain this $7 billion decline in

25    Goldman's marketing capitalization against the next two trading

O2MQfon3                         Mason - Cross

1    days.

2    Q.  Dr. Mason, in offering your opinion that the November 8,

3    2018 information regarding the 2013 meeting was value relevant,

4    you didn't account for how many, if any, analysts covering

5    Goldman specifically mentioned a 2013 meeting, correct?

6    A.  I accounted for those.  I believe we went through those in

7    our deposition -- in my deposition, rather.

8    Q.  And how many analysts specifically reference the 2013

9    meeting as part of your analysis?

10   A.  I think maybe one specifically referenced the meeting, the

11   2013 meeting.  I remember there was some that just referred to

12   meeting or meetings.

13   Q.  Dr. Mason, isn't it true that ---

14   A.  As I said earlier, the first meeting was to refer to

15   meetings to demonstrate their revealed concern, new-found

16   concern, with the value implications of such meetings.

17   Q.  Dr. Mason, isn't it true that there was not a single

18   analyst that specifically referenced the 2013 meeting?

19   A.  You can show me.  I believe there were only two that I

20   think mentioned a meeting or meetings.  I'm happy to take a

21   look at them to --

22   Q.  Do you recall that one analyst specifically referenced the

23   2009 meeting?

24   A.  That might be right.

25   Q.  And do you recall another analyst just mentioned that

O2MQfon3                          Mason - Cross

1    Mr. Blankfein had met with Mr. Low?

2    A.   Again, I haven't committed these analyst comments to

3    memory, but I do have some on my slides that I'm happy to refer

4    back to.

5    Q.   That's okay, Dr. Mason, in the interest of time --

6    A.   No.  No.  It's fine with me.  I prefer to be exact about

7    this because you are drawing a distinction here that you

8    believe is very important.  So we have the Barclay's

9    November 12, former Goldman Sachs CEO Lloyd Blankfein

10   reportedly met with 1MDB representatives, and that's as a

11   reason for Goldman stock price declined.

12   Q.   Well, let me try and short-circuit this, Dr. Mason, because

13   we have limited time.

14        If I could direct your attention to tab 18 in your

15   binder.  This is a document you reviewed in the course of your

16   analysis, correct?

17   A.   Yes.

18   Q.   Okay.  And this is a Barclay's report from November 12,

19   2018, correct?

20   A.   Yes.

21   Q.   And the title is, "Top Ten Excuses We Have Heard for

22   Goldman Sachs' Recent Selloff," right?

23   A.   Yes.

24             (Continued on next page)

25

O2MCfon4                          Mason - Cross

1    BY MR. TOAL:

2    Q.   And you see the second one talks about the November 1st

3    unsealing by DOJ of a criminal information and guilty plea by

4    Tim Leissner?

5    A.   Sure.

6    Q.   The entirety of that paragraph talks about that indictment

7    and guilty plea, and then the last sentence says:

8    "Furthermore, former GS CEO Lloyd Blankfein reportedly met with

9    1MDB representatives."  Do you see that?

10   A.   Yes.

11   Q.   It doesn't specifically reference the 2013 meeting; right?

12   A.   That's correct.

13   Q.   Then if I could direct your attention to tab 19, this is a

14   WOLFE research report that you reviewed as part of your

15   analysis; right?

16   A.   Yes.

17   Q.   And this is from November 12th, 2018; correct?

18   A.   Yes.

19   Q.   Do you see at the bottom of the first paragraph, it

20   references Leissner's guilty plea was unsealed by courts on

21   Friday and two press reports suggest late last week ex-CEO

22   Blankfein was present at a meeting with Low in 2009; right?

23   A.   Yes.

24   Q.   That doesn't specifically reference the 2013 meeting, does

25   it?

O2MCfon4                              Mason - Cross

1   A.  No, it doesn't.

2   Q.  And you expect securities analysts to have commented on

3   information that contemporaneous market participants saw likely

4   to affect Goldman's evaluation or stock price; right?

5   A.  Yes.  And it's my opinion they did when they revisited the

6   valuation of Goldman Sachs' 1MDB exposure in light of the news

7   revealed the evening of November 8.

8   Q.  You agree that if there was value relevant information

9   about a company, it would appear in at least one or more

10  analyst reports; right?

11  A.  Generally, that's the case.  I do want to be clear, the

12  analysts are usually concerned with accounting measures and

13  things like that that are discussed widely and what different

14  accounting measures mean.  Accounting is sort of a language in

15  and of itself and they're parsing the language.

16          While I do find it heartening that some analysts are

17  referring to meetings and referring to the timing of the

18  selloff, there is one thing that is clear in a large number of

19  these analyst reports, that is these analysts are now

20  expressing a new found concern with the value of Goldman Sachs'

21  1MDB exposure following November 8th, not during the day,

22  November 8th when news of the 2009 meeting comes out on

23  November 9th after the evening November 8th news about Lloyd

24  Blankfein's meeting with Mr. Low.

25  Q.  You haven't identified a single analyst report that

O2MCfon4                              Mason - Cross

1    specifically references this 2013 meeting that you say had

2    billions of dollars in consequence for Goldman Sachs' stock;

3    right?

4    A.   We have the analyst reports that we have, we have the

5    language we just reviewed.  I interpret that language as

6    relating to the 2013 meeting because, as I said, it's a

7    financial economic principle that here we have the market

8    already knowing about Mr. Leissner's relationship with Mr. Low

9    and where there are certain employees of Goldman Sachs who have

10   been involved with this fraud.  We get on the 13th, there's an

11   elevation of concern to the complicity of Goldman Sachs as a

12   whole.  It would make sense to me as a financial economist that

13   the stock drop derived from that, which was demonstrated by the

14   Lloyd Blankfein meeting with Mr. Low in 2013.

15            THE COURT:  I have a question.  The news that came out

16   about the 2009 Blankfein meeting during the day, during the

17   trading day on November 8th, would you, as an economist, expect

18   that to be incorporated into the stock price by the close of

19   business that day, the 8th?

20            THE WITNESS:  I believe you noted that came out about

21   11:00 a.m.; is that correct?

22            MR. TOAL:  That's correct.

23            THE WITNESS:  So yes, it didn't come out just before

24   the close of trading.

25            THE COURT:  Thank you.

O2MCfon4                          Mason - Cross

1    Q.  Dr. Mason, in any event, because this article was published

2    after the close of trading, you agree that Goldman's stock

3    price should have begun to react to this information no later

4    than the markets opening on the morning of Friday, November

5    9th; right?

6    A.  Sure.  And that's a good point to also place against the

7    answer I just gave to you.  The stock price might not finish

8    reacting on the 8th if that news was important, that in fact

9    might go into the 9th, but I would expect it to start on the

10   8th and likely see something.

11   Q.  You didn't do any analysis to determine whether Goldman's

12   stock price showed a statistically significant stock drop as of

13   the open on November 9th; correct?

14   A.  If you're asking did I perform an intraday analysis, no, I

15   did not.

16   Q.  Including, you didn't see if there was a statistically

17   significant stock drop as of the open; correct?

18   A.  Do you mean at the open --

19   Q.  At the open.

20   A.  -- it was alleged by Dr. Kothari within the first

21   15 minutes of trading.

22   Q.  My question was at the open, did you do any analysis to see

23   if there's a statistically significant stock drop at the open

24   on November 9th?

25   A.  I observed the opening price and, no, there wasn't.  But I

O2MCfon4                        Mason - Cross

1  can perform a statistically significant study of any sort.

2  Q.  You didn't do an intraday analysis to see if there was a

3  statistically significant stock movement during trading the day

4  of November 9th; correct?

5  A.  That's right.  I did not undertake an intraday analysis.  I

6  do take issue with the intraday analysis that Dr. Kothari

7  performed.  I do not find that reliable at all for the purposes

8  he advances, largely because it doesn't take into account any

9  order and balances, but there are other issues, as well, that

10 are more technical.

11         On that note, with regard to the opening price, there

12 is also an opening auction that takes place with the NYSC with

13 dissemination of information on a couple of hours before the

14 open.  That opening process would report order and balances

15 that may or may not have existed.  Again, a lot of people might

16 have wanted to sell and there might have not been enough buyers

17 to meet that demand.  That information is knowable.

18 Therefore -- but Dr. Kothari has not taken that into account.

19 As you noted, an analysis of that opening price would take that

20 into account.  When you say close to open, we go close to

21 close.

22         THE COURT:  Five more minutes, counsel.

23 Q.  And you recognize that Dr. Kothari found there's no

24 statistically significant drop in Goldman's stock price on the

25 9th at any time at the 95-percent confidence interval at any

O2MCfon4                          Mason - Cross

1    time prior to 3:00 p.m.; right?

2    A.  That's what Dr. Kothari found.  We already covered there's

3    a 10-percent significance level drop in the first 15 minutes,

4    but again, it's my opinion that his methodology is flawed and

5    shouldn't be taken into account.  You don't just take the

6    techniques you use for a close-to-close event study and start

7    using them intraday.  There's a lot more you need to take into

8    account.

9    Q.  And you agree that Dr. Kothari's analysis showed that,

10   first of all, in the first 15 minutes, you agree his results

11   showed no statistically significant stock drop at the

12   95-percent confidence interval; right?

13   A.  At the 95-percent confidence interval, yes.

14   Q.  That's the standard in social sciences, including

15   economics; right?

16   A.  That is incorrect, as I covered earlier.

17   Q.  In your expert reports --

18   A.  -- association statement on statistical significance in my

19   report, if one cares to take a look at it.

20   Q.  In your expert report in this case, you reported results at

21   the 95-percent confidence level; right?

22   A.  Sure.

23   Q.  And you agree that the 95 percent confidence interval is

24   the most common characteristic of acceptable statistical

25   significance; right?

O2MCfon4                          Mason - Cross

1    A.  Sure, in line with those principles laid down by the

2    American Economic Association.  You will also notice that I do

3    report the EP values.  So even if something is 64 percent

4    statistically significant, I include the 64 for the reader to

5    consider, which is the standard for reporting according to the

6    American Economic Association.

7    Q.  And you also agree that the 95-percent confidence interval

8    is the typical threshold that most people and most courts look

9    at; right?

10   A.  Sure.  The courts tend to focus on 95 percent, that's

11   right.

12   Q.  Now, you recognize on the morning of the 12th of November,

13   information came out about an interview that the Malaysian

14   prime minister gave to a radio station; correct?

15   A.  Yes.

16   Q.  And what you did in your analysis is you tried to back out

17   of the stock drop on November 12th, $600 million in fees that

18   1MDB paid to Goldman; right?

19   A.  Sure, that's a reasonable explanation.

20   Q.  Did you listen to the interview that the Malaysian prime

21   minister gave to that radio station?

22   A.  I read the transcript, I didn't listen to it.

23   Q.  Do you recall in that transcript, in addition to -- well,

24   let me ask you.  Do you recall that transcript said the

25   Malaysian prime minister would seek to recover fees for

O2MCfon4                          Mason - Cross

1    starters?

2    A.  Sure.  The prime minister said what he said in the

3    interview after the news came out the evening of November 8th,

4    but the message was really unchanged from the June statement,

5    that the State of Malaysia was going to try to seek

6    compensation for everything it could get.

7    Q.  And did the Malaysian prime minister also say that he was

8    going to seek to recover Malaysia's consequential losses?

9    A.  Absolutely.  That's similar to what they said in June.

10   When things changed was evidence of Goldman Sachs'

11   institutional complicity demonstrated by the CEO's meeting with

12   Mr. Low that came out on the news the evening of November 8th.

13   Q.  The other thing it changed is Tim Leissner pleaded guilty

14   to a number of federal crimes; right?

15   A.  He did, but we know investors weren't particularly

16   concerned with that.

17   Q.  Dr. Mason, you're not a professional investor, are you?

18   A.  No.

19   Q.  And I think you told us you're not an expert on the English

20   language; right?

21   A.  Yes.

22   Q.  You're not an expert in assessing media narratives;

23   correct?

24   A.  I suppose that's correct, yes.

25          MR. TOAL:  Thank you, your Honor.  No further

O2MCfon4                         Mason - Redirect

1   questions.

2            THE COURT:  Thank you.

3            MR. HASIUK:  Your Honor, if I may just a few brief

4   questions very quickly.

5            THE COURT:  Sure.

6   REDIRECT EXAMINATION

7   BY MR. HASIUK:

8   Q.  Dr. Mason, counsel asked you about the Leissner guilty plea

9   and affidavit that was released on November 1st.  Do you recall

10  that?

11  A.  Yes.

12  Q.  The Leissner affidavit and his guilty plea to criminal

13  information described how Tim Leissner hid Jho Low's

14  involvement from Goldman's compliance function.  Do you recall

15  that?

16  A.  Yes.

17  Q.  Why do you think Goldman's stock price did not decline in

18  response to news about Tim Leissner's admissions of guilt with

19  respect to his conspiracy with Jho Low?

20  A.  I think that information was pretty well known by markets

21  at the time.  This followed the release of the book Billion

22  Dollar Whale, which had a great deal of information about

23  Mr. Leissner and Mr. Ng.  As I said, this had been going for

24  four years, at least, and there were certainly four years of

25  denials by Goldman Sachs that there weren't any further ties to

O2MCfon4                        Mason - Redirect

1    the firm.

2    Q.  Counsel asked you about reports of Goldman committees and

3    executives reviewing the deals.  In your view, is there a

4    distinction between the deals and the criminal conspiracy

5    involving Jho Low and others?

6    A.  Absolutely.  It was obvious that Goldman Sachs had

7    underwritten the deals.  What was not obvious was what was

8    constructively revealed the evening of November 8th, that the

9    CEO of Goldman Sachs was meeting with the mastermind of the

10   fraud.

11   Q.  Do you think it was important to investors whether Goldman

12   was the victim of rogue employees, like Tim Leissner, or

13   institutionally complicit in this fraud?

14   A.  I'm sorry.  Do I think --

15   Q.  That it was important to investors whether Goldman was the

16   victim of rogue bankers on the one hand or institutionally

17   complicit on the other.  That distinction, was that important

18   to investors?

19   A.  Oh, that distinction is absolutely important.  The costs to

20   a firm of a fraud in which they're found to be institutionally

21   complicit is far greater in terms of reputational damage as

22   well as direct fines and penalties than if their exposure is

23   limited to a couple of rogue employees based upon that

24   narrative to use that shortcut term.

25   Q.  In fact, in tab 16 of your binder, which is the November

O2MCfon4                          Mason - Redirect

1   8th after-hours Financial Times report, it states in reporting

2   on the 2013 meeting, quote, whether Goldman is successful in

3   its efforts to show it was a victim of a rogue employee could

4   play an important part on what sanctions, if any, the DOJ

5   brings against the bank.

6           That section I just read of the report, does that

7   suggest to you that investors are now, in light of the 2013

8   meeting, more concerned that Goldman could face sanctions for

9   its institutional misconduct?

10  A.   Absolutely.  And this is the subject of an article by

11  Dr. Karpov that's cited by both Dr. Kothari and I, published in

12  2020, and cited in both of our reports that firms found to be

13  institutionally complicit faced far greater impacts upon their

14  value than firms that aren't.

15          MR. HASIUK:  Thank you very much, Dr. Mason.

16          THE COURT:  Thank you.  You may step down.

17          (Witness excused)

18          So we are going to take a lunch break and it is 1:20.

19  So if you could, try to get back here by 2:10 just so we can

20  make up a little time.  Thank you.

21          (Luncheon recess)

22          (Continued on next page)

23

24

25

O2MCfon4                          Mason – Redirect

```
 1                        AFTERNOON SESSION

 2                          2:12 p.m.

 3              THE COURT:  We are back on the record and I think

 4    ready for the defendants' expert witness.

 5              MS. SOLOWAY:  Yes.  Thank you, your Honor.  Our expert

 6    is professor S.P. Kothari.  Dr. Kothari why don't you come on

 7    up.

 8              One quick housekeeping matter before we start with

 9    Dr. Kothari.  The parties discussed and we request the

10    demonstratives be put into the record so later when we read

11    this transcript, we understand what people were looking at when

12    they were talking.  Is that all right?

13              THE COURT:  Absolutely.

14              MS. SOLOWAY:  We used a binder with Dr. Mason.  We

15    have another binder for Dr. Kothari.  Those are all marked with

16    hearing exhibit tabs.  So is handing your Honor a binder

17    sufficient to getting them into the record, as well?

18              THE COURT:  Yes, if there's agreement by the parties.

19              MR. MUSTOKOFF:  It's fine.

20              THE COURT:  I guess what I would ask is that you file

21    them on ECF tomorrow by close of business.

22              MS. SOLOWAY:  We'll do that with both the

23    demonstratives and the --

24              THE COURT:  Yes.  Yes.

25              MS. SOLOWAY:  We can take care of that.  We'll work
```

O2MCfon4                    Kothari - Direct

1    together to figure that out.

2                THE COURT:  Thank you.

3    S.P. KOTHARI,

4        called as a witness by the Defendants,

5        having been duly sworn, testified as follows:

6                THE DEPUTY CLERK:  Please state your name for the

7    record.

8                THE WITNESS:  S.P. Kothari.

9                THE COURT:  Dr. Kothari, when you speak, I just ask

10   you speak slowly and into the microphone so that the court

11   reporter can hear you clearly.

12   DIRECT EXAMINATION

13   BY MS. SOLOWAY:

14   Q.  Dr. Kothari, can you please start by summarizing your

15   qualifications to serve as an expert in this case.

16   A.  I will.  I'm professor of accounting and finance at MIT

17   Sloan School of Management, and I've been there for 25 years.

18   In the past, I have various positions in the industry as well

19   as in government.  Most recently, I was chief economist at

20   Securities and Exchange Commission.  I had a team of 160

21   financial economists, and there were about 70 Ph.D.s among

22   them.  I was also global head of equity research at Barclays

23   Global Investors, that was 2008 and 2009.  At that time, my

24   portfolio was well over $300 billion when I started.  And I had

25   50 Ph.D.s and offices in Sidney, in London, in San Francisco,

O2MCfon4                        Kothari - Direct

1    of course, and other places.  I have conducted research that

2    has been published in economics, finance, and accounting.  I

3    have extensively cited research for four and a half decades, I

4    have been doing that.  And I was also editor.  So I was in a

5    position to evaluate other work and publish that, make

6    decisions on publishing or rejecting that for more than

7    20 years.

8    Q.  Thank you, Dr. Kothari.

9        Turning to slide 3, please.  Could you please

10   summarize for the Court what your principle conclusions were in

11   this case.

12   A.  In this case, what I looked at was the totality of

13   evidence.  So I said are there initial alleged misstatements,

14   is their price inflation created by those.  I do not find any

15   evidence of that.  Then the plaintiffs' theory was there was

16   price maintenance for the entire class period.  There were

17   several alleged misstatements as well as contrary information

18   that was disclosed in various publications and I do not find

19   any stock price impact that would be consistent with inflation

20   maintenance.  So that theory is also rejected.

21       Finally, on November 9th and 12th, I do not find any

22   price impact that was caused by the alleged corrective

23   disclosure that came out on November 8 after hours.

24       THE COURT:  As to your second opinion, no inflation

25   maintenance, is that based on your analysis of various news

O2MCfon4                    Kothari - Direct

1  articles that came out between the misstatement and the

2  corrective disclosure and assessment of whether that news

3  affected stock price?

4         THE WITNESS:  That is certainly part of it.  It is

5  also based on analyst commentary and the calls.

6  Q.  So we're going to start by talking about what are the

7  different buckets of evidence you looked at to form this

8  totality of evidence.  So why don't we start on slide 4.

9  Again, we're going to go through each of these seven things

10 with the Court, but if you could, at a very high level, walk

11 through the evidence you looked at.

12        THE COURT:  I don't think there's any dispute that the

13 misstatements didn't cause an uptick in the stocks, so I don't

14 think you need to spend a lot of time on that.

15        MS. SOLOWAY:  Actually, your Honor, I'm also going to

16 skip limited new information because I had a chance to cover

17 that in my opening and I want to try to get to the good stuff.

18 Q.  Go ahead, Dr. Kothari.

19 A.  So first is limited new information.  The alleged

20 corrective disclosure was preceded by several contrary

21 information disclosures.  So in many ways, the air was let out

22 of the balloon by the time the alleged corrective disclosure

23 took place and, therefore, there was limited new information.

24        As I mentioned earlier, at the front end of the -- of

25 this whole period, there was no inflation creation.  The stock

O2MCfon4                         Kothari - Direct

1    price did not increase on alleged misstatements, and I have a

2    theory on those.  There was no stock price decline following

3    contrary disclosures of information, and there is a barrage of

4    that information that came through, and on none of those days

5    there was any negative stock price reaction.  Analysts didn't

6    find this important enough, the alleged misstatements, to

7    comment on this.  And there's normally market moving

8    information, important information.  They comment on that, they

9    summarize, they analyze for the benefit of their clients, but

10   no analysts chose to comment on these alleged misstatements.

11        The price reaction on November 9th, it was delayed by

12   several hours.  Goldman is an intensely formal, fairly actively

13   traded stock, and professor Mason, as well as I, agree market

14   is efficient, and yet, we do not find a significant stock price

15   reaction until 3:00 p.m.  That is grossly inconsistent with the

16   notion of market efficiency.

17        November 12th stock price decline is even more

18   farfetched claim that it is due to information that came out on

19   the night of 8th.

20        Finally, I do find that there is some conforming news

21   on 9th, and I cannot quantify the science, economic science has

22   not done enough to quantify those types qualitative pieces of

23   information, so I cannot quantify that.  But what I look is

24   that the four pieces of confounding information that were

25   negative in tone and the timing of those was in the first half

O2MCfon4                        Kothari - Direct

and second half of the day, and that is -- that potentially

explains the decline that was observed post-3:00 p.m.

