**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

SJUNDE AP-FONDEN, individually and on behalf
of all others similarly situated,

                              Plaintiffs,

              -against-

THE GOLDMAN SACHS GROUP, INC.,
LLOYD C. BLANKFEIN, GARY D. COHN, and
R. MARTIN CHAVEZ,

                              Defendants.
----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/5/2024
```

**18-CV-12084 (VSB) (KHP)**

**REPORT AND RECOMMENDATION ON
MOTION FOR CLASS CERTIFICATION**

**To:    The Honorable Vernon S. Broderick, United States District Judge**

**From:  Katharine H. Parker, United States Magistrate Judge:**

This securities fraud litigation, filed in 2018, arises out of the 1Malaysia Development

Berhad ("1MDB") scandal.  1MDB was Malaysia's investment development fund and intended to

promote economic development in Malaysia for the benefit of the country and its people.  The

fund was established in 2009.  Between in or about 2009 through in or about 2015, billions of

dollars belonging to the fund were misappropriated by high-level officials of 1MDB, the former

Prime Minister of Malaysia Najib Razak ("Najib"); Low Take Jho ("Jho Low" or "Low"), a

businessman and architect of the fund; and their associates.  The stolen funds were used to

finance Low's extravagant lifestyle and for bribes and political patronage, among other uses.

When the corruption was uncovered, the scandal resulted in multiple legal proceedings,

including multiple criminal actions.  Najib was criminally prosecuted in Malaysia, convicted, and

is serving a jail sentence.  Low was criminally charged in Malaysia and the United States but

remains a fugitive.  The book, "Billion Dollar Whale" by Tom Wright and Bradley Hope discusses the scandal in depth with a focus on Low.

The institutional Defendant, The Goldman Sachs Group Inc. ("Goldman"), provided investment banking services to 1MDB.  During a ten-month period beginning in May 2012 and ending in March 2013, Goldman underwrote $6.5 billion of 1MDB debt in three bond offerings for which it was paid $600 million in fees.  Although Goldman profited handsomely from the deals, it was complicit in the criminal diversion of money from the fund.  Former Goldman Managing Director Roger Ng and former head of Goldman's Southeast Asia division, Tim Leissner, who worked on the 1MDB transactions, were both criminally convicted in the United States for conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and conspiring to commit money laundering.  Goldman itself also pleaded guilty to conspiracy to violate the FCPA and entered into a deferred prosecution agreement with the United States Department of Justice ("DOJ").  Goldman ended up paying $2.9 billion in fines to settle with the DOJ.  In addition, Goldman's Malaysian branch agreed to pay $3.9 billion in connection with a settlement with Malaysian prosecutors.

Plaintiff, Ajunde AP-Fonden ("AP7"), was an investor in Goldman and appointed by the Court as Lead Plaintiff.[1]  (ECF No. 56.)  Plaintiffs allege that shareholders of Goldman common stock were injured by various misstatements and omissions made by Defendants, including by ex-Goldman Chief Executive Officer Lloyd Blankfein ("Blankfein"), during the period October 29, 2014 through November 8, 2018 about the nature of Goldman's interactions with 1MDB and

---

[1] Other plaintiffs include Daniel Plaut, who first initiated this action, Zuheir R. Safe, IWA Forest Industry Pension Plan, Nebraska Investment Council, and Meitav Dash Provident Funds and Pension Ltd.

knowledge of any corruption associated with the fund.  In particular, Defendants denied culpability in (and knowledge of) any of the wrongdoing.  According to AP7, the misstatements and omissions caused Goldman common stock to trade at an inflated price during the class period.  Then, at about 11:00 p.m. (EST) on November 8, 2018, news came out that Blankfein met with Low in 2013 while serving as CEO and after Goldman's compliance and legal teams had raised red flags about Low.  Goldman's stock price tumbled on Friday, November 9 and continued to drop on Monday, November 12.  The drop in price on the 9th was the largest single day drop in Goldman's share price in four years.  The combined two-day price drop was the largest drop in Goldman's share price in eight years and represented a 11% drop in share price.  (ECF No. 292-66.)  AP7 contends the news of the 2013 meeting between Blankfein and Low disproved the lies Goldman told the market in denying culpability and knowledge of wrongdoing and injured shareholders who relied on earlier disclaimers of corporate culpability in the scandal.

Plaintiffs bring this action against Goldman, as well as Blankfein, Gary Cohn, former President and Chief Operating Officer of Goldman, and R. Martin Chavez, former Chief Financial Officer of Goldman.  Before the Court is Plaintiffs' Motion to Certify a Class pursuant to Federal Rule of Civil Procedure 23 ("Rule 23").  The class Plaintiffs seek to certify is all persons and entities that purchased or otherwise acquired Goldman's common stock between October 29, 2014, and November 8, 2018, inclusive, and were damaged thereby.[2]

---

[2] Excluded from the proposed class are: (i) Defendants; (ii) Goldman's subsidiaries and affiliates; (iii) any officer, director, or controlling person of Goldman, and members of the immediate families of such persons; (iv) any entity in which any Defendant has a controlling interest; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vi) the legal representatives, heirs, successors, and assigns of any excluded party.

After careful consideration of the parties' evidence and arguments, including at the February 22, 2024, evidentiary hearing, I recommend that the motion be granted in part and denied in part for the reasons discussed below.

## BACKGROUND

The Court assumes familiarity with the facts alleged and as summarized in the Court's decisions on the motion to dismiss and motion to amend and includes only certain facts relevant for context and adjudication of the instant motion.  (*See* ECF Nos. 102 and 270.)  On October 22, 2020, after this case was filed, Goldman admitted to certain facts in its deferred prosecution agreement with the DOJ.  In particular, it admitted:

- Low "worked as an intermediary in relation to 1MDB"; "Leissner, Ng, and other Goldman employees worked with Low" on the 1MDB deals; Goldman's control functions "were on notice that [Low] was involved in the [1MDB] transactions"; and "Leissner's electronic communications" included "multiple messages linking Low to . . . the bond deal[s]." ECF No. 295-2, Statement of Facts ("SOF") ¶¶ 21, 25, 32, 47.

- Leissner, Ng and Andrea Vella[3] knew that Low intended "to pay bribes." *Id.* ¶¶ 38, 48. Immediately after each deal closed, Low and his co-conspirators misappropriated $577 million, $790 million, and $1.4 billion of the proceeds, respectively, with Leissner personally "direct[ing] follow-on transfers." *Id.* ¶¶ 50-52, 56-58, 64.

- Goldman ignored "significant red flags raised during the due diligence process and afterward," including "1MDB raising large sums of money with no identified use of proceeds." *Id.* ¶¶ 25, 55, 62. Goldman also "fail[ed] to verify [1MDB's] use of past bond proceeds," "failed to investigate" red flags related to "Low's involvement in the deals and the possible payment of bribes," and failed "to perform an internal review of its role in the bond deals despite the clear implication that the deals had involved criminal wrongdoing." *Id.* ¶¶ 55, 62, 72-74.

---

[3] Vella was co-head of Goldman's Asia investment bank.  Although he was not the subject of a criminal indictment, the Board of Governors of the Federal Reserve System barred Vella from the banking industry for his role in the 1MDB scandal. Federal Reserve, "Federal Reserve Board fines the Goldman Sachs Group, Inc. $154 million for failure to maintain appropriate oversight, internal controls, and risk management with respect to 1Malaysia Development Berhad (1MDB)," October 22, 2020, (last accessed April 3, 2024).

- Low was "an active participant" in a deal with Coastal Energy, but "arranged for another entity to become Goldman's putative client" after his involvement was flagged by Goldman's control functions. *Id.* ¶ 78. Further, "Low's monetary contribution to this deal involved funds misappropriated from the bond offerings." *Id.* ¶ 24 n.1.

- On at least three occasions between 2009 and 2013, "senior executives at Goldman," including Blankfein and Asia Chairman Michael Evans, met with Low. *Id.* ¶ 79.

Plaintiffs contend that Low's role as an intermediary for 1MDB and the Goldman deals was widely known among senior Goldman bankers at the time of the bond deals, pointing to internal emails identifying Low as a key player.  They also assert that 1MDB's payment of bribes from the bond proceeds was the subject of gossip among Goldman bankers, and that there was knowledge that Low was diverting proceeds from the bond deals to shell companies disguised to look like they were affiliated with a United Arab Emirates sovereign wealth fund ("Aabar").  They allege that the terms of the three Goldman bond deals were suspicious and were flagged as such by Goldman's in-house counsel and compliance officers.  High level executives of Goldman, including Blankfein, met with Low, underscoring that it was well understood that Low was involved in the deals, as well as another deal – the Coastal Energy transaction.  And, Plaintiffs say, Goldman improperly continued to advise 1MDB after the bond deals despite evidence that Low and 1MDB had diverted money from the bond deals for improper purposes (i.e., payment of bribes).  In fact, in October 2015, three Goldman executives were told that Leissner had conspired with Low to divert money from the 1MDB bond deals, yet Goldman's Legal Department approved statements in 2016 denying Low's involvement in the bond deals (and Goldman's complicity in the fraud).

1. ___The Misstatements to the Market___

Plaintiffs contend that during the class period, news reporters questioned Goldman about its role in the 1MDB bond deals, its fees in relation to the bond deals, and its knowledge of wrongdoing by 1MDB and Low.  They identify 13 statements made between October 28, 2014 and November 1, 2018 that they assert were false and misleading and caused Goldman stock to trade at an artificially inflated price.  Defendants characterize the statements as falling into four categories:  1) statements about reasons for the high fees received in connection with the 1MDB bond deals; 2) statements about diversion of funds from 1MDB to purposes other than benefitting the Malaysian people; 3) statements about knowledge of Low's involvement with 1MDB or another transaction involving Coastal Energy; and 4) a statement by Blankfein that he was not aware of "red flags" about potential fraud with 1MDB.   The following are the 13 misstatements at issue:

- On October 28, 2014, Edge Malaysia published an article in which Goldman stated that "[o]ther than legal and accounting firms providing professional services, ___no fees or commissions were paid by 1MDB or Goldman Sachs to external third parties___ in connection with" 1MDB's bond transactions to date.  Similar statements were made on July 21, 2015 in a Bloomberg article, on June 22, 2018 in a Wall Street Journal article, and on July 30, 2018 in another Bloomberg article.

- On July 20, 2016, Reuters published an article wherein Goldman stated it ___"had no visibility into whether some of those funds may have been subsequently diverted to other purposes."___  Similar statements from Goldman were made on July 28, 2016 in The Guardian, on March 12, 2018 in The Australian, on June 14, 2018 in the New York Times, and again on August 7, 2018 in the New York Times.

- On December 22, 2016, the Wall Street Journal published an article in which Goldman is quoted saying "[w]e have ___found no evidence showing any involvement by Jho Low in the 1MDB bond transactions___."

- On June 13, 2017, CNBC published a statement from Goldman related to Compañía Española de Petróleos ("CEPSA") and Strategic Resources Global's ("SRG") acquisition of

Coastal Energy;[4] specifically, that **"[n]either Jho Low, Jynwel or SRG [Low entities] were a client of Goldman in connection the Coastal Energy acquisition."**

- On November 1, 2018, at the New York Times Dealbook Conference, Blankfein said in an interview that he was ***"not aware" of any "red flags"*** concerning the 1MDB transactions.