          THE COURT:  Can I just stop you for a second.

          I want to understand why you can't quantify a piece of

news.  Isn't that what you're doing in the "no inflation

maintenance," you're looking at particular news and if it

affected the price of the stock?  Why can't you do that for

each of the statements made on November 9?

          THE WITNESS:  And the answer is that on the

announcement of those, there, the stock price didn't decline.

But what we know is that if you do the close-to-close as

professor Mason has done, that after 3:00 p.m., the stock price

is significantly negative.  The question is, can I explain the

significant stock price decline from 3:00 p.m. to 4:00 p.m.

using these four pieces of news, conforming news that came, and

the answer is economic science has not advanced to enable me to

objectively estimate the unusual effect of each of these four

different pieces.

          THE COURT:  There's no type of aggression analysis

that you can do to say this piece of news was 25 percent of the

stock decline on the 9th and this piece of news was another

25 percent, you can't do that?

          THE WITNESS:  No.  We can do that with earnings

because the science is general enough and that's what earnings

is responsible portion literature (sic).  And I was one of the

O2MCfon4                          Kothari - Direct

1    early producers of that research and I have written extensively

2    on that.  So -- but for these other types of information, these

3    are qualitative in nature.  What you need is, in a regression,

4    the stock price impact, yes, that can be measured in terms

5    of -- or what is the stock price change in a day, but you need

6    to explain a regression with an independent variable.  An

7    independent variable cannot be quantified here.  This is, for

8    example, Brexit.  It cannot be quantified that it was X amount

9    that match it to the Y amount, which is the stock price.

10            THE COURT:  Why couldn't you compare the Brexit news

11   of all people in the industry and see how Goldman Sachs' stock

12   compared to how other companies were also impacted by the

13   Brexit news reaction?

14            THE WITNESS:  So, generally, that would be the

15   industry effect.  An industry effect is already reborn.  So we

16   will have to devise a way what is called cross-sectional

17   variation in how different forms are affected by Brexit, and

18   that would be a qualitative subjective analysis, and that, at

19   least to my knowledge, economics has not advanced to quantify

20   that precisely, those kind of events.

21            THE COURT:  You're talking about intraday news?

22            THE WITNESS:  Not because it is intraday.  Intraday,

23   the science has dealt with enough to be able to pinpoint and

24   measure.  There are event stories with 15-minute increments,

25   one-minute increments and like that.  So that's not the

O2MCfon4                          Kothari - Direct

1    obstacle we have to overcome.  The obstacle we have to overcome
2    is there are four pieces of news — what is the value of that.
3    And regression is that so first you will have to say typically,
4    market reaction, this is one-time event.  So it's not like
5    earnings, which is every quarter, there is a forms earnings and
6    one can use in a regression, say, 350 observations over
7    12 years and say that, okay, this is the normal relation
8    between earning price and stock price reaction, and on these
9    days, this was the earnings surprise and I can account for what
10   might be the stock price impact of that.  Similar thing cannot
11   be done with the kind of conforming news that came out.
12            THE COURT:  What about Dr. Mason's testimony earlier,
13   which I think you heard, that said Brexit, for example, would
14   reflect a cost of approximately $500 million, and the stock
15   drop reflected the $7 billion, and so, it's necessarily not
16   making up for the full set 7 billion.  Do you disagree with
17   that kind of analysis?
18            THE WITNESS:  That kind of analysis for Brexit perhaps
19   is possible.  But the goal is what do these four conforming
20   pieces of news, and do they go to explain the observed decline,
21   and that part is, at least to the best of my knowledge, that
22   science has not advanced.  And I swim in those waters all the
23   time.  I mean, I wish I could --
24            THE COURT:  The smart people can't figure that out?
25            THE WITNESS:  Not smart enough, I guess.

O2MCfon4                    Kothari - Direct

1              MS. SOLOWAY:  Thank you, Dr. Kothari.  If we turn to

2     slide 11, I want to jump ahead.

3              By the way, your report is in front of you if you need

4     it at tab 24.

5              Your Honor, we've also submitted two correction pages

6     correcting some errors.  That's the tab right behind it, just

7     to make the record complete on his report.

8              THE COURT:  Sure.

9     Q.  If you take a look at this chart, Dr. Kothari, which is

10    drawn from your report.  First, just taking a step back, you

11    testified earlier that you looked for contrary information that

12    had come into the market that was on the same subjects as the

13    alleged misstatements.  Walk us through what you did at a high

14    level and what your findings were.

15    A.  As I said, Goldman is a forum that is intensely followed.

16    This issue about Goldman's whatever association with 1MDB

17    matters, that was important.  So there was a lot of information

18    that reached the marketplace.  And I have classified news

19    reports or disclosures in four buckets, which were the alleged

20    misstatements.  So focusing on the first alleged fees

21    misstatements --

22    Q.  Should we fast forward to the next slide?

23    A.  Okay.

24    Q.  There we go.

25    A.  So there were 82 contrary disclosures of 67 distinct

O2MCfon4                          Kothari - Direct

1    things.  So here, I start with the initial alleged fee

2    misstatement, which took place on 29th October 2014, that is

3    given in blue above the line.  And then there was a series of

4    disclosures that were contrary to the alleged fee misstatement.

5    And I look for, for example, on November 5th, 2015, Reuters

6    wrote a report which said fees are unusually high, and that

7    would conflict the alleged fee misstatement.  And I asked the

8    question, is there stock price that would be negative to those

9    contrary disclosures.  And to my, you know, I mean, what is

10   compelling about the evidence is that on none of the days, not

11   even on some of the initial days or later days or any of those

12   days, stock price reaction is significantly negative.  It is on

13   none of those 67 days stock price reaction is significantly

14   negative, which conflicts plaintiffs' theory of inflation

15   maintenance, in my opinion.

16   Q.  So Dr. Kothari, what would you have expected to see -- so

17   just taking a step back.  The plaintiffs' theory in the case is

18   that the alleged fee misstatements were denials, right, and

19   they maintained a constant level of inflation in the stock

20   price.  When this contrary information came out, if the alleged

21   misstatements had been inflating the stock price or holding it

22   up, propping it up, what pattern would you have expected to see

23   in the stock price?

24   A.  I would have expected that the contrary disclosures

25   depressed the stock price and the alleged, as the plaintiffs

O2MCfon4                          Kothari - Direct

1    call them, denials, they would have propped up the price.  And
2    what is surprising to me is that that theory would say that,
3    well, not only that the contrary disclosures will have to be
4    simultaneously the propping up those repetition of
5    misstatements and they would have to have equal magnitude to
6    produce Rock-of-Gibraltar type of uniform inflation
7    maintenance.  And that just seems so implausible.
8    Economically, it is seemingly implausible, the sort of pattern.
9    You observe a flat pattern because whatever decline in stock
10   price because of contrary disclosures is exactly offset by the
11   denials, even though the denials are few, and none were -- and
12   contrary disclosures are far more frequent.
13   Q.  So we've done this analysis, and --
14        MS. SOLOWAY:  Your Honor, in the interest of time, I'm
15   going to skip ahead a little bit for each of the buckets.  So
16   the next few slides are by the bucket.
17   Q.  But I want to bring Dr. Kothari to slide 16.  We've talked
18   about this already today, this is the day, November 1, when the
19   Leissner guilty plea and the related materials become public.
20   Was this one of the dates that you tested when you looked at
21   contrary prior disclosures?
22   A.  I did.
23   Q.  And what were your findings?
24   A.  The stock price did not decline on November 1.  On
25   November 1 Leissner plea, in my opinion, this is someone who is

O2MCfon4                           Kothari - Direct

1    from Goldman, an ex-employee, and he has commented in

2    excruciating detail on number of different alleged

3    misstatements, right, fees, fund diversion, and Jho Low.  If

4    this was not known previously or market had not believed that

5    it was not credible enough until this, I would have expected

6    this Leissner guilty plea, at least that would have moved the

7    needle to some extent, and would have increased the stock

8    price, but do I not observe any negative stock price reaction.

9    And, to me, that is also inconsistent with plaintiffs' theory

10   of inflation maintenance as well as saying that those contrary

11   disclosures are all being ignored because of, you know --

12            THE COURT:  To be clear, your analysis is factoring in

13   industry news that's affecting similar institutions and trying

14   to isolate this news; is that correct?

15            THE WITNESS:  Absolutely.  This is the standard event

16   study methodology of market movement as well as industry effect

17   are control for and only focuses on the -- what professor Mason

18   called abnormal recurring or residual recurring effects.  And

19   so, that's -- so throughout the analysis, yes, I have exercised

20   tremendous order of care to make sure that we focus on the

21   abnormal.

22            THE COURT:  And the abnormal return would be at the

23   95-percent level outside of what you would expect for similar

24   financial institutions?

25            THE WITNESS:  Right.  Yes.  Yes.  So it would be -- if

O2MCfon4                          Kothari - Direct

1    it is significant, it would be -- I have consistently used the

2    95-percent level of significance, meaning it is only 1-in-20

3    chance you might observe as extreme an observation by chance.

4    So that's what 95-percent significance level means.  And that

5    is -- if I may jump ahead, but that is the gold standard in my

6    40 years of research, I have used that in terms of 20 years

7    being an editor, that is a standard I have applied.  If

8    anything, the world has moved toward using more stringent

9    criteria, and I will comment on that in my commentary, if

10   Ms. Soloway asks me.

11   Q.  In your binder, we gave you, at tab 12, the 10Q from

12   Goldman that we've been talking about this morning,

13   Dr. Kothari.

14          MS. SOLOWAY:  If we can also put up, if it's easier,

15   16A from the closing deck.

16   Q.  Dr. Kothari, this morning, there was some discussion about

17   Goldman's risk warning that came out in their 10Q published on

18   November 1st.  Was this also one of the dates that you --

19   excuse me.  One of the disclosures that you examined in your

20   analysis?

21   A.  I did, yes.

22   Q.  And had Goldman ever put out a risk disclosure like this

23   prior to November 1st with all this information in it?

24   A.  Not on this issue, no.  The first time that it expanded and

25   it delved into considerable amount of detail, for whatever

O2MCfon4                        Kothari - Direct

1   reason, they chose to describe it in much greater detail in

2   this quarterly disclosure, but not previously.

3   Q.  And this is on the heels of the Leissner guilty plea

4   becoming unsealed; correct?

5   A.  Exactly that.

6   Q.  And the plaintiffs' expert -- I'm going to paraphrase here,

7   I don't have his exact words, but he testified this morning —

8   Dr. Mason — that the market, you know, didn't react to this

9   and, in his view, it was sort of, I think he said boilerplate.

10  Do you have a reaction to that?

11  A.  These are not boilerplate.  I mean, risk disclosures tend

12  to be in several pages, and some of it can be boilerplate.  But

13  this particular disclosure with such specificity and departure

14  from the previous disclosures, which was much abbreviated, but

15  whereas this one is much more expanded, that's not boilerplate.

16  That simply cannot be boilerplate.

17          MS. SOLOWAY:  I'd like to turn now to the analyst

18  commentary issue.  Why don't we turn to slide 18, please.  So.

19  Q.  Dr. Kothari, could you walk the Judge through your analysis

20  of the analyst reports covered at least during the class

21  period.

22  A.  So, to set the stage, analysts, they comment on

23  market-moving information, they comment on the form strategy,

24  they comment on the past performance, they explain that, they

25  comment on the future -- what the future looks like.  They also

O2MCfon4                          Kothari - Direct

1    provide some forecast.  But, in general, their discussion tries

2    to capture market-moving economic events put into a particular

3    form and try to explain that, analyze that, and explain the

4    implications of that for the benefit of their clients.

5            I looked at a comprehensive set of analyst reports

6    from October 29, 2014.  That was initial misstatement --

7    alleged misstatement all the way beyond the alleged corrective

8    disclosure, which took place on the night of 8th November.  So

9    three months, almost three months after that.  S&P was the

10   source that I used and there was 1,430 analyst reports.

11           What is striking is that no analyst reports discussed

12   or commented on alleged misstatements, none.  They commented on

13   one 1MDB and some other issues, but not on the four categories

14   of alleged misstatements.  In the period, three-months period

15   after the alleged corrective disclosure, I believe there was 72

16   reports, and no analyst reports link the news about Blankfein

17   and Low's purported 2013 meeting and commented on that.

18           So, again, the silence is -- speaks volumes, as we

19   say.  So analysts, if they had thought that these were

20   market-moving economic events, these were important economic

21   event, I would have expected some of the analyst reports to

22   have some description of it.  Finding none is, in my opinion,

23   highly inconsistent with the plaintiffs' theory.

24   Q.  Dr. Kothari, could you also describe — if we turn to the

25   next slide — your analysis of the earnings calls.

O2MCfon4                              Kothari – Direct

1    A.   Earnings calls are every quarter.  Informs management,

2    describes what was its performance in the previous three

3    months, as well as some of the forward-looking information is

4    discussed.  Analysts and investors have an opportunity to ask

5    unscripted questions, and they ask difficult questions,

6    actually, sometimes.  None of the 17 earnings calls that took

7    place in this four-plus-year class period analysts asked a

8    single question.  So we analyzed the transcripts of all these

9    earnings, 17 quarterly earnings calls, and no question asked

10   about any of the alleged misstatements implying analysts as

11   well as investors participating in those earnings calls did not

12   think these alleged misstatements were economically serious.

13   Q.   So Dr. Mason cited, I think he called it the charter of

14   financial analysts, I might have gotten the title wrong, but he

15   made a suggestion during his direct testimony that somehow

16   analysts are barred from breaking, like, new information.  In

17   your view, does this explain why no analysts commented on the

18   alleged misstatements or on the alleged corrective disclosure?

19   A.   I think that is wrong on two dimensions.  One, these

20   misstatements were public knowledge.  So it's not like these

21   were -- that analysts were barred from commenting on them

22   because they were private, no, these were public.

23        Second, there are some analysts who have made the name

24   by doing some analysis that is of a nature that was beneficial

25   to their clients.  Like Elaine Garzarelli is a name that comes

O2MCfon4                         Kothari - Direct

1   to mind.  I think she was with Goldman.  But there are some
2   analysts who have made their name, investments, the lady from
3   Arkansas, Kathy Wood I think is her name.  She's now an assets
4   manager as well as an analyst, but she makes routinely some
5   statements that are market-moving in nature, also.  So I don't
6   think analysts, in general, they are barred from performing
7   analysis.  What they are barred from, like anyone else is, from
8   insider-trading related or they cannot -- you know much more
9   than I do, but that kind of information.  But in terms of the
10  analysis and digging of information they do for a living.  And,
11  in fact, they wear it on their sleeve if they have been
12  successful in uncovering some information that moves the
13  market.
14  Q.  So before we turn to the back end of, because I want to
15  make sure we leave time for that, the piece of evidence you've
16  sort of walked through are -- I know I made you skip the
17  incremental new information at the beginning, the lack of price
18  movement, we didn't see an increase of the stock price when the
19  13 statements came out, you walked us through the hundreds of
20  articles you looked at with contrary information, you walked us
21  through the analyst calls, you walked us through the earnings
22  calls.  Taking the totality of this evidence, explain to us how
23  it supports your conclusion that the alleged misstatements were
24  not propping up Goldman's stock price.
25  A.  I do not find any evidence.  So I'm not trying to sell mine

O2MCfon4                              Kothari - Direct

1    in terms of my perception or anything, I'm looking for hard

2    evidence.  I followed the most scientific approach in trying to

3    uncover impact of any news items.  There were 13 alleged,

4    misstatements, I looked at all 13 dates, none of them.  Now one

5    can say at least one or two were true I found, I find on none

6    of them.

7         Then, similarly, I perform analysis for inflation

8    maintenance and I do not find any evidence to support inflation

9    maintenance.  And as I said, I've not injected myself

10   subjectively in any of this.  I have followed the standards,

11   economical approach, and I have looked at hard data for

12   Goldman, for analysts, what they have said, and I failed to

13   find evidence -- of any evidence to suggest that at the front

14   end, there was price inflation and inflation maintenance

15   throughout the class period.

16        THE COURT:  Well, your inflation maintenance

17   throughout the class period depends, as I understand it, on the

18   content of the news that came out during that class period; is

19   that correct?  Your assessment of the contents of that.

20        THE WITNESS:  Not my assessment.  I looked at all

21   dates on which news came up.  I didn't try to qualify or

22   exercise my judgment, was this news good or bad or any of

23   those.  This is objective way of finding was there disclosure

24   in Wall Street Journal, for example.

25        THE COURT:  I guess what I mean is you suggested news

O2MCfon4                        Kothari - Direct

 1   that was contrary to the identified misstatement that came out.

 2           THE WITNESS:  Well, they commented on -- yes.

 3           THE COURT:  Is that correct --

 4           (Indiscernible crosstalk)

 5           -- earlier corrective disclosures under your analysis.

 6   Is that what you're saying?

 7           THE WITNESS:  Yes.  But I'm more than happy to, if

 8   anybody suggests that some more dates are to be included, I'm

 9   more than happy to include those.  I have tried to be and laid

10   out exactly how I followed the process.  As I said, like when

11   in journal articles, we asked have they injected their own

12   subjective view or is it objective.  I have used that same

13   standard in performing this analysis, and there were two types,

14   where one were repetition of misstatement and the other was

15   information that an economist would view contrary information.

16   And I have looked at all those dates and do not find

17   statistically significant stock price reaction that would be

18   consistent with the inflation maintenance theory.

19   Q.  Dr. Kothari, this morning, Dr. Mason testified that he

20   agreed -- I'm going to summarize some of his testimony.  He

21   said he agreed with you there were no statistically significant

22   declines when, for example, Billion Dollar Whale came out, when

23   the Leissner plea was unsealed, when the 2009 meeting news came

24   out, when the 2013 high-ranking executive news came out, he

25   agreed with you on all of those things, but he said when the

O2MCfon4                          Kothari - Direct

1    2013 meeting, the extra detail, right, that it's Blankfein who

2    was the high ranking executive of the 2013 meeting comes out,

3    he says on that day the stock price declined and that tells him

4    that that information is important to the market, where he says

5    all of these other things, the stock prices don't move so it's

6    not important to the market.  Can you, as an economist having

7    applied the methodology here that you just described, how do

8    you react to that?

9    A.  I find that approach is subjective as well as the logic is

10   circular.  You do not find, therefore, you say that, well,

11   okay, this was not market movement.  And when you find, you say

12   oh, this is market moving.  To me, that is looking at the

13   evidence and saying that this is what was going on.  Whereas

14   what I did is I took the theory -- okay.  And say that these

15   are contrary information -- and in my opinion, these are

16   regularly some of those examples are more important, but that's

17   not what I limited my attention to because that came out in the

18   testimony today, we are commenting on that.  Those are contrary

19   information in the sense that they speak directly questioning

20   the alleged misstatements, and yet, the market didn't react at

21   all.  That, in my opinion, unless it is like lightning

22   striking, that negative piece of information came and it was

23   exactly offset by the denial, and therefore, no information, no

24   stock price was formed.  That could happen once, but to find

25   that many times for that to happen seems, economically, highly,

O2MCfon4                          Kothari - Direct

1    highly implausible.

2    Q.  So I'm going to turn now to the back-end price movement,

3    and we'll start with November 9th.  If we turn to slide 21,

4    could we just start by laying out for us your view of how quick

5    information is incorporated in an efficient market.

6    A.  Right.  Efficient market is in social sciences one of the

7    most important economic hypothesis.  The logic is amazingly

8    simple, that there are many people who trade on information,

9    they have priority incentives to trade on that information, and

10   when they trade on it, the price moves up or down and such that

11   very quickly, there's no more profit opportunity left for

12   anyone.  That's what official market hypothesis says.

13           Apply to Goldman.  All the classic characteristics

14   apply to Goldman here.  There are a large number of investors,

15   they have priority incentives to make money and get rich.

16   They're market makers, get's traded on exchanges, information

17   is disseminated very rapidly.  So in an efficient market, the

18   main prediction that price should react immediately, within

19   seconds, if not minutes, in my opinion, applies to Goldman.

20           THE COURT:  In your opinion, can all of the owners of

21   Goldman Sachs who think that the news is important sell their

22   stock if they think it's negative news within the first

23   15 minutes?

24           THE WITNESS:  No.  No, not at all, because most of

25   people -- I don't, for example, sell or buy every day.  No, I

O2MCfon4                        Kothari - Direct

1    rarely trade.  And yet, I draw comfort from the fact that there

2    are number of people who are buying and selling so that when I

3    go and buy some stock, I'm not systematically overpaying or

4    underpaying.  That's the whole -- that's -- well, the objective

5    of this is also that investor protection.  And investor

6    protection is by having markets that are efficient and stocks

7    that are traded at fair prices at all times.  That's what we

8    strive to do.  I said we — I did.  And every other chair of the

9    SEC or chief economists, that's what they do.

10        MS. SOLOWAY:  Your Honor, I think what you may have

11   been getting at is how many traders actually have to trade

12   quickly to see the stock price move.  Is that what you were

13   getting at?

14   Q.  Like, do you need everyone who's in Goldman to trade right

15   away to see a statistically significant decline or do you need

16   some number of traders?  Can you explain that?

17   A.  Yes.  Only a few traders.  50, 100 might be more than

18   enough to move the stock price.

19        THE COURT:  Depends on the volume?

20        THE WITNESS:  Depends on the volume.  Taking a stock

21   like Goldman, it is fiercely efficient because there are a

22   large number of traders who trade in there, every second they

23   trade.  And professor Mason said he tested for nine factors,

24   Cammer factors as well as Croton factors.  One of the factors

25   is serial correlation in returns, meaning, thereby, does the

O2MCfon4                          Kothari - Direct

1    stock move up and down.  If it moved up, predictably because

2    some people were trading and buying and stock moved up and it

3    has to fall because it was -- it moved up because of demand.