Plaintiffs explain that the media and public understood the above-referenced statements to be denials of corporate wrongdoing and later, promotion of a "rogue employee" story (i.e., that Goldman itself was not culpable in any criminal wrongdoing by executives in Malaysia but rather rogue employees lied and evaded controls).

### 2.   *The November 8-9, 2018, Corrective Disclosure*

Plaintiffs contend the falsity of Goldman's public narrative came to light aftermarket hours (at 11:17 p.m. EST) on November 8, 2018, when the Financial Times reported that "[p]rosecutors believe that Mr. Low met on a second occasion with a senior Goldman executive in 2013," and that "[a] person briefed on the matter said that the unnamed executive at the 2013 meeting . . . was Mr. Blankfein."  (ECF No. 295-64.)  The title of the article was "Lloyd Blankfein revelation piles pressure on Goldman over 1MDB."  The reporter concluded that Blankfein's meeting "could undermine this 'rogue employee' narrative.  *Id.*  Mid-morning on November 9, 2018 (11:02 a.m. EST), the Wall Street Journal came out with a longer article reporting that Blankfein's 2013 meeting with Low took place "after the Wall Street bank's compliance department had raised multiple concerns about the financier's background and said the bank shouldn't do business with him" and "included discussions of 1MDB."  (ECF No. 295-65.)  The article was titled, "Goldman Sachs ex-CEO met 1MDB Financier."   The Wall Street

---

[4]  Low controlled SRG. CESPA is a Spanish energy group associated with Abu Dhabi sovereign wealth fund International Petroleum Investment Company ("IPIC"), which, according to AP7, had a reputation for corruption.

Journal issued an updated article on the same topic at 4:23 p.m. (EST) on November 9 titled "Goldman Sach's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal: Second of two meetings came after bank's compliance department had raised concerns about dealings with financier Jho Low."  In the story, the Wall Street Journal reported that Blankfein had blamed the scandal on rogue employees (i.e., Leissner and Ng) who evaded Goldman's purported safeguards.  The article appeared in the print version of the Wall Street Journal on Saturday, November 10, 2018, which was the start of Veteran's Day Weekend, a national holiday (though not a bank holiday).  Over the weekend, other news outlets also reported that Blankfein met with Low and Najib in New York in September 2013 after Goldman's compliance department had raised concerns about Low.  Additionally, on November 12, 2018, at 4:56 a.m., before trading opened, Bloomberg reported that Malaysia was seeking a "full refund" from Goldman – both return of the $600 million in fees and other consequential damages – based on Goldman's "indirect" admission of wrongdoing.

### 3. *Plaintiff's Evidence of Price Impact*

Following the revelations about Blankfein's 2013 meeting with Low, Goldman's stock price dropped on November 9, 2018 by 3.89% on a close-to-close basis (i.e., from the market close on November 8 to the market close on November 9).  The stock price continued to decline by 7.46% on November 12, 2018, with various news reporters attributing the decline in price to the news about Blankfein's 2013 meeting with Low.  (ECF No. 295; Exs. 66-69.)  Plaintiffs thus contend that there was a multi-day price impact from November 9-12, 2018 associated with the November 8-9 disclosures (the "corrective disclosures").  Plaintiffs' expert, Dr. Joseph R. Mason, currently a Fellow at the Wharton School at University of Pennsylvania and former professor of

Finance at the Ourso School of Business at Louisiana State University, noted that the drop in price on a close-to-close basis was statistically significant at the 1% level, or 99% confidence level. (ECF No. 123, Transcript of the February 22, 2024, Hearing ("Tr.") at 43.) After extensive review of news and analyst reports on Goldman and the 1MDB scandal, Dr. Mason opined that the initial misstatements and omissions were material in relation to Goldman's stock price over time – that is from 2014 through 2018—and had maintained price inflation. November 2019 Expert Report of Dr. Mason ("Nov 2019 Mason Report") at 47. He also provided a method to compute price inflation on a class wide basis with reference to the dates of the corrective disclosure, the share price of Goldman on specific dates, and reference to stock purchase/sale dates. *Id* at 48.

Plaintiffs point to various news outlets, including Dow Jones, Barron's, the Business Times, and the Financial Times, that reported on Goldman's stock price decline. The articles, published on November 12, 2018 and later dates, attributed the decline in stock price to the concern that Goldman was complicit in the 1MDB fraud, citing the report that Blankfein had met with Low and expressing a concern that Goldman's leaders would be dragged into the criminal investigation of Goldman. (ECF No. 292 at 19.) On November 19, 2018, the Wall Street Journal reported that, "[f]or the first time, investors are punishing Goldman Sachs for its role in one of the biggest financial scandals in history." Nov 2019 Mason Rpt. at ¶ 121d. The article opined that Goldman's "share performance . . . is likely to lag peers until the ultimate costs become clear." *Id.* On November 22, 2018, the New York Times reported that Blankfein attended a third meeting with Low – a one-on-one meeting in 2012. (ECF No. 295-1 at 39.) In sum, from the time of the disclosure and for several more weeks there was intense news

scrutiny of the meaning of the Blankfein meetings with Low and whether those meetings would destroy Goldman's ability to successfully defend the ongoing criminal investigations it was facing and what the costs to it would be, both financially and reputationally.

Plaintiffs also point to analyst coverage of Goldman after the revelation of the 2013 Blankfein-Low meeting that extensively discussed reputational and regulatory risk of the 1MDB scandal on Goldman's future earnings. Barclays explicitly mentioned Blankfein meeting with 1MDB representatives as a reason for the decline in the stock price. Nov 2019 Mason Rpt. At ¶123a. Arbat Capital explained that Goldman quotes didn't react to earlier news about the 1MDB scandal, including the criminal indictment of Leissner, Ng and Low, because "it was perceived as an investigation just against former GS bankers. [But,] [l]ater it became evident that [Goldman] wouldn't be able to avoid fines." *Id.* at ¶ 124b. Plaintiffs argue that while there had been a lot of news coverage of the scandal beginning in 2014 through November 8, 2018, only 14 analyst reports referenced 1MDB in that four-year period prior to the disclosure of the 2013 Blankfein-Low meeting. December 2023 Reply Expert Report ("Dec 2023 Mason Rpt.") at ¶¶ 47-48. In the 12 weeks after the corrective disclosure, 72 analyst reports of Goldman referenced 1MDB, indicating heightened focus and concern over the scandal. *Id.* Plaintiffs characterize the November 8-9, 2018, corrective disclosure as an "inflection point" when the market began to show concern and react to the implications of the scandal to Goldman as an institution. They posit that until then, the misstatements Goldman made propped up the value of the stock because they falsely reassured the market that Goldman as an institution would not be implicated or suffer reputationally from the scandal.

#### 4. *Defendants' Rebuttal Evidence Offered to Disprove Price Impact*

Defendants disagree that the misstatements had any price impact and point to years of news articles about the 1MDB scandal, including news of the Leissner and Ng indictments and Goldman's own voluntary disclosures, to argue that the misstatements did not in fact prop up the price of Goldman's stock and that the market had already accounted for the risks to Goldman's value by the time of the November 8-9, 2018 corrective disclosure. ECF No. 307 at 10-11. Defendants downplay the significance of the revelation of the 2013 Blankfein-Low meeting, describing it as a client event with approximately 20 clients at which the former Prime Minister of Malaysia and Low were present.[5] *Id.* at 7. They offer the expert opinion of Christianna Wood ("Wood"), a professional investor, who opines that because the market was already aware that the DOJ was investigating Goldman and that Leissner and Ng had been indicted and Leissner pleaded guilty, investors would not have modified investment decisions about Goldman or changed their view about the value of Goldman stock after learning about the 2013 Blankfein-Low meeting. Expert Report of Christianna Wood, ECF No. 308-2 ("Wood Report") at ¶ 18.

Defendants contend that the November 8-9, 2018, revelations about the 2013 Blankfein-Low meeting were not the cause of any decline in the stock price on Friday, November 9 or Monday, November 12. They contend that a two-day window (with a weekend in between) is not a proper measurement period for stock that trades in an efficient market.

---

[5] Although the corrective disclosure indicated that Low attended the meeting, other evidence suggests that the newspapers may have been mistaken about whether Low attended the event. Whether or not Low attended the meeting has no bearing, however, on whether the corrective disclosure alerted the market to the falsity of the earlier misstatements.

Additionally, they point to other news that broke later in the day on November 9, 2018, but before any statistically significant decline in the stock price, which they argue was more likely to impact the stock.  This news included: (1) a *Bloomberg* article reporting that Goldman lagged behind peer firms in its plan to transfer assets to Germany because of the United Kingdom's departure from the European Union (i.e., "Brexit") (10:28 a.m.); (2) Leissner's plea transcript, in which Leissner made the accusation that his actions were "in line" with a "culture" at Goldman to "conceal facts from certain compliance and legal employees" (12:17 p.m.); (3) a statement by Peter Navarro, an advisor to then-President Trump, that Goldman was acting as "China's unpaid agent" during trade discussions between the United States and China (12:24 p.m.); and (4) a report that the Federal Reserve intended to amend the "Stress Capital Buffer," which would have caused Goldman to have a $15 billion capital deficit (2:08 p.m.).  October 2023 Expert Report of Dr. Kothari, ("Oct 2023 Kothari Rep.") at ¶¶ 94, 97–98 & tbl. 5.

Defendant's economic expert, Dr. S.P. Kothari, a professor of accounting and finance at the Sloan School of Management of the Massachusetts Institute of Technology, testified that because Goldman stock traded in an efficient market, if the news of the 2013 Blankfein-Low meeting was sufficient to impact Goldman's stock price, this impact would have been reflected in the stock price within the first 15 minutes of trading on November 9, 2018.  Tr. at 145. Although the stock price did drop at opening, that initial drop was not statistically significant at the 95% confidence level—it was only "statistically significant" at a 91% confidence level.  Dec 2023 Mason Rpt. at ¶ 72.  Dr. Kothari testified that the stock decline did not become statistically significant at the 95% level until 3:00 p.m. on November 9, 2018, well after the news should have been incorporated into the price and after the four pieces of confounding

news.  Tr. at 122.  However, Dr. Kothari also testified that he could not actually measure whether the confounding news played a role in the stock price drop on November 9.  Tr. at 124-5.  Plaintiffs argue the confounding news to which Dr. Kothari points was neither new nor confounding, and Dr. Mason also offered his opinion that none of these four pieces of news was confounding.  *See* ECF No 313 at 16-17.

As for the fall in stock price on November 12, 2018, Defendants point to news articles from that day stating Malaysia's Finance Minister announced that he was seeking a "full refund" of Goldman's fees on the three bond deals (i.e., $600 million) and "consequential losses" due to Goldman's complicity in the 1MDB scandal, as the explanation for the full drop in price that day.  Dr. Kothari testified that the drop in share price on November 12 corresponds to the value of the total fines that Goldman ultimately paid to Malaysia; Goldman stock lost approximately $4 billion in value on November 9 and the ultimate settlement with Malaysia was $3.9 billion.  Tr. 155-56.  Defendants note that Plaintiffs originally pointed to this very news as a corrective disclosure, and as one of the reasons for the stock price drop on November 12, but were forced to abandon this argument when the Honorable Vernon S. Broderick held that this news reflected materialization of a known risk and was thus not an actionable disclosure. (ECF No. 102 at 40.)