4    And that would generate negative serial correlation.  There is

5    no negative serial correlation in Goldman's stock.  And that's

6    true of all similar to Goldman, that kind of stocks.

7            So it's highly unlikely that efficient market, the

8    implications of that, that the market would react immediately

9    and react within minutes, if not seconds, I think is hugely

10   applicable in the case of Goldman.

11   Q.  So let's turn to slide 22.  And this is a chart that we

12   pulled from your report.  And you start -- if we start on the

13   left side, Dr. Kothari, we have the November 8th after-hours

14   alleged corrective disclosure, and then we've got the overnight

15   hours; right?

16   A.  Right.

17   Q.  And then we've got the stock price compared to an index;

18   right?  Can you walk the judge through what your observations

19   are of how the stock price moved on November 9th and what

20   conclusions you drew from that.

21   A.  The alleged corrective disclosure took place through

22   Financial Times at 11:17 p.m.  That is after hours, after

23   trading, closed at 4:00 p.m., so it is after hours.  So the

24   market had an opportunity to reflect the consequences of that

25   in the morning when the stock opened.  What this chart depicts

O2MCfon4                              Kothari - Direct

1    is what was the behavior of stock prices from the open all the

2    way to the close of November 9th, and the market did not at the

3    open, first 15 minutes, it did not show it was statistically

4    significant negative price drop.  It did not show a significant

5    price drop until 3:00 p.m.  It is inconceivable that in an

6    efficient market, for a stock like Goldman, which is so closely

7    followed and so heavily traded and billions of dollars are, as

8    the plaintiff argue, out on the table, that the market would

9    not react to that information for -- what is it?  About 15

10   hours or several hours of trading and several overnight hours

11   that it wouldn't react for that period.  That is entirely

12   inconsistent with the market being impacted by the alleged

13   corrective disclosure.

14   Q.  So if we turn to the next slide, Dr. Kothari, this is the

15   intraday analysis.  I want to pause for a moment on the point

16   that Dr. Mason raised about the 90-percent statistical

17   significance level or against the confidence level or the

18   10-percent significance level.  In the first 15-minute

19   measurement there, tell us what your findings are.

20   A.  So this is -- first of all, just to make sure, it's from

21   the previous close, so close of 8th to 9:45 a.m.  So what that

22   stock price drop wasn't statistically significant (sic).  And

23   the answer is, if one were to ask the question, is it

24   statistically significant, I would say no.

25          Now, the printout would give you what is the B value,

O2MCfon4                              Kothari - Direct

1    and the B value is 9 percent here. But for publications or for

2    all the work that I have done so far, 5 percent is the standard

3    that gets used. The logic is that the higher the B value, the

4    greater the likelihood that you are drawing the incorrect

5    influence, that it is not significant, but you're labeling it

6    as significant. So the higher the significance level, the less

7    confidence we would have that some price impact did take place,

8    and 5 percent is the standard that gets used. And here, what I

9    find is that the 9:45, it's not. Then at 10:00 a.m., which is

10   again from the close of the previous night until 10:00 a.m.,

11   the B value is .45. That means it's really -- I mean, now,

12   nobody will say that it is significant. And so on, so forth,

13   it's not until 3:00 p.m. that it becomes significant. So it is

14   hard to say, looking at this data, that the alleged corrective

15   disclosure that came overnight caused the price drop.

16           THE COURT: But does this also show that the other

17   information that you point to, the Brexit-related asset

18   transfers that were announced at 10/28, the Leissner plea

19   transcript that's listed at 12/17, the White House comments on

20   the trade talks and the stress buffer capital impact on Goldman

21   Sachs, all which happened well outside of 15 minutes of

22   3:00 p.m., does it also suggest that those also didn't impact

23   the price?

24           THE WITNESS: Usually, those four did not have a

25   measurable impact, statistically significant. And yes, I would

O2MCfon4                         Kothari - Direct

1    never make that claim that those all -- I'm trying to do is

2    first and foremost is to test the hypothesis, did the alleged

3    corrective disclosure cause a price decline, and I'm able to

4    rule that out 100 percent.  That is with great degree of

5    confidence I can say that there is no evidence of price impact,

6    negative price impact of the alleged corrective disclosure.

7    Then I say that, but I do observe some negative stock price

8    reaction, and at that time, I'm just pointing that there were

9    four pieces of news that were negative in tone, and timing-wise

10   was closer to 3:00 p.m.  And that -- those four pieces could

11   have some negative implication for the stock price.  So I'm

12   merely pointing that out and not making any claim.  And as I

13   said, we talked about it earlier, I wish I could measure the

14   impact of each piece of news — I cannot.  Science has not

15   developed to enable me to conduct that kind of analysis.

16            THE COURT:  For example, the stress capital buffer

17   impact, that, similar to Brexit, that's the 15 or whatever, the

18   $500 million figure that was given earlier.  The stress capital

19   buffer that also is something that you would know the dollar

20   value of what -- the potential dollar value of that, is that

21   something similar that you could look at?

22            THE WITNESS:  No.  I'm sorry to say that, but -- so

23   every dollar of buffer capital makes it more difficult for the

24   firm to earn a higher rate of return.  So the happening of a

25   billion dollars extra in buffer capital into market value, that

O2MCfon4                          Kothari - Direct

1    is not easily measured.  So what you could say is, well, okay,

2    $5 billion more buffer capital is needed.  On that also, other

3    side will also question me, and rightfully so, they'll say but

4    what was the expectation, what is the surprise.  So -- and that

5    level of granularity of data of what was the surprise in that.

6    And then how does that surprise map into changes in market

7    values.  That simply isn't there.

8              THE COURT:  So the statistics can show there is a

9    change, but it doesn't necessarily show the reason?

10             THE WITNESS:  Yes.

11   Q.  Dr. Kothari, if you had examined November 9th and had found

12   no confounding news, would it change your conclusion about

13   whether the alleged corrective disclosure from the evening of

14   the 8th caused the decline of the stock price at the end of the

15   day?

16   A.  No, it wouldn't.  The reason is that the necessary

17   implication is if this was such a market-moving event that came

18   out at night, then it wouldn't take up to 3:00 p.m. for the

19   market to reflect that.  So even if there were no confounding,

20   I would say -- I would throw my hands up and say that I don't

21   know what is contributing to this negative stock price

22   reaction, but I can tell you it is not the alleged corrective

23   disclosure.

24             THE COURT:  And you base that on the time of the

25   reaction?

O2MCfon4                              Kothari - Direct

```
1            THE WITNESS:  Yes.  And that's not me, but that is the

2     implication of market efficient.

3     Q.  That's actually a good segue to our next slide, 24.  So

4     Dr. Mason has made the claim and he cited Eugene Fama that

5     rejects the notion that the longterm return, to just look at

6     inefficiency, I think he's arguing effectively that immediate

7     price reactions aren't necessary, and I wanted to give you an

8     opportunity to respond to that.

9     A.  I know her.  Eugene Fama is a celebrated researcher in

10    Chicago.  I interacted with Eugene Fama.  I read this.  He's

11    widely thought of as the father of efficient markets

12    hypothesis, even though it predicts him, but people don't

13    really give him credit for efficient market.  And he, in 2014,

14    he filed a brief, and in that, also, he said market price moves

15    instantly and fully incorporates, it does not tolerate even

16    modest lags or other anomalies.

17           So I think the necessary condition is that in a stock

18    like Goldman, if some news comes and if it is market moving, we

19    have to see it getting manifested in the prices within seconds,

20    literally within seconds, if not minutes.

21           And the 15 minute you also referenced and I referenced

22    that, that is the average that people have.  So an unusual

23    stock could take a little longer, could take a little shorter,

24    15 minutes is the average.  But in all of those cases, market

25    reacts immediately.  The reaction is almost instantaneous.  I
```

O2MCfon4                          Kothari - Direct

 1    can give you many examples if --

 2                  (Continued on next page)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2MQfon5                    Kothari - Direct

1   BY MS. SOLOWAY:  (Continued)

2   Q.  I think we'll go on.  Let's turn to slide 25.  Again, I

3   think just to respond to another claim that Dr. Mason has made,

4   he said he's unaware of economic literature that would support

5   the finding that share price reactions to new value relevant

6   reactions could be expected to be completed within 15 minutes.

7   And I wanted to give you an opportunity to talk about these two

8   sources on the slides.

9   A.  It's true that that much literature has these days beyond

10  minutes and seconds, and the reason is most of the action is

11  within seconds, if not minutes.  So as just related, I would

12  not entertain or as a researcher, I would not write too many

13  papers that focus on what was the price reaction half a day

14  later or day later.  That's not what most people do.

15          THE COURT:  And is that because of the high frequency

16  trading?

17          THE WITNESS:  That is part of it, yes.  That is

18  certainly algorithmic trading and high-frequency trading.  That

19  is certainly technology has to lot to do with it.  But at

20  NASDAQ, for example, they worry about is information available

21  to all the traders like Citadel and others.  Well, Citadel and

22  others, they locate their data centers within 30 miles of the

23  exchanges because even the electrons that travel at the speed

24  of light, a thousand miles will give you a millisecond or

25  something delayed, and that is worrisome.  So NASDAQ also

O2MQfon5                           Kothari - Direct

1    worries about it, and access, they worry about it sub-50

2    microseconds.  At the SEC, we were concerned about measuring in

3    milliseconds.  So we never said, hey, an hour later or two

4    hours later or one day later.

5              Now, there is an extensive literature, which is a long

6    horizon, which is generally one year or longer.  I myself have

7    written on it.  Fama has commented on it.  That literature, I

8    don't think has any relevance here.  The fact that there are

9    some papers that look at a year or two and all that long

10   horizon, that is not relevant.  Even they would say that price

11   reacts immediately.

12             Now, based on behavioral theories, some people might

13   say the reaction is incomplete, the trend tendency is to go up

14   or down.  Fama and I would say that those are arguments of

15   convenience.  There's a theory for every observed behavior, but

16   we don't have to go into that.

17             The essential point is that there is reaction that is

18   immediate.  And finding none of that, I find it difficult to

19   say that the hypothesis that alleged corrective disclosure had

20   a price impact is warranted.

21   Q.  Before we move to the next topic, if we could turn to slide

22   26.  So we talked a little bit before about how analysts didn't

23   cover the alleged misstatements and didn't connect the

24   corrective disclosure back to the alleged misstatements, but

25   just to close this point out, what were your findings on

O2MQfon5                        Kothari - Direct

1   whether analyst reports expressly discussed the 2013 meeting
2   itself?
3   A.   Yes.  So these are 72 analyst reports that came after
4   November 8 alleged corrective disclosure.  And I looked at it
5   for three months, and there were 72 reports, which is not
6   surprising.  Goldman is a very closely followed stock.  And
7   none of those analyst reports discuss the Blankfein and Low
8   purported 2013 meeting.  They did not.
9        If it was such a market moving multibillion dollar
10  watershed event in the history of Goldman, then I would have
11  expected several analysts to link it to that meeting, but no
12  analyst did.
13  Q.   I'd like to turn now -- you know what, on confounding news
14  I have one more point I'd like to cover.  It's slide 28.
15       Dr. Kothari, you already talked with the judge about
16  the different confounding news that you found, and there was
17  one issue I wanted to cover.  Did security analysts cover the
18  confounding news that you found happened on the day of the 9th?
19  A.   Yes, they do.  In fact, several of the analysts talked
20  about the confounding news in their analyst commentary.  So the
21  analysts thought it was worthwhile to disclose these
22  confounding events regardless of whether they had the price
23  impact or not as we saw on November 9.  But the analysts
24  thought these were important economic events to comment on, and
25  I have listed the number of analysts.  And the Leissner plea

O2MQfon5                    Kothari - Direct

 1    allocution that was unsealed, that attracted eight security

 2    analysts discussing that and the trade advisor Peter Navarro

 3    criticizing Goldman's role, that was discussed by five security

 4    analysts.

 5              THE COURT:  What's the average amount of time it takes

 6    for security analyst to digest news and put it into a report,

 7    do you know?

 8              THE WITNESS:  It can be -- most analysts issue for

 9    something like Goldman, after the earnings announcement, they

10    generally show within two, three, four days.

11              On other matters, they might take couple weeks or a

12    month.  So I would err on the side of including a long window,

13    three months.  But it kind of tapers off and some of the

14    discussion is early on within few days, and -- so it's not --

15    it's not to measure price impact.  It is just to see whether or

16    not an economic event the analyst thought was worthy enough to

17    discuss for the benefit of their clients.

18              THE COURT:  So why would a financial newspaper

19    reference an event as affecting stock price but an analyst not

20    reference news as impacting stock price?  If you know, or have

21    a guess.

22              THE WITNESS:  Yes.  So analysts, they do not publish

23    on a daily basis, okay?  Newspapers publish everyday news

24    reports.  So they are in the business of reporting news,

25    whereas analysts are more information intermediaries.  They

O2MQfon5                          Kothari - Direct

1    digest the news, analyze it, and provide some -- their

2    assessment for the benefit of their clients.

3           So if there is a merger announcement, a newspaper

4    would report the merger announcement, and within minutes the

5    stock price would go up or down of a merger announcement.

6    Normally, the target firm earns about 20 percent return, and

7    that happens within seconds of the announcement.

8           THE COURT:  Then what's the value of the analyst

9    reports if the news is affecting the stock price right away?

10          THE WITNESS:  Yeah.  That's a great question.  I, in

11   fact, have published a paper which asks what is the value of an

12   analyst's report?  And most -- the conclusion is that the value

13   is very little in terms of price impact.  The value is more

14   dissemination.  So investors like BlackRock would want.  When I

15   was at Barclay's and analysts used to come and give some talks,

16   and we used to use that information of analysts in making

17   decisions about which stocks to buy and sell, not necessarily

18   that we would make more money from that, but also from the

19   standpoint of what is called asset allocation or

20   diversification or, you know, how we want to weigh some stocks.

21   Occasionally you get lucky and you make some money also, which

22   is fine, and the analysts claim that that is their benefit.

23   But vast majority of the analyst reports do not contribute to

24   any stock price movement.

25   Q.  Before we turn to the 12th just a very quick question for

O2MQfon5                          Kothari - Direct

1   you.  Dr. Mason referred this morning to momentum trading.  Do

2   you think momentum trading is an issue here?

3   A.  Momentum trading is something that gets talked about a fair

4   bit.  By and large, momentum trading has been found six months

5   or longer.  Within a day, it is much less salient kind of

6   thing.  And certainly for a stock like Goldman, it does not

7   happen.  It's not relevant because momentum trading would also

8   generate serial correlation in returns.  And people have looked

9   at serial correlation in returns, and there is none, high

10  frequency as well as low frequency.  So momentum trading is

11  something that many people talk about, but there's no economic

12  impact for a firm like Goldman to do some events study analysis

13  of this nature.

14          THE COURT:  And if there were news that the fed is

15  considering interest rate movement.  That would be news that

16  affects the entire industry that would be accounted for in your

17  studies by industry-related news.

18          THE WITNESS:  Yes, market and industry.  It is both.

19  You are absolutely right, Judge.  Yeah, and we have control for

20  that.  Now -- anyway, that is true.  That is exactly true.  I'm

21  always tempted to give some additional color, but that's not

22  needed.

23  Q.  I just want to make sure we get through the analysis of the

24  12th.  So if we could turn to slide 30 and let's sort of set

25  the point with Dr. Mason's testimony in the morning.

O2MQfon5                          Kothari - Direct

1          Dr. Mason is attributing -- and maybe you can start by

2    walking the Judge through what this graph shows, but he's

3    attributing the abnormal movement in Goldman stock, from the

4    evening of the 8th, he says it becomes, in his view, you see it

5    late in the 9th and then in an increasing way on the 12th.

6          First, explain to the judge what -- of course, there's

7    a weekend in the middle which we haven't shown.  Explain to the

8    judge what this represents and how in an efficient market you

9    would explain this.

10   A.   Right.  So this chart is behavior of Goldman stock price

11   from the open of 9th all the way to the close of 12th, okay.

12   The blue areas show -- the bigger the blue area, that means the

13   stock decline to a greater extent.  As you can see, the stock

14   was barely in the negative region all the way till about

15   3:00 p.m. on the 9th.  And then it starts to go down.  In my

16   opinion, market not reacting for so many hours is entirely

17   inconsistent with market efficiency, especially for a stock

18   like Goldman.

19         And then the news about Malaysian authorities, their

20   resolve to recover all the cost came on the night of or early

21   morning of 12th.

22   Q.   Why don't we switch to slide 31.

23         Dr. Kothari, why don't you walk the Judge through -- I

24   didn't mean to interrupt you, but walk her through what

25   happened in the morning.

O2MQfon5                        Kothari - Direct

A.  Right.  Early morning of 12th, the news came that Malaysian
authorities, Mr. Lim, the finance minister expressing resolve
to recoup not only fees but interest rate differential and
consequential losses.  And the opening price first few minutes
the price is statistically significant negative.  So that was
impounded.  To say that it was the effect of overnight
disclosure on the 8th getting reflected on the 12th, I think
that is making a mockery of an efficient market hypothesis.
That simply is not plausible, economically plausible.

        Here, what is true is that the price immediately
reflected the effect of the overnight -- the early morning
disclosure of Malaysian authorities.  The market was processing
that information, and I find that by 11:30 the price is
completed, price reaction is completed, and then it is flat
more or less thereafter.

Q.  If we turn to slide 32, Dr. Kothari, you mentioned the
finance minister announcement, and Dr. Mason has claimed that
the 600 million in fees which he's removed suffices to address
this issue to believe that this announcement by the finance
minister needs to be accounted for.  Can you address that
claim, please?

A.  In my opinion, 600 million is the tip of the iceberg that
Malaysian authorities were trying to recoup.  They explicitly
say that they we will seek a refund of all the fees paid plus
interest rate differential, which they claim is hundred basis

O2MQfon5                          Kothari - Direct

1   point, which is one percent, and finally other consequential

2   losses.

3           And consequential losses can be quite substantial

4   because they include whatever the damages that were inflicted

5   as a result of this fraud, and that can be substantial.  So

6   $600 million, netting that out, seems like a grossly inadequate

7   amount to net out of the total impact of the --

8           THE COURT:  The ultimate -- let's just say it was

9   5 billion.  That's still less than how much the stock dropped,

10  right?

11          THE WITNESS:  Well, but this news came only on the

12  12th morning.  So we have to look at what was the stock price

13  drop on that day.  And I do have --

14          MS. SOLOWAY:  Actually, your Honor, are you referring

15  to Dr. Mason using the term 7 billion?  I think that was both

16  the 9th and the 12th?

17          THE COURT:  The total.

18          MS. SOLOWAY:  I think so.  I'm sure the plaintiffs

19  will address that when they get up.

20  Q.  But if we look -- turn to the next slide, please.

21          Dr. Kothari, you've set out here what your findings

22  were about the 12th, right, which is the rough market cap

23  decline on the 12th.  Walk us through the bar graph on the left

24  first.

25  A.  Well, the amount of losses sought by Malaysian authorities

O2MQfon5                          Kothari - Direct

1    and the stock price drop that Goldman experience on 12th, they
2    are comparable amounts.  They are in the ballpark of $4 and a
3    half billion.  And I also looked at, well, what did Goldman
4    ultimately settle for?  Well, it settled for about
5    $3.9 billion.

6        Now, if this was information that -- suppose this was
7    information that market was ignoring and market was focusing on
8    something else, as the plaintiffs argue.  Then on the date of
9    settlement, I would have observed some negative stock price
10   reaction, but I don't.  So meaning thereby, it was priced in
11   when the announcement came, which was on the 12th.

12       So putting the pieces together, it creates -- the
13   mosaic that it created is that Malaysian authorities said we
14   want to recoup all losses.  Leissner had pled guilty; that was
15   used as the basis.  Market said this is serious.  The credible
16   retort at that time, the Malaysian authorities were saying
17   market reacted about 4, 4 and a half billion dollars, which was
18   in the right ballpark of what Malaysian authorities were
19   seeking.  And then subsequently when the actual came out, with
20   hindsight, of course, the market didn't move.  So meaning
21   thereby on 12th, this news was priced in.

22       THE COURT:  And the reason you can't do this same
23   analysis on the 9th is because all of the other news also
24   related to Goldman?

25       THE WITNESS:  Yes.

O2MQfon5                          Kothari - Direct

1          THE COURT:  And there was no other news relating to

2    Goldman on the 12th?

3          THE WITNESS:  Not to my knowledge.  There is some, but

4    nothing that made waves.  This was the piece of information

5    that was important.

6    Q.  If we turn to the next slide, you also address that -- it

7    so happens that there's academic literature that actually

8    studied price reactions to announcements of enforcement

9    proceedings, correct?

10   A.  Yes.

11   Q.  There's actually established literature on this topic as

12   well.  Could you walk the Judge through what that literature

13   says and how you applied it here.

14   A.  Authorities having enforcement actions, SEC or some other,

15   that's pretty commonplace.  So Jonathan Karpoff, a very

16   well-respected finance researcher, he looked at, I think, 400

17   or 500 enforcement actions and asked the question, what is the

18   fine and what is the stock price decline?  And what he finds is

19   the stock price decline is multiple times the fines.  And

20   meaning thereby the reputational loss suffered by firms swamps

21   the actual fines.  And I apply his analysis and model, but, of

22   course, that is an average.  There is a range there.  And when

23   I apply his model to the Goldman setting, what I find is that

24   the observed price decline is in the range of values that

25   Karpoff model would predict.  So it is providing the evidence

O2MQfon5                          Kothari - Direct

1    that what you observe in the case of Goldman is not -- it is in

2    line with what Karpoff model would say.

3    Q.  Dr. Kothari, if we could turn to slide 36 I will give you

4    an opportunity to summarize your findings and pull together

5    what you've testified to today.