Plaintiffs similarly note that Defendants' current arguments about the November 12, 2018 stock price drop are contrary to arguments they made earlier in the case that the November 12, 2018 "full refund" news was not new and therefore could not have affected the price on November 12, 2018.  For this reason, Plaintiffs claim that the continued decline in Goldman's share price on November 12 was a continuation of the drop on November 9 caused

by the November 8-9 corrective disclosure.  In other words, they argue that Defendants cannot now argue that the Malaysia full refund news was suddenly material to the market and a confounding variable when they previously argued that this news was already known to the market.  Plaintiffs also point out that Defendants' position is contrary to their own expert's contention that in an efficient market, news such as this would be incorporated within 15 minutes of it becoming known to the market when the steep decline in price on November 12 happened later and over the course of the day.

Dr. Kothari, Defendants' expert, testified that none of the 13 misstatements inflated the stock price when they were made – a point that Plaintiffs do not dispute, because Plaintiffs rely instead on a price maintenance theory.  Defendants also point to stock analyst reports that do not specifically reference the misstatements or link the decline in stock price to the disclosure of the 2013 Blankfein-Low meeting.  They also argue that the misstatements were not relevant to investors because no questions were asked about them on 17 quarterly earnings calls.  Oct. 2023 Kothari Rpt. at ¶ 17(b)(ii)-(iii).  Dr. Kothari also testified that he would have expected Goldman stock to have reacted to all of the prior news about the 1MDB scandal, such as the news of the Leissner/Ng indictment and plea, but that the stock did not react.  *Id.* at ¶ 17(b)(i)(2).  Defendants thus argue that the market had already priced in the risk of the 1MDB scandal and that the drop in share price on November 9-12 was attributable to something else, including the confounding news.

## LEGAL STANDARD

Rule 23 provides that a class may be certified when: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the

class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).

In addition to the Rule 23(a) requirements set forth above, a class must meet one of the 23(b) criteria. Here, Plaintiffs seek to certify a damages class under Rule 23(b)(3), which requires a demonstration that "common" issues of law or fact "predominate over any questions affecting only individual members," and that a class action is "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). See *Amgen*, 568 U.S. at 460. Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof*." Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).

Finally, the proposed class must be "ascertainable." *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). If the court finds that the requirements of Rule 23 have been met, it may, in its discretion, certify the class. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

A motion for class certification should not become a minitrial of the merits; the question before the Court is whether the plaintiff meets Rule 23's requirements, not whether the plaintiff will prevail on the merits. *In re Visa CheckMasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). At the

same time, the Court's analysis under Rule 23 must be "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), which may require it to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal quotation marks and citations omitted).

A plaintiff bears the burden of showing that Rule 23's requirements are satisfied by a preponderance of the evidence, with the caveat that in securities fraud cases where a plaintiff seeks to utilize a presumption of reliance via a fraud-on-the-market theory, as here, the defendant may rebut the presumption of reliance and defeat class certification. To rebut the presumption, the defendant must show, by a preponderance of the evidence, that the alleged misstatements had no price impact. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013); *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 124-26, (2021) ("*ATRS III*").

In determining the appropriateness of class certification, the court may consider the parties' pleadings, declarations and appended supporting materials, analyst reports, as well as expert testimony on price impact, using a "good dose of common sense." *See ATRS III, 594 U.S. at 121-22; Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.,* 77 F.4th 74, (2d Cir. 2023) ("*ATRS IV*").

## ANALYSIS

Defendants do not dispute that Plaintiffs satisfy the majority of the Rule 23 criteria. The focus of Defendants' arguments is that Plaintiff AP7 is not an adequate representative, and that Plaintiffs cannot satisfy Rule 23(b)(3) predominance because the alleged misstatements and omissions had no price impact and because Plaintiffs cannot show damages on a class-wide

basis.  I nevertheless briefly address the Rule 23 factors that are not contested and analyze Defendants' main arguments in greater detail below.

1. ***Rule 23(a)***

   a. **Numerosity**

There is no question that Plaintiffs satisfy Rule 23(a)'s numerosity requirement. Goldman's stock was heavily traded on the NYSE during the proposed class period, with approximately 371 million shares of common stock outstanding every trading day, and an average weekly turnover of 3.8%.  Dec 2023 Mason Rpt. ¶¶ 41, 78.  Thus, this factor is easily satisfied.  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007), aff'd sub nom. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (collecting cases noting "the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period,").

   b. **Commonality**

Plaintiffs similarly satisfy Rule 23(a)'s commonality requirement.  Commonality "is generally considered a low hurdle easily surmounted."  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009).  A single common question of fact or law suffices to satisfy this element.  *Dukes*, 564 U.S. at 359.

In this case, Plaintiffs identify several common questions, including: (i) whether Defendants materially misrepresented and omitted facts through the statements identified above; (ii) whether Defendants acted with scienter; (iii) whether the price of Goldman common

stock was artificially inflated by Defendants' misrepresentations and omissions; and (iv) the proper methodology of measuring damages.  Thus, this factor is met.

### c. Typicality

Likewise, Plaintiffs' claims satisfy Rule 23(a)'s typicality requirement.  Typicality is satisfied if "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability*." In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  This showing "is not demanding."  *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80, n.16 (S.D.N.Y. 2018).

Here, Plaintiffs purchased and/or held Goldman stock during the proposed class period and their claims arise from the same alleged misstatements as those of the proposed class. Further, each member of the proposed class will rely on similar legal arguments and evidence to prove liability.  Therefore, this factor is met.

### d. Adequacy

Rule 23(a)'s adequacy requirement looks at the adequacy of the lead plaintiff and of proposed class counsel.  When assessing this element, the Court evaluates whether the plaintiff's attorneys are qualified, experienced, and able to conduct the litigation and whether the lead plaintiff's interests are antagonistic to those of the proposed class.  *Baffa v. Donaldson, Lafkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  A proposed representative plaintiff may not satisfy the adequacy prong if that plaintiff is subject to unique defenses that "could become the focus of cross-examination . ... , to the detriment of the class."  *NYSE Specialists Sec. Litig.*, 240 F.R.D.

128, 144 (S.D.N.Y. 2007); *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir.

1990).

### i. **Adequacy of Lead Plaintiff**

Judge Broderick appointed AP7 Lead Plaintiff in this case, noting that it has a large

financial interest in the litigation. (ECF No. 56.) During the proposed class period, AP7, a

pension fund and institutional investor, purchased 179,082 shares of Goldman common stock

and retained 100,069 shares, at a net cost of over $21 million. Its alleged injuries are the same

as those of the proposed class, and it was allegedly injured by the same alleged course of

conduct. (*See* ECF 272-1.) Thus, AP7's interests are not antagonistic to the proposed class.

AP7 also has demonstrated its commitment to participate in and supervise the

prosecution of this action on behalf of the proposed class. AP7 engaged experienced counsel

and has vigorously prosecuted this matter. AP7's counsel point out that AP7 undertook the

time and expense of investigating the claims, filing amended pleadings, opposing a motion to

dismiss, searching for and producing discovery, sitting for a Rule 30(b)(6) deposition, reviewing

and analyzing Defendants' document production, taking 32 depositions, including 10 of

witnesses outside the U.S., participating in case management conferences, retaining experts,

and otherwise fully participating in this action. Its counsel represents that AP7 will continue to

vigorously prosecute the case on behalf of the proposed class. These facts all demonstrate that

AP7 is an adequate class representative. *In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290,

at *7 (S.D.N.Y. June 9, 2016); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008).

Defendants challenge AP7's adequacy as a representative on two grounds. First, they

argue that AP7 had an unusual trading pattern that makes it subject to unique defenses. AP7

made 60 trades of Goldman stock during the class period (40 purchases and 20 sales affecting more than 250,000 shares) and increased its holdings after revelation of the alleged fraud. Defendants also contend that AP7 is not a credible representative because it did not retain certain internal memos regarding its stock trades and, thus, did not produce them in discovery.

Taking these points in reverse order, AP7's conduct in discovery is not a basis to find it is not an adequate representative. The undersigned has been overseeing discovery in this matter and there have been no motions to compel or for sanctions related to the missing internal memos. Nor could there be. AP7 has explained that the memos were destroyed according to its document retention policy before this litigation was commenced. Therefore, it did not engage in any spoliation or otherwise act improperly with respect to discovery. *See e.g., Sleevi v. Merit Sys. Prot. Bd.,* 2021 WL 2879045, at *2 (Fed. Cir. July 9, 2021) (holding that where a party "follow[s] its general record retention policies when no litigation was threatened or reasonably foreseeable," this does not constitute spoilation.) Further, notwithstanding the missing memos, AP7 has produced sufficient information for Defendants to understand its complete trading history in Goldman stock during the class period. Thus, Defendants have all the information they need concerning AP7's stock ownership, purchase, and sale of Goldman shares. *See GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 359 (S.D.N.Y. 2012) (no spoilation where destroyed documents were produced in another format.)

The cases cited by Defendants are inapplicable here because they involved situations where the court found that a putative lead plaintiff had actually and significantly failed to comply with discovery obligations. *See Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir. 1983) (one plaintiff admitted previous testimony was erroneous, another refused to answer discovery

questions, raising credibility concerns); *Koss v. Wackenhut Corp.*, 2009 WL 928087, at *7

(S.D.N.Y. Mar. 30, 2009) (plaintiffs refused to answer proper discovery questions and failed to

appear for depositions); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007) (among

other issues, plaintiff failed to "comply with discovery requests and document production in a

timely fashion").

Likewise, AP7's trading activity is not a basis for finding it an inadequate class

representative.  AP7 was a net purchaser of 100,269 Goldman shares during the Class Period

and never liquidated its entire position.  *See* (ECF No. 63-1) (PSLRA certification); PX 9, 10; PX 8

at 110:5-18.  Therefore, AP7 is not an in-and-out trader "who both purchase[s] and sell[s] all of

[its] shares prior to a corrective disclosure."  *Pearlstein*, 2021 WL 253453, at *11.  The cases

cited by Defendants are distinguishable.  *Bensley v. FalconStor Software, Inc*. 277 F.R.D. 231,

237, 240 (E.D.N.Y. 2011) (unlike in this case, plaintiff "sold *all* of its shares" before the corrective

disclosure and thus was inadequate class representative); *In re Puda Coal Inc. Sec. Litig*, 2013

WL 5493007, at *18 (S.D.N.Y. Oct. 1, 2013) (case involved plaintiff who sought to add "leakage"

theory due to admitted in-and-out trading);  *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136

(S.D.N.Y. 2007) (noting post-class purchases are "particularly harmful" to a claim of adequacy

where plaintiff had engaged in post-class purchases despite awareness of an alleged but, unlike

here, *not publicly known* fraud); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6

(S.D.N.Y. July 3, 2013) (each named plaintiff, which included no institutional investors, were all

in-and-out investors who had purchased and sold all of their shares prior to the corrective

disclosure.).

That AP7 bought Goldman shares after the corrective disclosure also does not render it inadequate to represent the proposed class because such purchases are irrelevant to the class claims and issues before the court in this action. *In re Monster Worldwide*, *Inc.,* 251 F.R.D. 132, 135 (S.D.N.Y. 2008)(post-disclosure purchases have "no bearing on whether or not [the class representative] relied on the integrity of the market during the class period"); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (same).

In sum, AP7 satisfies the adequacy requirements of Rule 23(a).