6    A.  So I have looked at the totality of evidence.  So first I

7    do not find on the front-end alleged misstatements, I do not

8    see any evidence of inflation creation.  I have combed through

9    the data, looked at stock price reaction, analyst reports,

10   earnings calls, and I do not find support for the inflation

11   maintenance theory of the plaintiffs.

12         And then when I look at November 8 alleged corrective

13   disclosure, I do not find in the opening price a stock price

14   impact which would be consistent with market efficiency, which

15   would be predicted by efficient market that Professor Mason and

16   I both agree Goldman stock trades in an efficient market.  So

17   the stock price decline observed on 9th cannot be because of

18   the alleged corrective disclosure.

19         I find some confounding events.  And then on

20   November 12, the big confounding piece is Malaysian

21   authorities, and in my opinion it's a mockery of efficient

22   markets to think that Goldman's stock price would react to some

23   piece of information that was disclosed on the night of 8th and

24   the market took time till 12th to react to that.  That is

25   economically implausible.  So the totality of the evidence

O2MQfon5                        Kothari – Cross

1    suggests that alleged corrective disclosure did not have the

2    price impact that plaintiffs are arguing

3            MS. SOLOWAY:  Thank you, your Honor.

4            THE COURT:  All right.

5            Let's take a quick bio break, and then we'll hear the

6    cross-examination.

7            (Recess)

8    CROSS-EXAMINATION

9    BY MR. MUSTOKOFF:

10   Q.  Excuse me, Dr. Kothari, my apologies for the frog in my

11   throat.  Been practicing too much.

12           Good to see you again, Dr. Kothari.

13   A.  Good to see you.

14   Q.  Let's start with confounding factors.  You testified you

15   didn't try to measure the impact of any of the potentially

16   confounding factors on November 9, correct?

17   A.  That is correct.

18   Q.  And you determined that none of the confounding factors had

19   any statistically significant measurable impact, correct?

20   A.  I didn't measure, so yes.

21   Q.  Okay.  Now let's talk about BREXIT.  I think you had a

22   slide that Ms. Soloway showed you.  It's slide 28?

23           THE COURT:  Do you have a hard copy?

24           MS. SOLOWAY:  Would it be easier to give him a hard

25   copy?

O2MQfon5                         Kothari - Cross

1              MR. MUSTOKOFF:  That's fine.

2              THE COURT:  Because the signal on the screen is not

3    showing up.

4              MS. SOLOWAY:  Your Honor, may I approach?

5              THE COURT:  Yes, you may.

6              MS. SOLOWAY:  Here is a hard copy.

7              THE COURT:  Thank you.  We're going to slide 28, you

8    said?

9              MR. MUSTOKOFF:  Dr. Kothari, do you have a book?

10   Q.  Dr. Kothari, if you turn to slide 28, it says here that

11   there were two securities analysts that discussed BREXIT in the

12   weeks after November 9, correct?

13   A.  Yes.

14   Q.  Now, neither of those two reports actually say anything

15   about Goldman Sachs in connection with BREXIT, correct?

16   A.  I would have to look at those reports.

17   Q.  Let's look at that report from, let's see, Arbat Capital.

18   I believe that was one of the two reports you cited.  Do you

19   have a copy of your report, Dr. Kothari, as well?

20   A.  No.  Okay.  Thank you.  Which report are we talking about?

21   Q.  Let's look at your most recent report, the 2023 report.

22   A.  Okay.

23   Q.  Let's go to footnote 199.  This is where you cite the two

24   analysts reports for the proposition that BREXIT was being

25   discussed, correct?

O2MQfon5                                Kothari - Cross

 1   A.  Yes.

 2   Q.  The first report is the Arbat Capital report.  Do you see

 3   that?

 4   A.  I do.

 5   Q.  If you go to tab 9 in your exhibit binder, this is the

 6   Arbat Capital report that you cited?

 7   A.  Yes.

 8   Q.  You want to show me where in this report it talks about

 9   Goldman Sachs in connection with BREXIT?

10   A.  You want to represent something?

11   Q.  I'd like to represent that there is no mention in this

12   report of Goldman Sachs in connection with BREXIT.

13   A.  Okay.

14   Q.  Will you accept my representation?

15   A.  Let us for the moment let us accept that.

16   Q.  Okay.  In fact, sir, the only mention of Goldman Sachs in

17   this entire analyst report is in connection with the 1MDB

18   scandal, correct?  I can draw your attention, to speed things

19   up, to page 1?

20   A.  Okay.

21   Q.  This is a banking sector report, right?  It talks about

22   multiple financial institutions?

23   A.  Yes.

24   Q.  Second paragraph, it says, "The dynamics within the sector

25   were relatively uniform.  Just 8 out of 34 banks from our

O2MQfon5                        Kothari - Cross

1    sample showed negative performance.  The key underperformer was

2    Goldman Sachs, which decreased by 15 month over month in

3    absolute terms on news about Malaysia 1 MDB wealth probe."

4            Do you see that?

5    A.  I do.

6    Q.  Nothing about BREXIT though in connection with

7    Goldman Sachs, correct?

8    A.  I haven't read the whole thing, but you have represented

9    that, so yes.

10   Q.  Okay.  Now, you cited another article -- sorry -- another

11   analyst report Wells Fargo in footnote 199.  Do you see that?

12   A.  Yes, Wells Fargo.

13   Q.  Again, you're citing this for the proposition that BREXIT

14   was discussed after the November 9 -- in the weeks following

15   the November 9 disclosure, correct?

16   A.  Yes, that's what these reports are talking about what

17   happened after the alleged corrective disclosure.

18   Q.  If we look at the first bullet point --

19   A.  First bullet point of what.

20   Q.  I'm sorry, tab 10, which is the Wells Fargo report.

21   A.  Okay.

22   Q.  I'm getting ahead of myself.

23   A.  All right.

24   Q.  About halfway down the first paragraph, it says, "Today

25   three key issues weigh on Goldman Sachs stock:  1MDB, capital

1   markets and macro concerns."  Do you see that?

2   A.  You will have to help me.  Okay.  1MDB, capital markets and

3   macro concerns, yes.

4   Q.  It says, "The new news is that Malaysia has filed criminal

5   charges."  Do you see that?

6   A.  Yes.

7   Q.  And that announcement was made on December 17, correct, the

8   filing of the criminal charges?

9   A.  That I do not recall, but, it's possible.

10  Q.  BREXIT is mentioned.  Do you see that it's mentioned among

11  many macroeconomic factors there, right?

12  A.  Okay.

13  Q.  But it's in the mentioned in the context of 1MDB, right?

14  It says, "Second reduced risk appetite by Goldman Sachs post

15  1MDB could exacerbate Goldman Sachs specific capital markets

16  issues."  Then it goes on to list a bunch of macroeconomic

17  factors:  Lower oil prices, fewer hedge fund clients, macro

18  issues such as BREXIT, weaker global economic growth.  Do you

19  see that?

20  A.  Okay.

21  Q.  But the point is that 1MDB is what's being emphasized in

22  this report, correct?

23  A.  Well, there's no question that 1MDB would be in many of

24  these reports because that was certainly the news.  And all I'm

25  trying to say is that there were other confounding news that

O2MQfon5                              Kothari - Cross

1    also came on 9th and that was subsequently discussed.  What

2    you're pointing out is the information that they received was

3    less than 1MDB.  I'm not overly surprised by that.

4    Q.  Why not?

5    A.  Well, 1MDB, you know, that matter was --

6    Q.  It was big news.

7    A.  Pardon?

8    Q.  It was big news.

9    A.  That Malaysian authorities were trying to recoup, it is in

10   that context, for example, one of the earlier ones Arbat was

11   talking about.  Of course it is huge, and I in fact submitted

12   that it was about 4 and a half billion dollars in my analysis.

13   Q.  By the way, the fact that BREXIT might have a

14   disproportionate impact only Goldman Sachs as compared to other

15   financial institutions, that risk was first disclosed by

16   Goldman Sachs in February of 2018, correct?

17   A.  I don't know exactly, but perhaps.

18   Q.  Do you have any reason to question my representation?

19   A.  I don't question you at all.

20   Q.  Okay.  That will make this go much quicker, all right.

21             Now, let's talk about the next confounding factor that

22   you reference.  It's the U.S. China trade talks.

23   A.  Yes.

24   Q.  Going back to the slide that Ms. Soloway showed you.

25   A.  Okay.

O2MQfon5                        Kothari - Cross

Q.  Slide 28, the slide says that "Trump's top trade advisor
Peter Navarro, criticizes Goldman's role in the China trade
conflict"?

A.  Correct.

Q.  Then it says, "Five securities analysts discussed China
trade talks in the following weeks"?

A.  Yes.

Q.  Do you see that?  Did any of these five analyst reports
mention Goldman Sachs?

A.  Sitting here, I do not recall that.

Q.  Did any of these analyst reports discuss Mr. Navarro's
comments on November 9?

A.  I do not know.  I will have to jog my memory by looking at
those reports.

Q.  Now, it's not your opinion that Mr. Navarro's comments
provided any sort of value relevant information, is it?

A.  Navarro is -- was a White House, in the White House and a
high-ranking official in the Trump administration.  China trade
was an important issue.  So I -- the question if you're saying
was it statistically significant that day, the stock price
reaction, I have not been able to isolate for unusual
confounding events.  But in terms of value relevant that's a
loosely defined term, and when some high-ranking official makes
certain statements about some issues that are economic issues,
I would think that they are generally value relevant but not

O2MQfon5                         Kothari - Cross

1    necessarily in each and every case.

2    Q.  Well, you testified -- when I deposed you in December, you

3    testified that you weren't "conducting this analysis to

4    estimate the value relevance or the price impact of

5    Mr. Navarro's statements," correct?

6              MS. SOLOWAY:  Objection.

7              THE COURT:  Can you repeat the question?

8    Q.  Yes.  You weren't conducting this analysis to estimate the

9    value relevance or the price impact of Mr. Navarro's statements

10   correct?

11             MS. SOLOWAY:  Your Honor, I would just -- just one

12   request:  That if we're going to go back to his testimony, just

13   as we did with Dr. Mason, we should put it in front of him.

14   It's not fair to read it and not have him look at it.

15             MR. MUSTOKOFF:  That's fair.

16             THE COURT:  That's fair.

17   Q.  If you can answer my question, I'll repeat it one more

18   time.  You weren't conducting this analysis to estimate the

19   value relevance or the price impact of Mr. Navarro's comments,

20   correct?

21   A.  I said that earlier also; that there are four confounding

22   events, and economic theory does not -- is not advanced or

23   developed enough to be able to estimate the unusual impact of

24   these four confounding events.

25   Q.  Now, you said a minute ago Mr. Navarro was a high-ranking

O2MQfon5                              Kothari - Cross

1    official?

2    A.   Yes.

3    Q.   The Trump administration disavowed Mr. Navarro's comments

4    within hours of these comments, correct?

5    A.   That is correct.

6    Q.   Let's talk about the stress capital buffer; that's the

7    third confounding factor you identified?

8    A.   Okay.

9    Q.   Now, you say that Mr. Quarles, the vice chairman of the

10   Fed, gave a speech on November 9 about the proposed stress

11   capital buffer requirement, correct?

12   A.   That's correct.

13   Q.   And this was reported by Bloomberg later that day?

14   A.   That is correct.

15   Q.   Now, the new capital requirements, they were first unveiled

16   in April of 2018, correct?

17   A.   None of these things are a one-shot deal.  These things

18   people talk about the socialized idea that there would be some

19   buffer capital or some requirement, some regulation, and then

20   subsequently there are more speeches or references to that.

21   And what the market always reacts is, especially in these

22   regulatory matters, is what is the revision in likelihood of

23   that kind of regulation or that action.  So the fact that it

24   was disclosed earlier does not eliminate the possibility that

25   it was positive or negative news on this particular date.

O2MQfon5                          Kothari - Cross

1    Q.  Well, in his speech on November 9, the Federal Reserve Vice

2    Chair reported that the Fed was delaying the new capital

3    measures until 2020, correct?

4    A.  I don't have off the top of my head exact details of what

5    Mr. Quarles said.

6    Q.  Well, you wrote about this in your report.  Let's go to

7    your report.

8    A.  Okay.

9    Q.  In footnote 215.

10   A.  Okay.

11   Q.  Which is on page 75.

12          And you quote from an article from the *American Banker*

13   *Online*, the title of which it says "Fed to Delay New Big Bang

14   Capital Measure Until 2020."  Do you see that?

15   A.  Okay.

16   Q.  Does that refresh your recollection that Mr. Quarles on

17   November 9 said that the Fed would be delaying the new capital

18   measures until 2020?

19   A.  Well, it's possible.  I mean, there must be a long speech.

20   I don't think the speech entirely was focused on this.  It

21   might be; it might not be.  But I doubt that it would be.  And

22   still when there is a discussion about buffer capital, and

23   Goldman -- as I recall, Goldman had some deficit in the buffer

24   capital, and, therefore, this news buffer capital in general

25   makes firms like Goldman or other banks, they want less buffer

O2MQfon5                          Kothari – Cross

1  capital so that they could have more leverage and therefore

2  higher rate of return.  And this speech I don't think was

3  helpful to Goldman.  And to the extent that it was unhelpful, I

4  believe the tone was negative.

5  Q.  But the analysts, they wrote about this speech, correct?

6  A.  Analysts did write about it, and they thought it was

7  important enough to comment on it, yes.

8  Q.  But the analysts characterized this news as positive news

9  for banks, correct?

10 A.  Can you show me that?

11 Q.  Yeah, I'd be happy to.  If you go to tab 14 of your book.

12 A.  Okay.

13 Q.  This is the Wolfe Research analysts report dated

14 November 9, 2018.  I'll read the headline.  It says,

15 "Regulatory Update.  Stress Capital Buffer Guidance Mostly In

16 Line With Some Incremental Positives."  Do you see that?

17 A.  I do.

18 Q.  It goes on to say, "Update on stress capital buffer

19 proposal.  Key takeaways not too surprising with a few

20 incremental positives."  Right?  Do you see that?

21 A.  Yeah, but that, you know, it could be incremental positive

22 for the overall, but for Goldman, it might not be, necessarily.

23 You know, Goldman had a deficit in their buffer capital, so

24 regardless of what the -- for the entire industry it might be,

25 it might still have an adverse effect on Goldman.

O2MQfon5                          Kothari - Cross

1    Q.  But the fact that Goldman was going to have a deficit as a

2    result of these requirements, that was old news, right?  That

3    was first disclosed in September of 2018, correct?

4    A.  Well, as I said, you know, all of these things do not come

5    in one shot.  There is more -- more and more news that keeps

6    coming.  And here, if I have found these as confounding and as

7    having talking about stress capital, the importance of stress

8    capital, and Goldman has a deficit, I thought that this was --

9    I would interpret this as at least mildly negative.

10   Q.  But the analyst is characterizing it as positive, correct?

11   A.  The analyst is not talking about Goldman in particular.

12   Q.  It's not talking about Goldman in particular.  There's

13   nothing about Goldman in this report, right?

14   A.  No, but the inference -- because we know about Goldman's

15   deficit.  That has implications for Goldman.

16   Q.  Did any analyst say that in a report?

17   A.  Again, you know, I have quoted two analysts, so it wasn't

18   covered by many analysts, but two analysts talked about it.

19   Q.  Let's move to the last of the four confounding factors that

20   you identify.  Mr. Leissner, I guess it would be the unsealing

21   of Mr. Leissner's plea transcript on November 9, right?

22   A.  That's right.  November 9 or what was the date?  Was it

23   November 9?

24          THE COURT:  The unsealing.

25   Q.  The unsealing of the guilty plea was on November 1,

O2MQfon5                          Kothari - Cross

 1    correct?

 2    A.   Right.

 3    Q.   But you identify November 9 -- I'm sorry, you identify the

 4    unsealing of his transcript as a potentially confounding factor

 5    on November 9, correct?

 6    A.   So is it not that that day Mr. Leissner, you know --

 7              THE COURT:   I think the plea allocution, which is

 8    where the defendant explains why the defendant is guilty of the

 9    crime to which he is pleading guilty, so that transcript was

10    released.

11    Q.   On the 9th.

12    A.   I think he talks about the culture in that, culture of

13    Goldman, and that was an unfavorable light.

14    Q.   Right.  But the unfavorable comments about Goldman's

15    culture, that had also been described earlier, right?  That was

16    described in Goldman's 10-Q on November 2, correct?

17    A.   But Leissner himself saying that to me, that was -- that

18    carried some weight, and it was negative in nature.

19    Q.   Leissner saying it himself as opposed to the justice

20    department had more -- strike that.  You think that his

21    comments had more weight than what the justice department said

22    a week earlier?

23    A.   I'm not trying to compare justice department with Leissner,

24    but I'm saying that if Leissner talks about and gives some

25    concrete example of culture being bad in the plea allocution,

O2MQfon5                         Kothari - Cross

1    that to me strikes as negative news about Goldman.

2    Q.  But you'd agree with me that the contents of the transcript

3    of Mr. Leissner's plea allocution was not a major piece of

4    information, right?

5    A.  Well, as I said, I have not been able to unusually

6    calculate the price impact of these four pieces of information.

7    I'm just saying here that I have ruled out with great degree of

8    certainty that the price impact or price movement is not caused

9    by the overnight disclosure of that meeting, the alleged

10   corrective disclosure.  But we do observe on 9th negative stock

11   price reaction, and I have documented four confounding pieces

12   of news that are negative in tone and closer in time to the

13   observed stock price reaction, but I'm not able to measure

14   them.  I don't think scientific analysis can do that.  Would

15   have loved to measure it, but I cannot.

16   Q.  But you'd agree it was also not a major piece of

17   information?

18   A.  That's a matter of judgment.  And I don't want to offer

19   just opinions here on that basis, but I am just saying that

20   these -- what evidence we find is stock price reaction is

21   significant after 3:00.  I'm providing that four pieces of

22   information came from, whatever, 9:00 or 10:00 a.m. till later

23   that had in my opinion negative tonality, and the timing is

24   closer to the negative stock price reaction.  Beyond that, I'm

25   not offering any other opinion.

O2MQfon5                              Kothari - Cross

1    Q.  And just to be clear, the four pieces of confounding

2    information that you identify, none of them were released

3    within -- strike that.  Let me take a step back.

4            You testified that it's your opinion that the

5    statistically significant movement in the stock price on

6    November 9 doesn't begin until roughly 3:00 p.m., correct?

7    A.  That is correct.

8    Q.  You would agree though that none of these four pieces of

9    potentially confounding information that you identify, none of

10   those were issued within 15 minutes of 3:00 p.m., correct?

11   A.  15 minutes is not the magic number.  But that said, you

12   know, factually, it is true that they were not released within

13   15 minutes.

14   Q.  You'd agree with me that stock prices don't always

15   incorporate new information within 15 minutes?

16   A.  I did not say any of that.  All I'm saying is that if it is

17   market moving information, like as in the case of Goldman, we

18   are talking about several billion dollars worth of information,

19   it is inconceivable that in an efficient market that market

20   does not react to it for several hours.  Efficient market would

21   predict that market reacts within first few seconds, first few

22   minutes.  The completion part is on average about 15 minutes.

23   In specific cases, and depending upon the flow of information,

24   it can take a little longer, a little less, but rarely more

25   than few hours.

O2MCfon6                          Kothari - Cross

1          THE COURT:  Can I ask you a question just as a

2     followup of what you just said.  If you turn to page 31 on that

3     slide, the same document you're looking at, because this talks

4     about the November 12 stock going down, and I think you

5     identified news that came out at about 4:56 a.m., a full refund

6     news, and it seems it's not fully incorporated until 11:30 a.m.

7          THE WITNESS:  That's correct.

8          THE COURT:  Why would that news take that amount of

9     time?

10          THE WITNESS:  First of all, it did react immediately.

11     So I do find in the first 15 minutes statistically significant

12     negative stock price reaction.

13          THE COURT:  You mean at the 95-percent confidence

14     level?

15          THE WITNESS:  Yes.  Yes.  Okay.

16          Now, there is some continuation here in this

17     particular case, that's not in general necessarily true, but in

18     this case, there is.  And that can happen for a number of

19     reasons, either new information keeps coming and people

20     reassess the possibilities, and that can take some little time.

21     The evidence that gets cited, and counsel here is talking about

22     15 minutes, that is the average that has been -- that -- okay.

23     And that, too, there is a distinction between positive and

24     negative.

25          THE COURT:  Is there a difference between the average

O2MCfon6                         Kothari - Cross

1   and the median in the studies?

2           THE WITNESS:  Yes, there is.

3           THE COURT:  What's the median?

4           THE WITNESS:  Sitting here, I cannot tell you, but

5   probably median is 15 minutes.

6           THE COURT:  The average is 15 and the median is less

7   than 15?

8           THE WITNESS:  Yes, because there would some cases that

9   would entail something, but vast majority, like, if you take

10  Goldman or Google or this, it will be few seconds or maybe a

11  few minutes or half an hour.

12          THE COURT:  This on November 12th, we're talking about

13  Goldman.

14          THE WITNESS:  I know.  I know.  But as I said,

15  exceptions prove the rule.

16  Q.  Let me ask you, Dr. Kothari, you don't have any direct

17  evidence that the Malaysian refund news on November 12th caused

18  the stock drop on 12th, do you?

19  A.  What do you mean, direct evidence?  The news came at

20  5:00 a.m., and then in the opening price, it goes statistically

21  significantly negative, but in the first 15 minutes, to me,

22  that, to an economist, that is direct evidence cause and effect

23  kind of.  That's what event studies are all for.

24  Q.  Do you have a copy of your deposition transcript up there,

25  the one from 2023?