### ii. <u>Adequacy of Proposed Class Counsel</u>

Defendants do not challenge the adequacy of proposed class counsel, Kessler Topaz Meltzer & Check, LLP ("KTMC") or proposed liaison counsel Bernstein Litowitz Berger & Grossmann LLP ("BLBG"). Nor is there any basis to challenge them. Both firms are highly experienced in complex securities litigation and class actions and have appeared for plaintiffs in numerous securities class actions in this District. Further, KTMC already has demonstrated its competency by its excellent advocacy in this case thus far. It has been prepared for all conferences and arguments, submitted top quality briefs, and otherwise zealously represented the interests of its client and the proposed class. Thus, it satisfies Rule 23(a)'s adequacy requirement. *See, e.g.*, *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015). For the same reasons, proposed class counsel satisfies the requirements of Rule 23(g).

### e. *Ascertainability*

Although not a required showing under Rule 23, I note that the proposed class is also ascertainable, because it is defined by objective criteria—persons and entities that purchased

or otherwise acquired Goldman common stock during the proposed class period and were damaged thereby. *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *13 (S.D.N.Y. Jan. 26, 2021) (class members can be "easily" ascertained "by references to investor records").

In sum, all of the Rule 23(a) criteria are satisfied.

### 2. *Rule 23(b)(3)*

Defendants contend that Plaintiffs do not satisfy Rule 23(b)'s predominance requirement – that common questions predominate over individualized ones – for two reasons. First, they contend that the misstatements on which Plaintiffs rely did not impact the price of Goldman shares and, thus, Plaintiffs and the proposed class were not damaged by the misstatements. Rather, Defendants contend the drop in the share price on November 9-12, 2018 is attributable to something other than price inflation in Goldman stock maintained by the misstatements. Second, Defendants contend that Plaintiffs cannot prove damages on a class-wide basis consistent with their theory of liability as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). I address both these predominance-related arguments as well as Rule 23(b)(3)'s superiority requirement below.

#### a. *Predominance*

Rule 23(b)'s requirement that common issues predominate is "far more demanding" than the commonality requirement under Rule 23(a)(2). *Amchem Prods.*, 521 U.S. at 623-24. Designed to test the proposed class's cohesiveness, the predominance inquiry "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation defeating individual issues." *Tyson Foods, Inc. v. Bouaphekeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citations omitted). This is a qualitative, not

quantitative, inquiry, where the Court "must account for the nature and significance of the material common and individual issues in the case." *In re Petrobras Sec.*, 862 F.3d at 271. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*").

The elements of the Section 10(b) claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc.*, 568 U.S. at 467 (cleaned up). Courts regularly hold that the falsity, scienter, materiality, and loss causation elements of a Section 10(b) claim are common to all class members. *Id.* ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alteration in original).   In contrast, the reliance element is typically the most contested. *Halliburton I*, 563 U.S. at 810.

Here, Plaintiffs contend they are entitled to the so-called *Basic* presumption; that is, a presumption of reliance as set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because their claims arise from alleged material misrepresentations and omissions made to the public and because Goldman's stock traded in an efficient market.   *In Re Petrobras*, 862 F.3d at 278.  For the *Basic* presumption to apply, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268

(2014) ("*Halliburton II*").  The burden to demonstrate that stock traded in an efficient market is not onerous.  If the presumption applies, then reliance can be proven through common proof.

The presumption may be rebutted at the class certification stage through proof by a preponderance of the evidence that the alleged misrepresentation did not impact the price of the stock.  *ATRS III*, 594 U.S. at 124-26.  If rebutted, "then *Basic's* fundamental premise 'completely collapses, rendering class certification inappropriate'" because individual issues of reliance will predominate.  *ATRS III*, 594 U.S. at 119 (quoting *Halliburton II*, 573 U.S. at 283).

   i.  **Fraud-on-the-Market Presumption of Reliance – The *Basic* Presumption**

Although Defendants do not contest that Plaintiffs can satisfy all criteria for invoking the *Basic* presumption, I address them briefly.  Courts consider five factors when assessing whether a plaintiff has met its burden of showing market efficiency.  These factors – the *Cammer* factors – are:  (i) a large weekly trading volume; (ii) significant securities analyst coverage; (iii) the existence of market makers and arbitrageurs in the security; (iv) the eligibility of the issuer to file an S-3 registration statement; and (v) a history of a cause-and-effect relationship between public information revealing unexpected corporate events or financial results and movement in the corporation's stock price.  *See Cammer v. Bloom,* 711 F. Supp. 1264, 1285-87 (D.N.J. 1989).

Courts also consider the so-called *Krogman* factors in evaluating market efficiency, as set forth in *Krogman v. Sterritt,* 202 F.R.D. 467, 477-78 (N.D.Tex. 2001).  Under *Krogman*, "[s]ubstantial market capitalization with a narrow bid-ask spread[ ] and a large public float . . . indicate that [a corporation's securities] trade[ ] in an efficient market such that the *Basic* presumption is appropriate."  *In re JPMorgan Chase & Co. Sec. Litig*, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) (first alteration supplied).

Here there is no question that there was a high weekly trading volume in Goldman shares.  During the proposed class period, the average weekly trading volume of Goldman common stock as at least 3.8% of shares outstanding.  Dec 2023 Mason Rpt. ¶ 41.  At least 30 securities analysts from major financial institutions published reports on Goldman during each quarter of the proposed class period.  *Id.* at ¶ 43.  There were numerous market makers for Goldman common stock, and, during the proposed class period, at least 81% of Goldman common stock was owned by more than 2,000 institutional investors.  *Id.* at ¶¶ 48, 51-52.  Goldman was eligible to file a Form S-3 registration statement throughout the proposed class period.  *Id.* at ¶ 55.  Dr. Mason also conducted an event study showing a causal connection between public releases of new company-specific information and the market price of Goldman common stock.  *Id.* at ¶¶ 59-75.  In particular, the study showed statistically significant abnormal returns on days when Goldman released its quarterly and annual financial results.  *Id.* at ¶¶ 59-62, 72-74.  All of this supports a finding of market efficiency and satisfies the *Cammer* factors.

Additionally, Goldman's market capitalization exceeded $57.4 billion throughout the proposed class period.  Its stock was included in the S&P 500 and S&P 100 Indices because it was among the largest publicly traded companies in the U.S.  And, during the proposed class period, its common stock float exceeded 87% of the shares outstanding.  *Id.* at ¶¶ 78-79.  Finally, the average daily bid-ask spread for Goldman stock was 0.02% of the stock price during the proposed class period – indicating market efficiency.  *Id.* at ¶ 83.  These additional factors support a finding of market efficiency such that Plaintiffs may invoke the *Basic* presumption of reliance.

### ii.    Defendants' Rebuttal of Price Impact

Having shown why invocation of the *Basic* presumption is appropriate here, Defendants offer evidence that they contend shows the misstatements had no price impact.  Before turning to this evidence, I address the legal standard for rebutting price impact as recently articulated by the U.S. Supreme Court and Second Circuit.  As noted above, Plaintiffs rely on an "inflation-maintenance" theory—that is, that misstatements and omissions maintained an inflated stock price until such time that the truth was disclosed, causing the stock price to fall.

Under the price maintenance theory, "a misrepresentation causes a stock price 'to remain inflated by preventing preexisting inflation from dissipating from the stock price.'" *ATRS III*, 594 U.S. at 119-20 () (quoting *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1315 (11th Cir. 2011)).  A drop in stock price upon a corrective disclosure thus "operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price." *ATRS IV*, 77 F.4th at 80.  The measure of damages is the amount the stock's price would have fallen absent the misrepresentation.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Addressing the price maintenance theory, the Supreme Court recently held that the "inference [ ] that the back-end price drop equals front-end inflation [ ] starts to break down" when the earlier misrepresentation is generic and the later corrective disclosure is specific, and that, "[u]nder those circumstances it is less likely that the specific disclosure actually corrected the generic misrepresentation ...." *ATRS III*, 594 U.S. at 123.  It instructed courts to evaluate whether there is a match between the misrepresentation and the corrective disclosure, even though this evaluation is also relevant to whether the misrepresentation was material to a

shareholder's investment decision. *ATRS IV,* 77 F.4th at 80. Courts must be careful, however, not to make a conclusion on the merits issue of materiality. *Id*. The mismatch inquiry goes "to the value of the back-end price drop as *indirect evidence* of a front-end, inflation-maintaining price impact" of the alleged misstatements. *Id*. at 93 (emphasis in original). The greater the mismatch between the misstatements and corrective disclosure, the weaker the inference that the misstatements propped up the value of the stock. *Id.* at 99.

One way to test for whether a misstatement propped up the value of stock is to test whether it resulted in an uptick in the stock price, or "price inflation." *Id*. at 100; *Vivendi*, 838 F.3d at 259. Where there is a mismatch in generality between the initial misstatement and the corrective disclosure, courts evaluate whether a truthful substitute to the misstatement, at the same level of generality as the misstatement, would impact the price. *ATRS IV,* 77 F.4th 98-99. If the corrective disclosure does not specifically address the misstatement as false, the truthful substitute should at least align with the misstatement in genericness such that an assessment can made to its impact on price. *Id*. The court also may look at other evidence of price inflation such as pre-corrective-disclosure reports of analysts referencing the misstatements when discussing the value of the stock. *Id*. at 103. Here, Defendants point to analyst reports before and after the November 8-9 corrective disclosure to argue that the alleged misstatements and corrective disclosure were not important to investors and did not impact or prop up the value of the share price. Oct. 2023 Kothari Rpt. at ¶ 62.

Finally, where there is a match between the front and back-end statements, defendants can demonstrate that the corrective disclosure did not actually cause a drop in stock price to rebut price impact. *Id*. at 86 n.5; *In re Moody's Corp. Sec. Litig*., 274 F.R.D. 480, 493 (S.D.N.Y.

2011). Here, Defendants offer the expert reports and testimony of Dr. Kothari and Ms. Wood to support their argument that the November 8-9, 2018 corrective disclosure was not the cause the drop in Goldman's stock price on November 9-12.

Importantly, when assessing Defendants' rebuttal evidence, the court must assess whether it actually "severs the link between the misrepresentation and the price a plaintiff paid or received for a stock." *Waggoner*, 875 F.3d 79, 101 (2017) (cleaned up). Said another way, defendants' evidence "must demonstrate that the misrepresentations did not affect the stock's price." *Id.*; *see also Amgen*, 568 U.S. at 483. "[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Id.* at 104 (emphasis in original). When evaluating whether defendants have met their burden, the court must consider "all probative evidence" on price impact, "qualitative as well as quantitative—aided by a good dose of common sense." *ATRS III*, 594 U.S. at 122 (cleaned up).

I address Defendants' arguments below.

### A. "Match" Analysis

How closely alleged misstatements match the corrective disclosure can be evaluated across a spectrum defined by three cases relied on by both parties: *Waggoner*, *Vivendi*, and *ATRS*. On the "perfect match" end of the spectrum is *Waggoner*, wherein Barclays PLC made various statements about its operation of "dark pools" which supposedly allowed investors to trade securities in an anonymous manner. *Waggoner*, 875 F.3d at 88. The corrective disclosure was the New York Attorney General's ("NYAG") decision to bring an action against Barclays for making those exact same statements, which the NYAG had determined were false and

misleading. *Id.* Therefore, the corrective disclosure in *Waggoner* directly referenced the alleged misstatements it was correcting, there was a "perfect" match, which obviated the need for a "truthful substitute," and Defendants were required to rely on expert testimony and event studies to try to disprove price impact by a preponderance of the evidence. *Id* at 104-5.