O2MCfon6                        Kothari - Cross

1           I'm sorry, Dr. Kothari.  It's a spiral-bound --

2   A.  The number of times you're saying "sorry" has been rising.

3   It's an alarming level.

4           MR. MUSTOKOFF:  I was always taught to be polite with

5   the witness.

6           THE COURT:  I have it here, the deposition transcript.

7           THE WITNESS:  Thank you.

8   Q.  If I could turn your attention to page 153 of that

9   transcript.

10  A.  153.  Are there two transcripts here?

11  Q.  There is.  Remember, we spent two days together.

12  A.  153 you said; right?

13  Q.  Right.  At line 7, I asked you:

14  "Q.  What's your evidence that there was assessment of the full

15  refund news at some point within the first two and a half hours

16  of trading on November 12th."

17  Q.  Do you see that?

18  A.  Yeah.  I don't -- I mean, not to be argumentative here.  I

19  don't think I understood the -- this was the question you were

20  asking earlier.  Okay.  What evidence do you have and you

21  said -- so -- okay.

22  Q.  You didn't tell me at the time that you didn't understand

23  the question; right?

24  A.  No.  No.  No.  At that time, I understood it, now I

25  understood the question you asking.

O2MCfon6                              Kothari - Cross

Q.   And when I asked you the question, you said the evidence is
that what went on in the marketplace, that on that day, you
know, the news came, Malaysian authorities, and I don't have
any direct evidence, a whole lot; right?

A.   In terms of any event study analysis, what cause and
effect, timing is the main tool that people use because prices
are set by traders.  They don't say this is the reason why I'm
taking the price up or down, but if the earnings surprise is
positive and the price reacts within seconds and goes up, you
say that the earning surprise cause the price increase.  The
same way here, the news came at 4:54 or somewhere around early
morning that day and the price dropped immediately, immediately
meaning when the market opened, first 15 minutes is
statistically significantly negative.  To me, that is, as an
economist, I would say the stock price decline was caused by
that piece of news.

Q.   Now, let's stick with the full refund, the November 12th
refund news for a second.  The fact that the Malaysian
government was seeking to recruit the entirety of Goldman's
$600 million in fees from the 1MDB deals, that was known as
early as June 2018; correct?

A.   Yes.

Q.   And the fact that the Malaysian government was seeking to
recruit the entirety, the entirety of the diverted 1MDB bond
proceeds, that was also known as of June 2018; correct?

O2MCfon6                     Kothari – Cross

1   A.  Sure.

2   Q.  Now, you issued two reports in this case, you issued a 2022

3   report and a second report in 2023 after her Honor ordered

4   additional briefing; correct?

5   A.  Okay.

6   Q.  Now, you'll recall in the 2022 report, you took the

7   position -- and you'll recall, sir, that the plaintiffs at one

8   point in this case, we alleged December 17th, 2018 as a

9   corrective disclosure.  Do you recall that?

10  A.  I do recall that.

11  Q.  And the news on December 17th, 2018 was that Malaysia filed

12  criminal charges against Goldman.  Do you recall that?

13  A.  I do not, but if you say so.

14  Q.  Well, why don't we look at your 2022 report.

15  A.  All right.  January 27, 2022?

16  Q.  Yes.  Thank you.

17  A.  Okay.

18  Q.  If you go to paragraph 103 of that report.

19  A.  Okay.

20  Q.  This is discussing the December 17th, 2018 corrective

21  disclosure and your opinion that that corrective disclosure did

22  not cause a price impact.  Do you recall that?

23  A.  That's repetitive.  Okay.  Yeah.  Okay.

24  Q.  And so, if we look at 103, you say about halfway through

25  the paragraph, indeed, various news sources and Goldman Sachs'

O2MCfon6                    Kothari - Cross

1    own statements, prior to December 17th, 2018, had already

2    informed market participants of the risk of potentially severe

3    penalties from Malaysia.  Do you see that?

4    A.  I do.

5    Q.  You go on to say, therefore, the market had already priced

6    in that risk and this is consistent with the absence of

7    statistically significant abnormal price decline on December

8    17th, 2018.  Do you see that?

9    A.  Yes.

10   Q.  You go on to say in paragraph 104, the risk of severe

11   penalties from Malaysia was already widely disseminated public

12   information prior to the alleged corrective disclosure on

13   December 17th, and then you go on to cite a Reuters article

14   from June 14th, 2018.  Do you see that?

15   A.  I do.

16   Q.  And you say that the June 2018 article reported that

17   Malaysia would intend to recover all funds illicitly taken from

18   1MDB, and determine whether there are grounds for clinics

19   against companies, including Goldman Sachs, that profited from

20   dealing with the beleaguered state fund.  Do you see that?

21   A.  Okay.

22   Q.  When this is talking about all illicitly taken funds from

23   1MDB --

24   A.  That statement is not about Goldman.

25   Q.  Well, the article's talking about how Malaysia intended to

O2MCfon6                          Kothari - Cross

1   go after Goldman Sachs; correct?

2   A.   Look at that sentence, that has two parts.  The first part

3   says that all illicitly taken funds from 1MDB, they weren't

4   going to cover.  That doesn't mean all illicitly taken funds

5   were taken by Goldman, at least it doesn't say it explicitly.

6   Q.   No, it's saying that its funds were siphoned off away from

7   1MDB, the state fund; right?

8   A.   It doesn't say who takes the funds.  That might be taken by

9   is Jho Low or someone else.  I'm not trying to split hairs, but

10  at least this sentence does not say that those funds.  The

11  second part of it says they will go after Goldman Sachs.  I do

12  agree that the second part has reference to Goldman, but the

13  first part, it could include Goldman, but it does not say that

14  recovered all the funds taken from 1MDB will be recovered from

15  Goldman.

16  Q.   But this is not excluding the possibility that Malaysia was

17  going to seek whatever they could from Goldman Sachs; correct?

18  A.   That's a different question you are saying.  I was

19  referring to your first half of the statement, but if you are

20  now -- you may want to ask a question and I will answer.

21  Q.   Well, let me ask you this:  The risk of Malaysian penalties

22  to Goldman, that was priced in as of June 14th; correct?

23  A.   No, I did not say that.  I'm saying that it was priced in

24  by December 17th.

25  Q.   Right.  So it was priced in -- it was priced in as of

O2MCfon6                              Kothari - Cross

1    December -- strike that.

2              You say in 103, various news sources and Goldman

3    Sachs' own statements, prior to December 17th, had already

4    informed market participants of the risk of potentially severe

5    penalties from Malaysia.

6    A.   That could very well be that it was in on November 12th.  I

7    mean, that is also prior news, right?

8    Q.   The import of your statement here, sir, is that the

9    December 17th corrective disclosure could not be corrective and

10   could have not caused a price impact because as of June, the

11   market had already known that Malaysia was going after Goldman

12   Sachs and others to recover this money.

13   A.   I don't really disagree with that, because here, I'm

14   referring to a Financial Times article on November 26th, also.

15             THE COURT:  Can I just ask a clarifying question.  Are

16   you saying that by December 17, the aggregate news that came

17   out over time concerning this had been priced in?

18             THE WITNESS:  Yes.

19             THE COURT:  And so, does the market take into account

20   the news over time?

21             THE WITNESS:  Yes, because --

22             THE COURT:  Because this wouldn't have been

23   incorporated into the price all at once, neither of these

24   pieces of news?

25             THE WITNESS:  Not necessarily.

O2MCfon6                          Kothari - Cross

1            THE COURT:  How do you test for that, economically,

2    whether news comes over time or in one day?

3            THE WITNESS:  There are many studies that I've been

4    editor, as well as, you know, I have my student -- peer

5    students have also done  that kind of work.  For example,

6    Iz-Lynn Chan has a paper that looks at a series of news

7    regulatory revisions.  So what you try to get is what is the

8    probability revised on various dates, because so many of the

9    regulations, they get passed.  First, they're introduced in

10   congress, something happens, boom, it's a process.  You can

11   get, to the extent possible, it's not an easy exercise, but

12   what is the revision in probably, and that can help you figure

13   out whether or not the price reaction is predicted to be

14   significant.

15           THE COURT:  So step-wise analysis?

16           THE WITNESS:  Yes.  And steps can go up and down also,

17   because sometimes things delve, which make it less likely

18   something -- and which make -- and some other steps or that

19   make it more likely that the regulation will pass.  So it's not

20   like one-way direction, it can be up and down, it doesn't have

21   to be, but it's possible.  That's all I'm saying.

22           THE COURT:  And why wouldn't a step-wise analysis be

23   done with this 1MDB situation since there appears to have been

24   a series of news over a period of time?  So what happened?

25           THE WITNESS:  So fair enough, but that was not the

O2MCfon6                          Kothari - Cross

1   objective of the analyst.  The objective of the analysis was,

2   was stock price reaction on the 12th, is that consistent with

3   Malaysian authorities and expressing their resolve, was that

4   viewed by the market as market moving, and the answer is I find

5   yes.

6   BY MR. MUSTOKOFF:

7   Q.  Go to paragraph 105, sir, of your report.  You make the

8   point here that as early as February 26th, 2018, Goldman had

9   warned of ongoing investigations by various governments, right,

10  and that this could cause damage to our reputation.  Do you see

11  that?

12  A.  I do.

13  Q.  So as of November 12th, 2018, the market knew there was a

14  risk that Malaysia could go after Goldman Sachs; correct?

15  A.  It's like this is the principle of materialization of this.

16  Everybody knows that California is subject to earthquake risk,

17  but if the earthquake takes place, would we view that as

18  negative news, yes, of course we would.  So same thing here.

19  And I'm doing two things.  One is what is causing the November

20  12th stock price reaction and, more importantly, we are

21  interested in knowing did the alleged corrective disclosure,

22  which took place several days earlier, did that cause the stock

23  price reaction.  If you are giving me so much grief on this

24  thing and the 12th, I don't know what you will say how you can

25  tie the 12th stock price reaction to news that came out on

O2MCfon6                          Kothari - Cross

1    November 8th.

2    Q.  Well, the news on November 8th that Mr. Blankfein had met

3    with Mr. Low for a second time, that was new news; correct?

4    A.  Yes, but the point is that it wasn't new news on 12th, it

5    was on the 8th.

6    Q.  But what was new on the 12th, sir?  What was new on

7    November 12th?

8    A.  These Malaysian authorities, their resolve -- as I said

9    many times, that these are events, they do not take place in

10   one day, and there can be revision in probabilities as assessed

11   by the marketplace.  If you're going by new information, I'm

12   telling you that it wasn't new -- many things was not new.

13   There was so much discussion, prior discussion.  So we would

14   have nothing here.

15              THE COURT:  I have another question, because Dr. Mason

16   in his testimony talked about economic studies looking at the

17   impact of negative news implicating a CEO.

18              THE WITNESS:  Yes.

19              THE COURT:  Are you familiar with any such studies?

20              THE WITNESS:  Yeah.  I mean, there are studies on bad

21   CEOs, there are studies on character of CEO for all of those

22   kind of things.

23              THE COURT:  So if there's this negative news about a

24   CEO, does that have an outside impact or would it change the

25   nature of prior news?

O2MCfon6                      Kothari - Cross

1            THE WITNESS:  It can, but it doesn't, you know, it

2    depends on the context.  I don't want to use the word "context"

3    these days because that has some negative connotations.  That

4    said, it really is dependent on the context.

5    Q.  One last point on November 12th, if you turn to tab 15.

6    A.  What is it?

7    Q.  Tab 15 of the cross examination binder.

8    A.  News article, right, Wall Street Journal?

9    Q.  Yes.  At the risk of belaboring the point, this is a June

10   22nd, 2018 article.  The title is:  Malaysia's Tall Order:

11   Trying to Recoup 1MDB Funds; right?

12   A.  Mhm.

13   Q.  If you look at page 1 of the third paragraph, the article

14   states -- talks about how $4.5 billion had been misappropriated

15   from 1MDB; right?

16   A.  Yes.

17   Q.  And it says the minister, Finance Minister Lim — one M —

18   announced Thursday that the government will inject $2.8 billion

19   to complete the tower.  It then says Mr. Lim's mission is to

20   recover as much of the missing 1MDB money as possible.  Do you

21   see that?

22   A.  I do.

23   Q.  If you go over to the next page, about halfway down, it

24   says Malaysia is also looking into whether it can recover from

25   Goldman Sachs group, which earned about $600 million for

O2MCfon6                              Kothari - Cross

1    placing nearly $6.5 billion in bonds for 1MDB.  Do you see

2    that?

3    A.  I do.

4    Q.  Now sir, you've read the district court's opinion on the

5    motion to dismiss in this case?

6    A.  I can't recall that.  I'm sure I read a lot of documents

7    and that might be one of those, but you will have to -- I will

8    have to refresh my memory on that.

9    Q.  You identified it as one of the articles you looked at in

10   connection with your work in your report.

11   A.  You know how it is, hundreds of articles.  I cannot sit in

12   here off the top of my head say this is the particular article

13   unless it is my own research.

14   Q.  Why don't you turn to tab 16.  This is the Court's opinion.

15   If you turn to page 39.

16   A.  Okay.

17   Q.  This is describing the December 20th, 2018 corrective

18   disclosure about Malaysia bringing in the criminal charges.  Do

19   you see that?

20   A.  Okay.

21   Q.  All right.  If you turn to page 40 of the Court's opinion.

22   Second full paragraph, Judge Broderick says, quote, the 5th

23   disclosure is not actionable as the Malaysian authorities had

24   repeatedly telegraphed graphed their intention to recover as

25   much of the missing 1MDB money as possible.  Do you see that?

O2MCfon6                          Kothari - Cross

1    A.  Okay.

2    Q.  And he's quoting from the article we just looked at from

3    June 22nd; correct?

4              THE COURT:  To be fair, the witness may not know what

5    to say.

6              MR. MUSTOKOFF:  Fair enough.

7              THE COURT:  Judge Broderick's doc is 81-5, for the

8    record.

9    Q.  If you turn to tab 15, Dr. Kothari, you'll see at the top,

10   it says at the top, document 81-5.

11   A.  Yes.

12   Q.  This is, in fact, the article cited by Judge Broderick for

13   the proposition that it was old news that Malaysia was going to

14   try to go after Goldman Sachs for all of the money from the

15   1MDB scandal; correct?

16   A.  So all I'm saying is that it's on that day, on December

17   20th.  It might be old news, but when it became old news and

18   didn't become an entirely old news in June, I find the evidence

19   is inconsistent with that.  There are two things that are

20   happening.  One is earlier statements by Goldman -- I'm sorry.

21   By Malaysian authorities, they want to recoupe all

22   misappropriated funds.  At that time, they were not saying

23   those were the funds all misappropriated, meaning they will

24   recoupe from Goldman.  They may be, they may not be, but there

25   is some ambiguity at least.

O2MCfon6                          Kothari - Cross

1           The second on November 12th, early morning report,

2      that following the plea by Leissner, they have explicitly

3      expressing resolve to recoupe all those funds from Goldman.

4      Now, that also wouldn't be the first time, but at least there

5      is a -- that the seriousness with which they want to go after

6      Goldman and they also are armed with the fact that Leissner and

7      others, they have pled guilty.

8           THE COURT:  So you're saying that the plea news

9      contextualizes the request for the refund for purposes of how

10     the market reacts?

11          THE WITNESS:  Certainly looks that way.  Thank you.

12     It does look that way.  And beyond all of that, I'm looking at

13     the timing and the price reaction.  If there was something else

14     that had come in between 4:00 a.m. and 9:30 or whatever time it

15     was and the first reaction, I would say, well, I'm handicapped

16     now, I don't know what's driving it.  I don't think there was

17     anything else that came.  This news comes and the market reacts

18     negatively.  As a financial economist, I say that the cause is

19     that.

20          And even more importantly, one can be very confident

21     that in an efficient market for a stock like Goldman, news that

22     came on 8th is unlikely to impact the price on 12th.  That just

23     seems economically so implausible, and we have already gone

24     through the event that took place on 9th, but now we're talking

25     about the whole weekend and then Monday morning, seems

O2MCfon6                                Kothari - Cross

1    economically implausible to me.

2    Q.  But the two components of Mr. Lim's radio address the

3    morning of the 12th, the fact that they were going to go after

4    Goldman Sachs and the fact that Mr. Leissner had pled guilty,

5    those were both two pieces of old news; correct?

6    A.  You are, again --

7    Q.  It's a simple question.

8    A.  I'm trying to answer fully.  They are old news, but the

9    likelihood probability evidence, they can take place.

10            THE COURT:  I think you should move on, counsel.

11            MR. MUSTOKOFF:  I'll move on, your Honor.

12   Q.  Dr. Kothari, there was a statistically significant price

13   decline in Goldman's stock price on November 9th, on a

14   close-to-close basis, at a 99-percent confidence level;

15   correct?

16   A.  I believe that's correct.

17   Q.  And there was also a statistically significant price

18   decline in Goldman's stock on November 12th on a close-to-close

19   basis; correct?

20   A.  That is correct.

21   Q.  And you would agree measuring a stock price movement on a

22   close-to-close basis is the standard approach used by

23   economists; correct?

24   A.  No.  That is, A, the world has moved much beyond that.  I'm

25   doing now research that is literally trade-by-trade and trying

1    to find out and -- okay.  And people have their event study

2    methodologies with 15 minutes interval and things like that.

3    And I don't want to bring that necessarily, but context here

4    also matters.  There's nothing in the literature that says that

5    it will take several hours.  Market efficiency.  You saw Jeanne

6    Fama's statement.  And it's not just recently met up on good

7    news and its stock price went up by 18 percent or something.

8    The earnings news Meta announced was overnight.  And you can

9    look at the price.  The price change took place before the

10   market opened.  Aftermarket hours, that price changed, it went

11   like a rocket up 17 percent, and then it eventually it was

12   19 percent or something.  But that kind of story, that is the

13   norm.

14   Q.  Sir, you did testify when I deposed you in December that

15   close-to-close is the standard approach; correct?

16   A.  As I said, context matters.  Here, if there is, and the

17   Court I'm sure wants all the information, and the information

18   that I'm providing is that the news came at 11:17, what is the

19   implication of market efficiency on which both professor Mason

20   and I 100 percent agree that Goldman trades in an efficient

21   market, what is the most basic implication of that, that the

22   price reaction would be immediate.  And if you don't observe

23   until 3:00 p.m., I think the whole notion of efficiency is

24   being thrown out of the window here.

25   Q.  Now, the Fama article that you mentioned, was that part of

O2MCfon6                         Kothari - Cross

1    one of the briefs submitted to the Supreme Court in the

2    *Halliburton* case, I believe?

3    A.  I would imagine something like that, but anyway -- but that

4    brief is an example or the evidence is uncontroversial, you can

5    do any amount, and that's what I'll show.  NASDAQ and SEC, they

6    worry about milliseconds, not about hours, not about days.

7    Q.  Well, you were talking about being able to profit in

8    milliseconds, right, from news, you testified about that?

9    A.  Sure.

10   Q.  Those are high frequency trades, correct, that are making

11   money within milliseconds?

12   A.  But that --

13   Q.  Sir, yes or no.

14   A.  The reason I will say yes or no, I refuse to say, is

15   because the price is price.  If I go -- the price being set by

16   high frequency traders doesn't mean that I may get some

17   different price because I cannot go and say, hey, I'm not high

18   frequency trader, give me different price.  That's not how it

19   works.  Price is price.  So if the price has been moved, has

20   been set by high frequency traders, I got to shrug and say,

21   yeah, I have to accept that price.

22   Q.  But high frequency traders that are making profits in

23   milliseconds, they're not trading off of qualitative

24   information, new news about CEOs meeting with criminal

25   masterminds, right, they're trading on quantitative

O2MCfon6                         Kothari - Cross

1    information, economic indicators that are immediately released

2    and immediately absorbed; correct?

3    A.   I don't think so.  I used to have high frequency traders in

4    my team, also, okay.  So it's not like I'm just talking out of

5    hand here.  I know from personal experience high frequency

6    traders and others.  So, yes, many of them do trade on

7    quantitative information, but they also trade on earnings

8    information.  What they try to do is they take information and

9    work it into quantitative metrics.

10        So the $300 million portfolio that I manage, that was

11   for quantitative investing.  What we did was earnings quantity

12   was one of the things that was part of our investment strategy.

13   The attempt is to try to create a quantitative measure of

14   underlying factors, and those underlying factors can be

15   anything, earnings quality, earnings firm size, accounting

16   accruals.  So number of different things.  So high frequency

17   trading only implies that they act on information with high

18   frequency.

19   Q.   The Fama article that we were looking at before that was

20   submitted in the amicus briefing in the *Halliburton* case, have

21   you read the *Halliburton* decision from the Supreme Court?

22   A.   Yes.

23   Q.   Are you aware of the fact that in that decision, the

24   Supreme Court refused to adopt a bright-line test and said

25   we're not going to adopt the 15-minute test or even a 60-minute

O2MCfon6                         Kothari - Cross

 1    test, there's no bright-line test to how long it takes a stock

 2    price to react on new information.  Are you aware of that?

 3    A.  I'm not a legal expert and I'm not going to tell others as

 4    to what they should do.  I'm just telling you, just as

 5    professor Mason was saying, as an economic person, what do I

 6    expect and can I assign what caused the stock price to go up or

 7    down from an economic standpoint.

 8          Now, you are bringing in some legal issues and I --

 9    the Judge can decide, you know, if it is for one hour, one day,

10    one month, whatever it is.  I'm not in a position to --

11    Q.  Fair enough.

12    A.  -- offer any advice.

13    Q.  Let me ask you about the truthful substitutes.

14          MR. MUSTOKOFF:  Your Honor, how much time do I have?

15          THE COURT:  Not much.

16    Q.  Dr. Kothari, you have an appendix E to your report?

17          THE COURT:  Five minutes.

18    A.  Yes.

19    Q.  That's where you set forth all of these, I think it's 259

20    articles that you contend are truthful substitutes.  Do you

21    recall that?