Closer to the middle of the match/mismatch spectrum, but still an example of a "strong match," is *Vivendi*. There, the defendant company made a series of semi-generic statements about its "comfortable liquidity situation" that were later contradicted by reports that the company "faced massive refinancing needs." *Vivendi*, 838 F.3d at 236-7. The corrective disclosures in that case, therefore, did not directly reference the earlier misstatements as in *Waggoner*, but they instead "directly rendered false the company's [earlier] affirmative misrepresentations." *ATRS IV*, 77 F.4th at 98.

*Vivendi* teaches that when plaintiffs are proceeding under a price maintenance theory, there need not be a "precise" match between the corrective disclosure and the initial misstatements, as it "frequently" may be the case that a back-end disclosure contains more details than the initial misstatement. *Id.* The court in *Vivendi* illustrated this point by opining that if the defendant company had issued a "truthful substitute" for the misstatements at the same level of generality – such as sharing executives' fears of a credit downgrade – the market would have reacted negatively in a manner similar to the actual corrective disclosure. *Vivendi*, 838 F.3d at 258.

On the "weak to no match" end of the spectrum is *ATRS*. The alleged misstatements in *ATRS* were far more generic than those at issue in *Waggoner*, *Vivendi*, or here. The alleged misstatements in *ATRS* (made by Goldman) included platitudes such as "we are dedicated to

complying fully with the letter and spirit of the laws," "integrity and honesty are at the heart of our business," and a Form 10-K a statement that "we have extensive procedures and controls that are designed to identify and address conflicts of interest." The three corrective disclosures in *ATRS* were: 1) an SEC announcement of an investigation against Goldman and one of its employees regarding a collateralized debt obligation transaction ("CDO") asserting Goldman lied to investors by telling them a key hedge fund held a long interest in the CDO when the hedge fund had actually taken a short position – betting on a loss; 2) a Wall Street Journal article announcing that Goldman was under investigation for its role in other CDOs, and 3) various media reports that the SEC was investigating Goldman's conduct in another transaction. *ATRS IV*, 77 F.4th at 83.

The District Court concluded that there was a "considerable gap" between the genericness of the initial misstatements and the corrective disclosures, but nevertheless considered all of the statements actionable and certified the class. When assessing Goldman's rebuttal on price impact, the court utilized a "truthful substitute" that was more specific than the alleged misstatements—that Goldman would disclose "a detailed admission of severe wrongdoing." *Id.* at 99. The Second Circuit reversed, finding that the District Court misapplied *Vivendi's* truthful substitute test when analyzing the statements in the 10-K, because the chosen truthful substitute did not match the genericness of the alleged misstatements. The Second Circuit further found that an investor would not have relied on Goldman's conflicts disclosures in any event because of their generic nature and that any truthful substitute would also be too generic to alert investors to the issues addressed by the corrective disclosure. *Id. at* 100-01.

Accordingly, the Second Circuit remanded to the District Court with instructions to de-certify the class.

### 1. *Matching Statements*

Of the 13 misstatements identified by Plaintiffs in this case, there are only two that are a sufficient match to the November 8-9, 2018, corrective disclosure to support the *Basic* presumption of reliance. The first is the misstatement made on December 22, 2016 in the Wall Street Journal that Goldman had "found no evidence showing any involvement by Jho Low in the 1MDB bond transactions." Plaintiffs identified this statement as the "closest" match at the evidentiary hearing. Tr. at 206:1. This is not a generic statement or mere puffery like those at issue in *ATRS*. Rather, this alleged misstatement is specific: it disavows any knowledge that a specific person was involved in a specific series of transactions. Therefore, there is no need to engage in the genericness assessment discussed in *ATRS*, which noted that the more generic a misstatement, the less likely that it had a price impact. *ATRS III*, 594 U.S. at 122, 124. Had Goldman issued a "truthful substitute" to this misstatement with the same level of generality, it would have read "Goldman is aware of evidence that Low had involvement in the 1MDB bond transactions," a statement equivalent to an admission of fact included in Goldman's deferred prosecution agreement with the DOJ that likely would have adversely affected the stock price. Although there is no genericness issue with this misstatement, the Court still must assess whether there is a mismatch between this misstatement and the back-end corrective disclosure, because if there is no match between the two, there can be no inference of price impact.

There is no dispute that on November 8-9, 2018, the market learned for the first time that Blankfein met with Low a second time in 2013 to discuss 1MDB, and that this meeting occurred after Goldman's compliance department had raised multiple concerns about Low's background while saying the bank should not do business with him.  While the public was aware that *a* Goldman executive had met with Low in 2013 from the Leissner plea, it was not known that the executive was *Blankfein* until the corrective disclosure on November 8-9, 2018. Notably, the corrective disclosure came after Leissner's conviction and plea were unsealed, after indictments of Ng and Low were unsealed, and after Blankfein himself (on November 1, 2018) denied the bank's culpability in the 1MDB fraud, instead blaming it on "guys who evaded our safeguards and lie."  (ECF No. 295-65.)

While the market may have initially believed Goldman's and Blankfein's denials that the bank (and particularly C-suite executives in New York) were unaware of Low's involvement in the 1MDB bond transactions, and did not react to news of a meeting between Blankfein and Low that occurred in 2009 (three years before any of the bond transactions), the revelation that Blankfein himself met with Low shortly after the last 1MDB bond transaction to discuss 1MDB rendered it implausible that the institution and its chairman did not know about Low's involvement in the 1MDB bond transactions.  Said another way, there could no longer be plausible deniability of Goldman's knowledge that Low – the fraudster at the heart of the 1MDB scandal – was intimately involved with 1MDB if Blankfein met with him after the 1MDB transactions notwithstanding compliance department warnings about Low.   Indeed, as Goldman's admissions in its deferred prosecution agreement make clear, it knew Low "worked as an intermediary in relation to 1MDB;" Goldman's control functions "were on notice that

[Low] was involved in the [1MDB] transactions;" Goldman ignored "significant red flags raised during the due diligence process and afterward," and on at least three occasions (in 2009, 2012, and 2013) "senior executives at Goldman," including Blankfein and Asia Chairman Michael Evans, met with Low." Ex. 2, SOF ¶¶ 21, 25, 32, 47, 55, 62, 79. Of course, the corrective disclosure does not expressly say that that Goldman found evidence showing Jho Low was involved in the 1MDB bond transactions. Nonetheless, the revelation that Blankfein himself met with Low shortly after the last bond transaction closed to discuss 1MDB made it abundantly clear that Blankfein understood Low was key to Goldman's 1MDB business.

Goldman's argument that there is no match at all between the corrective disclosure and this statement is not persuasive. True, the market knew a high-level executive had met with Low to discuss 1MDB which may have hinted that the denial of Low's involvement was a lie, but the stark news that it was the bank's Chief Executive Officer who only a week before had denied knowledge of red flags (such as Low's involvement), served to highlight Blankfein's and Goldman's duplicity. And while the corrective disclosure did not specifically reference the December 22, 2016 Wall Street Journal article that Goldman had "found no evidence showing any involvement by Jho Low in the 1MDB bond transactions," the article referenced more recent denials from Blankfein and others that "laid the blame on rogue employees" and effectively denied Goldman's complicity in working with Low. Therefore, the corrective disclosure both renders the statement denying knowledge of Low's involvement false, and also incorporates the prior denial implicitly by referencing Goldman's continued denials of wrongdoing, red flags, and evasion of compliance controls by Leissner and Ng that would have hidden Low's involvement from C-Suite executives. Under these facts, the match between the

front-end denial and the back-end corrective disclosure falls between *Waggoner* and *Vivendi*, and is a substantially stronger match than existed in *ATRS*.

The second matching misstatement is Blankfein's comment on November 1, 2018 that he was not aware of red flags attached to the 1MBD transactions. The comment was made during an interview in which the interviewer asked Blankfein about the 1MDB scandal and just-released news about Leissner and Ng and what it meant to the bank's reputation. In response to questioning, Blankfein said the bank was cooperating with authorities and that he did not have all the facts that were the predicate for the indictments. The interviewer then gently pushed back, stating that compliance and legal raised concerns and asking Blankfein to confirm that there were "red flags on this beforehand, fair?" In response, Blankfein demurred and said he wasn't aware of them but also did not have all the information. He further stated that at least one Goldman employee lied to the bank and evaded the bank's systems and controls (i.e., was a rogue employee).

The corrective disclosure is a match, or at least a partial match, to Blankfein's denial that he was aware of red flags for several reasons. First, Blankfein's denial is a specific statement – given as an answer to a specific question about 1MBD. Like the first misstatement, a "truthful substitute" at the same level of generality would be a statement such as, "I was aware of red flags raised by Goldman's compliance department about 1MDB beforehand." Such a statement surely would have been relevant to investors and impacted the market's view of the bank because it would have revealed that Goldman's Chairman was complicit in the scandal or at least willing to ignore warnings by the bank's compliance department. Second, the corrective disclosure, which states that Blankfein's 2013 meeting with Low "came after [the] bank's

compliance department had raised concerns about dealing with financier Jho Low" renders

false Blankfein's statement that he was unaware of any red flags.   Finally, while the corrective

disclosure does not mention the "red flags" comment specifically, it does quote Blankfein

saying the scandal was the result of employees "who evaded our safeguards and lie."  That

statement was made as part of an answer to the same question as the "red flags" statement –

and therefore must be read together with the "no red flags" remark.  Goldman does not

persuasively argue otherwise.

In sum, while the match between the corrective disclosure and the above-two

statements is not as close as the match in *Waggoner*, it is far closer a match than in *ATRS*

because, as was the case in *Vivendi*, the import of the corrective disclosure renders the two

statements false.[6]  And, in fact, Goldman entered into a deferred prosecution agreement in

which it is clear that these two statements that allegedly propped up the price of Goldman's

stock were false statements and important enough for Goldman to have to correct them in the

deferred prosecution agreement.

Finally, Goldman argues that there were truthful substitutes for these two

misstatements (or prior corrections to the misstatements) that did not impact the stock price--

pointing to the Leissner plea and other news implicating Leissner and Ng in wrongdoing and

revealing that Goldman facilitated the bond transactions notwithstanding compliance

---

[6] Defendants have emphasized that the Court must evaluate the front- and back-end statements "as written," citing *ATRS IV*, 77 F.4th at 99.  The Court has done so here, noting that the front- and back-end statements are not literal matches, but are sufficient matches to render the front-end statement false.  The Second Circuit in *Vivendi* recognized that this can be sufficient to infer price impact, and *ATRS* did not overrule *Vivendi* in this regard. Similarly, *ATRS* requires courts to evaluate whether the alleged misstatement and corrective disclosure "[are] written [] specific enough to evoke investor reliance." *Id.* at 101.  For the reasons discussed above, neither the misstatements nor the corrective disclosure is so generic "as written" that this Court could conclude at this stage in the litigation that no investor would rely on them.

department concerns.  However, none of this prior news indicated that Blankfein himself knew of red flags and Low's involvement, which Plaintiffs contend was the final piece of news about 1MDB that caused the stock price to react.  While it is true that Leissner and Ng themselves were high level executives within Goldman and that their involvement in the scandal no doubt may have been concerning to investors, the involvement of Goldman's chair necessarily would have more significance.