22    A.  Yeah.  And, yes.

23    Q.  And you would agree during the class period, during this

24    time, Goldman was making public statements denying culpability

25    in connection with the 1MDB bondings; correct?

O2MCfon6                          Kothari - Cross

1    A.  Sure.

2    Q.  Now, your appendix E, you reference 259 articles.  You

3    didn't determine how many of these 259 articles referenced or

4    repeated Goldman's statements denying that the bank had

5    evidence of Jho Lowe's involvement in the 1MDB deals; correct?

6    A.  Well, I had the benefit of listening to professor Mason and

7    I believe he said 23 percent.

8    Q.  But you didn't undertake that counting; right?

9    A.  You want the information or do you want to know who did

10   that?

11   Q.  Okay.  You didn't do it.  You didn't do it; right?

12   A.  I didn't do that.

13   Q.  So you had no basis to contest his quantification of those

14   repeated denials?

15   A.  I will never contest it.

16   Q.  Now, you testified at deposition that -- strike that.

17            Would you agree that the standard practice for

18   companies to deny wrongdoing until it becomes more or less

19   inevitable that they're going to have to disclose the truth?

20   A.  I think there's a variation some people might do that, some

21   people may not.  There's also requirement that you have to

22   disclose what risk you are facing, and that is a way of trying

23   to disseminate at least a lot of the risk facing the forum.  If

24   you look at, for example, any company and you will have 10, 20,

25   25 pages of risk disclosure.  I believe it is section 1A of

O2MCfon6                          Kothari - Cross

1    annual report in which you disclose that.

2    Q.  I just want to look very quickly, I just want to look at a

3    few of the articles you cite in your report and you claim are

4    truthful substitutes.

5    A.  Did I say only truthful substitute -- there can have some

6    other information.  I'm not disputing that they might have some

7    other information.

8    Q.  Well, let's --

9    A.  If that's what you're saying.

10   Q.  Let's look at some examples.  So if you go to tab 19 and

11   if you go to page 3 -- let me take a step back.  This is a

12   July 9, 2018 article that you cite among the articles in your

13   appendix E, and if you go to the third page.

14   A.  Okay.

15   Q.  Toward the bottom of the page, about two-thirds down, it

16   says, quote, Goldman has said it did nothing wrong, had no way

17   of knowing there might be fraud surrounding 1MDB.  Do you see

18   that?

19   A.  Okay.

20   Q.  That's a denial of wrongdoing.  You would agree?

21   A.  It says Goldman has said.  So not to split hairs, but that

22   statement is Goldman.  Although, the full length sentence is

23   Goldman had repeatedly denied Mr. Lowe's request to open

24   personal account, but the first statement, Goldman has said it

25   did nothing wrong.  Someone else is quoting that Goldman has

O2MCfon6                          Kothari - Cross

1    said.  It's not like --

2    Q.  It's repeating Goldman's denial of wrongdoing; correct?

3    Goldman has said it did nothing wrong?

4    A.  I know, but it does not say that on this date, sir.  It

5    says -- sometimes it has said that.  All I'm trying to say is

6    that this sentence, if you read it, it does not say on the date

7    this news report came.  On that day, Goldman denied its

8    wrongdoing.

9    Q.  If you look at the top of the page, it says -- this is a

10   quote from Goldman, since we suspended Mr. Leissner, we have

11   discovered that certain activities he undertook were

12   deliberately hidden from the firm, which we brought to the

13   attention of the relevant authorities.  Do you see that?

14   A.  Where are you?

15   Q.  Top of the same page.

16           THE COURT:  Page 3, second paragraph.

17   A.  Okay.  Since we suspending, okay.

18   Q.  They're making a statement that the wrongdoing was hidden

19   from the firm and that it was all Mr. Leissner's fault;

20   correct?

21   A.  It talks about what Mr. Leissner did.  It doesn't say

22   anything about what Goldman did.

23   Q.  Well, it talks about what Goldman said, right, it talks

24   about their statement to the market.

25   A.  I agree that Goldman has denied, but it does not say that

O2MCfon6                          Kothari – Cross

1    on this day it did deny it.

2    Q.  Fair enough.

3         Now, if you go to the bottom of the page, second to

4    last paragraph, it says, still, no one flagged the 1MDB

5    transaction to regulators.  The Journal has reported, quote, we

6    have found no evidence showing any involvement by Jho Low in

7    the 1MDB bond transactions the firm had said previously.  Do

8    you see that?

9    A.  The key part is previously.  That's what I'm trying to say

10   here.  I'm not questioning that Goldman has denied.  I'm saying

11   that on this day, I don't see evidence that you brought up.  I

12   haven't seen that Goldman has denied on this day when this

13   article truthful substitute you are calling, that they denied.

14   Q.  My point is, the press was reporting on this statement by

15   Goldman Sachs; right?  This was important to this reporter, the

16   fact that Goldman had said that we have no evidence of Jho Low,

17   that was important --

18        THE COURT:  Counsel, let's finish up your question and

19   I'll give you one more question.

20   Q.  Sure.

21        THE COURT:  Can you answer the question.

22   A.  Well, the denials are -- there are several of them, but the

23   contradictory evidence to the misstatements or truthful

24   substitutes, there are many more.  There is a barrage of those

25   that came out, and then the denials are also there, punctuated,

O2MCfon6                           Kothari - Cross

1    and I reference those.  For the inflation maintenance theory,

2    the negative impact of the contrary disclosures will have to be

3    exactly offset by the periodic denials.  And that seems -- I

4    mean, it seems economically implausible that every time there

5    is a contrary to alleged misstatements statement being made,

6    the denial exactly offsets the effect of the two and we find no

7    stock price --

8              THE COURT:  You're saying you would have expected it

9    to go like this and, instead, it was this?

10             THE WITNESS:  Exactly.

11             THE COURT:  For the record, I was showing a sawtooth

12   versus a straight line.

13             MR. MUSTOKOFF:  Your Honor, just one, slash, two more

14   questions, if the Court would indulge me.

15   Q.  Now, you say the stock market didn't drop after all of

16   these so-called truthful substitutes; correct?

17   A.  That's what the evidence -- I looked at the date and I

18   looked for statistically significant stock price reaction, and

19   I didn't find on any of those dates.

20   Q.  You've read the *Arkansas Teacher* decision from the Second

21   Circuit?

22             THE COURT:  That was more than one question.

23             MR. MUSTOKOFF:  Yes.

24             THE COURT:  Is this important, because he's not a

25   lawyer.

O2MCfon6                        Kothari - Cross

1                    THE WITNESS:  Yeah, I'm not a lawyer.

2                    THE COURT:  If you're asking about the *Arkansas*

3    *Teacher* --

4                    MR. MUSTOKOFF:  I was going to ask about a similar

5    economic situation that was discussed by the court and *Arkansas*

6    *Teacher*.

7                    THE COURT:  You can make your argument on that,

8    counsel.

9                    MR. MUSTOKOFF:  That's fine.  Thank you, your Honor.

10                    THE WITNESS:  Thank you.

11                    THE COURT:  Are there any other questions that you

12   need to ask Dr. Kothari?

13                    MS. SOLOWAY:  No.  Thank you, your Honor.

14                    THE COURT:  Thank you, Dr. Kothari.  You may step

15   down.

16                    (Witness excused)

17                    I think in counsel's schedules, you did didn't account

18   for bio breaks and slight delays, so it is 20 of 5:00.  I'm

19   willing to stay to hear oral arguments if you want to do that

20   because I don't know that I have another day in close time from

21   today.

22                    What do the parties think?

23                    MR. MUSTOKOFF:  Speaking for myself, I mean, we've

24   covered a lot of ground today.  I think I could probably hit

25   the high points in 20, 30 minutes, if the Court was willing to

O2MCfon6                         Kothari - Cross

1    stretch this another hour.

2              MS. SOLOWAY:  We would be fine with that, your Honor.

3              THE COURT:  We'll take a short break and come back for

4    oral arguments, five minutes.

5              (Recess)

6              MR. MUSTOKOFF:  Thank you, your Honor.

7              Your Honor, thank you for taking the time today.

8    We've covered a lot of ground, but I'd like to quickly take a

9    few minutes to touch back on the misstatements it and the match

10   issue.

11             THE COURT:  Could I ask you a question, please.

12             MR. MUSTOKOFF:  Sure.

13             THE COURT:  What is your position on what the

14   defendants must show to rebut price impact, because that's what

15   we're talking about today.

16             MR. MUSTOKOFF:  That's right.

17             THE COURT:  Is it zero price impact, zero

18   statistically significant impact?  What is your position on

19   that?

20             MR. MUSTOKOFF:  It is unequivocal, in my view, that

21   the burden is they have to show no price impact, zero.  I mean,

22   that was stated in *Halliburton*, too.  It was reaffirmed by the

23   court in Goldman Sachs.  There's no question about that.  And

24   so, let's take the two stock drops one at a time.

25             In terms of statistical significance, look, the

O2MCfon6                        Kothari - Cross

 1    Supreme -- I'll put it back up here.  The Supreme Court clearly

 2    said there's no threshold.  Court after court in the Second

 3    Circuit has said -- these two cases, *Carpenters* and *Alexion*, it

 4    was a 24-hour differential between the time the disclosure came

 5    out and the time there was any price reaction.

 6            In the *Alexion* case, there were two examples of that.

 7    There were two corrective disclosures.  The second one there,

 8    the corrective comes out after the close on November 9th, there

 9    there's no decline until November 11th.  If you read these

10    decisions, I mean, Judge Scheindlin says there's no bright-line

11    test.  Dr. Kothari conceded in his deposition that

12    close-to-close is the standard.  There is no intraday test,

13    there is no test of immediate reaction.  That's the law.

14    That's the majority of cases.

15            They cite to one case, they cite to one outlier case,

16    it's called *Ramirez* in the Southern District of Texas.  In that

17    case, your Honor, the plaintiff's expert didn't even give an

18    opinion on the corrective disclosure.  So it's a complete

19    outlier, it's contrary to the great weight of authority, and

20    it's certainly contrary to what the Supreme Court said.

21            THE COURT:  Just going back to my question, I'm going

22    tease that out.  Your contention is the law says that the

23    defendants have to show, for purposes of defeating class cert,

24    zero price impact, zero?

25            MR. MUSTOKOFF:  Zero.

O2MCfon6                         Kothari - Cross

1             THE COURT:  And any partial price impact would be left

2    for loss causation issue?

3             MR. MUSTOKOFF:  That's exactly right.

4             THE COURT:  Is that your position?

5             MR. MUSTOKOFF:  Exactly right, your Honor.  In terms

6    of statistical significance, we think we meet the test of price

7    impact in two ways.  Certainly, undeniably, there was a

8    statistically significant price reaction on the 9th at the

9    99-percent confidence level.  Nobody disputes that.  That's

10   under the standard close-to-close approach, which is what the

11   courts follow and what Mr. Kothari himself conceded at

12   deposition is the standard approach.  If you look at Exhibit

13   91, that's Dr. Kothari's deposition.  Page 179, he concedes

14   close-to-close is the standard approach.  So that's one way.

15            The second way we show price impact, Dr. Kothari

16   conceded that there was a statistically significant price

17   impact in the first 15 minutes of trading on November 9th at

18   the 91-percent confidence level.  That's in one of these

19   exhibits that Ms. Soloway put up.  It's exhibit 10 to his

20   report.  All of the talk today about how scientists and

21   economists don't -- that it's a bright-line test at 95 percent,

22   it's not the case.  We cite many cases in our brief.  We cited

23   Judge Furman's opinion in the *Pirnik* case, where it was a

24   92-percent confidence level.  He said there it doesn't include

25   the absence of price impact.

O2MCfon6                         Kothari - Cross

1              I would also direct your attention, your Honor, Judge

2    Scheindlin in the *Chi. Bridge* case, that's 2019 WL 5287980 at

3    *13.  She has a terrific discussion about statistical

4    significance and how 95 percent is an arbitrary number.  She

5    says, you know, it can't be that there's price impact at 95.1

6    percent, but there's no statistical significant 94.9 percent.

7    She goes on and she cites cases.

8              There's a Third Circuit decision that we cite in our

9    brief, the *Bing Li* case, where the Third Circuit said that an

10   84-percent confidence level does not demonstrate an absence of

11   price impact.

12             And one final legal cite, your Honor.  There was a

13   recent case in the District of New Jersey, *Johnson & Johnson,*

14   2023 WL 9017023 where the court there said 95 percent is not

15   required.

16             And beyond the legal authorities, there's plenty of

17   scientific authority.  I think Dr. Mason referred to the

18   statement by the American Statistical Association.  It's up

19   there.

20             And so, it's simply not the case that you need to show

21   95 percent.  91 percent, your Honor, it's evidence, it's

22   evidence of price impact.  In fact, Dr. Kothari himself

23   testified -- I don't have a slide on this, but if you take a

24   look at his testimony later on at Exhibit 91 at 202, 203, he

25   said if you're rejecting the hypothesis, then you'd use a

O2MCfon6                    Kothari - Cross

1    5-percent significance level or a 95-percent confidence level.

2    But then he said if you want to provide, quote, some evidence

3    of what is the probability, you assign to a particular

4    hypothesis.  He says you might use 10 percent.  So even

5    Dr. Kothari is conceding that statistical significance at a

6    90-percent confidence level is some evidence of price impact.

7            I'll just make the general point now, your Honor,

8    Dr. Kothari, he equivocated during his deposition -- this is at

9    page 200.  I asked him to characterize the Blankfein-Low news

10   that came out on the evening of November 8th.  He said it could

11   have some price impact.  That's his quote.  Could have some

12   impact.  So he hedged.

13           And look, it's no surprise, because, look, the Supreme

14   Court in Goldman Sachs says you have to use common sense.  I

15   would ask you to use your common sense here.  Goldman Sachs

16   suffered the largest decline, two-day decline in eight years.

17   It was the first time -- you know, sure, there was press about

18   1MDB throughout the class period.  Not once did the stock drop.

19   Then all of a sudden after this bombshell news about Blankfein,

20   the stock drops for two straight days.  You have to ask

21   yourself why that is.  It can't be Brexit, it can't be the

22   China trade talks.  Kothari says there's not even a measurable

23   impact.  It just defies common sense.

24           THE COURT:  Part of this analysis of whether there was

25   price impact goes to the fit between the front and the back-end

O2MCfon6                           Kothari - Cross

1    statements.

2               MR. MUSTOKOFF:  That's right.

3               THE COURT:  The Second Circuit noted that the price

4    impact in this inquiry, there must be a closer fit between the

5    front and the back-end statements than in the loss causation

6    inquiry.  So in what ways does your proof go beyond the lower

7    bar for the loss causation inquiry?

8               MR. MUSTOKOFF:  Well, your Honor, this is a brand new

9    decision, right.  There isn't a lot of guidance out there where

10   the courts talk about the difference between the loss causation

11   standard and the price impact standard.

12              THE COURT:  That's why I'm asking the question.

13              MR. MUSTOKOFF:  Okay.  But what the Second Circuit

14   clearly says is you don't need a precise match.  I gave the

15   example this morning.  Clearly, there was not a near image

16   precise match there, and yet, the court referred to that as the

17   classic --

18              THE COURT:  I'm not quibbling with what the case law

19   says.  What I'm asking you is about your proof.

20              MR. MUSTOKOFF:  Well, let's look at the proof.  Let's

21   look at the Jho Low statement.

22              THE COURT:  What would you say, of the 13

23   misstatements, what would you say is the closest fit to the

24   disclosure.

25              MR. MUSTOKOFF:  If I had to rank them, your Honor, I

O2MCfon6                        Kothari - Cross

1   would submit this is the closest match.  You have a statement

2   in December of 2016, you have no evidence showing any

3   involvement by Low in the 1MDB bond transactions.  Lo and

4   behold, the market learns on November 8th that Mr. Blankfein

5   met with Low for a second time, he met with him after the bond

6   transactions, he met with him after the compliance department

7   on multiple occasions flagged the guy as a major corruption

8   risk, said you shouldn't do business with the guy, and yet,

9   they have this meeting.  Clearly, The Wall Street Journal

10  article on the 9th said that 1MDB business was discussed.  I

11  mean, there was some back and forth about that today, but

12  clearly, that was the case.

13          In fact, if you look at the Leissner affidavit, I

14  believe it's -- this is exhibit D to the defendants' briefing,

15  paragraph 70 makes clear -- this is before Blankfein's name was

16  disclosed, but that paragraph makes clear that it was 1MDB

17  business that was discussed.  They say this was a client

18  meeting, this was some other client meeting.  No.  No.  No.

19  No.  This was a meeting that took place just months after

20  Goldman had received the last piece of its $600 million fee.

21  This was the biggest fee Goldman Sachs had ever made in the

22  investment bank's history.  There's no question that

23  Mr. Blankfein was aware of that fact.

24          And he meets with Low, he meets with the CEO, CFO, and

25  the general counsel.  This is in the record of 1MDB at that

O2MCfon6                        Kothari - Cross

1    meeting right after they complete the third bond deal to talk

2    about new 1MDB business.

3           THE COURT:  Well, if these were the biggest fees ever

4    for a bond deal, why wouldn't the market have assumed that the

5    highest ranking people were aware of it and aware of those

6    involvement earlier?

7           MR. MUSTOKOFF:  Well, you just said two separate

8    things.  The market knew that Goldman was the underwriter, no

9    question, but there was no suggestion that the highest level of

10   the bank was meeting with this guy who everybody said they had

11   no evidence that he was involved.  I mean, it was a seat

12   change.  As Dr. Mason testified, I mean, it was a lot of talk

13   about the analyst report today, right?  Dr. Kothari himself

14   made the finding that before the November 8th corrective

15   disclosure, there were only 14 analyst reports that talk about

16   1MDB.  None of them suggested that Goldman was complicit in any

17   sort of wrongdoing.  In fact, they just repeated the mantra

18   that there had been no implication of wrongdoing.  They gave

19   the example of the Barclays's reports in 2016 and 2017.

20          In the three months after the disclosure, there's 72

21   reports that talk about the reputational and regulatory risk

22   and harm that's befallen the company.  That didn't happen in a

23   vacuum.  It happened after the news about Mr. Blankfein.  It

24   didn't happen after the -- it happened after this bombshell

25   tipping point moment.  I mean, there's a lot of talk from

O2MCfon6                          Kothari – Cross

1    Ms. Soloway today about, well, all this stuff was out there.

2    Yeah, it was all out there, but it was all in the context of

3    denying institutional complicity.  And, you know, the media is

4    talking about the statements.

5              (Continued on next page)

1          MR. MUSTOKOFF:  Ms. Soloway, she talked about -- this

2     is important.  Ms. Soloway talked about how you've got to look

3     at the statements as written, and she's accusing the plaintiffs

4     of rewriting the statements.

5          Well, this is what the Second Circuit said.  It's at

6     page 100 of the opinion *Arkansas Teachers*.  The court says:

7     Utilizing a back-end price drop as a proxy for the front-end

8     misrepresentations price impact works only if at the front end

9     the misrepresentation is propping up the price."  That is, in

10    the district court's words, and Goldman's last misstatements,

11    reinforce the market's misconception.  In other words,

12    reinforcement requires some indication that investors relied

13    upon the conflicts disclosure as written.  It's in the context

14    of reliance that that quote comes.  And that's important

15    because there's evidence here.  There's evidence here that the

16    market considered the statements to be --

17          THE COURT:  Well, that's all we're talking about here,

18    because the rebuttal of price impact goes to the reliance

19    element, right?

20          MR. MUSTOKOFF:  Well, that's right, but that's the

21    point is that in *Arkansas Teachers*, there was no evidence of

22    the media, or analysts or anybody talking about the statements.

23    Here, I mean, here's the evidence:  Pre-disclosure commentary

24    and post-disclosure commentary, including the disclosure

25    itself.  They're talking about the statements.  Goldman has

1   maintained it was duped; had no idea Mr. Low was operating in

2   the shadows.  I mean, this is what they're talking about before

3   the disclosure.  It's important to investors.  It's clearly

4   important.  This is nothing like *Arkansas Teachers* and the

5   generic statements there.

6          THE COURT:  Would you say that in this case the

7   back-end disclosure is more generic than the front-end

8   statement, that it's almost a reverse of the scenario in

9   *Arkansas Teachers*?  An inference has to be made, no, from the

10  back-end statement?

11         MR. MUSTOKOFF:  Well, I mean, if I understand your

12  question, in *Arkansas Teachers*, the Court said at page 98:  "We

13  don't suggest that the inflation maintenance theory requires a

14  precise match.  It may frequently be the case that what is

15  corrective about a corrective disclosure is situated among

16  details, which, in the aggregate, make for a somewhat more

17  specific back-end disclosure."

18         So, here, look, the statement "We have no evidence of

19  Jho Lo."  That's not a generic statement.  It's a very specific

20  statement.  But I would submit that this is sort of like what

21  they're describing here, is that the disclosure of the meeting,

22  that's a very specific piece of information.  But the market's

23  perception of that information was, wow, the bank was

24  complicit.  The bank was in cahoots with Mr. Low.

25         And so, I mean, I would submit -- like I said, I said

O2MQfon7                        Summation - Mr. Mustokoff

it this morning, I would submit the match here is equally, if

not as great, as it was in *Vivendi*.  You certainly didn't have

this commentary in *Vivendi* either.

You know, the same with the fund diversion

misstatements.  There's commentary, pre-disclosure and

post-disclosure, where over and over again, the *Wall Street*

*Journal*, *Reuters*, *New York Times*, they're repeating Goldman's

denials.  It's obviously important, and then in the

post-disclosure commentary, they come back to that.  And they

make reference to these statements which so doubt in the

denials.