### 2. *Mismatched Statements*

I have reviewed each of the other alleged misstatements, but none are close enough matches to the corrective disclosure to invoke the *Basic* presumption.  The corrective disclosure does not match the statements about fees and commissions because the corrective disclosure does not even address the size of the fees and commissions from the 1MDB bond deals, and revelation of the 2013 Blankfein-Low meeting does not reveal anything at all about fees and commissions nor render the statements about fees and commissions false.  Further, there is no dispute that the market was well aware of the outsized fees and commissions Goldman earned from the bond deals well before the corrective disclosure.  Nor is there any dispute that the market did not react to hearing about the outsized fees and commissions.

Similarly, the corrective disclosure does not match the statements about visibility into diversion of funds from 1MDB.  That Blankfein met with Low in 2013 does not address whether Blankfein had visibility as to the diversion of funds from 1MDB.  While it is true that knowledge of Low's involvement in the 1MDB bond deals may have raised suspicions about whether Goldman/Blankfein also knew about diversion of funds from 1MDB to Low, there is no direct match, and the 2013 Blankfein-Low meeting does not necessarily render false the statements

that Goldman did not have visibility into where the 1MDB funds went after the bond deals closed.  That is, Blankfein could have known of Low's involvement in 1MDB when approving the bond deals and that there were compliance concerns about his involvement but not had a clear picture as to movement of funds out of 1MDB.

The corrective disclosure also is not a match to the statement that "[n]either Jho Low, Jynwel or SRG [both Low entities] were a client of Goldman in connection the Coastal Energy acquisition.  The corrective disclosure does not mention Coastal Energy at all, and a 2013 meeting between Blankfein and Low to discuss 1MDB does not render false a statement that Low, Jynwel or SRG were not clients of Goldman in connection with Coastal Energy.  Since there is no match between the eleven other statements at issue and the corrective disclosure, Plaintiffs cannot rely on the inference that the front-end statements had any impact on price, and the *Basic* presumption does not apply as to these statements. *ATRS III*, 594 U.S. at 123.

### B.  Price Impact of the Matching Misstatements

In addition to persuasively arguing that there is a match between the corrective disclosure and the two misstatements about Goldman's knowledge of Low's involvement in 1MDB and knowledge of red flags, Plaintiffs offer other evidence to show price impact from those statements.  This evidence includes opinions from their economic expert showing a statistically significant drop in Goldman's stock price on November 9-12, 2018, when measured on a close-to-close basis; articles from the financial press, including Dow Jones and Barron's, attributing the drop in price on November 9-12, 2018 to the corrective disclosure; heightened analyst attention to the risk that the 1MDB scandal presented to Goldman's reputation after

the corrective disclosure as compared to before the disclosure; and analyst reports specifically referencing that Blankfein met with 1MDB representatives.

Because there is a sufficient match between the corrective disclosure and the two statements discussed above, as well as evidence of price impact, Defendants face a difficult task to refute price impact and rebut the *Basic* presumption. *Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 (S.D.N.Y. 2016) (recognizing that it is difficult to rebut price impact where there is a match, and collecting cases). Part of the difficulty for Defendants here is the underlying factual background.

At a high level, Plaintiffs' consistent theory of price impact is that Goldman's longstanding dishonesty about its role in one of the largest financial scandals in history propped up its stock price *until* it was revealed that Goldman's CEO had met with the fraud's architect, Low, after Goldman's internal compliance team raised red flags about Low and the transactions, which caused a precipitous decline in Goldman's stock price over the next two trading days. Defendants argue that the market did not focus on the misstatements, did not react to various reports of the scandal over a multi-year period, did not react to the misstatements at issue, did not care about Goldman's involvement in the fraud or, alternatively, that it already knew about it by the time the corrective disclosure came out, and that the historic stock drop was due to a combination of other confounding news. But, as discussed below, Defendants offer no economic analysis to demonstrate that the confounding stories were the cause of the stock drop on November 9, and their alternative "confounding" explanation for the decline in share price on November 12 is inconsistent with an argument they made in their motion to dismiss

that the supposedly confounding news on November 12 was in fact already known to the market.

### 1.  *Economic Analyses*

Turning first to the economic analyses, the parties agree that the alleged corrective disclosure occurred at 11:17 p.m. on November 8, 2018 and that additional articles on the same topic were published on November 9.  The parties also agree that from November 9 to November 12, the two trading days immediately following the corrective disclosure, Goldman's stock experienced the largest combined price drop in eight years.  Evaluated on a "close-to-close" basis (i.e., comparing a stock's closing price from one day to the previous day's close) there is no dispute there was a statistically significant drop, approximately 11% of the total share price.  The parties disagree on the following:  a) whether the proper window to evaluate the statistical significance of abnormal returns is limited to the first fifteen minutes after market open on November 9; b) whether there was a "statistically significant" change in Goldman's stock price during the first fifteen minutes of trading on November 9; and c) whether the damage window can be two trading days.

As to the first issue, Defendants argue unpersuasively that courts expect the stock market to incorporate material new information into stock prices within fifteen minutes and thus the corrective disclosure was not the cause of the drop in stock price on November 9.  A review of the case law makes clear that there is no bright line legal rule as to when within a trading day there must be a decline in stock price to infer causation or price impact.  *See Halliburton I,* 573 U.S. at 274 ("the market price will incorporate public information within a *reasonable period*") (emphasis added); *Basic*, 485 U.S. at 249 n28 ("we do not. . . adopt any

particular theory of how quickly and completely publicly available information is reflected in market price"); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *16 (N.D. Tex. Aug.  21, 2023)("both Experts seemingly agree that the close-to-close window is the "standard" or "default" window.")  At the evidentiary hearing, Defendants' expert admitted that there is no "magic number" for when within the trading period new material is expected to be incorporated.  Tr. at 173:11 (Defendant's expert Dr. Kothari testifying, "15 minutes is not the magic number.").

In fact, Defendants' own theory that other confounding news caused the decline in Goldman's stock price on November 9 is inconsistent with their 15-minute rule, as none of the confounding news was within 15 minutes of the drop in price at 3 p.m. that Defendants contend is the relevant time when Goldman's stock price dropped to a statistically significant degree.  *Id.* (Dr. Kothari testifying, "on the announcement of [the other pieces of news], there, the stock price didn't decline."); 2023 Deposition of Dr. Kothari Transcript ("Kothari Tr.") at 193:6-9 ("[n]one of these [confounding news stories] had a statistically measurable impact, nor did I attempt to individually find out what was the statistical impact of each of these.").

Plaintiffs argue, consistent with case law cited above, that a "close-to-close" analysis is appropriate here and offer persuasive expert evidence that factors such as intraday momentum, wherein trading trends from earlier in the day tend to intensify in the final minutes of trading, could explain any delay in the market's reaction on November 9 to the corrective disclosure. 2023 Dec Mason Rpt. at ¶¶74-75.  Even Defendants' expert found that the volume of trading in Goldman stock increased generally at the end of the day on November 9 and 12, which is consistent with Plaintiffs' theory of intraday momentum.  *Id.*  Thus, Defendants' attempt to

rebut price impact by arguing that price impact is implausible if it did not occur within the first 15 minutes after the market opened on November 9 is unavailing.

Turning to the second issue, Defendants posit that statistical significance must be at the 95% confidence threshold to be legally meaningful and, therefore, because there was not a statistically significant drop in the price of Goldman stock within the first 15 minutes of trading on November 9, 2018 at this level, there is no price impact.  For the reasons discussed above, the case law does not require an analysis of price impact to be confined to the first 15 minutes of trading.  And, Defendants' argument regarding a 95% confidence level also fails.  In this case, there is no dispute that there was an immediate drop in Goldman's stock price at market open. Both sides' economic experts agree that the initial drop in price at market open – compared to market models of returns for that day – yielded a "p-value"[7] of roughly 0.1 – a 90% confidence level. Tr. at 142.  Defendants (and their expert Dr. Kothari) contend that any p-value greater than .05 is insufficient to reject the "null hypothesis" that market models could explain the stock price decline (as opposed to the corrective disclosure).  *Id.*  Plaintiffs (and their expert Dr. Mason) counter that in economics, a p-value of 0.1 can still be considered "statistically significant" (i.e. a strong enough result to reject the null hypothesis).  Tr. at 64.

Defendants overstate the significance of a statistical result below the 95% confidence level but that is at least at the 90% confidence level, and their expert conceded as much in his testimony.  *See* Kothari Tr. at 202-203 ("[i]f you are rejecting [a] hypothesis, you use the 5

---

[7] A p-value represents the probability that the observed data (here, the stock returns from the 9th)  would occur assuming that the "null hypothesis" is true.  Here, the null hypothesis tested by Defendants' expert was that market models – not new value-relevant information – could explain the abnormal stock returns for November 9. The lower the p-value, the greater the discrepancy between the null hypothesis and the observed data, and the stronger the justification to reject the null hypothesis.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 n6, (2011).

percent significant [i.e., 95% confidence] level.  But if you want to provide some evidence on …

the probability you assign … to that particular hypothesis, then you might use 10 percent [i.e.,

90% confidence level].")  There is no bright line legal or statistical rule that a result below the

95% confidence level *disproves* price impact—particularly at the class certification stage.  *See*

*Pirnik v. Fiat Chrysler Automobiles, N.V.,* 327 F.R.D. 38, 46 (S.D.N.Y. 2018) (holding a confidence

level of 92% "is obviously less comfort than a result that is statistically significant at a

confidence level of 95%, but it does not prove the *absence* of price impact.") (emphasis in

original); *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 344–45 (D.N.J. 2018) (holding that the

expert's report "[did] not demonstrate the absence of a price impact," even though he failed to

find price impact with 95% confidence).

Courts have recognized that while a lack of a statistically significant price drop could

demonstrate an absence of evidence of price impact, the converse is not true.  In other words,

the absence of a statistically significant price drop does not disprove price impact.  *See Rooney*

*v. EZCORP*, Inc., 330 F.R.D. 439, 450 (W.D. Tex. 2019) ("[T]he absence of a statistically significant

price adjustment does not show the stock price was unaffected by the misrepresentation.")*;*

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.,* 2015 WL 5097883, at *13

n.8 (D.N.J. Aug. 31, 2015) ("[I]t also does not necessarily follow from the mere absence of a

statistically significant change in the stock price that there was no price impact.")*;  Carpenters,*

310 F.R.D. at 95 ("The failure of an event study to find price movement does not prove lack of

price impact with scientific certainty.")

Further, the standard at the class certification is merely a preponderance of the

evidence, or "that the fact is more likely true than not true." *Velasquez v. United States Postal*

*Serv.*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016) (*quoting Fischi v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997)).  The preponderance of the evidence standard is necessarily a less demanding standard than statistical significance at a 95% confidence level.  *See Pirnik,* 327 F.R.D. at 46. (internal quotations omitted) ("a 95% confidence-level burden appears to be a heavier burden than the normal probabilities, just better than a 50% chance, required of the… preponderance of the evidence rule.")  Plaintiffs have shown, and Defendants do not dispute, that there was a drop in the stock price within the first 15 minutes of the market opening on November 9 and that the level of the drop in price was attributable to new market-moving information at a 91% confidence level.  Even if only the first 15 minutes of the trading day were the relevant period, this drop is sufficient at this stage to infer price impact and Defendants' statistical and expert testimony evidence is insufficient to fully rebut price impact.