This is how the market reacted.  They called all the

denials into question.  This type of evidence is completely

lacking in *Arkansas Teachers*.  I pointed your Honor to the -- I

pointed your Honor to footnote 14 this morning from the Court's

decision where the Court is discussing the *Ferris v. Wynn*

*Resorts* case from District of Nevada, I believe, and I think we

fit the facts there.  It's the same thing there.  There was

sort of this generic denial of wrongdoing about the CEO.  There

were allegations the CEO had been involved in some sort of

wrongdoing.  The company kept saying did nothing wrong.  The

CEO did nothing wrong.  Ultimately, it's disclosed that the CEO

was involved in sexual misconduct.  And I think the defendants

there tried to company argue, well, there's a mismatch.  The

corrective disclosure there was more specific.  It didn't

O2MQfon7                         Summation - Mr. Mustokoff

1   matter to that court.  The court said that the defendant was

2   straining and relying on technicalities that they don't defeat

3   the match that's required.  You don't need a precise match.  I

4   don't know how else to say it.

5           Clearly, as the Second Circuit said, there is some

6   difference between the loss causation fit and the price impact

7   fit.  The courts haven't really figured that out.

8           But I keep coming back to *Vivendi*.  I mean, if the

9   match -- I mean, this is stronger than *Vivendi*.  I would

10  submit -- remember, the court in *Arkansas Teachers* talks about

11  *Vivendi*.  It also talks about the *Barclay's v. Waggoner* case.

12  That's the case where the statements were referenced in the

13  corrective disclosure.  We have that here.  We have that here.

14          And so the idea of this probing heightened inquiry,

15  again, we looked at this this morning, it's arguably not even

16  implicated here, because none of these circumstances are

17  present here.  This case is so far afield from *Arkansas*

18  *Teachers*.  It's night and day.

19          I want to talk about the each of the trials for a

20  minute.  Again, I think there's three critical pieces of

21  evidence that support price impact on November 9.  Like I said,

22  there's evidence commentary from the financial press — go to

23  slide 16 — directly attributing the drop to the news about the

24  Blankfein-Low meeting.  They're attributing the drop not just

25  on the 9th but also the 12th.  If you look at the *Barron's*

O2MQfon7                    Summation - Mr. Mustokoff

article up there, they're talking about the drop over the last

two sessions.  These articles are all dated November 12.

They're not dated November 9.  So there's evidence.  There is

evidence of price impact.

        Just to mention it one more time, as we saw before,

the corrective disclosure in the *Financial Times* and the *Wall

Street Journal* reports, there's references to the

misstatements.  And in the days that followed, the market

questioned Goldman's complicity in light of the news.

        And just to make the point one more time, there is

evidence of a statistically significant stock price decline on

November 12 whether you look at it close to close at 95 percent

or you look at it in the first 15 minutes at 91 percent.  And

so it's their burden to show no price impact.  Given that

evidence, I don't see how they overcome that.

        Just one more point about the 15-minute cutoff.  We

talked about the *Carpenters* and *Alexion* decisions within the

Second Circuit.  You know, the late-day reaction here is

explained by the academic literature.  Dr. Mason cites research

papers at paragraph 74 of his reply report showing that

intra-day momentum toward the end of the trading day, it's not

at all unusual, and may be stronger in cases like this where

you have this informational shock, and you heard Dr. Mason

testify about it.

        Dr. Kothari, you know, you heard him concede today in

O2MQfon7                          Summation - Mr. Mustokoff

1    some instances it does take longer than 15 minutes for stock

2    prices to react.  In fact, he used the example of November 12.

3    We disagree the cause of the November 12 drop was the full

4    refund news, but, nonetheless, he said it took two and half

5    hours for the stock price to react.  That's completely

6    inconsistent with what he said in his report that stock prices

7    react within 15 minutes.

8            Turning quickly to the -- let me talk about

9    November 12 for a second.

10           THE COURT:  Well, you said I don't even have to reach

11   November 12, because you're saying that goes to loss causation.

12   Is that what you're saying?

13           MR. MUSTOKOFF:  I really do believe that's right

14   because once we've shown price impact, whether it's in the

15   first 15 minutes based on the 91 percent confidence level,

16   whether it's based on a close to close with a 95 percent

17   confidence level, yes, there is price impact for November 9.

18           But to the extent the Court wants to go to

19   November 12, I submit there's evidence of it.  You know, Judge

20   Broderick said in his opinion — we looked at it during

21   Dr. Kothari's cross — he said that the November 12 full refund

22   news was old news because it was disclosed in June of 2018,

23   okay?  And Dr. Kothari said that December 20, 2018 was old news

24   because of the same June 2018 article.  That was at paragraphs

25   103 and 104 of his 2022 report.

1           Now he's saying that November 12 was new news in spite

2    of the June news.  Well, given what Judge Broderick said at the

3    motion to dismiss stage, and given that it's their burden, not

4    ours, to show a lack of price impact, I would submit, in the

5    face of what Judge Broderick had to say, that they don't meet

6    the burden.

7           And, look, there's good reasons as to why the stock

8    price would have continued to drop for two straight days on

9    this bombshell news.  Again, you've got to remember the context

10   here.  The context is for four years there's news in the market

11   about 1MDB and Goldman Sachs, and the stock never moves.  All

12   of a sudden, it moves on November 9 and November 12.  We submit

13   that the stock drop at the open on November 12 is a

14   continuation of the drop that intensified in the final hour of

15   trading on Friday, the 9th, and continued over the weekend.

16          You've got to ask yourself, what's more likely?  Was

17   it a continuation of this bombshell news or was it a reaction

18   to old news that was first announced on June 18?  and the

19   fact --

20          THE COURT:  Let me just stop you for a second, because

21   in the papers submitted, I believe I saw that there was also a

22   meeting, a one-on-one meeting in 2012 between Blankfein and

23   Low.

24          MR. MUSTOKOFF:  That's right.

25          THE COURT:  When did that news come out?

O2MQfon7                          Summation - Mr. Mustokoff

1          MR. MUSTOKOFF:  That came out on, I believe,

2     November 22.

3          THE COURT:  Of '18.

4          MR. MUSTOKOFF:  Of '18.

5          THE COURT:  Did that impact reflect that day?

6          MR. MUSTOKOFF:  Well, the stock was still down.  The

7     stock continued to go down, not in a significantly fashion

8     after the 12th, but the stock remained depressed for the next

9     several months because of the 1MDB news.  And that's borne out

10    by the analysts' reports.

11         I'm glad you raised that, your Honor.  They announced

12    the fact there had been a third meeting on November 22.  Now,

13    The reason the stock didn't really drop in a statistically

14    significant manner by November 22, I would submit, is because

15    by that point Blankfein was palling around with Jho Lo was old

16    news.  But it's a continuation of the same pattern, the same

17    institutional complicity.

18         And I think we lay out the facts in our brief.  That

19    was a meeting that Mr. Low had with Mr. Blankfein right before

20    the Coastal Energy deal.  That was in December of 2012.  Their

21    meeting with the head of IPIC, which was the Saudi Arabian

22    entity that was guaranteeing the loans.  I mean, they've

23    admitted to it.  They've admitted --

24         THE COURT:  Well, the corrective disclosure that

25    you're pointing to for November 8 and 9 don't discuss Coastal

O2MQfon7                        Summation - Mr. Mustokoff

1    Energy.

2            MR. MUSTOKOFF:  No, they don't.  That's right, they

3    don't.  But again, it's the -- what the November 8 corrective

4    and November 9 corrective was, it was a -- it was a

5    constructive revelation of Goldman's institutional complicity.

6            And, you know, Dr. Kothari made the point that it's

7    inconceivable that news on the 8th would still continue to have

8    a stock price reaction on the 12th.  I will just point out

9    there was incremental new news on the 9th.  The *Wall Street*

10   *Journal* article, unlike the *Financial Times* article, made the

11   express point -- it's in the first sentence of the article.  It

12   makes the point that the 2013 meeting occurred after Mr. Low

13   had been flagged as a corruption risk.  That was pretty

14   significant.  It's one thing to meet with Jho Lo in 2009 before

15   there's been any wrongdoing, before there's been any suggestion

16   that he's a bad guy.  It's a whole other thing to meet with him

17   after they consummated these deals and made $600 million and

18   they're meeting to do more business

19           THE COURT:  And it's your position you're not required

20   to disaggregate or account for any alleged confounding factors

21   at the class cert stage.

22           MR. MUSTOKOFF:  That's exactly right, your Honor.  We

23   just have to show a little bit of price impact, that's it.

24   Just a little bit.  They have to show no price impact.  To the

25   extent there's some debate -- I would submit, just getting back

1    to November 12 for a second, you have two competing pieces of

2    information.  We say that it was a continuation of the

3    Blankfein news.  They say it was the full refund news.  Well,

4    again, the full refund news, it's old news, and so the fact

5    that Malaysia's ability to recover 1MDB-related costs from

6    Goldman may it have become more likely after Leissner's guilty

7    plea, right, that doesn't necessarily mean that it was

8    responsible for 100 percent of the stock drop.  And so to the

9    extent there's a debate over how much of the drop on the 12th

10   was attributable to the Blankfein news versus how much was

11   attributable to the full refund news, that's an issue of

12   quantum.  It's a quantum of damages, which is not -- has no

13   implications at class certification.  It's a jury issue.  It's

14   a damages issue.  And I submit that they haven't shown that the

15   full refund news was responsible for 100 percent of the drop,

16   certainly in light of Judge Broderick's ruling.

17          I'm conscious of the time, your Honor.  I do want to

18   address the truthful substitutes argument --

19          THE COURT:  Mmm-hmm.

20          MR. MUSTOKOFF:  -- because there was a lot of talk

21   about that today, how the news was out there.

22          THE COURT:  Right.  I understand your argument that

23   your position is that none of the truthful substitutes are

24   actually correcting because they include the denial of

25   corporate-wide culpability.

O2MQfon7                        Summation – Mr. Mustokoff

1          MR. MUSTOKOFF:  That's one of the reasons.

2          THE COURT:  Mmm-hmm.

3          MR. MUSTOKOFF:  There's three others.

4          THE COURT:  Okay.

5          MR. MUSTOKOFF:  And if you would indulge me.

6          *Arkansas Teachers* says that the truthful substitute

7    formula applies only where the corrective disclosure doesn't

8    reference the election misstatements.  As we've shown, that's

9    not the case here for at least some of the statements:

10   Certainly, the Jho Lo statement and the diverted fund

11   statements.  Those statements are expressly mentioned,

12   discussed, in the corrective disclosure and in the context of

13   questioning Goldman's denials.

14         Secondly, *ATRS* says at page 198 that the truthful

15   substitute analysis asks the Court to look at what would happen

16   to the stock price if the company had spoken truthfully at an

17   equally generic level as the misstatements.  That's the test.

18         THE COURT:  Right.  But the front-end statement, the

19   one that you say is the closest match, is not really generic.

20         MR. MUSTOKOFF:  Well, right, that's right.  But even

21   if it was generic, let's just take the statement:  We have no

22   evidence of Jho Lo being involved.  Let's assume they had told

23   the truth at an "equally generic level," and they said we do

24   have evidence that Jho Lo was involved, this criminal

25   mastermind.  We were complicit in his involvement.  Is there

1    any question as to what the stock price would have done at that

2    point in time?  Or had they told the truth with respect to the

3    fund diversion statements, if they had said, yeah, we actually

4    did have visibility into the bond proceeds, what happened to

5    the proceeds.  Is there any question what would have happened

6    to the stock price?

7         *Vivendi*, getting back to *Vivendi* real quick, it

8    describes as the truthful substitute there for the company's

9    rosy picture of its liquidity, "the misgivings that its

10   executives were sharing behind the scenes."  That was the

11   truthful substitute that the *Vivendi* court pointed to.

12        Well, here, there's evidence that Goldman knew Low was

13   involved in the deals.  There's evidence that it arranged at

14   least three meetings with Low and Blankfein; that it knew about

15   the red flags.  All of this evidence, your Honor, it's laid out

16   in our opening brief at pages 3 to 8.  And Goldman admitted

17   that it was complicit in the fraud.  In the deferred

18   prosecution agreement, they admit all of this.

19        Defendants contort the test by saying we don't have to

20   speculate how the market would have reacted because the

21   truthful substitutes were out there in the marketplace.  But

22   the truth wasn't out there.

23        And let me just make one final point, your Honor.  I

24   promise this will be the last point.  This argument that

25   they're raising today, your Honor, that there were these legion

O2MQfon7                    Summation - Mr. Mustokoff

1   of truthful substitutes that were out there throughout the

2   class period that they say revealed the truth, and yet there

3   was no stock price reaction, and so what does that tell you?

4   That tells you nobody cared about any of this stuff.  That's

5   what they're saying.  This was the exact argument made by

6   Goldman Sachs in the *ATRS* case.  Now *ATRS* turned out pretty

7   well for Goldman Sachs.  But the one argument by the plaintiffs

8   that was credited by the *ATRS* court, the court rejected this

9   analysis.  There, in that case, Goldman said there were 36

10  prior disclosures that were effectively truthful substitutes.

11  They said there was similar information that mirrored the

12  corrective disclosure.  36 times the stock price didn't move at

13  all, and, therefore, nobody must have cared about this.  It was

14  all immaterial news.

15          The Second Circuit rejected that argument.  The Second

16  Circuit at pages 91 and 292 said: "There is a qualitative

17  difference in the respective buckets of news before and after

18  the disclosure, especially because of because the ultimate

19  disclosure was unencumbered by any of the denials or mitigating

20  commentary that rendered prior reports less jarring."

21          It's the same situation here, your Honor, and I would

22  submit that the Court should reach the same conclusion here.

23          Unless the Court has any other questions, I'll turn it

24  over to defense counsel.

25          THE COURT:  Okay.  Thank you.

O2MQfon7                          Summation – Ms. Soloway

1           MS. SOLOWAY:  Your Honor, I'm going to try to condense

2      a 40-minute presentation into a 20-minute presentation.

3           THE COURT:  I just want to be clear up front.  You are

4      not contesting that the plaintiffs have satisfied the

5      Cammer-Krogman factors.

6           MS. SOLOWAY:  We are not contesting market efficiency,

7      that is correct.

8           So, your Honor, I want to just start, if we could, on

9      slide 2, because I'd like to frame the last 20 minutes I have

10     with you in terms of the three questions that we started with.

11          And having heard the evidence come in today, we would

12     respectfully submit the answers to these questions are clearly

13     no.  What the plaintiffs are doing here, your Honor, is they

14     have tried to construct like a fulcrum or a tipping point where

15     they construct everything as the before and after this

16     additional detail that Lloyd Blankfein happened to be the

17     senior executive of this 2013 meeting.  There's the before and

18     there's the after.  So then they say, oh, look, the stock price

19     dropped that day, therefore, we can prove price impact.

20          That is an artificial creation that is not backed up

21     by the actual economic evidence that has come in through the

22     only expert who has actually done a methodological economic

23     analysis of all of the relevant corrective or truthful

24     information and/or alternate or corrective disclosures,

25     whichever you want to call them.

O2MQfon7                           Summation - Ms. Soloway

1              THE COURT:  Are you saying plaintiffs are saying *res*

2     *ipsa loquitur*, whereas your economic data is showing something

3     different?

4              MS. SOLOWAY:  I mean, I don't know if they're saying

5     *res ipsa loquitur* or if -- what I think they're doing is just

6     reverse engineering a stock drop litigation because they found

7     a stock drop on November 9, they said what information came out

8     that day, and now they're saying that that decline that is the

9     basis of their entire -- really their entire damages theory

10    now, your Honor, we can assume that there was a constant amount

11    for four years, a constant amount of inflation baked into

12    Goldman Sachs stock price for a four-year period on the basis

13    of that decline.  But what *Arkansas Teachers* teaches us, right,

14    is that you can only make this -- this actually goes to your

15    question, your Honor, about what's the burden and does there

16    have to be no price impact.  What *Arkansas Teachers* is telling

17    us is that if you want to make this inference — and it's an

18    indirect inference — that back-end decline is proxy for

19    front-end inflation, you need a tight match between the

20    information and the front-end disclosures.

21             And even if we look, your Honor, at the one that the

22    plaintiffs say is their best case, right, we would respectfully

23    submit it definitely doesn't meet *Waggoner,* **right?**  *Waggoner* is

24    a situation where it's expressly false.  You say A, the

25    disclosure is not A.  *Vivendi*, which provides a little bit

O2MQfon7                          Summation - Ms. Soloway

1    more, you know, flexibility, that's a situation where the

2    corrective disclosure directly renders false the front-end

3    statement.  So we would respectfully submit that this

4    additional nugget of information that Lloyd Blankfein happens

5    to be the senior executive at this meeting does not make a

6    statement about Jho Lo's involvement in the 1MDB deals, does

7    not directly render it false.  It just doesn't fit the way

8    *Vivendi* requires.  But, your Honor, let's imagine --

9              THE COURT:  What it's a partial fit, going back to

10   some of my original questions today.

11             MS. SOLOWAY:  A partial fit for just that one

12   statement?

13             THE COURT:  Yeah, take that one statement.  Let's say

14   it's a partial fit for that.  How does that impact the analysis

15   of whether or not there is price impact?

16             MS. SOLOWAY:  Well, I think in that situation you have

17   to turn to the rest of the economic evidence that the *ATRS*

18   court said was really important.  And, you know, I'm actually

19   going to flip ahead.  If you wouldn't mind, Randall, if we

20   could flip to slide 16 for a minute.  Sorry, your Honor.

21             So, look, the *ATRS* court walked through -- I'm sorry,

22   we should have handed up a copy of the presentation.  We will

23   do that as soon as I finish.  The *ATRS* court walked through a

24   number of different pieces of evidence that had come in there.

25   It went through each one, and it tried to do it in a

O2MQfon7                          Summation – Ms. Soloway

1   methodological way.  That is what Dr. Kothari has done here,

2   right?  He said, okay, if you want to understand whether

3   statements are inflating the stock or maintaining inflation of

4   stock, you look for other pieces of information on the same

5   subject:  Fees, fund diversion, Low's involvement, red flags,

6   and you look and see what happened, right, when that

7   information comes out.  And even if there is the so-called

8   denials going on, you would expect to see a sawtooth pattern.

9   We don't see any of that.

10       So the first question is when truthful information

11  enters the market, if there had been inflation, right, this

12  constant band of inflation over a four-year period, which is

13  the plaintiff's whole theory, you would see the stock price

14  jumping around.  That's basic principals of economics.

15       The plaintiffs have done no analysis, anything like

16  that.  What they say to you is, Judge, just ignore all of that,

17  right?  Ignore all of the truthful information that has come

18  out because it didn't move the stock price.  That is reverse

19  engineering of stock drop litigation.  If you ignore the

20  truthful of information as it comes out and focus only on your

21  hypotheses, which is that the stock price fell on November 9,

22  you haven't proved anything.  It's entirely circular, as

23  Dr. Kothari explained.

24       The *ATRS* case said, what else can we do to try to

25  figure out if the stock price is being propped up?  So I jumped

1    to two, which is the statistical -- excuse me -- the truthful

2    substitutes, but going back to one.  It is also meaningful

3    here, your Honor, that not one of the alleged misstatements

4    caused a statistically significant stock price increase.  The

5    *ATRS* case did point out that none of the alleged misstatements

6    had caused an increase.  Maybe, you know, one or two of them

7    might have.  None of them here.

8         THE COURT:  But that also wouldn't be surprising with

9    the price maintenance theory, right?  Isn't that the point of

10   the price maintenance theory?

11        MS. SOLOWAY:  I would say it's permitted under a price

12   maintenance theory, but, again, the fact that not one of the 13

13   statements causes a price increase, I think that's another data

14   here.  Again, we're just not seeing that sawtooth pattern.

15        Then we have analyst reports.  So analysts, their job

16   is to figure out what is value relevant information for a

17   company.  So Goldman, according to the plaintiffs, is making

18   these repeated statements that are getting published in the

19   press.  They're so important, they're holding billions of

20   dollars, billions of inflation in the stock price.  Yet, we

21   don't have a single securities analyst who even comments on an

22   alleged misstatement, not one over the entire class period.

23        And then after what the plaintiffs claim is the big

24   reveal, right, this moment when the 2013 attendance of

25   Blankfein at this meeting comes out, not one analyst, not one

O2MQfon7                              Summation - Ms. Soloway

1    says -- let's see, they don't say many things.  One thing they

2    don't say is anything about the 2013 meeting at all.  No

3    analyst even specifically comments on the 2013 meeting.  One

4    comments on the 2009 meeting.  One offers some generic

5    reference to a meeting.  None even discuss the 2013 meeting.

6    So this is such an important moment.  It's the fulcrum of

7    plaintiff's whole theory, but no analyst discuss it.  And it

8    causes, according to the plaintiff's expert, $7 billion of

9    market cap loss.  This is -- it's ridiculous, your Honor.  It's

10   just ridiculous.

11        Then, we have the other problem, which is, again, you

12   would think that if this 2013 meeting was so important, and it

13   connects with the front-end statements, right — we're looking

14   for a link between the front end and the back end — that

15   someone who covers this company would have said, huh, Goldman

16   has previously said the following things, but now that I see

17   this 2013 client event news, those things weren't true.  We

18   also don't see that.  It is not in any of the analysts'

19   reports.

20        Again, I've tried to put this out in a way that the

21   *Arkansas Teachers* case approaches it.  But these are really

22   devastating pieces of evidence for the plaintiffs.

23        THE COURT:  So what is the explanation for the stock

24   drop, the largest one in four years from the November 9?