Turning to the third issue, unlike the stock drop on November 9, there is no dispute that there was a statistically significant drop in Goldman's share price beginning at market open on November 12.  Instead, the parties dispute whether it is appropriate to include a second trading day in the analysis of the corrective disclosure and price impact for purposes of this motion. Defendants argue that, in an efficient market, a stock would not continue to incorporate new value relevant information for a second trading day, and therefore only the returns from November 9, 2018 should be analyzed.  This argument is unpersuasive because there is no bright line rule that price impact is confined to one trading day.  The cases on which Defendants rely are not to the contrary.

For example, Defendants cite *Erica P. John Fund, Inc. v. Halliburton Company*, for the proposition that courts "routinely" reject a two-day window "if the stock at issue trades in an

efficient market." 309 F.R.D. 251, 269 (N.D. Tex. 2015); (ECF No. 307 at 28.) However, the

court's analysis in *Erica P. John Fund, Inc.* was explicitly limited to a scenario where "an alleged

corrective disclosure released to the market at the start of Day 1, *coupled with an absence of*

*price impact throughout Day 1*, followed by a price impact on Day 2, will not show price

impact." 309 F.R.D. at 269 (emphasis added). As discussed above, there was a price impact

observed November 9, or "Day 1" in this analysis, and therefore Defendant's reliance on *Erica*

*P. John Fund, Inc.* is misplaced.

Next, Defendants cite *In re Intuitive Surgical Sec. Litigation*, wherein the court rejected a

two-day window proposed by *Defendants* opposing class certification. 2016 WL 7425926, at

*14 (N.D. Cal. Dec. 22, 2016). In that case, there was an 11% drop in share price in the first few

minutes after an alleged corrective disclosure, which itself occurred minutes before the market

close. *Id.* Faced with this obviously statistically significant drop in price, defendants' expert

proposed an event study that incorporated a second day of trading, which when combined with

"Day 1" did not yield a statistically significant result because the stock had slightly rebounded

the next day. *Id.*

There, the court was concerned that widening the event window was an attempt to

eliminate an obviously statistically significant result, which is not a concern here where there

was a statistically significant drop on *both* November 9 and 12 on a close-to-close basis.

Further, even in the *Intuitive Surgical* case – the court did not limit the event window to a single

day, but instead adopted Plaintiffs' expert's proposal that the proper window would run "from

just before the release of [the corrective disclosure on Day 1] through market close *on the next*

*trading day." Id.* (emphasis added).

The final case cited by Defendants is *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, a decision on a motion to dismiss, in which plaintiffs' allegations involved changes in the relevant stock price over a period of *weeks to months* with several gaps in-between—a fact scenario far different than in this case. 729 F. Supp. 2d 569, 600-02 (S.D.N.Y. 2010). While the court in that case noted the damages window "in many cases. . . will be relatively short—as short as one trading day," it did not hold that damages windows are confined to a day and certainly not to 15 minutes. *Id.* at 600 n5.

Plaintiffs, on the other hand, persuasively argue that the inclusion of stock returns on the 12th is appropriate at least at this stage, and that they be permitted to prove damages continued on this day at the merits stage of the case. Courts in this District routinely find that an event window of at least two days can be appropriate. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sept. 28, 2023) (use of three-day window permissible)*; Carpenters,* 310 F.R.D. at 96 ("it is standard for experts to utilize an event window including both the day of the event and the day following an event"); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009) (three day event window permissible).

And, several news articles from November 12 and in the following week explicitly linked Goldman's returns on November 12 to the disclosure of Blankfein's meeting with Low in 2013, suggesting the two-day drop in price was linked to the corrective disclosure. Dec. 2023 Mason Rep. ¶ 120-121. These included articles in The Financial Times, Barron's Analyst Reports, and the New York Times. *Id*. Further, Dr. Mason demonstrated there may have been "intraday momentum" on November 9, i.e., that volume in Goldman stock trades increased at the end of the day in a way that reflected earlier trends. This evidence supports the use of a longer event

window, from a full day to multiple days, to determine when the "momentum" had stopped.

Dec. 2023 Mason Rpt. ¶ 74; *See Fogarazzo,* 263 F.R.D. at 104 (S.D.N.Y. 2009) (multiday window

was appropriate when there is "momentum trading by investors").

### 2.   *Potentially Confounding News*

Defendants point to four pieces of "confounding news" released on the 9th, and one

article released on the 12th, to explain the stock drop on both days.  The four pieces of

purportedly confounding news for November 9 are:

- News reports on November 9 regarding then President Trump's senior adviser Peter Navarro's attacks on Wall Street banks, including Goldman Sachs, for allegedly aiding China in trade disputes;

- A November 9 *Bloomberg* article relating to plans of JPMorgan, Goldman, Citi, and Morgan Stanley to transfer assets and headquarters from London to Frankfurt because of Brexit;

- The release of Leissner's plea transcript, in which Leissner made the accusation that his actions were "in line" with a "culture" at Goldman to "conceal facts from certain compliance and legal employees"; and

- Several news reports about amendments to the stress capital buffer ("SCB") requirements that would demand investment banks, including Goldman, to retain more capital than they were already retaining.  ECF No. 307 at 25-26.

None of this news, however, fully explains or completely rebuts an inference of price

impact on November 9.

To start, Dr. Kothari repeatedly testified at his deposition that these four pieces of news

"might" have impacted Goldman's stock price, but he did not – and testified he could not –

conduct an economic analysis to demonstrate that these pieces of news contributed to the

decline in Goldman's stock price on November 9.  (*See* ECF No 160-1, March 2022 Reply Report

of Dr. Mason ("2022 Mason Reply") at 7 ¶11a-d) (collecting testimony from Dr. Kothari explaining that he did not attempt to estimate the impact of any piece of confounding news).

Defendants note that these confounding articles were released "closer in time" to the 3 p.m. drop in stock price (at the statistically significant 95% confidence level) on November 9 – but they ignore the initial drop at market opening at the approximately 91% confidence level that Plaintiffs claim is also attributable to the corrective disclosure. Moreover, Defendants' argument about the confounding news is inconsistent with their other argument that value-significant news is incorporated into stock price in 15 minutes. That is because none of the confounding news was released within 15 minutes of the 3:00 p.m. drop in Goldman's share price. Insofar as Defendants' own expert has not attempted to measure the extent to which this confounding news impacted the price drop on November 9, there is no economic evidence entirely disproving price impact for November 9. Even if the confounding news had *some* negative impact on the stock price, that does not fully rebut price impact as is required to avoid class certification.

In addition to Defendants not fully explaining the drop in share price on November 9, Plaintiffs present evidence to suggest the four pieces of confounding news did not play a role in the drop in share price on November 9 on a close-to-close basis. To start, Peter Navarro's remarks (published at 12:24 p.m.) were quickly walked-back by the Trump administration (at 2:30 p.m.), meaning that, under Defendants' 15-minute theory, they would have been neutralized before the 3:00 p.m. drop in share price and certainly by market close. Further, Navarro's remarks referred to Goldman "*and* Wall Street" – and, thus, did not necessarily

impact Goldman more than any of its peers, if they impacted stock prices at all. March 2022 Mason Reply at 7 ¶¶20-22.

Next, with respect to the Brexit news, it is unclear whether it was actually new to the market or specific to Goldman. At the February 22 hearing on this motion, Dr. Mason noted the total costs of Brexit to Goldman were expected to be about $500 million, meaning that this news could not explain a market capitalization loss of nearly $7 billion in Goldman stock over November 9-12. Tr. at 65. Thus, even if this news impacted stock price, it would not account for the full drop in price.

The news about the stress capital buffer also was not truly new. Dr. Mason explained that the increased capital buffer requirements for Goldman were already known by April 2018, when the proposal for new stress capital buffers was announced. *See* Wolfe Research, "Regulatory Update: SCB Guidance Mostly In-Line with Some Incremental Positives," November 9, 2018 (one of two analyst reports covering the Nov. 9 speech, noting "not too surprising, with a few incremental positives."). Additionally, the news on November 9 was that regulators were looking to *ease* compliance with an earlier-announced standard. March 2022 Mason Reply at 10 ¶¶ 33-35. In other words, this news would, if anything, mitigate the previous news on the same topic and be viewed as a positive by the market, according to Plaintiffs' expert.

The last piece of purportedly confounding news —the release of Leissner's plea allocution—contained additional information about the scandal and included Leissner's admission that he had evaded controls, consistent with Goldman's prior public statements about Leissner's conduct. To be sure, it is possible that the release of the full plea allocution may have aided the market in evaluating the corrective disclosure and contributed to the

decline in price; however, Defendants do not attempt to measure the impact of this news.  Nor was this news released within 15 minutes of the 3:00 p.m. drop in share price that Defendants contend is the relevant time period.

Thus, Defendants fail to demonstrate that the confounding news completely explains the drop in share price and have not rebutted the inference of price impact on November 9.

Turning next to November 12, Defendants contend a pre-market open announcement that the Malaysian government would be seeking a "full refund" and "consequential losses" from Goldman for the 1MDB transactions explains the drop in share price on November 12. (ECF No. 307 at 9.)  Defendants' expert Dr. Kothari noted that the stock price drop on November 12 represented about $4.5 billion in lost value, which roughly corresponds with the $3.9 billion Goldman agreed to pay the Malaysian government for its role in the scandal.  Tr. at 155-156.

Despite the relative strength of this argument, it also fails to fully rebut price impact on November 12 for many of the same reasons as the November 9 confounding statements discussed above.  First, it took the market over two hours after open (and seven hours after the news was announced) for the stock price to fully incorporate the news of the announcement. *See* Kothari Rep. Figure 2.  By Defendants' own 15-minute standard, this is insufficient to tie the Malaysia news announcement to the price drop on November 12.  Second, although the $3.9 billion in fines seems close to the $4.5 billion in lost share value, Defendants' burden at this stage is to prove *no* price impact.  Even if this Court fully credited the Malaysian announcement with $3.9 billion in lost value, that still leaves the entire price drop on the 9th and an additional $600 million on November 12 unexplained.  Finally, Defendants argued in their motion to

dismiss that this news was not new nor corrective. (*See* ECF 83 at 15-16.)  Judge Broderick agreed with Defendants and ruled that the November 12 announcement was not actionable because "the Malaysian authorities had repeatedly telegraphed their intention 'to recover as much of the missing 1MDB money as possible" as early as June 2018.  (ECF 102 at 40.)  It would be completely inconsistent for the Court to find on the motion to dismiss that this news was stale and then on class certification find that it was new and explained the price drop on November 12.  As Judge Broderick held, the statement by the Malaysian authorities was a materialization of a known risk – otherwise Plaintiffs would be entitled to pursue it as a corrective disclosure.  Thus, Defendants have failed to demonstrate that this confounding news fully refutes the price impact for November 12.