25        MS. SOLOWAY:  I think for sure, your Honor, what

O2MQfon7                        Summation - Ms. Soloway

1    Dr. Kothari said is we know it's not the information, it's not

2    the information that come out on the 8th, because in efficient

3    markets, and I think we have to really underscore this, your

4    Honor, if you -- if the plaintiffs want to certify a class

5    based on the idea that markets rapidly incorporate information

6    and that this stock Goldman Sachs, right, a very widely traded

7    stock with, as your Honor pointed out, has tons of

8    institutional investors, they want to say that this traded in

9    an efficient market, they have to deal with the consequences of

10   trading in an efficient market.  In an efficient market,

11   Goldman Sachs stock does not take 15 hours to react.  So we

12   know it's not the information that comes out before the market

13   opened, or, I should say, late evening on the 8th, because

14   otherwise we would not have seen this 15-hour reaction.

15          Then we say, you know what, let's check that, right?

16   Let's look at the open and see what happens at the open.  And

17   the plaintiffs have attempted to sort of drive a wedge in this

18   by raising this issue of statistical significance about what

19   happened at the open.

20          But, your Honor, even if you could lower your

21   standards to the 90 percent level instead of the 95 percent

22   level, the evidence demonstrates unequivocally that once you

23   hit 9:45 -- excuse me -- 10:00, 10:15, 10:45, as you go through

24   all of the subsequent moments of the day and you look compared

25   to the prior close, it's nowhere near that level.  So we

O2MQfon7                         Summation - Ms. Soloway

1    effectively have indisputably a 15-hour delay here.

2           Now the plaintiffs are trying to cover that up by

3    saying, oh, well, you know, it's not always the case that the

4    market completely incorporates new information within 15

5    minutes.  Dr. Kothari was very candid with you.  He said it's

6    not always the case.  There are averages, and sometimes it

7    takes longer; sometimes it takes less time.  But what the

8    market always does, always, is it rapidly reacts.  And the fact

9    that you don't see that rapid reaction in a stock that trades

10   as hyper-efficiently as Goldman's is just completely damning to

11   the plaintiff's theory on November 9.

12          And then actually, your Honor, let me just --

13          THE COURT:  So then why are you saying that the news

14   about Malaysia seeking its money back on the 12th is the cause,

15   and that also is not incorporated, fully incorporated for a

16   portion of the morning.

17          MS. SOLOWAY:  Your Honor --

18          THE COURT:  And is not necessarily new.

19          MS. SOLOWAY:  Well, it is, it certainly is new, and we

20   can talk about that in a second.

21          I think the key with the decline in the morning on

22   November 12 is that it was immediate.  So it's been a weekend,

23   right?  We come into the day, the market price opens, and you

24   just immediately see a decline.  So this idea that you wait to

25   see a decline for 15 hours is actually inconsistent with what

1    we see on November 12.

2            So then the plaintiffs say, oh, but it took longer

3    than 15 minutes to be fully priced in.  It did.  I mean,

4    there's no doubt there was a longer period of time in the

5    morning when the stock price was declining.  Then it goes up a

6    little bit; then it declines a little more.  It takes a couple

7    of hours.  Again, averages, sometimes it's going to take

8    longer; sometimes it's going to take less time.  But what it

9    never does, your Honor, is it never waits 15 hours to actually

10   start to react.  Even Dr. Mason said it should begin to react

11   at the market open on the 9th, and we just see no evidence of

12   that, your Honor.

13           THE COURT:  What about the point the 91 percent

14   confidence level?

15           MS. SOLOWAY:  But the 91 confidence levels once you

16   add in another 15, it disappears.  And then you add in another

17   15 minutes, it disappears.

18           THE COURT:  I see.  You're saying it would have

19   continued to accelerate like it did --

20           MS. SOLOWAY:  Of course.  Of course.  In an efficient

21   market, if you could account for what the plaintiffs claim is a

22   bump first thing in the morning because of this new

23   information, then you'd continue to see the market reacting.

24   That's exactly what happens on the 12th, right?  On the 12th,

25   you asked the question, your Honor, whether the information was

O2MQfon7                         Summation - Ms. Soloway

1    new.  So what Dr. Kothari explained is that sometimes you can

2    have a threat, right, like a threat comes in June in this case,

3    there was a threat by Malaysia that they're going to start

4    thinking about whether — the words they use — are there grounds

5    to try to recover this money.  So there is a warning sign out

6    there.

7         When Judge Broderick looked at this, he said, as a

8    legal matter under loss causation principles, right, as a legal

9    matter, if the risk of a regulator coming after you for fines

10   is understood, then when the risk becomes more probable, right,

11   the stock price might decline, that's what happened here, but

12   as a legal matter, that's the realization of a known risk, and

13   it's not actionable.

14        THE COURT:  Right, but that was on loss causation.

15   Here, I'm looking at price impact, which I guess is the flip

16   side of the same coin, really.

17        MS. SOLOWAY:  Well, I actually think the *Arkansas*

18   *Teachers* court held -- and this is in a footnote in *Arkansas*

19   *Teachers* -- that you actually need an even closer fit between

20   the back end and the front end for price impact than you do for

21   loss causation, your Honor.  But I think Judge Broderick also

22   issued that decision without the benefit of *Arkansas Teachers*,

23   and he was looking at loss causation.

24        But I think the legal principle that he's articulating

25   actually fits really well with the economic principal that

1    Dr. Kothari is articulating, which is that you can know that

2    there's a risk of something happening, but when that risk

3    becomes -- the probabilities change, and the risk becomes more

4    likely, then, you know, you can have the market move and react

5    to that, but that doesn't necessarily mean the information is

6    new.  It's that there is new information that changes the

7    probabilities.

8            And that morning — your Honor, this is actually in

9    Dr. Kothari's report — what happened was that the finance

10   minister was interviewed, and he was asked a question, and I

11   think he even says -- the question has to do with the Leissner

12   indictment and Goldman's 10-Q, which had come out the week

13   before, and he says, yes, now we have grounds to really think

14   about -- not to really think about, you know, we're going to go

15   after Goldman.  By the way, your Honor, it's very interesting

16   those are the things they cite.  They cite the fact that

17   there's been a criminal guilty plea by the chair of the

18   Southeast Asia office, and they cite the 10-Q.  They don't say

19   now we know that Blankfein was the executive at this 2013

20   meeting.  That's not the thing that changes the probability of

21   Malaysia going after Goldman.  So I think the plaintiff's

22   arguments actually entirely undermine their theory on the 12th.

23           Just to make one more point about the 12th, and then I

24   want to answer a couple of your other questions.  You may

25   recall, your Honor, and this is in slide 31, if you wouldn't

O2MQfon7                    Summation - Ms. Soloway

1    mind putting it up.  You may recall that the plaintiffs

2    originally pleaded that November 12 was the result of the

3    Malaysia refund news.  That was their theory.  We know exactly

4    what happened on November 12.  They pleaded it.  This is what

5    happened on November 12.  And now because the judge said for a

6    legal reason, you can't recover, they're asking you to sort of

7    dig them out of an efficient market problem, which is give them

8    the benefit of a day four decline, even though efficient

9    markets process information rapidly and completely.

10          Your Honor, I want to come back to the question that

11   you asked my opposing counsel at the outset, which is about the

12   standard, and how you draw these inferences, and what do we

13   have to prove.

14          On the first question of the match and front-end price

15   impact, I don't think the right question is:  Has Goldman like

16   disproved every penny of price impact, because that's not

17   really the analysis, right?  The analysis is:  Has Goldman --

18   and, of course, the Supreme Court used the word equipoise, but

19   I like to think of it have we been a smidge more persuasive,

20   right?

21          THE COURT:  Well, that's just a preponderance of the

22   evidence.

23          MS. SOLOWAY:  It is, your Honor.  Have we been a

24   smidge more persuasive that the back-end decline which is

25   indirect evidence of front-end inflation is insufficiently

O2MQfon7                         Summation - Ms. Soloway

1   linked to the alleged misstatements, and does economic

2   evidence, you know, again just at that preponderance standard,

3   is it more likely than not that like what we're really seeing

4   here is a disconnect, right, between the front end and the back

5   end, and that this economic evidence that the stock was being

6   propped up all along.  Again, if it's more likely than not that

7   we're right that the stock wasn't being propped up all along,

8   we win.  It's not really about did we disprove every penny of

9   inflation.  That's not really the Goldman analysis.

10          On the back end, I think it is Goldman's burden to

11  prove that, again, it's more likely than not that the stock

12  price decline wasn't the result of the back-end disclosure.

13  And we've met that standard by introducing evidence, your

14  Honor, of how efficient markets behave both on the 9th and the

15  12th and demonstrating those stock price declines simply cannot

16  in an efficient market be attributed to the alleged corrective

17  disclosure.  Does that answer your question about --

18          THE COURT:  Yeah, but isn't it -- don't I consider all

19  of the evidence together of the match-mismatch together with

20  price impact?  I mean, it goes to the same question of price

21  impact.  Match -- the match or mismatch is a way to assess

22  price impact.  It's indirect evidence of price -- it goes to

23  that issue, no?

24          MS. SOLOWAY:  I think -- remember when we laid out

25  those three questions, I think there's a threshold legal

1   question, which is, is there a sufficient match or tight fit.

2            THE COURT:  You think if answer to that is no, then

3   you don't even look at it?

4            MS. SOLOWAY:  We're done.  We're done.  I think we're

5   done, because if you don't meet *Vivendi*, we're done.  If we're

6   so far apart that we don't meet *Vivendi*, you don't need to go

7   further.

8            But even, your Honor, if you said, particularly if the

9   plaintiffs say their strongest statement is this Jho Lo

10  statement, you would still have to go to step two, right?  And

11  there, again, we're just weighing the evidence on the one side

12  and on the other, and the evidence, just like the evidence that

13  the court found persuasive in *Arkansas Teachers*, is incredibly

14  compelling here, your Honor, that there is just no -- I think

15  of it almost like a hot air balloon, right?  There's a hot air

16  balloon floating above the alleged misstatements have allegedly

17  created this inflation, and there's just no evidence, your

18  Honor, that that actually happened, because if there had been,

19  the truthful substitutes would have caused that balloon to come

20  back down and new information on the same topics as the

21  misstatements would have had an impact on the market, and it

22  didn't.  Analysts would have been talking about it, but they

23  weren't.

24           And so I think when you assess the evidence there,

25  again, it's a more likely than not standard, and the total --

1    you know, when you put all of the evidence together, it's

2    incredibly compelling that there's --

3            THE COURT:  So you're reading the Second Circuit's

4    interpretation of the Supreme Court's decision to require this

5    step-wise, if I can use an old economic term, analysis as

6    opposed to looking at the evidence of price impact as a whole?

7            MS. SOLOWAY:  I think we do need to look at the

8    totality of the evidence, and that's the economic evidence,

9    which is what Dr. Kothari walked you through, right?

10           THE COURT:  Well, it's not just a statistical and

11   economic report; it's also the analysts' reports that you're

12   talking about.

13           MS. SOLOWAY:  Agreed.

14           THE COURT:  It's also news reports.  It's also

15   anything else that you might want to bring to bear.

16           MS. SOLOWAY:  I agree with that, your Honor.  You have

17   to look at it all.

18           I want to spend a minute on the news reports, which

19   really I think are the only thing the plaintiffs pointed to

20   here to support their theory.  They don't have analysts'

21   reports.  They haven't dealt with truthful substitutes.  So

22   they're basically left with saying, Judge you should look at

23   the news, right, the statements got repeated.  That's

24   essentially their argument.  And their argument is the

25   statements got repeated, and then, you know, there's this

O2MQfon7                         Summation - Ms. Soloway

1    terrible moment in time where the market realizes Goldman is

2    culpable and the stock price drops.

3              The problem, your Honor, is even if you assume the

4    price stock price dropped from the disclosures of 2013 meeting,

5    which we don't think it did, their theory is effectively --

6    what the plaintiffs are basically saying is the statements got

7    repeated, so, okay, this is what happens when reporters called

8    Goldman and ask for comment, they then print their statements.

9    That's not evidence that investors care about the statements.

10   That's a reporter called and Goldman gave a statement.  Then

11   they say they got repeated later, right, and a lot of the

12   examples that you saw, your Honor, the press is saying Goldman

13   has previously stated something, right, but they're saying it

14   in the context of all of this new information that has come

15   out.  That's not evidence that the statement is inflating the

16   stock price.  It's actually evidence that all this new

17   information is coming out, and it's being juxtaposed against

18   Goldman's prior statement.

19             And I think for the plaintiffs to ignore -- I just

20   want to look at a couple of documents, your Honor.  If we look

21   at slide 15, for example, thinks the Q, right?  I mean, again,

22   this is Goldman coming out and telling the market on November 1

23   we have had senior level employees plead guilty, and we may

24   face significant fines, penalties, and other sanctions.  But

25   the plaintiffs -- they don't know what to do with this, right?

1   So they say, oh, this didn't tell the market that Goldman --

2   Goldman, the institution, faced real culpability.  I mean,

3   that's just not -- that's not a defensible position.  And, your

4   Honor, I want to remind you that we have another expert in this

5   case who, for time reasons, we didn't bring today.

6            THE COURT:  Wood.

7            MS. SOLOWAY:  That's right, Ms. Wood.  If we could

8   bring up some testimony from Ms. Wood.  This is what Ms. Wood

9   had to say about this 10-Q disclosure, and it's in her

10  deposition.  Ms. Wood is a professional investor.  She's been

11  doing this for decades.  She has managed money for pension

12  funds like the plaintiff.  She looked at that disclosure, and

13  she said this is very powerful language.  Having sat on an

14  audit committee, having seen this kind of language is

15  extraordinary as an investor.  This is extraordinary.

16           THE COURT:  Yet, it didn't have any impact on the

17  price on November 1.

18           MS. SOLOWAY:  Exactly.

19           THE COURT:  Why would that be?

20           MS. SOLOWAY:  Because the stock price was not being

21  propped up by Goldman's statements.  That is the answer.  Any

22  other conclusion flies in the face of all of the dates that

23  Dr. Kothari looked at where truthful information came out and

24  the stock price didn't move.  The only conclusion you can draw,

25  your Honor, is that inflation was not being maintained in the

 1  stock price, because it's the only explanation for why

 2  Goldman's stock price didn't decline.

 3          Just give me a moment your Honor.  I want to make sure

 4  I have hit my key points.  We are going to hand up the deck to

 5  you, but you'll see we've laid out the Leissner indictment and

 6  the very specific disclosures Dr. Kothari walked you through,

 7  again, on the very subjects, articles that came out talking

 8  about how senior executives had reviewed the deals and red

 9  flags that were raised.  This is all coming out before the

10  alleged corrective disclosure and all having no stock price

11  impact.  Again, the only conclusion you can draw is that the

12  stock price simply was not inflated during the class period.

13          One more point, your Honor, on the cases that the

14  plaintiffs cite.  This goes, again, to the use of the longer --

15  they want to use a longer window.  We say that's not

16  appropriate.  I went back through last night all of the cases

17  cited in plaintiff's brief, and since I know we're not going to

18  be here much longer, I want to be very concise.  They fall into

19  a couple of categories.  Several of them are before -- almost

20  all of them are before *Arkansas Teachers*.  Some are expressly

21  overruled by *Arkansas Teachers*.

22          So I will just point your Honor to footnote 5 of the

23  Second Circuit's decision.  in footnote 5, the Second Circuit

24  explains what does it mean for a stock price to drop and not

25  achieve a level of statistical significance.  And the Second

O2MQfon7                         Summation - Ms. Soloway

1    Circuit says:  If there's no statistical significance, it's

2    random.  Several of the courts that the plaintiffs cite

3    actually say things like, well, since the defendants have the

4    burden, we don't care that these weren't statistically

5    significant declines.  That is not good law any more.  Footnote

6    5 of *Arkansas Teachers* clearly overrules that.  That includes,

7    your Honor, the *Alexion* case, and it includes the *Adams v.*

8    *Catalyst* case.  So I think you have to, when you go back

9    through the cases, you'll see that many of these things are not

10   good law.

11              The other trend, by the way, in these cases is judges

12   refused to hear evidence of price impact because they said I

13   can't hear this it overlaps with loss causation it overlaps

14   with materiality.  Also not good law under *Arkansas Teachers*.

15              The other thing I saw in those cases is that a number

16   of them said it was permissible to use a second day for a

17   reason.  The announcement was late in the day, so they said

18   let's use the second day because, you know, otherwise we won't

19   capture the price.

20              (Continued on next page)

21

22

23

24

25

O2MCfon8

1    THE COURT:  Do you agree I don't have to reach the

2    second day?

3    MS. SOLOWAY:  No, your Honor.  You're asking me

4    whether the 12th is necessary to reach --

5    THE COURT:  Yes.

6    MS. SOLOWAY:  We would respectfully submit that if you

7    find there is no price impact on the 9th, there's certainly no

8    price impact on the 12th, and they would both get thrown out.

9    If you were to find -- and again, we disagree the evidence

10   supports this, but the 9th has a drop that can actually be

11   correlated with the corrective disclosure.  We think you still

12   have to address the 12th.

13   THE COURT:  Why?

14   MS. SOLOWAY:  Because defendants have the right at the

15   class certification stage to rebut the presumption of reliance,

16   and if you look through the cases, and we cited them in our

17   brief, your Honor, defendants often do that as to some portion

18   of the claim.  So sometimes it's as to certain misstatements,

19   some -- so here, for example, you could go through the

20   categories of alleged misstatements and you could potentially

21   take some misstatements out and keep others.  That happens in

22   some cases.  Some courts say, you know what, I'm going to go

23   through these.  The *Ramirez* case, for example, the *Exxon* case

24   that has the intraday trading analysis in it.  That case, the

25   court had I think seven corrective disclosures.  It goes

O2MCfon8

1    through them one by one, even though it keeps one, it gets rid

2    of the other three.

3            Courts do this and I think reason they do this is

4    because, A, defendants have the right at this stage to rebut

5    the presumption of reliance, and also the Second Circuit has

6    used the word "hydraulic."  When you certify a class in a case

7    like this one, the amount of pressure it puts on defendants

8    creates hydraulic pressure.  So we would respectfully submit,

9    your Honor, that you should address the problem on November 12

10   because to certify a class as to something that simply, you

11   know, as Dr. Kothari put it, makes a mockery of the efficient

12   market theory, puts enormous pressure on defendants, hydraulic

13   pressure on defendants and isn't merited.

14           So look, I think, your Honor, in closing, you know, I

15   would say this:  There is an enormous amount of evidence here

16   that news came out over a period of time that looked just like

17   the alleged misstatements, nothing happened.  News came out

18   that looked just like the corrective disclosure, nothing

19   happened.  There was a 2009 meeting between Blankfein and Low,

20   didn't move the market.  There's a third meeting that comes out

21   between Blankfein and Low, also doesn't move the market.  And

22   the plaintiffs' claim doesn't matter.  We have this aha moment,

23   right, it's the second meeting.  It's the only one that moves

24   the market, but the economic evidence that has been supplied by

25   the only expert who applied an actual methodology to look at it

O2MCfon8

simply does not support that.  And because the answer to all three of those questions is no, your Honor, we submit the class certification should be denied.

THE COURT:  Okay.  Thank you.  Anything else that plaintiffs would like to --

MR. MUSTOKOFF:  Just two seconds.  Just to reiterate the point about the analysts, I cited the cases this morning. The *Perlstein* case, *Chi. Bridge* case.  Judges Scheindlin and McMahon both say analyst commentary is not the sine qua non. Even in *Arkansas Teacher*, if you read the guidance moving forward section, they talk about how Wall Street -- how -- excuse me.  My throat is really -- they talk about how media reports can provide evidence.  They make the point that in that particular case, the evidence wasn't there, but they certainly don't say it's exclusively analyst commentary.

The second other point, at the risk of repeating, Ms. Soloway said there was a 15-hour gap.  Okay.  Again, *Carpenters, Alexion*, I disagree those cases have been overruled by *Arkansas Teacher*.  You can decide that for yourself.  There were 24-hour gaps in those cases, but the other point is, it really isn't a 15-hour gap here because the defendants, they like to forget about The Wall Street Journal article the next day that came out at about -- I think it was 11 o'clock, 11:00, 12:00 a.m.  There's additional -- there's additional information there that he -- that Blankfein meets with Low

O2MCfon8

```
1    after all of the warnings, after the bond deals were

2    consummated.  That was new information.  That was not in the

3    article the night before.

4              THE COURT:  You're saying it was an accelerant?

5              MR. MUSTOKOFF:  It was an accelerant, it was

6    additional information.  Dr. Kothari talks about how the market

7    continues to assess information --

8              THE COURT:  But there is no intraday study that you're

9    introducing, and what I heard from the experts is there's no

10   way to assess how information intraday impacts the total price

11   drop close-to-close.

12             MR. MUSTOKOFF:  Right, but if you use your common

13   sense and you come to the conclusion that the confounding

14   factors that Dr. Kothari identified, we walked through it.  He

15   says the analyst reports talk about it — they really don't.  I

16   think I was able to establish that on cross.  Use your common

17   sense.  What else could it possibly have been?  A stock drop of

18   this magnitude.  What else could it have been?

19             Thank you, your Honor.

20             THE COURT:  Thank you.

21             I want to thank counsel for their excellent

22   preparation and briefing and argument, and both sides have

23   given me a lot to chew on.  Thank you very much and thank you

24   to the court reporters for staying late.  We're adjourned.

25                                 * * *
```

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    JOSEPH MASON

 4   Direct By Mr. Hasiuk . . . . . . . . . . . . .42

 5   Cross By Mr. Toal  . . . . . . . . . . . . . .77

 6   Redirect By Mr. Hasiuk . . . . . . . . . . . 115

 7    S.P. KOTHARI

 8   Direct By Ms. Soloway  . . . . . . . . . . . 119

 9   Cross By Mr. Mustokoff . . . . . . . . . . . 159

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```