### 3.   Other Evidence of Price Impact or Lack Thereof

Defendants also try to rebut price impact by pointing to a supposed lack of coverage of the 1MDB scandal and Goldman's misstatements in analyst reports and lack of interest in quarterly earnings calls.  Defendants first note that Plaintiffs' expert admitted that securities analysts covering Goldman did not quote or refer to the alleged misstatements, that the alleged misstatements were not discussed on earnings calls, and that even after November 8, market observers did not connect the corrective disclosure to the alleged misstatements.  (ECF No. 307 at 7.)  Dr. Kothari identified 24 news articles predating the corrective disclosure that discussed senior-level meetings between Goldman officials and 1MDB officials, including meetings in 2009 and 2013.  Several articles also noted that Goldman had denied any institutional wrongdoing. 2023 Kothari Rep. ¶¶ 79–87; Appendix E.5.  After conducting an economic analysis, Dr. Kothari found that none of these 24 articles impacted Goldman's stock price and thus were not value-

relevant. *Id.* However, none of the articles revealed that Goldman's Chairman met with Low about 1MDB after legal and compliance departments had warned against dealing with Low. Dec. 2023 Mason Rpt. at ¶¶ 14-15. Plaintiffs' theory is that the market reacted when it was revealed that Blankfein himself was implicated in the scandal and that this represented significant institutional risk—more than the market had previously accounted for. Dr. Kothari does not offer analysis sufficient to disprove this theory of price impact. Rather, the lack of price movement following each of the 24 articles supports Plaintiffs' theory that investors believed Goldman's denials up until the corrective disclosure. *Id.*

Defendants' other expert, Wood, opined that professional investors "would have been aware of extensive information regarding the 1MDB scandal" before the corrective disclosure. Wood Rpt. ¶¶ 21–22. This is undoubtedly true, but does not fully rebut the theory Plaintiffs are pursuing – that for all of the information in the market – investors continued to credit Goldman's denials of institutional complicity in the 1MDB fraud. Finally, Wood opined that the "corrective" disclosure of Low's attendance at a 2013 "client event" would not be meaningful to investors' decisions regarding Goldman's stock. Wood Rep. ¶¶ 23–29. While this is one opinion, it is not based on any survey of investors and does not offer an alternative explanation for the precipitous drop in stock price after the corrective disclosure and is insufficient to rebut price impact at this stage.

*ATRS IV* requires only "some indication that investors relied upon the [misstatements] *as written,"* and Plaintiffs provide several analyst and media reports that explicitly say investors previously relied on Goldman's "rogue employee narrative." 77 F.4[th] at 100; Dec. 2023 Mason Report, ¶¶ 120-121; Exs. 69, 68, 67, 71; March 2022 Mason Reply at 16-20. While it is true that

analysts and media reports did not link back to the specific statements denying knowledge of Low's involvement in the bond transactions and of red flags, these statements were in effect denials of institutional complicity, and analyst and newspaper reports prior to the corrective disclosure can be read to support Plaintiffs' theory that investors were not concerned about institutional complicity in the 1MDB scandal until they learned of Blankfein's involvement. Consistent with Plaintiffs' theory, media reports following the corrective disclosure state that markets had been indifferent to Goldman's involvement in the 1MDB scandal until the corrective disclosures made Goldman's denials of knowledge and complicity in the fraud less credible. March 2022 Mason Reply at 20 ¶ 56. Additionally, Defendants' expert Dr. Kothari conceded that some commentators did explicitly tie the stock price drop on November 9 and 12 to the corrective disclosure, noting that investors perceived that Goldman was "complicit" in the fraud and faced greater exposure than previously thought. (ECF No. 315-9, Ex. 91 at 172, 276.) Thus, Defendants' collection of analyst reports and absence of questions about 1MDB during earnings calls are insufficient, even when combined with other defense evidence, to fully rebut price impact.

In sum, Plaintiffs have offered persuasive evidence that Goldman's stock dropped to a statistically significant degree — above the 95% confidence level — on both November 9 and 12 on a close-to-close basis, including a drop in stock price at the 91% confidence level within the first 15 minutes of market open on November 9. Plaintiffs also cited financial news articles and analyst reports tying the drop in stock price to the corrective disclosure. And, given there is a sufficient match between the corrective disclosure and two of the misstatements, there is sufficient evidence to infer at the class certification stage that the two misstatements propped

up the price of the stock and that the drop in price on November 9-12 may have been caused by the corrective disclosure as opposed to random fluctuations in the stock price.

In contrast, Defendants have pointed to no other reasons that completely explain the drop in stock price on November 9 or November 12. While they point to confounding factors that might have contributed to the drop in price on November 9, their expert testified that he did not and could not analyze whether those factors actually influenced the stock price or by how much. Further, evidence suggests the potential dollar value of the confounding news' impact is less than the total value of the drop in stock price, suggesting that even if the confounding news partially explains the drop in stock price, the corrective disclosure also may have impacted the drop in stock price. While the fact that investors did not inquire about the misstatements in shareholder calls might suggest that the misstatements were not important or did not maintain inflation in the stock price, this evidence falls short of "sever[ing] the link between the misrepresentations and" the stock price given the totality of evidence before the court. *ATRS III*, 594 U.S. at 126; *see also Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir. 2020), *rev'd on other grounds*, 141 S. Ct. 1951 (2021)( [Defendant "must demonstrate …that [] other events explain the entire price drop."). In sum, Defendants have failed to rebut price impact.

### iii.    **Common Theory of Damages**

Defendants' last argument against class certification is that Plaintiffs cannot show classwide damages through common proof. Rule 23 does not require a plaintiff to set forth a detailed model for calculating damages at the class certification stage. *Waggoner*, 875 F.3d at 105-06. Plaintiffs need only show that their damages model "measure[s] damages that result

from the class's asserted theory of injury." *Id.* at 106 (interpreting *Comcast Corp.*, 569 U.S. at 27); *Roach*, 778 F.3d at 407 (same); *see also Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.")  However, Defendants criticize Dr. Mason for not proposing a methodology for addressing the different buckets of misrepresentations and the changing severity of the 1MDB news over time, which they say is necessary for a "but-for" damages model.  They also take issue with the proposed methodology for computing damages on a classwide basis, contending Dr. Mason does not explain how he would disaggregate the four pieces of confounding news on November 9.

The first criticism is without merit, particularly in light of the fact that only two misstatements are at issue if the Court adopts the recommendations in this Report.  Both misstatements concern denial of Low's involvement and denial of knowledge of red flags (which Low's involvement would be).  These two misstatements, which Goldman characterizes as falling in different categories of news, are not so dissimilar that they cannot be viewed as part of a continuum of denials of corporate complicity in the scandal.  And, while it is true that the severity of the 1MDB news changed upon news of Leissner's plea, even Defendants' expert has testified that Goldman's stock price did not decline in a statistically significant manner for more than four years in response to 1MDB news until the 11% decline on November 9-12.  *See* Oct 2023 Kothari Rpt. ¶81-83.  This includes a lack of statistically significant change in stock price following disclosure of the Leissner complaint and the publication of *Billion Dollar Whale*.  *Id*.  Therefore, this case is distinct from *Loritz v. Exide Technologies*, cited by Defendants, where

there were "multiple alleged disclosures unfolding simultaneously" and "information disclosed

at different times in multiple alleged corrective disclosures." 2015 WL 6790247, at *24 (C.D. Cal.

July 21, 2015).   Given that only two misstatements remain at issue, and Plaintiffs point to a

discrete (and historic) decline in stock price connected to a single disclosure, this case does not

raise the same "serious concerns" as in *Loritz.*

As for Dr. Mason's methodology, he has proposed an event study methodology to

measure out-of-pocket damages based upon AP7's sole theory of liability—that Defendants'

material misstatements created or maintained artificial inflation in Goldman's stock price

during the class period, causing losses when that inflation was released from the stock price

following the disclosure of information revealing the fraud.  *See* Expert Report of Dr. Mason

Dated November 2021, ("Nov. 2021 Mason Rpt.") ¶¶ 95-97.  Defendant's expert, Dr. Kothari,

concedes that "the standard formula under Section 10(b) for assessing damages for each class

member" is the out-of-pocket method.  Jan 2022 Kothari Rpt. ¶¶ 64-65.  This methodology has

been endorsed repeatedly by courts in this Circuit.  *See, e.g.*, *Waggoner*, 875 F.3d at 106.  It is

also consistent with *Comcast*, 569 U.S. 27, which requires only that a proposed class-wide

damages methodology "measure damages that result from the class's asserted theory of

injury."  *Roach*, 778 F.3d at 407 ; *see also Teva*, 2021 WL 872156, at *40; *Signet*, 2019 WL

3001084, at *20; *Wilson*, 2018 WL 3913115, at *17 (proposed damages methodology using

event study, similar to the one here, to measure artificial stock price inflation acceptable to

calculate damages on a class wide basis.)  In sum, Defendants' argument that damages cannot

be proved on a class wide basis is unpersuasive.

Defendants' argument that Dr. Mason has not proposed how he would disaggregate the confounding news on November 9 and 12 is not a basis to deny class certification. This argument is, in actuality, a complaint that Plaintiffs have not demonstrated loss causation as to the entire drop in the stock price. But the law is clear that a plaintiff is not required to demonstrate loss causation on a Rule 23 motion. *Erica P. John Fund, Inc.*, 563 U.S. at 813 ("loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 86 (S.D.N.Y. 2015) ("the net result of Halliburton I and Halliburton II is that at class certification, a plaintiff is not required to prove. . . loss causation.").

Although it may be difficult to measure the precise amount of the impact of the corrective disclosure on the stock price given potential confounding factors, this difficulty does not mean damages cannot be proved on a class-wide basis. *Id.* at 99 (the need to determine the impact of confounding news is a question going "to the merits and not whether common issues predominate.") Quite simply, there is no requirement to provide such details at class certification. *See Waggoner*, 875 F.3d at 106 ("failure to disaggregate . . . did not preclude class certification"); *Allergan*, 2021 WL 4077942, at *15 (plaintiff "need not [disaggregate] at this juncture to establish that common issues relating to damages predominate"); *Signet*, 2019 WL 3001084, at *20 (same). Thus, Defendants' argument is unavailing.

### b. Superiority

Defendants do not make any arguments on the second prong of Rule 23(b) – superiority. When assessing whether a class action is superior to individual actions, the court considers various factors including:

> the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).  And, as a general matter, many courts have held in securities cases like this one, that class actions are generally superior to individual cases.  *See In re SunEdison, Inc. Sec. Litig.,* 329 F.R.D. 124, 144 (S.D.N.Y. 2019)*; Yi Xiang v. Inovalon Holdings, Inc.,* 327 F.R.D. 510, 526 (S.D.N.Y. 2018); *Lapin*, 254 F.R.D. at 187  ("In general, securities suits ... easily satisfy the superiority requirement of Rule 23."); *Amchem*, 521 U.S. at 625.  This is because there are many shareholders in the class with small claims who may not be able to prosecute their case as easily or efficiently absent the class mechanism.  There is no reason this case should be treated differently than other securities fraud cases that are certified. The superiority element is thus met.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that the motion be granted in part and denied in part and that the following class be certified:  all persons and entities that purchased or otherwise acquired Goldman's common stock between December 22, 2016, and November 8, 2018, inclusive, and were damaged thereby (the "Class"), with the same exclusions noted in footnote 2, *supra*.

Dated:  April 5, 2024

New York, New York

Respectfully submitted,

*Katharine H. Parker*

_____

Katharine H. Parker
United States Magistrate Judge

### NOTICE

**Parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy, and must do so within fourteen days of service of the objections. Fed. R. Civ. P. 72(b)(2).**

**Objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Broderick. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).**